FILED
JAMES BONINI
CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

2004 JAN 21  P 4: 44

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

|  |  |
|---|---|
| IN RE: NATIONAL CENTURY FINANCIAL ENTERPRISES, INC. FINANCIAL INVESTMENT LITIGATION | ) ) ) ) ) |

Case No. 2:03-md-1565
Judge Graham
Mag. Judge Abel

**FILED**

TIME:_____

**JAN 2 7 2004**

JAMES BONINI, Clerk
COLUMBUS, OHIO

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

Case No. 3:03CV-467-J-25-TEM

|  |  |
|---|---|
| MICHAEL MAHONEY, LOUIS JANSSEN and LARRY R. WHITE on behalf of themselves, and all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| JOHN F. ANDREWS, FRANK P. MAGLIOCCHETTI, DONALD H. AYERS, AYERS LLC, SUZANNE HOSCH, GEORGE A. KUSELIAS, SAM J. W. ROMEO, ALBERT MARSTON, CEDRIC JOHNSON, LANCE K. POULSEN, BARBARA L. POULSEN, REBECCA S. PARRETT, CHEYENNE-BLAZE, LLC, J.P. MORGAN CHASE & CO., THE BEACON GROUP, LLC, THE BEACON GROUP III FOCUS VALUE FUND, L.P., MITCHELL J. STEIN, TSI TECHNOLOGIES AND HOLDINGS, LLC (a/k/a "Swab Financial, LLC), SWAB FINANCIAL LLC and R. J. GOLD & COMPANY, P.C., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs make the following allegations, except as to allegations specifically pertaining to

them, based upon the investigation undertaken by their counsel, which included analysis of publicly-

available news articles and reports, the review of relevant testimony and court pleadings, review of relevant electronic mail, public filings, press releases and other matters of public record, and consultation with a forensic accountant.

## NATURE OF THE ACTION

1.      This is a class action on behalf of all purchasers of the securities of e-MedSoft.com ("e-MedSoft" or the "Company") between December 6, 2000 and February 11, 2002, inclusive, (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      E-MedSoft announced on February 9, 2000 that it had entered into an alliance with National Century Financial Enterprise, Inc. ("NCFE"), a company that purchased medical accounts receivable from health care providers and securitized them, that is, issued notes and bonds to institutional investors whose principal and interest was backed by the cash flow from the accounts receivable.    According to e-MedSoft, the relationship with NCFE was an important one. Unfortunately for the investing public, however, the heart of the relationship was a sophisticated financial Ponzi scheme, which ultimately drove both companies into bankruptcy and left e-MedSoft investors with worthless stock.

3.      NCFE controlled e-MedSoft through its substantial stock ownership which it maintained at all relevant times.  In effect, NCFE used e-MedSoft as its personal "piggy bank." NCFE accomplished this by advancing funds to e-MedSoft in payment for accounts receivable which the Company had assigned to NCFE.  NCFE charges e-MedSoft exorbitant interest on these receivables -- 24% to 25% -- and thus was able to suck money out of e-MedSoft at rates much higher than the Company could have borrowed elsewhere.  Frequently, however, NCFE "overfunded" the

Company's accounts receivable, that is, it advanced money to e-MedSoft based on "phantom" or non-existent accounts receivable. NCFE recorded these "future" or phantom accounts receivable on its own financial statements and, in turn, used them as a basis for issuing new notes and bonds to institutional bond investors who paid cash to NCFE for the bonds.

4.      Defendant Rebecca S. Parrett ("Parrett"), a officer and director of NCFE, described this Ponzi scheme herself in a lawsuit she brought against many of the same defendants named here, including the principals of NCFE, Lance and Barbara Poulsen, Donald H. Ayers, and J.P. Morgan Chase & Co.  According to Parrett, NCFE overfunded e-MedSoft's accounts receivable by approximately $100 million.  (Parrett Complaint, para. 68).  Defendant Frank P. Magliochetti ("Magliochetti") also testified to NCFE's overfunding of e-MedSoft's accounts receivable, which he called "pro forma funding."

5.      Ultimately NCFE's Ponzi scheme was detected after it declared bankruptcy and investigations by criminal prosecutors in this District and the Securities and Exchange Commission ("SEC") ensued.  As described below, NCFE used its substantial and controlling share interest in e-MedSoft to orchestrate several acquisitions of undisclosed related parties to give the Company the appearance of progress and growth.

6.      On December 6, 2000, the beginning of the Class Period, the Company issued a press release announcing that it had been "selected" by Chartwell Diversified Services, Inc. ("Chartwell") to build a customized healthcare portal solution.  The press release represented that the contract was secured through the Company's joint venture with NCFE.  The Company's stock price rose on the news of the Chartwell contract.  NCFE and several of its affiliates, were principal shareholders of e-MedSoft and Chartwell.  Defendants Lance Poulsen, his wife Barbara Poulsen, Donald H. Ayers

and Rebecca Parrett, through Thor Capital Holdings, LLC ("Thor Capital") obtained an 88% interest in Chartwell in August 2000. E-MedSoft, however, did not disclose of the following material related-party facts: Defendant Ayers was a member of e-MedSoft's board and a significant Chartwell shareholder; several NCFE affiliates (including Ayers who owned 25% of NCFE through July 2001) were also significant e-MedSoft shareholders, and Chartwell shareholders. Much later in public filings, the Company admitted that these NCFE affiliates represented the largest related group of stockholders and had the "ability to influence the election of directors and other important corporate transactions requiring shareholder approval." (Form 10-K for the fiscal year ended March 31, 2001, filed August 1, 2001).

7.      Thereafter, on May 3, 2001, the Company announced it had executed a letter of intent to acquire Chartwell, a company run by defendant Magliochetti. According to the press release, Chartwell and its partnerships had "profitably generated annual revenues of more than $150 million." This press release also stated that Magliochetti would join the combined company as Co-CEO and Vice-Chairman. A few weeks later, on May 21, 2001, defendant Andrews was quoted in *The Florida-Times Union* as stating that "Chartwell is a profitable company with annual earnings before interest, depreciation, taxes and amortization of about $7 million to $15 million."

8.      No disclosure was ever made of the related parties, nor was there any basis for the statements about Chartwell's profitability. Several other press releases were issued during the Class Period regarding Chartwell's profitability and business prospects, as set forth below. On August 1, 2001, the Company first disclosed that only defendant Donald H. Ayers ("Ayers") had an interest in Chartwell. Not until August 21, 2001, in the Company's Form 8-K, however, did the Company disclose that "Chartwell's principal shareholders are also principal shareholders of ... NCFE." (The

Company's proxy statement for its annual shareholders' meeting to be held on December 27, 2001, disclosed that the following related parties received payment for their Chartwell shares in the merger: Lance & Barbara Poulsen, Ayers, LLC, Cheyenne-Blaze, LLC and Frank P. Magliochetti, Jr.)

9.    The Company continued to issue positive press releases about its plan to acquire two other companies, Addus Healthcare, Inc. ("Addus") and Tender Loving Care, Inc. ("Tender Loving Care"). NCFE controlled the Company's selection of these acquisition candidates. At the time the Company made these statements, however, it did not have the financial means to acquire them.

10.    As detailed below, the Company fraudulently obtained $70 million in financing from Private Investment Banking Group ("PIBL") to help pay for these planned acquisitions, a scheme which ultimately caused the Company's auditor to resign. The Company agreed in writing to pledge its medical accounts receivable as collateral to repay the principal and interest on convertible debentures the Company issued in exchange for the cash financing PIBL provided. (The Company issued the debentures to Societe Financiere du Seujet, Ltd. ("SFSL"), a Swiss company that acted as a broker in finding a source of financing -- PIBL -- for the Company.)

11.    After PIBL had advanced $70 million to the Company, PIBL received a copy of financing documents that the Company inadvertently or mistakenly faxed to PIBL, showing that the Company had deleted the key paragraphs of the debentures setting forth the Company's obligation to collateralize the debentures with its medical accounts receivable. PIBL also noticed that PIBL directors' names had been forged. The forged documents had apparently been used to deceive the Company's auditor, KPMG LLP ("KPMG") about the medical accounts receivable, which the Company had already pledged to NCFE, not to PIBL, as agreed.

-5-

12.    Although the Company conducted an "independent" investigation of these allegations, which PIBL asserted in a complaint against the Company for fraud and breach of contract, KPMG nevertheless refused to certify the Company's fiscal-year end March 31, 2002 financial statements and resigned on July 26, 2002. A few days later, on August 1, 2002, defendant George Kuselias, e-MedSoft's CFO, also resigned or was forced to leave the Company.

13.    The Company's positive statements about Chartwell proved illusory as well. After the merger, the Company twice restated Chartwell's financial statements in October and November 2001.

14.    Meanwhile, the Company's insiders dumped millions of dollars of their Company stock. Controlling shareholders TSI Technologies and Holdings, LLC ("TSI"), SWAB Financial, LLC ("SWAB Financial") and Mitchell Stein, entered into a series of secret agreements during 2000 to 2001 to sell up to 10 million shares of eMedSoft shares, described below. Defendants Lance Poulsen and Mitchell Stein (operating through his company TSI) dumped millions of shares of stock between November 2001 and January 2002, just before the second restatement was announced in a Form 8-K filing on February 11, 2002, the end of the Class Period. With that announcement, the Company's stock dropped and continued a downward slide thereafter as the Company spiralled into bankruptcy.

15.    The Company's stock was delisted from the AMEX on July 15, 2002. On July 26, 2002, as stated above, KPMG resigned. On November 27, 2002, the Company filed for bankruptcy; it is not named as a defendant herein. NCFE -- a controlling person of e-MedSoft -- also filed for bankruptcy protection in November 2002.  According to a witness cooperating with the Government's criminal investigation of NCFE and others, NCFE has operated as a Ponzi scheme

-6-

to defraud thousands of investors nationwide. The SEC has also brought suit, alleging that NCFE "senior officials ... defrauded investors who invested billions of dollars in securities issued by wholly owned subsidiaries of [NCFE]." (<u>See</u> Exs. B, C & D, annexed hereto.) As a result, the usual formalities of corporate separateness insulating NCFE's owners and officers should be disregarded and liability imposed for the fraud on e-MedSoft shareholders alleged herein.

16.     On August 21, 2003, the Company disclosed that it had received a subpoena as part of a formal inquiry by the SEC. The subpoena requested items relating to the Company's accounting and auditing matters, and relationships with current and former financing sources and analysts, among other things.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1337 and 1367 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

18.     This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § § 78j(b) and 78t(a)) and Rule 10b-5(a), (b) and (c), promulgated thereunder (17 C.F.R. § 240.10b-5).

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c). Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District including the preparation of the false and misleading press releases and financial statements alleged herein, and later moved its headquarters to Massachusetts at the end of 2001. The Judicial Panel on Multi-District Litigation transferred this case to this District because certain officers and directors of NCFE live in this District and NCFE is headquartered here.

20.    In connection with the acts and omissions alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

21.    Plaintiffs purchased e-MedSoft common stock during the Class Period, as set forth in the certifications filed with the original complaint and which are incorporated herein by reference, and were damaged thereby. Proposed lead plaintiffs, Laurie & Gary Davis, Glenn & Donna Schrader and Larry R. White, timely moved for appointment as lead plaintiffs and approval of their choice of lead counsel on August 18, 2003 in the Middle District of Florida prior to transfer to this Court by the MDL panel. Their certifications are filed with their lead plaintiff motion and are incorporated herein by reference. Proposed lead plaintiffs also moved at that time to consolidate this action with the related and later filed action, John P. Houlihan v. John F. Andrews, et al., Case No. #:03-656 (M.D. Fla.), which is also now before this Court.

22.    The defendants, at all times relevant to this action, served in the capacities listed below:

| **Name** | **Position** |
| --- | --- |
| John F. Andrews | Chairman and Chief Executive Officer of e-MedSoft (1999 to May 2001; Co-CEO from May 2001 to his resignation on August 6, 2001). |
| Frank P. Magliochetti | Chairman and Chief Executive Officer of e-MedSoft (August 6, 2001 to present; Co-CEO and Vice-Chairman May 2001 to August 6, 2001); formerly Chief Executive Officer and 10% owner of Chartwell. |

-8-

| | |
|---|---|
| Donald H. Ayers | A member of e-MedSoft's Board of Directors, a significant shareholder of Chartwell, Vice Chairman, Chief Operating Officer and a director of NCFE, a principal shareholder of e-MedSoft. |
| Ayers LLC | Managed by defendant Donald H. Ayers, the sole trustee of a trust which is the sole member of Ayers LLC. During the class period, Ayers LLC was the *alter ego* of Donald H. Ayers. |
| Suzanne Hosch | Chief Accounting Officer. |
| George A. Kuselias | Chief Financial Officer until his resignation on August 1, 2002 |
| Sam J.W. Romeo | Director; signed the Company's August 1, 2001 Form 10-K (for period ended 3/31/01). |
| Albert Marston | Director; signed the Company's August 1, 2001 Form 10-K (for period ended 3/31/01). |
| Cedric Johnson | Director; signed the Company's August 1, 2001 Form 10-K (for period ended 3/31/01). |
| Lance K. Poulsen | President and Chairman of NCFE; shareholder of Chartwell; controlling person as alleged below. |
| Barbara L. Poulsen | A Director of NCFE, wife of Lance K. Poulsen, owner of Chartwell, and a controlling shareholder as alleged below; upon information and belief, Barbara Poulsen maintained an offshore account through which she traded securities. |
| Rebecca S. Parrett | Principal shareholder of Chartwell and Vice Chairman, Secretary and Treasurer of NCFE, and a controlling person of e-MedSoft. Parrett and Donald H. Ayers were previously husband and wife, upon information and belief. |
| Cheyenne-Blaze, LLC | Alter ego of Rebecca S. Parrett; managed by Parrett, the sole trustee of the trust which is the sole member of Cheyenne-Blaze, a controlling shareholder of the Company. |

| | |
|---|---|
| J.P. Morgan Chase & Co. | A Delaware corporation that directly or indirectly (through the Beacon defendants described below) owned approximately 20% of the common stock of NCFE and which was represented by two directors on NCFE's board. NCFE was a controlling person of the Company under the federal securities laws. |
| The Beacon Group, LLC | A Delaware limited partnership through which defendant J.P. Morgan Chase & Co. (its owner) directly or indirectly controlled NCFE, which in turn, was a controlling person of the Company. |
| The Beacon Group III Focus Value Fund, L.P. | A Delaware limited partnership that became the wholly-owned subsidiary of J.P. Morgan Chase & Co. in 2000 and was the alter ego of J.P. Morgan Chase & Co. through The Beacon Group III Focus Value Fund, L.P. and/or The Beacon Group, LLC, J.P. Morgan Chase & Co. owned 20% of the common stock of NCFE. |
| Mitchell J. Stein | Founder of the Company and a board member in 1999 to 2000; owner and controlling person of TSI Technologies and Holdings, LLC (later renamed to SWAB Financial, LLC), HealthMed, Inc., Sanga International (prior to its' bankruptcy). |
| TSI Technologies and Holdings, LLC (a/k/a "SWAB Financial LLC") | Owner of 20.76% of the Company's stock during the relevant period and controlling person; controlled by defendant Mitchell Stein; TSI Technologies and Holdings, LLC was later renamed "SWAB Financial, LLC," according to the first amended complaint filed by SWAB Financial, LLC as plaintiff in SWAB Financial, LLC v. Daniel Feldman, et al., Civil No. BC 280610 (Calif. Superior Court, LA County) (filed 4/14/02). |

| | |
|---|---|
| SWAB Financial, LLC | Owner of 20.76% of the Company's stock during the relevant period and a controlling person; controlled by defendant Mitchell Stein; previously named TSI Technologies and Holdings, LLC until June 28, 2001 when a name change to SWAB Financial, LLC was instituted. SWAB Financial, LLC entered into an agreement with San Diego Asset Management to systematically and surreptitiously sell 10 million shares of e-MedSoft common stock, as alleged below. |
| R. J. Gold & Company, P.C. | Chartwell's auditors; audited Chartwell's financial statements which were included in financial statements the Company presented in public filings with the consent of R. J. Gold & Company, P.C. |

23.    Defendants (except R.J. Gold & Company, P.C.), as senior officers and/or directors or significant shareholders, were controlling persons of the Company. Each exercised their power and influence to cause the Company to engage in the fraudulent scheme alleged herein.

24.    According to the Company's report on Form 10-K filed on November 11, 2002 (for the fiscal year ended 3/31/02), NCFE and its affiliates beneficially own approximately 33% of the Company's common stock during the Class Period, "and such represents the largest related group of stockholders [the Company has]. *__Accordingly, they could have an ability to influence the election of directors and other important corporate transactions requiring stockholder approval__*. In addition, Donald H. Ayers, a principal of NCFE, is also one of our directors." Lance K. Poulsen was president of NCFE, a controlling shareholder of e-MedSoft. NCFE exercised significant control over the Company because of its stock ownership and because it controlled the financing to fund the Company's operations and formed a joint venture with e-MedSoft as described in the Company's December 6, 2000 press release.

-11-

25.    NCFE filed for bankruptcy in November 2002 and, accordingly, is not named as a defendant herein.  By virtue of their stock ownership and/or positions as officers and directors of NCFE, defendant Poulsen and the other NCFE affiliates, Donald Ayers, Ayers LLC, Parrett and Barbara Poulsen (Lance Poulsen's wife), J.P. Morgan Chase & Co., The Beacon Group, LLC and The Beacon Group III Focus Value Fund, L.P. are controlling persons of NCFE.  Their ownership of NCFE (according to the Parrett complaint discussed below) was as follows:  Parrett (18%); the Poulsens (38%); Ayers (18%); J.P. Morgan Chase/Beacon Group (20%).  In addition, defendant Lance K. Poulsen admitted in paragraph 23 of his answer dated January 23, 2002 in National Medical Care Inc., et al. v. Home Medical Care of America, Inc., et al., Civil No. 00-1225-J (Mass. Superior Court), that he, Donald Ayers and Rebecca Parrett "are or were officers of NCFE."

26.    Lance Poulsen and several of  the other NCFE affiliates were also significant e-MedSoft stockholders, including Barbara Poulsen, Donald Ayers, Ayers, LLC, Parrett and Cheyenne-Blaze, LLC.  According to the Company's filings, the NCFE affiliates represented the "largest group of related stockholders" and thus had the "ability to influence the election of directors and other important corporate transactions requiring stockholder approval."  During the Class Period, Lance Poulsen personally owned at least 12,056,500 shares of common stock or 8.11% of e-MedSoft.  As of August 16, 2001, defendant Donald Ayers personally owned 1,400,000 shares of e-MedSoft common stock.

27.    Each of the defendants is liable as a participant in a scheme to defraud e-MedSoft common stock purchasers, by disseminating materially false and misleading statements and concealing material adverse facts and/or by possessing controlling person authority.  Defendants deceived the investing public regarding e-MedSoft's business, its finances and the intrinsic value of

-12-

the Company's common stock, and caused plaintiffs and other Class members to purchase the Company's common stock at artificially inflated prices.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

28.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3), Fed. R. Civ. P., on behalf of a Class, consisting of all persons who purchased e-MedSoft (or Med Diversified) securities between December 6, 2000 and February 11, 2002, inclusive (the "Class Period"), and who were damaged thereby. Excluded from the Class are defendants, members of the immediate family of each of the Individual Defendants, and the present and former directors and officers of e-MedSoft (or Med Diversified), or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

29.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are thousands of members of the Class located throughout the United States. As of June 12, 2001, there were reportedly more than 80 million shares of e-MedSoft common stock outstanding. Throughout the Class Period, the Company's common stock was actively traded on the American Stock Exchange (an open and efficient market) under the symbol "MED." It currently trades in the Pink Sheets under the symbol "MDDVQ.PK." Record owners and other Class members may be identified from records maintained by the Company and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

30.    Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

31.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

32.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

b.    whether defendants participated in and pursued the common course of conduct complained of herein;

c.    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of the Company;

d.    whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the Company's business, finances, value, performance and prospects;

e.    whether the market price of e-MedSoft common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

-14-

f.    the extent to which the members of the Class have sustained damages and the proper measure of damages.

33.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

**Background to the Class Period**

34.    E-MedSoft traces its roots back to a "blank check" company, High Hopes, Inc., a Nevada company formed on August 25, 1986.  High Hopes, Inc. changed its name to Medtech, Inc. in January 1999, and was later merged with Sanga International, a company based in California and owned by defendants Mitchell Stein and John Andrews.  In January 1999, Sanga International changed its name to e-MedSoft.com.  E-MedSoft's public filings show that in 1999, e-MedSoft was owned by Sanga International, TSI (a company that was formerly known as Sanga e-Health LLC), Stein and Andrews.  (HealthMed, Inc., another company owned and controlled by defendant Stein, owned a controlling interest in TSI).

35.    On January 7, 1999, e-MedSoft acquired certain rights to a Java-based, online healthcare management system from TSI (formerly known as Sanga e-Health, LLC), in exchange for 41.417 million shares of e-MedSoft stock.  In connection with this transaction, the Company completed a 5 for 1 forward stock split and as a finder's fee, issued 2,553,144 restricted shares and 1,035,429 warrants to purchase restricted shares of common stock at an exercise price of $0.25 per

-15-

share over 5 years. As a result of these transactions, TSI owned approximately 80% of the outstanding shares. John F. Andrews was CEO of Sanga International, Inc. at the time and became chairman and CEO of e-MedSoft when the company acquired the software. Defendant Stein became a member of the board of e-MedSoft on September 1, 1999 as an ex-officio member representative of TSI, a principal stockholder of e-MedSoft.com, according to the Company's June 30, 2000 Form 10-KSB. According to that filing, Stein was the Chairman of TSI. Because Andrews worked out of Jacksonville Beach, Florida, e-MedSoft officially moved its headquarters from California to Jacksonville in 1999.

36.    In March 1999, defendant Magliochetti met defendant Lance Poulsen. In addition, defendant Donald H. Ayers made a $250,000 loan to the Company on March 19, 1999 and received 1,000,000 shares of the Company as consideration for the loan.

**Prior Undisclosed Related-Party Interest: HMA**

37.    On July 9, 1999, e-MedSoft issued a press release announcing that "Home Medical of America ("HMA"), the nation's largest privately-held provider of home healthcare services, has selected e-MedSoft.com to Web-enable selected legacy mainframe applications in connection with the significant base of physicians on the e-MedSoft.com network." According to defendant John Andrews, then Chairman and CEO of e-MedSoft.com, "e-MedSoft.com is pleased to be associated with such a prestigious provider of home health services." Defendants, however, did not disclose that HMA was a company partially owned and controlled Ayers, among others. As alleged above, Ayers had obtained 1,000,000 shares in e-MedSoft on March 19, 1999 in consideration for a $710,000 loan to e-MedSoft.

-16-

38.    On January 11, 2000, the Company announced that it had begun trading on the American Stock Exchange under the symbol "MED."

**E-MedSoft's Relationship with NCFE**

39.    On February 2, 2000, the Company entered into a seven-year Preferred Provider Agreement with NCFE to provide it services and software solutions and to have access to NCFE's clients. In return, the Company issued 9.5 million shares of stock to NCFE, and NCFE cancelled approximately $4.8 million of debt owed to it by e-MedSoft. NCFE held half the stock (or 4,750,000 shares) in its own name; the other half (4,750,000) NCFE assigned to Healthcare Capital, LLC, a company owned and controlled by NCFE. The 9.5 million shares that NCFE received then had a market value of $113 million, according to the Company's March 31, 2001 Form 10-K, filed August 1, 2001.

40.    On February 9, 2000, the Company and NCFE issued a joint press release announcing that the Company and NCFE had finalized a "joint venture valued at more than $500 million to e-MedSoft.com over the next seven years." The press release stated that the two companies would work together to create a website that health-care providers could use to buy an "entire suite of products and services." E-MedSoft was to provide the suite of products and services to support the site, and NCFE would provide the "healthcare financing options by offering its high grade financial products." "'This joint venture is groundbreaking for the future of healthcare,' stated Donald H. Ayers, co-founder and vice-chairman of NCFE." According to Ayers, "The ability to rely upon a proven system and technology, in conjunction with a reliable leader in the area of healthcare securitizations and ultimate funding, is essential to the provider's capability to survive in today's dynamic healthcare market."

-17-

41.    On June 8, 2000, the Company and NCFE announced that e-MedSoft had completed Phase I of the NCFE/e-MedSoft "Master Portal."  According to the press release, health-care providers for the first time would be able to gain electronic access through the Master Portal to the "network of business and financial resources" of NCFE and e-MedSoft.com.  "These capabilities, together with the e-MedSoft-offered Medical Business Applications, create for the companies a Web-based, comprehensive 'money' distribution network where clients -- from hospitals and clinics to home health agencies -- can access funding or payment for their claims in a totally electronic environment."  According to Lance Poulsen, the "mass rollout" of the project would have a substantial impact on both companies' core businesses.  Andrews, then the Company's Chairman and CEO, said: "This implementation will continue to enhance NCFE's position and stature in the industry."

42.    In August 2000, as alleged below, the NCFE related principals, Lance and Barbara Poulsen, Donald H. Ayers and Rebecca S. Parrett purchased a substantial portion of Chartwell, a privately-held health care company run and managed by Magliochetti.

**The Class Period Begins**

43.    The Class Period begins on December 6, 2000.  On that date, e-MedSoft issued a press release announcing that it had been selected by Chartwell to build a customized healthcare portal solution:

> JACKSONVILLE BEACH, Fla. -- Dec. 6, 2000 -- e-MedSoft.com (AMEX: MED) . . . today announced that the Company has been selected by Chartwell Diversified Services, Inc., a leader in the rapidly growing home care healthcare industry, to build a customized healthcare portal solution.
>
> The portal will link Chartwell's network of home healthcare offices.

-18-

* * * * *

Frank Magliochetti, chief executive officer of Chartwell, stated: 'This portal will serve as an integral point of contact for our employees, contractors, physicians and patients, providing the foundation for all of our home healthcare applications.'

* * * * *

Commenting further, Magliochetti said: 'Since the portal will be such an important tool in our management infrastructure, ***it was essential we choose a company with proven capabilities in this area, which is why we decided to go with e-MedSoft. e-MedSoft has proven design and implementation abilities, and their solutions provide the scalability necessary to accommodate our expected growth.***'

John F. Andrews, e-MedSoft.com chairman and chief executive officer, stated: 'We are excited to continue the momentum in the connectivity segment of our business by securing this contract with Chartwell through our joint venture with NCFE, the leading provider of healthcare accounts receivable financing in the nation. This marked the first step in what we expect to be an ongoing relationship with Chartwell, eventually leading to implementation of e-MedSoft's full suite of e-healthcare business and clinical products and services.'

'Additionally this contract demonstrates both the strengths of our technical capabilities as well as reinforces our expanded relationship with NCFE to provide Web network solutions to benefit healthcare customers. Our joint venture arrangement provides a significant distribution channel through which to market our innovative solutions to NCFE's customer base, including more than 2,000 healthcare clients representing nearly 20,000 physicians.'

44.    E-MedSoft's stock price rose on the December 6, 2000 news announcement.

The foregoing statements, however, were false and misleading because Andrews and the other

defendants did not disclose that Chartwell, a privately held company, was owned by several NCFE

affiliates, including Lance Poulsen and Ayers. The press release gave the misleading impression that

Chartwell chose e-MedSoft to perform a contract without any reference to the fact that Chartwell was

owned by the same NCFE related parties group that owned both Chartwell and e-MedSoft. As set

forth below, NCFE became an owner of Chartwell in August 2000, and upon information and belief,

acquired 88% of Chartwell. NCFE also owned 9.5 million shares of NCFE as of February 2000, or

approximately 14% of e-MedSoft at that time. (NCFE's ownership in e-MedSoft increased to over

50 million shares when the announced Chartwell acquisition closed on August 1, 2001).

**Defendant Magliochetti's Testimony**

45.      Defendant Magliochetti was CEO and a 10% owner of Chartwell Diversified Services

before its sale to e-MedSoft. According to Magliochetti's testimony on November 14, 2002 in <u>Med</u>

<u>Diversified, Inc. v. National Century Financial Enterprises, Inc., et al</u>., Case No. C2-02-1085 (S.D.

Ohio), before Judge Marbley on a motion for a preliminary injunction, defendant Poulsen and other

NCFE-affiliates owned a majority of the shares of Chartwell Diversified Services:

> Q.    Now, let's understand who is Med Diversified. In fact, Lance Poulsen and people affiliated with him are the largest shareholders of Med Diversified, isn't that true?
>
> A.    Absolutely true. (Tr. at 92).
>
>                        * * * * *
>
> Q.    Now, Rebecca Parrett that you mentioned, she's also a shareholder of Med Diversified, is she not?
>
> A.    She is.
>
> Q.    And Mr. Ayres is also a shareholder in Med Diversified, is he not?
>
> A.    As well as a board member.
>
> Q.    So when we talk about Lance Poulsen and people affiliated with him owning the largest single block of shares in Med Diversified, that's who we are referring to, correct? Parrett?
>
> A.    Yes.
>
> Q.    Poulsen, Ayres. Anybody else?

A.    Yes, Barbara Poulsen.

Q.    That's Lance's wife, correct?

A.    That's correct. (Tr. at 94-95)

\* \* \* \* \*

Q.    ***When did Mr. Poulsen and people affiliated with him first become the largest shareholder block in your company [Chartwell Diversified Services, Inc.], sir?***

A.    ***They became a shareholder in Chartwell Diversified Services in August of 2000. In August of 2001, we sold our company to E-MEDSOFT.COM which was, for all practical purposes, owned by NCFE,*** and at that point, the fair market value based on a fairness opinion was approximately 80- to 90 million. That's how they became owners of approximately 45 million in new equity shares. (Tr. at 104) (emphasis added).

\* \* \* \* \*

[Questions & Answers from pp.104-105 omitted]

My salary at the time was 600 thousand. I owned 10 percent of Chartwell Diversified Services. I received five million shares in the acquisition of E-MEDSOFT – the acquisition of Chartwell by E-MEDSOFT. I received a signing bonus of 5 million options, and that's my extent of my compensation, so – (Tr. at 106)

## The NCFE Ponzi Scheme and E-MedSoft

46.    According to a confidential witness ("C/W") with first-hand knowledge who worked for e-MedSoft in Florida and California from early 2002 until August 2002, the Chartwell acquisition was organized by defendants Andrews, Magliochetti, Stein, Lance Poulsen, Donald Ayers and Rebecca Parrett. (The C/W reported directly first to defendant Andrews then to Magliochetti.) The related party transactions between e-MedSoft, Chartwell and NCFE were not a secret among e-MedSoft employees, according to C/W. Defendant Magliochetti told C/W that e-MedSoft's failure

-21-

to disclose the related parties was done purposely because it "smelled bad." Shortly after the Chartwell deal was completed (see below), Magliochetti "bragged" to C/W that "if something is not disclosed, it can't come up and bite you." According to C/W, defendants Andrews, George Kuselias, Suzanne Hosch, Sam J. W. Romeo, Albert Marston and Cedric Johnson also all knew of the related party deals and e-MedSoft's failure to disclose the information.

47.    According to C/W, all of e-MedSoft's acquisitions and related party transactions were engineered by NCFE, particularly Lance Poulsen. According to C/W, it was known throughout e-MedSoft that Magliochetti was Poulsen's "guy." (According to C/W, Magliochetti and Parrett also have interests together in a number of limited liability companies.)

48.    Throughout the class period, the Company financed its operations through an accounts receivable purchase program with NCFE and its subsidiaries, which was the principal source of financing for its operations. Because e-MedSoft was in such poor financial condition and depended on NCFE for cash, NCFE charged e-MedSoft approximately 24-25% to finance receivables, according to C/W. This was an exorbitantly high rate of interest and e-MedSoft could have borrowed money for substantially less. NCFE was thus sucking money out of e-MedSoft by charging such high rates for receivables, according to C/W.

49.    There were also "phantom receivables," i.e., receivables that exceeded the amounts of actual receivables, which enabled NCFE to record more receivables on its books and, in turn, sell more notes to institutional investors, and thereby raise more capital, according to C/W. NCFE paid e-MedSoft for receivables and e-MedSoft paid back 24-25% to NCFE in interest.

50.    According to C/W, e-MedSoft was not alone, NCFE obtained control over companies like e-MedSoft and then (1) sucked cash out of them; (2) caused them to become dependent on

NCFE for cash to survive; which (3) led the companies to cooperate with NCFE to inflate accounts receivables. This is particularly true with regard to Chartwell, which had three subsidiaries that could sell accounts receivable to NCFE: CCS, CGI and CHI.

**Defendant Parrett Describes the NCFE Ponzi Scheme**

51.    C/W's statements regarding NCFE's Ponzi scheme with e-MedSoft and Chartwell is corroborated by defendant Parrett's own account set forth in her civil complaint. <u>Rebecca S. Parrett v. Bank One, N.A., et al.</u>, CV 2003-002781 (Superior Court, Arizona) (filed February 22, 2003) (transferred to this Court by the MDL Panel).

52.    In her complaint, Parrett alleges that she married defendant Ayers in April 1991 and became a Director and Treasurer of NCFE. According to Parrett, between 1994 and 2001, NCFE (which Parrett alleges includes Lance Poulsen and Ayers, as well as NCFE's various subsidiaries), purchased receivables at a discount from healthcare providers with funds obtained from the sale of asset-backed bonds issued by NCFE subsidiaries: NPF VI, NPF VIII and NPF XII, with J. P. Morgan Chase & Co.'s assistance, among others. (Parrett Complt., ¶56)

53.    Parrett alleges that some time before 1998, Lance Poulsen and Ayers created a scheme whereby receivables purchased and funded by NCFE were intentionally and substantially overvalued. Lance Poulsen directed NCFE to advance additional funds to healthcare providers on their <u>future</u> receivables, which then did not exist. (Parrett Complt., ¶60)

54.    NCFE's overfunding of existing receivables and advances on future receivables, according to Parrett, resulted in substantially excessive overfunding, and thus higher fees and interest that healthcare providers owed to NCFE. The scheme also allowed NCFE to list significantly higher assets, revenues and income on its financial statements and huge sums that healthcare providers had

-23-

to pay NCFE to buy back the "bogus" receivables. (Parrett Complt., ¶63) NCFE did not disclose on its financial statements that they included overvalued existing receivables or advances in non-existent future receivables. (Id.) According to Parrett, by 1999, as much as 50% of NCFE's receivables were either worthless or non-existent.

55.    According to Parrett, "NCFE made fraudulent payments to ... Med Diversified of almost $100 million." (Parrett Complt., ¶68)

56.    According to Parrett, in 2000 J. P. Morgan Chase & Co., through Beacon, became an equity investor in and partner of NCFE by acquiring 20% of NCFE. Under the terms of Beacon's equity acquisition, Beacon was entitled to have two members on NCFE's board, which was enlarged from four to six members. On July 31, 1998, according to Parrett, Harold W. Pote and Eric R. Wilkinson, then Beacon officers, became NCFE directors. Pote became Chairman of the Audit Committee. In 2000, J. P. Morgan acquired Beacon and then "had control of NCFE's Audit Committee, and with the Poulsens and other Defendants, substantial control of NCFE's business and operations." (Parrett Complt., ¶79)

**Magliochetti Testifies About E-MedSoft's "Pro Forma" Receivables**

57.    Parrett's account of the NCFE-e-MedSoft Ponzi scheme is, in turn, corroborated by Magliochetti's testimony. Magliochetti testified that Poulsen directed him to divert several million dollars. (Magliochetti Tr. at 96-97, 214). Magliochetti also testified that NCFE paid up front cash for future non-existent receivables -- the "phantom receivables" that Parrett described -- which Magliochetti called "pro forma funding." (Magliochetti Tr. at 108-109).

58.    On May 3, 2001, the Company issued a press release announcing the execution of a letter of intent whereby it would acquire Chartwell, a privately held company. The press release

-24-

stated that, as a result of the acquisition, the Company would ***"immediately achieve a combined annual revenue run rate in excess of $250 million with a substantial positive EBIDTA."*** The May 3, 2001 press release also stated: "Upon consummation of the merger, e-MedSoft.com intends to undergo a name change to Med Diversified Inc. in order to accurately reflect the sustained integration and diversification its technology has continued to bring about." According to the press release, Chartwell's CEO Magliochetti would now become Vice-Chairman and president of e-MedSoft. The press release also stated the merger was subject to shareholder approval (although none would ever be sought as later disclosed) and to "the receipt of two fairness opinions," among other things.

59.      According to C/W, the announcement of naming Magliochetti the sole chairman and CEO was delayed until October 6, 2001 due to the structuring of Andrews' severance package. (Before the Chartwell acquisition, there was also talk internally, according to C/W, of a merger between NCFE and e-MedSoft.)

**Chartwell's Revenues**

60.      Significantly, the May 3, 2001 press release also discussed Chartwell's alleged annual revenues:

> Chartwell Diversified Services is a privately held company that, through efficiently matched technology and services solutions, provides home infusion services, clinical respiratory services, home medical equipment, home health services, and specialty pharmacy services throughout the United States. As a provider and manager of health-care services within the alternate site setting, ***Chartwell and its partnerships have profitably generated annual revenues of more than $150 million*** and has some 9,000 full-time and part-time employees
> . . .

61.    The investing public relied upon the truth of the foregoing statements because Chartwell was a privately held company with financial statements that were unavailable to the investing public. As a result of the press release, the price of the Company's stock jumped 61% from a closing price of $0.74 on May 3, 2001 to a closing price of $1.19 on May 4, 2001 on heavy trading volume of 3,945,600 shares. In the days that followed, the stock jumped even higher, to almost $2 per share in extremely heavy trading.

62.    On May 21, 2001, *The Florida Times-Union* of Jacksonville published an article concerning e-MedSoft's acquisition of Chartwell based upon an interview with defendant John F. Andrews:

> The Jacksonville Beach-based company, which provides health care information systems through the Internet, agreed earlier this month to buy Chartwell Diversified Services Inc., a Boston-based firm that provides home health care services and has annual revenue of more than $150 million. That's quite a jump up for e-MedSoft, which reported revenue of only $32 million in the nine months ended Dec. 31.
>
> "It changes the scale of the company, the financial status of the company," said John F. Andrews, chairman and chief executive officer of e-MedSoft . . . ***Andrews said Chartwell is a profitable company with annual earnings before interest, depreciation, taxes and amortization of about $7 million to $15 million. "Financially they're doing very, very well,"*** he said.
>
> E-MedSoft, which only began its operations at the beginning of 1999, had a net loss of $30.1 million for the nine months ended Dec. 31. Before the merger, analysts had projected the company would not be profitable before fiscal 2003.

63.    The May 3, 2001 press release and the statements Andrews made in the May 21, 2001 news article were materially false and misleading because there was no basis for the statement that the combined Company would "immediately achieve a combined annual revenue run rate in excess

of $250 million" and the statement that "Chartwell is a profitable company with annual earnings before interest, depreciation, taxes and amortization of about $7 million to $15 million" was untrue. In addition, the statements were materially false and misleading because they failed to disclose that Chartwell was a related party by virtue of Ayers' significant Chartwell shareholdings beginning in August 2000, and the fact that Chartwell's principal shareholders were also the principal and controlling shareholders of NCFE, a principal shareholder of the Company).

64.     On May 15, 2001, the Company and Chartwell issued a joint press release announcing they had executed a definitive merger agreement.  The press release stated that Chartwell was a privately held company and described its business but did not disclose that Chartwell was a related party, and thus was materially false and misleading.

65.     On May 18, 2001, the Company issued a press release announcing that Margaret Harris, the Company's Chief Financial Officer had resigned effective May 16, 2001, to "pursue other opportunities."

66.     On June 1, 2001, the Company issued a press release stating that Chartwell received a fairness opinion justifying the purchase price contemplated in the definitive agreement and that Chartwell shareholders had approved the transaction.  (No disclosure was made about whether the Company had received a fairness opinion.)  Significantly, the June 1, 2001 press release stated that: "Consummation of the merger is subject to among other conditions . . . the completion of due diligence of the business and operations of each company by the other."

-27-

**TSI and Mitchell Stein's Secret Sales of e-MedSoft Stock in June and July 2001**

67.    In June and July, 2001, TSI, SWAB Financial and Mitchell Stein sold millions of shares of e-MedSoft stock in a way designed to avoid detection. In an amended complaint filed in Los Angeles on April 14, 2003, defendant TSI, now known as SWAB Financial, LLC, described a series of stock transactions by which it sought to secretly sell millions of shares of e-MedSoft.com common stock. (SWAB Financial, LLC v. David Feldman, et al., Case No. BC 280610 (Cal. Sup. Ct., Los Angeles Cty.). TSI and its successor SWAB Financial, LLC, are owned and controlled by defendant Mitchell J. Stein.

68.    TSI, entered into five separate written stock transfer agreements with San Diego Asset Management, a company that managed wealthy individuals' portfolios, to sell millions of shares of e-MedSoft.com stock. The agreements to sell TSI's e-MedSoft.com stock were structured to avoid incurring a large stock price drop that would inevitably accompany a wholesale dumping of e-MedSoft.com stock into the marketplace. The five agreements were entered into, according to the SWAB complaint, "for the business purpose of facilitating an orderly and regulated sale of its shares of MED stock into the market." (SWAB amended complaint, ¶ 21). Under the terms of the five stock agreements, San Diego Asset Management was to create 5 partnerships that would hold TSI's e-MedSoft.com stock and sell shares of the stock at regular intervals.

69.    TSI entered into the following five agreements:

a.    Under the terms of the First Agreement, dated December 20, 2000, TSI agreed to sell 6,000,000 shares of e-MedSoft.com stock to "Partnership I" for $1.15 per share. (SWAB Complaint, ¶23). In the First Agreement, Partnership I agreed not to sell more than 150,000 shares of e-MedSoft.com stock per month.

     b.  Under the terms of the Second Agreement, dated January 23, 2001, TSI agreed to sell 3,500,000 shares of e-MedSoft.com stock to Partnership II at $1.20 per share. Partnership II agreed not to publicly sell more than 100,000 shares of the eMedSoft.com stock per month.

     c.  Under the Third Agreement, dated February 5, 2001, TSI agreed to sell 1,500,000 shares of e-MedSoft.com stock to Partnership III at $1.20 per share. Partnership III agreed not to sell publicly more than 60,000 share of e-MedSoft.com stock per month.

     d.  Under the Fourth Agreement, dated February 19, 2001, TSI agreed to sell 2,000,000 shares of e-MedSoft.com stock to Partnership IV at $1.35 per share. Partnership IV agreed not to publicly sell more than 80,000 shares per month.

     e.  Under the Fifth Agreement, dated February 7, 2001, TSI agreed to sell 1,000,000 shares of e-MedSoft.com stock to Partnership V at $1.50 per share. Partnership V agreed not to publicly sell more than 50,000 shares of e-MedSoft.com stock per month.

(The 5 agreements are annexed hereto together as Exhibit A).

   70.  SWAB's complaint alleges that the Partnerships sold $1.056 million worth of e-MedSoft.com stock during the month of June 2001 and $2.075 million of e-MedSoft.com stock during the month of July 2001, an amount far in excess of the agreed-upon amounts under the five stock transfer agreements. (SWAB complaint, ¶32).

   71.  On July 15, 2001, the Company issued a press release stating that it would delay filing of its audited financial statements and annual report on Form 10-K for the fiscal year ended March 31, 2001. The Company gave a number of reasons for the delay, including the Company's relocation of its finance department from California to Florida and its need for additional time to assess asset

-29-

impairment issues. These reasons and others stated in the July 16, 2001 press release were false. According to C/W, the Company delayed filing because of its inability to "make its numbers."

**Defendants Continue to Pump the Stock**

72.     On July 17, 2001, the Company issued a press release announcing that "an institutional investor" had agreed to purchase $83 million of newly issued shares of the e-MedSoft.com's common stock. According to defendant Andrews who was quoted in the press release the stock purchase: "'represents in my view the last piece of the puzzle of MED to roll up significant and wide reaching portions of the health care industry, in all sectors, following the Chartwell closing.'" Andrews also told the public: "'I believe that the hurdles for this investment are minimal and the Company is forecasting that it will be able to access the full amount of cash by the end of calendar year 2001.'"

73.     The so-called "institutional investor" referred to that would provide $83 million in financing was San Diego Asset Management the Company that Mitchell Stein used to surreptitiously sell his e-MedSoft stock.

**False Statements About the Chartwell Merger**

74.     On August 1, 2001, the Company issued a press release stating that, for the 2001 fiscal year ended March 31, 2001, the Company reported a loss from continuing operations of $258.8 million, or $3.25 a share, much wider than the $9.3 million, or 17 cents a share, loss reported the previous fiscal year. According to the press release, the loss was largely due to $201 million in write-downs of impaired assets. It also quoted Andrews:

> 2002 will be a year of continued challenges, transition and focus on the Company's core business segments. We will emphasize execution of the Company's business plan to evolve from a pure-play dot-com

to a service oriented company. **We will continue to exploit opportunities to reduce costs while exploring market opportunities that offer long-term profit potential. Consistent with this strategy is the Company's previously announced merger with Chartwell Diversified Services, Inc., a privately held company that provides home infusion services, clinical respiratory services, home medical equipment, home health services and specialty pharmacy services throughout the United States.**

75.    The August 1, 2001 press release was materially false and misleading because there was no basis for the inference that the Chartwell merger presented an opportunity to reduce costs and to increase long-term profit potential.

76.    On August 1, 2001, the Company also filed its Annual Report on Form 10-K for the fiscal year ended March 31, 2001. The Form 10-K was signed by defendants John F. Andrews, Suzanne Hosch, Donald Ayers, Sam J. W. Romeo, Albert Marston and Cedric Johnson. With respect to Chartwell, the Form 10-K stated:

> Consummation of the pending merger with Chartwell could be of critical importance to the Company's ability to continue as a going concern.

> * * * * *

> We believe that the combination of our technology services and pharmacy services with their healthcare operations will result in new business opportunities, as well as provide financing resources.

77.    The foregoing statements were false and misleading for the reasons stated in ¶61, 63. The Form 10-K disclosed that Ayers, a member of e-MedSoft's board was also a shareholder of Chartwell but said nothing about the extensive ownership of Chartwell by the Poulsens and Parrett. In fact Ayers, the Poulsens and Parrett owned 88% of Chartwell. This was a fact well known to defendants, including those that signed the Form 10-K, according to C/W.

-31-

78.    On August 6, 2001, the Company issued a press release announcing that the merger

with Chartwell "has been completed today." The press release stated, in relevant part:

> John F. Andrews stated: "The combination with Chartwell brings to
> us all of Chartwell's management and operational strengths. We also
> expect that Chartwell will generate a healthy cash flow from
> providing health care services using our technologies . . . *I believe*
> *our investment should start reaping returns, especially with the*
> *added management strength provided by Chartwell.* I believe MED
> is poised to benefit from the current health care industry flux."
>
> For the five months ended June 30, 2001, Chartwell recorded
> unaudited net revenues under management of approximately
> $60,000,000 with gross profit of approximately $40,000,000 and
> approximately $5,500,000 of EBITDA before minority interest.
> Commenting on this performance, Mr. Andrews continued: *"We*
> *expect that this transaction will have a significantly positive impact*
> *on our operations. We expect this to be our platform for growth*
> *over the next several years.* Equally as important is the proven record
> of execution of Chartwell's team. We are very fortunate to have the
> opportunity to work with Mr. Magliochetti in taking this company to
> its next level of achievement."
>
> * * * * *
>
> As originally contemplated, MED shareholders were to be asked to
> approve the issuance in the merger of 50,000,000 in common stock
> and warrants covering an additional 20,000,000 in compliance with
> the rules of the American Stock Exchange ("AMEX"). Under
> applicable corporate law, shareholder approval is not required to
> approve the merger itself. It was originally anticipated that this
> approval would be sought prior to the merger, sometime in
> September. *The delays in completing its year-end audit and filing*
> *of its annual report on SEC Form 10K caused the companies to*
> *realize that MED could benefit immediately from Chartwell's*
> *finance and accounting infrastructure as opposed to waiting several*
> *months under the original schedule.* Additionally, MED's cash
> resources reached a level of inadequacy such that there was no
> assurance that the additional time required to prepare and clear a
> proxy statement with the SEC and close the transaction under the
> original schedule would not cause MED to be unable to meets its
> current obligations as they became due. Also, as a result of the delays
> in filing the 10K, the AMEX halted trading for 3 days in MED stock.
> Trading resumed on August 3. Accordingly, the Boards of Directors

-32-

of the companies restructured the form of the consideration to be paid to Chartwell shareholders to permit an expedited closing of the merger and to provide the shareholders of MED an opportunity to approve the issuance of the common stock in the future. All required corporate action has been taken by both parties to proceed with completion of the merger.

79.     The August 6, 2001 press release was materially false and misleading because there was no basis for the statement that:

a.     The Chartwell investment "should start reaping returns."

b.     "We expect that this transaction will have a significantly positive impact on our operations."

c.     "We expect this [Chartwell] to be our platform for growth over the next several years."

80.     In addition, the August 6, 2001 press release was materially false and misleading because it failed to disclose that Chartwell was a related party as set forth above. E-MedSoft paid for the Chartwell acquisition using 500,000 shares of newly-issued Series A preferred stock (carrying voting rights and convertible into common stock) and warrants to purchase 20,000,000 shares of the Company's common stock at a $4.00 exercise price. According to a Company disclosure filed months after the merger, the following related parties received the consideration the Company paid for their Chartwell stock: Lance Poulsen (108,900 preferred shares; 4.365 million warrants); Barbara Poulsen (same); Ayers, LLC (same); Cheyenne-Blaze, LLC (same); Frank P. Magliochetti, Jr. (50,000 preferred shares; 2 million warrants); Edwin A. Reilly (2,500 preferred shares; 100,000 warrants). See Schedule DEF 14A, filed November 21, 2001.

81.    According to C/W, Magliochetti also received undisclosed compensation in connection with the Chartwell acquisition. Defendant Magliochetti became Co-CEO and Vice-Chairman of the Company on August 6, 2001 and received $7.1 million as a sign-on and performance bonus.[1]

82.    Magliochetti also received residential property in Fort Myers, Florida as part of his sign-on bonus, according to C/W. The grant of this property to Magliochetti was not disclosed in any of the Company's public filings. This home previously belonged to defendant Donald H. Ayers, according to C/W. A search of the property records in Lee County, Florida reveals that Donald and Elise Ayers transferred ownership of a house in Fort Myers, Florida to Patricia Magliochetti on December 6, 2001.

83.    On August 7, 2001, the Company issued a press release stating that the Company had **performed due diligence and analysis of Chartwell's business "over the past six months."** This representation induced the investment community to believe falsely that the above identified statements were based upon the Company's factual investigation of Chartwell's financial data, which was untrue.

84.    On August 21, 2001, the Company filed a Form 8-K with the SEC reporting the Chartwell acquisition. The 8-K stated: "The financial statements of Chartwell Diversified Services Inc. will be filed by amendment on or before October 21, 2001.*" **For the first time, the Form 8-K disclosed that related parties (unidentified except for Ayers) were tied to Chartwell**:

---

[1] Defendant Andrews was Co-CEO from August 6, 2001 to October 6, 2001, when he stepped down from his executive position, but stayed on as a board member and consultant. On October 6, 2001, Magliochetti became CEO and Chairman of the Board.

*Chartwell's* principal shareholders are also the principal shareholders of *National Century Financial Enterprises ("NCFE")*, a principal shareholder of the Company. This includes Donald Ayers, a member of the Board of Directors of the Company. *As a result, at the Transaction Date, NCFE and affiliates of NCFE (including employees) have approximately 38% of the voting rights of the Company's shareholders*.

## Defendants Hype a Proposed Acquisition of Addus

85.    On August 22, 2001, the Company issued a press release touting the Chartwell merger

and announcing that it would soon acquire Addus Healthcare, Inc. ("Addus"):

> JACKSONVILLE BEACH, Fla. & LOWELL, Mass. - August 22, 2001
>
> e-MedSoft.com, dba Med Diversified (AMEX: Med-news), fresh off its recent merger with Chartwell Diversified Services, Inc., announced today that it has inked a Letter of Intent to acquire privately held Addus Healthcare, Inc. for $57,000,000 in cash and as much as 5,000,000 worth of Med Diversified common stock.
>
> The acquisition is the first in a series of transactions the Company hopes to attract under its new health care technology and services approach.
>
> * * * * *
>
> Frank Magliochetti, President and Co-CEO of Med Diversified, commented: 'We are very pleased to have such an opportunity to bring a premier company like Addus within the Med Diversified organization.'
>
> Mr. Magliochetti also said: 'The cumulative synergies between the companies are remarkable. Not only in complimentary service lines but with a migration of our technology into Addus' core business in lowering operational costs.'

86.    The foregoing statements were false and misleading because they gave the investing

public the impression that e-MedSoft.com had adequate financing to acquire Addus and other

companies and thus continue to expand its "diversified" business. In fact, however, the Company

-35-