IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

                              :

In re National Century        :    Case No. 2:03-md-1565
Financial Enterprises,
Inc., Investment Litigation.  :    Judge Graham

                              :    Magistrate Judge Abel

                              :


OPINION AND ORDER ON CERTAIN MOTIONS TO DISMISS
FILED BY NATIONAL CENTURY'S FOUNDERS


        This matter is before the Court on certain motions filed by
the Founders of National Century Financial Enterprises, Inc. to
dismiss the complaints against them for failure to state a claim.
The Founders – Lance Poulsen, Donald Ayers, and Rebecca Parrett –
are common defendants in this multidistrict securities litigation.

        The Plaintiffs largely are institutional investors that
collectively lost between two and three billion dollars when
National Century collapsed in November 2002.  They allege that the
Founders orchestrated a massive Ponzi scheme.  National Century
financed itself by issuing investment-grade notes.  According to
the complaints, the Founders looted cooperate assets, such that
they had to cause the company to issue more notes in order to make
interest payments to noteholders and meet cash reserve
requirements.  Plaintiffs allege that the Founders likewise
misappropriated the proceeds from the sales of the new notes.  When
the fraudulent scheme came to light in 2002, National Century filed
for bankruptcy and Plaintiffs lost their investments.

        Plaintiffs assert numerous claims against the Founders.

Though the claims of the various Plaintiffs are not identical, there is significant overlap. Plaintiffs assert the following state law claims: fraud, misrepresentation, breach of fiduciary duty, negligence, aiding and abetting, conspiracy, unjust enrichment, and violations of the Blue Sky laws of numerous states. Certain Plaintiffs also assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a) respectively.

The Founders have filed numerous motions to dismiss the complaints against them. The Founders argue that the fraud and Section 10(b) claims fail to allege with particularity the role and mental state of each individual Founder. They argue that the complaints impermissibly rely on group pleading, without specifying how each Founder participated in the alleged wrongdoing. The Founders argue that the Plaintiffs' other claims fail as well, for various reasons.

The Court finds that the motions to dismiss should be denied, with a few exceptions explained below. The complaints plainly allege that the Founders conceived and carried out a massive fraud on investors, and they contain unmistakable allegations of how each Founder committed fraud and violated securities laws.

I.   **FACTUAL ALLEGATIONS**

    A.   <u>**Introduction**</u>

Lance Poulsen, Donald Ayers and Rebecca Parrett formed National Century Financial Enterprises, Inc. in Ohio in 1990. They operated the company as a healthcare finance firm. As such, National Century purchased accounts receivable from healthcare

2

providers, giving hospitals and medical firms a steady cash flow in exchange for a discount on the receivables. To generate funds to buy receivables, National Century issued investment-grade promissory notes. These notes were sold to institutional investors and were backed by purchased receivables.

National Century used special-purpose entities, most notably NPF VI, Inc. and NPF XII, Inc., to purchase receivables and issue notes. These entities were wholly owned by National Century. A Master Indenture governed the operation of each special-purpose entity. According to the complaints, NPF VI and NPF XII were supposed to purchase high-quality receivables (known as "eligible" receivables) and maintain significant pools of reserves.

National Century ran a successful business and became one of the nation's largest healthcare finance firms. NPF VI and NPF XII issued billions of dollars worth of notes. The notes received "AAA" ratings from Fitch, Inc. and Moody's Investors Services, Inc. – a rating typically reserved for bonds of the best quality.

Plaintiffs allege that despite National Century's apparent success, the Founders were looting corporate funds and causing NPF VI and NPF XII to violate the terms of the Master Indentures. According to Plaintiffs, National Century used noteholder money to purchase low-quality or even non-existent receivables from healthcare companies that the Founders controlled or had some financial interest in. These healthcare companies became overfunded because National Century paid them for receivables that had little or no value. The Founders then allegedly used their control of these companies to gain access to the overfunded amounts. Plaintiffs allege that the Founders treated the companies

3

as their personal "piggy banks."

**B.   The Founders and Related Defendants**

The complaints allege that Lance Poulsen was a founder, principal shareholder, chairman, chief executive officer, and director of National Century. Poulsen also served as president and director of NPF VI and NPF XII. Poulsen's wife, Barbara Poulsen, is named as a defendant in many of the complaints. She allegedly was a principal shareholder, secretary, treasurer, and director of National Century.

Donald Ayers was a founder, principal shareholder, vice-chairman, chief operating officer, and director of National Century. Ayers served as director of NPF VI and NPF XII.

Rebecca Parrett was a founder, principal shareholder, secretary, treasurer, and director of National Century.

The complaints also name as defendants certain companies that are alleged alter egos of the Founders. Kuld Corporation is the alleged alter ego of Lance Poulsen. E&D Investments, Inc. and Ayers LLC are the alleged alter egos of Ayers. Cheyenne-Blaze LLC is the alleged alter ego of Parrett.

**C.   The NPF VI and NPF XII Programs**

NPF VI and NPF XII both had trustees appointed to oversee their operations. JP Morgan Chase Bank served as Indenture Trustee for the NPF VI program, and Bank One, N.A. served as Indenture Trustee for the NPF XII program.

Master Indentures governed the operations of NPF VI and NPF XII. Under the Master Indentures, NPF VI and NPF XII periodically issued notes to investors and used the proceeds to purchase healthcare receivables. The Plaintiffs allege that the Master

4

Indentures required National Century to purchase "eligible" receivables. To be "eligible," a receivable had to meet certain criteria designed to lower the risk of default. These criteria included that the receivables be less than 180 days old and that they be billed to highly-rated payors, such as commercial insurers, managed healthcare organizations, Medicare, and Medicaid.

The Indentures further required trust accounts to be created for the purpose of offsetting the risk associated with buying receivables. One such account, the Equity Account, was required to have a minimum balance of 8.5% of the greater of the value of the notes outstanding or the net value of purchased receivables. The Seller Credit Reserve Account was required to have a balance of 6.5% of the outstanding amount owed on purchased receivables. The Offset Reserve Account was required to have a balance of at least 2% of the outstanding amount owed on purchased receivables. Monthly tests were conducted to check for compliance with the reserve levels.

### D.  **The Plaintiffs and Their Allegations of Wrongdoing**

The Founders have moved to dismiss the complaints filed by the following Plaintiffs: Metropolitan Life Insurance Company ("MetLife"); Lloyds TSB Bank PLC; the State of Arizona, the City of Chandler, and Crown Cork & Seal Company (collectively the "Arizona Noteholders"); the New York City Pension Funds; the Beacon Group III - Focus Value Fund, L.P. (the "Focus Value Fund"); and the Florida Class Action Plaintiffs.[1]

------

[1]  After the Defendants in the MDL filed their motions to dismiss, several Plaintiffs sought leave to amend their complaints. Defendants had an opportunity to incorporate their responses to certain of the proposed amended complaints in their reply briefs to the motions to dismiss. With respect to other proposed amended complaints, however, Defendants had already submitted

The Court's Order rules on all of these motions, but it does not address the Founders' motions to dismiss the lawsuit filed by the Unencumbered Assets Trust, nor does it deal with Poulsen's motion to dismiss the lawsuit filed against him by co-founder Rebecca Parrett.  The Court will consider those motions to dismiss in forthcoming orders.

### 1.    MetLife and Lloyds

MetLife is a New York corporation with its principal place of business in New York.  Between June 2001 and July 2002, MetLife purchased a total of $102.6 million of NPF XII notes.  In August 2002, MetLife's affiliate, Metropolitan Insurance and Annuity Company, purchased $18.46 million of notes from NPF XII.

Lloyds is a British public limited company with its principal place of business in London, England.  Lloyds purchased a total of $128 million of NPF XII notes in March 2001 and November 2002.

MetLife and Lloyds bring suit against Lance Poulsen, but not Ayers or Parrett.   They allege that NPF XII had a three-member board of directors composed of Poulsen, Harold Pote, and Eric Wilkinson.  Wilkinson was later replaced by Thomas Mendell.  The complaints sometimes refer to Poulsen individually and sometimes

---

their reply briefs by the time leave was sought.
    This order evaluates the motions to dismiss based on the complaints or proposed amended complaints to which Defendants had an opportunity to respond. In instances where leave to amend was sought after the Defendants had filed their reply briefs, the motion to dismiss is evaluated against the operative pleading at the time the motion was filed.
    To be clear, the Court is evaluating the Founders' motions to dismiss against the following complaints: MetLife's Third Amended Complaint, Lloyds's Third Amended Complaint, the State of Arizona's Second Amended Complaint, the City of Chandler's Second Amended Complaint, Crown Cork & Seal Company's First Amended Complaint, the New York City Pension Funds' Second Amended Complaint, the Focus Value Fund's First Amended Complaint, the Mahoney Florida Class Action Plaintiffs' Second Amended Complaint, and the Houlihan Florida Class Action Plaintiffs' First Amended Complaint.

refer to him as one of the "Directors."

MetLife and Lloyds allege that Poulsen was privy to information that made him aware, or should have made him aware, of NPF XII's failure to comply with the Master Indenture. The complaints cite a number of letters and reports, which Poulsen either received or authored, that discussed compliance problems with NPF XII. For instance, the complaints allege that Poulsen received a July 1, 1999 letter from National Century employee Sherry Gibson alerting him to the fact that National Century had overfunded a healthcare provider by $47 million. According to MetLife and Lloyds, National Century's principals "owned significant interests" in many of the healthcare providers from which National Century purchased receivables. Moreover, a September 21, 1999 letter from National Century employee Brian Stucke informed Poulsen of National Century's vast shortages, "poor collections," and "uncollateralized advances." Other letters and reports told Poulsen of severe depletions in the trust accounts, fraudulent billing anew or "re-aging" of older receivables, and the need to wire funds between National Century affiliates so that the trust accounts' required reserve levels would be satisfied at the time of monthly testing. The complaints further allege that Poulsen directed Indenture Trustee Bank One to wire funds back and forth between NPF VI and NPF XII in order to cover up trust account deficiencies.

MetLife and Lloyds claim that when they were prospective buyers of NPF XII notes, they received Private Placement Memoranda, Supplemental Private Placement Memoranda, and the Master Indenture (collectively, the "Offering Materials") concerning NPF XII. They

7

allege that these Offering Materials contained false representations by the Directors, of whom Poulsen was one. The false representations included, among other things, that: NPF XII would purchase eligible receivables only; NPF XII would be capitalized by National Century in accordance with the Indenture; and NPF XII would properly maintain the trust accounts. According to the complaints, the Directors stated in the Offering Materials that they had taken reasonable care to insure accuracy of the information contained in the Materials and that they accepted responsibility for the Materials.

MetLife and Lloyds allege that NPF XII impermissibly used the proceeds generated from the sales of notes. Rather than buy eligible receivables, NPF XII allegedly advanced money, unsecured, to healthcare providers for future or nonexistent receivables. Eventually, NPF XII's reserves became depleted and MetLife and Lloyds lost their investments.

MetLife asserts the following claims against Poulsen: violations of Sections 10(b) and 20(a) of the Securities Exchange Act, violations of Ohio's and New Jersey's Blue Sky laws, fraud, misrepresentation, negligence, and breach of fiduciary duty. Lloyds asserts the following claims against Poulsen: violations of Section 20(a) of the Securities Exchange Act, violations of Ohio's and New Jersey's Blue Sky laws, and breach of fiduciary duty.

### 2.  The Arizona Noteholders

The Arizona Noteholders are a large collection of investors, many of them Arizona governmental entities, who purchased about $1.4 billion of NPF VI and NPF XII notes between 1998 and 2002. Some of the Arizona Noteholders lack any direct connection to

8

Arizona, but they are included in the group because they joined in lawsuits originally filed in Arizona. Attached to the Arizona Noteholder complaints are detailed lists of when and how much each plaintiff invested in NPF VI and NPF XII.

The Arizona Noteholders bring suit against each of the Founders, as well as Barbara Poulsen, Kuld Corp., and E&D Investments. Their complaints contain many of the same allegations made by MetLife and Lloyds. The complaints allege that the Offering Materials given to the Arizona Noteholders contained many fraudulent misrepresentations and omissions. The complaints specify what those misrepresentations were, including that NPF VI and NPF XII would purchase eligible receivables only and that trust accounts would be maintained at certain reserve levels. Further, the complaints allege that the Offering Materials failed to disclose the Founders' ownership interests in certain healthcare providers.

The Arizona Noteholders allege that Lance Poulsen was National Century's "public face" who met with investors to promote the notes issued by NPF VI and NPF XII. They contend that Barbara Poulsen helped found National Century and served on its board of directors. The complaints further allege that the Poulsens, along with Ayers and Parrett, were active in the management of National Century and played integral roles in conceiving and carrying out the scheme to defraud investors. The Founders allegedly engaged in a practice of re-aging receivables whereby outdated receivables were billed anew so that they did not violate the aging provisions of the Master Indentures. The Arizona Noteholders further allege that the Founders used certain terminology like "pro forma funding" and

"advance" funding" to refer to their practice of advancing funds on an unsecured basis to healthcare providers for future receivables. The complaints quote a December 13, 1999 letter from Poulsen to Parrett and allege that it shows the Founders' knowledge of practices – including pro forma funding and the re-aging of receivables – that violated the Master Indentures.

The Arizona Noteholders assert the following claims: fraud, misrepresentation, conspiracy, unjust enrichment, aiding and abetting, breach of fiduciary duty, negligence, and violations of the Blue Sky laws many states.

### 3.    The New York City Pension Funds

The New York City Pension Funds are a group of public pension funds in charge of managing the assets of various New York City employees and retirees.  The New York Funds purchased $89 million of NPF XII notes in October 2000 and May 2002.

The New York Funds bring suit against the Founders and Barbara Poulsen.  They contend that the Founders and Barbara Poulsen used their control over National Century and NPF XII to defraud investors.  The New York Funds allege that the Offering Materials led them to believe that the notes they purchased were a legitimate investment.  But, according to the New York Funds, the Offering Materials were false and misleading for the same reasons that the other Plaintiffs have stated.  The New York Funds allege that the Founders, as officers and directors, reviewed and approved the Offering Materials given to potential investors.

The New York Funds assert claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act, fraud, negligence, and breach of fiduciary duty.

### 4.    The Focus Value Fund

The Focus Value Fund is a Delaware limited partnership with its principal place of business in New York. The Focus Value Fund did not purchase notes from NPF VI or NPF XII. Rather, it invested $40 million in National Century through a July 1998 stock purchase agreement. Ten million dollars of the investment was paid directly to the Founders, with the remaining $30 million paid to National Century. Under the agreement, the Focus Value Fund acquired a 19% equity position in National Century.

The Focus Value Fund brings suit against each of the Founders, as well as Barbara Poulsen, Kuld Corp., and E&D Investments, Ayers LLC, and Cheyenne-Blaze LLC. The Focus Value Fund alleges that the Founders had already implemented their scheme to defraud noteholders by the time it invested in National Century.

The Focus Value Fund received a Private Placement Memorandum in February 1998 when it was a prospective investor. The Focus Value Fund alleges that the Memorandum was false and misleading in many ways. For instance, the Memorandum stated that the note programs had experienced no instances of noncompliance with the Master Indentures, when in reality the programs had already adopted the practice of improperly assigning receivables. Further, the Memorandum allegedly misstated various pieces of financial information about National Century and misrepresented that its reserves were adequate to cover any future losses. The Focus Value Fund also contends that the Founders made similar misrepresentations and material omissions during the Fund's due diligence investigation of National Century.

The Focus Value Fund further alleges that the Founders

11

continued to conceal their alleged fraud even after the stock purchase. The complaint cites a number of letters and reports to show that the Founders had knowledge of the note programs' violations of the Master Indentures. The Fund alleges that the Founders advanced hundreds of millions of dollars to healthcare providers in exchange for non-eligible receivables and that the Founders held ownership interests in those healthcare providers. According to the complaint, the Founders issued false reports and wired funds among National Century affiliates to conceal the fraud. The Founders also allegedly used their alter ego companies to acquire interests in healthcare providers, such that their was no direct link between the Founders and the healthcare providers.

The Focus Value Fund asserts claims for fraud, negligence, breach of fiduciary duty, and indemnification.

### 5. The Florida Class Action Plaintiffs

The Florida Class Action Plaintiffs are investors of a different sort. They are persons who purchased securities in the company e-MedSoft.com, a provider of software services to healthcare companies. The class period runs from December 2000 to February 2002. The Florida Class Action Plaintiffs originally filed two separate complaints, one by John Houlihan and one by Michael Mahoney, but their cases are now consolidated.

The Florida Plaintiffs bring suit against the Founders, Barbara Poulsen, Ayers LLC, and Cheyenne-Blaze LLC. Plaintiffs allege that National Century purchased 9.5 million shares of e-Medsoft stock in February 2000 and announced that e-MedSoft would develop software products to support National Century's operations. Plaintiffs contend that National Century and the Founders

12

substantially controlled e-MedSoft and used it as their "piggy bank." According to Plaintiffs, National Century advanced money to e-MedSoft for future or non-existent receivables, thereby overfunding e-MedSoft by about $100 million.

Beginning in December 2000, e-MedSoft allegedly issued a series of misleading press releases and submitted misleading filings with the Securities and Exchange Commission. These press releases and filings spoke favorably of e-MedSoft's plans to acquire or merge with other companies. These statements were misleading, the Florida Plaintiffs allege, because they: (1) failed to disclose the financial ties existing among e-MedSoft, National Century, the Founders, and the target companies, and (2) gave false impressions that e-MedSoft had adequate financing to complete the transactions.

The Florida Plaintiffs allege that the value of e-MedSoft's stock rose on the news of e-MedSoft's plans. Plaintiffs further contend that the value of e-MedSoft's stock plummeted as the alleged wrongdoing at National Century came to light. The stock was delisted from the American Stock Exchange in July 2002.

The Florida Class Action Plaintiffs assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act. They assert no further claims against the Founders.

## II.  JURISDICTION

As an initial matter, Defendants Poulsen and Parrett have challenged this Court's subject matter jurisdiction over the Focus Value Fund's suit, which asserts no federal causes of action. The Fund's complaint asserts that the Court has "related to" bankruptcy

jurisdiction under 28 U.S.C. 1334(b).  That provision grants federal district courts "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. §1334(b).  The test for determining "related to" jurisdiction is "whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."  <u>In re Dow Corning Corp.</u>, 86 F.3d 482, 489 (6th Cir. 1996) (quoting <u>Pacor, Inc. v. Higgins</u>, 743 F.2d 984, 994 (3d Cir. 1984)).

The Court has fully addressed this issue in a previous order. <u>See</u> June 10, 2004 Opinion and Order, pp. 9-15 (finding that "related to" jurisdiction exists in the National Century MDL).  For the reasons stated in the June 10, 2004 Opinion and Order, Poulsen's and Parrett's motions to dismiss the Focus Value Fund's complaint for lack of subject matter jurisdiction are denied.

## III. MOTION TO DISMISS STANDARD OF REVIEW

When considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974); <u>Roth Steel Prods. v. Sharon Steel Corp.</u>, 705 F.2d 134, 155 (6th Cir. 1982).  A complaint may be dismissed for failure to state a claim only where "it appears a beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).  A motion to dismiss under Rule 12(b)(6) will be granted if the complaint is without merit due to an absence of law to support

14

a claim of the type made or of facts sufficient to make a valid claim, or where the face of the complaint reveals that there is an insurmountable bar to relief.  Rauch v. Day & Night Mfg. Corp., 576 F.2d 697 (6th Cir. 1978).

Because a motion under Rule 12(b)(6) is directed solely to the complaint itself, the court must focus on whether the claimant is entitled to offer evidence to support the claims, rather than whether the plaintiff will ultimately prevail.  Scheuer, 416 U.S. at 236; Roth Steel Prods., 705 F.2d at 155.  A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory.  Weiner v. Klais & Co., Inc., 108 F.3d 86, 88 (6th Cir. 1997).  The court is not required to accept as true unwarranted legal conclusions or factual inferences.  Morgan v. Church's Fried Chicken, 829 F.2d 10 (6th Cir. 1987).  Nor may the court consider extrinsic evidence in determining whether a complaint states a claim.  Roth Steel Prods., 705 F.2d at 155; Sims v. Mercy Hosp. of Monroe, 451 F.2d 171, 173 (6th Cir. 1983).

## IV.  STATE LAW CLAIMS

### A.  Choice of Law

The Court has not yet made a choice-of-law determination.  This multidistrict litigation includes cases from a number of states, and, as the New York Funds note, there are plausible arguments for applying the law of several of those states.  The Court agrees with the New York Funds' conclusion that the facts need further development before a choice-of-law determination can properly be made.

15

In determining whether Plaintiffs' common law claims can survive a motion to dismiss, the Court will look to Ohio law. Unless noted otherwise, there is no argument that Ohio law varies from the law of other states in any way pertinent to the matters at hand.

**B.**    **Fraud and Misrepresentation**

    **1.    Alleging Fraud with Particularity, Rule 9(b)**

The Founders argue that Plaintiffs' claims for fraud and misrepresentation fail under Fed. R. Civ. P. 9(b), which requires that averments of fraud and the circumstances constituting the fraud be stated with "particularity."  "In complying with Rule 9(b), a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" Walburn v. Lockheed Martin Corp., 431 F.3d 966, 972 (6th Cir. 2005) (quoting Coffey v. Foamex L.P., 2 F.3d 157, 161-62 (6th Cir. 1993)).

After reviewing the complaints, the Court finds that Plaintiffs' common law claims for fraud and misrepresentation satisfy Rule 9(b).  The complaints allege that the misrepresentations were made in the Offering Materials which Plaintiffs received when purchasing notes, or, in the Focus Value Fund's case, when purchasing stock.  The complaints specify the dates when each Plaintiff purchased notes.  Plaintiffs make extensive allegations of how the Offering Materials were misleading.  The most common of these allegations is that the Offering Materials falsely represented that NPF VI and NPF XII would purchase eligible receivables only, falsely represented that

16

trust accounts would be maintained at certain reserve levels, and failed to disclose that the Founders had ownership interests in certain healthcare providers. The Founders allegedly made these misrepresentations and omissions in order to gain the confidence of potential investors. Once the investments were made, the Founders allegedly took investors' money and funneled it to healthcare companies they owned. With respect to scienter, Plaintiffs plainly allege that the Founders orchestrated the fraud and knowingly, or at least recklessly, made the misrepresentations and concealed their wrongdoing. Finally, the Plaintiffs allege that they invested and lost hundreds of millions, if not billions, of dollars as a result of the fraud.

The Founders object to what they perceive as the complaints' undue reliance on group pleading. Traditionally, courts have permitted plaintiffs to use group pleading. The "group pleading" or "group published" doctrine is "premised on the assumption that '[i]n cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other "group-published information," it is reasonable to presume that these are the collective actions of the officers.'" City of Monroe Employees Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 689 (6th Cir. 2005) (quoting Wool v. Tandem Computers Inc., 818 F.2d 1433, 1440 (9th Cir. 1987)). "'Under such circumstances, a plaintiff fulfills the particularity requirement of Rule 9(b) by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations.'" In re SmarTalk Teleservices, Inc. Sec. Litig., 124 F.Supp.2d 527, 545

17

(S.D. Ohio 2000) (quoting <u>Wool</u>, 818 F.2d at 1440).

Since the passage of the Private Securities Litigation and Reform Act, 15 U.S.C. §78u-4(b), federal courts have disagreed on whether the group pleading doctrine may be used to assert a claim under §10(b) of the Securities Exchange Act.  <u>See</u> <u>City of Monroe Employees Ret. Sys. v. Bridgestone Corp.</u>, 399 F.3d 651, 689-90 (6th Cir. 2005) (citing cases); <u>Makor Issues & Rights, Ltd. v. Tellabs, Inc.</u>, __ F.3d __, 2006 WL 172142, at *12 (7th Cir. Jan. 25, 2006) (finding that the group pleading doctrine does not satisfy the heightened pleading requirements of the Private Securities Litigation and Reform Act).  However, this disagreement has arisen within the context of federal claims under §10(b), which will be discussed later.  The Court finds no barrier to Plaintiffs relying on group pleading to state a claim for common law fraud.

The Court disagrees with the Founders' argument that the complaints fail to specifically connect the individual Founders to the alleged misrepresentations.  The complaints spell out exactly which positions Poulsen, Ayers, and Parrett held with National Century, NPF VI, and NPF XII.  Each complaint either directly alleges or supports an inference that Poulsen, Ayers, and Parrett reviewed and approved the Offering Materials, despite knowing that the Offering Materials contained misrepresentations and material omissions.  And the complaints allege that the Founders actively concealed their wrongdoing from Plaintiffs after the note purchases were made.  In sum, the Court finds that Plaintiffs have satisfied the pleading requirements of Rule 9(b).

### 2. Elements of a Fraud Claim

The elements of common law fraud are: (1) a representation or,

where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. Russ v. TRW, Inc., 59 Ohio St.3d 42, 49, 570 N.E.2d 1076, 1083-84 (Ohio 1991).

The Court finds that Plaintiffs have sufficiently alleged these elements. The complaints allege that the Offering Materials contained misrepresentations that were material to the note purchases. The misrepresentations were material because they went to the quality of the notes – for instance, the Offering Materials assured investors that NPF VI and NPF XII would purchase only eligible receivables. The complaints allege that the Founders knew of the falsity of those representations and intended Plaintiffs to rely on them so that the Founders could carry out their Ponzi scheme. The complaints allege that Plaintiffs relied on those misrepresentations in purchasing notes and, in doing so, have lost their investments.

Justifiable reliance is the focus of Defendant Ayers's motion to dismiss. He argues that the Arizona Noteholders fail to allege that element. However, the Arizona Noteholders clearly alleged that the Offering Materials induced them to purchase the notes. See, e.g., State of Arizona Second Am. Compl., ¶¶3, 10, 11, 20.

With respect to the complaints of the New York City Pension Funds and the Focus Value Fund, Ayers argues that any reliance on

19

the Offering Materials was not justifiable because those Plaintiffs knew of the fraud allegedly taking place at National Century.  But the Court finds that the issue of whether Plaintiffs knew of the alleged fraud before making their investments is a factual dispute not appropriate for resolution on a motion to dismiss.  See Lepera v. Fuson, 83 Ohio App.3d 17, 26, 613 N.E.2d 1060, 1065 (Ohio Ct. App. 1992) (noting that the "question of justifiable reliance is one of fact").

### 3.    Rule 8(a)

Ayers further argues that the Arizona Noteholders' fraud claims fail to comply with the pleading standard of Rule 8(a), Fed. R. Civ. P.  Under Rule 8(a), a complaint shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Ayers contends that the Arizona Noteholders' "voluminous" complaints violate Rule 8.

Though the Arizona complaints are indeed lengthy, this reflects the magnitude of the fraud being alleged against the Founders and other defendants.  The Court finds that the complaints satisfy Rule 8.  The Arizona complaints put Ayers on notice of the reasons why he is being sued for fraud.  See Conley v. Gibson, 355 U.S. 41, 48 (1957) (stating that "all" Rule 8 requires of a complaint is to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

### 4.    Statute of Limitations

Defendant Parrett argues that the Focus Value Fund's fraud claim is time-barred.  Ohio has a four-year statute of limitations for claims of fraud.  See Ohio Rev. Code §2305.09(C).  A "discovery rule" applies to the limitations period, such that the period runs

20

from the date of reasonable opportunity to discover the fraud. <u>See</u> Ohio Rev. Code §2305.09 (cause of action does not accrue "until the fraud is discovered"); <u>Bossey v. Al Castrucci, Inc.</u>, 105 Ohio App.3d 666, 669, 664 N.E.2d 1301, 1303 (Ohio Ct. App. 1995) ("The limitations period begins to run when the claimant discovered or, in the exercise of reasonable care, should have discovered the fraud."). According to Parrett, the Focus Value Fund had reasonable opportunity to discover the alleged fraud when it performed its due diligence investigation in 1997 and 1998. The Fund did not file suit until 2004.

The Court finds that Parrett has raised a factual issue not appropriate for resolution at this time. The complaint does state that the Focus Value Fund conducted a due diligence investigation, but it contains no admission that the Focus Value Fund knew or should have known of the alleged fraud at that time. Rather, the complaint alleges that the Founders concealed their alleged wrongdoing from the Focus Value Fund.[2]

C. **Blue Sky Law Claims**

MetLife, Lloyds, and the Arizona Noteholders assert claims under the Blue Sky laws of various states. Generally speaking, Blue Sky laws prohibit the use of fraud in connection with the sale of securities. <u>See</u>, <u>e.g.</u>, Ariz. Rev. Stat. §§44-1991, 44-2001; N.J. Rev. Stat. §49:3-71; Ohio Rev. Code §§1707.41, 1707.44.

---

[2] The Founders also make statute of limitations arguments against the Focus Value Fund's claims for breach of fiduciary duty, negligence, and conspiracy. As they point out, the discovery rule generally does not apply to non-fraud claims. <u>See</u> <u>Orvets v. National City Bank</u>, 131 Ohio App.3d 180, 189, 722 N.E.2d 114, 120 (Ohio Ct. App. 1999). But when, as here, those claims include allegations of fraud, such as a fraudulent breach of fiduciary duty, the discovery rule does apply. <u>Id</u>.

### 1.    Particularity

Defendant Poulsen argues that MetLife's and Lloyds's Blue Sky law claims fail because they rest on conclusory allegations of fraud.  Poulsen further argues that the complaints fail to connect him to the misrepresentations allegedly contained in the Offering Materials.

The Court finds Poulsen's argument unconvincing.  MetLife's and Lloyds's complaints identify which statements in the Offering Materials they believe were false, allege that these misrepresentations induced them to purchase notes, allege that Poulsen had knowledge of the misrepresentations, and allege that Poulsen participated in preparing the Offering Materials.  The complaints make a clear connection between Poulsen and the alleged misrepresentations.  According to the complaints, the Offering Materials expressly stated that the NPF XII directors – of whom Poulsen was one – took "all reasonable care" to ensure the accuracy of the Materials and "accept[ed] responsibility accordingly."  See, e.g., MetLife Third Am. Compl., ¶93.

### 2.    Private Cause of Action – New Jersey

Poulsen further argues that MetLife's and Lloyds's claim under N.J. Rev. Stat. §49:3-52 must be dismissed because that provision does not create a private cause of action.  Poulsen cites Resolution Trust Corp. v. Del Re Castellet, No. 92-4635, 1993 WL 85973 (D.N.J. March 8, 1993), where the court concluded that "a private cause of action for defrauded sellers was not intended under N.J.S.A. 49:3-52."  1993 WL 85973, at *5-6 (citing cases).

The Court agrees with Poulsen's argument.  The Resolution Trust case and the cases cited therein squarely hold that there is

no private right of action under N.J. Rev. Stat. §49:3-52.  <u>See also</u> N.J. Rev. Stat. §49:3-71(j) (stating that New Jersey's Blue Sky law "does not create any cause of action not specified in [§49:3-71]"). The Court could find no authority to the contrary, nor do Plaintiffs cite to any cases otherwise.  Therefore, MetLife's and Lloyds's claims under §49:3-52 are dismissed.

It should be noted that MetLife and Lloyds also asserted claims under N.J. Rev. Stat. §49:3-71. Poulsen raises no objection to the §49:3-71 claims.  Those claims, therefore, survive the motion to dismiss.

### 3.    Commerce Clause Challenge

The Arizona Noteholders assert claims under the Blue Sky laws of more than a dozen states.  Poulsen argues that there is no nexus between the alleged wrongdoing on his part and those states.  He contends that enforcing the Blue Sky law of any state but Arizona would amount to an extraterritorial application of those laws, in violation of the Commerce Clause of the United States Constitution.

The Court agrees that the Blue Sky law of California, for instance, could not be lawfully applied to a transaction with no connection to California.  <u>See</u> <u>Edgar v. MITE Corp.</u>, 457 U.S. 624, 642-643 (1982) ("The Commerce Clause also precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State."). Nevertheless, the complaints make clear that the "Arizona" Noteholders include parties from many different states. The complaints explain the connections that specific Plaintiffs have with particular states.  For example, the complaints allege that a certain group of Plaintiffs known as the "Lincoln

Plaintiffs" purchased notes in Illinois.  On the face of the complaint, the Lincoln Plaintiffs' assertion of an Illinois Blue Sky law claim would not violate the Commerce Clause.  <u>See</u> <u>Hall v. Geiger-Jones Co.</u>, 242 U.S. 539 (1917) (upholding Ohio's Blue Sky law because the statutory language limited the law's application to transactions within Ohio).  <u>See also</u> <u>Caldwell v. Sioux Falls Stock Yards Co.</u>, 242 U.S. 559 (1917), and <u>Merrick v. N.W. Halsey & Co.</u>, 242 U.S. 568 (1917) (collectively known as the "Blue Sky Cases").  The Court will allow the Arizona Noteholders to assert claims under the Blue Sky laws of the states with which they have a connection.

     D.  **Breach of Fiduciary Duty**

Plaintiffs assert that the Founders breached their fiduciary duties to NPF VI and NPF XII noteholders.  They allege that the Founders, in their capacity as corporate officers, breached their duty not to waste corporate assets while National Century was insolvent.  "Under long-standing Ohio law, the officers and directors of a corporation that is insolvent or is on the brink of insolvency owe a fiduciary duty to the corporation itself and to its creditors not to waste corporate assets which otherwise could be used to pay corporate debts." <u>DeNune v. Consolidated Capital of North America, Inc.</u>, 288 F.Supp.2d 844, 859 (N.D. Ohio 2003).

     1.  **Insolvency**

Defendant Poulsen recognizes that officers owe creditors a fiduciary duty not to waste corporate assets while the company is insolvent.  Yet Poulsen argues that the wrongdoing alleged in the complaints took place before National Century became insolvent.  Poulsen contends that National Century was not insolvent until it filed for bankruptcy in 2002.

Plaintiffs respond that "insolvency" means something different than filing for bankruptcy. The Court agrees and finds that Plaintiffs have stated a claim for breach of fiduciary duty. Traditionally, a person is insolvent when his liabilities exceed the fair value of his assets. See O.R.C. §1336.02; Abood v. Nemer, 128 Ohio App.3d 151, 157, 713 N.E.2d 1151, 1155 (Ohio Ct. App. 1998); Prudential Ins. Co. of Am. v. Science Park, L.P., 106 Ohio App.3d 823, 830, 667 N.E.2d 437, 442 (Ohio Ct. App. 1995). The complaints allege that the Founders drove National Century into insolvency by massively overfunding healthcare providers. The Founders allegedly funneled hundreds of millions of dollars to healthcare providers in exchange for receivables that had little or no value. According to Plaintiffs, National Century lost over $2 billion by the time it filed for bankruptcy. The Court thus finds that the complaints adequately allege that the Founders wasted corporate assets while National Century was insolvent.

### 2. Preemption

Defendant Ayers argues that the New York Funds' breach of fiduciary duty claim is preempted by New York's Blue Sky law, known as the Martin Act. See N.Y. Gen. Bus. Law, Art. 23-A, §§352 *et seq.* The Act prohibits "fraudulent and deceitful practices in the distribution, exchange, sale and purchase of securities." Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 190 (2d Cir. 2001). A majority of New York state and federal courts have held that the Martin Act "precludes a private right of action for common law claims the subject matter of which is covered by the Martin Act." Pro Bono Investments, Inc. v. Gerry, No. 03 Civ 4347, 2005 WL 2429787, at *16 (S.D.N.Y. Sept. 30, 2005) (citing cases). These

25

courts have dismissed breach of fiduciary duty claims which allege wrongs within the Martin Act's purview.  See, e.g., Gabriel Capital, L.P. v. Natwest Finance, Inc., 137 F.Supp.2d 252, 266-67 (S.D.N.Y. 2000); Horn v. 440 East 57th Co., 547 N.Y.S.2d 1, 5 (N.Y. App. Div. 1989).  A minority of courts have held that the Martin Act has no preemptive effect.  See Scalp & Blade, Inc. v. Advest, Inc., 722 N.Y.S.2d 639 (N.Y. App. Div. 2001); Cromer Fin. Ltd. v. Berger, No. 00 Civ. 2498, 2001 WL 1112548, at *4 (S.D.N.Y. Sept. 19, 2001).

Ayers's argument highlights one area where Ohio law and the law of another state seem to differ.  As stated above, the Court is not prepared to make a choice-of-law determination at this time. Even so, the Court finds that the New York Funds' fiduciary duty claim rests on allegations that are outside the purview of the Martin Act.  The complaint alleges that Ayers breached his duty to the New York Funds because he wasted corporate assets while National Century, NPF VI, and NPF XII were insolvent.  This claim is different in nature from a typical Martin Act claim based on fraud in the sale and purchase of securities.  The New York Funds could conceivably fail on their Martin Act claim against Ayers but still have a viable claim for breach of fiduciary duty.  In other words, the evidence could show that Ayers made no misrepresentations to the New York Funds in connection with their purchase of notes, but that he still wasted corporate assets after National Century went insolvent.[3]

    **3.  Standing**

---

[3] Ayers also makes a preemption argument against the New York Funds' negligence claim.  That argument is rejected for the same reasons.

26

The Founders oppose the Focus Value Fund's breach of fiduciary duty claim on the grounds that the Fund lacks standing to bring suit. They argue that an action by a stockholder against a corporation to recover funds wrongfully taken by a corporate officer is a derivative action in the corporation's favor. See Grand Council of Ohio v. Owens, 86 Ohio App.3d 215, 221, 620 N.E.2d 234, 238 (Ohio Ct. App. 1993). Shareholders must comply with the requirements of Ohio R. Civ. P. 23.1 to bring a derivative action. The Founders argue that the Focus Value Fund did not comply with Rule 23.1.

The general corporate-law rule cited by the Founders does not apply to the factual situation alleged in the Focus Value Fund's complaint. The complaint alleges that National Century was a close corporation, with the Founders owning over 80% of the stock even after the Focus Value Fund became a shareholder. The complaint alleges that the Founders used their majority interest and executive positions to exercise "complete control" of National Century to their advantage. In such a circumstance, a minority shareholder may bring a direct action against the majority owners and need not comply with Ohio R. Civ. P. 23.1:

> Where majority or controlling shareholders in a close corporation breach their heightened fiduciary duty to minority shareholders by utilizing their majority control of the corporation to their own advantage, without providing minority shareholders with an equal opportunity to benefit, such breach, absent a legitimate business purpose, is actionable. Where such a breach occurs, the minority shareholder is individually harmed. When such harm can be construed to be individual in nature, then a suit by a minority shareholder against the offending majority or controlling shareholders may proceed as a direct action.

Crosby v. Beam, 47 Ohio St.3d 105, 109, 548 N.E.2d 217, 221 (Ohio

1989).

### E. Negligence and Gross Negligence

Plaintiffs have asserted claims for negligence against the Founders. To prevail on a claim for negligence, the plaintiff must prove: (1) the existence of a duty owed by the defendant to the plaintiff, (2) breach of that duty, (3) causation, and (4) damages. See Menifee v. Ohio Welding Products, Inc., 15 Ohio St.3d 75, 77, 472 N.E.2d 707, 710 (Ohio 1984).

Defendant Poulsen argues that the negligence claims fail because he owed no duty of care to Plaintiffs. Poulsen cites Associated Ins. Mgmt. Corp. v. Delta General Agency, Inc., No. 99-6495, 2000 WL 1909392, at *4 (6th Cir. Dec. 28, 2000), for the proposition that corporate officers are not liable to creditors for simple mismanagement of the company.

While Poulsen correctly states the general rule, an exception exists whereby officers can owe a duty to creditors under "special circumstances" such as "fraud, insolvency, or a violation of a statute." Geyer v. Ingersoll Publications Co., 621 A.2d 784, 787 (Del. Ch. 1992) (quoted in Associated Ins. Mgmt., 2000 WL 1909392, at *4). Plaintiffs have alleged both that Poulsen engaged in fraud and that National Century was insolvent; thus, they have stated a basis for Poulsen owing a duty of care.

### F. Aiding and Abetting

The Arizona Noteholders assert a claim for aiding and abetting. They allege that the Defendants knowingly and substantially assisted each other in fraudulently offering NPF VI and NPF XII notes.

The tort of civil aiding and abetting has two elements: "(1)

28

knowledge that the primary party's conduct is a breach of duty and (2) substantial assistance or encouragement to the primary party in carrying out the tortious act." Andonian v. A.C. & S., Inc., 97 Ohio App.3d 572, 574-75, 647 N.E.2d 190, 191-92 (Ohio Ct. App. 1994). See also Aetna Cas. and Sur. Co. v. Leahey Const. Co., 219 F.3d 519, 533 (6th Cir. 2000).

Defendant Poulsen argues that the aiding and abetting claim must be dismissed because it relies on group pleading and does not specify the roles of each of the Founders. But again, the Court finds no barrier to Plaintiffs relying on group pleading to state a common law claim. Indeed, an aiding and abetting claim rests on the existence of multiple tortfeasors. See Andonian, 97 Ohio App.3d at 574-75, 647 N.E.2d at 191-92 (requiring "substantial assistance"). The Arizona Noteholders have stated a claim for aiding and abetting because their complaints specify what positions the Founders held and allege that the Founders knowingly organized and assisted each other in executing the fraudulent scheme.

### G. Conspiracy

The Arizona Noteholders assert a claim for civil conspiracy. Defendant Poulsen argues that this claim fails because "there is no underlying tort alleged." Ohio and Arizona law both require the existence of an underlying tort in order to state a claim for conspiracy. See Gosden v. Louis, 116 Ohio App.3d 195, 219, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996) ("[A]n underlying unlawful act is required before a civil conspiracy claim can be successful."); Guy v. City of Phoenix, 668 F.Supp. 1342, 1352 (D. Ariz. 1987).

Poulsen's argument must be rejected because the Arizona Noteholders have alleged at length that Poulsen engaged in tortious

29

conduct, including fraud and breach of fiduciary duty.

**H.    Unjust Enrichment**

The Arizona Noteholders also assert a claim for unjust enrichment.  They allege that the Founders wrongfully benefited from the note offerings because they received "some type of compensation, payment, or fee" in connection with the offerings. State of Ariz Second Am. Compl., ¶327.

A claim for unjust enrichment requires the following elements: "(1) a benefit upon the defendant, (2) the defendant's knowledge of the benefit, and (3) that it would be unjust for the defendant to retain the benefit without payment." Hiram College v. Courtad, 162 Ohio App.3d 642, 646, 834 N.E.2d 432, 435 (Ohio Ct. App. 2005). See also Arnold & Assoc., Inc. v. Misys Healthcare Sys., 275 F.Supp.2d 1013, 1025 (D. Ariz. 2003).

Defendant Poulsen argues that the Arizona Noteholders have failed to allege the elements of an unjust enrichment claim.  The Court disagrees.  The Arizona Noteholders have alleged that they conferred a benefit ("compensation, payment, or fee") on the Founders.  The allegations support an inference that the Founders knew of the benefit and that, given the Founders' alleged fraudulent conduct in gaining the benefit, it would be unjust for them to retain it.

**I.    Indemnity**

The Focus Value Fund has asserted a claim for indemnity against the Founders.  Many of the other lawsuits in the National Century MDL name the Focus Value Fund as a defendant.  Those suits allege that the Fund knowingly participated in the Founders' alleged wrongdoing.  The Fund's complaint asserts that if it incurs

30

liability in the MDL, the Founders must indemnify the Fund.

Indemnity "arises from contract, express or implied, and is a right of a person who has been compelled to pay what another should pay in full to require complete reimbursement." <u>Travelers Indemnity Co. v. Trowbridge</u>, 41 Ohio St.2d 11, 13-14, 321 N.E.2d 787, 789 (Ohio 1975). "The right to indemnity requires an allegation of some implied or express contract creating a duty by one party to indemnify the other." <u>Yank v. Howard Hanna Real Estate Services</u>, No. 02 CA 117, 2003 WL 21500191, at *3 (Ohio Ct. App. June 27, 2003).

The Founders argue that the Fund has failed to allege any basis for its indemnity claim. They contend that the complaint does not point to any contractual obligation, express or implied, by which the Fund is entitled to indemnification.

The Focus Value Fund argues that Ohio courts have found implied contracts of indemnity when a close relationship exists between two parties. They cite <u>Reynolds v. Physicians Ins. Co. of Ohio</u>, 68 Ohio St.3d 14, 623 N.E.2d 30 (Ohio 1993), where the Ohio Supreme Court held that "[a]n implied contract of indemnity should be recognized in situations involving related tortfeasors, where the one committing the wrong is so related to a secondary party as to make the secondary party liable for the wrongs committed solely by the other." 68 Ohio St.3d at 16, 623 N.E.2d at 31. Examples of such relationships include "wholesaler/retailer, abutting property owner/municipality, independent contractor/employer, and master/servant." <u>Id</u>. (citation omitted). The Fund argues that its relationship with the Founders was like that of a master/servant because the Founders, as fiduciaries, acted as the Fund's agents.

The Court finds that the Focus Value Fund's claim for indemnity fails as a matter of law. "Indemnification is not allowed when the two parties are joint or concurrent tortfeasors and are both chargeable" with wrongdoing. Reynolds, 68 Ohio St.3d at 16, 623 N.E.2d at 31-32. Where the Fund is named as a defendant in this multidistrict litigation, it is being sued for its own alleged wrongdoing. Plaintiffs do not attempt to hold the Fund vicariously liable for wrongs committed solely by the Founders. If the evidence proves, as the Fund alleges it will, that the Founders are indeed responsible for National Century's collapse (and the Fund fully innocent), then the claims against the Fund will fail and there will be nothing to indemnify it for.

## V.  SECURITIES ACT CLAIMS

### A.  Section 10(b) Claims

#### 1.  Pleading Standard

Section 10(b) of the Securities Exchange Act and Rule 10b-5(b) promulgated thereunder prohibit "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security." Morse v. McWhorter, 290 F.3d 795, 798 (6th Cir. 2002); see 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5(b). To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege, in connection with the purchase or sale of securities: "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) justifiably relied on by plaintiffs, and (5) proximately causing them injury." Helwig v. Vencor, Inc., 251 F.3d 540, 554 (6th Cir. 2001); In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 548 (6th Cir. 1999).

32

The Founders argue that Plaintiffs' Section 10(b) claims fail to meet the heightened pleading requirements of the Private Securities Litigation and Reform Act ("PSLRA"), 15 U.S.C. §78u-4(b). The PSLRA requires that securities fraud complaints "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1). Moreover, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.A. §78u-4(b)(2).

The Sixth Circuit has described the PSLRA's provisions as "[a]dding to the Federal Rules of Civil Procedure 9(b) requirement that fraud must be stated with particularity." In re Ford Motor Co. Sec. Litig., 381 F.3d 563, 567 (6th Cir. 2004). "[N]ot only must the complaint make particular factual allegations, but the inference of scienter which those allegations generate must be strong." PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 682 (6th Cir. 2004).

The strength of the inference of scienter "depends on how closely a conclusion of misconduct follows from a plaintiff's proposition of fact." Helwig, 251 F.3d at 553. But the inference from the complaint need not be irrefutable. Id. "Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder. Rather, the 'strong inference' requirement means that plaintiffs

33

are entitled only to the most plausible of competing inferences." _Id_. "The PSLRA does not change the Rule 12(b)(6) maxim that when an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." _PR Diamonds_, 364 F.3d at 682; _see also Helwig_, 251 F.3d at 553 ("Our willingness to draw inferences in favor of the plaintiff remains unchanged by the PSLRA.").

The requisite state of mind in a Section 10(b) case is scienter, a mental state embracing "intent to deceive, manipulate or defraud." _Ernst & Ernst v. Hochfelder_, 425 U.S. 185, 194 (1976); _see also In re Comshare,_, 183 F.3d at 548. With respect to "'statements of present or historical fact,' plaintiffs may satisfy the scienter pleading requirement 'by alleging facts giving rise to a strong inference of recklessness.'" _In re Ford_, 381 F.3d at 567 (quoting _Helwig_, 251 F.3d at 552 and _In re Comshare_, 183 F.3d at 549). "[R]ecklessness [is] highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." _In re Comshare_, 183 F.3d at 550 (internal quotation marks and citation omitted).

A plaintiff cannot satisfy the scienter pleading requirement "merely by alleging facts demonstrating motive and opportunity [to commit securities fraud] where those facts do not simultaneously establish that the defendant acted recklessly or knowingly, or with the requisite state of mind by alleging facts merely establishing that a defendant had the motive and opportunity." _In re Comshare_, 183 F.3d at 551. Nonetheless, "facts regarding motive and opportunity may be 'relevant to pleading circumstances from which

a strong inference of fraudulent scienter may be inferred.'" Id. (quoting In re Baesa Sec. Litig., 969 F.Supp. 238, 242 (S.D.N.Y. 1997)).

### 2. MetLife's Claim

Of the five elements of a §10(b) claim, only scienter is at issue in Poulsen's motion to dismiss MetLife's complaint. Poulsen argues that MetLife has failed to state a §10(b) claim because the complaint relies on group pleading. Poulsen contends that the complaint does not specifically allege that he acted with knowledge of the alleged misrepresentations in the Offering Materials given to MetLife.

Courts have disagreed as to PSLRA's effect on the viability of the group pleading doctrine in §10(b) cases. See City of Monroe Employees Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 689-90 (6th Cir. 2005) (citing cases); In re SmarTalk Teleservices, Inc. Sec. Litig., 124 F.Supp.2d 527, 545 (S.D. Ohio 2000) (concluding that the group pleading doctrine "survived the PSLRA"). The Seventh Circuit recently rejected the group pleading doctrine, concluding that it conflicted with the PSLRA's requirement that "the complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Makor Issues & Rights, Ltd. v. Tellabs, Inc., __ F.3d __, 2006 WL 172142, at *12 (7th Cir. Jan. 25, 2006) (quoting 15 U.S.C. §78u-4(b)(2)) (emphasis in original). The Sixth Circuit recently declined to rule on the issue. See City of Monroe, 399 F.3d at 690.

The Court need not here decide the viability of the group pleading doctrine. MetLife's complaint satisfies the PSLRA's pleading requirements regardless of group pleading. The complaint

details each alleged misrepresentation and omission in the Offering
Materials.  See MetLife Third Am. Compl., ¶¶87-93.  The complaint
ties Poulsen to the alleged misrepresentations and omissions by
quoting a portion of the Offering Materials which stated that "the
directors of the Issuer have taken all reasonable care to ensure
that the information contained [herein] is true and accurate in all
material respects . . . [and] accept responsibility accordingly."
Id., ¶93.  Poulsen might protest the complaint's reference to the
"directors," but that is the word used in the Offering Materials.
NPF XII had just three directors, and the complaint supports the
inference that each one of the three reviewed and approved the
Offering Materials.  Compare with City of Monroe, 399 F.3d at 690
(finding §10(b) claim insufficient because the complaint did not
allege that corporate officer "played any role in drafting,
reviewing, or approving" the reports that contained alleged
misrepresentations).

     MetLife's complaint does more than rely on Poulsen's corporate
title to show scienter.  The complaint cites numerous memoranda,
which Poulsen allegedly either authored or received, to establish
a strong inference that Poulsen knew of the falsity of the
statements made in the Offering Materials.  The allegations give
specific dates for each of the memos and single out Poulsen by name
in alleging that he viewed them.  See MetLife Third Am. Compl.,
¶¶59-77.  The strong inference arising from these allegations is
that the memos gave Poulsen knowledge of the following: significant
overfunding of healthcare providers, large shortfalls in
receivables, uncollateralized advances, severe depletions in the
reserve levels of NPF XII's trust accounts, and the practice of

36

wiring funds between National Century programs to create the appearance of satisfying the required reserve levels. Each of these facts, if true, are contrary to the representations allegedly made in the Offering Materials. The complaint further alleges that Poulsen himself directed Bank One to wire funds to hide shortfalls. Moreover, the complaint establishes a clear motive for Poulsen's conduct. It alleges that Poulsen held undisclosed ownership interests in "many" of the healthcare providers that were being overfunded. Id., ¶80.

In sum, the complaint paints a clear picture of Poulsen as a corporate insider who had intimate knowledge of pervasive fraud at National Century. Despite this knowledge, Poulsen allegedly reviewed and approved Offering Materials that misrepresented the nature of National Century's operations. The Court finds that the complaint sets forth factual allegations giving rise to a strong inference that Poulsen acted with an intent to deceive or defraud.

### 3. The New York City Pension Funds' Claim

Scienter is also the focus in Defendant Ayers's motion to dismiss the New York Funds' §10(b) claim. Ayers argues that the complaint fails to connect him with the Offering Materials and fails to create a strong inference that he knew of the alleged misrepresentations and omissions in the Materials. Ayers likewise contends that the complaint improperly rests on group pleading.

The Court disagrees with Ayers. The complaint specifies which statements in the Offering Materials were misrepresentations and which material facts were omitted. See New York Funds Second Am. Compl., ¶¶49-52. The complaint alleges that Ayers, in his capacity as an officer and director, "drafted, assisted in drafting, edited

37

reviewed, approved, and/or supervised the preparation of the Offering Materials." Id., ¶219. The complaint further alleges that Ayers "had a practice of reviewing the Offering Materials." Id., ¶220.

The allegations also support a strong inference that Ayers knew, or at least was reckless in not knowing, of the falsity of the statements made in the Offering Materials. The complaint cites the minutes of a December 1999 board meeting attended by Ayers in which the board members discussed National Century's practice of purchasing "pro forma" receivables, that is, receivables that did not meet the eligibility criteria stated in the Offering Materials. By purchasing "pro forma" receivables, National Century effectively made unsecured advances to healthcare providers. According to the complaint, the board minutes state that in 1998 over 50% of the receivables purchased by National Century were ineligible. See New York Funds Second Am. Compl., ¶135.

The complaint further alleges that Ayers served as Chairman and CEO of National Recovery & Consulting Group, LLC, a company Lance Poulsen allegedly created as a sham to cover up the cash shortages resulting from National Century's purchase of overvalued receivables. The complaint alleges that National Recovery & Consulting in turn "purchased" the overvalued receivables from National Century by issuing promissory notes to National Century. Under the terms of the notes, however, National Recovery & Consulting would only pay on the notes if it ever collected on these "largely uncollectible" receivables. See New York Funds Second Am. Compl., ¶116. Ayers allegedly directed this scheme, which functioned to hide National Century's shortfalls from the

accounting books. These allegations support a strong inference that Ayers knew of National Century's massive cash shortages and its practice of overvaluing receivables.

The complaint also contains numerous allegations that Ayers had undisclosed ownership interests in healthcare providers overfunded by National Century. These providers included RX Medical Services, Inc., Chartwell Caregivers, NMC Homecare, Home Care Concepts, Thera-Kinetics, National Rehab of Florida, and Infusion Management Systems – each of which ranked in the top ten healthcare providers in terms of the volume of receivables sold to NPF VI and NPF XII. The complaint supports an inference that Ayers, and the other Founders, took steps to conceal those interests. Ayers allegedly disguised his ownership interest in RX Medical, for example, by acquiring interests in Intercontinental Investment Advisors and Kachina, Inc., which then in turn acquired common stock in RX Medical. The complaint alleges that Ayers similarly used Intercontinental to gain stock in Home Care Concepts, Thera-Kinetics, National Rehab of Florida, and Infusion Management Systems.

Thus, the Court finds that allegations in the New York Funds' complaint give rise to a strong inference that Ayers acted with an intent to deceive or defraud.

### 4. The Florida Class Action Plaintiffs' Claims

The Florida Plaintiffs are a class of persons who purchased securities in e-MedSoft between December 2000 and February 2002. They allege that e-Medsoft made misrepresentations in a series of press releases and SEC filings between December 2000 and February 2002. These documents allegedly spoke favorably of e-MedSoft's

plans to merge with or acquire other companies, but failed to disclose the financial ties existing among e-MedSoft, National Century, the Founders, and the target companies.

The Founders have moved to dismiss the Florida Plaintiffs' §10(b) claims. Their primary argument is that the allegations fail to connect the Founders to the allegedly false statements.

The Court finds that the Florida complaints do fail to state a §10(b) claim against any of the Founders. The complaints contain many allegations about the financial relationships among the Founders, e-MedSoft, and the target companies. For instance, the Florida complaints allege that National Century and the Founders were e-MedSoft's largest group of related stockholders. National Century acquired 9.5 million shares of stock in e-MedSoft, and Ayers served as an e-MedSoft director and held 1 million shares of the company's stock. Poulsen and Parrett received e-MedSoft stock when it merged with Chartwell Diversified Services, Inc., a company owned by the Founders.

However, the Florida complaints fail to specifically attribute any of the alleged misrepresentations to the Founders. With respect to Poulsen and Parrett, the complaints fail to allege that they were involved in any way with e-MedSoft's press releases and SEC filings. Indeed, the complaints identify other individuals, such as e-MedSoft CEOs John Andrews and Frank Magliochetti, as having made the misrepresentations. While Poulsen and Parrett allegedly were controlling persons of e-MedSoft by virtue of their positions with National Century and ownership of e-MedSoft stock, they are not alleged to have drafted, reviewed, or approved the press releases and SEC filings. In short, the complaints simply do

40

not allege that Poulsen and Parrett made any misrepresentations about e-MedSoft.

With respect to Ayers, the complaints connect him only to e-MedSoft's August 1, 2001 Form 10-K, which Ayers allegedly signed. The Form 10-K stated that the "pending merger with Chartwell" would "result in new business opportunities" and would "provide financing resources." According to the complaints, the Form 10-K disclosed that Ayers held stock in Chartwell but did not disclose the same about Poulsen and Parrett. Plaintiffs allege that this failure to disclose Poulsen's and Parrett's ownership in Chartwell was misleading because it made the news of the merger sound good when in fact the Founders allegedly orchestrated the entire deal.

The Court finds that the allegations concerning the Form 10-K do not support a strong inference of scienter. Critically, Plaintiffs admit that the Form 10-K disclosed Ayers's ownership of Chartwell stock. Had Ayers been acting with an intent to deceive, one would have expected him to hide that information. Instead, Ayers disclosed that he, an e-Med-Soft director, owned stock in the company e-MedSoft planned to merge with. Further, it was no secret that National Century owned stock in e-MedSoft (e-MedSoft's March 31, 2001 Form 10-K disclosed that information, according to the complaint) or that Ayers was an officer and founder of National Century. Thus, all of the information an investor needed in order to link Ayers with e-MedSoft, Chartwell, and National Century was public. There is no allegation that Ayers hid that information in order to facilitate the merger of e-MedSoft and Chartwell.

Plaintiffs are left arguing that Ayers should have ensured that the Form 10-K disclosed Poulsen's and Parrett's ownership in

41

Chartwell. But the complaints plainly fail to make specific allegations as to what mental state Ayers acted with. Plaintiffs contend that Ayers had a motive to commit fraud, pointing to Ayers's financial interest in inflating e-MedSoft's stock value. However, a plaintiff cannot plead scienter "merely by alleging facts demonstrating motive and opportunity [to commit securities fraud] where those facts do not simultaneously establish that the defendant acted recklessly or knowingly . . . ." In re Comshare, 183 F.3d at 551. The Court finds that the complaints fail to allege facts giving rise to a strong inference that Ayers acted recklessly or knowingly in signing the Form 10-K. Accordingly, the Florida Plaintiffs' §10(b) and SEC Rule 10b-5(b) claims against the Founders are dismissed.

### 5. Claims under SEC Rule 10b-5(a) and (c)

The Florida Plaintiffs argue that apart from their claims for failure to disclose under SEC Rule 10b-5(b), the complaints state claims under Rule 10b-5(a) and (c). These paragraphs prohibit the use of "any device, scheme, or artifice to defraud" or "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of securities. 17 C.F.R. §240.10b-5(a),(c).

The Sixth Circuit recently held that "Rule 10b-5(a) and (c) encompass conduct beyond disclosure violations. . . . [A] defendant 'not liable under Rule 10b-5(b) for failure to disclose . . . may still be held liable under Rule 10b-5(a) and 10b-5(c).'" Benzon v. Morgan Stanley Distributors, Inc., 420 F.3d 598, 610 (6th Cir. 2005) (quoting Scholnick v. Schecter, 752 F.Supp. 1317, 1323 (E.D. Mich 1990)). Even so, the court observed that "there is very

42

little case law explaining more specifically what types of claims
are actionable under these provisions." Id., 420 F.3d at 611.

The Second and Ninth Circuits have characterized Rule 10b-5(a)
and (c) as concerning "market manipulation." Lentell v. Merrill
Lynch & Co., Inc., 396 F.3d 161, 177-78 (2nd Cir. 2005); Corsair
Capital Partners, L.P. v. Wedbush Morgan Securities, Inc., 24 Fed.
Appx. 795, 798 (9th Cir. 2001). Liability under those provisions
may be appropriate for someone who made no misrepresentations or
omissions, but who nonetheless used fraud to manipulate the market.
See Corsair, 24 Fed. Appx. at 797 ("[A] market manipulator cannot
hide behind the lack of a relationship with his victims."). "To
state a claim under Rule 10b-5(a) and (c), a plaintiff must allege
that the defendant (1) committed a deceptive or manipulative act
(2) with scienter, (3) that the act affected the market for
securities or was otherwise in connection with their purchase or
sale, and (4) that defendants' actions caused the plaintiffs'
injuries." In re Parmalat Sec. Litig., __ F.Supp.2d __, 2006 WL
317021, at *2 (S.D.N.Y. Feb. 9, 2006); see also Chemetron Corp. v.
Business Funds, Inc., 682 F.2d 1149, 1163 (5th Cir. 1982).

Although the PSLRA's heightened pleading requirements do not
apply to Rule 10b-5(a) and (c) claims, Fed. R. Civ. P. 9(b)'s
particularity requirement does. Thus, "a plaintiff alleging market
manipulation in violation of Rule 10b-5(a) and (c) must specify,
with particularity, 'what manipulative acts were performed, which
defendants performed them, when the manipulative acts were
performed and what effect the scheme had on the securities at
issue.'" In re Parmalat, 2006 WL 317021, at *2 (quoting In re
Blech Sec. Litig., 961 F.Supp. 569, 580 (S.D.N.Y. 1997)).

The Florida Plaintiffs offer three ways in which the Founders manipulated the market.  First, Plaintiffs allege that the Founders employed a scheme to inflate the market price of e-MedSoft's common stock.  The Founders allegedly executed this scheme fraud by issuing "misleading financial statements" and by failing to disclose "related party transactions."  Houlihan First Am. Compl., ¶150.  The Court finds that this theory does not state a claim under Rule 10b-5(a) and (c) because it merely repeats the allegations made in support of Plaintiffs' misrepresentation and omission claim under Rule 10b-5(b).  See Lentell, 396 F.3d at 177 ("[P]laintiffs cast their claims in terms of market manipulation, pursuant to Rule 10b-5(a) and (c).  We hold that where the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c) . . . .").

Second, Plaintiffs argue that the Founders participated in a scheme to fraudulently obtain financing from a Swiss investment bank.  However, the complaints make clear that it was e-MedSoft's CEO and executives, not any of the Founders, who took part in the alleged scheme.  See Houlihan First Am. Compl., ¶¶89-99.

Third, Plaintiffs argue that the Founders engineered a scheme to "suck money" out of e-MedSoft.  The complaints allege that National Century charged e-MedSoft an exorbitant interest rate for financing e-MedSoft's receivables.  See Houlihan First Am. Compl., ¶48.  This theory fails, however, because the complaints contain no allegations of how this scheme affected the value of e-MedSoft stock or otherwise manipulated the market.  In other words, there are no allegations that the fraud was in connection with

44

Plaintiffs' purchase of securities or that it caused Plaintiffs' injuries.  See In re Parmalat, 2006 WL 317021, at *2 (plaintiff must allege "what effect the scheme had on the securities at issue").

Accordingly, the Court finds that the Florida Plaintiffs have not stated a claim against the Founders under Rule 10b-5(a) and (c).

**B.   Section 20(a) Claims**

       **1.   Legal Standard**

MetLife, Lloyds, the New York Funds, and the Florida Plaintiffs have asserted claims for control person liability under §20(a) of the Securities Exchange Act, 15 U.S.C. §78t(a). MetLife, Lloyds, and the New York Funds allege that the Founders caused NPF XII to violate the Exchange Act.  The Florida Plaintiffs allege that the Founders caused e-MedSoft to violate the Act.

Section 20(a) of the Exchange Act provides as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce that act or acts constituting the violation or cause of action.

15 U.S.C. §78t(a).  There are two requirements for a finding of control person liability.  "First, the 'controlled person' must have committed an underlying violation of the securities laws or the rules and regulations promulgated thereunder.  Second, the controlling person' defendant in a Section 20(a) claim must have directly or indirectly controlled the person liable for the

securities law violation." <u>PR Diamonds, Inc. v. Chandler</u>, 364 F.3d 671, 696 (6th Cir. 2004). "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. §230.405.

### 2. Heightened Pleading Standard Does Not Apply

The Founders argue that the Florida Plaintiffs' §20(a) claims fail because they do not adequately demonstrate that the Founders controlled e-MedSoft. The Founders contend that they merely held minority interests in the company.

The Court finds this argument unconvincing. "Allegations of control are not averments of fraud and therefore need not be pleaded with particularity. They need satisfy only the less stringent requirements of Fed. R. Civ. P. 8." <u>In re Parmalat</u>, 2006 WL 317021, at *8. The Florida complaints adequately allege that the Founders controlled e-MedSoft. The complaints state that the Founders, along with National Century, were the largest related group of stockholders, owning about 33% of e-MedSoft's common stock. They allege that Ayers served on the board of directors and that the company was dependent upon National Century for financing. Further, the complaints quote e-MedSoft's own Form 10-K, dated November 11, 2002, which said that National Century "could have an ability to influence the election of directors and other important corporate transactions." Houlihan First Am. Compl., ¶24.

### 3. Defendant Ayers's Argument

Ayers argues that the New York Funds have failed to state a control person claim because their complaint alleges that

46

defendants other than Ayers also were in control of NPF XII. Not everybody could be in control of NPF XII at the same time, Ayers argues.

This argument too is unconvincing. The Court finds that the complaint states a control person claim against Ayers, a founder, principal shareholder, and officer of National Century. The complaint alleges that the Founders controlled NPF XII and operated it as a Ponzi scheme for their financial benefit. Whether Ayers, or others, did in fact control NPF XII is a matter for discovery to resolve. See In re Nord Resources Corp. Sec. Litig., No. C-3-90-380, 1992 WL 1258516, at *3 (S.D. Ohio Dec. 16, 1992) (denying motion to dismiss where "it is possible for the Plaintiffs to develop facts which will prove this Defendant's controlling person liability").

### 4. Defendant Poulsen's Arguments

Poulsen argues that the control person claims of MetLife and Lloyds must fail because one cannot be both a control person and a primary violator. On this point, the Sixth Circuit has observed:

> Without deciding the question, we note that some authority suggests that a plaintiff may not be able simultaneously to assert both Section 10(b) and Rule 10b-5 claims and Section 20(a) claims against the same defendant. "Arguably, a §20(a) claim cannot be asserted against a defendant who is also charged with primary violation of §10(b) and Rule 10b-5; that is, secondary liability under §20(a) is an alternative, not a supplement, to primary liability under §10(b) and Rule 10b-5." Lemmer v. Nu-Kote Holding, Inc., No. CIV. A. 398CV0161L, 2001 WL 1112577, at *12 (N.D. Tex., Sept.6, 2001), citing Kalnit v. Eichler, 85 F.Supp.2d 232, 246 (S.D.N.Y.1999) (suggesting that plaintiffs could not allege primary liability against the directors of a corporation and at the same time allege control person liability against the directors).

PR Diamonds, 364 F.3d at 697 n.4.

The Court will allow MetLife and Lloyds to pursue both their §10(b) and their §20(a) claims against Poulsen at this time. Under Rule 8(e)(2), Fed. R. Civ. P., plaintiffs may plead alternate legal theories "regardless of consistency." See also 183 A.L.R. Fed. §2[b] (2003) ("A plaintiff may also plead that a defendant is both a primary violator and a control person without redundancy."). Given the allegations against Poulsen, both legal theories are equally plausible. Discovery hopefully will establish which of the sections, if either, apply most appropriately to Poulsen.

Poulsen next argues that he cannot be held liable as a control person because the controlled entity, NPF XII, is not named as a defendant. This argument ignores the obvious – that NPF XII is bankrupt and cannot be sued. "[W]here the primary offender is insolvent or otherwise unavailable, the courts have proceeded to adjudicate the underlying liability of that offender regardless of its presence as a party-defendant." Briggs v. Sterner, 529 F.Supp. 1155, 1171 (S.D. Iowa 1981) (citing cases); see also In re Exodus Communications, Inc. Sec. Litig., No. C 01-2661 MMC, 160, 163, 2005 WL 1869289, at *45 (N.D. Cal. Aug. 5, 2005) ("[T]he Court has located no case holding that the controlled entity must actually be named as a defendant."). Here, the Court's review of the complaints finds that MetLife and Lloyds have sufficiently pleaded a predicate violation of §10(b) by NPF XII and alleged that Poulsen controlled NPF XII.

Finally, Poulsen argues that MetLife and Lloyds have not alleged culpable participation by Poulsen in NPF XII's violation. Courts disagree on whether §20(a) claims must allege "the

controlling person's culpability in the primary violation." <u>Kalnit v. Eichler</u>, 85 F.Supp.2d 232, 246 (S.D.N.Y. 1999) (requiring allegations of culpable participation); <u>but see</u> <u>In re Parmalat</u>, 2006 WL 317021, at *8 ("[T]his Court repeatedly has held that plaintiffs need not allege culpable participation by the controlling person.").

The Court will not apply a culpable participation requirement. The Sixth Circuit's most recent statement on the elements of a §20(a) claim makes no mention of such a requirement. <u>See</u> <u>PR Diamonds</u>, 364 F.3d at 696 (stating two requirements: an underlying violation and control of the primary violator).  And while the statutory language of §20(a) exempts those control persons who act in good faith from liability, it does not otherwise contain a requirement of culpable participation.  Here, MetLife and Lloyds have adequately alleged that Poulsen did not act in good faith.


**VI.  ALTER EGO LIABILITY**

Certain Plaintiffs have sued Kuld Corporation, E&D Investments, Inc., Ayers LLC, and Cheyenne-Blaze LLC, alleging that these companies are wholly owned by the respective Founders and are their alter egos.  The Founders argue that Plaintiffs have failed to state a claim for alter ego liability, citing <u>Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos.</u>, 67 Ohio St.3d 274, 617 N.E.2d 1075 (Ohio 1993).

"A fundamental rule of corporate law is that, normally, shareholders, officers, and directors are not liable for the debts of the corporation." <u>Belvedere</u>, 67 Ohio St.3d at 287, 617 N.E.2d at 1085.  Nonetheless, the "'veil' of the corporation can be

49

'pierced' and individual shareholders held liable for corporate misdeeds when it would be unjust to allow the shareholders to hide behind the fiction of the corporate entity," and "when the shareholder is indistinguishable from or the 'alter ego' of the corporation itself." Id.  The corporate form may be disregarded when "(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." 67 Ohio St.3d at 289, 617 N.E.2d at 1086.

Upon review of the complaints, the Court finds that Plaintiffs have stated claims for alter ego liability with respect to Kuld Corporation, E&D Investments, Inc., Ayers LLC, and Cheyenne-Blaze LLC.  Plaintiffs allege that the Founders wholly owned and completely controlled the alter egos companies.  Plaintiffs further allege that the Founders used the companies to funnel Plaintiffs' investments out of NPF VI and NPF XII and to disguise their interests in healthcare providers that were overfunded by National Century.

## VII. CONCLUSION

Accordingly, the Court rules as follows:

- Poulsen's March 1, 2004 motion to dismiss the complaints filed by MetLife and Lloyds (doc. 148) is GRANTED as to Plaintiffs' claims under N.J. Stat. §49:3-52, but is DENIED in all other respects;

- Ayers's March 1, 2004 motion to dismiss the complaints filed by the Arizona Noteholders (doc. 150) is DENIED in all respects;

- Ayers's March 1, 2004 motion to dismiss the complaints filed by the Florida Class Action Plaintiffs (doc. 151) is GRANTED as to Plaintiffs' claims under §10(b) of the Securities Exchange Act, but is DENIED in all other respects;

- Poulsen's March 1, 2004 motion to dismiss the complaints filed by the Arizona Noteholders (doc. 158) is DENIED in all respects;

- Parrett's March 1, 2004 motion to dismiss the complaints filed by the Florida Class Action Plaintiffs (doc. 159) is GRANTED as to Plaintiffs' claims under §10(b) of the Securities Exchange Act, but is DENIED in all other respects;

- Poulsen's March 1, 2004 motion to dismiss the complaints filed by the Florida Class Action Plaintiffs (doc. 164) is GRANTED as to Plaintiffs' claims under §10(b) of the Securities Exchange Act, but is DENIED in all other respects;

- Ayers's April 30, 2004 motion to dismiss the complaint filed by the New York Funds (doc. 249) is DENIED in all respects;

- Ayers's December 30, 2004 motion to dismiss the complaint filed by the Focus Value Fund (doc. 26 in Case No. 2:04-cv-697) is GRANTED as to Plaintiff's claim for indemnity, but is DENIED in all other respects;

- Poulsen's January 3, 2005 motion to dismiss the complaint filed by the Focus Value Fund (doc. 27 in Case No. 2:04-cv-697) is GRANTED as to Plaintiff's claim for indemnity, but is DENIED in all other respects; and

- Parrett's January 3, 2005 motion to dismiss the complaint filed by the Focus Value Fund (doc. 28 in Case No. 2:04-cv-697) is GRANTED as to Plaintiff's claim for indemnity, but is DENIED in all other respects.

IT IS SO ORDERED.

                                    s/James L. Graham
                                    JAMES L. GRAHAM
                                    United States District Judge

DATE: February 27, 2006