IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
|  | : |  |
| In re National Century | : | Case No. 2:03-md-1565 |
| Financial Enterprises, |  |  |
| Inc., Investment Litigation. | : | Judge Graham |
|  | : | Magistrate Judge Abel |
|  | : |  |

OPINION AND ORDER ON CERTAIN MOTIONS TO DISMISS
FILED BY THE OUTSIDE DIRECTORS

This matter is before the Court on motions to dismiss filed by Harold W. Pote, Eric R. Wilkinson, and Thomas G. Mendell (the "Outside Directors"). Several investor plaintiffs have filed claims against the Outside Directors for their alleged roles in the collapse of National Century Financial Enterprises, Inc. The claims include ones under federal and state securities laws, as well as common law claims for breach of fiduciary duty, fraud, negligent misrepresentation, aiding and abetting, and conspiracy.

For the reasons set forth below, the motions are granted in part and denied in part.

I. **BACKGROUND**

A. **Allegations**

The underlying factual allegations regarding National Century's operations have been discussed in prior orders. See June 10, 2004, Feb. 27, 2006, and Oct. 3, 2006 Orders. At issue here are the allegations against National Century's former outside directors, Harold W. Pote, Eric R. Wilkinson, and Thomas G.

Mendell.  A discussion of those allegations must start with an introduction of the companies the Outside Directors allegedly had ties to: the Beacon Group, LLC (the "Beacon Group"); the Beacon Group III - Focus Value Fund, L.P. (the "Focus Value Fund"); JPMorgan Chase & Co., JPMorgan Chase Bank, and JPMorgan Partners, LLC (collectively "JPMorgan").

Plaintiffs allege that the Beacon Group, an investment banking firm from New York, and its subsidiary, the Focus Value Fund, acquired a 20% interest in National Century in 1998.  Under the terms of the equity investment, the Beacon Group was entitled to appoint: (1) two of six seats on National Century's board of directors; (2) two of three seats on the board of directors of NPF VI, a wholly-owned subsidiary of National Century; (3) two of three seats on the board of directors of NPF XII, a wholly-owned subsidiary of National Century; (4) and the chairman position of National Century's audit committee.

At the time of the investment, Pote, Wilkinson, and Mendell served as officers of the Beacon Group.  Plaintiffs allege that Pote and Wilkinson were appointed as the initial outside directors[1] of National Century, NPF VI, and NPF XII.  Mendell later replaced Wilkinson in those positions.  Plaintiffs further allege that Pote served as chairman of National Century's audit committee.

According to Plaintiffs, Chase Manhattan Corporation (a predecessor of JPMorgan) acquired the Beacon Group in July 2000.  Pote, Wilkinson, and Mendell each became officers of JPMorgan.

---

[1]  An outside director is a director who is not an officer, an employee, or "so deeply involved" to really be an insider.  In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288DLC, 2005 WL 638268, at *10 (S.D.N.Y. March 21, 2005) (citing cases).

2

Pote became Executive Vice President for Regional Banking at JPMorgan Chase Bank, while Wilkinson and Mendell became managing directors of JPMorgan Partners, LLC.

As outlined in previous orders, National Century allegedly engaged in a massive scheme to defraud investors. Plaintiffs allege that the Outside Directors knew of the fraud at National Century and helped conceal it. Plaintiffs further allege that the Outside Directors are responsible for misrepresentations contained in the offering materials that National Century issued to induce investors to purchase notes in its note programs, NPF VI and NPF XII. Plaintiffs also allege the Outside Directors knew that National Century was violating the Master Indentures governing the note programs but failed to act to protect the interests of investors.

### B. **Plaintiffs and Their Claims**

Many of the plaintiffs in this multidistrict litigation brought suit against the Outside Directors. Several plaintiffs, including the Arizona Noteholders, the Unencumbered Assets Trust, and the New York City Pension Funds have settled their claims with the Outside Directors. Still remaining, and at issue in this opinion, are claims brought against the Outside Directors by Metropolitan Life Insurance Company ("MetLife"), Lloyds TSB Bank PLC, ING Bank N.V., and Pharos Capital Partners, L.P. The claims and cross-claims asserted against the Outside Directors by National Century's founders will be addressed in a separate opinion.

#### 1. **MetLife**

MetLife is a New York corporation with its principal place of

3

business in New York. Between June 2001 and July 2002, MetLife invested a total of $102.6 million in NPF XII notes. In August 2002, MetLife's affiliate, Metropolitan Insurance and Annuity Company, invested $18.46 million in NPF XII notes.

MetLife originally filed suit in New Jersey federal court. MetLife asserts statutory claims against the Outside Directors under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) & 78t(a), and under the Blue Sky laws of Ohio and New Jersey, Ohio Rev. Code §§1707.41 & 1707.43, N.J. Stat. Ann. §49:3-71. MetLife additionally brings common law claims for breach of fiduciary duty, fraud, negligent misrepresentation, and negligence.

### 2.  Lloyds

Lloyds is a British public limited company with its principal place of business in London, England. Lloyds invested a total of $128 million in NPF XII notes in March 2001 and November 2002.

Lloyds originally filed suit in New Jersey federal court. Lloyds asserts claims against the Outside Directors under Section 20(a) of the Securities Exchange Act and under Ohio's and New Jersey's Blue Sky laws. Lloyds also asserts a common law claim for breach of fiduciary duty.

### 3.  ING Bank

ING Bank is a banking association organized under the laws of the Netherlands. ING invested $500 million in NPF VI notes on June 20, 2001.

ING originally brought suit in New York federal court. ING asserts claims against the Outside Directors for breach of fiduciary duty, fraud, aiding and abetting breach of fiduciary

4

duty, aiding and abetting fraud, and negligence.

**4. Pharos Capital Partners**

Pharos is a limited partnership organized under the laws of Delaware. Pharos describes itself as being in the business of making equity investments on behalf of its limited partner investors. Pharos purchased $12 million worth of National Century preferred stock on July 8, 2002.

Pharos originally brought suit in the Southern District of Ohio. Pharos asserts claims against the Outside Directors under Ohio's Blue Sky law, and for fraud, aiding and abetting fraud, and conspiracy.

## II. MOTION TO DISMISS STANDARD OF REVIEW

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Roth Steel Prods. v. Sharon Steel Corp., 705 F.2d 134, 155 (6th Cir. 1982). A complaint may be dismissed for failure to state a claim only where "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). A motion to dismiss under Rule 12(b)(6) will be granted if the complaint is without merit due to an absence of law to support a claim of the type made or of facts sufficient to make a valid claim, or where the face of the complaint reveals that there is an insurmountable bar to relief. Rauch v. Day & Night Mfg. Corp., 576 F.2d 697 (6th Cir. 1978).

5

Because a motion under Rule 12(b)(6) is directed solely to the complaint itself, the court must focus on whether the claimant is entitled to offer evidence to support the claims, rather than whether the plaintiff will ultimately prevail.  <u>Scheuer</u>, 416 U.S. at 236; <u>Roth Steel Prods.</u>, 705 F.2d at 155.  A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory.  <u>Weiner v. Klais & Co., Inc.</u>, 108 F.3d 86, 88 (6th Cir. 1997).  The court is not required to accept as true unwarranted legal conclusions or factual inferences.  <u>Morgan v. Church's Fried Chicken</u>, 829 F.2d 10 (6th Cir. 1987).  Nor may the court consider extrinsic evidence in determining whether a complaint states a claim.  <u>Roth Steel Prods.</u>, 705 F.2d at 155; <u>Sims v. Mercy Hosp. of Monroe</u>, 451 F.2d 171, 173 (6th Cir. 1983).

## III. FEDERAL STATUTORY CLAIMS

### A.    <u>Section 10(b)</u>

Section 10(b) of the Securities Exchange Act and Rule 10b-5(b) promulgated thereunder prohibit any person from making "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security."  <u>Morse v. McWhorter</u>, 290 F.3d 795, 798 (6th Cir. 2002); <u>see</u> 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5(b).  To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege, in connection with the purchase or sale of securities: "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) justifiably relied on by plaintiffs, and (5) proximately causing them injury."  <u>Helwig v. Vencor, Inc.</u>, 251 F.3d 540, 554 (6th Cir. 2001); <u>see also</u> <u>In re Comshare, Inc. Sec.</u>

6

Litig., 183 F.3d 542, 548 (6th Cir. 1999).

The Private Securities Litigation and Reform Act ("PSLRA"), 15 U.S.C. §78u-4(b), requires complaints asserting a claim of federal securities fraud to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1).

Plaintiff MetLife brings a claim against the Outside Directors for violating Section 10(b). MetLife alleges that it received certain private placement memoranda ("Offering Materials") in connection with its purchase of NPF XII notes. MetLife contends that the Offering Materials contained material misstatements and omissions regarding how NPF XII operated, namely that NPF XII:

- maintained separate books and records from other National Century entities;

- had on its board of directors an independent director unaffiliated with National Century;

- restricted its business to purchasing eligible receivables and issuing notes;

- provided certain credit enhancements for the notes in accordance with the Master Indenture;

- was capitalized by National Century in accordance with the Indenture;

- maintained segregated reserve accounts;

- used proceeds from issuing notes to purchase eligible receivables;

- did not purchase receivables in excess of payor concentration limitations set forth in the Indenture.

7

See MetLife Compl., ¶¶100-106.

The Outside Directors acknowledge that the Court, in its February 27, 2006 Order ruling on Founder Lance Poulsen's motion to dismiss, held that MetLife's complaint sufficiently identified the alleged misrepresentations in the Offering Materials. See Feb. 27, 2006 Order, pp. 16-19. The Court also held that the alleged misrepresentations were material because they led potential investors to believe the NPF XII notes were of high quality.

Though the Outside Directors concede that the complaint identifies the alleged misrepresentations with particularity, they argue that they cannot be held liable for those misrepresentations. They contend that the complaint improperly relies on group pleading in trying to impute the misrepresentations in the Offering Materials to them. According to the Outside Directors, the complaint lacks allegations showing that they assisted in preparing the Offering Materials.

MetLife responds by citing a paragraph in the Offering Materials stating that the directors of NPF XII had "taken all reasonable care to ensure that the information contained [herein] is true and accurate in all material respects" and "accept responsibility accordingly." MetLife Compl., ¶106. MetLife argues that this paragraph factored into the Court's earlier decision that Lance Poulsen, a director of NPF XII, could be held liable for the alleged misrepresentations in the Offering Materials. See Feb. 27, 2006 Order, pp. 35-36. In that decision, the Court found that the complaint supported an inference that Lance Poulsen – founder, principal shareholder, chairman, chief executive officer, and director of National Century - had reviewed and approved the

8

Offering Materials. MetLife argues that the complaint supports an inference that the Outside Directors also reviewed and approved the Offering Materials.

The Outside Directors argue that the Court's holding with respect to Lance Poulsen does not apply to them. They cite case law in which courts have distinguished outside directors from corporate insiders for purposes of Section 10(b) liability. To state a claim against an outside director for misrepresentations contained in published corporate documents, a complaint must make specific allegations that the outside director took part in preparing the documents or was involved in the company's day-to-day management. See, e.g., Dresner v. Utility.com, Inc., 371 F.Supp.2d 476, 494 (S.D.N.Y. 2005); In re Syntex Corp. Sec. Litig., 855 F.Supp. 1086, 1100 (N.D. Cal. 1994).

After reviewing the case law, the Court finds that the complaint does not state a Section 10(b) claim against the Outside Directors. The complaint fails for three reasons. First, it improperly relies on group pleading in attempting to impose liability on the Outside Directors. Second, even if group pleading were permitted, the complaint does not allege a basis for holding the Outside Directors responsible for the Offering Materials. For instance, the complaint does not allege that the Outside Directors actively participated in managing NPF XII. Third, while the complaint may support a claim for aiding and abetting, private plaintiffs cannot maintain a cause of action for aiding and abetting under Section 10(b).

Since the passage of the Private Securities Litigation and Reform Act, 15 U.S.C. §78u-4(b), federal courts have disagreed on

9

whether plaintiffs may state a claim under Section 10(b) by simply alleging that corporate officers are liable as a group for their company's SEC filings, prospectuses, and other published materials. See <u>City of Monroe Employees Ret. Sys. v. Bridgestone Corp.</u>, 399 F.3d 651, 689-90 (6th Cir. 2005) (discussing the split but declining to take a position).  The trend among courts of appeals is that group pleading does not satisfy the heightened pleading requirements of the PSLRA.  See <u>Financial Acquisition Partners LP v. Blackwell</u>, 440 F.3d 278, 287 (5th Cir. 2006); <u>Makor Issues & Rights, Ltd. v. Tellabs, Inc.</u>, 437 F.3d 588, 602-03 (7th Cir. 2006).  But even where group pleading has been permitted, only those individuals with direct involvement in the everyday business of the company may be presumed to be responsible for statements made in group-published documents. See <u>In re Parmalat Sec. Litig.</u>, __ F.Supp.2d __, 2007 WL 869012, at *4 (S.D.N.Y. Mar. 23, 2007) ("Alleging direct involvement in the company's everyday business is critical to support the presumption."); <u>In re GeoPharma, Inc. Sec. Litig.</u>, 399 F.Supp.2d 432, 445 (S.D.N.Y. 2005); <u>In re Oxford Health Plans, Inc.</u>, 187 F.R.D. 133, 142 (S.D.N.Y. 1999).

MetLife's complaint uses group pleading in attempting to impose liability on the Outside Directors for the alleged misrepresentations in the Offering Materials.  The complaint refers to the "directors" and does not specify the roles played by each individual Outside Director in preparing, reviewing, or approving the Offering Materials.  It is not alleged that any of the Outside Directors signed the Offering Materials or that any of their names appeared in the Offering Materials.

MetLife's citation to the Court's earlier decision is

unavailing.  That decision concerned Lance Poulsen, a true insider. See In re Enron Corp. Sec., Derivative & ERISA Litig., 258 F.Supp.2d 576, 626 n.55 (S.D. Tex. 2003) [hereinafter "Enron I"] (stating that for purposes of Section 10(b) liability, "this Court distinguishes between a corporation's inside directors, who normally participate in its operations and create its policies, and outside directors"); In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288DLC, 2005 WL 638268, at *9 (S.D.N.Y.) (S.D.N.Y. March 21, 2005) (drawing a distinction between insiders and outsiders); Goldstein v. Alodex Corp., 409 F.Supp.2d 1201, 1203 (E.D. Pa. 1976) (noting that the situation of outside directors is "legally and factually different from that of the corporation and the other inside directors").  Though MetLife's complaint initially grouped Poulsen with the rest of the directors, it went on to provide particularized allegations that "painted a clear picture of Poulsen as a corporate insider who had intimate knowledge of pervasive fraud at National Century."  Feb. 27, 2006 Order, p. 37.  This led the Court to find that, regardless of group pleading, the complaint met the heightened pleading standard with respect to Poulsen.  See WorldCom, 2005 WL 638268, at *9 (observing that corporate insiders usually will be liable for company's misrepresentations).

The complaint's reliance on group pleading with respect to the Outside Directors is problematic because outside directors "[b]y definition . . . do not participate in the corporation's day-to-day affairs."  Syntex, 855 F.Supp. at 1100; see also In re Indep. Energy Holdings PLC Sec. Litig., 154 F.Supp.2d 741, 767-68 (S.D.N.Y. 2001).  The rationale behind group pleading is that the "facts about fraud flowing from the internal operation of a

11

corporation are peculiarly, and often exclusively, within the
control of the corporate insiders who manage the parts of the
corporation involved in the fraud." In re Ross Sys. Sec. Litig.,
No. C-94-0017, 1994 WL 583114, at *5 (N.D. Cal. July 21, 1994).
Outside directors, by contrast, cannot be assumed to have assisted
in preparing, reviewing, or approving offering materials. See
Dresner, 371 F.Supp.2d at 494.  This is true even when an outside
director's name or signature appears in a company statement. See
Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co., 940 F.Supp.
1101, 1134-35 (W.D. Mich. 1996); In re Gupta Corp. Sec. Litig., 900
F.Supp. 1217, 1241 (N.D. Cal. 1994) ("[T]he mere fact that an
outside director signed a group published document does not make
the outside director liable for the contents of the document.").
Thus, the "standard of specificity required with respect to
corporate outsiders is higher than that for corporate insiders."
In re Marion Merrell Dow, Inc., No. 92-0609-CV-W-6, 1993 WL 393810,
at *6 (W.D. Mo. Oct. 19, 1993) (citing Cohn v. Lone Star Indus.,
Inc., No. B-89-617, 1990 U.S. Dist. LEXIS 19414, at *9 (D. Conn.
May 18, 1990)); see also Fisk v. Superannuities, Inc., 927 F.Supp.
718, 727-28 (S.D.N.Y. 1996) (pleading standard less rigorous for
insiders participating in the securities offering).

Even where group pleading is allowed, the complaint must make
specific assertions that the outside director was either directly
involved in the company's management or had a special relationship
with the company.  See In re Mutual Funds Inv. Litig., 437
F.Supp.2d 444, 446-47 (D. Md. 2006); Dresner, 371 F.Supp.2d at 494;
Indep. Energy Holdings, 154 F.Supp.2d at 768; Syntex, 855 F.Supp.
at 1100; Gupta, 900 F.Supp at 1241; KVH Indus., Inc. v. Van

<u>Heyningen</u>, No. CA 05-273 ML, 2006 WL 2521440, at *9 (D.R.I. Aug. 29, 2006); <u>Strassman v. Fresh Choice, Inc.</u>, No. C-95-20017, 1995 WL 743728, at *13-14 (N.D. Cal. Dec. 7, 1995).

MetLife's complaint fails to make specific allegations that the Outside Directors participated in the daily operations or management of NPF XII.  <u>See</u> <u>Gupta</u>, 900 F.Supp at 1241 (requiring "assertions of specific day-to-day involvement in the management" of the company).  The complaint makes no allegations to show that the Outside Directors played any role in NPF XII beyond what would be expected of an outside director.  <u>See</u> <u>Enron I</u>, 258 F.Supp.2d at 626 n.55 (court will assume that outside directors are not directly involved in company's management unless the complaint shows "that the situation is otherwise").  Though the complaint asserts that the Outside Directors were "far more involved" with the operations of NPF XII than "typical outside directors," MetLife Compl., ¶109, the complaint makes no further allegations to support that assertion.  <u>See</u> <u>In re Enron Corp. Sec. Litig.</u>, No. MDL-1446, 2003 WL 230688, at *15 (S.D. Tex. Jan. 28, 2003) [hereinafter "<u>Enron II</u>"] (finding insufficient under §10(b) the bare allegation that defendants were "deeply involved" in the operation).

The complaint alleges that Pote was the chair of an audit committee, but "[m]ere membership on committees . . . is also insufficient to subject an outside director to liability under a group pleading theory."  <u>Gupta</u>, 900 F.Supp. at 1241; <u>see</u> <u>also</u> <u>Strassman</u>, 1995 WL 743728, at *13-14.  The complaint must allege "operational involvement" rather than "boardroom titles."  <u>Syntex</u>, 855 F.Supp. at 1100.  The complaint contains no allegations about Pote's responsibilities as chair of the audit committee, nor does

it otherwise allege what involvement the Outside Directors had in NPF XII's management.  See Bruce v. Martin, No. 90 Civ. 1002, 1992 WL 204395, at *6 (S.D.N.Y. Aug. 14, 1992) (finding that mere reference to an outside director's membership on a corporate committee is "empty of significance").

The complaint also alleges that Pote once referred to himself in a letter as an "active director" and that one of the Offering Materials referred to the Outside Directors as being part of the "management team."  The complaint, however, fails to state what being an "active director" or part of the "management team" meant in terms of involvement in NPF XII's operations.  The complaint does not make particularized allegations that any of the Outside Directors took part in managing NPF XII.  See Bruce, 1992 WL 204395, at *6 (holding that complaint asserting a securities fraud claim against an outside director must provide specifics about what role the outside director played in the company).

MetLife argues that the Outside Directors can be held liable for the Offering Materials because they had insider-type access to information.  MetLife points to allegations in the complaint that the Outside Directors had knowledge, or at least should have known, of National Century's failure to operate the note programs in compliance with the Master Indentures.  The complaint alleges that Pote attended board meetings and that each of the Outside Directors had access to documents which should have signaled to them that NPF XII had violated the Master Indenture.  These documents include two draft prospectuses, a draft report, two memos from Poulsen, and the minutes from a board of directors meeting.  See MetLife Compl., ¶¶77-83.  The Outside Directors allegedly knew that National

14

Century had failed to comply with "various documentary and reporting provisions of the indentures," purchased ineligible health care receivables in 1998 and 1999, and experienced a shortage in reserves.

The Court finds that these allegations are insufficient to attribute the alleged misrepresentations in the Offering Materials to the Outside Directors. First, courts have held that having insider-type access to information is, without more, not sufficient to impose Section 10(b) liability on outside directors. See, e.g., In re Interactive Network, Inc. Sec. Litig., 948 F.Supp. 917, 921 (N.D. Cal. 1996) ("[T]he majority of the decisions in this district have not extended the group publication doctrine where plaintiffs merely allege that outside directors were privy to inside information."). Second, even if insider-type access to information were sufficient, MetLife's complaint does not establish that the Outside Directors had such access. The complaint does not show that the Outside Directors had a level of access to information beyond what would be expected for an outside director. As board members, the Outside Directors, not surprisingly, attended board meetings, had access to board minutes, and received occasional memos from Poulsen and occasional draft prospectuses and reports. These allegations do not show that the Outside Directors really functioned as insiders, such that they are subject to primary liability under Section 10(b). See Enron I, 258 F.Supp.2d at 627-28 (finding that attendance at board and committee meetings and access to the minutes from those meetings was insufficient to support Section 10(b) claim against outside directors); Gupta, 900 F.Supp at 1241-42 (dismissing Section 10(b) claim against outside

directors who had access to company's financial reports and press releases); Syntex, 855 F.Supp. at 1100 (finding that outside director's access to company's internal business plans, budgets, forecasts, and reports was "not sufficient to establish that [he] enjoyed a special relationship with Syntex").

In the end, the complaint's group pleading that the Outside Directors reviewed the Offering Materials for accuracy at best supports an aiding and abetting claim. See Palladin Partners v. Gaon, No. 05-cv-3305, 2006 WL 2460650, at *7 (D.N.J. Aug. 22, 2006) (unspecific allegations of helping to prepare SEC filings "amount to little more" than claim of aiding and abetting fraud). While the Blue Sky laws of certain states recognize such a cause of action, as will be discussed below, Section 10(b) does not. See Central Bank of Denver, N.A., v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 176-77, 114 S.Ct. 1439, 1447-48 (1994).

Accordingly, MetLife's Section 10(b) claim against the Outside Directors must be dismissed.

## B.  Section 20(a)

MetLife and Lloyds assert claims for control person liability against the Outside Directors under Section 20(a) of the Securities Exchange Act, 15 U.S.C. §78t(a), which provides:

> Every person who, directly or indirectly, controls any
> person liable under any provision of this title or of any
> rule or regulation thereunder shall also be liable
> jointly and severally with and to the same extent as such
> controlled person to any person to whom such controlled
> person is liable, unless the controlling person acted in
> good faith and did not directly or indirectly induce that
> act or acts constituting the violation or cause of
> action.

15 U.S.C. §78t(a).  MetLife and Lloyds allege that the Outside

16

Directors had direct or indirect power over NPF XII.

There are two requirements for a finding of control person liability. "First, the 'controlled person' must have committed an underlying violation of the securities laws or the rules and regulations promulgated thereunder." PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 696 (6th Cir. 2004). Here, in a prior order, the Court determined that MetLife and Lloyds have sufficiently pleaded a predicate violation of Section 10(b) by NPF XII. See Feb. 27, 2006 Order, p. 48. NPF XII may therefore serve as the "controlled person" for Section 20(a) liability.

The second requirement is that the controlling person defendant "must have directly or indirectly controlled the person liable for the securities law violation." PR Diamonds, 364 F.3d at 696. In the absence of a statutory definition, "control" has been defined by the SEC as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. §230.405. "Control" is "'the practical ability to direct the actions of the people' who committed the violation." Stavroff v. Meyo, No. 95-4118, 1997 WL 720475, at *7 n.5 (6th Cir. Nov. 12, 1997) (quoting Schlifke v. Seafirst Corp., 866 F.2d 935, 949 (7th Cir. 1989)).

"Allegations of control are not averments of fraud and therefore need not be pleaded with particularity. They need satisfy only the less stringent requirements of Fed. R. Civ. P. 8." In re Parmalat Sec. Litig., 414 F.Supp.2d 428, 440 (S.D.N.Y. 2006) (citing In re Philip Servs. Corp. Sec. Litig., 383 F.Supp.2d 463, 485 (S.D.N.Y. 2004), and In re WorldCom, Inc. Sec. Litig., 294

17

F.Supp.2d 392, 415-16 (S.D.N.Y. 2003)).  <u>See also</u> <u>Enron II</u>, 2003 WL 230688, at *11-14 (surveying the case law and finding that Rule 8(a)'s notice pleading standard applies to allegations of control).

A defendant's status as a control person is normally a question of fact.  <u>See</u> <u>Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.</u>, 973 F.2d 474, 485 (6th Cir. 1992).  Nonetheless, courts agree that merely being a director is typically insufficient to support a claim for control person liability.  <u>See</u> <u>Herm v. Stafford</u>, 663 F.2d 669, 684 (6th Cir. 1981) ("A director of a corporation is not automatically liable as a controlling person."); <u>Thiemann v. OHSL Fin. Corp.</u>, No. 1:00-cv-793, 2001 WL 34128240, at *9 (S.D. Ohio July 25, 2001).  A plaintiff must bolster its claim with allegations supporting an inference that the director possessed control.  <u>See</u> <u>Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.</u>, 940 F.Supp. 1101, 1134 (W.D. Mich. 1996) ("With respect to the outside directors, plaintiffs must plead facts from which some degree of influence or control over the Perrigo's operations may be inferred.") (footnote omitted); <u>Gupta</u>, 900 F.Supp. at 1243 (same).

Here, in addition to relying on the Outside Directors' status as directors, the complaints allege that the Outside Directors constituted a majority of NPF XII's board of directors.  The complaints allege that beginning in 1998, Pote and Wilkinson held two of the three seats on NPF XII's board of directors.  At some unspecified point, Mendell replaced Wilkinson on the board.  Moreover, the complaints allege that the Outside Directors held two seats on National Century's six-seat board of directors.  With respect to Pote, the complaints further allege that he chaired

18

National Century's audit committee. See In re Livent, Inc. Noteholders Sec. Litig., 151 F.Supp.2d 371, 437 (S.D.N.Y. 2001) (outside director who also served on the audit committee is in a position of control).[2] Finally, the complaints allege that Pote and Wilkinson were employed by the Beacon Group, which held a 20% interest in National Century, and that Pote, Wilkinson, and Mendell later became officers of JP Morgan when JP Morgan acquired the Beacon Group and its 20% interest in National Century. The Court finds that under Rule 8(a), Fed. R. Civ. P., these allegations support an inference that the Outside Directors were in positions from which they had the ability to exercise control over NPF XII.

The Outside Directors argue that besides alleging the capacity to control, the complaints must also allege that the Outside Directors actually exercised control over NPF XII and culpably participated in NPF XII's securities violation. This argument touches on areas in which the law is unsettled. Courts use different tests in determining whether a plaintiff has sufficiently alleged the element of control in a Section 20(a) claim. See WorldCom, 294 F.Supp.2d at 414 (noting the "lack of clarity in the law concerning Section 20(a)"); Enron II, 2003 WL 230688, at *9 ("The requirements for demonstrating controlling person liability vary widely, depending on the court."). The most rigorous standard is the "culpable participation" test used by the Second Circuit. Under this test, a claim under Section 20(a) is stated when, in addition to alleging a primary violation and control, the complaint

---

[2] Pote's mere status as audit committee chairman is insufficient to support an inference of operational involvement under the heightened pleading standard for Section 10(b) claims, but it does help support an inference that he was in a position of control under the Rule 8 pleading standard for Section 20(a) claims.

also shows that the controlling person "was in some meaningful sense a culpable participant in the primary violation." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998); SEC v. First Jersey, Inc., 101 F.3d 1450, 1472 (2d Cir. 1996).

The culpable participation test has been criticized because Section 20(a) "contains no requirement that plaintiffs must prove a control person's state of mind." Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1109 (10th Cir. 2003) (observing that the statute specifically provides for an affirmative defense of good faith); see also Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990) ("The statute does not place such a burden on the plaintiff. . . . [T]he statute premises liability solely on the control relationship, subject to the good faith defense."). This Court has already declined to adopt the culpable participation requirement, noting both that Section 20(a) does not contain a requirement of culpable participation and that the Sixth Circuit's most recent statement on the elements of a Section 20(a) claim makes no mention of such a requirement. See Feb. 27, 2006 Order, pp. 48-49, citing PR Diamonds, 364 F.3d at 696 (stating two requirements: an underlying violation and control of the primary violator).

The Eighth Circuit in Metge v. Baehler, 762 F.2d 621 (8th Cir. 1985), rejected the culpable participation test as contrary to "the plain meaning" of the statute and to its remedial purpose. Id. at 631. The court instead adopted a two-part test that it believed adhered more closely to the statute and to case precedent: (1) the defendant "actually participated in (i.e., exercised control over) the operations of the corporation in general"; and (2) the

defendant "possessed the power to control the specific transaction or activity upon which the primary violation is predicated, but [plaintiff] need not prove that this later power was exercised." Id.

Other courts have adopted similar tests in which the complaint must allege both a capacity to control the primary violator and an exercise of that control.  In the First Circuit, "[t]o meet the control element, the alleged controlling person must not only have the general power to control the company, but must also actually exercise control over the company." Aldridge v. A.T. Cross Corp., 284 F.3d 72, 85 (1st Cir. 2002).  The Seventh Circuit looks to "whether the alleged control-person actually participated in, that is, exercised control over, the operations of the person in general and, then, to whether the alleged control-person possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." Harrison v. Dean Witter Reynolds, Inc., 974 F.2d 873, 881 (7th Cir. 1992).

Finally, other courts have applied a less rigorous test requiring that the complaint allege only the ability to control. The Ninth Circuit interprets Section 20(a)'s mention of a good faith defense as shifting "the burden to the defendant to show that 'she acted in good faith and did not directly or indirectly induce the violations.'" Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000) (quoting Hollinger, 914 F.2d at 1575). Accordingly, "in order to make out a prima facie case, it is not necessary to show actual participation or the exercise of actual power; however, a defendant is entitled to a good faith defense if

21

he can show no scienter and an effective lack of participation." Id.; accord Flood v. Miller, 35 Fed. Appx. 701, 703 (9th Cir. 2002) (unpub.).

One district court in the Fifth Circuit has interpreted circuit precedent to mean that "a plaintiff may assert controlling person liability by alleging that the controlling person had the power to control the controlled person or to influence corporate policy, but that actual exercise of that control need not be alleged." Enron I, 258 F.Supp.2d at 642 (citing Fifth Circuit cases). The Enron court's decision was based in part on its understanding of Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992 (2002). The Supreme Court in Swierkiewicz emphasized that Rule 8 imposes a simplified notice pleading standard and, in the context of a Rule 12(b)(6) motion to dismiss, a court should not evaluate the merits of a claim governed by Rule 8(a). See also Enron II, 2003 WL 230688, at *13 (stating that Swierkiewicz appears to have implicitly overruled more rigorous standards).

The Sixth Circuit has not adopted a test for liability as a controlling person. In Sanders Confectionery Prods., Inc. v. Heller Fin., Inc., 973 F.2d 474 (6th Cir. 1992), the court noted that circuits had reached "slightly conflicting results" and cited Metge and a case from the Ninth Circuit, which at the time required culpable participation. Id. at 486. The court then stated, "We find it unnecessary to choose between the various tests suggested because [plaintiff] Merigian failed to plead sufficient acts of control under the least rigorous standard applied in Metge." Id. The complaint failed to state a claim under §20(a), the court held, because "[n]owhere does Merigian claim that Heller 'actually

participated in the operations'" of the company accused of violating Section 10(b). Id. (quoting Metge, 762 F.2d at 631). District courts in the Sixth Circuit have adopted the Metge test because they view Sanders as citing Metge with approval. See In re Direct General Corp. Sec. Litig., 398 F.Supp.2d 888, 897 (M.D. Tenn. 2005); In re Hayes Lemmerz Int'l, Inc. Equity Sec. Litig., 271 F.Supp.2d 1007, 1021 (E.D. Mich. 2003); In re Prison Realty Sec. Litig., 117 F.Supp.2d 681, 692 (M.D. Tenn. 2000).

The standard applied here makes a difference because the complaints do not allege that the Outside Directors, either as a group or individually, actually exercised control over NPF XII. As explained above in relation to the Section 10(b) claim, the complaint does not identify how any of the Outside Directors participated in the daily management of the company or how they exerted control. Though the complaints support an inference that the Outside Directors had the capacity to control, they fail to allege any exercise thereof.

In Sanders, the Sixth Circuit described the standard applied in Metge as the "least rigorous" one available. Since Sanders was decided, courts in the Fifth and Ninth Circuits have applied a less rigorous standard. Though other district courts in this circuit view Sanders as approving the Metge standard, the Sixth Circuit expressly declined to adopt a standard for controlling person liability.[3] Sanders, at 486. This Court does not view Sanders as

---

[3] The Outside Directors cite Herm v. Stafford, 663 F.2d 669 (6th Cir. 1981) for the proposition that allegations of an actual exercise of control are necessary to survive a motion to dismiss. This is not an accurate characterization of the court's holding. In Herm, the court granted a motion for *summary judgment* against a Section 20(a) claim because plaintiff failed to present evidence of the defendant director's "influence" or "actual participation in the corporation's operation." Id. at 684.

adopting the Metge standard.  Rather, the Sixth Circuit applied it because it was the least rigorous standard used at that time.

The Court finds persuasive the Enron court's reasoning in holding that a Section 20(a) plaintiff must allege only the power to control, and not an actual exercise of control, in order to survive a motion to dismiss.  The court found, as a majority of courts have, that Rule 8(a) applies to controlling person claims. See Enron II, 2003 WL 230688, at *12.  The court then looked to the Supreme Court's decision in Swierkiewicz for guidance in applying Rule 8(a) to a controlling person claim.  In Swierkiewicz, the Supreme Court reversed the dismissal of a Title VII and age discrimination suit for failing to allege facts supporting a prima facie case of discrimination under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 802 (1973).  The Supreme Court held that under Rule 8 an employment discrimination complaint does not have to allege specific facts in support of the prima facie case.  Swierkiewicz, 534 U.S. at 506-07.  A prima facie case "is an evidentiary standard, not a pleading requirement."  Id. at 510.  Courts may not turn the prima facie case "into a rigid pleading standard" that exacts more than what Rule 8 requires.  Id. at 512.  The complaint need only contain a "'short plain statement of the claim showing that the pleader is entitled to relief.'"  Id. at 508 (quoting Fed. R. Civ. P. 8(a)(2)).  "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims."  Id. at 512.  Thus, "'[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with

24

the allegations.'" <u>Id</u>. at 514 (quoting <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73, 104 S.Ct. 2229 (1984)).

The Supreme Court's holding in <u>Swierkiewicz</u> led the <u>Enron</u> court to conclude that, in order to state a Section 20(a) claim, a complaint need not allege an actual exercise of control.  The <u>Swierkiewicz</u> decision has caused district courts in even the Second Circuit to relax their pleading standards for controlling person claims.  In <u>Worldcom</u>, the court cited <u>Swierkiewicz</u> in rejecting the Second Circuit's requirement that a complaint plead culpable participation.  <u>Worldcom</u>, 294 F.Supp.2d at 415-16.  "At the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard. . . . Although previous opinions of this Court have imposed a greater burden on plaintiffs at the pleading stage, this Court now finds that plaintiffs need not meet the PSLRA's heightened pleading standard in alleging a violation of Section 20(a), or separately allege culpable participation."  <u>Id</u>. at 415.  <u>See also</u> <u>Parmalat</u>, 414 F.Supp.2d at 440-41 (not requiring allegations of an actual exercise of control); <u>In re Global Crossing, Ltd. Sec. Litig.</u>, No. 02 Civ. 910, 2005 WL 2990646, at *8 (S.D.N.Y. Nov. 7, 2005) (citing <u>Swierkiewicz</u> in holding that allegations of control are sufficient even when they do not support an inference of an actual exercise of control).

In light of the Supreme Court's decision in <u>Swierkiewicz</u> and the Sixth Circuit's express refusal in <u>Sanders</u> to adopt a pleading standard for Section 20(a) claims, the Court concludes that a plaintiff need only allege the power to control and not an actual exercise of control.  The complaints of MetLife and Lloyds satisfy

Rule 8's standard.  The complaints sufficiently allege that the
Outside Directors were in positions of control.  The Outside
Directors will have an opportunity later to present evidence
demonstrating that they acted in good faith or did not exercise
control over NPF XII.  See In re MicroStrategy, Inc. Sec. Litig.,
115 F.Supp.2d 620, 661 (E.D. Va. 2000) (control person liability is
a "complex factual issue . . . not ordinarily subject to resolution
on a motion to dismiss.").  The Court's decision to allow the
Section 20(a) claims to go forward but to dismiss the Section 10(b)
claim reflects "the scheme established by Congress.  It has imposed
a heightened pleading standard for a Section 10(b) claim but not
for a Section 20(a) claim."  Worldcom, 294 F.Supp.2d at 420.


IV.  **STATE BLUE SKY CLAIMS**

   A.  **Ohio**

   Plaintiffs MetLife, Lloyds, and Pharos Capital Partners assert
claims under Ohio's Blue Sky law against the Outside Directors.
Ohio's Blue Sky law prohibits the use of misrepresentations or
material omissions in connection with the sale of securities.
Under Ohio Revised Code §1707.41,

> (A) . . any person that, by a written or printed
> circular, prospectus, or advertisement, offers any
> security for sale, or receives the profits accruing from
> such sale, is liable, to any person that purchased the
> security relying on the circular, prospectus, or
> advertisement, for the loss or damage sustained by the
> relying person by reason of the falsity of any material
> statement contained therein or for the omission of
> material facts, unless the offeror or person that
> receives the profits establishes that the offeror or
> person had no knowledge of the publication prior to the
> transaction complained of, or had just and reasonable

26

> grounds to believe the statement to be true or the
> omitted facts to be not material.

O.R.C. §1707.41(A). A "lack of reasonable diligence" in "ascertaining the fact of a publication or the falsity of any statement contained in it or of the omission of a material fact shall be deemed knowledge of the publication and of the falsity of any untrue statement in it or of the omission of material facts." O.R.C. §1707.41(C).

The statute specifically makes directors liable for violations committed by a corporation:

> (B)(1) Whenever a corporation is liable as described in
> division (A) of this section, each director of the
> corporation is likewise liable unless the director shows
> that the director had no knowledge of the publication
> complained of, or had just and reasonable grounds to
> believe the statement therein to be true or the omission
> of facts to be not material.

O.R.C. §1707.41(B)(1).

Further, the statute makes jointly and severally liable to the purchaser "every person that has participated in or aided the seller in any way in making such sale or contract for sale." O.R.C. §1707.43(A).

### 1. Application to Private Offerings

The Outside Directors argue that the claims under Ohio's Blue Sky law must be dismissed because National Century's securities offerings were not public. They contend that the law applies only to securities that are part of a public offering. The Outside Directors do not cite any cases directly on point, but argue that Ohio's Blue Sky law should be interpreted the same as courts have interpreted Section 12(2) of the Securities Act of 1933. In Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 115 S.Ct. 1061 (1995),

27

the United States Supreme Court held that Section 12(2) applies to
public offerings of securities and not to private agreements to
sell securities.  The Outside Directors believe that Ohio's statute
likewise should not apply to private sales, such as the ones to
MetLife, Lloyds, and Pharos.

This argument is unconvincing.  The language of Section 12(2)
is different from that of the Ohio statute.  Section 12(2) imposes
liability for misstatements in a "prospectus" or an oral
communication related to a prospectus.  15 U.S.C. §77*l*(2).  In
Gustafson, the Supreme Court held that a prospectus "is confined to
documents related to public offerings by an issuer or its
controlling shareholders."  513 U.S. at 569.  In reaching this
conclusion, the Supreme Court looked to the definition of
"prospectus" in other provisions of the 1933 Act and looked to the
traditional understanding of the word as referring to a public
offering.  Id. at 568-71, 575-76.

The Ohio statute is not so limited in application.  It imposes
liability for misstatements in a "written or printed circular,
prospectus, or advertisement."  O.R.C. §1707.41(A).  Black's Law
Dictionary defines an "offering circular" as a "document, similar
to a prospectus, that provides information about a *private*
securities offering."  Black's Law Dictionary (8th ed. 2004)
(emphasis added).  The Ohio Supreme Court has referred to a private
placement memorandum as being a "circular."  Arpadi v. First MSP
Corp., 68 Ohio St.3d 453, 454, 628 N.E.2d 1335, 1336 (Ohio 1994);
see also Abrams & Wofsy v. Renaissance Inv. Corp., 820 F.Supp.
1519, 1525 (N.D. Ga. 1993) (referring to a private placement
memorandum as a circular); Westland Energy 1981-1 Ltd. v. Bank of

28

Commerce and Trust Co., 603 F.Supp. 698, 702 (N.D. Okla.,1984);
Mendelsohn v. Capital Underwriters, Inc., 490 F.Supp. 1069, 1075
(N.D. Cal. 1979); Conrardy v. Ribadeneira, No. 86-1745-C, 1990 WL
66603, at *3 (D. Kan. Apr. 19, 1990).  And one Ohio court of
appeals, though not directly confronting the issue of whether the
Ohio statute applies to private offerings, held that preparing a
private placement memorandum, which was distributed to prospective
investors, could subject one to liability under O.R.C. §1707.43.
See Corporate Partners, L.P. v. National Westminster Bank PLC, 126
Ohio App.3d 516, 524, 710 N.E.2d 1144, 1149-1150 (Ohio Ct. App.
1998).

Thus, the Court finds that Ohio's Blue Sky law applies to
private securities offerings like the ones made to MetLife, Lloyds,
and Pharos.

### 2.   Application to Non-Sellers

#### a.   Ohio Revised Code Section 1707.41

The Outside Directors next argue that any claims for primary
violations of the Ohio statute must fail because the Outside
Directors are not "sellers."

Under Ohio law, a seller of a security includes: (1) an owner
who passes title, or other interest in the security, to the buyer
for value, and (2) a person, who motivated in part by his own
financial interest or the interest of the security's owner,
successfully solicits the purchase of a security.  See Byrley v.
Nationwide Life Ins. Co., 94 Ohio App.3d 1, 15, 640 N.E.2d 187, 196
(Ohio Ct. App. 1994) (relying on the definition of "seller" found
in Pinter v. Dahl, 486 U.S. 622, 647, 108 S.Ct. 2063, 2078 (1988)).

Plaintiffs do not argue that the Outside Directors fit within

the definition of a seller.  Instead, they point to those provisions of the Ohio statute that extends liability to directors and to those who aid the seller.  O.R.C. §§1707.41(B)(1), 1707.43(A).  Plaintiffs contend that the complaints sufficiently state causes of action under these provisions.

Under Ohio law, the director of a violating corporation is "likewise liable unless the director shows that the director had no knowledge of the publication complained of, or had just and reasonable grounds to believe the statement therein to be true or the omission of facts to be not material." O.R.C. §1707.41(B)(1). Here, the complaints allege both an underlying securities violation by National Century and that Pote, Mendell, and Wilkinson were outside directors of the corporation.  The complaints thus appear to state a claim under the plain language of O.R.C. §1707.41(B)(1).

The Outside Directors argue, without citing any Ohio cases, that when the statute says "director," it means an inside director, not an outside one.  They would have the Court engage in the same analysis as it did above in determining that the federal Section 10(b) claim failed.  In order for an outside director to be liable under O.R.C. §1707.41(B)(1), they argue, the complaint must plead that he participated in the day-to-day management of the company.

The Court must reject the Outside Directors' argument at this stage.  The federal statute's heightened pleading standard, combined with the body of federal case law treating outside directors differently from inside directors, led the Court to require particularized allegations of the Outside Directors' involvement in the company's management.  In contrast, the Ohio statute expressly provides that directors are liable for the

30

securities violations of their corporations unless they prove otherwise. See Federated Mgmt. Co. v. Coopers & Lybrand, 137 Ohio App.3d 366, 398, 738 N.E.2d 842, 866 (Ohio Ct. App. 2000) (holding that "R.C. 1707.41 makes the director(s) of such corporation likewise liable, unless certain facts are proven"). The Ohio statute simply says "director" and does not exclude outside directors. Further, the Court could find no Ohio case law in support of making a distinction between inside and outside directors at the pleading stage.

Allowing the claims under O.R.C. §1707.41(B)(1) to go forward does not make the difference between inside and outside directors unimportant. Indeed, the very considerations behind federal courts distinguishing outside directors at the pleading stage are the same factors available to directors as a defense under Ohio law. If an outside director did not participate in the sale or preparation of the offering materials, had no knowledge of the misstatement, had reasonable grounds to believe the statement was true, or exercised reasonable diligence in his capacity as outside director, then Ohio law provides him with an opportunity to prove as much and avoid liability. See O.R.C. §§1707.41(A)&(B)(1); Hainbuchner v. Miner, No. 1558, 1986 WL 3205, at *1 (Ohio Ct. App. Mar. 14, 1986) (director not liable if evidence at trial proved that he had no participation in the sale).

The Court therefore finds that the complaints of MetLife, Lloyds, and Pharos state claims under O.R.C. §1707.41 against the Outside Directors.

### b.   **Ohio Revised Code Section 1707.43**

MetLife, Lloyds, and Pharos also argue that the Outside

31

Directors are liable under O.R.C. §1707.43, which imposes joint and several liability to "every person that has participated in or aided the seller in any way in making such sale or contract for sale." O.R.C. §1707.43(A). The Court will examine the claims of MetLife and Lloyds first.

MetLife and Lloyds argue that §1707.43 applies because their complaints support an inference that the Outside Directors aided in preparing the Offering Materials. In support of their argument, they turn the Court's attention back to the statement in the Offering Materials that the directors of NPF XII had "taken all reasonable care to ensure that the information contained [herein] is true and accurate in all material respects" and "accept responsibility accordingly." MetLife Compl., ¶106; Lloyds Compl., ¶151. This statement was insufficient to support MetLife's Section 10(b) claim because it failed to identify with particularity how each of the Outside Directors assisted, if it all, in preparing or approving the Offering Materials.

In contrast to Section 10(b), the Ohio statute does not carry a heightened pleading standard, nor is it accompanied by a body of case law disfavoring group pleading and requiring particularized allegations of involvement with respect to outside directors. Ohio courts have stressed that "the securities laws are to be liberally construed." Federated Mgmt., 137 Ohio App.3d at 392, 738 N.E.2d at 861 (citing In re Columbus Skyline Sec., Inc., 74 Ohio St.3d 495, 660 N.E.2d 427 (Ohio 1996)). Further, "[i]t must be emphasized that R.C. 1707.43 uses very broad language." Federated Mgmt., 137 Ohio App.3d at 392, 738 N.E.2d at 861. This use of the phrase "in any way" suggests that the statute is "broad in scope." Id., Ohio

32

App.3d at 391, 738 N.E.2d at, 860; <u>see also</u> <u>Hild v. Woodcrest</u> <u>Ass'n</u>, 59 Ohio Misc. 13, 28-29, 391 N.E.2d 1047, 1056-57 (Ohio Ct. Com. Pl. 1977).  Liability extends beyond the seller of the security to any person who participates or aids the sale in any way, including "inducing the purchaser to invest."  <u>Federated</u> <u>Mgmt.</u>, 137 Ohio App.3d at 391, 738 N.E.2d at 860; <u>see also</u> <u>Hild</u>, 59 Ohio Misc. at 28-29, 391 N.E.2d at 1056-57.  An inducement is not required, but it is "one factor in determining liability." <u>Federated Mgmt.</u>, 137 Ohio App.3d at 391, 738 N.E.2d at 860-61.

The complaints of MetLife and Lloyds sufficiently allege that the Outside Directors aided NPF XII in the sale of notes.  Under Rule 8's liberal pleading standard, the complaints support an inference that the Outside Directors at least reviewed the Offering Materials to ensure their accuracy.  MetLife and Lloyds allege that they relied on the accuracy of the Offering Materials in making their decision to purchase notes.  The complaints therefore allege that the Outside Directors aided in inducing MetLife and Lloyds to invest in NPF XII notes.

Turning to the complaint of Pharos, it alleges that the Outside Directors gave "rubber-stamp" approval to audits prepared by Deloitte & Touche, L.L.P.  These audits allegedly gave a "clean" report for National Century's financial statements.  According to Pharos, the audits were misleading because they did not reveal National Century's true financial condition, namely that it was purchasing worthless accounts receivable and engaging in related-party transactions which personally benefitted National Century's Founders.  Pharos contends that it received and relied on these audits during the course of its decision to purchase National

Century preferred stock.  The Outside Directors' approval of the audits allegedly helped induce Pharos to buy the stock.  Therefore, Pharos's complaint sufficiently alleges that the Outside Directors aided in inducing Pharos to invest in National Century.

The Court thus finds that MetLife, Lloyds, and Pharos have stated claims under O.R.C. §1707.43 against the Outside Directors.

**B.  New Jersey**

MetLife and Lloyds assert claims under New Jersey's Blue Sky law against the Outside Directors.  New Jersey's Blue Sky law prohibits the use of misrepresentations or material omissions in connection with the sale of securities.  It imposes primary liability upon any person who "offers, sells or purchases a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission)."  N.J. Stat. Ann. §49:3-71(a)(2).

The statute also imposes joint and several liability on every person who "directly or indirectly controls a seller liable under subsection (a)" or who "materially aids in the sale or conduct." N.J. Stat. Ann. §49:3-71(d).

**1.  Nexus with New Jersey**

The Outside Directors argue that the claims under New Jersey law must fail because MetLife and Lloyds do not allege any connection between the actionable conduct and the state of New Jersey.  The Outside Directors add that it would violate the Commerce Clause of the United States Constitution to apply New

34

Jersey law extraterritorially.

New Jersey's Blue Sky law applies to "persons who sell or offer to sell when (1) an offer to sell is made in this State, or (2) an offer to buy is made or accepted in this State." N.J. Stat. Ann. §49:3-51(a). MetLife's complaint alleges that "private placement memoranda and other sales materials" were delivered to MetLife at its "New Jersey office, where the decisions to purchase the Notes were made." MetLife Compl., ¶41. Therefore, MetLife's complaint sufficiently alleges a basis for applying New Jersey law.

In contrast, the complaint of Lloyds (a British public limited company with its principal place of business in London, England), makes no allegations about where it was offered, or where it accepted an offer, to purchase notes. The complaint alleges that Credit Suisse First Boston LLC served as lead underwriter for the notes. According to the complaint, Credit Suisse First Boston LLC is a Delaware limited liability company, with its principal place of business in New York. Banc One Capital Markets, a broker-dealer that allegedly had a role in the note offering, is incorporated in Delaware, with it principal place of business in Illinois.

The Court finds that the complaint of Lloyds fails to contain any allegations that would bring the Outside Directors' alleged conduct within the scope of New Jersey's Blue Sky law. On the face of the complaint, there is no connection between New Jersey and the Outside Directors' actionable conduct. Lloyds has amended its complaint four times, and despite the Outside Directors raising this issue from the outset, the complaint fails to allege any connection to New Jersey. Accordingly, Lloyds's claim under New Jersey's Blue Sky law is dismissed.

###     2.    Application to Non-Sellers

As they argued with the Ohio statute, the Outside Directors contend that any claims for primary violations of the New Jersey law must fail because the Outside Directors are not "sellers."

New Jersey courts, also borrowing the definition of "seller" found in Pinter v. Dahl, 486 U.S. at 647, have held that a seller of a security includes both (1) an owner who passes title, or other interest in the security, to the buyer for value, and (2) a person, who motivated in part by his own financial interest or the interest of the security's owner, successfully solicits the purchase of a security.  See Zendell v. Newport Oil Corp., 226 N.J.Super. 431, 439-440, 544 A.2d 878, 882 (N.J. Super. Ct. 1988).

Again, MetLife does not argue that the Outside Directors are sellers, but points to those provisions of the New Jersey statute extending liability to control persons and those who aid the seller.  See N.J. Stat. Ann. §49:3-71(d).

With respect to control person liability, the Outside Directors repeat the argument they made in relation to the federal Section 20(a) control person claims.  The Outside Directors argue that in order to state a claim under New Jersey law, the complaint must allege an actual exercise of control and culpable participation in the primary violation.

The Court finds that MetLife's complaint states a claim under New Jersey law for controlling person liability.  New Jersey courts look to federal securities law to define controlling person liability.  See Abrams v. Ohio Cas. Ins. Co., 322 N.J. Super. 330, 337, 731 A.2d 48, 51-52 (N.J. Super. Ct. App. Div. 1999); Zendell, 226 N.J. Super. at 439-40, 544 A.2d at 882.  The Third Circuit,

36

though it once used a culpable participation test, no longer does so at the pleading stage.  See In re NUI Secur. Litig., 314 F.Supp.2d 388, 400 (D.N.J. 2004); Jones v. Intelli-Check, Inc., 274 F.Supp.2d 615, 645 (D.N.J. 2003) ("[T]he overwhelming trend in this circuit is that culpable participation does not have to be pleaded in order to survive a motion to dismiss.") (internal quotations and citations omitted).

Moreover, New Jersey federal and state courts have not required complaints to allege an actual exercise of control in order to survive a motion to dismiss.  See Palladin Partners v. Gaon, No. 05-cv-3305, 2006 WL 2460650, at *16 (D.N.J. Aug. 22, 2006) (holding that a complaint pleading "the potential to influence and direct the activities of the primary violator will survive a motion to dismiss") (internal quotations and citations omitted); Cammer v. Bloom, 711 F.Supp. 1264, 1294-95 (D.N.J. 1989); Abrams, 322 N.J.Super. at 337, 731 A.2d at 51-52.  Thus, MetLife's claim under New Jersey law for controlling person liability is sufficient for the same reasons discussed in relation to its federal Section 20(a) claim.

Turning to liability for aiding the sale, MetLife's complaint again relies on the allegations that the Outside Directors reviewed the Offering Materials for accuracy and that MetLife relied on the accuracy of the Offering Materials in deciding to purchase NPF XII notes.  This is sufficient to state a claim under New Jersey law because liability under N.J. Stat. Ann. §49:3-71(d) extends to those who have "minimal participation in the sale." Abrahamsen v. Laurel Gardens Ltd. P'ship, 276 N.J.Super. 199, 213, 647 A.2d 869, 877 (N.J. Super. Ct. Law Div. 1993); Cola v. Terzano, 129

37

N.J.Super. 47, 54, 322 A.2d 195, 199 (N.J. Super. Ct. Law Div. 1974).

The Court thus finds that MetLife has sufficiently stated claims against the Outside Directors under New Jersey's Blue Sky law.

## V.    COMMON LAW CLAIMS[4]

### A.    Breach of Fiduciary Duty

Metlife, Lloyds, and ING allege that the Outside Directors breached their fiduciary duties to NPF VI and NPF XII noteholders. They allege that the Outside Directors knew of self-dealing and corporate waste by National Century's Founders while the company was insolvent.  Plaintiffs contend that the Outside Directors had a fiduciary duty to protect the interests of noteholders but breached their duty by failing to prevent the self-dealing and corporate waste allegedly occurring at National Century.

A breach of fiduciary duty claim has three elements: (1) the existence of a duty arising from a fiduciary relationship, (2) a failure to observe such duty, and (3) an injury proximately resulting therefrom.  See Strock v. Pressnell, 38 Ohio St.3d 207, 216, 527 N.E.2d 1235, 1243 (1988); McConnell v. Hunt Sports Ent., 132 Ohio App.3d 657, 687, 725 N.E.2d 1193, 1215 (Ohio Ct. App. 1999).

Though a corporate officer generally does not owe a fiduciary duty to the corporation's creditors, "[u]nder long-standing Ohio law, the officers and directors of a corporation that is insolvent

---

[4]  The Court has refrained from making choice-of-law determinations until the facts are further developed.  Unless otherwise noted, the parties and the Court look primarily to Ohio law.

or is on the brink of insolvency owe a fiduciary duty to the corporation itself and to its creditors not to waste corporate assets which otherwise could be used to pay corporate debts." DeNune v. Consol. Capital of N. Am., Inc., 288 F.Supp.2d 844, 859 (N.D. Ohio 2003) (citing Thomas v. Matthews, 94 Ohio St. 32, 47, 113 N.E. 669 (Ohio 1916)); see also In re Amcast Indus. Corp., No. 04-40504, 2007 WL 777704, at *9 (Bankr. S.D. Ohio Mar. 12, 2007) (acknowledging the ruling in DeNune but emphasizing that the scope of the director's duty to creditors upon insolvency is not as broad as the duty he owes to the corporation itself).

The Outside Directors argue that the complaints do not sufficiently plead the first and second elements of a breach of fiduciary duty claim.  With respect to the existence of a fiduciary duty, the Outside Directors argue that the complaints are deficient because they simply allege that National Century went insolvent, without pinpointing when the insolvency occurred.  The Outside Directors contend that the complaints must satisfy the particularity requirement of Rule 9(b), Fed. R. Civ. P., because the breach of fiduciary duty claims "sound in fraud."  As to the second element, the Outside Directors argue that the complaints do not allege specific facts to overcome the presumption that the Outside Directors are protected by the business judgment rule.  See Gries Sports Enterprises, Inc. v. Cleveland Browns Football Co., Inc., 26 Ohio St.3d 15, 20, 496 N.E.2d 959, 963-64 (Ohio 1986).

Under Rule 9(b), all averments of fraud must be stated with particularity.  This holds true, whether the averment of fraud is "part of a fraud claim or [is] an element of a non-fraud claim." Tramontana v. May, Nos. 02-10012-BC, 01-10234-BC, 2004 WL 539065,

at *5 (E.D. Mich. March 16, 2004). When a breach of fiduciary duty
claim rests on averments of fraud, the allegations of fraudulent
conduct must satisfy Rule 9(b). See Sachs v. Sprague, 401 F.Supp.
2d 159, 170 n.15 (D. Mass. 2005) (applying Rule 9(b) to claim of
intentional breach of fiduciary duty); Mulbarger v. Royal Alliance
Associates, Inc., No. 96-cv-739, 1999 WL 33432317, at *2 (S.D. Ohio
Dec. 22, 1999) ("The Rule 9(b) particularity requirement also
applies to claims of breach of fiduciary duty predicated upon
fraud."); Tramontana, 2004 WL 539065, at *6-7 (same).

Here, the allegations regarding the existence of a fiduciary
duty do not rest on averments of fraud, but on whether National
Century was insolvent. See DeNune, supra (an officer's fiduciary
duty to creditors arises when a corporation becomes insolvent or is
on the brink of insolvency). Plaintiffs' allegations are subject
only to Rule 8(a)'s notice-pleading standard. Traditionally, a
company is insolvent when its liabilities exceed the fair value of
its assets. See O.R.C. §1336.02; Abood v. Nemer, 128 Ohio App.3d
151, 157, 713 N.E.2d 1151, 1155 (Ohio Ct. App. 1998); Prudential
Ins. Co. of Am. v. Science Park, L.P., 106 Ohio App.3d 823, 830,
667 N.E.2d 437, 442 (Ohio Ct. App. 1995). The complaints here
allege that National Century was insolvent while Plaintiffs held
notes. The complaints further allege National Century became
insolvent because it gave hundreds of millions of dollars to
healthcare providers in exchange for accounts receivable that had
little or no value. National Century allegedly had lost over $2
billion by the time it filed for bankruptcy. The Court finds that
the complaints sufficiently allege that National Century was
insolvent while Pote, Wilkinson, and Mendell were outside

40

directors, giving rise to the existence of a fiduciary duty.

Turning to the element of breach, the Outside Directors again believe Rule 9(b) should apply.  But the allegations of breach do not involve fraud on the part of the Outside Directors.  Instead, the alleged breach was their failure to protect Plaintiffs' interests against the fraud of National Century and its Founders. The Court has already determined that the underlying allegations of fraud committed by National Century and the Founders satisfy Rule 9(b).  See Feb. 27, 2006 Order, pp. 16-21.  The allegations of the Outside Directors' breach of fiduciary duty are not subject to Rule 9(b).

The Outside Directors nonetheless contend that the business judgment rule imposes a heightened pleading standard.  The business judgment rule is a "rebuttable presumption that directors are better equipped than the courts to make business judgments and that the directors acted without self-dealing or personal interest and exercised reasonable diligence and acted in good faith."  See Gries Sports, 26 Ohio St.3d at 20, 496 N.E.2d at 963-64.  According to the Outside Directors, the complaints must allege specific facts sufficient to overcome the rule's presumption.

In support of their argument, the Outside Directors cite Delaware case law holding that in order to survive a motion to dismiss, a plaintiff "must sufficiently plead facts which if true would take defendants' actions outside the protection afforded by the business judgment rule."  Crescent/Mach I Partners, L.P. v. Turner, 846 A.2d 963, 984 (Del. Ch. 2000); see also In re General Motors Class E Stock Buyout Sec. Litig., 694 F.Supp. 1119, 1132 (D. Del. 1988) ("[I]n order to overcome the presumption of the business

41

judgment rule [the plaintiff] must allege with particularity facts which establish that the contested decision was not a product of valid business judgment."); <u>Aronson v. Lewis</u>, 473 A.2d 80, 812 (Del. 1984). This heightened pleading standard stems from Delaware's rules of court, which impose a burden of particularity in shareholder derivative actions. See <u>Khanna v. McMinn</u>, No. Civ.A. 20545-NC, 2006 WL 1388744, at *11 (Del. Ch. May 9, 2006). Nonetheless, the pleading standard has been extended to direct actions challenging the business decisions of corporate officers. See <u>In re IT Group Inc.</u>, No. 02-10118, 2005 WL 3050611, at *8 n.10 (D. Del Nov. 15, 2005); <u>Stanziale v. Nachtomi</u>, No. Civ.A. 01-403 KAJ, 2004 WL 1812705, at *2 (D. Del. Aug. 6, 2004); <u>In re RSL COM PRIMECALL, Inc.</u>, Nos. 01-11457, 2003 WL 22989669, at *10 (Bankr. S.D.N.Y. Dec. 11, 2003) (applying Delaware law).

The rule in Ohio appears to be different. In the lone case that is directly on point, an Ohio Court of Appeals ruled that the business judgment rule imposes a burden of proof, not a burden of pleading. See <u>Marsalis v. Wilson</u>, 149 Ohio App.3d 637, 642, 778 N.E.2d 612, 616 (Ohio Ct. App. 2002). The court held that when a plaintiff alleges "breach of fiduciary duty on the [corporate officer's] part, the business judgment rule would impose on plaintiffs a burden at trial to present evidence to rebut the presumption the rule imposes. However, plaintiffs are not likewise obligated to plead operative facts in their complaint that would rebut the presumption." <u>Id.</u>; see also <u>Thompson v. Cent. Ohio Cellular, Inc.</u>, 93 Ohio App.3d 530, 544, 639 N.E.2d 462, 471 (Ohio Ct. App. 1994) (noting that "issues concerning . . . the business judgment rule are not properly before this court or the trial court

42

on appellees' motion to dismiss.").

In any event, federal courts are to apply federal procedural law. See Hanna v. Plumer, 380 U.S. 460, 465, 85 S.Ct. 1136, 1141 (1965). The Third Circuit has observed that the Delaware pleading standard does not match the federal standard – "The problem is that Delaware courts interpret Chancery Rule 8 to require pleading with specificity. That is not the federal notice pleading standard." In re Tower Air, Inc., 416 F.3d 229, 236 (3d Cir. 2005). In Tower Air, the court held that the district court erred by "imposing a heightened pleading standard not required by Federal Rule of Civil Procedure 8." Id. at 237. The court then found that the proper standard is to require a plaintiff to "plead around the business judgment rule" when the complaint brings the rule directly into issue. Id. at 238. Thus, a plaintiff whose complaint challenges a director's business action or decision must plead, under the Rule 8 standard, an exception to the business judgement rule. Id. See also NCS Healthcare, Inc. v. Candlewood Partners, LLC, 160 Ohio App.3d 421, 429, 827 N.E.2d 797, 803 (Ohio Ct. App. 2005) (dismissing complaint against directors for failing to allege that an exception to business judgment rule applied). The plaintiff is not required to plead the exception with particularity. Tower Air, 416 F.3d at 237-38; see also Marsalis, 149 Ohio App.3d at 149, 778 N.E.2d at 616 ("Any matters that involve the business judgment rule, as such, are not among those matters that Civ. R. 9 requires a plaintiff to specially plead.").

The business judgment rule does not protect directors who engage in self-dealing or act with bad faith. Gries Sports, 26 Ohio St.3d at 20, 496 N.E.2d at 963-64. Also not protected are

directors who waste the corporate assets of an insolvent company, DeNune, 288 F.Supp.2d at 859, and those who are uninformed, not independent, or grossly negligent. NCS Healthcare, 160 Ohio App.3d at 429, 827 N.E.2d at 803; Granada Invs., Inc. v. DWG Corp., 823 F.Supp. 448, 456 (N.D. Ohio 1993). Finally, the business judgment rule does not protect a director who fails to attempt to prevent waste or self-dealing, of which the director knew or should have known, was being committed by another corporate officer. Biggins v. Garvey, 90 Ohio App.3d 584, 601, 630 N.E.2d 44, 55 (Ohio Ct. App. 1993) (holding that a director breached her fiduciary duty when she failed to act on knowledge of fellow director's waste of corporate assets); Geygan v. Queen City Grain Co., 71 Ohio App.3d 185, 193-94, 593 N.E.2d 328, 332-33 (Ohio Ct. App. 1991) (holding that director breached her fiduciary duty when she acquiesced to fellow director's misappropriation of insurance proceeds).

The complaints here sufficiently plead around the business judgment rule. They assert that the Outside Directors breached their fiduciary duties by not acting to stop National Century and its Founders from self-dealing and wasting corporate assets. The complaints allege at length that the Founders of National Century wasted corporate assets by setting up an elaborate scheme to misappropriate money invested by noteholders. In short, the Founders allegedly funneled the money to themselves by "purchasing" non-existent or worthless receivables from healthcare companies in which the Founders held a financial interest. The complaints additionally allege that the Outside Directors knew or should have known about the scheme. Specifically, the complaints allege that the Outside Directors either possessed information or had access to

44

information which should have alerted them to National Century's wasting of assets. <u>See</u> MetLife Compl., ¶¶76-83, 89; Lloyds Compl., ¶¶73-80, 86; ING Compl., ¶¶100-103. Despite this knowledge, the Outside Directors allegedly did not act to protect the interests of noteholders.

Without citing any cases, the Outside Directors contend that a director does not breach his fiduciary duty unless he personally benefits from the self-dealing. However, "[w]hen a director has knowledge of a fellow director's improprieties and does not act upon the information, her decision to stand idly by is not a defense." <u>Geygan</u>, 71 Ohio App.3d at 193, 593 N.E.2d at 333. This amounts to a breach of duty "unprotected by the business judgment rule," <u>id</u>., even though the director does not personally benefit from the other's self-dealing. <u>Biggins</u>, 90 Ohio App.3d at 601, 630 N.E.2d at 55 ("The mere fact that she did not directly receive any of the proceeds from the fire insurance does not exonerate her."). <u>See also</u> <u>Atherton v. Anderson</u>, 99 F.2d 883, 888-89 (6th Cir. 1938) (directors owe duty to "maintain a reasonable control and supervision over the affairs" of the company and cannot "shut their eyes" to misconduct going on around them); <u>Pereira v. Cogan</u>, 265 B.R. 32, 34 (S.D.N.Y. 2001) ("[T]he Directors had a duty to prevent self-dealing from happening."); <u>Trieweiler v. Sears</u>, 268 Neb. 952, 975-76, 689 N.W.2d 807, 832-33 (Neb. 2004) (outside director breached fiduciary duty by failing to detect and prevent insider's misappropriation of corporate money); <u>Francis v. United Jersey Bank</u>, 87 N.J. 15, 39, 432 A.2d 814, 826 (N.J. 1981) (holding that directors have duty to stop insiders from "bleeding a corporation to death").

45

Accordingly, the Court finds that Metlife, Lloyds, and ING have stated claims for breach of fiduciary duty against the Outside Directors.

### B.  **Fraud**

#### 1.  **Elements and Pleading Standard**

MetLife, ING Bank, and Pharos each assert claims for fraud against the Outside Directors.  The elements of common law fraud are: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance.  Russ v. TRW, Inc., 59 Ohio St.3d 42, 49, 570 N.E.2d 1076, 1083-84 (Ohio 1991).

Under Rule 9(b), Fed. R. Civ. P., averments of fraud and the circumstances constituting the fraud must be stated with "particularity."  To comply with Rule 9(b), "a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'"  Walburn v. Lockheed Martin Corp., 431 F.3d 966, 972 (6th Cir. 2005) (quoting Coffey v. Foamex L.P., 2 F.3d 157, 161-62 (6th Cir. 1993)).  Scienter may be inferred from circumstantial evidence.  S.E.C. v. Blackwell, 291 F.Supp.2d 673, 696 (S.D. Ohio 2003).

46

2.   **MetLife**

MetLife's fraud claim is based on the same allegations as its Section 10(b) claim.  MetLife alleges that the Outside Directors committed fraud because the Offering Materials contained misrepresentations about how NPF XII operated.  In response, the Outside Directors return to their argument that group pleading is improper and they cannot be held liable for any misrepresentations in the Offering Materials absent particularized allegations that they prepared the Offering Materials or were involved in the daily operations of NPF XII.

A plaintiff is not necessarily barred from using group pleading to support a common law fraud claim, so long as Rule 9(b) is ultimately satisfied.  See MBIA Ins. Corp. v. Royal Indem. Co., 221 F.R.D. 419, 421 (D. Del. 2004) ("[P]rovided a plaintiff alleges sufficiently particularized allegations, there is no per se rule that group pleading cannot satisfy Rule 9(b).").  In the case of National Century's Founders, the complaints initially used group pleading to assert that one or all of the Founders reviewed the Offering Materials, but went on to provide particularized allegations regarding each of the Founders' insider roles at National Century and their first-hand knowledge of the fraud.  This was sufficient to hold the Founders responsible for the alleged misrepresentations in the Offering Materials.  Thus, even with National Century's Founders, the Court required something more than bare group pleading.  See Feb. 27, 2006 Order, pp. 16-18.

With respect to the Outside Directors, MetLife uses bare group pleading to allege that the Outside Directors reviewed the Offering Materials for accuracy.  This is not sufficient under Rule 9(b)

47

because a "plaintiff is required to meet the Rule 9(b) standard as
to *each* defendant against whom fraud is alleged." Blackwell, 291
F.Supp.2d at 686 (emphasis added). MetLife's complaint contains no
particularized allegations about what role each of the Outside
Directors played in preparing the Offering Materials or in managing
NPF XII's operations. See Adams v. NVR Homes, Inc., 193 F.R.D.
243, 250 (D. Md. 2000) ("A complaint fails to meet the
particularity requirements of Rule 9(b) when a plaintiff asserts
merely conclusory allegations of fraud against multiple defendants
without identifying each individual defendant's participation in
the alleged fraud."); Haskin v. R.J. Reynolds Tobacco Co., 995
F.Supp. 1437, 1439 (M.D. Fla. 1998) (holding that Rule 9(b)
"require[s] plaintiffs to differentiate their allegations when
suing more than one defendant . . . and inform each defendant
separately of the allegations surrounding his alleged participation
in the fraud") (internal quotation omitted); Wiener v. Napoli, 760
F.Supp. 278, 284 (E.D.N.Y. 1991) (holding that where "multiple
defendants are involved in the alleged fraud, it is especially
important that the fraud be particularized as to each one of
them.").

In In re Cendant Corp. Sec. Litig., 190 F.R.D. 331 (D.N.J.
1999), a company's outside directors were sued for alleged
misrepresentations in the company's financial statements. The
complaint used group pleading to allege that the outside directors
had reviewed the statements. The court dismissed the fraud claims,
finding "[s]uch conclusory pleading" does not withstand Rule 9(b)
scrutiny. Cendant, 190 F.R.D. at 335. As with MetLife's
complaint, the complaints in Cendant failed to set forth

48

particularized facts concerning each of the outside directors'
participation in the statements or their roles in the company's
operations.  Id.; see also In re Suprema Specialties, Inc. Sec.
Litig., 438 F.3d 256, 281-82 (3d Cir. 2006) (group allegation that
outside directors reviewed company's financial reporting was
insufficient under Rule 9(b) absent "any attempt to link specific
individuals to specific instances" of wrongdoing); Thornock v.
Kinderhill Corp., 712 F.Supp. 1123, 1128-29 (S.D.N.Y. 1989) (group
allegation that outside directors helped prepare the company's
private placement memoranda did not satisfy Rule 9(b)); Bruce v.
Martin, No. 90 Civ. 1002, 1992 WL 204395, at *6 (S.D.N.Y. Aug. 14,
1992) (dismissing fraud claim against outside director where
complaint alleged that all defendants had helped prepare offering
materials).

Accordingly, MetLife's fraud claim against the Outside
Directors is dismissed.

### 3.  ING

ING's fraud claim rests on a different theory than MetLife's
claim did.  ING alleges that the Outside Directors owed a duty "to
advise ING Bank of NPF VI's true financial condition."  ING Compl.,
¶206.  According to the complaint, NPF VI's true condition was that
it was buying ineligible or non-existent accounts receivable,
failing to maintain sufficient reserves, and engaging in related-
party transactions.  ING alleges that the Outside Directors knew of
these facts but failed to disclose them to ING.  Unaware of those
facts, ING decided to invest in NPF VI.

The Outside Directors argue that the fraud claim must be
dismissed for three reasons.  First, they argue that there is no

49

basis for them owing a duty to disclose to ING.  Second, they contend that the complaint does not support an inference that they knew of NPF VI's financial condition.  Third, they argue that the complaint fails to sufficiently allege an intent to mislead.

### a.    Duty

Ohio law "prohibits not only affirmative misrepresentation, but also fraudulent nondisclosure where there is a duty to disclose."  State v. Warner, 55 Ohio St.3d 31, 54, 564 N.E.2d 18, 40 (Ohio 1990); see also Chiarella v. United States, 445 U.S. 222, 228, 100 S.Ct. 1108, 1114 (1980) ("[T]here can be no fraud absent a duty to speak.").  The existence of a fiduciary duty can give rise to a duty to speak - "'the duty to disclose arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'"  Warner, 55 Ohio St.3d at 54, 564 N.E.2d at 40 (quoting Chiarella, 445 U.S. at 228, 100 S.Ct. at 1114) (internal quotation and footnote omitted).  Here, as discussed above, ING has sufficiently pleaded that a fiduciary duty existed.

### b.    Knowledge

The Outside Directors next argue that ING's complaint does not sufficiently allege that they had knowledge of, or recklessly disregarded, facts concerning NPF VI's alleged financial condition. The Outside Directors contend that the complaint relies on vague allegations and does not state with particularity what information within their knowledge they should have disclosed.

The complaint's allegations regarding what each of the Outside Directors knew are as follows.  ING alleges that Pote, Wilkinson, and Mendell "had access to the books and records" of National

50

Century and its subsidiaries, thereby "acquir[ing] extensive knowledge" of National Century's "activities." ING Compl., ¶100. As a member of the audit committee, Pote allegedly had knowledge of National Century's financial statements and "the fraudulent processes that produced those financial statements." Id. In April 1999, Pote and Wilkinson allegedly received draft prospectuses indicating that some of National Century's programs "have not complied with various documentary and reporting provisions of the indentures." Id., ¶104. At a board meeting attended by Pote on December 7, 1999, it was revealed that non-existent and ineligible receivables accounted for 54% of all of National Century's receivables in 1998 and 27% of all receivables in 1999. Id., ¶102. At a meeting attended by Pote on July 13, 2000, it was revealed that National Century was engaging in related-party transactions. Id., ¶103.

The complaint additionally alleges that the accounting firm KPMG prepared an audit report for the Focus Value Fund in 1998. The report allegedly disclosed that National Century had purchased ineligible receivables and "problem assets" and had manipulated reserves and re-aged receivables to support performance tests. ING Compl. ¶101. The complaint alleges that Pote, Wilkinson, and Mendell were senior managers of the Focus Value Fund and, through the report, became informed of National Century's purchase of ineligible receivables and manipulation of reserves.

The Court starts with the allegation that the Outside Directors are liable for fraud because, by virtue of their positions and access to records, they acquired "extensive knowledge" of National Century's "activities." This is

51

insufficient to satisfy Rule 9(b). As one court stated, "allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.'" <u>In re Advanta Corp. Sec. Litig.</u>, 180 F.3d 525, 539 (3d Cir. 1999) (quoting <u>Maldonado v. Dominguez</u>, 137 F.3d 1, 10 (1st Cir. 1998)). The Sixth Circuit has held that plaintiffs "may not simply rely on the proposition that Defendants must have known or should have known of, and participated in, the fraud." <u>Bovee v. Coopers & Lybrand C.P.A.</u>, 272 F.3d 356, 361 (6th Cir. 2001); <u>see also</u> <u>Suprema Specialties</u>, 438 F.3d at 282 ("The allegation that the Outside Directors . . . had access to unspecified business records and a duty to review them" does not satisfy Rule 9(b)); <u>DiLeo v. Ernst & Young</u>, 901 F.2d 624, 629 (7th Cir. 1990) (holding that "bare inference that the defendant 'must have had' knowledge of the facts" does not satisfy Rule 9(b)); <u>Albert Fadem Trust v. American Elec. Power Co.</u>, Inc. 334 F.Supp.2d 985, 1013 (S.D. Ohio 2004) (same).

ING stresses that knowledge "may be averred generally" under Rule 9(b). <u>See</u> Fed. R. Civ. P. 9(b); <u>Minger v. Green</u>, 239 F.3d 793, 800 (6th Cir. 2001). This is true, but the flaw in ING's complaint is that it generally avers that the Outside Directors must have known about National Century's "activities" – an allegation so vague that a defendant cannot be expected to read the complaint and know what exactly he supposedly knew and should have disclosed to ING. <u>See</u> <u>Bovee</u>, 272 F.3d at 361 (noting that Rule 9(b) "'ensures that allegations are specific enough to inform a

defendant of the act of which the plaintiff complains, and to enable him to prepare an effective response and defense'") (quoting Vennittilli v. Primerica, Inc., 943 F.Supp. 793, 798 (E.D. Mich. 1996)).  As noted above, the Sixth Circuit has interpreted Rule 9(b) as requiring a plaintiff to "allege the time, place, and content of the alleged misrepresentation." Walburn, 431 F.3d at 972.  The complaint must therefore specify the content of what the Outside Directors knew and should have disclosed.  See Sanderson v. HCA-The Healthcare Co., 447 F.3d 873, 877 (6th Cir.  2006) (fraud claim must set out precisely what omissions were made); Shaffer v. Eden, 209 F.R.D. 460, 463 (D. Kan. 2002) (dismissing fraud claim where the complaint failed to specify what facts corporate officers knew and did not disclose).

The Court finds that ING's complaint does ultimately satisfy Rule 9(b)'s standard in identifying what information the Outside Directors knew and should have disclosed.  It alleges that Pote learned during meetings in December 1999 and July 2000 that National Century had purchased ineligible receivables and engaged in related-party transactions.  The complaint also alleges that Pote and Wilkinson each received draft prospectuses indicating that NPF VI had violated reporting provisions of the Master Indenture. Moreover, each of the Outside Directors allegedly received the KPMG report disclosing National Century's purchase of ineligible receivables and manipulation of reserves.  According to the complaint, the Outside Directors received this information in their roles as senior managers of the Focus Value Fund, which at the time was in the process of acquiring 20% of National Century's stock.

### c.   Intent

The Outside Directors finally argue that the complaint does not sufficiently allege that the Outside Directors had an intent to mislead ING.   Rule 9(b) provides that intent may be averred generally.   Fed. R. Civ. P. 9(b); Green, 239 F.3d at 800.   The complaint alleges that the Outside Directors intentionally withheld the information they knew (that National Century had purchased ineligible receivables, engaged in related-party transactions, manipulated reserves, and violated reporting provisions of the Master Indenture) in an effort to deceive ING and the investing public.   ING Compl., ¶¶206, 208.   The complaint further alleges that the Outside Directors, who were senior managers of the Focus Value Fund, were motivated by their interest in protecting the Fund's stake in National Century.   Id., ¶99.   The Court finds that these allegations sufficiently plead an intent to mislead ING.   See Ballan v. Upjohn Co., 814 F.Supp. 1375, 1387 (W.D. Mich. 1992) (pleading motive "can be a means to establish scienter").

Accordingly, ING's complaint states a claim for fraud against the Outside Directors.   It should be noted that ING seeks punitive damages in connection with its fraud claim.   "Under Ohio law, an award of punitive damages in a tort case may be made only upon a finding of actual malice, fraud, oppression, or insult on the part of the defendant."   Estate of Schmidt v. Derenia, 158 Ohio App.3d 738, 740, 822 N.E.2d 401, 404 (Ohio Ct. App. 2004).   Though the Outside Directors argue that their alleged conduct does not rise to the level of actual malice or fraud, ING has stated a claim for fraud and it cannot be said that there are no set of facts that would entitle ING to punitive damages.

###### 4.    Pharos

Pharos brings a fraud claim against all defendants, including the Outside Directors, for alleged misrepresentations and material omissions in various documents given to Pharos when it purchased preferred stock in National Century.  The complaint lists five categories of documents that contained misrepresentations: a private placement memorandum, financial statements, audit reports, an opinion letter, and "other materials" issued by National Century.  The Outside Directors argue that the allegations fail for several reasons, chiefly that the documents cannot be attributed to them.

The first of the documents is a "Private Placement Memorandum, prepared and issued by CSFB [underwriter Credit Suisse First Boston Corp.] and Shattan [co-underwriter The Shattan Group, L.L.C.]." Pharos Compl., ¶114.  By the complaint's own description, the underwriters prepared and issued the document. See also id., ¶76 (stating that "CSFB and Shattan prepared and circulated the Memorandum").  After specifically attributing the private placement memorandum to Credit Suisse and the Shattan Group, the complaint then alleges that all of the named defendants "created, reviewed and/or approved" all five categories of documents, including the private placement memorandum. Id., ¶114.  This allegation grouping together all named defendants is insufficient to state a fraud claim against the Outside Directors for the alleged misrepresentations in the private placement memorandum.  The complaint contains no particularized allegations regarding the roles of each Outside Director in preparing, reviewing, or approving the memorandum. See Suprema Specialties, 438 F.3d at

55

281-82 (group allegation that outside directors reviewed financial
reports was insufficient under Rule 9(b) absent "any attempt to
link specific individuals to specific instances" of wrongdoing).

The second category of documents is National Century's
"financial statements."  The complaint repeatedly mentions
"financial statements" without identifying which financial
statements it is referring to, nor does it specify what the
misrepresentations were.  This alone is fatal to the fraud claim.
See Walburn, 431 F.3d at 972 (to comply with Rule 9(b), a plaintiff
must allege the "time, place, and content of the alleged
misrepresentation").  The complaint does make brief references to
National Century's 1999 and 2000 financial statements.  See Pharos
Compl., ¶¶61, 70, 73.  But the complaint mentions these statements
in relation to audit reports prepared by Deloitte & Touche and does
not link the Outside Directors to the 1999 and 2000 financial
statements.

The third category of documents is audit reports prepared by
Deloitte & Touche.  Though the Outside Directors are alleged to
have approved the audits, the complaint does not support an
inference that the Outside Directors acted with an intent to
mislead Pharos.  According to the complaint, the Outside Directors
"rubber-stamped Deloitte's audits," gave a "blind seal of
approval," and "asked no questions of Deloitte and merely took
Deloitte at its word."  Pharos Compl., ¶¶86, 105.  These
allegations show negligence, not an intent to mislead, on the part
of the Outside Directors.[5]

---

[5]  Pharos used the same allegations to successfully support its claim
under O.R.C. §1707.43.  See Section IV.A.2.b, supra.  The statute extends
liability to "every person that has participated in or aided the seller in any

The fourth category of documents is "an opinion letter issued by Purcell & Scott," a law firm that served as counsel to National Century.  Pharos Compl., ¶114.  Again, the complaint fails to state what role the Outside Directors had in preparing the opinion letter.

The fifth and final category of documents is described as a catch-all: "other materials created, reviewed and/or approved by National Century, its officers and directors, and its agents and consulting professionals."  Pharos Compl., ¶114.  This allegation fails because the complaint does not identify what these "other materials" were.  See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1422 (3d Cir. 1997) (to state claim for fraud, a plaintiff must support his allegations with specific facts laying out the "who, what, where, when, and how" of the fraud); Walburn, 431 F.3d at 972; Giannaris v. Cheng, 219 F.Supp.2d 687, 695 n.5 (D. Md. 2002) (dismissing "catch-all" allegations of fraud); Gross v. Diversified Mortgage Investors, 431 F.Supp. 1080, 1087 (S.D.N.Y. 1977) ("[T]here must be a specific identification of what statements were made in what reports and in what respects they were false, misleading or inaccurate or what omissions were made and why the statements made are believed to be misleading.").

Accordingly, Pharos's fraud claims against the Outside Directors are dismissed in their entirety.

----

way in making such sale or contract for sale."  A plaintiff need not allege fraudulent intent in order to state a claim under the statute.

C.    **Aiding and Abetting**

    1.    **Existence of a Cause of Action in Ohio**

ING and Pharos both assert a claim for aiding and abetting fraud.  ING also asserts a claim for aiding and abetting breach of fiduciary duty.  The Outside Directors argue that Ohio does not recognize a claim for aiding an abetting tortious conduct.  The Court has dealt with this issue in a previous order, noting the uncertainty in the case law.  See Oct. 3, 2006 Order, pp. 16-17 (citing Pavlovich v. National City Bank, 435 F.3d 560, 570 (6th Cir. 2006) ("It is unclear whether Ohio recognizes a common law cause of action for aiding and abetting tortious conduct.")).  As it did in the previous order, the Court declines, on a Rule 12(b)(6) motion, to dismiss the aiding and abetting claims because it cannot be said conclusively that Ohio law does not recognize such a cause of action.

    2.    **ING**

The Outside Directors next argue that even if a cause of action for aiding and abetting tortious conduct exists, ING has failed to state the elements of such a claim.  Those elements are: "(1) knowledge that the primary party's conduct is a breach of duty and (2) substantial assistance or encouragement to the primary party in carrying out the tortious act."  Andonian v. A.C. & S., Inc., 97 Ohio App.3d 572, 574-75, 647 N.E.2d 190, 191-92 (Ohio Ct. App. 1994); see also Aetna Cas. and Sur. Co. v. Leahey Constr. Co., 219 F.3d 519, 533 (6th Cir. 2000).  Courts have interpreted the first element as requiring actual knowledge of the underlying tortious conduct.  See Aetna, 219 F.3d at 533; Javitch v. First Montauk Fin. Corp., 279 F.Supp.2d 931, 946 (N.D. Ohio 2003); see

58

also In re Sharp Int'l Corp., 403 F.3d 43, 49 (2d Cir. 2005).  A plaintiff, however, need not allege that the aider and abettor had actual knowledge "of all of the details of the primary party's scheme." Aetna, 219 F.3d at 536.  "[I]t is enough for the aider and abettor to have a general awareness of [his] role in the other's tortious conduct for liability to attach." Id. at 534 (citing Camp v. Dema, 948 F.2d 455, 460 (8th Cir. 1991)).  A plaintiff may use circumstantial evidence to support an inference of actual knowledge.  Id. at 535.

ING's complaint supports a reasonable inference that the Outside Directors had actual knowledge of the alleged fraud and breaches of fiduciary duty occurring at National Century.  As explained in relation to ING's fraud claim, the complaint states that the KPMG report gave the Outside Directors actual knowledge of National Century purchasing ineligible receivables, engaging in related-party transactions, manipulating reserves, and violating reporting provisions of the Master Indenture.  The complaint further alleges that Pote learned of the same information during meetings in 1999 and 2000.

Turning to the element of substantial assistance, ING alleges that the Outside Directors assisted by failing to disclose what they knew about the fraud and breaches at National Century.  Typically, "mere inaction" is not sufficient to support aider and abettor liability, but when the aider and abettor owes a fiduciary duty to the plaintiff, his failure to act may constitute substantial assistance. Lerner v. Fleet Bank, N.A., 459 F.3d 273, 295 (2d Cir. 2006).  Here, the complaint sufficiently alleges that the Outside Directors owed a fiduciary duty to ING and thus states

59

claims against the Outside Directors for aiding and abetting.

### 3. Pharos

Unlike ING, Pharos does not rely on the existence of a fiduciary duty to support its aiding and abetting claim. Thus, to state a claim, Pharos must allege an affirmative act of assistance. Lerner, 459 F.3d at 295. The complaint does not expressly state how the Outside Directors assisted in National Century's alleged fraud. In its brief, Pharos points out two possible ways.

First, Pharos argues that the Outside Directors participated in preparing certain offering materials. However, as discussed in relation to Pharos's fraud claim, the complaint expressly credits other defendants with preparing the materials. Second, Pharos argues that the Outside Directors approved Deloitte & Touche's audits. The complaint does specifically allege that the Outside Directors "rubber-stamped Deloitte's audits." Even so, aiding and abetting liability does not attach unless a defendant's assistance was knowing. See Aetna, 219 F.3d at 534; Lerner, 459 F.3d at 292-93. By the complaint's own description, the Outside Directors gave a "blind seal of approval" and "asked no questions of Deloitte and merely took Deloitte at its word." Pharos Compl., ¶86. These allegations do not support an inference that the Outside Directors had actual knowledge of the falsity of the audits.

Thus, Pharos has failed to state a claim for aiding and abetting fraud against the Outside Directors.

### D. Negligent Misrepresentation

#### 1. Elements

Under Ohio law, a person is liable for negligent

misrepresentation when: (1) he supplies false information (2) for the guidance of others in their business transactions, (3) causing pecuniary loss to plaintiff, (4) who justifiably relies upon the information, (5) if he fails to exercise reasonable care or competence in obtaining or communicating the information. <u>Delman v. Cleveland Heights</u>, 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 838 (Ohio 1989).

MetLife asserts a claim for negligent misrepresentation against the Outside Directors. Relying on the same allegations that it made in support of its Section 10(b) and fraud claims, MetLife alleges that the Outside Directors are responsible for the misrepresentations contained in the Offering Materials. MetLife alleges that the Outside Directors acted negligently and "without any reasonable grounds for believing the representations they made were true." MetLife Compl., ¶167.

### 2. Pleading Standard

The parties disagree over the application of Rule 9(b) to a negligent misrepresentation claim. This is an issue over which courts have reached different conclusions. <u>See</u> <u>@Wireless Enterprises, Inc. v. AI Consulting, LLC</u>, No. 05-cv-6176, 2006 WL 3370696, at *13 (W.D.N.Y. Oct. 30, 2006) ("[I]t is unclear whether or not Rule 9(b) applies to negligent misrepresentation claims."). Some courts, including this one, have applied Rule 9(b) without discussion or elaboration. <u>See</u> <u>In re SmarTalk Teleservices, Inc. Sec. Litig.</u>, 124 F.Supp.2d 487, 502 (S.D. Ohio 2000) ("Rule 9(b) applies to Plaintiffs' negligent misrepresentation claims."); <u>Mulbarger v. Royal Alliance Assocs., Inc.</u>, No. C-2-96-0739, 1999 WL 33432317, at *2 (S.D. Ohio Dec. 22, 1999) ("[S]tandards of Rule

9(b) apply to claims of negligent misrepresentation."); see also
Northwestern Mut. Life Ins. Co. v. Banc of Am. Sec. LLC, 254
F.Supp.2d 390, 400 (S.D.N.Y. 2003) ("A common law claim for
negligent misrepresentation must satisfy the requirements of Fed.
R. Civ. P. 9(b)); In re U.S. Office Prods. Co. Sec. Litig., 251
F.Supp.2d 58, 74 (D.D.C. 2003).

Other courts, including ones in the Sixth Circuit, have
applied Rule 9(b) while emphasizing that the particular negligent
misrepresentation claim before the court sounded in fraud. See
Anderson v. Merck & Co. Inc., 417 F.Supp.2d 842, 848 n.6 (E.D. Ky.
2006) (applying Rule 9(b) because negligent misrepresentation claim
alleged that defendant "knew or should have known" of the falsity
of a representation); Krieger v. Gast, No. 4:99-cv-86, 2000 WL
288442, at *6 (W.D. Mich. Jan. 21, 2000) (holding that "Rule 9(b)
applies to non-fraud claims 'grounded in fraud'"). As one court
put it, the "requirements of Rule 9(b) apply to all cases where the
gravamen of the claim is fraud even though the theory supporting
the claim is not technically termed fraud." Adams v. NVR Homes,
Inc., 193 F.R.D. 243, 250 (D. Md. 2000); see also Advisor's Capital
Invs., Inc. v. Cumberland Cas. & Sur. Co., No. 8:05-CV-404-T-23MAP,
2007 WL 220189, at *4 (M.D. Fla. Jan. 26, 2007) ("[I]n Florida, an
action for negligent misrepresentation sounds in fraud rather than
negligence."); Breeden v. Richmond Cmty. Coll., 171 F.R.D. 189, 199
(M.D.N.C. 1997).

Similarly, when a party brings both fraud and negligent
misrepresentation claims but fails to plead an independent basis of
liability for each of the claims, courts will apply Rule 9(b)'s
standard to both claims. See Williams v. WMX Technologies, 112

F.3d 175, 177 (5th Cir. 1997) (applying Rule 9(b) because plaintiffs "d[id] not attempt to distinguish" their negligent misrepresentation claim from their fraud claim and relied on "the same misrepresentations" for both claims); Shushany v. Allwaste, Inc., 992 F.2d 517, 520 n.5 (5th Cir. 1993) (same). Rule 9(b) applies if a claim for negligent misrepresentation simply "realleges and incorporates by reference all prior allegations, including those alleging fraud,". In re Parmalat Sec. Litig., No. 04-md-1653, 2007 WL 869012, at *3 n.30 (S.D.N.Y. Mar. 23, 2007); see also Applied Elastomerics, Inc. v. Z-Man Fishing Prods., Inc., No. C 06-2469, 2007 WL 703606, at *5 (N.D. Cal. Mar. 5, 2007) (applying Rule 9(b) when fraud and negligent misrepresentation claims rest on "the same facts").

The Fifth Circuit in American Realty Trust, Inc. v. Hamilton Lane Advisors, Inc., 115 Fed. Appx. 662 (5th Cir. 2004) (unpub.), distinguished its prior rulings in Williams and Shushany. In American Realty, the plaintiffs carefully set out a separate basis for their negligent misrepresentation claim, independent from their fraud claim. See 115 Fed. Appx. at 669 n.30. The court concluded that such "negligent misrepresentation claims are only subject to the liberal pleading requirements of Rule 8(a)." Id. at 668.

In a recent ruling, the Seventh Circuit applied Rule 8(a) to a negligent misrepresentation claim without discussion and without acknowledging case law to the contrary. See Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP, 475 F.3d 824, 833 (7th Cir. 2007). District courts in the Seventh Circuit have declined to apply Rule 9(b) to negligent misrepresentation claims because "lacking in such a claim is the fraud requirement of scienter."

<u>Banta Corp. v. Honeywell Int'l, Inc.</u>, No. 05-C-989, 2006 WL 801008,
at *1 (E.D. Wis. Mar. 24, 2006); <u>see also</u> <u>Service Auto Parts, Inc.</u>
<u>v. Benjamin & Birkenstein, P.C.</u>, No. 04 C 2926, 2004 WL 2359233, at
*2 (N.D. Ill. Oct. 19, 2004).

MetLife cites a decision, <u>In re Cendant Corp. Sec. Litig.</u>, 190
F.R.D. 331 (D.N.J. 1999), that was discussed above in relation to
MetLife's fraud claim.  In <u>Cendant</u>, plaintiffs asserted claims for
fraud and negligent misrepresentation.  The complaint used group
pleading to allege that a company's outside directors were
responsible for misrepresentations in the company's financial
statements because they had reviewed the statements.  The court
dismissed the fraud claim for failure to allege with particularity
that any of the outside directors had helped prepare the statements
or participated in the fraud.  But the court allowed the negligent
misrepresentation claim to go forward:

> Although this claim incorporates the general factual
> allegations that seek to establish fraud, the plaintiffs'
> reference to "reasonable care" denotes that they had no
> intention to assimilate their cause of action for
> negligence into a claim for fraud.  <u>See</u> <u>Resolution Trust</u>
> <u>Corp. v. del Re Castellett</u>, 1993 WL 719764, at *2 (D.N.J.
> 1993) (refusing to apply Rule 9(b) to a claim grounded in
> negligence though the events underlying a parallel fraud
> count were identical, because "plaintiff is entitled to
> proceed on alternate grounds of liability").  Faced with
> similar arguments, the Eastern District of Pennsylvania
> also concluded: "Because a claim of misrepresentation is
> distinct from a claim of fraud [under state law], Rule
> 9(b) does not apply to the former according to its
> terms."  <u>Small v. Provident Life and Accident Insur. Co.</u>,
> 1998 WL 848112, at *3 (E.D. Pa. 1998) (citation omitted).

<u>Cendant</u>, 190 F.R.D. at 337.

A court "must look beyond labels to the facts alleged in the
complaint."  <u>Minger v. Green</u>, 239 F.3d 793, 800 (6th Cir. 2001).

After reviewing MetLife's complaint and the relevant case law, the Court concludes that Rule 8(a) should be applied to the negligent misrepresentation claim. Like the plaintiffs in <u>Cendant</u>, MetLife alleges that the Outside Directors failed "to use ordinary care in carrying out their duties." MetLife Compl., ¶163. According to the complaint, one such duty of the Outside Directors was to review the Offering Materials. The complaint thus sufficiently sets forth a basis for liability that is independent of its fraud claim. The decision to apply Rule 8(a) is also supported by Ohio case law making clear that fraud and negligent misrepresentation are "separate and distinct tort claims." <u>Ferro Corp. v. Blaw Knox Food & Chem. Equip. Co.</u>, 121 Ohio App.3d 434, 440-441, 700 N.E.2d 94, 98 (Ohio Ct. App. 1997); <u>Dejaiffe v. KeyBank USA Nat'l Ass'n</u>, No. L-05-1191, 2006 WL 1580053, at *7 (Ohio Ct. App. June 9, 2006) (reversing district court for failing "to recognize and consider negligent misrepresentation as a separate claim"); <u>Carpenter v. Scherer-Mountain Ins. Agency</u>, 135 Ohio App.3d 316, 328, 733 N.E.2d 1196, 1204 (Ohio Ct. App. 1999) (calling negligent misrepresentation a "distinct cause of action"). <u>Cf</u>. <u>Lentini v. Fidelity Nat'l Title Ins. Co.</u>, ___ F.Supp.2d ___,

, at *3 (D. Conn. Mar. 23, 2007) (applying Rule 8(a) because a negligent misrepresentation claim under Connecticut law does not sound in fraud).

### 3. Economic Loss Rule

The Outside Directors next argue that Ohio's economic loss rule precludes MetLife from recovering damages for their negligent misrepresentation claim. "The economic-loss rule generally prevents recovery in tort of damages for purely economic loss."

Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc., 106 Ohio St.3d 412, 414, 835 N.E.2d 701, 704 (Ohio 2005).  The rule is based on the principle that "a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable."  Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co., 42 Ohio St.3d 40, 44, 537 N.E.2d 624, 630 (Ohio 1989) (internal quotations omitted).  Applying the rule in this case would be fatal to MetLife's claim because the complaint seeks recovery for the loss of MetLife's failed investment in NPF XII.  See Pavlovich v. National City Bank, 435 F.3d 560, 569 (6th Cir. 2006) ("Economic losses include . . . failed investments.").

The issue of whether to apply the economic loss rule to a negligent misrepresentation claim was recently addressed in National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., No. 2:02-cv-1288, 2007 WL 894833 (S.D. Ohio Mar. 22, 2007).  There, the court concluded that the rule does not apply because the tort of negligent misrepresentation, as formulated by the Ohio Supreme Court, is expressly directed at pecuniary loss:

> A majority of [Ohio] courts have recognized that a claim for negligent misrepresentation is actionable even when the plaintiff's damages consist only of economic loss. E.g., Universal Contracting Corp. v. Aug, No. C-030719, 2004 WL 3015325, at *3 (Ohio App. 1st Dist. Dec. 30, 2004); Ferro Corp. v. ChemicalLaw Knox Food & Chem. Equip. Co., 121 Ohio App.3d 434, 440-41 (1997); McCarthy, Lebit, Crystal & Haiman Co. v. First Union Mgmt., Inc., 87 Ohio App.3d 613, 631-32 (1993).  In McCarthy, Lebit, the court reasoned that application of the economic loss rule to a negligent misrepresentation claim directly contradicts the express wording of the cause of action of negligent misrepresentation as stated by the Supreme Court of Ohio in Haddon View [Inv. Co. v. Coopers & Lybrand, 70 Ohio St.2d 154, 156 n.1 (Ohio 1988)]. McCarthy, Lebit, 87 Ohio App.3d at 632.  Under the tort

> of negligent misrepresentation, a person who supplies
> false information to others in breach of the common law
> duty not to do so is liable for "pecuniary loss" to them.
> <u>Id</u>. Because "'pecuniary loss' is by its very definition
> 'economic loss,'" the economic loss rule cannot logically
> be applied to a negligent misrepresentation claim. <u>Id</u>.

<u>National Mulch</u>, 2007 WL 894833, at *6. Relying on <u>McCarthy,</u>
<u>Lebit</u>, the Sixth Circuit has also held that "the economic loss rule
does not apply to claims for negligent misrepresentation" under
Ohio law. <u>HDM Flugservice GMBH v. Parker Hannifin Corp.</u>, 332 F.3d
1025, 1032 (6th Cir. 2003). This Court adopts the same reasoning
and finds that the economic loss rule does not apply to bar
MetLife's claim for negligent misrepresentation.

Accordingly, MetLife's complaint sufficiently states a claim
for negligent misrepresentation.

### E. <u>Negligence</u>
#### 1. Elements

MetLife and ING assert claims for negligence against the
Outside Directors. The elements of a negligence claim are: "(1)
the existence of a legal duty, (2) the defendant's breach of that
duty, and (3) injury that is the proximate cause of the defendant's
breach." <u>Wallace v. Ohio Dep't of Commerce</u>, 96 Ohio St.3d 266,
274, 773 N.E.2d 1018, 1025-26 (Ohio 2002).

#### 2. MetLife

The Outside Directors argue that MetLife's negligence claim
must be dismissed because it is indistinguishable from its
negligent misrepresentation claim. The Court agrees. Under even
a liberal reading of the complaint, the only alleged breach relates
to the misrepresentations in the Offering Materials. MetLife's

briefing of the motion to dismiss makes this clear - "As alleged, the Directors breached their duty by issuing Offering Materials replete with misrepresentations and omissions causing injury to MetLife." See Doc. No. 261, p. 64.

The situation was the same in Northwestern Mut. Life Ins. Co. v. Banc of Am. Sec. LLC, 254 F.Supp.2d 390 (S.D.N.Y. 2003). There, the court dismissed a negligence claim because plaintiffs failed to explain how it differed from their claim for negligent misrepresentation. "The Complaint alleges negligence . . . but makes no specific allegations other than the alleged oral misrepresentations and omissions and the alleged misstatements in the Offering Memoranda." Northwestern Mut., 254 F.Supp.2d at 401. Likewise, MetLife has not made any distinction between its negligence and negligent misrepresentation claims. Thus, the Court will treat MetLife's negligence claim as one for negligent misrepresentation. See Vanguard Mun. Bond Fund, Inc. v. Cantor, Fitzgerald L.P., 40 F.Supp.2d 183, 188 (S.D.N.Y. 1999) ("[T]he Court does not find any substantial difference between Vanguard's negligence and negligent misrepresentation claims and will address them together as a claim for negligent misrepresentation.").

### 3.   ING

ING alleges that the Outside Directors, who were fiduciaries, breached their duty of care by failing to inform ING of the fraud at National Century and by failing to take steps to protect ING's investment in NPF VI. The Outside Directors argue that this claim is barred by the economic loss rule.

The economic loss rule prevents recovery in tort of damages for economic loss, and it applies squarely to negligence claims.

See Chemtrol Adhesives, 42 Ohio St.3d at 44, 537 N.E.2d at 630. ING contends that the rule does not apply where a fiduciary relationship exists between the parties. ING relies on the Sixth Circuit's description of the economic loss rule in Pavlovich, supra. The Sixth Circuit stated that Ohio's rule prevents recovery of purely economic losses in a negligence action either where there is no privity or "where recovery of such damages is not based upon a tort duty independent of contractually created duties." Pavlovich, 435 F.3d at 569 (citing Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc., 106 Ohio St. 3d 412, 835 N.E.2d 701 (Ohio 2005)). Tracking this language, ING argues that the rule does not apply where recovery for economic loss is based on a fiduciary relationship independent of contractually created duties.

There are no Ohio cases directly on point, but cases from other states support ING's argument. In Massachusetts, for example, courts do not apply the economic loss rule to claims of negligence by a fiduciary. See Clark v. Rowe, 428 Mass. 339, 342, 701 N.E.2d 624, 626 (Mass. 1998) ("We have not applied the economic loss rule to claims of negligence by a fiduciary . . . ."); Zichelle v. Parigian, No. 19950137B, 2006 WL 4114290, at *8 (Mass. Super. Ct. Dec. 22, 2006). The reasoning is that, even in the absence of privity, the fiduciary relationship supports a basis for a duty of care. See Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., No. 000751F, 2001 WL 1249303, at *5 (Mass. Super. Ct. July 26, 2001). Courts in other states have reached the same conclusion. See Town of Alma v. Azco Constr., Inc., 10 P.3d 1256, 1264 (Colo. 2000) (holding that economic loss rule does not apply when an independent duty of care under tort law exists);

Derkevorkian v. Lionbridge Technologies, Inc., No. 04-cv-1160, 2007 WL 638717, at *4 (D. Colo. Feb. 27, 2007) (concluding that rule is inapplicable when a fiduciary relationship exists); Performance Paint Yacht Refinishing, Inc. v. Haines, 190 F.R.D. 699, 701 (S.D. Fla. 1999).  In light of these cases, the Court declines to apply the economic loss rule to bar ING's negligence claim at this stage.

The Outside Directors next contend that the business judgment rule bars ING's negligence claim.  This argument is not convincing because the business judgment rule typically raises fact issues that are inappropriate for consideration on a motion to dismiss. See Smith v. Arthur Andersen L.L.P., 175 F.Supp.2d 1180, 1204 (D. Ariz. 2001); Resolution Trust Corp. v. Heiserman, 839 F.Supp. 1457, 1463 (D. Colo. 1993); Wieboldt Stores, Inc. v. Schottenstein, 111 B.R. 162, 174 (N.D. Ill. 1990).  Moreover, as discussed in relation to ING's breach of fiduciary claim, the complaint sufficiently pleads around the business judgment rule.

Accordingly, the Outside Directors' motion to dismiss ING's claim for negligence is denied.


**F.**  **Conspiracy**

   **1.  Elements**

Pharos asserts a claim for civil conspiracy against the Outside Directors.  The complaint alleges the existence of three separate conspiracies.  The first was a conspiracy to commit breach of fiduciary duty; the second, to commit negligent misrepresentation; and the third, to commit fraud.  See Pharos Compl., ¶132.

The Ohio Supreme Court has defined a civil conspiracy as "'a

malicious combination of two or more persons to injure another in
person or property, in a way not competent for one alone, resulting
in actual damages.'"  Kenty v. Transamerica Premium Ins. Co., 72
Ohio St.3d 415, 419, 650 N.E.2d 863, 866 (Ohio 1995) (quoting
LeFort v. Century 21-Maitland Realty Co., 32 Ohio St.3d 121, 126,
512 N.E.2d 640, 645 (1987)).  The elements of a civil conspiracy
claim are: "(1) a malicious combination; (2) two or more persons;
(3) injury to person or property; and (4) existence of an unlawful
act independent from the actual conspiracy."  Universal Coach, Inc.
v. New York City Transit Auth., Inc., 90 Ohio App.3d 284, 292, 629
N.E.2d 28, 33 (Ohio Ct. App. 1993).

The element of a malicious combination "does not require a
showing of an express agreement between defendants, but only a
common understanding or design, even if tacit, to commit an
unlawful act."  Gosden v. Louis, 116 Ohio App.3d 195, 219, 687
N.E.2d 481, 496 (Ohio Ct. App. 1996).  Because "conspirators seldom
make records of their illegal agreements," United States v. Short,
671 F.2d 178, 182 (6th Cir. 1982), the existence of an agreement is
often "provable only through circumstantial evidence."  Aetna Cas.
and Sur. Co. v. Leahey Constr. Co., 219 F.3d 519, 538 (6th Cir.
2000) (discussing a conspiracy claim under Ohio law).  A plaintiff
need not show that co-conspirators made an agreement as to every
detail of the plan; rather, plaintiff must show that the co-
conspirators "'shared in the general conspiratorial objective.'"
Id. (quoting Hooks v. Hooks, 771 F.2d 935, 944 (6th Cir. 1985));
see also Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007);
Borden, Inc. v. Spoor Behrins Campbell & Young, Inc., 828 F.Supp.
216, 225 (S.D.N.Y. 1993) ("[T]o demonstrate a conspiracy,

71

plaintiffs need not show that each conspirator agreed to every detail of the conspiracy but only that each agreed on the 'essential nature of the plan.'").

### 2.  Conspiracy to Commit Breach of Fiduciary Duty

The Outside Directors argue that the claim for conspiracy to commit breach of fiduciary duty must be dismissed because the complaint does not assert an underlying cause of action for breach of fiduciary duty against any of the named co-conspirators.  This is true – Pharos has not asserted a claim for breach of fiduciary duty in their complaint.  Without an underlying wrongful act, this conspiracy claim fails.  See Orbit Elec., Inc. v. Helm Instrument Co., Inc., 167 Ohio App.3d 301, 313, 855 N.E.2d 91, 100 (Ohio Ct. App. 2006) ("An action for civil conspiracy cannot be maintained unless an underlying unlawful act is committed."); NPF IV, Inc. v. Transitional Health Services, 922 F.Supp. 77, 83 (S.D. Ohio 1996) ("Conspiracy in and of itself does not normally establish a basis for recovery in a civil action in Ohio; rather, there must be an actionable wrong committed as a result of the conspiracy.").

### 3.  Conspiracy to Commit Negligent Misrepresentation

The complaint also does not state a claim for conspiracy to commit negligent misrepresentation.  It is "impossible to conspire to commit negligence."  Senart v. Mobay Chem. Corp., 597 F. Supp. 502, 505 (D. Minn. 1984).  The "great majority" of courts "agree that conspiracy claims cannot be founded on the tort of negligence."  Ruth v. A.O. Smith Corp., No. 1:04-cv-18912, 2005 WL 2978694, at *3 (N.D. Oct. 11, 2005); see also Wright v. Brooke Group Ltd., 114 F.Supp.2d 797, 837 (N.D. Iowa 2000) ("[B]ecause conspiracy requires an agreement to commit a wrong, there can

hardly be a conspiracy to be negligent - that is, to intend to act negligently."); <u>Sonnenreich v. Philip Morris Inc.</u>, 929 F.Supp. 416, 419 (S.D. Fla. 1996) ("Logic and case law dictate that conspiracy to commit negligence is a non sequitur."); <u>Rogers v. Furlow</u>, 699 F.Supp. 672, 675 (N.D. Ill. 1988) ("What the plaintiffs suggest is a conspiracy to commit negligence, a paradox at best."); <u>Bevan Group v. A-Best Prods. Co.</u>, No. 502694, 2004 WL 1191713, at *9 (Ohio Ct. Com. Pl. May 17, 2004) (dismissing claim of conspiracy to commit negligence).

### 4.   Conspiracy to Commit Fraud

"An act of fraud can serve as the underlying unlawful act or tort" in support of a conspiracy claim.  <u>Dickerson Internationale, Inc. v. Klockner</u>, 139 Ohio App.3d 371, 380, 743 N.E.2d 984, 990 (Ohio Ct. App. 2000).  Pharos alleges that all of the named defendants "reached a meeting of the minds" to induce "third-party capital investment in National Century."  Pharos Compl., ¶¶131, 132.  The named defendants are: the Outside Directors, the Beacon Group, the Focus Value Fund, JPMorgan, underwriter Credit Suisse First Boston, auditor Deloitte & Touche, law firm Purcell & Scott, and underwriter Shattan Group.  The defendants allegedly induced Pharos to purchase National Century preferred stock by supplying it with false information about National Century's financial health and note programs.  Pharos alleges that the false information was conveyed in a private placement memorandum prepared by Credit Suisse and the Shattan Group, audit reports prepared by Deloitte & Touche, and an opinion letter prepared by Purcell & Scott.

The Outside Directors argue that the claim of conspiracy to defraud must be dismissed because Pharos has failed to state an

underlying cause of action for fraud.  The Court does not agree entirely, but does find that the scope of the conspiracy must be narrowed.  As explained above in Section V.B.4, the complaint does not sufficiently allege that any of the Outside Directors committed the underlying fraud of supplying false information to Pharos. Further, the complaint fails to state an underlying claim for fraud against the Beacon Group, the Focus Value Fund, and JPMorgan.  The complaint's lone basis for liability as to those defendants, who employed the Outside Directors as officers and directors, is the doctrine of *respondeat superior*.  But employers are not liable when, as here, there is no underlying tort claim against the employee.  See Strock v. Pressnell, 38 Ohio St.3d 207, 217, 527 N.E.2d 1235, 1244 (Ohio 1988).  Thus, a conspiracy claim cannot be founded on allegations that the Outside Directors conspired with each other or with the Beacon Group, the Focus Value Fund, or JPMorgan.

This leaves Credit Suisse, the Shattan Group, Deloitte & Touche, and Purcell & Scott as the parties who allegedly committed the underlying fraud.  The Outside Directors do not challenge the sufficiency of the fraud claims against those parties, and the Court will assume that the fraud claims are legally sufficient, for purposes of the current motion to dismiss only.  If Pharos can adequately allege that the Outside Directors made an agreement with Credit Suisse, the Shattan Group, Deloitte & Touche, or Purcell & Scott to defraud Pharos, then the Outside Directors may be liable for conspiracy based on the fraudulent acts of those parties.  See Williams v. Aetna Fin. Co., 83 Ohio St.3d 464, 476, 700 N.E.2d 859, 868 (Ohio 1998) (holding that the acts of co-conspirators are

74

"attributable to each other"); Automotive Fin. Corp. v. WW Auto, No. 2:04-cv-261, 2005 WL 1074331 (S.D. Ohio Apr. 20, 2005) ("[W]hile Plaintiff is required to prove the existence of some unlawful act independent of the civil conspiracy itself, that unlawful act does not need to be committed by each of the alleged co-conspirators."); Matthews v. New Century Mortgage Corp., 185 F.Supp.2d 874, 890 (S.D. Ohio 2002) (same).

Courts are not in unison as to whether Rule 8 or Rule 9 applies to pleading the existence of an agreement to commit fraud. It is clear that Rule 9(b) requires that the averments of the underlying fraud be pleaded with particularity. Many courts have held that "the conspiracy must also be pled with the particularity required by Rule 9(b)." Southern Union Co. v. Southwest Gas Corp., 165 F.Supp.2d 1010, 1020 (D. Ariz. 2001); see also Borsellino v. Goldman Sachs Group, Inc., 477 F.3d 502, 509 (7th Cir. 2007) (dismissing a common law claim of conspiracy to commit fraud because it "fail[ed] to state with particularity the circumstances constituting the conspiracy"); JP Morgan Chase Bank v. Winnick, 406 F.Supp.2d 247, 259 (S.D.N.Y. 2005); Alfus v. Pyramid Tech. Corp., 745 F.Supp. 1511, 1521 (N.D. Cal. 1990) ("In civil conspiracy actions, courts insist upon a higher level of specificity than is usually demanded of other pleadings.") (quoted with approval in Wasco Prods., Inc. v. Southwall Techs., Inc., 435 F.3d 989, 991 (9th Cir. 2006)).

Courts applying Rule 9 to the elements of a civil conspiracy claim have required plaintiffs to "allege with sufficient factual particularity that defendants reached some explicit or tacit understanding or agreement." Alfus, 745 F.Supp. at 1521; see also

<u>Southern Union</u>, 165 F.Supp.2d at 1021 ("[A] plaintiff must allege specific facts which support the inference of an agreement.").  In <u>Borsellino</u>, the court found the complaint defective because it said "nothing about the nature of the purported agreement to defraud the plaintiffs, such as when it was made or which individuals at Goldman Sachs arranged the conspiracy." <u>Borsellino</u>, 477 F.3d at 509.  Likewise, the Eleventh Circuit applied Rule 9(b) in dismissing a civil conspiracy claim that "did not explain how" and "failed to state when" the co-conspirators agreed to engage in fraud. <u>American United Life Ins. Co. v. Martinez</u>, 480 F.3d 1043, 1068 (11th Cir. 2007). <u>See also</u> <u>Masco Contractors Servs. West v. New Hampshire Ins. Co.</u>, No. C 04-4183, 2005 WL 405361, at *6 (N.D. Feb. 17, 2005) (dismissing conspiracy claim because complaint did not "reference a single document, participant, or conversation" to support an inference that an agreement existed); <u>Cohabaco Cigar Co. v. U.S. Tobacco Co.</u>, No. 98 C 1580, 1998 WL 773696, at *6 (N.D. Ill. Oct. 30, 1998) (requiring allegations of "particular facts sufficient to establish an agreement exists between the alleged conspirators to inflict the alleged wrong").

Other courts have declined to apply Rule 9(b) to pleading the existence of an agreement.  These courts "recognize the difficulty of pleading with specificity the facts necessary to show the existence of an unlawful agreement." <u>In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.</u>, 175 F.Supp.2d 593, 634 (S.D.N.Y. 2001) (citing <u>Cofacredit, S.A. v. Windsor Plumbing Supply Co. Inc.</u>, 187 F.3d 229, 242 (2d Cir. 1999)).  "'[C]onspiracies are by their nature usually clandestine. . . . [D]epending upon the conspiracy alleged in any particular case, the complainant may or may not be

76

in a position to allege with precision the specific facts giving rise to the claim.'" Stephenson v. Deutsche Bank AG, 282 F.Supp.2d 1032, 1070 (D. Minn. 2003) (quoting White v. Walsh, 649 F.2d 560, 561 (8th Cir. 1981)).  But even these courts acknowledge that "conclusory allegations are insufficient." Adams v. Teamsters Local 115, No. 03-3680, 2007 WL 142540, at *6 (3d Cir. Jan. 22, 2007) (holding that a complaint must set forth at least some facts which, if proved, would support an inference of the participants, conduct, time, and place of the conspiracy). See also Ryan v. Mary Immaculate Queen Center, 188 F.3d 857, 859-60 (7th Cir. 1999) (dismissing conspiracy claim where complaint gave "no indication of the nature of [the defendant's] agreement with the other defendants"); Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985) ("In any event, mere . . . referrals to plans and schemes" are insufficient); In re Methyl Tertiary Butyl Ether Prods., 175 F.Supp.2d at 634 (noting that "bare allegations are insufficient to support a conspiracy claim").

The Sixth Circuit has not addressed which pleading standard should be applied to a common law claim of civil conspiracy.  Out of caution, this Court will apply Rule 8.  Even doing so, the Court finds the complaint fails to state that the Outside Directors entered into an agreement with Credit Suisse, the Shattan Group, Deloitte & Touche, or Purcell & Scott to defraud Pharos.

As to Credit Suisse, the Shattan Group, and Purcell & Scott, the complaint rests on the bare allegation that the Outside Directors reached a "meeting of the minds" with these parties to induce Pharos to purchase National Century preferred stock.  The complaint contains no other allegations that would support the

existence of a common understanding or shared objective between the Outside Directors and Credit Suisse, the Shattan Group, or Purcell & Scott.  The complaint fails to indicate what relationship the Outside Directors may have had with these parties or when or how they reached a common understanding.[6]  See Borden, Inc. v. Spoor Behrins Campbell & Young, Inc., 828 F.Supp. 216, 225 (S.D.N.Y. 1993) ("[A]mong the factors a fact finder may consider in inferring a conspiracy are the relationship of the parties, proximity in time and place of the acts, and the duration of the actors' joint activity.").

Turning to Deloitte & Touche, the complaint alleges that the Outside Directors "rubber-stamped Deloitte's audits."  The complaint, therefore, at least states some connection between the Outside Directors and Deloitte & Touche.  Nonetheless, the complaint does not support an inference that the Outside Directors and Deloitte & Touche shared a general conspiratorial objective to defraud Pharos.  The Outside Directors allegedly gave a "blind seal of approval" to the audits and "asked no questions of Deloitte and merely took Deloitte at its word."  Pharos Compl., ¶86.  At best, the complaint alleges that the Outside Directors acted negligently in approving the audits.  To state a claim for conspiracy, Pharos must allege that the Outside Directors and Deloitte & Touche entered into a malicious combination to injure Pharos.  Malice is defined as "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another."  Pickle v. Swinehart, 170 Ohio St. 441, 443, 166

---

[6]  By contrast, the complaint alleges that Credit Suisse and the Shattan Group worked together to prepare and circulate a private placement memorandum.

N.E.2d 227, 229 (Ohio 1960).   The Outside Directors' alleged negligence in reviewing the audits does not support an inference that they formed a malicious combination with Deloitte & Touche.

Accordingly, Pharos's conspiracy claims are dismissed in their entirety.

## VI.   CONCLUSION

For the reasons set forth above, the motions of Harold W. Pote, Eric R. Wilkinson, and Thomas G. Mendell to dismiss the complaints of MetLife, Lloyds, ING, and Pharos (docs. 166, 675, 733) are GRANTED IN PART and DENIED IN PART.

The motions to dismiss are GRANTED as to the following claims:

- MetLife's claim under Section 10(b) of the Securities Exchange Act, and claims for fraud and negligence;

- Lloyds's claim under New Jersey's Blue Sky law; and

- Pharos's claims for fraud, aiding and abetting fraud, and conspiracy.

The motions to dismiss are DENIED as to the following claims:

- MetLife's claims under Section 20(a) of the Securities Exchange Act, Ohio's Blue Sky law, and New Jersey's Blue Sky law, and claims for breach of fiduciary duty and negligent misrepresentation;

- Lloyds's claims under Section 20(a), Ohio's Blue Sky law, and claim for breach of fiduciary duty;

- ING's claims for breach of fiduciary duty, fraud, aiding and abetting breach of fiduciary duty, aiding and abetting fraud, and negligence; and

- Pharos's claims under Ohio's Blue Sky law.

IT IS SO ORDERED.

                                    s/ James L. Graham
                                    JAMES L. GRAHAM
                                    United States District Judge

DATE: May 7, 2007