IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| In re: National Century Financial Enterprises, Inc. Financial Investment Litigation, | Case No. 2:03-md-1565<br><br>Judge Graham<br><br>Magistrate Judge Abel |

OPINION AND ORDER

This matter is before the Court on the motion of defendant R.J. Gold Company, P.C. to dismiss the claims made against it in the two Florida class action suits, <u>Michael Mahoney, et al. v. John F. Andrews, et al.</u>, Case No. 3:03-467 (M.D. Fla.); <u>John P. Houlihan v. John F. Andrews, et al.</u>, Case No. 3:03-656 (M.D. Fla.). The class action plaintiffs, who were shareholders of the healthcare software company e-Medsoft, bring claims against R.J. Gold under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b). Plaintiffs allege that R.J. Gold is liable under Section 10(b) because it audited financial statements that contained material misrepresentations and omissions.

As discussed below, the Court finds that the complaints fail to satisfy the heightened pleading standard for scienter applicable to Section 10(b) claims. Accordingly, R.J. Gold's motion to dismiss is granted.

**I.   Background**

   **A.   General Allegations**

Both Florida cases are brought as class actions on behalf of shareholders in the healthcare software company e-Medsoft. The

class period covers those who purchased stock from December 6, 2000 to February 11, 2002.  The complaints allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act against persons and entities affiliated with e-Medsoft.  According to the complaints, defendants defrauded the market by making false and misleading statements that caused the price of e-Medsoft stock to artificially inflate.

Plaintiffs allege that National Century Financial Enterprises, Inc. controlled e-Medsoft through its substantial stock ownership of the company.  In February 2000, the two companies entered into agreements whereby e-Medsoft would provide software services to National Century and, in turn, National Century gave e-Medsoft access to its clients.  Further, National Century canceled a debt that e-Medsoft owed to it and acquired 9.5 million shares of e-Medsoft stock.  National Century and its principals owned approximately 33% of e-Medsoft's common stock and became the largest shareholder of the company.

Following these agreements, e-Medsoft and National Century issued a press release announcing a joint venture between the two companies.  The press release stated that the companies planned to create an online network of financing resources for healthcare providers.  Plaintiffs allege that e-Medsoft failed to disclose the true nature of its financial dealings with National Century.  The company allegedly became a "piggy bank" of sorts for National Century's principals.  National Century purchased e-Medsoft's accounts receivable, but also advanced it funds for worthless or non-existent receivables.  National Century used these worthless receivables as a basis for issuing new notes to institutional

investors. At one point, the complaints allege, National Century had overfunded e-Medsoft by $100 million. National Century's principals then allegedly took the money out of e-MedSoft through a Ponzi scheme.

In late 2001 and early 2002, e-Medsoft's insiders sold off their stock holdings. The company's stock was delisted from the American Stock Exchange in July 2002, and it filed for bankruptcy on November 27, 2002.

**B.   Chartwell**

In August 2000, National Century's principals purchased "a substantial portion" of Chartwell Diversified Services, Inc., a privately-held health care company. On December 6, 2000, e-Medsoft issued a press release announcing that it had been "selected" by Chartwell to "build a customized healthcare portal solution." This news caused e-MedSoft's stock price to rise. Plaintiffs allege that the press release was misleading because it did not disclose that National Century held substantial ownership interests in both e-MedSoft and Chartwell.

The complaints allege that in May 2001, e-Medsoft issued a press release announcing that it would acquire Chartwell. Plaintiffs again allege that the press release failed to disclose National Century's relatedness to both e-MedSoft and Chartwell. Plaintiffs also allege the press release contained misleading statements about Chartwell's annual revenue and earnings. Other press releases were issued from May to August 2001 that were allegedly misleading because they inaccurately characterized the positive financial impact the acquisition would have on e-MedSoft. On August 6, 2001 e-MedSoft issued a press release announcing that

3

the merger with Chartwell had been completed.

### C. R.J. Gold

The allegations regarding R.J. Gold are relatively few. The complaints allege that R.J. Gold audited Chartwell's financial statements from February 23, 2000 to June 30, 2001. The complaints further allege that with R.J. Gold's consent, its audits of Chartwell were made part of e-MedSoft's financial statements for periods ending March 31 and June 30, 2001. That is the extent of the allegations expressly mentioning R.J. Gold.

The complaints make other allegations that indirectly concern R.J. Gold, and it is these indirect allegations on which plaintiffs primarily rely in defending against the motion to dismiss. The complaints allege that e-MedSoft filed a Form 8-K/A with the United States Securities and Exchange Commission on October 22, 2001. The Form 8-K/A contained Chartwell's financial statements, which allegedly overstated Chartwell's gross profit, operating income, and net income.

On November 15, 2001, e-MedSoft filed a Form 10-Q with the SEC. In the Form 10-Q, e-MedSoft disclosed that the it had reexamined Chartwell's financial statements and intended to amend the Form 8-K/A filed in October.

On November 30, 2001, e-MedSoft filed a Form 8-K/A with the SEC in which it restated Chartwell's financial statements. For the period of February 23, 2000 to December 31, 2000, the restatement reported lower gross profit (from $40.3 million to $28.8 million), operating income (from $4.7 million to $1.7 million), and net income (from $8.8 million to $1.3 million) for Chartwell. For the period of January 1, 2001 to June 30, 2001, the restatement

4

reported lower gross profit (from $50.8 million to $21.9 million) and operating income (from a gain of $2.4 million to a loss of $482,000); net income did not change.

The November 30, 2001 Form 8-K/A stated that the original financial statements did not comply with generally accepted accounting principles. It stated that the equity method of accounting, which is called for by GAAP when accounting for a company's joint ventures, should have been used in accounting for Chartwell's joint ventures. The alleged failure to use the equity method caused Chartwell's gross profit, operating income, and net income to be overstated.

The complaints allege that even the restated Chartwell financial statements were false and misleading because they had to be restated a second time. On February 11, 2002, e-MedSoft filed a Form 8-K/A disclosing that it was restating the Chartwell financial statements again. This second restatement reported slightly higher gross profit ($30.2 million) and operating income ($1.9 million) for the period of February 23, 2000 to December 31, 2000. There was no second restatement for the period of January 1, 2001 to June 30, 2001.

As to scienter, the complaint makes no specific mention of R.J. Gold, but generally alleges that all defendants knew that the public documents issued by e-MedSoft were materially false and misleading.

**II. Standard of Review**

This matter is before the Court on the motion of defendant to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for

5

failure to state a claim for which relief may be granted. In ruling on a motion to dismiss under Rule 12(b)(6), the court must construe the complaint in a light most favorable to the plaintiff and accept all well-pleaded allegations in the complaint as true. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a district court weighing a motion to dismiss asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.").

A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory. Weiner v. Klais & Co., Inc., 108 F.3d 86, 88 (6th Cir. 1997). The factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim. Bell Atlantic Corp. v. Twombly, ___ U.S. ___, 127 S.Ct. 1955, 1964-65 (2007); Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 526 (1983)("It is not . . . proper to assume that [the plaintiff] can prove facts that it has not alleged . . . .") Plaintiff must provide more than labels and conclusions, or a formulaic recitation of the elements of a cause of action, Twombly, 127 S.Ct. at 1965, and the court is not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986); see also Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987)(the court is not required to accept as true unwarranted legal conclusions or factual inferences). A motion to dismiss under Rule 12(b)(6) will be granted if the complaint is without merit due to an absence of law

6

to support a claim of the type made or of facts sufficient to make a valid claim, or where the face of the complaint reveals that there is an insurmountable bar to relief.  Rauch v. Day & Night Mfg. Corp., 576 F.2d 697 (6th Cir. 1978).

**III. Discussion**

    **A.    Pleading Standard for Section 10(b) Claims**

Plaintiffs allege that R.J. Gold should be held liable under Section 10(b) because of its role in auditing Chartwell's financial statements.  R.J. Gold allegedly used the wrong accounting method for Chartwell's joint ventures, resulting in an overstatement of gross profit, operating income, and net income for the periods of February 23, 2000 to December 31, 2000 and of January 1, 2001 to June 30, 2001.  The audited statements allegedly made their way into e-MedSoft's public filings regarding the acquisition of Chartwell and made the transaction look better than it really was.

Section 10(b) of the Securities Exchange Act and Rule 10b-5(b) promulgated thereunder prohibit any person from making "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security."  Morse v. McWhorter, 290 F.3d 795, 798 (6th Cir. 2002); see 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5(b). To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege, in connection with the purchase or sale of securities: "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) justifiably relied on by plaintiffs, and (5) proximately causing them injury."  Helwig v. Vencor, Inc., 251 F.3d 540, 554 (6th Cir. 2001); see also In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 548 (6th Cir. 1999).  Plaintiffs also assert

7

a claim under Rule 10b-5(a) & (c), which prohibit any person from, in connection with the purchase or sale of securities, employing any device or scheme to defraud or engaging in any act or practice that operates as fraud.

The Private Securities Litigation and Reform Act ("PSLRA"), 15 U.S.C. §78u-4(b), requires complaints asserting a claim of federal securities fraud to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1). Moreover, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2).

The Sixth Circuit has described the PSLRA's provisions as "[a]dding to the Federal Rules of Civil Procedure 9(b) requirement that fraud must be stated with particularity." In re Ford Motor Co. Secs. Litig., 381 F.3d 563, 567 (6th Cir. 2004). "[N]ot only must the complaint make particular factual allegations, but the inference of scienter which those allegations generate must be strong." PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 682 (6th Cir. 2004).

To establish liability under Section 10(b) and Rule 10b-5, a plaintiff must prove that the defendant acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94, n. 12 , 96 S.Ct.

8

1375 (1976).  In the Sixth Circuit, reckless behavior may suffice for liability under Section 10(b).  <u>Robert N. Clemens Trust v. Morgan Stanley DW, Inc.</u>, 485 F.3d 840, 847 (6th Cir. 2007); <u>Helwig v. Vencor, Inc.</u>, 251 F.3d 540, 548 (6th Cir.2001) (en banc). Recklessness is a mental state falling "somewhere between intent and negligence" and is characterized by "highly unreasonable conduct which is an extreme departure from the standards of ordinary care."  <u>Mansbach v. Prescott, Ball & Turben</u>, 598 F.2d 1017, 1025 (6th Cir. 1979).  "While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it."  <u>Id</u>.

    **B.    Scienter**

R.J. Gold argues in its motion to dismiss that the complaints fail to adequately allege the requisite level of scienter.  A recent decision of the United States Supreme Court discusses the scienter requirement in detail.  In <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, __ U.S. __, 127 S.Ct. 2499 (June 21, 2007), the Court was called on to interpret the PSLRA's requirement that a complaint's allegations give rise to a "strong inference that the defendant acted with the required state of mind."

> In the case before us, the Court of Appeals for the Seventh Circuit held that the "strong inference" standard would be met if the complaint "allege[d] facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." 437 F.3d 588, 602 (2006).  That formulation, we conclude, does not capture the stricter demand Congress sought to convey in § 21D(b)(2) [of the PSLRA].  It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind. Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by § 21D(b)(2) must engage in a comparative evaluation; it must consider, not only

> inferences urged by the plaintiff, as the Seventh Circuit did, but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as "strong" within the intendment of § 21D(b)(2), we hold, an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

127 S.Ct. at 2504-05.

The Court set the following guidelines for analyzing whether a complaint sufficiently pleads scienter. "First, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." 127 S.Ct. at 2509. "Second, courts must consider the complaint in its entirety . . . . The inquiry, as several Courts of Appeals have recognized, is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. (citing cases). "Third, in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Id. With respect to this last point, the Court explained:

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable . . . . Yet the

10

>   inference of scienter must be more than merely
>   "reasonable" or "permissible" - it must be cogent and
>   compelling, thus strong in light of other explanations.
>   A complaint will survive, we hold, only if a reasonable
>   person would deem the inference of scienter cogent and at
>   least as compelling as any opposing inference one could
>   draw from the facts alleged.

Id. at 2510.

Turning to the case at hand, the Court finds that the complaints fall well short of the Tellabs standard for pleading scienter.  R.J. Gold is mentioned in only a few of the 160 paragraphs in each complaint.  There are no specific allegations that R.J. Gold knew that the Chartwell financial statements overstated Chartwell's gross profit, operating income, and net income.  Rather, the complaints generally allege that all defendants knew that every document and statement mentioned in the complaints were false and misleading.  This allegation is not well-taken as to R.J. Gold.  The complaints are primarily focused on the alleged fraud committed by e-MedSoft and National Century.  R.J. Gold is not alleged to have been an insider or substantially involved with either e-MedSoft's or National Century's operations, and the complaints mention numerous documents and statements that R.J. Gold had nothing to do with.  Thus, the general allegation that all defendants knew that all documents were false is not sufficient to support a strong inference of scienter as to R.J. Gold.  See e.g., Dresner v. Utility.com, Inc., 371 F.Supp.2d 476, 494 (S.D.N.Y. 2005) (holding that to the extent group pleading is permissible under the PSLRA, it applies only to corporate insiders at the heart of the alleged fraud or to outsiders who substantially participated in the company's management and operations).

Plaintiffs contend that the complaints support a strong

11

inference of scienter because Chartwell's financial statements twice had to be restated in the Forms 8-K/A that e-MedSoft filed. The restatements were necessary because of an alleged failure to use the equity method of accounting for joint ventures, a failure that plaintiffs allege violated generally accepted accounting principles. Plaintiffs argue that the GAAP violation supports a strong inference of scienter on the part of R.J. Gold.

In the context of accounting improprieties, the Sixth Circuit has required that a complaint plead "specific facts which, when viewed together" support a strong inference that the defendants "must or should have known about the [accounting] problems and nevertheless knowingly or recklessly made the allegedly misleading public statements." PR Diamonds, 364 F.3d at 683-84. "[T]he meaning of recklessness in securities fraud cases is especially stringent when the claim is brought against an outside auditor." Id. at 693. "'When the standard of recklessness for an auditor is overlaid with the pleading requirements of the PSLRA, a simple rule emerges: to allege that an independent accountant or auditor acted with scienter, the complaint must allege specific facts showing that the deficiencies in the audit were so severe that they strongly suggest that the auditor must have been aware of the corporation's fraud.'" Id. at 694 (quoting In re SmarTalk Teleservices Sec., Inc. Litig., 124 F.Supp.2d 505, 514 (S.D. Ohio 2000)).

Generally, a defendant's "failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." In re Comshare Inc. Sec. Litig., 183 F.3d 542, 553 (6th Cir. 1999). However, "recklessness may be drawn from allegations of accounting

12

violations that are so simple, basic, and pervasive in nature, and so great in magnitude, that they should have been obvious to a defendant." PR Diamonds, 364 F.3d at 684-85 (citing In re Oxford Health Plans, Inc. Sec. Litig., 51 F.Supp.2d 290, 294 (S.D.N.Y. 1999) ("[P]laintiffs allege 'in your face facts,' that cry out, 'how could [defendants] not have known that the financial statements were false.'")).

Here, plaintiffs argue that the GAAP violation of not using the equity method in accounting for Chartwell's joint ventures was such a basic violation that it supports a strong inference of scienter. They argue that it is fundamental rule that "investors should account for the investments in common stock of corporate joint ventures by the equity method." According to the complaints, this GAAP violation caused overstatements of Chartwell's gross profit, operating income, and net income.

The Court does not agree that R.J. Gold's alleged failure to use the equity method in accounting for Chartwell's joint ventures is alone sufficient to give rise to a strong inference of scienter. "Scienter 'requires more than a misapplication of accounting principles. The [plaintiff] must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.'" PR Diamonds, 364 F.3d at 693-94 (quoting In re Worlds of Wonder Secs. Litig., 35 F.3d 1407, 1426 (9th Cir. 1994)).

In the cases cited in PR Diamonds where courts have found that

13

GAAP violations alone supported a strong inference of scienter, the complaints alleged multiple, repeated violations that were drastic in magnitude and suspicious in timing. See In re Telxon Corp. Secs. Litig., 133 F.Supp.2d 1010, 1026 (N.D. Ohio 2000); In re MicroStrategy, Incorporated Secs. Litig., 115 F.Supp.2d 620, 636 (E.D. Va. 2000). Here, plaintiffs have simply alleged that R.J. Gold used the wrong method in how to account for Chartwell's joint ventures. In Telxon and MicroStrategy, the complaints alleged violations so great in magnitude and frequency that the violations were incapable of having been committed negligently by the auditor. The allegation that R.J. Gold chose the wrong accounting method for joint ventures does not, without more, support a strong inference that the alleged violation was incapable of being committed negligently. See PR Diamonds, 364 F.3d at 693 ("Recklessness on the part of an independent auditor entails a mental state so culpable that it approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company.") (internal quotations omitted); Pegasus Fund, Inc. v. Laraneta, 617 F.2d 1335, 1341 (9th Cir. 1980) (auditor's recklessness "must come closer to being a lesser form of intent (to deceive) than merely a greater degree of ordinary negligence") (internal quotations omitted).

In the absence of a GAAP violation that itself "cries out scienter," courts have looked for allegations of the defendant deliberately ignoring red flags of accounting errors, suspicious timing of events, insider-type access to information, motive and opportunity to deceive the investing public, or other "highly suspicious facts and circumstances available to the auditor at the time of the audit." SmarTalk, 124 F.Supp.2d at 515; see also PR

14

Diamonds, 364 F.3d at 694-96; In re Cardinal Health Inc. Secs. Litig., 426 F.Supp.2d 688 (S.D. Ohio 2006). The complaints here are devoid of any of these types of allegations. See Tellabs, 127 S.Ct. at 2511 ("We agree that omissions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' § 78u-4(b)(2).").

In Tellabs, the Supreme Court instructed courts to "take into account plausible opposing inferences" when considering whether the complaint supports a strong inference of scienter. 127 S.Ct. at 2509. The complaints here allege that Chartwell was a privately held company until e-MedSoft acquired it in August 2001. Thus, when R.J. Gold audited Chartwell's financial statements from February 23, 2000 to June 30, 2001, it did not prepare those audits in connection with the purchase or sale of securities, as Section 10(b) requires. The complaints indeed allege that Chartwell's financial statements were not available to the public. Even if R.J. Gold used the wrong accounting method, it is did so for a company who was not selling securities to the public. The Sixth Circuit in PR Diamonds made clear that a complaint must support a strong inference the defendant "must or should have known about the [accounting] problems and nevertheless knowingly or recklessly made the allegedly misleading *public* statements." 364 F.3d at 684 (emphasis added).

The complaints do not allege that, at the time R.J. Gold prepared the audits, it knew or should have known those audits would eventually make their way into e-MedSoft's public filings.

15

According to the complaints, the first sign that e-MedSoft might acquire Chartwell came in May 2001, at nearly the end of the time frame in which R.J. Gold prepared Chartwell's audits. Even then, the complaints make no specific allegation that R.J. Gold audited Chartwell's June 30, 2001 financial statement knowing, or recklessly disregarding, that they might appear in e-MedSoft's public filings.

Plaintiffs emphasize the allegation that R.J. Gold later consented to e-MedSoft using the audited financial statements. Plaintiffs argue that, by the time of consent, R.J. Gold must have known that e-MedSoft was acquiring Chartwell and that the financial statements would be used in connection with public filings regarding the acquisition. Plaintiffs allege that R.J. Gold acted in reckless disregard by giving its consent for e-MedSoft to use financial statements that did not comply with GAAP.

The problem with this argument is again that the GAAP violation, by itself, is insufficient to state a Section 10(b) claim. Comshare, 183 F.3d at 553; PR Diamonds, 364 F.3d at 684. Further, the complaints do not specify when R.J. Gold gave its consent, so there are no allegations of suspicious timing. And the complaints lack allegations that R.J. Gold knew or should have known of the violation, ignored red flags of accounting problems, or had any motive or opportunity to deceive e-MedSoft's public shareholders. Without more, the complaints fall short of the PSLRA's requirement that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); see SmarTalk, 124 F.Supp.2d at 518-19 (dismissing Section 10(b) claim

"premised on the simple fact" that PricewaterhouseCooper's made accounting errors; "The Sixth Circuit and other courts have squarely held that such allegations, although possibly sufficient to plead negligence, are insufficient to establish the strong inference of scienter necessary to state a securities fraud case.").

**IV. Conclusion**

Accordingly, R.J. Gold's motion to dismiss (doc. 144) is GRANTED, and its motion for leave to submit supplemental case law authority in connection with its motion to dismiss (doc. 629) is GRANTED.  R.J. Gold is hereby dismissed as a defendant in the Florida class action complaints.

R.J. Gold's motion to stay discovery (doc. 1008) is denied as moot.

                                    s/ James L. Graham
                                    JAMES L. GRAHAM
                                    United States District Judge

DATE: August 13, 2007