IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | : | |
|---|---|---|
| In re: National Century Financial Enterprises, Inc. Financial Investment Litigation, | :<br>:<br>:<br>: | Case No. 2:03-md-1565<br><br>Judge Graham<br><br>Magistrate Judge Abel |

OPINION AND ORDER ON CERTAIN MOTIONS TO DISMISS
THE CLAIMS IN THE FLORIDA CLASS ACTIONS

This matter is before the Court on the motions of Mitchell Stein, TSI Technologies and Holdings, LLC, Swab Financial, LLC, the Beacon Group, LLC, the Beacon Group III-Focus Value Fund, L.P., and JPMorgan Chase & Co. to dismiss the claims made against them in the two Florida class action suits, Michael Mahoney, et al. v. John F. Andrews, et al., Case No. 3:03-467 (M.D. Fla.), and John P. Houlihan v. John F. Andrews, et al., Case No. 3:03-656 (M.D. Fla.). The class action plaintiffs, who were shareholders of the healthcare software company e-Medsoft, brought claims against a number of defendants under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) and §78t(a). Plaintiffs allege that e-MedSoft issued a series of false and misleading public statements that artificially increased the value of e-MedSoft stock. Plaintiffs further allege that e-MedSoft was being manipulated by National Century Financial Enterprises, Inc., which allegedly controlled e-Medsoft through its stock holdings in the company and through the substantial involvement of National Century's Founders – Lance Poulsen, Donald Ayers, Rebecca Parrett – in e-MedSoft's business affairs.

The Court has already ruled on the motions to dismiss filed by National Century's Founders and by e-MedSoft's accounting firm R.J. Gold Company, P.C. Another group of defendants who were e-MedSoft's officers and directors have notified the Court of a settlement with Plaintiffs. Still pending are a motion to dismiss filed by Mitchell Stein, e-MedSoft's founder,

and his companies TSI Technologies and Swab Financial, as well as motions to dismiss filed by the Beacon Group, the Beacon Group III-Focus Value Fund (the "Beacon Entities"), and JPMorgan, who are alleged to have been control persons of National Century.

As discussed below, the Court finds that the complaints fail to state a claim under Section 10(b) against Mitchell Stein, TSI Technologies, Swab Financial, the Beacon Entities, or JPMorgan. The Court further finds that Plaintiffs have failed to state a claim against the moving Defendants for Section 20(a) control person liability.

## I. BACKGROUND

### A. General Allegations

The allegations of the Florida Plaintiffs are familiar to all the parties involved and to the Court, which has issued two decisions dealing in part with the Florida class actions. See Feb. 27, 2007 Opinion; Aug. 13, 2007 Opinion.

The bulk of the complaints pertain to a series of e-MedSoft press releases and filings with the United States Securities and Exchange Commission during the class period of December 6, 2000 to February 11, 2002. These releases and filings allegedly touted e-MedSoft's business dealings and corporate acquisitions, gave the appearance of growth and progress, and caused the value of e-MedSoft's stock to rise. Plaintiffs allege that the press releases and SEC filings were false and misleading because they failed to disclose certain material facts that, if revealed, would have seriously undermined the apparent significance of e-MedSoft's dealings. Included among the undisclosed facts was that the corporate acquisitions made by e-MedSoft were self-related transactions. The complaints allege that National Century owned 33% of e-Medsoft's common stock and that it also owned or controlled the companies that e-MedSoft was acquiring.

It should be noted that the defendants whose motions to dismiss are at issue in this opinion are not alleged to have authored, reviewed, or approved any of e-MedSoft's press releases or SEC filings.

### B. Allegations as to Mitchell Stein

The complaints allege that Mitchell Stein co-founded e-MedSoft in January 1999. Stein served as a director of e-MedSoft in 1999 and 2000, before the start of the class period. Plaintiffs further allege that Stein owned and controlled a company named TSI Technologies and Holdings, which was renamed Swab Financial. Stein held shares in e-MedSoft, doing so in the name of TSI, and later Swab. Stein allegedly owned 20.76% of e-MedSoft's stock during the class period.

The allegations concerning Stein fall into three categories. First, the complaints allege that in June and July 2001, Stein "secretly" sold a substantial amount of e-MedSoft stock. According to the complaints, TSI entered into five stock transfer agreements with San Diego Asset Management. In each agreement, TSI sold a set number of e-MedSoft shares (ranging from 1 million to 6 million shares) at a set price (from $1.15 to $1.50 per share). San Diego Asset Management agreed not to turn around and sell more than a certain number of the shares (from 50,000 to 150,000 shares) per month. Plaintiffs allege that the transfer agreements were structured "to avoid a large stock price drop that would inevitably accompany a wholesale dumping of e-MedSoft stock into the marketplace." See Mahoney Compl., ¶68. Plaintiffs further allege that San Diego Asset Management sold stock in excess of the limits set in the agreements, and this matter was the subject of litigation between Swab Financial and San Diego Asset Management in California state court.

Second, the complaints allege that Stein, along with Frank Magliochetti, e-MedSoft's chief executive officer, and Donald Ayers, a director of e-MedSoft and officer of National Century, approached a Swiss investment bank on September 1, 2001 about acting as a broker to find financing for e-MedSoft. Days earlier, e-MedSoft had announced it intentions to acquire two healthcare companies, Addus Healthcare and Tender Loving Care, and it needed financing for the acquisitions. According to the complaints, the Swiss bank arranged for the Private Investment Bank Limited to loan $70 million to e-MedSoft, and the loan was supposed to have been secured in part by e-MedSoft's accounts receivable. The complaints allege that e-MedSoft fraudulently

obtained the loan because the pledged accounts receivable already belonged to National Century and because Magliochetti had forged signatures on certain debenture agreements. Plaintiffs contend that the Private Investment Bank Limited confronted Stein and Magliochetti, and Magliochetti admitted that he had forged signatures and that the accounts receivable had been pledged to National Century. The complaints allege that the dispute between the Private Investment Bank Limited and e-MedSoft was litigated in federal district court in California.

Third, the complaints allege that Stein, through TSI and Swab Financial, made "highly suspicious" sales of e-MedSoft stock. See Mahoney Compl., ¶134. Stein allegedly sold 700,000 shares on November 20, 2001, 366,000 shares on December 31, 2001, and 869,000 shares on January 31, 2002. According to the complaints, e-MedSoft was de-listed from the American Stock Exchange on July 15, 2002, and it filed for bankruptcy on November 27, 2002.

### C. Allegations as to the Beacon Entities and JPMorgan

The allegations against the Beacon Entities and JPMorgan are few. The complaints allege that the Beacon Entities owned 20% of the common stock of National Century, that the Beacon Entities were wholly-owned subsidiaries of JPMorgan, and that JPMorgan had the power to appoint two directors on National Century's board of directors. The complaints assert that the Beacon Entities and JPMorgan were control persons of National Century. They further assert that National Century caused e-MedSoft to commit violations of federal securities law and that the Beacon Entities and JPMorgan are liable as control persons for e-MedSoft's violations .

## II. MOTION TO DISMISS STANDARD OF REVIEW

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Roth Steel Prods. v. Sharon Steel Corp., 705 F.2d 134, 155 (6th Cir. 1982). A complaint may be dismissed for failure to state a claim only where "it appears beyond a doubt that the plaintiff can prove no

set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). A motion to dismiss under Rule 12(b)(6) will be granted if the complaint is without merit due to an absence of law to support a claim of the type made or of facts sufficient to make a valid claim, or where the face of the complaint reveals that there is an insurmountable bar to relief. Rauch v. Day & Night Mfg. Corp., 576 F.2d 697 (6th Cir. 1978).

Because a motion under Rule 12(b)(6) is directed solely at the complaint itself, the court must focus on whether the claimant is entitled to offer evidence to support the claims, rather than whether the plaintiff will ultimately prevail. Scheuer, 416 U.S. at 236; Roth Steel Prods., 705 F.2d at 155; see also Bell Atlantic Corp. v. Twombly, 550 U.S. _, 127 S.Ct. 1955, 1965 (2007) (Rule 8 "does not impose a probability requirement at the pleading stage"). A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory. Weiner v. Klais & Co., Inc., 108 F.3d 86, 88 (6th Cir. 1997). The court is not required to accept as true unwarranted legal conclusions or factual inferences. Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987). Though the complaint need not contain detailed factual allegations, the factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim. Bell Atlantic, 127 S.Ct. at 1964-65; Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 526 (1983). Plaintiff must provide more than labels and conclusions, or a formulaic recitation of the elements of a cause of action, Bell Atlantic, 127 S.Ct. at 1965, and the court is not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986); accord Morgan, 829 F.2d at 12.

### III. SECTION 10(B) CLAIMS

#### A. Text of the Statute and Rule 10b-5

Under Section 10(b) of the Securities Exchange Act, it is unlawful for:

> any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). The SEC promulgated Rule 10b-5, which makes it unlawful, in connection with the purchase or sale of any security, to:

> (a) employ any device, scheme, or artifice to defraud,
>
> (b) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5. The Unites States Supreme Court has stated that "Rule 10b-5 encompasses only conduct already prohibited by § 10(b)." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., __ U.S. __, 128 S.Ct. 761, 768 (2008).

In Count One of both complaints, Plaintiffs bring claims under Rule 10b-5(b) for false statements of material fact. In Count Two, Plaintiffs bring claims under Rule 10b-5(a) & (c) for a scheme or device to defraud and for a practice that operates to defraud.

### B.  Claims for a False Statement, Rule 10b-5(b)

Section 10(b) and Rule 10b-5(b) promulgated thereunder prohibit any person from making "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security." Morse v. McWhorter, 290 F.3d 795, 798 (6th Cir. 2002); see 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b). To state a claim under § 10(b) and Rule 10b-5(b), plaintiffs must allege, in connection with the purchase or sale of securities: "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) justifiably relied on by plaintiffs, and (5) proximately causing them injury." Helwig v. Vencor, Inc., 251 F.3d 540, 554 (6th Cir. 2001); accord Stoneridge, 128 S.Ct. at 768.

6

The Private Securities Litigation and Reform Act ("PSLRA") requires complaints asserting a claim for misleading statements to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Moreover, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

The Court finds that the Plaintiffs have failed to state a claim under Rule 10b-5(b) against the moving Defendants. The complaints identify seventeen misleading press releases and six misleading SEC filings issued by e-MedSoft, but none of the moving Defendants are alleged to have authored, reviewed, approved, assisted with, or given direction to any of the releases or filings. Indeed, these documents are specifically attributed to defendants other than Stein, TSI Technologies, Swab Financial, the Beacon Entities, and JPMorgan. Moreover, none of the moving Defendants were officers or directors during the class period, so Plaintiffs may not rely on the group-published doctrine. See Dresner v. Utility.com, Inc., 371 F.Supp.2d 476, 494 (S.D.N.Y. 2005) (allowing Rule 10b-5(b) claims to go forward when the complaint adequately alleges a corporate officer's involvement in the company's public statement). Simply put, there are no allegations in the complaints that attribute the false statements to the moving Defendants.

Accordingly, Plaintiffs' claims against the moving Defendants under Rule 10b-5(b) are dismissed.

### C. Claims for Deceptive Conduct, Rule 10b-5(a) & (c)

#### 1. Elements

Rule 10b-5(a) and (c) prohibit the use of "any device, scheme, or artifice to defraud" or "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5(a) & (c).

The Sixth Circuit has held that "Rule 10b-5(a) and (c) encompass conduct beyond disclosure violations. Benzon v. Morgan Stanley Distributors, Inc., 420 F.3d 598, 610 (6th Cir. 2005). Thus, "a defendant 'not liable under Rule 10b-5(b) for failure to disclose . . . may still be held liable under Rule 10b-5(a) and 10b-5(c).'" Id. (quoting Scholnick v. Schecter, 752 F.Supp. 1317, 1323 (E.D. Mich 1990)). Even so, the court observed that "there is very little case law explaining more specifically what types of claims are actionable under these provisions." Id., 420 F.3d at 611.

The Supreme Court in Stoneridge refrained from defining exactly what types of claims are actionable under Rule 10b-5(a) and (c), but it did state that "[c]onduct itself can be deceptive" and, thus, written statements are not required for liability under § 10(b). Stoneridge, 128 S.Ct. at 769. Regardless of whether the deceptive device is conduct or a written statement, it is actionable only when there is "the requisite proximate relation to the investors' harm. . . . Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." Id.

Extensive discussions of Rule 10b-5(a) and (c) can be found in In re Parmalat Sec. Litig., 376 F.Supp.2d 472, 492-504 (S.D.N.Y. 2005) and In re Enron Corp. Sec., Derivative & "ERISA" Litig., 439 F.Supp.2d 692, 713-24 (S.D. Tex. 2006). The court in Parmalat traced how Rule 10b-5(a) and (c) claims were uncommon until the Supreme Court's holding in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 114 S.Ct. 1439 (1994), that there is no private civil liability for aiding and abetting a violation of § 10(b). Before the holding in Central Bank, "the path of least resistance for a plaintiff suing based on a deceptive arrangement with multiple actors was to allege that one actor had misrepresented or omitted a material fact and that the other actors had aided and abetted that fraud." Parmalat, 376 F.Supp.2d at 497. Once Central Bank closed off that legal theory, plaintiffs began to bring claims under Rule 10b-5(a) and (c) against defendants who allegedly engaged in deceptive conduct but had not themselves made any misrepresentations or omissions of material fact. Id. at 497-98.

8

An issue discussed in both Parmalat and Enron is the difficulty of deciding what conduct gives rise to liability under Rule 10b-5(a) and (c) and what conduct is merely aiding and abetting a primary violator. Both courts concluded that to be liable, a defendant must engage in conduct that is in itself deceptive, not simply engage in non-deceptive conduct that supports an overall deceptive scheme. See Parmalat, 376 F.Supp.2d at 502-03; Enron, 439 F.Supp.2d at 719 (citing Simpson v. AOL Time Warner, Inc., 452 F.3d 1040, 1048 (9th Cir. 2006)). And both courts agreed that in order to state a claim under Rule 10b-5(a) and (c), "plaintiff must allege that a defendant (1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries." Parmalat, 376 F.Supp.2d at 491-92; Enron, 439 F.Supp.2d at 717.

### 2. Mitchell Stein, TSI Technologies, and Swab Financial

Plaintiffs argue that Stein is liable under Rule 10b-5(a) and (c) because he "participated" and "assisted" in e-MedSoft's scheme to defraud investors through false public statements. The complaints allege three ways in which Stein participated in the scheme: by entering into five stock transfer agreements with San Diego Asset Management; by approaching a Swiss investment bank about obtaining financing for e-MedSoft; and by selling stock near the end of the class period.

Plaintiffs emphasize that Stein "participated" in the alleged scheme, but "[t]he term 'substantially participated' does not appear in the text of Section 10(b) or Rule 10b-5 . . . . The text asks only whether a defendant directly or indirectly used or employed a manipulative or deceptive device or contrivance." Parmalat, 376 F.Supp.2d at 502-03. Moreover, while Plaintiffs argue that Stein "assisted" in the scheme, Central Bank held that there is no cause of action under § 10(b) for aiding and abetting.

The Court finds that the complaints fail to state a claim under Rule 10b-5(a) and (c) against Stein because he is not alleged to have engaged in any deceptive conduct. Plaintiffs contend that the deceptive aspect of the stock transfer agreements with San Diego Asset Management was that

9

the sales were "secret." However, there are no allegations that Stein owed Plaintiffs a duty to disclose his stock sales. Though not a matter alleged in the complaints, Plaintiffs argue in their brief that Stein did not report the sales to the SEC even though he should have. Regardless of whether this is correct, the complaints still fail to allege any causal connection between Stein's nondisclosure and Plaintiffs' loss. A plaintiff asserting a claim under Rule 10b-5(a) and (c) must allege "what effect" the deceptive conduct had on the market for the securities at issue. In re Global Crossing, Ltd. Secs. Litig., 322 F.Supp.2d 319, 329 (S.D.N.Y. 2004). Plaintiffs do not allege that Stein's nondisclosure constituted a fraud on the market, that the price of e-MedSoft stock would have changed had Stein disclosed his sales, or that either the manner or the price range in which Stein sold the stock undermined the efficiency of the market for e-MedSoft stock. To the contrary, the complaints expressly allege that Stein structured the transfer agreements in a way to be as least disruptive to the marketplace as possible. Cf. Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 346, 125 S.Ct. 1627, 1633-34 (2005) (plaintiff must allege that defendant's deceptive conduct "proximately caused the plaintiff's economic loss").

From the description in the complaints, the stock sales appear to be legitimate transactions. The only way in which Plaintiffs allege that they were deceived concerning the sales was from the way another defendant described them. The complaints allege that an e-MedSoft executive referred to the stock sales in a press release and mischaracterized them as showing that San Diego Asset Management had committed to a substantial and long-term investment in e-MedSoft, when in fact San Diego Asset Management (unbeknownst to Stein and in violation of the stock transfer agreements) was poised to sell off the stock it had just purchased. It was this misleading press release that allegedly caused the value of e-MedSoft stock to be artificially inflated. Stein's non-deceptive stock sales cannot give rise to liability under Rule 10b-5(a) and (c). See Parmalat, 376 F.Supp.2d at 505 (finding that loan transactions were not a deceptive device because "there is no suggestion that the transactions were something other than what they appeared to be. These arrangements therefore were not inventions, projects, or schemes with the tendency to deceive.

10

Any deceptiveness resulted from the manner in which Parmalat or its auditors described the transactions on Parmalat's balance sheets and elsewhere."); Enron, 439 F.Supp.2d at 721 (finding that bank's loans were not deceptive because the transactions themselves were not shams; rather, it was Enron officers who used the existence of the loans to create "the false appearance of a financially strong Enron").

Also deficient are Plaintiffs' allegations about Stein approaching a Swiss investment bank to obtain financing for e-MedSoft. Again, it was someone other than Stein who was alleged to have engaged in deceptive conduct. According to the complaint, e-MedSoft announced in several press releases that it intended to acquire Addus Healthcare and Tender Loving Care and misrepresented its ability to fund the purchases. With e-MedSoft lacking the means to pay for the acquisitions, Stein, Magliochetti, and Ayers allegedly requested the Swiss investment bank to find financing. The Swiss bank arranged a loan from the Private Investment Bank Limited. The complaints allege that e-MedSoft, through Magliochetti, deceived the Private Investment Bank Limited by providing false information about how the loans were collateralized. Stein is alleged only to have requested the Swiss bank to find financing for e-MedSoft. It is Magliochetti who allegedly committed the deceptive acts. There are no allegations that Stein knew e-MedSoft could not collateralize the loans or that he otherwise deceived either the Swiss bank or the Private Investment Bank Limited.

Finally, the complaints allege that Stein sold e-MedSoft stock between November 20, 2001 and January 31, 2002. The sales were allegedly suspicious because of their proximity to the end of the class period, February 11, 2002, and to the date on which e-MedSoft was de-listed from the American Stock Exchange, July 15, 2002. At best, these allegations support an inference that Stein had access to some inside company information, but the complaints, which expressly concede that Stein reported the sales to the SEC, are devoid of any allegations the sales were deceptive.

11

### 3. The Beacon Entities and JPMorgan

Though Count Two purports to bring claims under Rule 10b-5(a) and (c) against "all Defendants," the complaints fail to allege any act, let alone a deceptive one, that was committed by the Beacon Entities or JPMorgan. All of the allegations against the Beacon Entities and JPMorgan go to their control person status with National Century.

### C. Summary

Plaintiffs' claims under Rule 10b-5(b) are dismissed because the complaints do not attribute any of the alleged false statements to the moving Defendants. Plaintiffs' claims under Rule 10b-5(a) & (c) are dismissed because the complaints do not allege that the moving Defendants engaged in deceptive conduct on which Plaintiffs relied in purchasing e-MedSoft stock.

## IV. SECTION 20(A) CLAIMS

### A. Elements

Section 20(a) of the Securities Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce that act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

There are two requirements for a finding of control person liability. "First, the 'controlled person' must have committed an underlying violation of the securities laws or the rules and regulations promulgated thereunder." PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 696 (6th Cir. 2004). Second, the control person defendant "must have directly or indirectly controlled the person liable for the securities law violation." Id. In the absence of a statutory definition, "control" has been defined by the SEC as "the possession, direct or indirect, of the power to direct

or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. §230.405. "Control" is "'the practical ability to direct the actions of the people' who committed the violation." Stavroff v. Meyo, No. 95-4118, 1997 WL 720475, at *7 n.5 (6th Cir. Nov. 12, 1997) (quoting Schlifke v. Seafirst Corp., 866 F.2d 935, 949 (7th Cir. 1989)).

### B. Mitchell Stein, TSI Technologies, and Swab Financial

For the purposes of the following discussion, the Court will assume, without deciding, that the complaints satisfy the first element of a § 20(a) claim – that e-MedSoft committed an underlying violation of the securities laws.

The Court discussed in a prior opinion how courts have applied different pleading standards for the second element of a control person claim. See May 7, 2007 Opinion, pp. 19-24. The most rigorous standard is that the controlling person "was in some meaningful sense a culpable participant in the primary violation." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998). Other courts have declined to impose a requirement of culpability, but do require allegations that the controlling person both had the capacity to control the primary violator and actually exercised that control. See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 85 (1st Cir. 2002); Metge v. Baehler, 762 F.2d 621 (8th Cir. 1985). Finally, other courts apply a more lenient standard yet, requiring only that the controlling person be alleged to have had the capacity to control the primary violator; the "actual exercise of that control need not be alleged." In re Enron Corp. Sec., Derivative & ERISA Litig., 258 F.Supp.2d 576, 642 (S.D. Tex. 2003) (citing Fifth Circuit cases); accord Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000); In re Baan Co. Sec. Litig., 103 F.Supp.2d 1, 24 (D.D.C. 2000); In re System Software Associates, Inc. Sec. Litig., No. 97 C 177, 2000 WL 283099, at *16 (N.D. Ill. March 8, 2000).

This Court chose to apply the most lenient standard that the complaint must allege the capacity to control but not the exercise of control. See May 7, 2007 Opinion, pp. 24-26. This conclusion was guided by the Supreme Court's ruling in Swierkiewicz v. Sorema N.A., 534 U.S.

506, 122 S.Ct. 992 (2002), that Federal Rule of Civil Procedure 8 imposes a simplified notice pleading standard and, in the context of a Rule 12(b)(6) motion to dismiss, a court should not evaluate the merits of a claim governed by Rule 8(a).  See In re Parmalat Sec. Litig., 414 F.Supp.2d 428, 440-41 (S.D.N.Y. 2006) (not requiring allegations of an actual exercise of control because allegations of control are not averments of fraud and are subject only to Rule 8(a)); accord In re WorldCom, Inc. Sec. Litig., 294 F.Supp.2d 392, 415-16 (S.D.N.Y. 2003); Davidco Investors, LLC v. Anchor Glass Container Corp., No. 8:04CV2561T-24EAJ, 2006 WL 547989, at *28 (M.D. Fla. March 6, 2006); In re Enron Corp. Sec., Derivative & ERISA Litig., No. MDL-1446, 2003 WL 230688, at *13 (S.D. Tex. Jan. 28, 2003).

The complaints must therefore contain allegations supporting an inference that Stein or his companies had the capacity to control e-MedSoft.  See In re Adelphia Communications Corp. Sec. and Derivative Litig., 398 F.Supp.2d 244, 262 (S.D.N.Y. 2005) (holding that to survive a motion to dismiss, the complaint must plead facts supporting an inference that the control person "had the potential power to influence and direct the activities of the primary violator.") (internal quotations omitted).  The complaints allege that Stein, through TSI Technologies and Swab Financial, had control over e-MedSoft by virtue of his 20.76% stock ownership in the company.  In their brief, Plaintiffs further contend that Stein "continued to exert managerial authority" over e-MedSoft even after he stepped down as a director before the start of the class period.  However, the complaints contain no such allegations that Stein had any involvement in the company's management during the class period.  Further, there are no allegations that his status as a founder enabled him to exert any degree of influence over e-MedSoft.  At most, the complaints allege that Stein may have had some insider knowledge, based on the timing of his stock sales.

The issue then is whether Stein's status as a 20.76 % stockholder, standing alone, satisfies the second element of a control person claim.  The Court finds that it does not.  Many courts follow the general rule that a "'person's status as an officer, director, or shareholder, absent more, is not enough to trigger liability under § 20.'"  In re Adelphia, 398 F.Supp.2d at 262 (quoting

14

Hemming v. Alfin Fragrances, Inc., 690 F.Supp. 239, 245 (S.D.N.Y. 1988)); see also Starr v. !Hey, Inc., No. 01 C 6087, 2003 WL 21212596, at *4 (N.D. Ill. May 23, 2003) (citing cases). What is important here is that Stein is not alleged to have been a majority shareholder or even the largest shareholder. The complaints expressly allege that National Century was e-MedSoft's largest shareholder, holding 33% of common stock during the class period. See Mahoney Compl., ¶ 24.

In Theoharous v. Fong, 256 F.3d 1219 (11th Cir. 2001), plaintiffs asserted a § 20(a) claim against Metromedia International Group. Plaintiffs alleged that Metromedia owned 39% of the primary violator, Roadmaster Industries, and that Metromedia had the contractual right to appoint four members of Roadmaster's nine-person board of directors. The court found that plaintiffs' allegations of Metromedia's minority ownership and minority position on the board were insufficient to support an inference that it had the capacity to control Roadmaster. Those allegations showed "only that Metromedia held a minority interest in Roadmaster" and "did not establish that Metromedia had the power to control the general business affairs of Roadmaster, nor that Metromedia had the power to control or influence the specific corporate policy which resulted in the alleged misconduct." Theoharous, 256 F.3d at 1227 (internal quotations omitted).

In In re Baan Co. Sec. Litig., 103 F.Supp.2d 1 (D. D.C. 2000), the complaint alleged that defendant Jan Baan founded the Baan Company, the primary violator, and that he and his brother owned 39% of the company. The court stated that the allegations of Baan founding the company and having minority ownership "are not sufficient to show control in themselves." In re Baan, 103 F.Supp.2d at 24. The complaint, however, went on to allege that the brothers held executive positions with the company and actively managed the company on a daily basis. The court found that those allegations sufficiently stated a § 20(a) claim. Id.

Minority ownership was found insufficient for control person liability in Sloane Overseas Fund v. Sapiens Int'l Corp., 941 F.Supp. 1369 (S.D.N.Y. 1996). The alleged control person, Swiss Bank Corporation, founded the corporate wrongdoer, Sapiens International Corporation,

15

owned 8% of its stock, and had a member on the board of directors. After observing that a different investor group held a 34.5% stake in the company, the court found that Swiss Bank "was not a controlling stockholder of Sapiens. . . . [it's] 8% holding together with the other facts alleged do not meet the standard for control person status . . . ." Sloane, 941 F.Supp. at 1379. See also Copland v. Grumet, No. CIV.A 96-3351, 1998 WL 256654, at *15 (D.N.J. Jan. 9, 1998) (dismissing § 20(a) claim against former director, who resigned before the class period began and who owned 12% of the company's stock, because "mere fact of stock ownership does not transform an individual into a controlling person"); Starr, 2003 WL 21212596, at *4 (bare allegation of "shareholder status" is insufficient). One possible exception is when the alleged control person owns 100% of the corporate wrongdoer's stock. See Borden, Inc. v. Spoor Behrins Campbell & Young, Inc., 735 F.Supp. 587, 590-91 (S.D.N.Y. 1990) (finding the allegation that defendants were 100% shareholders to alone be sufficient); Whirlpool Financial Corp. v. GN Holdings, Inc., 873 F.Supp. 111, 120-21 (N.D. Ill. 1995) (same).

Here, the lone allegation of control against Stein is that he was a 20.76 % stockholder during the class period. Not only was Stein a minority shareholder, the complaint alleges that National Century held more stock in e-MedSoft than he did. "Control" is defined as the power to direct the management and policies of the wrongdoer. See 17 C.F.R. §230.405. The Court finds that the allegation of Stein's minority interest in e-MedSoft is not sufficient to support an inference that he had the power to influence and direct e-MedSoft's activities.

### C. The Beacon Entities and JPMorgan

Plaintiffs' control person claims against the Beacon Entities and JPMorgan rest on the following allegations: the Beacon Entities owned 20% of the common stock of National Century; JPMorgan acquired the Beacon Entities in 2000 and thereby acquired 20% of National Century's stock, as well as the right to appoint two members of National Century's board of directors; National Century, in turn, owned 33% of e-MedSoft.

The claim against the Beacon Entities and JPMorgan is even more attenuated than the one

against Stein.  Plaintiffs do not allege that the Beacon Entities or JPMorgan directly owned stock in e-MedSoft or could appoint members to e-MedSoft's board.  While it is true that the definition of "control" includes indirect power, the allegations here boil down to the theory that defendants were control persons because they held a minority interest in another alleged control person, National Century, which itself held a minority interest e-MedSoft.  The complaints do not contain any further allegations of how it was that the Beacon Entities or JPMorgan had the ability to control National Century, let alone e-MedSoft.  If direct minority ownership alone is insufficient to satisfy § 20(a), see Theoharous, In re Adelphia, Sloane, *supra*, then having a minority stake in a company that has a minority interest in the primary violator, without more, fails too.

It should be noted that in a prior order, the Court allowed to go forward Plaintiffs' § 20(a) claims against National Century's Founders, who also allegedly held a minority interest in National Century.  See Feb. 27, 2007 Opinion.  However, the control person allegations against the Founders were much more extensive.  The complaints further alleged that the Founders directly owned stock in e-MedSoft, held executive positions with e-MedSoft, used their positions to manipulate e-MedSoft for their own monetary gain, and were listed on e-MedSoft's SEC filings as persons having potential influence over e-MedSoft's corporate transactions.

**V.    Conclusion**

For the reasons stated above, the motion to dismiss of Mitchell Stein, TSI Technologies, and Swab Financial (doc. 476) is GRANTED.  The motions to dismiss of the Beacon Entities and JPMorgan (docs. 167, 175) are GRANTED as to Florida complaints (note: those motions remain pending as to the Pharos and Parrett complaints), and their motion for leave to suggest the decision in Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., __ U.S. __, 128 S.Ct. 761, 768 (2008), as supplemental case law authority (doc.1221) is GRANTED.

                                                                        s/ James L. Graham
                                                                        JAMES L. GRAHAM
                                                                        United States District Judge

DATE: April 2, 2008