IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
|  | : |  |
| In re National Century | : | Case No. 2:03-md-1565 |
| Financial Enterprises, |  |  |
| Inc., Investment Litigation. | : | Judge Graham |
|  | : | Magistrate Judge Abel |
|  | : |  |

OPINION AND ORDER ON MOTIONS TO DISMISS FILED BY
RATING AGENCIES MOODY'S AND FITCH

This matter is before the Court on motions to dismiss filed in this multidistrict litigation by credit rating agencies Moody's Investors Service, Inc. and Fitch, Inc.  Plaintiff Lloyds TSB Bank PLC has sued Moody's for the alleged role that Moody's credit ratings played in inducing Lloyds to invest millions of dollars in notes issued by National Century Financial Enterprises, Inc.  Plaintiff New York Pension Funds has sued Fitch on the same grounds.  Plaintiffs allege that Moody's and Fitch gave the National Century notes their highest credit ratings and that, in reliance on those ratings, Plaintiffs decided to purchase the notes.  Plaintiffs lost the value of their investments when National Century went bankrupt amid allegations of a massive financial fraud.

In their respective motions to dismiss, Moody's and Fitch argue that their credit ratings were predictive opinions of creditworthiness.  They contend that their credit rating opinions were not guarantees or statements of fact on which Plaintiffs can base a claim for common law fraud or securities fraud under federal and state law.  Moody's and Fitch further argue that their credit ratings are protected as expression under the First Amendment.

I.      BACKGROUND

A.      Lloyds's Allegations and Claims Against Moody's

Lloyds is a British public limited company with its principal place of business in London, England.  In March 2001, Lloyds purchased $60 million of Class A notes in the 2001-1 Series

issued by NPF XII, a note program of National Century. In November 2002, Lloyds purchased $68 million of Class A notes in the NPF XII 2000-4 Series under a Participation Agreement with defendant underwriter Credit Suisse First Boston.

Lloyds alleges that, as a prospective purchaser of the notes, it received certain private placement memoranda and supplemental memoranda regarding the NPF XII notes. The memoranda stated that the Class A notes in the 2001-1 Series were required to be rated Aaa by Moody's, and Class A notes in the 2000-4 Series were required to be rated Aa3 by Moody's. According to the complaint, an "'Aaa' bond rating assigned by Moody's represents that the bond is of the 'best quality' and carries the 'smallest degree of investment risk.' An 'Aa' bond rating assigned by Moody's represents that the bond is 'high quality by all standards,' and, together with the Aaa group, comprise 'high-grade' bonds." Lloyds Fourth Am. Compl., ¶117.

The complaint is silent on whether National Century paid Moody's to rate the notes. The complaint does allege that Moody's was "informed of the rating condition, and knew that the Notes were marketed to potential buyers as including the rating condition." Lloyds Compl., ¶115. Lloyds alleges that Moody's "continually received financial and operational information from NPF XII." Id., ¶118. Bank One, the Indenture Trustee for the NPF XII note program, was allegedly obligated under the Master Indenture to provide Moody's with a quarterly balance sheet of National Century, quarterly statements of income and retained earnings, and annual audited consolidated financial statements. Moody's is also alleged to have received monthly "Investor Reports" from National Century's financing arm, National Premier Financial Services, Inc. (NPFS), and annually received a randomly-selected Investor Report that had been audited.

The complaint alleges that on June 1, 2001 Moody's issued a publication entitled the "New Issue Report" in connection with its rating of the Series 2001-1 notes. The New Issue Report detailed the factors Moody's had considered in making its rating. The Report allegedly stated that Moody's had considered NPFS's ten-year history performance in purchasing and servicing accounts receivable, and had also considered the various steps National Century had taken to mitigate the risks associated with purchasing accounts receivable from healthcare providers, including: requiring

that the receivables purchased have a short average life, setting concentration limits to ensure a diversity of healthcare providers and a diversity of payors on the receivables, requiring that certain levels of reserves be set aside and maintained to offset defaults, and isolating assets from the bankruptcy of the healthcare provider or National Century.  See Lloyds Compl., ¶120.

Lloyds asserts the following claims against Moody's: violations of Section 10(b) of the Securities Exchange Act, violations of Ohio's and New Jersey's blue sky laws, fraud, negligent misrepresentation, negligence, and gross negligence.

### B.    The New York Funds' Allegations and Claims Against Fitch

The New York Pension Funds are a group of public pension funds in charge of managing the assets of various New York City employees and retirees.  In October 2000, the New York Funds purchased $80 million of 2000-2 Series notes issued by NPF XII.  In May 2002, the New York Funds purchased $9.425 million of 2002-1 Series notes issued by NPF XII.

The New York Funds allege that, as prospective purchasers of the notes, they received certain offering materials regarding the NPF XII notes.  According to the compliant, the offering materials required that the notes be rated "AAA" by Fitch.  This rating was the highest rating possible and indicated that the notes carried the "lowest expectation of credit risk."  New York Funds Second Am. Compl., ¶199.

The complaint alleges that National Century hired Fitch to "conduct a thorough analysis of the credit risk of the Notes and to provide a credit rating on the basis of that analysis."  New York Funds Compl., ¶199.  Fitch conducted its review of National Century in April 1999.  When it rated the notes, Fitch knew that the notes were required by the offering materials to be rated AAA.  The complaint alleges that Fitch issued a publication in April 1998 entitled "Rating Guidelines for Health Care Receivables" describing its ratings process.  The Rating Guidelines stated that Fitch considered the historical accuracy of the healthcare provider or oversight servicer in estimating the reimbursable amount of receivables, the servicer's experience and management, and the healthcare providers' financials, management, and performance history.

The complaint further alleges that Fitch received financial and operational information about

the NPF XII note program. According to the complaint, Bank One was obligated under the Master Indenture to provide Fitch with a quarterly balance sheet of National Century, quarterly statements of income and retained earnings, and audited consolidated financial statements. Fitch is also alleged to have received monthly "Investor Reports" and annually received a randomly-selected Investor Report that had been audited. The complaint quotes an internal memorandum dated June 21, 2001 from National Century's controller, John Snoble, to its president, Lance Poulsen, stating that "the investor reports that have been forwarded to Fitch" showed that the reserve accounts "did not meet the percentage requirements." New York Funds Compl., ¶204. The memo advised National Century to "admit [to Fitch] that we have not been in compliance." Id.

The New York Funds allege that Fitch gave the NPF XII notes a rating of AAA despite receiving three anonymous letters that outlined fraudulent activities at National Century. The first letter, dated April 26, 1999, allegedly described National Century as a "fraud" and "Ponzi scheme." New York Funds Compl., ¶207. The second letter, dated July 16, 1999, warned that National Century operated "outside the scope of its indentures and normal business practices" and estimated that 50% of its receivables were worthless or nonexistent. Id. The third letter, dated March 29, 2000, urged an investigation into the validity of the receivables. The complaint alleges that Fitch issued a press release on May 19, 2000 stating that it was actively investigating the allegations described in the third letter. Fitch issued an Asset Sales Report on May 22, 2000 stating that Fitch was obtaining "a ton of information" from National Century to determine if "there is any fire to the smoke." Id., ¶211. On July 7, 2000, Fitch issued another press release stating that its investigation showed that the allegations in the letters were unfounded.

The complaint states that despite the anonymous letters, the ensuing investigation, and being aware through the Investor Reports of the reserve shortages, Fitch continued to maintain its AAA rating of NPF XII notes. Not until May 23, 2002 did Fitch downgrade the notes, the complaint alleges.

The New York Funds assert the following claims against Fitch: aiding and abetting fraud, negligent misrepresentation, negligence, and gross negligence.

## II.    MOTION TO DISMISS STANDARD OF REVIEW

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. Erickson v. Pardus, __ U.S. __, 127 S.Ct. 2197, 2200 (2007) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)); Sensations, Inc. v. City of Grand Rapids, 526 F.3d 291, 295 (6th Cir. 2008). A motion to dismiss under Rule 12(b)(6) will be granted only if the complaint is without merit due to an absence of law to support a claim of the type made or of facts sufficient to make a valid claim, or where the face of the complaint reveals that there is an insurmountable bar to relief. Rauch v. Day & Night Mfg. Corp., 576 F.2d 697 (6th Cir. 1978). Under Rule 8(a), "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson, 127 S.Ct. at 2200 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Because a motion under Rule 12(b)(6) is directed solely at the complaint itself, the court must focus on whether the claimant is entitled to offer evidence to support the claims, rather than whether the plaintiff will ultimately prevail. Scheuer, 416 U.S. at 236; Bell Atlantic Corp. v. Twombly, __ U.S. __, 127 S.Ct. 1955, 1965 (2007) (Rule 8 "does not impose a probability requirement at the pleading stage").

Despite this liberal pleading standard, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986); see also Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ("[W]e need not accept as true legal conclusions or unwarranted factual inferences."). Though the complaint need not contain detailed factual allegations, the factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim. Bell Atlantic, 127 S.Ct. at 1964-65; Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 526 (1983). The plaintiff must provide the grounds of his entitlement to relief "rather than a blanket assertion of entitlement to relief." Bell Atlantic, 127 S.Ct. at 1965 n.3. Labels, conclusions, and formulaic recitations of the elements of a cause of action "will not do." Id. at 1965. "Accordingly, a complaint 'must contain either direct or inferential

5

allegations respecting all the material elements to sustain a recovery under some viable legal theory.'" Ferron v. Zoomego, Inc., No. 07-4007, 2008 WL 1988587, at *2 (6th Cir. May 7, 2008) (Lewis v. ACB Business Serv., Inc., 135 F.3d 389, 406 (6th Cir. 1998)).

## III.    ANALYSIS OF THE CLAIMS OF LLOYDS AGAINST MOODY'S

### A.    Section 10(b)

#### 1.    Elements and Pleading Standard

Lloyds brings a claim against Moody's for violating Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5(b). Section 10(b) prohibits any person from making "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security." Morse v. McWhorter, 290 F.3d 795, 798 (6th Cir. 2002); see 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b). To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege, in connection with the purchase or sale of securities: "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) justifiably relied on by plaintiffs, and (5) proximately causing them injury." Helwig v. Vencor, Inc., 251 F.3d 540, 554 (6th Cir. 2001) (en banc); see also In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 548 (6th Cir. 1999).

The Private Securities Litigation and Reform Act ("PSLRA") requires complaints asserting a claim of federal securities fraud to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Moreover, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Sixth Circuit has described the PSLRA's provisions as "[a]dding to the Federal Rules of Civil Procedure 9(b) requirement that fraud must be stated with particularity." In re Ford Motor Co. Secs. Litig., 381 F.3d 563, 567 (6th Cir. 2004). "[N]ot only must the complaint make particular factual

allegations, but the inference of scienter which those allegations generate must be strong." PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 682 (6th Cir. 2004).

### 2. The Ratings are the Misstatements of Fact

The complaint alleges that the ratings Moody's assigned to the NPF XII notes were the misstatements. Lloyds received private placement memoranda, which contained representations that the Class A notes in the 2001-1 Series were rated Aaa by Moody's and the Class A notes in the 2000-4 Series were rated Aa3. The complaint alleges that the Aaa rating falsely represented the Class A notes in the 2001-1 Series to be of the best quality and carry the smallest degree of risk. The complaint further alleges that the Aa3 rating falsely represented that the Class A notes in the 2000-4 Series were high quality and high-grade. Those ratings were false, according to the complaint, because National Century did not comply with the various requirements of the Master Indenture designed to minimize the risk of purchasing healthcare receivables, thereby making NPF XII Class A notes of lesser quality than the Moody's ratings indicated. The major alleged aspects of noncompliance with the Master Indenture were: purchasing worthless or nonexistent receivables, exceeding concentration limitations, failing to maintain reserve accounts, and engaging in related party transactions. The complaint alleges that had Lloyds considered the violations of the Master Indenture in determining the ratings, it could not have legitimately given the NPF XII notes the favorable ratings that it did.

In its response brief to the motion to dismiss, Lloyds contends that the New Issue Reports also were misstatements. The complaint identifies two New Issue Reports authored by Moody's: one dated June 1, 2001 regarding the Series 2001-1 notes, and one dated February 9, 2001 regarding Series 2000-3 notes. The Court finds that neither of the two New Issue Reports can form the basis of a § 10(b), fraud, or negligent misrepresentation claim, each of which have reliance as an essential element. See Helwig, 251 F.3d at 554 (§10(b)); Russ v. TRW, Inc., 59 Ohio St.3d 42, 49, 570 N.E.2d 1076, 1083-84 (Ohio 1991) (fraud); Delman v. Cleveland Hts., 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 838 (Ohio 1989) (negligent misrepresentation). Lloyds cannot plead the element of reliance as to the June 1, 2001 New Issue Report because it was issued after Lloyds had made its

7

decision to purchase the 2001-1 Series notes on March 23, 2001. There are no allegations that Lloyds received some sort of preliminary version of the Report before purchasing the 2001-1 Series notes. Lloyds cannot plead the element of reliance as to the February 9, 2001 Report because it was issued in connection with a series of notes not purchased by Lloyds. Further, the complaint does not allege that Lloyds ever received the February 9, 2001 Report. In any event, as discussed below, the complaint also fails to adequately allege scienter against Moody's, so a claim based on the New Issue Reports would fail on that ground as well.

The motion to dismiss argues that the alleged misstatement cannot be attributed to Moody's. What the complaint puts at issue, Moody's contends, is not the ratings themselves but the representation in the private placement memoranda that the notes would receive a certain rating. Moody's argues that it was not responsible for authoring or distributing the private placement memoranda. However, the Court finds that the complaint adequately attributes the alleged misstatement to Moody's. Lloyds alleges that Moody's, when it assigned the ratings, knew the ratings would be communicated in the offering materials to potential buyers of the notes. This is sufficient for attributing the alleged misstatement to Moody's. See In re Taxable Mun. Bond Secs. Litig., No. Civ. A. MDL No. 863, 1993 WL 591418, at *4 (E.D. La. Dec. 29, 1993) (finding that rating agency Standard & Poor's could be held liable under § 10(b) because it agreed to provide bond rating services and "knew that its rating would be disseminated to the public as part of the official statements"; thus, "S & P stands in no better position . . . than any other participant in the bond transactions").

Moody's next argues that its bond ratings were predictive opinions about creditworthiness. As such, Moody's contends, the ratings were a representation of opinion, not a representation of fact, and cannot serve as the basis for § 10(b) liability.

There is no dispute that, even as described in the complaint, the ratings that Moody's assigned to the notes ultimately represented Moody's own judgment or opinion about the quality of the bond. Cf. Compuware Corp. v. Moody's Investors Services, Inc., 499 F.3d 520, 522 (6th Cir. 2007) (finding that a Moody's rating of a publicly-held company "is a predictive opinion of a

company's future creditworthiness that is reached through a deliberative process" that "considers several objective factors, but is ultimately derived from the subjective weighing of those factors."). Nonetheless, the Supreme Court has "rejected the argument that statements containing opinions or beliefs . . . could not be a basis for" an action for securities fraud. Mayer v. Mylod, 988 F.2d 635, 638 (6th Cir. 1993) (citing Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1095 (1991)). "[S]tatements which contain the speaker's opinion are actionable under Section 10(b) of the Securities Exchange Act if the speaker does not believe the opinion and the opinion is not factually well-grounded." Mayer, 988 F.2d at 639; accord Saxe v. Dlusky, 268 Fed.Appx. 438, 441 (6th Cir. 2008); Helwig, 251 F.3d at 562; Rubin v. Schottenstein, Zox & Dunn, 110 F.3d 1247, 1256 (6th Cir. 1997).

The issue of whether Moody's believed the opinion will be addressed below in relation to the element of scienter. As to whether the ratings opinions were factually well-grounded, the complaint alleges that they were not. The complaint alleges that had Moody's considered the aspects of National Century's operations that were not in compliance with the Master Indenture, it could not have legitimately assigned the NPF XII notes the high ratings it did. These allegations that the ratings were not factually well-grounded are sufficient under Rule 12(b)(6). See Mayer, 988 F.2d at 639 (finding sufficient the allegations that the speaker's opinion was false or misleading because the opinion was "not supported by available facts," and observing that "[w]hether the statements here were true or false is not an issue to be decided under Rule 12(b)(6)"); accord Helwig, 251 F.3d at 562.

### 3. First Amendment Concerns

Citing numerous cases, Moody's argues that liability cannot be imposed on a financial publisher who disseminates information to the investing public. See, e.g., In re Enron Corp. Securities, Derivative & "ERISA" Litig., 511 F.Supp.2d 742, 826-27 (S.D. Tex. 2005). Moody's contends that its ratings are a matter of public concern and therefore entitled to First Amendment protection that can be overcome only by demonstrating actual malice. See Compuware Corp. v. Moody's Investors Services, Inc., 499 F.3d 520, 525 (6th Cir. 2007) (in the defamation context,

9

finding that Moody's rating of a publicly-held corporation was subject to actual malice standard of New York Times v. Sullivan, 376 U.S. 254, 280 (1964)); Enron, 511 F.Supp.2d at 820 (applying actual malice standard to claims against Moody's and Fitch because their ratings of Enron, a large public company, were distributed "to the world"). Moody's argues that holding a credit rating agency liable for its bond ratings would have an oppressive effect on the publication of important financial information to the public.

The Court finds that the complaint does not allege that the ratings of the NPF XII notes were published to the investing public at large. Rather, the notes were issued by a privately-held company, and the complaint characterizes the NPF XII note offerings as being targeted to a select class of institutional investors with the resources to invest tens of millions of dollars in the notes. And the only place that the ratings are alleged to have appeared were in the offering materials given to the select class of investors. The Court does not mean to treat the First Amendment concerns raised by Moody's lightly, but on a motion to dismiss all well-pleaded material allegations in the complaint must be accept as true. Erickson v. Pardus, __ U.S. __, 127 S.Ct. 2197, 2200 (2007). The complaint deliberately steers clear of characterizing Moody's ratings of the NPF XII notes as a matter of public concern. See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 762 (1985) (holding that a credit report published to five subscribers did not involve a matter of public concern because it was intended for a "specific business audience").

### 4. Scienter

To establish liability under Section 10(b) and Rule 10b-5, a plaintiff must prove that the defendant acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94, n.12 (1976). In the Sixth Circuit, reckless behavior may suffice for liability under Section 10(b). Robert N. Clemens Trust v. Morgan Stanley DW, Inc., 485 F.3d 840, 847 (6th Cir. 2007); Helwig, 251 F.3d at 548. Recklessness is a mental state falling "somewhere between intent and negligence" and is characterized by "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017, 1025 (6th Cir. 1979). "While the danger

10

need not be known, it must at least be so obvious that any reasonable man would have known of it." Id.; accord PR Diamonds, 364 F.3d at 681-82.

The United States Supreme Court recently discussed Section 10(b)'s scienter requirement in Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, 127 S.Ct. 2499 (2007). The Court was called on to interpret the PSLRA's requirement that the allegations in the complaint give rise to a "strong inference that the defendant acted with the required state of mind."

> In the case before us, the Court of Appeals for the Seventh Circuit held that the "strong inference" standard would be met if the complaint "allege[d] facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." 437 F.3d 588, 602 (2006). That formulation, we conclude, does not capture the stricter demand Congress sought to convey in § 21D(b)(2) [of the PSLRA]. It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind. Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by § 21D(b)(2) must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, as the Seventh Circuit did, but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as "strong" within the intendment of § 21D(b)(2), we hold, an inference of scienter must be more than merely plausible or reasonable - it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

127 S.Ct. at 2504-05.

The Supreme Court set the following guidelines for analyzing whether a complaint sufficiently pleads scienter. "First, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." 127 S.Ct. at 2509. "Second, courts must consider the complaint in its entirety . . . . The inquiry, as several Courts of Appeals have recognized, is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. (citing cases). "Third, in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Id. With respect to this last point, the Court explained:

11

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable . . . . Yet the inference of scienter must be more than merely "reasonable" or "permissible" - it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

Id. at 2510.

Moody's argues that the complaint fails to support a strong inference of scienter because it relies on allegations that Moody's had access to documents, without identifying particular pieces of information that alerted or should have alerted Moody's to National Century's fraudulent activities. Lloyds counters that Moody's either discovered or was reckless in failing to discover the Indenture violations during its bond rating review process. Lloyds further contends that the complaint alleges multiple red flags and fraud so pervasive in nature that Moody's should have known that its ratings were not factually well-grounded.

The allegations against Moody's are contained in a section of the complaint entitled "Lloyds Relied Upon The Ratings Provided By Moody's and Fitch." Lloyds Compl., ¶¶114-124. Moody's correctly points out that this section of the complaint makes no direct allegations that Moody's knew of the alleged Indenture violations or of any aspect of National Century's alleged fraud. The complaint simply lists the categories of documents that the Master Indenture directed Bank One and NPFS to provide to Moody's. The complaint does not state what the documents should have told Moody's; it does not identify which, if any, of the documents alerted Moody's to information that should have caused Moody's to refuse to give favorable ratings to the NPF XII notes. For instance, the complaint does not allege that Moody's received some particular document showing that National Century was purchasing worthless receivables or had inadequate levels in the reserve accounts. Simply put, the complaint fails to allege what Moody's should have learned from the documents it allegedly received.

Mere access to information is not enough to establish scienter.  See Fidel v. Farley, 392 F.3d 220, 229-30 (6th Cir. 2004); PR Diamonds, 364 F.3d at 688.  "[T]he Complaint must allege specific facts or circumstances suggestive of [defendant's] knowledge.  Without more, Plaintiffs fail to meet the PSLRA requirement to state with particularity facts giving rise to a strong inference of scienter." PR Diamonds, 364 F.3d at 688.  Lloyds tries to bolster its claim by alleging that Moody's "played a key role in developing and structuring the NPF XII healthcare receivables securitization program." Lloyds Compl., ¶118.  The argument, then, is that Moody's access to information, coupled with its alleged role, supports a strong inference of scienter.  The problem with that argument is that the complaint contains no further description of what role Moody's played other than assigning a bond rating.  Based on the allegations in the complaint, Moody's only role in the NPF XII program was rating the notes.  This is not a situation where the defendant is alleged to have been a corporate insider and, by virtue of the critical role he played in the company's affairs, must have been aware of the company's fraud.  See PR Diamonds, 364 F.3d at 688 (noting that "high-level executives can be presumed to be aware of matters central to their business's operation") (citing In re Complete Management, Incorporated Secs. Litig., 153 F.Supp.2d 314, 325-36 (S.D.N.Y. 2001)).

In its response brief, Lloyds emphasizes that Moody's, in its role of rating the notes, conducted an "extensive due diligence" review of National Century's operations.  Lloyds relies on LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co., 951 F.Supp. 1071 (S.D.N.Y. 1996), where the court found, on a motion to dismiss, that the complaint's description of rating agency Duff & Phelps' bond review process was sufficient to support an inference of scienter for a § 10(b) claim that Duff & Phelps had assigned an inflated bond rating.  Similar to what Lloyds did in its complaint, LaSalle Bank cited to Duff & Phelps' pamphlets in which it described its process for rating securities.  The court found that "Duff & Phelps' self-described due diligence process would have alerted it" to information that would have prevented it from assigning the ratings it did, and this supported at least an inference that Duff & Phelps acted with recklessness.  LaSalle, 951 F.Supp. at 1087.  "According to Duff & Phelps' own description of its review procedure, Duff & Phelps must have had extensive and intimate knowledge of the inner workings of Towers and its

13

Healthcare Subsidiaries. Such an investigation would have revealed at least some of the ways Towers violated the Bond program's structure and informed Duff & Phelps that its Bond ratings were inaccurate." Id. at 1086.

Lloyds' reliance on LaSalle is not persuasive. First, LaSalle is a pre- PSLRA case and, thus, the court applied Rule 9(b) and not the PSLRA's heightened pleading standard. The Supreme Court's decision in Tellabs makes clear that the PSLRA's requirements for pleading scienter are stringent. Further, and despite how Lloyds characterizes matters in its brief, the complaint here contains no allegation of Moody's performing an "extensive due diligence" review, and indeed the phrase "due diligence" is not used in the complaint with reference to Moody's. The only allegations about the review process are those relating to Moody's New Issue Report. In the Report, Moody's allegedly stated that it had reviewed the various steps National Century took to mitigate the risks of purchasing accounts receivable. Those steps served as credit enhancements for NPF XII notes. The complaint alleges that, in reality, National Century did not follow the steps. But the complaint does not support an inference, let alone a strong one, that Moody's review should have discovered that National Century was not following those steps. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 332 (1974) (holding that "mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth"). The complaint fails to allege specific facts or circumstances suggesting that Moody's knew or was reckless in not knowing that the steps were not being followed. See PR Diamonds, 364 F.3d at 688. The complaint does not state what part of the review process should have caused Moody's to question whether one or more of the credit enhancements applied, nor is there a reason cited in the complaint why Moody's should have conducted a more extensive review.

Lloyds next argues that certain red flags should have alerted Moody's to the alleged fraud at National Century. Lloyds cites five red flags: (1) anonymous letters sent to Duff & Phelps (a predecessor of Fitch) in 1999 and 2000 accusing National Century of fraud, (2) the termination of National Century's accountant in 1999 and the subsequent delay in a year-end audit, (3) the resignation of Deutsche Bank as underwriter in 2000, (4) Deloitte & Touche's refusal to complete

14

an audit of National Century in 2001; and (5) the existence of ownership interests that National Century's principals had in healthcare companies from whom National Century was purchasing accounts receivable.

"Specific factual allegations that a defendant ignored red flags, or warning signs" of fraudulent conduct "may support a strong inference of scienter." PR Diamonds, 364 F.3d at 686. The flaw with Lloyds's red flag argument is that the complaint does not allege the Moody's knew or should have been aware of the red flags.  All five red flags are mentioned in sections of the complaint pertaining to defendants other then Moody's.  And while the court must consider the complaint as a whole, Tellabs, 127 S.Ct. at 2509, the placement of these red flag allegations serves only to underscore that Moody's is not the party who allegedly should have known of the red flags. The anonymous letters were initially sent to Duff & Phelps and later reviewed by Fitch and Credit Suisse, not Moody's.  Similarly, it was Credit Suisse and/or Deloitte & Touche who allegedly knew of the second, third, and fourth red flags.  Finally, the complaint does not allege that Moody's knew of the fifth red flag or state a reason why it would have known.  The Court finds that these five alleged red flags do not support a strong inference of scienter.  See PR Diamonds, 364 F.3d at 686-87 (stating that to support a strong inference of scienter, red flags must have been "obvious" or "clearly evident" to someone in the defendant's position and be "sufficiently blatant that fraudulent intent can be inferred").

Lloyds also argues that the fraud at National Century was of such great magnitude that it must have been obvious to Moody's.  See PR Diamonds, 364 F.3d at 684-85 (finding that fraud of great magnitude, in combination with other factors, may support a strong inference of fraud).  While the complaint unquestionably alleges a fraud of great magnitude and the Court has ruled in prior decisions that the fraud should have been obvious to certain insiders of National Century, the complaint does not support an inference that the fraud should have been obvious to Moody's.  The various reasons listed in Lloyds' brief as to why the fraud was great in magnitude again only serve to emphasize that Moody's is not alleged to have been in a position where the fraud would have been obvious to it.  See Lloyds Memo Contra (doc. 819), pp. 44-49.  Lloyds cites pieces of

information and internal documents circulated among National Century insiders that Moody's simply is not alleged to have reviewed.

In its response brief, Lloyds contends that Moody's gave the NPF XII notes high ratings because Moody's wanted to maintain "its lucrative relationship with NCFE." Lloyds Memo Contra, p. 51. It is true that allegations of motive "may be relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred." In re Comshare Secs. Litig., 183 F.3d 542, 551 (6th Cir. 1999) (internal quotation and citation omitted). Nonetheless, "to demonstrate motive, a plaintiff must show concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," PR Diamonds, 364 F.3d at 690. The complaint here does not contain any allegations of a "lucrative relationship" between Moody's and National Century. Indeed, the complaint is silent on whether Moody's was paid to assign ratings to the NPF XII notes. The Court does not mean to ignore that, with asset-backed securities, rating agencies commonly instruct how the receivables program should be structured in order to get the desired bond rating. A rating agency would seem unlikely to perform this service without a fee. But quite simply, the complaint does not contain allegations along those lines, and even if the complaint did allege that Moody's received a fee, this alone would not support a strong inference of scienter. See In re SmarTalk Teleservices Secs., Inc. Litig., 124 F.Supp.2d 505, 518 (S.D. Ohio 2000) ("The majority of authority have held that a desire to maintain the fees flowing from a client relationship is not a sufficient basis on which to infer scienter.") (citing cases).

Under Tellabs, courts must "consider plausible nonculpable explanations for the defendant's conduct," and "omissions and ambiguities count against inferring scienter." 127 S.Ct. at 2510-11; see also In re Skechers U.S.A., Inc. Secs. Litig., No. 05-55980, 2008 WL 1721557, at *1 (9th Cir. April 10, 2008). After a thorough review of the complaint, the Court finds that it does not support a strong inference of scienter against Moody's. Lacking any specific allegations that Moody's knew or recklessly disregarded information that should have caused it to refuse to give the NPF XII notes a high rating, the complaint can plausibly be read as showing that National Century hid such information from Moody's. See Lloyds Compl, ¶¶ 55-61, 101-102 (describing how certain aspects

16

of the alleged fraud were concealed).  Indeed, the information that Moody's allegedly received is the very type of documents that National Century allegedly falsified.  The complaint, thus, can at best be read as showing that Moody's was not rigorous in its review of the NPF XII notes.  Given the omissions in the complaint, these nonculpable explanations are more compelling than the contention that Moody's acted with scienter.  Accordingly, the §10(b) claim against Moody's is dismissed.

### B.  Jurisdiction over Pendent State Law Claims

Moody's argues that if the federal securities claim is dismissed, then the Court should decline to exercise supplemental jurisdiction over the remainder of the claims against it.  The Court, however, finds that doing so would defeat the goal of judicial economy for which the action filed by Lloyds was consolidated into this multidistrict litigation.  See 28 U.S.C. § 1407; Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988) (holding that the decision of whether to exercise supplemental jurisdiction depends on "judicial economy, convenience, fairness, and comity").

### C.  Fraud

Lloyds has asserted a claim for common law fraud against Moody's.  The elements of a fraud claim are: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. Russ v. TRW, Inc., 59 Ohio St.3d 42, 49, 570 N.E.2d 1076, 1083-84 (Ohio 1991).[1]

Under Rule 9(b), Fed. R. Civ. P., averments of fraud and the circumstances constituting the fraud must be stated with "particularity."  To comply with Rule 9(b), "a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the

---

[1]  The Court has refrained from making choice-of-law determinations until the facts are further developed.  Unless otherwise noted, the Court looks primarily to Ohio law.

fraud.'" Walburn v. Lockheed Martin Corp., 431 F.3d 966, 972 (6th Cir. 2005) (quoting Coffey v. Foamex L.P., 2 F.3d 157, 161-62 (6th Cir. 1993)).

Lloyds stresses that under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Even so, the complaint contains little in the way of allegations about Moody's knowledge and intent. The section of the complaint dealing with Moody's, in fact, does not have even a general allegation regarding knowledge, recklessness, or intent to deceive. Earlier in the complaint, in describing the role of each defendant, Lloyds alleges that Moody's acted "recklessly or with gross negligence" in assigning its ratings to the NPF XII notes. Lloyds Compl., ¶ 9. And later in the complaint, in the count for fraud, Lloyds alleges that many of the defendants, Moody's included, knowingly or recklessly made material misrepresentations of fact and acted with the intent to induce Lloyds into purchasing the notes. Id., ¶ 177.

The Court finds that the complaint fails to state a claim of fraud against Moody's. Courts "must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a 'license to base claims of fraud on speculation and conclusory allegations.'" Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995) (quoting Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir.1990)). Lloyds has applied the labels of "reckless" and "intent" to Moody's without offering any factual allegations, even general ones, to support those labels. See Bell Atlantic, 127 S.Ct. at 1964-65 (holding that labels and formulaic recitations of the elements of a cause of action "will not do"; complaint must contain factual allegations enough to raise the claimed right to relief above the speculative level); Acito, 47 F.3d at 52 (requiring that the complaint "allege facts" sufficient to support an inference of fraudulent intent). As noted above with respect to the § 10(b) claim, the complaint does not allege that Moody's came across information during the ratings review process that should have caused it to refuse to give the ratings that it did. The complaint thus fails to allege that Moody's knew or recklessly disregarded that its note ratings were not factually well-grounded.

18

**D.**     **Negligent Misrepresentation**

**1.**     **Negligence-Based Claims Will Be Treated As A Claim For Negligent Misrepresentation**

Lloyds asserts claims for negligent misrepresentation, negligence, and gross negligence. The negligence-based claims are indistinguishable in that the only negligent act alleged against Moody's is a representation -- the rating itself.  The complaint alleges that Moody's was negligent because it gave favorable ratings to the NPF XII notes when the notes were not in fact deserving of those ratings.  The Court will therefore treat these claims together as a claim for negligent misrepresentation.  See Northwestern Mut. Life Ins. Co. v. Banc of Am. Sec. LLC, 254 F.Supp.2d 390, 401 (S.D.N.Y. 2003) ( "The Complaint alleges negligence . . . but makes no specific allegations other than the alleged oral misrepresentations and omissions and the alleged misstatements in the Offering Memoranda."); Vanguard Mun. Bond Fund, Inc. v. Cantor, Fitzgerald L.P., 40 F.Supp.2d 183, 188 (S.D.N.Y. 1999) ("[T]he Court does not find any substantial difference between Vanguard's negligence and negligent misrepresentation claims and will address them together as a claim for negligent misrepresentation.").

**2.**     **Elements**

The Ohio Supreme Court has defined negligent misrepresentation as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Delman v. Cleveland Hts., 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 838 (Ohio 1989) (quoting Restatement of the Law 2d, Torts, Section 552(1)).[2] Liability for negligent misrepresentation arises from "the actor's negligence in failing to exercise reasonable care or competence in supplying

---

[2] Moody's argues that if New York law were applied, the negligent misrepresentation claim would be preempted by New York's Martin Act, N.Y. Gen Bus. Law § 352 et seq.  Again, the Court has yet to make a choice-of-law determination and will reserve consideration of whether the negligent misrepresentation claim against Moody's is preempted by New York's Martin Act.

accurate information." Rece v. Dominion Homes, Inc., No. 07AP-295, 2008 WL 73707, at *6 (Ohio Ct. App. Jan. 8, 2008). A claim for negligent misrepresentation lies only for an affirmative false statement, not for an omission. Leal v. Holtvogt, 123 Ohio App.3d 51, 62, 702 N.E.2d 1246, 1261 (Ohio Ct. App. 1998).

### 3. A Special Relationship

Moody's contends that where, as here, there is no privity or fiduciary duty between the party who supplied the alleged misrepresentation and the party who relied on it, there can be no duty absent a special relationship. Several cases from the federal district court for the Northern District of Ohio have imposed a "special relationship" requirement for a negligent misrepresentation claim. See Doe v. SexSearch.com, 502 F.Supp.2d 719, 731 (N.D. Ohio 2007); Ziegler v. Findlay Indus., 464 F.Supp.2d 733, 738 (N.D.Ohio 2006); Hayes v. Computer Assoc. Inc., No. 03:02 CV 7452, 2003 WL 21478930, (N.D. Ohio June 24, 2003). These cases have stated that "[a] core requirement in a claim for negligent misrepresentation is a special relationship under which the defendant supplied information to the plaintiff for the latter's guidance in its business transaction." Doe, 502 F.Supp.2d at 731; Ziegler, 464 F.Supp.2d at 738. "Usually the defendant is a professional (e.g., an accountant) who is in the business of rendering opinions to others for their use in guiding their business, and the plaintiff is a member of a limited class." Doe, 502 F.Supp.2d at 731; Ziegler, 464 F.Supp.2d at 738.

A case from the Southern District of Ohio observed that the Ohio Supreme Court's definition of a negligent misrepresentation claim does not include a special relationship as "a formal element." National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., No. 2:02-cv-1288, 2007 WL 894833, at *9 (S.D. Ohio Mar. 22, 2007). The court found that a "special relationship" is best viewed as "a characterization of the requirements that for liability to exist: (1) the defendant must provide false information for the guidance of the plaintiff in its business transactions and (2) the plaintiff must be the person or one of a limited group of persons for whose benefit and guidance the defendant intends to supply the information or knows that the recipient intends to supply it." 2007 WL 894833, at *11.

This Court's review of Ohio case law on negligent misrepresentation supports the conclusion in National Mulch that even though a special relationship is not an express element of a negligent misrepresentation claim, it is an apt characterization of the requirements that the defendant supply false information in a business transaction for plaintiff's guidance and that the plaintiff be the person or part of a limited class for whom defendant intended to supply the information.  The Restatement of the Law, whose definition of the tort of negligent misrepresentation the Ohio Supreme Court has adopted, adds that liability is limited to loss suffered: "(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction."  Gutter v. Dow Jones, Inc., 22 Ohio St.3d 286, 288-89, 490 N.E.2d 898, 900 (Ohio 1986) (quoting Restatement of the Law 2d, Torts (1977), Section 552(2)).  Thus, "[t]he Restatement clearly indicates that liability may be imposed for negligent misrepresentation only if the disseminator of the information intends to supply it to a specific person or to a limited group of people."  Amann v. Clear Channel Communications, 165 Ohio App.3d 291, 297, 846 N.E.2d 95, 100 (Ohio Ct. App. 2006).  Ohio courts have accordingly drawn a line whereby misrepresentations to the public-at-large are not actionable but misrepresentations to a person or limited category of people whom the speaker or supplier intends to benefit or guide are actionable.  Compare Gutter, 22 Ohio St.3d at 289, 490 N.E.2d at 900-01 (readers of Wall Street Journal not a limited class); Amann, 165 Ohio App.3d at 298-299, 846 N.E.2d at 100-01 (general audience of a radio station not a limited class); Federated Mgmt. Co. v. Coopers & Lybrand, 137 Ohio App.3d 366, 384-85, 738 N.E.2d 842, 855-56 (Ohio Ct. App. 2000) (investing public not a limited class); with Haddon View Inv. Co.. v. Coopers & Lybrand, 70 Ohio St.2d 154, 157, 436 N.E.2d 212, 214-15 (Ohio 1982) (limited partners in a partnership were a limited class who foreseeably relied on financial information); Merrill v. William E. Ward Ins., 87 Ohio App.3d 583, 590-91, 622 N.E.2d 743, 748 (Ohio Ct. App. 1993) (children/beneficiaries of life insurance policy were a limited class who foreseeably relied on representations about the policy); Washington Mut. Bank v. Smith, No. 2001-

L-238, 2002 WL 31812944 (Ohio Ct. App. Dec. 13, 2002) (purchaser of real estate was a part of a limited class who foreseeably relied on appraiser's report).

Here, Lloyds sufficiently alleges that it was part of a limited class whose reliance on Moody's ratings of the NPF XII notes was foreseeable.  According to the complaint, Moody's prepared the bond ratings knowing that its ratings would be seen on the offering materials given to only a select class of qualified investors, of whom Lloyds was one.  Moody's again emphasizes that liability cannot be imposed on a financial publisher who disseminates information to the investing public, absent a showing of actual malice.  See In re Enron Corp. Securities, Derivative & "ERISA" Litig., 511 F.Supp.2d 742, 820 (S.D.Tex. 2005)  (applying actual malice standard to negligent misrepresentation claims against Moody's and Fitch because their ratings of Enron were distributed "to the world").  However, the complaint alleges that the NPF XII note offerings were targeted to a select class of institutional investors, not to the investing public.  See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 762 (1985).  Moody's will have a full opportunity after factual discovery to prove that its ratings of NPF XII were matters of public concern.

### 4.    Reasonable Care

Moody's next argues that the complaint fails to allege that Moody's did not exercise reasonable care in assigning its ratings.  Even though the Court has found that the complaint fails satisfy the scienter requirements of the § 10(b) and fraud claims, the complaint does sufficiently allege that Moody's failed to exercise reasonable care in ascertaining whether the factual basis for its ratings was well-grounded.  Lloyds alleges that if Moody's would have used reasonable care in assigning its ratings, it would have discovered multiple violations of the Master Indenture and could not have legitimately given the NPF XII notes the favorable ratings that it did.  Under the liberal pleading standard of Rule 8(a), Lloyds has sufficiently alleged that Moody's did not exercise reasonable care in obtaining and supplying financial information to Lloyds for its guidance in deciding whether to invest in NPF XII notes.

### 5.    Justifiable Reliance

Finally, Moody's argues that Lloyds could not have justifiably relied on the note ratings. Moody's claims that its ratings were merely predictive opinions and that Moody's issued cautionary statements about its ratings.  But, as noted above, opinions can be the basis of liability if the opinion is not factually well-grounded.  Mayer v. Mylod, 988 F.2d 635, 638 (6th Cir. 1993); Ziegler v. Findlay Indus., Inc., 464 F.Supp.2d 733, 738 (N.D. Ohio 2006) (noting that negligent misrepresentation claims usually involve a defendant "who is in the business of rendering *opinions* to others for their use in guiding their business") (emphasis added); Bellios v. Victor Balata Belting Co., 724 F.Supp. 514, 519 (S.D. Ohio 1989) (noting that the tort of negligent misrepresentation most often applies to those "rendering a professional *opinion*") (emphasis added).  Further, as this Court has explained in prior opinions in the National Century multidistrict litigation, the issue of whether a party's reliance was justifiable, even in the face of supposed cautionary language, is largely a question of fact inappropriate for resolution on a motion to dismiss.  In re National Century Financial Enterprises, Inc., Inv. Litig., 541 F.Supp.2d 986, 1004 (S.D. Ohio 2007) (citing Bass v. Janney Montgomery Scott, Inc., 210 F.3d 577, 590 (6th Cir. 2000)); see also Davis v. Montenery, 173 Ohio App.3d 740, 752, 880 N.E.2d 488, 497 (Ohio Ct. App. 2007) ("[A] determination regarding justifiable reliance involves a fact-based inquiry into the circumstances of the claim and the relationship between the parties.").

Accordingly, the Court finds that Lloyds has sufficiently alleged a claim for negligent misrepresentation against Moody's.

### E.    State Blue Sky Law Claims

#### 1.    New Jersey

Lloyds asserts a claim against Moody's under New Jersey's blue sky law, N.J. Stat. Ann. §§ 49:3-51, 49:3-71.  Moody's correctly argues that the complaint fails to allege any nexus with the state of New Jersey and that the claim must therefore be dismissed.  See N.J. Stat. Ann. §§ 49:3-51 (applying only to offers to buy or sell that are made or accepted "in this State"); Healy v. Beer Inst.,

491 U.S. 324, 336 (1989) (extraterritorial application of state regulation violates the Commerce Clause). As this Court found in an earlier decision, "the complaint of Lloyds (a British public limited company with its principal place of business in London, England), makes no allegations about where it was offered, or where it accepted an offer, to purchase notes." In re National Century Financial Enterprises, Inc., Inv. Litig., 504 F.Supp.2d 287, 309 (S.D. Ohio 2007). Moody's is alleged to be a Delaware corporation with its principal place of business in New York. The complaint contains no allegations that would bring Moody's alleged conduct within the scope of New Jersey's Blue Sky law.

### 2. Ohio

Moody's also challenges the application of Ohio's blue sky law, noting that neither it nor Lloyds is incorporated or based in Ohio. However, the complaint alleges that the notes were issued by an Ohio company, National Century, and this is sufficient for applying the Ohio statute, which regulates a sale or contract for sale of securities in Ohio. See Ohio Rev. Code § 1707.41; Federated Mgmt., 137 Ohio App.3d at 386-87, 738 N.E.2d at 857-58 (Ohio blue sky law applies where bond issuer was an Ohio company, even though lawsuit was between out-of-state purchaser and out-of-state underwriter).

Ohio's blue sky law has a provision imposing primary liability on sellers or solicitors who make untrue statements in connection with a sale, and it has a provision imposing secondary liability on persons who aid the seller. See Ohio Rev. Code § 1707.41(A) (primary liability), § 1707.43(A) (secondary liability). There is no dispute that Moody's was not the seller of notes to Lloyds. Thus, only secondary liability is at issue here. Moody's argues that the complaint does not allege that Moody's committed an act in aid of the seller. Merely assigning ratings to the notes is not enough, Moody's contends.

The Ohio statute imposes liability on "every person that has participated in or aided the seller in any way in making such sale or contract for sale." Ohio Rev. Code §1707.43(A). Courts have noted that "this language is broad in scope given the phrase 'in any way.'" Federated Mgmt.,

137 Ohio App.3d at 391, 738 N.E.2d at 860. Committing an act that induces a party to purchase securities may itself satisfy the "in any way" standard. Id., 137 Ohio App.3d at 391, 738 N.E.2d at 860-61; Hild v. Woodcrest Ass'n, 59 Ohio Misc. 13, 28-29, 391 N.E.2d 1047, 1056-57 (Ohio Ct. Com. Pl.1977). Here, at the pleading stage, the complaint adequately alleges that Moody's ratings of the NPF XII notes helped induce Lloyds to purchase the notes.

Moody's argues that the complaint fails to plead scienter. However, Ohio's statute does not contain a scienter requirement.[3] See Riedel v. Acutote of Colorado, 773 F.Supp. 1055, 1066 (S.D. Ohio 1991) (noting that § 1707.43, like the blue sky laws of most states, does not require scienter); Federated Mgmt., 137 Ohio App.3d at 392, 738 N.E.2d at 861 (noting that the Ohio statute is much broader than the federal securities statute).

### 3. Preemption

In supplemental briefing, Moody's argues that any blue sky law claim not dismissed on the grounds presented in the motion to dismiss should alternatively be dismissed as preempted by Credit Rating Agency Reform Act of 2006, Pub. L. No. 109-291, 120 Stat. 1327, 1337 (2006). The

---

[3] Ohio Revised Code § 1707.43 provides in full:

(A) Subject to divisions (B) and (C) of this section, every sale or contract for sale made in violation of Chapter 1707. of the Revised Code, is voidable at the election of the purchaser. The person making such sale or contract for sale, and every person that has participated in or aided the seller in any way in making such sale or contract for sale, are jointly and severally liable to the purchaser, in an action at law in any court of competent jurisdiction, upon tender to the seller in person or in open court of the securities sold or of the contract made, for the full amount paid by the purchaser and for all taxable court costs, unless the court determines that the violation did not materially affect the protection contemplated by the violated provision.

(B) No action for the recovery of the purchase price as provided for in this section, and no other action for any recovery based upon or arising out of a sale or contract for sale made in violation of Chapter 1707. of the Revised Code, shall be brought more than two years after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the person or director were unlawful, or more than five years from the date of such sale or contract for sale, whichever is the shorter period.

(C) No purchaser is entitled to the benefit of this section who has failed to accept, within thirty days from the date of such offer, an offer in writing made after two weeks from the date of the sale or contract of sale, by the seller or by any person that has participated in or aided the seller in any way in making the sale or contract of sale, to take back the security in question and to refund the full amount paid by the purchaser.

stated purpose of the Act is "[t]o improve ratings quality for the protection of investors and in the public interest by fostering accountability, transparency, and competition in the credit rating agency industry." Pub.L. No. 109-291, 120 Stat. 1327, 1327 (2006) (preamble). Under the Act, a credit rating agency may elect to register as a "nationally recognized statistical rating organization" (NRSRO). 15 U.S.C. § 78o-7(a). To register, a credit rating agency must furnish information about the procedures, policies, and methodologies used in formulating its credit ratings. 15 U.S.C. § 78o-7(a)(1)(B). The Act provides detailed rules about the registration process. 15 U.S.C. § 78o-7(a)-(b). The Court takes judicial notice that the Securities and Exchange Commission has granted the registration of Moody's to be recognized as a NRSRO. See SEC Release No. 56511, Sept. 24, 2007.

The Act describes conduct which NRSROs are prohibited from engaging in. See 15 U.S.C. § 78o-7(f) (banning representations of United States sponsorship); § 78o-7(h) (regulating conflicts of interest); § 78o-7(i) (prohibiting coercive or abusive use of credit ratings for direct or indirect advantage or gain). The Act gives the SEC the authority to issue final rules giving effect to the Act. See 15 U.S.C. § 78o-7(c), (d), (g)-(i).

Moody's argues that the Credit Rating Agency Reform Act gives the SEC exclusive authority to regulate NRSROs and preempts the application of any state securities laws. In support, Moody's cites the following provision of the Act:

> (2) Limitation
>
> The rules and regulations that the Commission may prescribe pursuant to this chapter, as they apply to nationally recognized statistical rating organizations, shall be narrowly tailored to meet the requirements of this chapter applicable to nationally recognized statistical rating organizations. Notwithstanding any other provision of law, neither the Commission nor any State (or political subdivision thereof) may regulate the substance of credit ratings or the procedures and methodologies by which any nationally recognized statistical rating organization determines credit ratings.

15 U.S.C. § 78o-7(c)(2). Moody's contends that this provision prohibits states from regulating NRSROs.

26

At this stage, and with as little briefing as this issue has received, the Court is not prepared to hold that the Credit Rating Agency Reform Act preempts the application of state blue sky laws to credit rating agencies who have registered as NRSROs.  The presumption is that Congress does not intend to preempt state law.  See N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 654-655 (1995) ("Despite the variety of these opportunities for federal preeminence, we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law.").  The language of the Act that Moody's cites does not appear, at first impression, to stand for the broad proposition that Moody's argues it does.  It says that states may not regulate the substance of credit ratings or the procedures or methodologies used to determine credit ratings.  This provision seems to mean that states may not tell NRSROs what ratings they should give or dictate how they arrive at their ratings.  The Act says that even the SEC cannot so regulate.  But the Court is not prepared to hold that § 78o-7(c)(2) broadly preempts state regulation, without the benefit of fuller briefing of the issue and of what the phrase "regulate the substance of credit ratings" means.  See Kenneth C. Kettering, Securitization and its Discontents: The Dynamics of Financial Product Development, 29 Cardozo L. Rev. 1553, 1688-89 (2008) (noting from the legislative history that § 78o-7(c)(2) was a "last-minute amendment" which appears to preempt state law "to some extent," and, though a "broad reading of what it means to 'regulate the substance' of a rating is discouraged," the exact extent of preemption is "a question about which reasonable minds might differ").[4]

---

[4]    Congress was more clear about preemption when it came to giving the SEC exclusive authority to regulate the registration of NRSROs.  The Act provides:

> No provision of the laws of any State or political subdivision thereof requiring the registration, licensing, or qualification as a credit rating agency or a nationally recognized statistical rating organization shall apply to any nationally recognized statistical rating organization or person employed by or working under the control of a nationally recognized statistical rating organization.

15 U.S.C. § 78o-7(o)(1).  The Act then expressly preserves a state's ability to "investigat[e] and bring[] an enforcement action with respect to fraud or deceit against any nationally recognized statistical rating organization or person associated with a nationally recognized statistical rating organization."  15 U.S.C. § 78o-7(o)(2).

There is also a substantial question about whether the Credit Rating Agency Reform Act can be applied retroactively.  The actionable conduct occurred in connection with notes issued in 2000 and 2001, and Lloyds originally filed its complaint in June 2003  The Act became effective on June 18, 2007.  See 15 U.S.C. § 78o-7(p); 72 Fed. Reg. 33,564 (June 18, 2007).  The issue of whether to apply a statute retroactively is often not a simple decision.  See Landgraf v. USI Film Products, 511 U.S. 244, 268 (1994) ("While statutory retroactivity has long been disfavored, deciding when a statute operates 'retroactively' is not always a simple or mechanical task.").  The Court will refrain from deciding the issue until it has the benefit of full briefing from the parties.

Thus, Moody's supplemental motion to dismiss the Ohio blue sky law claim as preempted is denied without prejudice to Moody's raising the argument again in a motion for summary judgment.

**F.      Summary**

For the reasons stated above, the § 10(b), fraud, and New Jersey blue sky law claims of Lloyds are dismissed, while its negligent misrepresentation and Ohio blue sky law claims are not dismissed.

**IV.      ANALYSIS OF THE CLAIMS OF THE NEW YORK FUNDS AGAINST FITCH**

**A.      Negligent Misrepresentation**

The New York Funds allege that Fitch assigned ratings of AAA, the highest possible, to the 2000-2 Series and 2002-1 Series NPF XII notes that the Funds purchased.  The New York Funds assert claims for negligent misrepresentation, negligence, and gross negligence.  As with Lloyds, the only negligent acts alleged in the complaint are representations.[5]  Though the complaint alleges

---

[5]      The Funds argue that there were other misrepresentations beyond just the note rating itself.  The Funds allege that Fitch issued press releases, dated May 19 and July 7, 2000, in which it misrepresented that it was investigating reports of fraudulent activities at National Century and had found the reports to be untrue.  But there is no allegation that the Funds received and relied on the press releases.  While the press releases may help support an inference that Fitch knew or should have known that its ratings were not factually well-grounded, they do not

that Fitch failed to reasonably investigate the NPF XII note program, Fitch owed no independent duty to the Funds to investigate NPF XII; there was no privity or fiduciary relationship between the Funds and Fitch.  It was not until Fitch supplied information to the Funds for guidance in their business transactions that Fitch owed a duty of care.  See Delman v. Cleveland Hts., 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 838 (Ohio 1989); see also Rubin v. Schottenstein, Zox & Dunn, 143 F.3d 263, 267-68 (6th Cir.1998) (en banc) (finding in a financial transaction that, where no duty existed otherwise, "a duty to provide complete and nonmisleading information" does arise "with respect to the subjects on which [a person] undertakes to speak").  Accordingly, the Funds' negligence claims will be treated together as a claim for negligent misrepresentation.  See Vanguard Mun. Bond Fund, Inc. v. Cantor, Fitzgerald L.P., 40 F.Supp.2d 183, 188 (S.D.N.Y. 1999).

In its motion to dismiss, Fitch repeats the arguments described above regarding Moody's motion to dismiss.  Fitch argues that no special relationship existed between it and the Funds, but the complaint alleges that Fitch knew that its ratings would be relied on by a "limited number of qualified institutional investors" to guide their decision on whether to purchase NPF XII notes.  New York Funds Compl., ¶199.  Fitch appeals to the same First Amendment concerns that Moody's raised.  Again, though, the Funds' complaint characterizes Fitch's ratings as concerning a private note issuance.  The complaint states that the NPF XII notes were targeted to a select class of investors, and the offering materials were the only place where the ratings are alleged to have appeared.  Also, Fitch contends that the Funds could not have justifiably relied on the note ratings because of disclaimers that Fitch issued separately from the ratings.  But again, the issue of whether a party's reliance was justifiable is largely a question of fact inappropriate for resolution on a motion to dismiss.  See Bass v. Janney Montgomery Scott, Inc., 210 F.3d 577, 590 (6th Cir.2000); Davis v. Montenery, 173 Ohio App.3d 740, 752, 880 N.E.2d 488, 497 (Ohio Ct. App. 2007).  This is particularly true here because the disclaimers did not appear with the ratings, and there is no admission in the complaint that the Funds ever saw the disclaimers.

form the basis for separate claims of negligent misrepresentation.

Finally, the parties debate at length the issues of how to define the duty of care that Fitch owed the Funds and whether Fitch breached that duty.  Fitch argues that it should not be under a duty to check every possible fact pertaining to its ratings.  The Funds argue that investors in NPF XII had a reasonable expectation that Fitch's rating would accurately reflect the financial position of NPF XII and National Century at the time of publication.  This debate is better reserved for a motion for summary judgment.  The Ohio Supreme Court states that the party supplying the business information must "exercise reasonable care or competence in obtaining or communicating the information."  <u>Delman</u>, 41 Ohio St.3d at, 4, 534 N.E.2d at 838; <u>see also</u> <u>Rece v. Dominion Homes, Inc.</u>, No. 07AP-295, 2008 WL 73707, at *6 (Ohio Ct. App. Jan. 8, 2008).  The Court finds that at the pleading stage under Rule 8(a)'s liberal standard, the complaint sufficiently alleges that Fitch failed to use reasonable care in ascertaining whether its credit ratings of the NPF XII notes were well-grounded in fact.  The Funds allege that had Fitch used reasonable care in assigning its ratings, it could not have given the NPF XII notes an AAA rating because it would have discovered multiple violations of the Master Indenture, including the purchase of worthless or nonexistent receivables and the failure to maintain reserve accounts.  Accordingly, the Court finds that the Funds have sufficiently alleged a claim for negligent misrepresentation against Fitch.

## B.  Aiding and Abetting Fraud

### 1.  Elements

The Funds allege that Fitch aided and abetted the fraud at National Century[6] by assigning a favorable credit rating to the NPF XII notes.  The elements of an aiding and abetting claim are: "(1) knowledge that the primary party's conduct is a breach of duty and (2) substantial assistance or encouragement to the primary party in carrying out the tortious act."  <u>Andonian v. A.C. & S., Inc.</u>, 97 Ohio App.3d 572, 574-75, 647 N.E.2d 190, 191-92 (Ohio Ct. App. 1994); <u>see</u> <u>also</u> <u>Aetna</u>

---

[6]  The alleged fraud at National Century has been described at length in prior orders and is familiar to the parties, so it need not be repeated in detail here.  In essence, National Century is alleged to have defrauded investors, like the plaintiffs here, who purchased notes on the false belief that National Century ran its operations in the manner described in the offering materials.

Cas. and Sur. Co. v. Leahey Constr. Co., 219 F.3d 519, 533 (6th Cir. 2000).  Courts have interpreted the first element as requiring actual knowledge of the underlying tortious conduct.  See Aetna, 219 F.3d at 533; Javitch v. First Montauk Fin. Corp., 279 F.Supp.2d 931, 946 (N.D. Ohio 2003); see also In re Sharp Int'l Corp., 403 F.3d 43, 49 (2d Cir. 2005).  A plaintiff, however, need not allege that the aider and abettor had actual knowledge "of all of the details of the primary party's scheme."  Aetna, 219 F.3d at 536.  "[I]t is enough for the aider and abettor to have a general awareness of its role in the other's tortious conduct for liability to attach."  Id. at 534 (citing Camp v. Dema, 948 F.2d 455, 460 (8th Cir. 1991)).  A plaintiff may use circumstantial evidence to support an inference of actual knowledge.  Id. at 535.

## 2.  Actual Knowledge

Fitch argues the complaint does not allege that it had actual knowledge of the fraud.  The Court disagrees.  The complaint alleges that Fitch received three anonymous letters informing it of fraudulent activities at National Century.  The first letter, dated April 26, 1999, accused National Century of being a "fraud" and "Ponzi scheme."  New York Funds Compl., ¶207.  The second letter, dated July 16, 1999, warned that National Century operated "outside the scope of its indentures and normal business practices" and estimated that 50% of its receivables were worthless or nonexistent.  Id.  The third letter, dated March 29, 2000, called for an investigation into the validity of the receivables.  The complaint alleges that Fitch conducted an investigation and, despite what Fitch said publicly, found that the letter's accusations were valid.  The complaint further alleges that the Investor Reports given to Fitch showed shortages in the reserve accounts.  The complaint quotes an internal memorandum dated June 21, 2001 from National Century's controller to Lance Poulsen stating that "the investor reports that have been forwarded to Fitch" showed the reserve accounts "did not meet the percentage requirements."  New York Funds Compl., ¶204.

As to the anonymous letters, Fitch argues that it could not have been aware of any fraud because the July 7, 2000 press release stated that Fitch had found no wrongdoing at National Century.  Fitch mistakes what the complaint says – it alleges that Fitch was lying when it said that

it had found no wrongdoing.  It alleges that the letters and ensuing investigation did make Fitch aware of National Century's violations of the Master Indenture.

Fitch next argues that the investigation did not in fact uncover any wrongdoing, and Fitch attaches a declaration and multiple exhibits in an effort to prove that it learned of no wrongdoing during the investigation.  However, the Court declines to consider such extrinsic evidence on a motion to dismiss.  See Sims v. Mercy Hosp. of Monroe, 451 F.2d 171, 173 (6th Cir. 1983).

Fitch also challenges the allegations about the Investor Reports and the June 21, 2001 memo. Fitch contends that the Reports, while perhaps showing a reserve shortage, did not show a shortage that rose to the level of a violation of the Master Indenture.  As the Funds correctly point out, Fitch's argument amounts to an assertion that the allegations in the complaint are not true.  On a motion to dismiss, the Court must treat the factual allegations as true.  The complaint plainly alleges that the Investor Reports received by Fitch showed, and the memo confirmed, that the reserve accounts "did not satisfy the percentage requirements under the Master Indenture."  New York Funds Compl., ¶204.

### 3.    Substantial Assistance

A plaintiff asserting an aiding and abetting claim must prove that the defendant provided "substantial assistance or encouragement to the primary party in carrying out the tortious act." Andonian, 97 Ohio App.3d at 574-75, 647 N.E.2d at 192.  The element of substantial assistance "'requires the plaintiff to show that the secondary party proximately caused the violation, or, in other words, that the encouragement or assistance was a substantial factor in causing the tort.'" Aetna, 219 F.3d at 533 (quoting K & S Partnership v. Continental Bank, N.A., 952 F.2d 971, 979 (8th Cir. 1991)); see also Primavera Familienstifung v. Askin, 130 F.Supp.2d 450, 510 (S.D.N.Y. 2001) ("The substantial assistance element has been construed as a causation concept, requiring that the acts of the aider and abettor proximately caused the harm upon which the primary liability is predicated."); Sender v. Mann, 225 F.R.D. 645, 651 (D. Colo. 2004).

The complaint alleges that Fitch substantially assisted the alleged fraud at National Century

by assigning an AAA rating to the NPF XII notes. Fitch argues that the element of substantial assistance cannot be satisfied by an act conducted in the ordinary course of business, in this case, Fitch's assignment of a rating. Fitch cites cases holding that "but for" causation is not enough to constitute substantial assistance. See Cromer Finance Ltd. v. Berger, 137 F.Supp.2d 452, 470 (S.D.N.Y. 2001); National Union Fire Ins. Co. of Pittsburgh, Pa. v. Eaton, 701 F.Supp. 1031, 1038-39 (S.D.N.Y. 1988). In Cromer, a clearing broker was sued for clearing trades that a fund manager had ordered. Noting that the defendant had merely done what a clearing broker routinely does, the court held that the injury caused by the fund manager's later fraudulent actions were not a "foreseeable result of the conduct" of the clearing broker. Cromer, 137 F.Supp.2d at 470.

Fitch's broad contention that the element of substantial assistance can never be satisfied by an ordinary act or transaction must be rejected. "Executing transactions, even ordinary course transactions, can constitute substantial assistance under some circumstances, such as where there is an extraordinary economic motivation to aid in the fraud." Primavera, 130 F.Supp.2d at 511; see also Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 48 (2d Cir. 1978) ("[S]ubstantial assistance might include . . . executing transactions or investing proceeds, or perhaps . . . financing transactions."). What is important is examining the particular facts of the case to determine the foreseeability of the result of the conduct or transaction. See Aetna, 219 F.3d at 537 (stating that "the nature of the act" and "the amount of assistance" must be considered).

In Aetna, defendant Key Bank extended a loan to an individual who used the loan to temporarily inflate the assets of his construction company. By inflating the company's assets, he was able to induce Aetna to bond the company's construction projects. Aetna sued Key Bank for aiding and abetting fraud. While acknowledging that "the routine extension of a loan" ordinarily would not constitute substantial assistance, the court held that Key Bank could be held liable for aiding and abetting because of the important role that the loan played in establishing the construction company's "credibility" in the eyes of Aetna. 219 F.3d at 537. The court found that under the circumstances, Key Bank's extension of a loan was "anything but routine." Id. (holding

also that an act of assistance need not be "necessary" to the fraudulent scheme, but need only make the scheme's execution "easier") (citing <u>Camp</u>, 948 F.2d at 462).

Here, the complaint supports an inference that Fitch's rating of the NPF XII notes was not routine. Fitch's assignment of an AAA rating gave the notes credibility in the eyes of the defrauded party, the Funds. The complaint alleges that Fitch assigned the AAA rating to the notes even though it knew of the fraudulent conduct at National Century and even though it was reasonably foreseeable that the class of potential investors would rely on the rating in deciding whether to purchase the notes. Thus, the Funds have sufficiently pleaded the element of substantial assistance, <u>see</u> <u>Primavera</u>, 130 F.Supp.2d at 511 ("Substantial assistance can take many forms."), and have stated a claim against Fitch for aiding and abetting fraud.

## V.    CONCLUSION

Moody's motion to dismiss (doc. nos. 152, 731) the claims asserted against it by Lloyds is GRANTED IN PART and DENIED IN PART. The motion is granted as to Lloyds's § 10(b), fraud, and New Jersey blue sky law claims. The motion is denied as to Lloyds's negligent misrepresentation and Ohio blue sky law claims.

Fitch's motion to dismiss (doc. 228) the claims asserted against it by the New York Funds is DENIED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: July 22, 2008

34