**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re National Century Financial Enterprises, Inc., Investment Litigation. | : | Case No. 2:03-md-1565 |
| | : | Judge Graham |
| | : | Magistrate Judge Abel |

_____

| | | |
|---|---|---|
| The Unencumbered Assets, Trust, et al., | : | |
| | : | |
| Plaintiffs, | | Case No. 2:04-cv-1090 |
| | : | |
| vs. | | Judge Graham |
| | : | |
| JP Morgan Chase Bank, et al., | | |
| | : | |
| Defendants. | | |

## OPINION AND ORDER ON CREDIT SUISSE'S MOTION TO DISMISS IN THE UNENCUMBERED ASSETS TRUST CASE

This matter is before the court on defendant Credit Suisse's motion to dismiss the claims filed against it in the Unencumbered Assets Trust (the "UAT") case. The UAT is a creation of the bankruptcy court's April 16, 2004 order confirming the liquidation plan of National Century Financial Enterprises, Inc. The liquidation plan transferred to the UAT all of the unencumbered assets of debtor National Century and its subsidiaries. Those assets included legal causes of action that belonged to the debtors prior to bankruptcy.

The UAT brings this action to pursue claims allegedly belonging to two subsidiaries of National Century, NPF VI and NPF XII, which were limited purpose corporations formed under Ohio law. NPF VI and NPF XII were securitization programs through which National Century purchased healthcare accounts receivable and issued investment-grade notes that were backed by the accounts receivable.

The complaint names numerous defendants who are alleged to have been involved in some way

in National Century's operations and have caused harm to NPF VI or NPF XII. Since this suit was filed, the UAT has reached settlements with many of the named defendants. Still remaining as defendants are: Lance and Barbara Poulsen, Donald Ayers, and Rebecca Parrett (collectively the "Founders"); certain companies that the Founders allegedly owned and controlled; Credit Suisse First Boston LLC (now Credit Suisse Securities LLC); and Task Holdings Ltd. Each of these remaining defendants, except Task Holdings, have filed motions to dismiss the claims against them.

This order deals with only Credit Suisse's motion to dismiss. A separate order concerning the Founders' motions to dismiss will follow.

## I.    BACKGROUND

### A.    Summary of Factual Allegations against Credit Suisse

Credit Suisse is a Swiss bank, with a principal office in New York City, that does investment banking in the United States. The complaint alleges that Credit Suisse served as the primary financial advisor for National Century, NPF VI, and NPF XII from 1995 until November 2002, when National Century went bankrupt. NPF VI and NPF XII designated Credit Suisse "as their sole financial adviser and agent for the purpose of issuing notes." UAT Third Am. Compl., ¶869. As agent for NPF VI and NPF XII, Credit Suisse "had complete and comprehensive control of the structuring of the securitization programs at NPF VI and NPF XII." Id., ¶768. Credit Suisse "drafted and dictated the content of every document used by NPF VI and NPF XII to issue notes, it communicated on their behalf with credit rating agencies and investors, and it issued analyst reports whose purpose was to conceal the true facts concerning NPF VI and NPF XII." Id. According to the complaint, Credit Suisse served as the placement agent for the notes and had "near complete dominion and control over all aspects of NPF VI and NPF XII's securities issuances." Id., ¶783.

The UAT alleges that Credit Suisse's relationship as placement agent for NPF VI and NPF XII was lucrative. Credit Suisse allegedly received investment banking fees totaling $17 million over the course of its relationship with NPF VI and NPF XII. The complaint alleges that the NPF VI and NPF XII notes brought in 5% of all of the fees Credit Suisse earned in its United States asset-backed business

from 1995 to 2002. In order to maintain this lucrative relationship with NPF VI and NPF XII, Credit Suisse allegedly bribed Ayers and attempted to bribe Poulsen to direct investment banking business to Credit Suisse. The bribes were allegedly in the form of guaranteed shares of "hot" initial public offerings, valued at over $100,000.

In allegations that are common to the National Century multidistrict litigation and thus will be not repeated in great detail here, the UAT alleges that the NPF VI and NPF XII note programs were operated as a fraud. The programs were initially structured to be legitimate and the Master Indenture Agreements governing the programs put many safeguards into to place. But the Founders, Credit Suisse, and other defendants allegedly caused NPF VI and NPF XII to violate the Master Indentures and misappropriated their assets. The major alleged aspects of noncompliance with the Indentures include: purchasing worthless or nonexistent accounts receivable, failing to maintain reserve accounts, engaging in related-party transactions, and exceeding concentration limits on the amounts purchased of the same type of receivable and on the amounts purchased from the same provider.

The complaint alleges that Credit Suisse owed fiduciary duties to NPF VI and NPF XII but failed to disclose the Indenture violations to them. The complaint further alleges that Credit Suisse loaned millions of dollars to NPF VI and NPF XII to keep the programs afloat and keep the fraudulent scheme concealed. It is alleged that Credit Suisse "knew, understood and agreed that these notes were being issued for a wholly improper purpose; namely, to generate additional funds to be siphoned off, embezzled, looted and diverted for its own wrongful enrichment and the wrongful enrichment of Poulsen, Ayers and Parrett." Compl., ¶871.

### B.    Claims against Credit Suisse

Count XXIV of the complaint asserts a cause of action against Credit Suisse under the Ohio Corrupt Activities Act, Ohio Rev. Code §§2923.32(A)(1), 2923.34(B). The UAT alleges that Credit Suisse and the Founders formed an organization, known as the "NPF Note Issuance Enterprise," that subverted the otherwise lawful operation of the NPF VI and NPF XII note programs, caused them to issue billions of dollars of worthless notes, misappropriated their assets, and forced them into insolvency and bankruptcy. Compl., ¶847. The complaint describes Credit Suisse's role in the enterprise as having

3

"near-exclusive control over the content of the offering documents used to issue notes on behalf of NPF VI and NPF XII." Id., ¶848. Credit Suisse also allegedly acted "as the primary liaison for the purpose of deceiving the Rating Agencies concerning the health and solvency of NPF VI and NPF XII." Id.

Count XXV, though just one count, purports to assert multiple causes of action against Credit Suisse for breach of agency, breach of fiduciary duty, fraud, negligent misrepresentation, and deepening insolvency. The claims in Count XXV all rest on the alleged existence of a fiduciary duty owed by Credit Suisse to NPF VI and NPF XII. The UAT alleges that as "placement agent and financial adviser for, and fiduciary to, NPF VI and NPF XII, CSFB owed each of them duties of care, fidelity, candor and good faith." Compl., ¶869. Credit Suisse allegedly breached those duties because, despite knowing of the Founders' wrongdoing and looting of NPF VI and NPF XII, Credit Suisse failed to take any actions to protect NPF VI and NPF XII. According to the complaint, Credit Suisse should have disclosed the Founder's wrongdoing to NPF VI and NPF XII and should have refused to issue notes.

Counts XXVI and XXVII are for concert of action and civil conspiracy. The complaint alleges that Credit Suisse is liable for concert of action because it "knowingly participat[ed] in the breaches of fiduciary duties owed to NPF VI and NPF XII by Poulsen, Parrett, Ayers, the Servicer [National Premier Financial Services] and the Trustees [Bank One and JPMorgan]." Compl., ¶882. The complaint alleges that Credit Suisse is liable for conspiracy because it agreed with Poulsen, Parrett, Ayers, the servicer and the trustees to misappropriate the assets of NPF VI and NPF XII.

Count XXVIII asserts a claim for professional negligence. The complaint alleges that Credit Suisse owed a duty to act with reasonable care as a professional underwriter to NPF VI and NPF XII. The UAT alleges that Credit Suisse breached the duty by "causing NPF VI and NPF XII to issue worthless notes, on the basis of materially misleading offering documents, and by knowingly disseminating financial statements, representations and reports to the Rating Agencies that it knew were materially false and misleading . . . ." Compl., ¶899.

Finally, Counts XL to XVIII are avoidable transfer claims under the Bankruptcy Code. The complaint alleges that on June 3, 2002, NPF XII made a payment to Credit Suisse of $100 million that

was purportedly made on a debt of $220 million owed by NPF XII to Credit Suisse. The UAT alleges that NPF XII was insolvent at the time of the payment and that Credit Suisse and the Founders did not act in good faith in directing the payment. The complaint alleges that the payment is avoidable by the trustee as a preferential transfer under Section 547 of the Bankruptcy Code and as a fraudulent transfer under Sections 544 and 548. The complaint further alleges that the payment may be recovered by the trustee under Section 550.

## II.        MOTION TO DISMISS STANDARD OF REVIEW

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)); Sensations, Inc. v. City of Grand Rapids, 526 F.3d 291, 295 (6th Cir. 2008). A motion to dismiss under Rule 12(b)(6) will be granted only if the complaint is without merit due to an absence of law to support a claim of the type made or of facts sufficient to make a valid claim, or where the face of the complaint reveals that there is an insurmountable bar to relief. See Evans-Marshall v. Bd. of Educ., 428 F.3d 223, 228 (6th Cir. 2005); Westlake v. Lucas, 537 F.2d 857, 858 (6th Cir. 1976). Under Rule 8(a), "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson, 127 S.Ct. at 2200 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Because a motion under Rule 12(b)(6) is directed solely at the complaint itself, the court must focus on whether the claimant is entitled to offer evidence to support the claims, rather than whether the plaintiff will ultimately prevail. Scheuer, 416 U.S. at 236; Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007) (Rule 8 "does not impose a probability requirement at the pleading stage").

Despite this liberal pleading standard, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986); see also Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ("[W]e need not accept as true legal conclusions

or unwarranted factual inferences."). Though the complaint need not contain detailed factual allegations, the factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim. Bell Atlantic, 127 S.Ct. at 1964-65; Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 526 (1983). The plaintiff must provide the grounds of his entitlement to relief "rather than a blanket assertion of entitlement to relief." Bell Atlantic, 127 S.Ct. at 1965 n.3. Labels, conclusions, and formulaic recitations of the elements of a cause of action "will not do." Id. at 1965. "Accordingly, a complaint 'must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'" Ferron v. Zoomego, Inc., No. 07-4007, 2008 WL 1988587, at *2 (6th Cir. May 7, 2008) (quoting Lewis v. ACB Business Serv., Inc., 135 F.3d 389, 406 (6th Cir. 1998)).

## III.    STANDING

### A.    Standing of a Bankruptcy Trustee

In order to establish standing under the "case or controversy" requirement of Article III of the United States Constitution, a plaintiff must show that: (1) he suffered some actual or threatened injury due the to alleged illegal conduct; (2) the injury must be fairly traceable to the challenged action; and (3) there must be a substantial likelihood that the relief requested will redress or prevent plaintiff's injury. In re Cannon, 277 F.3d 838, 852-53 (6th Cir. 2002); Grendell v. Ohio Supreme Court, 252 F.3d 828, 832 (6th Cir. 2001).

In the bankruptcy context, a trustee like the UAT "'has only those powers conferred upon him by the Bankruptcy [Code].'" Cannon, 277 F.3d at 853 (quoting Cissell v. American Home Assurance Co., 521 F.2d 790, 792 (6th Cir. 1975)). The Code empowers the trustee to "collect and reduce to money the property of the estate for which such trustee serves." 11 U.S.C. § 704(a)(1). The property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Because causes of action are included in the property interests of the debtor, Section 704 of the Code "grants the trustee the exclusive right to assert the debtor's claims."

Cannon, 277 F.3d at 853 (citing In re RCS Engineered Prods., 102 F.3d 223, 225 (6th Cir. 1996); In re Van Dresser Corp., 128 F.3d 945, 947 (6th Cir. 1997)). Thus, a trustee "stands in the shoes of the debtor and has standing to bring any action that the bankrupt could have brought had he not filed a petition for bankruptcy." Id. (citing Melamed v. Lake County Nat'l Bank, 727 F.2d 1399, 1404 (6th Cir. 1984)); see also In re Parmalat Secs. Litig. (Parmalat I), 383 F.Supp.2d 587, 594 (S.D.N.Y. 2005) ("A chapter 11 bankruptcy trustee stands in the shoes of the defunct corporation and may assert only the claims that the debtor could have asserted at the moment before it entered bankruptcy.").

**B.     Applicability of the Wagoner Rule**

Credit Suisse argues that the UAT lacks standing to bring the non-bankruptcy claims asserted in the complaint because the Founders, who were agents of the debtors, participated in the wrongdoing. Credit Suisse cites to the analysis employed by the Second Circuit in Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 120 (2d Cir. 1991). In Wagoner, the sole principal of a corporation engaged in stock trades that dissipated the assets of the corporation. After the corporation filed for bankruptcy, the bankruptcy trustee initiated arbitration against the corporation's stockbroker for alleged fraud. The Second Circuit enjoined the trustee from proceeding with the arbitration, holding that the trustee did not have standing. Key to the court's holding was the allegation that the corporation's principal collaborated with the defendant stockbroker in defrauding its creditors. The cooperation of the principal with the defendant in the alleged fraud was critical to the court's standing decision, which was that "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." Wagoner, 944 F.2d at 120.

As the UAT points out, other courts have declined to follow the Wagoner rule, and even courts in the Second Circuit have retreated from it. The criticism of Wagoner stems from its "characterizing an *in pari delicto* defense as a standing issue." In re Senior Cottages of America, LLC, 482 F.3d 997, 1003 (8th Cir. 2007) (collecting authorities criticizing Wagoner); In re Magnesium Corp. of Am., __ B.R. __, 2009 WL 116519, at *24 (Bankr. S.D.N.Y. Jan. 16, 2009) (noting that Wagoner has been criticized for conflating the *in pari delicto* defense into a matter of standing). That a third party defendant is alleged to have cooperated with corporate insiders is an *in pari delicto* issue. The Third Circuit has observed: "An

analysis of standing does not include an analysis of equitable defenses, such as *in pari delicto*. Whether a party has standing to bring claims and whether a party's claims are barred by an equitable defense are two separate questions, to be addressed on their own terms." Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 346 (3d Cir. 2001). See also In re Dublin Securities, Inc., 133 F.3d 377, 380 (6th Cir. 1997) (considering *in pari delicto* defense and declining to consider standing argument); Baena v. KPMG, LLP, 453 F.3d 1, 6 (1st Cir. 2006) (*in pari delicto* "has nothing to do with Article III requirements"); Official Comm. of Unsecured Creditors v. Edwards, 437 F.3d 1145, 1149-50 (11th Cir. 2006); In re Educators Group Health Trust, 25 F.3d 1281, 1286 (5th Cir. 1994); Parmalat I, 383 at 595-99; In re Adelphia Communications Corp., 365 B.R. 24, 46 (Bankr. S.D.N.Y. 2007) .

Credit Suisse argues that the Wagoner rule applies here because the Founders are alleged to have participated in the wrongdoing for which Credit Suisse is being sued. This court, however, declines to adopt the Wagoner rule and will examine the *in pari delicto* defense separately from the issue of standing. See Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006) ("[T]he *in pari delicto* doctrine does not implicate a plaintiff's standing to sue, but, rather, constitutes an affirmative defense."); CarrAmerica Realty Corp. v. Nvidia Corp., Nos. 06-17109, 07-15077, 2008 WL 5110821, at *2 (9th Cir. Nov. 25, 2008) ("[T]he Wagoner rule has been much criticized and we decline to follow it.").

## C.    Credit Suisse's Additional Standing Argument

Aside from the Wagoner rule, Credit Suisse argues that the UAT lacks standing because the claims asserted are ones that belong to National Century's creditors and not to National Century. Credit Suisse contends that its alleged role in National Century's operations – selling NPF VI and NPF XII notes to investors – brought money into National Century, and the harm allegedly caused by Credit Suisse was suffered by investors, who lost the money that Credit Suisse allegedly induced them to invest. Credit Suisse believes that the complaint does not allege that it was responsible for misappropriating money from NPF VI and NPF XII once the money was invested.

A trustee in bankruptcy has no standing to pursue a claim that belongs to an estate's creditors. Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 434 (1972); Cannon, 277 F.3d at 853; Dublin Securities, 133 F.3d at 379-80 (noting that "trustees in bankruptcy lack standing to pursue the claims

of creditors against third parties"). Thus, "'if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate.'" In re Van Dresser Corp., 128 F.3d 945, 947 (6th Cir. 1997) (quoting In re Educators Group Health Trust, 25 F.3d 1281, 1284 (5th Cir. 1994)).

Credit Suisse cites Knauer v. Jonathon Roberts Financial Group, Inc., 348 F.3d 230 (7th Cir. 2003), in support of its argument that the UAT lacks standing. In Knauer, a receiver for two companies who operated a Ponzi scheme brought suit against certain securities brokers who allegedly assisted the companies in carrying out the scheme. The court stated:

> [I]t is useful to think of Ponzi schemes as being comprised of two phases. First, the schemer solicits and receives money for investment, guaranteeing high returns while doing little with the money to produce actual profits. While in this first stage, the schemer may generate some income for himself by charging a fee or paying himself a salary with the funds, this "sales" step is not the source of most of his Ponzi gains. After all, the Ponzi schemer is not content to enrich himself modestly by extracting fees or salaries from the funds he has solicited. Rather, the schemer realizes most of his gains by appropriating large sums of money from the solicited funds, the pace of the withdrawals accelerating as he is ready to disband the Ponzi entity and make off with its assets. This "embezzlement" step of the Ponzi scheme depletes the Ponzi entity of resources, which are diverted to the entity's principal, the schemer.
>
> . . . As we see it, Ponzi entities themselves are not injured by the sales of securities. Even if Heartland and JMS were arguably being "misused" by Payne and Danker, this misuse, at the sales stage, resulted only in the fattening of the companies' coffers. Any claim relating to the fraudulent sales rightfully belongs to the wronged investors, and can be made by them against any one of Payne, Danker, Heartland, JMS or other culpable person or entity, including possibly the defendants here.

348 F.3d at 233-34 (footnote omitted). Accordingly, the court held that "[a]ny claim relating to the fraudulent sales rightfully belongs to the wronged investors, and can be made by them against any one of Payne, Danker, Heartland, JMS or other culpable person or entity." Id. at 234. In contrast, the receiver did have standing to assert claims "involv[ing] the embezzlement, rather than the sales, step of the Ponzi scheme. . . . [T]he diversion of funds by Payne and Danker from Heartland and JMS did arguably constitute injuries to the Ponzi entities, giving [the receiver] standing" to pursue claims based on the diversion of funds. Id. See also Liberte Capital Group, LLC v. Capwill, 248 Fed. Appx. 650,

662-63 (6th Cir. 2007) (citing <u>Knauer</u> with approval).

It is true that many of the allegations against Credit Suisse relate to harm done to investors during the sales phase of National Century's alleged Ponzi scheme. The complaint alleges that Credit Suisse had control over the content of the offering materials sent to potential investors and that these materials contained material misrepresentations and omissions about the note programs. The complaint further alleges that whenever some risk arose that National Century's fraud could be exposed, Credit Suisse took steps to conceal the fraud and keep investors reassured about the soundness of the note programs. Those steps included issuing reports giving National Century a "clean bill of health" and deceiving credit rating agencies concerning the existence of Indenture violations. At the sales stage, Credit Suisse is alleged to have helped attract billions of dollars in investments in NPF VI and NPF XII. Thus, it was the creditors, and not NPF VI and NPF XII, that Credit Suisse allegedly harmed during the sales stage. <u>See</u> <u>Hirsch v. Arthur Anderson & Co.</u>, 72 F.3d 1085, 1093 (2d Cir. 1995) (holding that claims based on misleading offering materials belong to investors and not to bankruptcy trustee); <u>Johnson v. Chilcott</u>, 590 F.Supp. 204, 210 (D. Colo. 1984) (holding that receiver lacked standing to assert claims based on defendant's misrepresentations to investors because those "misrepresentations and omissions are precisely what fueled continued investor contributions . . . . Chilcott's fraud is what attracted money to the fund. The fund could not have continued to exist but for Chilcott's fraud.").

Nonetheless, the court finds that the UAT has standing to assert its claims against Credit Suisse because the allegations of Credit Suisse's role in the sales stage serve primarily as context and do not form the basis of the claims. The alleged existence of a fiduciary duty owed by Credit Suisse to NPF VI and NPF XII is what forms the basis for the UAT's claims for breach of fiduciary duty, fraud, negligent misrepresentation, deepening insolvency, concert of action, civil conspiracy, and professional negligence. The complaint alleges that NPF VI and NPF XII hired Credit Suisse as their financial adviser and, in that capacity, Credit Suisse owed a fiduciary duty to its clients. According to the complaint, this duty required Credit Suisse to act in the best interests of NPF VI and NPF XII and to exercise full candor and fairness in providing financial advice. The complaint alleges that Credit Suisse breached its fiduciary duty because, despite knowing of the many violations of the Master Indentures

and of the Founders' misappropriation of assets, Credit Suisse: did not act to "protect its principals, NPF VI and NPF XII, against further looting and subversion"; agreed to issue additional notes that it knew would deepen their insolvency; misrepresented and failed to disclose to NPF VI and NPF XII what Credit Suisse knew about the Indenture violations and the Founders; and bribed the Founders in order to assure that Credit Suisse would remain the underwriter for the notes.

That Counts XXV through XXVIII rest on the existence of a duty is important. A bankruptcy trustee has standing to pursue claims based on the existence of a fiduciary duty owed to the debtor. See Senior Cottages, 482 F.3d at 1001-1002 (discussing cases holding that a bankruptcy trustee has standing to pursue claim based on alleged breach of duty owed to the debtor); In re Hampton Hotel Investors, L.P., 289 B.R. 563, 577 n.23 (Bankr. S.D.N.Y. 2003) (citing cases). This is so because the actionable conduct is not a misrepresentation to investors, but a breach of a duty owed to the debtor. See In re Del-Met Corp., 322 B.R. 781, 818 (Bankr. M.D. Tenn. 2005) (actions for breach of fiduciary duties "accrue to the corporation itself because fiduciary duties are owed to the corporation and it is the corporation that suffers injury when fiduciary duties are breached"); Magnesium Corp., 2009 WL 116519, at *21. The fiduciary obligation is one that the company could have enforced directly and, in the event of bankruptcy, is enforceable by the trustee. See Senior Cottages, 482 F.3d at 1002 (citing Pepper v. Litton, 308 U.S. 295, 306-07 (1939)); Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 157 (2d Cir. 2003) (holding that bankruptcy trustee had standing to pursue breach of fiduciary duty claim); In re Keene Corp., 164 B.R. 844, 853 (Bankr. S.D.N.Y. 1994) ("Claims based upon a breach of fiduciary duty belong to a corporation, but once bankruptcy ensues, they are enforceable by the trustee."). Thus, the court finds that the UAT has standing to assert claims that are based on an alleged duty owed by Credit Suisse to NPF VI and NPF XII. See also In re Educators Group Health Trust, 25 F.3d 1281, 1284 (5th Cir. 1994) (holding that bankruptcy trustee has standing the sue debtor's fiduciaries); Poth v. Russey, 99 Fed. Appx. 446, 457-58 (4th Cir. 2004) (dismissing breach of fiduciary duty claim brought by shareholder against bankrupt company's principals because only the bankruptcy trustee had standing to assert such a claim); In re Grumman Olson Indus., 329 B.R. 411, 427 (Bankr. S.D.N.Y. 2005) (trustee may sue dishonest

fiduciary).

The court finds that the UAT also has standing to assert its claim in Count XXIV under the Ohio Corrupt Activities Act, which is directly adopted from the federal Racketeer and Influenced Corrupt Organizations Act. Though the claim does allege Credit Suisse's involvement in the sales stage of the scheme, liability ultimately hinges on the existence of a "pattern of corrupt activity" committed by the enterprise. See O.R.C. §2923.32(A)(1). The complaint alleges that the corrupt activity of the enterprise which Credit Suisse joined was to loot the assets of NPF VI and NPF XII. The UAT has standing to assert claims based on alleged looting of the debtor. In Knauer, the court found that the receiver had standing to pursue claims "which involve the embezzlement, rather than the sales, step of the Ponzi scheme." Knauer, 348 F.3d at 234. Similarly, in DeNune v. Consol. Capital of N. Am., Inc., 288 F.Supp.2d 844, 850-51 (N.D. Ohio 2003), the court held that a receiver had standing to assert claims, including one under O.R.C. §2923.32(A)(1), where the complaint alleged that the defendant had misappropriated the assets of the business in receivership. See also Senior Cottages, 482 F.3d at 1004 (trustee has standing to sue for alleged "stripping" of debtor's assets); Drabkin v. L & L Construction Associates, Inc., 168 B.R. 1, 5 (Bankr. D. Colo. 1993) (distinguishing between claims brought directly on behalf of depositors in a Ponzi scheme, for which the bankruptcy trustee lacked standing, and claims for looting and stealing from the corporation, for which the trustee had standing). Indeed in the federal RICO context, courts hold that, with a bankrupt company, only the bankruptcy trustee has standing to assert a RICO claim because the "first victim" is the "plundered" company. Wooten v. Loshbough, 951 F.2d 768, 770 (7th Cir. 1991); see also Warren v. Manufacturers Nat'l Bank, 759 F.2d 542, 545 (6th Cir. 1985); Estate of Spirtos v. One San Bernardino County Superior Court Case Numbered SPR 02211, 443 F.3d 1172, 1175-76 (9th Cir. 2006); In re Interpictures Inc., 217 F.3d 74, 75 (2d Cir. 2000); Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc., 140 F.3d 898, 908 (11th Cir. 1998).

Accordingly, the court finds that the UAT has standing to assert each of its claims against Credit Suisse.

## IV. THE IN PARI DELICTO DEFENSE

Credit Suisse next argues that the UAT's claims must be dismissed under the doctrine of *in pari delicto*,[1] which "refers to the plaintiff's participation in the same wrongdoing as the defendant." Bubis v. Blanton, 885 F.2d 317, 321 (6th Cir. 1989) (citing Memorex Corp. v. International Business Machines Corp., 555 F.2d 1379, 1382 (9th Cir. 1977)). When applied, this equitable doctrine bars the plaintiff from recovering damages resulting from his own wrongdoing. Pinter v. Dahl, 486 U.S. 622, 632 (1988); Dublin Securities, 133 F.3d at 380-81. "The doctrine is premised upon the equitable principle that '[n]o Court will lend its aid to a man who founds his cause of action upon an immoral or illegal act.'" Dublin Securities, 133 F.3d at 380 (quoting In re Dow, 132 B.R. 853, 860 (Bankr. S.D. Ohio 1991)). The doctrine thus "prevents one wrongdoer from recovering from another because each should bear the consequences of their wrongdoing without legal recourse against the other." In re Amcast Indus. Corp., 365 B.R. 91, 123 (Bankr. S.D. Ohio 2007).

The complaint is lengthy, detailed, and squarely puts the Founders at the heart of National Century's alleged wrongdoing. See Compl., pp. 146-251. Credit Suisse therefore contends that the *in pari delicto* defense applies. In response, the UAT has made a number of arguments, each of which is addressed below.

### A. Resolution of the *In Pari Delicto* Defense on a Motion to Dismiss

The UAT argues that it is not appropriate for a court to resolve an *in pari delicto* issue on a motion to dismiss. It contends that *in pari delicto* is an equitable defense that requires an inquiry into factual issues about the relative fault of the parties. See Knauer, 348 F.3d at 237 n.6 ("*In pari delicto* is an affirmative defense and generally dependent on the facts, and so often not an appropriate basis for dismissal.").

The Sixth Circuit, however, has made clear that the *in pari delicto* defense may be applied on a

---

[1] Again, Credit Suisse does not seek dismissal of the bankruptcy avoidance claims under the *in pari delicto* defense. See Terlecky v. Abels, 260 B.R. 446, 453 (S.D. Ohio 2001) (explaining that bankruptcy avoidance claims are not subject to *in pari delicto* defense because those claims are brought under the trustee's statutory avoiding powers, not under the trustee's status as a successor in interest to the debtor).

motion to dismiss where the complaint "establishes conclusively" that the defense applies. Dublin Securities, 133 F.3d at 380 (dismissing complaint upon finding that the complaint conceded the debtors' instrumental role in perpetrating fraud on investors). What matters is "whether the factual scenario, as pleaded, is clear enough to permit peremptory resolution of the dispositive issue." Nisselson v. Lernout, 469 F.3d 143, 154 (1st Cir. 2006) (upholding the dismissal of a complaint on *in pari delicto* grounds).

Accordingly, the court may resolve the *in pari delicto* issue on a motion to dismiss if the defense is conclusively established on the face of the complaint. See Dublin Securities, 133 F.3d at 380, Color Tile, 322 F.3d at 164.

## B. Removal of the Wrongdoer

The UAT also argues that the *in pari delicto* defense does not apply because the Founders resigned from National Century before it went bankrupt. In particular, the complaint alleges that on November 8, 2002 Lance Poulsen resigned from National Century, NPF VI, and NPF XII, ten days before those entities went bankrupt on November 18, 2002. The UAT reasons that "NPF VI and NPF XII were purged of any wrongdoing by the removal of Poulsen." See UAT's Master Brief (doc. 85 in Case No. 04-cv-1090), p. 75. In support, the UAT cites Scholes v. Lehman, 56 F.3d 750, 754 (7th Cir. 1995), a receivership case in which the court held that "the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated."

The removal-of-the-wrongdoer argument fails here because the chief alleged wrongdoer, Poulsen, see UAT Compl., ¶411, resigned just ten days before the date National Century and its related entities filed for bankruptcy. The complaint does not support a conclusion that NPF VI and NPF XII somehow, in the handful of days between Poulsen's resignation and the petition date, cast off its identity as a wrongdoer and took on a new corporate character. In Scholes, the court found on a motion for summary judgment that the *in pari delicto* defense did not apply because the company in receivership had ceased being the "evil zombies" of the primary wrongdoer and were "[f]reed from his spell." Scholes, 56 F.3d at 754. Here, the complaint does not support the contention that NPF VI and NPF XII had taken on a separate identity by the time they filed for bankruptcy. See Smith v. Bull Mountian Coal Properties, Inc., No. CV-06-169, 2008 WL 1736047, at *12 (D. Mont. March 7, 2008) (*in pari delicto*

applies when "the entity has no identity separate from the removed wrongdoer").

This conclusion is all the stronger in the bankruptcy context. While <u>Scholes</u> represented "a generous approach toward certain lawsuits brought by corporate receivers," <u>Knauer</u>, 348 F.3d at 235, courts have been stricter in applying the defense in suits brought by bankruptcy trustees. "[T]he explicit language of section 541 directs courts to evaluate defenses as they existed at the commencement of the bankruptcy." <u>Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.</u>, 267 F.3d 340, 356 (3d Cir. 2001). Thus, the UAT stands in the shoes of the debtor and is subject to the *in pari delicto* defense to the same extent the debtor would have been. <u>Mosier v. Callister, Nebeker & McCullough</u>, 546 F.3d 1271, 1276 (10th Cir. 2008) ("[I] it is well established that *in pari delicto* may bar an action by a bankruptcy trustee against third parties who participated in or facilitated wrongful conduct of the debtor."); <u>In re Motorwerks, Inc.</u>, 371 B.R. 281, 288 (Bankr. S.D. Ohio 2007). At this stage, the court must reject the UAT's argument that the removal of Poulsen just before NPF VI and NPF XII went bankrupt precludes application of the *in pari delicto* defense. <u>See</u> <u>Nisselson</u>, 469 F.3d at 155-56 (rejecting bankruptcy trustee's attempts to "find sanctuary" in removal of wrongdoer).

### C. Imputation

When the plaintiff is a corporation or a trustee standing in the shoes of a corporation, the court will look to state law to determine if the alleged wrongful conduct can be imputed to the corporation. <u>See</u> <u>Nisselson</u>, 469 F.3d at 154; <u>Lafferty</u>, 267 F.3d at 358; <u>Parmalat I</u>, 383 F.Supp.2d at 609; <u>In re Crown Vantage, Inc.</u>, No. 02-3836, 2003 WL 25257821, at *7 (N.D. Cal. Sept. 25, 2003).

A principal is generally liable for the conduct of his agent committed in the scope of employment. <u>Losito v. Kruse</u>, 136 Ohio St. 183, 187-88, 24 N.E.2d 705, 707 (Ohio 1940); <u>Clark v. Southview Hosp. & Family Health Ctr.</u>, 68 Ohio St.3d 435, 438, 628 N.E.2d 46, 48 (Ohio 1994). But an exception exists if the agent acted adversely to the principal and entirely for his own, or another's, purpose. <u>First Nat'l Bank of New Bremen v. Burns</u>, 88 Ohio St. 434, 103 N.E. 93 (Ohio 1913); <u>Burger v. Board of Liquor Control</u>, 135 N.E.2d 786, 787 (Ohio Ct. App. 1955); <u>see also</u> <u>Collins v. Pioneer Title Ins. Co.</u>, 629 F.2d 429, 436 (6th Cir. 1980) ("The principal is not ordinarily charged with the knowledge of the agent in a matter where the agent's interests are adverse to those of the principal."). Under this

exception, then, the independent fraud of an agent acting "on his own account" will not ordinarily be imputed to the principal. Aetna Cas. and Sur. Co. v. Leahey Const. Co., 219 F.3d 519, 541-42 (6th Cir. 2000) (quoting American Export & Inland Coal Corp. v. Matthew Addy Co., 112 Ohio St. 186, 198 147 N.E. 89, 92-93 (Ohio 1925)). This "adverse interest" exception is widely acknowledged. See, e.g., Nisselson, 469 F.3d at 156; Color Tile, 322 F.3d at 164-65; Askanase v. Fatjo, 130 F.3d 657, 666 (5th Cir. 1997); Mosier v. Callister, Nebeker & McCullough, 546 F.3d 1271, 1276 (10th Cir. 2008).

The UAT argues that the Founders' alleged wrongful conduct should not be imputed to the debtor because their conduct was fraudulent and adverse to the interests of NPF VI and NPF XII. The complaint contains numerous allegations concerning the Founders' fraudulent conduct and the resulting downfall of NPF VI and NPF XII. The alleged conduct, which includes misappropriation of NPF VI's and NPF XII's assets, is the type of conduct traditionally considered adverse to the principal. See Baena v. KPMG LLP, 453 F.3d 1, 8 (1st Cir. 2006); Beck v. Deloitte & Touche, 144 F.3d 732, 737 (11th Cir. 1998); In re Fuzion Technologies Group, Inc., 332 B.R. 225, 237 (Bankr. S.D. Fla. 2005).

However, the adverse interest exception is itself subject to the "sole actor" exception. If the wrongdoer(s) who acted adversely to the principal's interests "so dominated and controlled" the principal that it "had no separate mind, will, or existence of its own," then the wrongful conduct is directly attributed to the principal. Dublin Securities, 133 F.3d at 380 (applying Ohio law); see also In re Motorwerks, Inc., 371 B.R. 281, 291 n.6 (Bankr. S.D. Ohio 2007) (noting that in pari delicto defense was not defeated by adverse interest exception because alleged wrongdoer was the sole owner and principal officer of the debtor). Accordingly, wrongful conduct may be imputed to a corporation when those responsible for the conduct either are the sole decision-makers or control and dominate the corporation. See, e.g., Color Tile, 322 F.3d at 164-65 (imputing fraudulent conduct to debtor when complaint established that shareholders who "dominat[ed] and controll[ed] the corporation" were responsible for "orchestrat[ing] the fraudulent conduct"); Lafferty, 267 F.3d at 359-60 (imputing fraudulent conduct to debtor where the individuals masterminding the fraud were the debtor's sole shareholders); FDIC v. Ernst & Young, 967 F.2d 166, 171 (5th Cir. 1992) (imputing fraudulent conduct where sole owner of corporation also dominated the board of directors); In re Parmalat Secs. Litig.

(Parmalat II), 477 F.Supp.2d 602, 610 (S.D.N.Y. 2007).

The UAT's complaint does contain allegations that could potentially support an inference that the Founders, and Poulsen in particular, dominated and controlled NPF VI and NPF XII. The complaint alleges that: Poulsen was president, treasurer, and a director of National Century, NPF VI, and NPF XII; Ayers was the chief operating officer of National Century, vice president of NPF XII, and a director of National Century, NPF VI, and NPF XII; and Parrett was vice president of NPF VI, secretary of National Century, and a director of National Century, NPF VI, and NPF XII. All three are further alleged to have founded National Century, been shareholders, and served as corporate officers for National Century's servicing arm, National Premier Financial Services, Inc. Throughout the complaint, the Founders are alleged to have committed, directed, and authorized acts of fraud. The complaint alleges that Poulsen was the "leader" and "principal architect" of the scheme, that he gave "primary direction" to NPF VI and NPF XII, and that everyone else involved in the fraud reported to him. See UAT Compl., ¶¶411-13, 498-500, 848.

At the same time, the complaint makes sufficient allegations, for purposes of surviving a motion to dismiss, to support a competing inference that the Founders were not the sole actors of NPF VI and NPF XII. The complaint alleges that the NPF VI and NPF XII note programs included many layers of controls designed to prevent power from accumulating in the hands of a sole actor. The Master Indentures required that banking institutions be appointed as trustees of the programs. According to the complaint, the trustees "were gatekeepers charged with protecting the assets of NPF VI and NPF XII" and disbursed assets "only for the purposes expressly set forth in the governing NPF VI and NPF XII Indentures." See UAT Compl., ¶¶148, 149. Other controls are alleged in detail in paragraphs 34 to 147 of the complaint and included restrictions on the types of receivables purchased, the maintenance of segregated accounts, restrictions on withdrawals and deposits from accounts, reports or tests on the reserves kept in the accounts, and regular audits.

Credit Suisse argues that the alleged controls were "paper controls" that the Founders disregarded. Again, there are allegations tending to support that argument, but there are also allegations supporting an inference that it was other parties, such as the Trustees, who disregarded the controls.

Under Rule 12(b)(6), a court must construe the allegations in the light most favorable to the plaintiff. Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007). The court finds that the complaint contains allegations that support each side's position on the sole actor exception. At this stage, the court will view the allegations in the UAT's favor and finds that the complaint contains allegations, which if proved, provide support for the UAT's position that the sole actor exception does not apply to this case. Resolution of the sole actor issue is best left until after the factual record is developed.

### D.    Equitable Considerations

The court has contemplated the *in pari delicto* defense at length and studied a multitude of judicial decisions dealing with the issue. It is an equitable defense, and, as the Third Circuit recently commented, "a murky area of law." Official Comm. of Unsecured Creditors of Allegheny Health, Educ. and Research Found. v. PricewaterhouseCoopers, LLP, No. 07-1397, 2008 WL 3895559, at *5 (3d Cir. July 1, 2008). "It is an ill-defined group of doctrines that prevents courts from becoming involved in disputes in which the adverse parties are equally at fault." Id.

There is the occasional case where an individual is the sole owner, sole shareholder, sole officer – a true alter ego of the company – and he is the sole wrongdoer. The *in pari delicto* defense rightly thwarts his attempts to hold innocent third parties liable for his own wrongdoing. But the situation is more difficult to evaluate when, as alleged here: National Century was composed of multiple entities, NPF VI and NPF XII among them; tight rules in the Master Indentures governed the operation of National Century and its note programs; numerous individuals, including outside directors, helped run the companies; and numerous independent institutions – the trustee banking institutions, placement agents, auditors, and others – played critical roles in the operation of the note programs. The court's evaluation would benefit from a complete factual record. See Baker O'Neal Holdings, Inc. v. Ernst & Young LLP, No. 1:03-cv-132, 2004 WL 771230, at *8 (S.D. Ind. March 24, 2004) ("[T]he equitable context in which the *in pari delicto* defense is asserted is crucial.").

On first impression, Credit Suisse's argument for applying the defense to bar the UAT's claims is inviting because support can be found for it in the complaint's allegations. It is hard to read the UAT's complaint and not develop the sense that the Founders are largely to blame. Indeed, in the

court's experience with overseeing the National Century multidistrict litigation, the common thread connecting the various cases included in the litigation is the allegation that it was the Founders who orchestrated this massive fraud of nearly $3 billion.

Yet the complaint squarely places the blame on Credit Suisse as well. According to the complaint, the fraud could never have been pulled off without Credit Suisse's involvement. It was allegedly Credit Suisse that the Founders enlisted to help misappropriate money from NPF VI and NPF XII. In Credit Suisse, the Founders had a partner who allegedly agreed to accept substantial investment banking fees in exchange for keeping quiet while the assets of their principal were looted, and who further helped conceal the fraud by contributing its own funds to prop up NPF VI's and NPF XII's reserves. And whenever the scheme needed more cash flow, it was Credit Suisse who is alleged to have knowingly issued more notes. It was Credit Suisse's expertise, reputation, and presence as a leading global investment bank that allegedly won the trust of institutional investors who would place millions, sometimes hundreds of millions, of dollars in NPF VI and NPF XII notes. The complaint describes a condemning picture of Credit Suisse's participation, knowledge, and motivation regarding the alleged scheme to defraud and regarding the injury to NPF VI and NPF XII.

When read in a light most favorable to plaintiff, the complaint pinpoints Credit Suisse as an insider and co-conspirator with the Founders in harming NPF VI and NPF XII, and it identifies the significant financial incentives Credit Suisse had for not disclosing the fraud to its principals. Application of the *in pari delicto* defense in such a situation is ill-advised, at least on a motion to dismiss. In a case similar to the one at hand, the court in <u>Baker O'Neal Holdings</u> declined to apply the *in pari delicto* defense on a motion to dismiss. The court stated that dismissal was not appropriate because the complaint alleged that the defendants were directly involved in the wrongdoing of the bankrupt company's chief executive officer and that they stood to benefit from the wrongdoing:

> Accepting plaintiffs' allegations, as the court must at this point, defendants engaged in a course of conduct that went far beyond simply facilitating O'Neal's fraudulent loans. Plaintiffs allege that Roach and Ernst & Young committed several torts in the course of their relationship with [plaintiffs]. Plaintiffs also allege that Roach and Ernst & Young acted negligently and fraudulently in not disclosing what they knew of O'Neal's financial and professional history and how these circumstances would affect the accounting treatment of the loans. According to [plaintiffs], defendants also had a duty,

as established by the Statement on Standards for Accounting and Review Services, to report the lack of "management integrity" within the company.

. . .

Also, at least under the allegations of the complaint, Roach and Ernst & Young stood to benefit from their alleged wrongful conduct. . . . [T]he fees and benefits received by Roach and Ernst & Young are alleged to have been obtained directly as a result of fraudulent conduct. . . . Plaintiffs are entitled to the inference that the benefits O'Neal distributed to Roach and Ernst & Young were the result of defendants' involvement in O'Neal's allegedly fraudulent scheme to enrich himself.

Baker O'Neal Holdings, 2004 WL 771230, at *9 (footnote omitted).

Other courts have discussed the same challenge of applying *in pari delicto* where the defendant is an alleged insider or co-conspirator. In PricewaterhouseCoopers, the district court granted summary judgment to the auditor defendant on *in pari delicto* grounds. On appeal, the Third Circuit expressed hesitation about applying the defense when the party invoking it "is an alleged co-conspirator" with the agents who harmed the principal. PricewaterhouseCoopers, LLP, 2008 WL 3895559, at *4. The court ultimately certified to the Supreme Court of Pennsylvania the question of what is the proper test for imputing an agent's fraud when an allegedly non-innocent third-party co-conspirator is the party who seeks to invoke the law of imputation to shield itself from liability. See also Knauer, 348 F.3d at 237 (dismissing complaint on *in pari delicto* grounds but stating, "Had the broker dealers been directly involved in the embezzlements, or attained some tangible benefit from them, this would be a different case."); NCP Litig. Trust v. KPMG, LLP, 901 A.2d 871, 882 (N.J. 2006) (holding that third parties who contribute to the wrongdoing should not be shielded from liability).

Another reason to refrain from applying the *in pari delicto* defense is the nature of the actionable conduct alleged against Credit Suisse. The complaint alleges that Credit Suisse breached a fiduciary duty to NPF VI and NPF XII and assisted the Founders in looting funds from NPF VI and NPF XII. Because the allegations supporting the UAT's claims support an inference that Credit Suisse knowingly acted against its principal and functioned as an insider, "it is not clear" that the fault imputed to NPF VI and NPF XII "should be considered equal to that of persons who knowingly act against it." PricewaterhouseCoopers, LLP, 2008 WL 3895559, at *6 ("Extending *in pari delicto* to a breach-of-fiduciary-duty action . . . gives us pause."). See also Parmalat I, 383 F.Supp.2d at 596, 599 (allowing

trustee's claims based on breach of fiduciary duty and looting to survive motion to dismiss filed by bank that allegedly cooperated with insiders of a company in structuring financial transactions that operated to defraud and bankrupt the company); In re Amcast Indus. Corp., 365 B.R. 91, 124 (Bankr. S.D. Ohio 2007) (holding that *in pari delicto* does not apply to bar breach of fiduciary duty claims against corporate insiders); In re Grumman Olson Industries, Inc., 329 B.R. 411, (Bankr. S.D.N.Y. 2005) (allowing breach of fiduciary duty claim to survive *in pari delicto* defense on motion to dismiss).

At the pleading stage, therefore, the court cannot say that Credit Suisse may escape liability for the harm it allegedly caused to NPF VI and NPF XII by invoking the *in pari delicto* defense. Credit Suisse will have ample opportunity in this case to demonstrate through evidence whether it is ultimately entitled to the defense.

## V.     SUFFICIENCY OF THE CLAIMS

### A.     Causation

Credit Suisse challenges the UAT's tort claims on the grounds that the complaint does not plead that Credit Suisse proximately caused the injuries to NPF VI and NPF XII. Credit Suisse stresses that its alleged role in raising money during the sales phase of the Ponzi scheme only benefitted NPF VI and NPF XII.

This argument misses the mark. The claims that the UAT has standing to pursue do not rest on Credit Suisse's alleged actions during the sales phase. Rather, they rest on alleged breaches of fiduciary duty by Credit Suisse. The complaint contains numerous allegations that Credit Suisse's deliberate failure to act, when it had a fiduciary duty to protect and inform its principals, proximately caused the assets of NPF VI and NPF XII to be looted.

That the Founders also are alleged to have proximately caused injury to NPF VI and NPF XII does not relieve Credit Suisse of liability. "[W]here an original act is wrongful or negligent and in a natural and continuous sequence produces a result which would not have taken place without the act, proximate cause is established, and the fact that some other act unites with the original act to cause injury does not relieve the initial offender from liability." Clinger v. Duncan, 166 Ohio St. 216, 222, 141

N.E.2d 156, 162 (Ohio 1957); <u>accord</u> <u>Aetna Cas. and Sur. Co. v. Leahey Const. Co.</u>, 219 F.3d 519, 543 (6th Cir. 2000); <u>Pang v. Minch</u>, 53 Ohio St.3d 186, 197-98, 559 N.E.2d 1313, 1324 (Ohio 1990).

## B. Fiduciary Duty

### 1. Existence of a Fiduciary Duty

The party asserting a claim for breach of fiduciary duty must establish the existence of a fiduciary duty, a breach of that duty, and an injury proximately resulting therefrom. <u>Strock v. Pressnell</u>, 38 Ohio St.3d 207, 216, 527 N.E.2d 1235, 1243 (Ohio 1998). The complaint alleges that Credit Suisse owed a fiduciary duty to NPF VI and NPF XII based on Credit Suisse's role as financial adviser and placement agent for NPF VI and NPF XII. A fiduciary is "'a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking.'" <u>Strock</u>, 38 Ohio St.3d at 216, 527 N.E.2d at 1243 (emphasis omitted) (quoting <u>Haluka v. Baker</u>, 66 Ohio App. 308, 312, 34 N.E.2d 68, 70 (Ohio Ct. App. 1941)). "The fiduciary's role may be assumed by formal appointment, or it may arise de facto from a more informal relationship between the parties; for the de facto status to be recognized, however, both parties must understand under the circumstances that a special trust and confidence has been reposed in one by the other." <u>Dunina v. LifeCare Hosps. of Dayton</u>, No. 21142, 2006 WL 1529475, at *6 (Ohio Ct. App. June 2, 2006) (citing <u>Blon v. Bank One, Akron, N.A.</u>, 35 Ohio St.3d 98, 101, 519 N.E.2d 363, 367 (Ohio 1988)); <u>see also</u> <u>Warren v. Percy Wilson Mortgage & Finance Corp.</u>, 15 Ohio App.3d 48, 51, 472 N.E.2d 364, 367 (Ohio Ct. App. 1984) (de facto relationship characterized by mutual understanding that one party has placed special confidence in the other).

The complaint does not definitively answer the question of whether the alleged fiduciary duty rests on a formal agency relationship or on a de facto relationship. There are allegations that would suggest the relationship was formal – Credit Suisse served as the financial adviser and placement agent for NPF VI and NPF XII, and one might expect that the parties entered into written agreements to memorialize their relationship. Nonetheless, the complaint des not expressly mention any formal agreements, and the UAT, in its brief, relies on the existence of a de facto relationship in defending the

sufficiency of its claim.[2]

Evaluating the complaint then for allegations that a de facto fiduciary relationship existed between Credit Suisse and NPF VI and NPF XII, the court finds that the complaint supports an inference of such a relationship. "A de facto fiduciary relationship may arise from a confidential relationship, in which 'one person comes to rely on and trust another in his important affairs and the relations there involved are not necessarily legal, but may be moral, social, domestic, or merely personal.'" Ohio Bureau of Workers' Comp. v. MDL Active Duration Fund, Ltd., 476 F.Supp.2d 809, 822 (S.D. Ohio 2007) (quoting Indermill v. United Savings, 5 Ohio App.3d 243, 245, 451 N.E.2d 538, 541 (Ohio Ct. App. 1982)). The complaint alleges that NPF VI and NPF XII entrusted Credit Suisse with "complete and comprehensive control of the structuring of the securitization programs at NPF VI and NPF XII" and with "near-exclusive control over the content of the offering documents used to issue notes on behalf of NPF VI and NPF XII." Compl., ¶¶768, 848. For its part, Credit Suisse understood that NPF VI and NPF XII were limited purpose entities with no employees of their own and "therefore dependent upon the integrity" of Credit Suisse, who had been appointed to act on behalf of NPF VI and NPF XII as their sole financial adviser. Id., ¶769. Further, Credit Suisse was trusted to act on behalf of NPF VI and NPF XII in dealings with third parties, including rating agencies. Id., ¶848. See General Acquisition, Inc. v. GenCorp, Inc., 766 F.Supp. 1460, 1472 (S.D. Ohio 1990) (holding on a motion to dismiss that de facto fiduciary relationship was sufficiently alleged where corporate financial adviser gave advice concerning prospective takeover bid).

Credit Suisse protests that the complaint lacks more specific details about the nature of the

---

[2] Credit Suisse devotes a great deal of attention to documents, which are attached to the motion to dismiss, purportedly showing that its relationship with NPF VI and NPF XII was governed by placement agency agreements and other letter agreements. The existence of these documents is not alleged in the complaint and is not central to plaintiff's claims as pleaded in the complaint. Further, the UAT objects that certain documents are either unsigned, pertain to entities (NPF-WL and NPF-LP) wholly separate from NPF VI and NPF XII, or relate to ancillary matters not relevant to the inquiry of a fiduciary relationship. Therefore, the court will not consider Credit Suisse's extrinsic evidence on the motion to dismiss. See Weiner v. Klais and co., Inc., 108 F.3d 86, 89 (6th Cir. 1997).

Moreover, because these extrinsic documents form Credit Suisse's sole reason for dismissing the professional negligence claim, the motion to dismiss is denied as to that claim.

relationship between Credit Suisse and NPF VI and NPF XII. However, the court finds that the complaint suffices under Rule 8(a)'s liberal pleading standard. See Prudential Ins. Co. v. Eslick, 586 F.Supp. 763, 766 (S.D. Ohio 1984) ("The existence of a de facto fiduciary relationship is a question of fact and depends on the circumstances of the case."); Combs v. Crown Life Ins., No. 1:07-cv-151, 2008 WL 641557, at *7 (S.D. Ohio March 4, 2008) (same).

### 2. Breach of a Fiduciary Duty

Credit Suisse also challenges whether the complaint sufficiently alleges a breach by Credit Suisse of its fiduciary duties to NPF VI and NPF XII. In defining what constitutes a breach, Credit Suisse refers to extrinsic documents that the court will not consider, as noted above in footnote 2. Looking to the complaint itself, the court finds that it adequately alleges that Credit Suisse breached a duty. It alleges that Credit Suisse had a duty of fidelity, disclosure, and good faith in advising NPF VI and NPF XII and acting as their agent. And the complaint amply alleges that Credit Suisse breached its duties by failing to disclose to NPF VI and NPF XII that they were being looted, by refusing to take steps to prevent the looting, and by actively assisting in the looting. See Genesis Respiratory Services, Inc. v. Hall, 99 Ohio App.3d 23, 28, 649 N.E.2d 1266, 1269 (Ohio Ct. App. 1994); Wing Leasing, Inc. v. M & B Aviation, Inc., 44 Ohio App.3d 178, 181, 542 N.E.2d 671, 676 (Ohio Ct. App. 1988); Myer v. Preferred Credit, Inc., 117 Ohio Misc.2d 8, 22-24, 766 N.E.2d 612, 623-24 (Ohio Ct. C.P. 2001).

### C. Fraud/Negligent Misrepresentation

The elements of a fraud claim are: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. Russ v. TRW, Inc., 59 Ohio St.3d 42, 49, 570 N.E.2d 1076, 1083-84 (Ohio 1991).

Under Rule 9(b), Fed. R. Civ. P., averments of fraud and the circumstances constituting the fraud must be stated with "particularity." To comply with Rule 9(b), "a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent

scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" Walburn v. Lockheed Martin Corp., 431 F.3d 966, 972 (6th Cir. 2005) (quoting Coffey v. Foamex L.P., 2 F.3d 157, 161-62 (6th Cir. 1993)).  Scienter may be averred generally and inferred from circumstantial evidence. See Fed. R. Civ. P. 9(b); S.E.C. v. Blackwell, 291 F.Supp.2d 673, 696 (S.D. Ohio 2003).

The complaint also asserts a claim for negligent misrepresentation.  The Ohio Supreme Court has defined negligent misrepresentation as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Delman v. Cleveland Hts., 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 838 (Ohio 1989) (quoting 3 Restatement of the Law 2d, Torts (1965), Section 552(1)).

Because the complaint alleges two types of fraud claims – one for failure to disclose and one for affirmative misrepresentations – the court will examine them separately below.

## 1.     Failure to Disclose

A claim for fraud or misrepresentation may be based on an omission where there is a duty to disclose.  Russ, 59 Ohio St.3d at 49, 570 N.E.2d at 1083.  A duty to disclose can arise from a fiduciary relationship.  In Ohio, "'[O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so.  And the duty to disclose arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'"  State v. Warner, 55 Ohio St.3d 31, 54, 564 N.E.2d 18, 40 (Ohio 1990) (quoting Chiarella v. United States, 445 U.S. 222, 228 (1980)).  See also Fifth Third Bank v. Cope, 162 Ohio App.3d 838, 849, 835 N.E.2d 779, 788 (Ohio Ct. App. 2005).  As explained above, the complaint sufficiently alleges that Credit Suisse owed a fiduciary duty to NPF VI and NPF XII.

The complaint satisfies Rule 9(b) in identifying exactly what information Credit Suisse should have disclosed to NPF VI and NPF XII, including: the assets of NPF VI and NPF XII were used to

purchase healthcare receivables that were not eligible for purchase under the Master Indentures[3]; impermissible withdraws were being made from NPF VI and NPF XII accounts; the assets of NPF VI and NPF XII were being wrongly commingled; account reserves were often not at the required levels; the Founders were self dealing by using the assets of NPF VI and NPF XII to purchase receivables in healthcare companies in which the Founders had an ownership interest; Credit Suisse accrued unearned fees and interest charges; and Credit Suisse bribed, or attempted to bribe, the Founders in order to retain its position as placement agent for the notes. Or to put it more directly, the complaint alleges that Credit Suisse sat idly by and profited by while the Founders plundered the assets NPF VI and NPF XII. The allegations of what Credit Suisse had a duty to tell NPF VI and NPF XII are repeated throughout paragraphs 763 to 879 of the complaint.

The element of materiality is not challenged, so the court will turn next to the element of knowledge. Under Rule 9(b), knowledge may be alleged generally. The complaint explains that Credit Suisse was thoroughly familiar with the requirements of the Master Indentures – after all, Credit Suisse drafted offering materials which recited those requirements. And the complaint goes on to allege how Credit Suisse knew that these requirements were not being satisfied. Credit Suisse allegedly received audited financial statements in 1995 showing that aged receivables and related-party receivables were being purchased. The complaint alleges that in January 1998, Credit Suisse participated in a decision to cause NPF VI to spend $100 million in "buying" aged, related-party, and over-valued receivables. In 1999, Credit Suisse is alleged to have received a document from legal counsel for NPF VI and NPF XII stating that a significant percentage (over one-third) of note proceeds were being advanced to parties related to the Founders. Other reports in 1999 allegedly informed Credit Suisse of reserve shortfalls and manipulation of NPF VI and NPF XII accounts. In 2000, Poulsen allegedly advised Credit Suisse that millions of dollars was being kited between NPF VI and NPF XII in order to conceal shortages in the

---

[3] The complaint cites a variety of ways that the receivables were ineligible under the Master Indentures: they were purchased from parties related to National Century or its principals; they exceeded the maximum aging requirements; they were billed to payors that were not highly rated; they lacked supporting documentary information; or they exceeded concentration limits on buying too many receivables of the same class of receivables or from the same provider.

account levels. These are just some of the examples of Credit Suisse's alleged knowledge. More examples are found in paragraphs 789 to 841 of the complaint.

The complaint also sufficiently alleges intent. According to the complaint, Credit Suisse, by not disclosing the facts within its knowledge, intended that the assets of NPF VI and NPF XII be misappropriated. The complaint alleges that Credit Suisse's motivation in keeping quiet was to protect the incoming stream of millions of dollars of fees that Credit Suisse received. Credit Suisse objects, citing cases for the proposition that an underwriter's desire to earn fees is itself not sufficient to support an inference of intent. But the case law cited by Credit Suisse deals with claims under Section 10(b) of the Securities Exchange Act, which has a higher pleading standard requiring a complaint to support a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). Here the claim is for common law fraud and intent may be generally alleged under Rule 9(b).

Finally, as to the element of reliance, the complaint alleges that NPF VI and NPF XII were dependent upon its fiduciaries, Credit Suisse included, to disclose material information about the operation of the note programs. According to the complaint, NPF VI and NPF XII relied on Credit Suisse, their financial adviser and placement agent, to inform them of material facts about the programs' non-compliance with the Master Indentures.

Credit Suisse argues that reliance is impossible because NPF VI and NPF XII should be charged with having already known of the programs' non-compliance. The complaint alleges that the Founders, who were officers and executives of NPF VI and NPF XII, knew about the programs' noncompliance and their knowledge should be imputed to NPF VI and NPF XII. The facts may ultimately prove Credit Suisse's argument to be true; however, for purposes of the motion to dismiss and for the reasons explained in Part IV.C above, the complaint sufficiently pleads the adverse interest exception to imputing the knowledge of the Founders to NPF VI and NPF XII.

Accordingly, the court finds that the complaint states a claim for fraud and misrepresentation based on a failure to disclose.

## 2. Affirmative Misrepresentations

In addition to alleging material omissions, the complaint alleges that Credit Suisse made

affirmative misrepresentations to NPF VI and NPF XII in the offering materials. Credit Suisse first argues that the complaint fails to satisfy Rule 9(b) in identifying the misrepresentations, but the court finds that it does satisfy Rule 9(b). The complaint lists nineteen note issuances by series number and date for which Credit Suisse drafted offering materials. Paragraph 854 of the complaint identifies the alleged misrepresentations contained in those offering materials, and the misrepresentations largely relate to the programs' compliance with the various requirements of the Master Indentures. Thus, the complaint alleges the time, place, and content of the misrepresentations.

Materiality is not in dispute. Credit Suisse again challenges the allegations of knowledge and intent, but those allegations are sufficient for the reasons stated above with respect to the failure-to-disclose fraud claim.

As to reliance, Credit Suisse argues that the offering materials were representations made by NPF VI and NPF XII to potential investors. While it is true that the offering materials ultimately were directed at potential investors in NPF VI and NPF XII notes, the complaint alleges that the offering materials were authored by Credit Suisse and initially reviewed and relied on by NPF VI and NPF XII. This factual allegation must be accepted as true at this stage in the litigation.

Credit Suisse next argues that the offering materials contained disclaimers stating that Credit Suisse was not making any representations or warranties in those materials; thus, the disclaimers precluded NPF VI and NPF XII from justifiably relying on any representations contained therein. Nonetheless, the Court finds that the purported disclaimers, even if considered on a motion to dismiss,[4] do not preclude the UAT from showing that NPF VI and NPF XII justifiably relied on Credit Suisse's alleged misrepresentations. The existence of disclaimers does not necessarily mean that plaintiff will not be able to demonstrate justifiable reliance. See, e.g., Greenberg v. Life Ins. Co. of Virginia, 177 F.3d 507, 516 (6th Cir. 1999) (finding that boilerplate language is not determinative of issue of reliance on motion to dismiss when plaintiff could establish reliance on factors that "trump" boilerplate provisions); Milman v. Box Hill Systems Corp., 72 F.Supp.2d 220, 231 (S.D.N.Y. 1999) ("[N]o degree of cautionary language

---

[4] Unlike the placement agency agreements and other letter agreements, the offering materials are expressly referenced in the complaint and their content is not in dispute.

will protect material misrepresentations or omissions where defendants knew their statements were false when made."); Jadoff v. Gleason, 140 F.R.D. 330, 335 (M.D.N.C. 1991). The issue of whether a party's reliance was justifiable is largely a question of fact inappropriate for resolution on a motion to dismiss. See Bass v. Janney Montgomery Scott, Inc., 210 F.3d 577, 590 (6th Cir. 2000) ("[T]he question of whether [plaintiff's] reliance was reasonable is beyond doubt a question of fact for a jury to decide, and not a fit subject for judgment as a matter of law."); Piper v. American Nat'l Life Ins. Co. of Texas, 228 F.Supp.2d 553, 560 (M.D. Pa. 2002) (justifiable reliance inquiry depends on subjective factors not conducive to resolution on motion to dismiss). Here, the complaint sufficiently alleges that NPF VI and NPF XII relied on the assurances Credit Suisse gave in the offering materials that the programs were in compliance with the Master Indenture. These assurances allegedly kept NPF VI and NPF XII from discovering that their assets were being misappropriated and caused them, to their detriment, to issue more notes.

Accordingly, the court finds that the complaint states a claim for fraud and misrepresentation based on affirmative misrepresentations.

### D. Deepening Insolvency

Alongside the breach of fiduciary duty claim, the UAT asserts a claim for deepening insolvency. The complaint alleges that as a result of Credit Suisse's failure to inform NPF VI and NPF XII and protect their interests, those programs continued to issue notes and ultimately became insolvent by at least $3 billion.

Credit Suisse challenges whether such a cause of action is recognized in Ohio, and the court agrees. Indeed, the UAT admits in its brief that no Ohio court has recognized deepening insolvency as an independent tort and that the issue "is largely academic" because the damages would mirror those for the breach of fiduciary claim.

An excellent discussion of the matter can be found in In re Amcast Indus. Corp., 365 B.R. 91, 115-19 (Bankr. S.D. Ohio 2007). The court in that case surveyed the case law and found that deepening insolvency is a "convoluted theory that has not been uniformly applied nor universally embraced. . . . Nor, for that matter, has it been precisely defined." Amcast, 365 B.R. at 115 (internal quotations and

citations omitted). Though courts applying Pennsylvania law have accepted the theory as a cause of action, see, e.g., Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 349-52 (3d Cir. 2001), most courts have rejected the theory because it is "duplicative of a claim for breach of fiduciary duty." Amcast, 365 B.R. at 117 (citing cases). As the court explained:

> There is no need to recognize a new cause of action when the traditional toolkit of claims [available against fiduciaries] of a corporation covers the same ground that a deepening insolvency cause of action would tread.
>
> . . .
>
> The court determines that, at its best, the deepening insolvency theory is redundant of traditional causes of action recognized under Ohio law. At its worst, the theory is inconsistent with principles of fiduciary responsibility and the business judgment rule codified in Ohio.

Amcast, 365 B.R. at 118-19.

Likewise, the UAT's claim for deepening insolvency is based on the same conduct that allegedly constituted a breach of Credit Suisse's fiduciary duties to NPF VI and NPF XII. As pleaded in the complaint, the theory is best viewed as a measure of damages to the bankrupt entities. Therefore, the UAT's claim for deepening insolvency is dismissed.

### E.     Conspiracy

The complaint alleges that Credit Suisse conspired with the Founders to misappropriate the assets of NPF VI and NPF XII. A civil conspiracy is "'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.'" Kenty v. Transamerica Premium Ins. Co., 72 Ohio St.3d 415, 419, 650 N.E.2d 863, 866 (Ohio 1995) (quoting LeFort v. Century 21-Maitland Realty Co., 32 Ohio St.3d 121, 126, 512 N.E.2d 640, 645 (Ohio 1987)). The elements of a civil conspiracy claim are: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." Universal Coach, Inc. v. New York City Transit Auth., Inc., 90 Ohio App.3d 284, 292, 629 N.E.2d 28, 33 (Ohio Ct. App. 1993).

The focus of the motion to dismiss is on the first element of an agreement. Credit Suisse argues that the complaint fails to allege that Credit Suisse entered into any agreement to harm NPF VI and NPF XII. In particular, Credit Suisse attacks the bare allegation that Credit Suisse "had an express agreement"

with the Founders. Compl., ¶888. The court agrees that there are no additional allegations supporting the existence of an express agreement, and the complaint's conclusory allegation need not be accepted as true. Papasan v. Allain, 478 U.S. 265, 286 (1986); Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987).

Nonetheless, the complaint adequately alleges that Credit Suisse and the Founders had a common understanding and design to misappropriate the assets of NPF VI and NPF XII. The element of a malicious combination "does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act." Gosden v. Louis, 116 Ohio App.3d 195, 219, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996); see also Aetna Cas. and Sur. Co. v. Leahey Constr. Co., 219 F.3d 519, 538 (6th Cir. 2000) (discussing a conspiracy claim under Ohio law). The complaint refers to circumstantial evidence supporting an inference that Credit Suisse and the Founders knowingly cooperated in a common design to defraud NPF VI and NPF XII. See Aetna, 219 F.3d at 538 (stating that the existence of a tacit understanding is often "provable only through circumstantial evidence"). The complaint alleges that: Credit Suisse occupied an insider's role as an underwriter, agent, and fiduciary; it knew of the Founders' wrongdoing; the wrongdoing depended on Credit Suisse's willingness to keep quiet; Credit Suisse breached its duties by concealing the wrongdoing from NPF VI and NPF XII; it reaped substantial financial benefits from the wrongdoing and even offered bribes to the Founders in order to retain its role in the operation; when the Founders needed immediate cash to keep the programs afloat, Credit Suisse "loaned" millions of dollars to them; and Credit Suisse actively concealed the wrongdoing from outsiders.

Credit Suisse also argues that the complaint fails to allege the fourth element of an independent unlawful act. However, the court finds that the complaint plainly alleges that Credit Suisse breached its fiduciary duties and engaged in fraud, for the reasons set forth above in Parts V.B and V.C. Thus, the complaint states a claim for conspiracy against Credit Suisse.

**F.    Concert of Action/Aiding and Abetting**

The complaint asserts a claim for concert of action, alleging that Credit Suisse knowingly helped the Founders to breach the fiduciary duties they owed to NPF VI and NPF XII. The UAT, while initially

arguing that concert of action is its own cause of action, ultimately treats it as a civil aiding and abetting claim.

Ohio courts that have dealt with concert of action claims have done so with reference to section 876 of the Restatement (Second) of Torts (1979), which states:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

See Great Central Ins. Co. v. Tobias, 37 Ohio St.3d 127, 130-31, 524 N.E.2d 168, 172 (Ohio 1988); State Auto. Mut. Ins. Co. v. Rainsberg, 86 Ohio App.3d 417, 420-21, 621 N.E.2d 520, 522 (Ohio Ct. App. 1993); Bevan Group 9 v. A-Best Prods. Co., No. 502694, 2004 WL 1191713, at *9 (Ohio Ct. C.P. May 17, 2004).

Section 876 of the Restatement (Second) of Torts is entitled "Persons Acting In Concert." Conspiracy and aiding and abetting are types of concerted-action liability. Courts commonly refer to liability under paragraph (b) of section 876 as a claim for civil aiding and abetting. See, e.g., Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177 (1994); Pavlovich v. National City Bank, 435 F.3d 560, 570 (6th Cir. 2006); Pittman by Pittman v. Grayson, 149 F.3d 111, 122-23 (2d Cir. 1998). The complaint, though labeling the claim as concert of action, clearly tracks the language of section 876(b). It alleges that Credit Suisse knowingly assisted the Founders in breaching their fiduciary duties to NPF VI and NPF XII. Thus, the court will construe the claim as one for aiding and abetting.

As discussed in prior orders, the case law is unclear about whether a cause of action exists in Ohio for civil aiding and abetting. See Pavlovich, 435 F.3d at 570 ("It is unclear whether Ohio recognizes a common law cause of action for aiding and abetting tortious conduct."). This court has held in prior orders that it will decline to dismiss the aiding and abetting claims on a Rule 12(b)(6) motion, because it cannot be said conclusively that Ohio law does not recognize such a cause of action. See Dec.

The elements of an aiding and abetting claim are: "(1) knowledge that the primary party's conduct is a breach of duty and (2) substantial assistance or encouragement to the primary party in carrying out the tortious act." Andonian v. A.C. & S., Inc., 97 Ohio App.3d 572, 574-75, 647 N.E.2d 190, 191-92 (Ohio Ct. App. 1994); see also Aetna, 219 F.3d at 533.

As for the element of knowledge, courts have required actual knowledge of the underlying tortious conduct. See Aetna, 219 F.3d at 533; Javitch v. First Montauk Fin. Corp., 279 F.Supp.2d 931, 946 (N.D. Ohio 2003); see also In re Sharp Int'l Corp., 403 F.3d 43, 49 (2d Cir. 2005). A plaintiff, however, need not allege that the aider and abettor had actual knowledge "of all of the details of the primary party's scheme." Aetna, 219 F.3d at 536. "[I]t is enough for the aider and abettor to have a general awareness of [his] role in the other's tortious conduct for liability to attach." Id. at 534 (citing Camp v. Dema, 948 F.2d 455, 460 (8th Cir. 1991)). Here, for the reasons explained in Part V.C.1 above, the court finds that the complaint throughly alleges that Credit Suisse knew the Founders, in an effort to misappropriate funds, were breaching their fiduciary duties as officers and directors by causing NPF VI and NPF XII to violate the Master Indentures.

Turning to the element of substantial assistance, the complaint alleges that Credit Suisse assisted the Founders by concealing their conduct. Though there is no case law directly on point in Ohio, other courts have held that a failure to act constitutes substantial assistance when, as alleged here, there is a duty to act. See Lerner v. Fleet Bank, N.A., 459 F.3d 273, 295 (2d Cir. 2006); Cromer v. Berger, 137 F.Supp.2d 452, 470 (S.D.N.Y.2001) (holding that substantial assistance exists when a defendant "helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed"). The complaint sufficiently alleges that Credit Suisse failed in its fiduciary duty to act in response to the Founders' tortious conduct. Accordingly, the complaint states an aiding and abetting claim against Credit Suisse.

### G. Ohio Corrupt Activities Act

The complaint asserts a claim under Ohio's Corrupt Activities Act, which states,

No person employed by, or associated with, any enterprise shall conduct or participate

in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt.

Ohio Rev. Code § 2923.32(A)(1). The complaint alleges that the Founders and Credit Suisse formed an enterprise for the purpose of looting the assets of NPF VI and NPF XII.

The elements of a claim under § 2923.32(A)(1) are: "(1) conduct of the defendant which involves the commission of two or more of specifically prohibited state or federal criminal offenses; (2) the prohibited criminal conduct of the defendant constitutes a pattern of corrupt activity; and (3) the defendant has participated in the affairs of an enterprise or has acquired and maintained an interest in or control of an enterprise." Universal Coach, Inc. v. New York City Transit Authority, Inc., 90 Ohio App.3d 284, 291, 629 N.E.2d 28, 32 (Ohio Ct. App. 1993) (citing Sedima S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985)).

### 1.    Predicate Acts

When, as here, a party seeks to bring a civil claim for a violation of § 2923.32(A)(1), the Ohio Act requires at least one of the predicate acts be something other than securities fraud, mail fraud, or wire fraud. O.R.C. § 2923.34(A); see Baker v. Pfeifer, 940 F.Supp. 1168, 1181 (S.D. Ohio 1996) ("[A] a private party seeking to recover under the Ohio Corrupt Activities Act must allege a pattern of corrupt activity that includes at least one predicate act that is not a form of securities fraud, mail or wire fraud, or the interstate transportation of stolen property or securities."); Mercy Health Partners v. Miller, No. A0301165, 2005 WL 2592674, at *4 (Ohio Ct. C.P. Sept. 30, 2005) (dismissing claim because mail and wire fraud were the only alleged forms of corrupt activity).

The complaint alleges that the enterprise committed five types of predicate activity: (1) securities fraud; (2) mail fraud; (3) wire fraud; (4) theft under Ohio law; and (5) commercial bribery under New York law. Credit Suisse argues, and the UAT concedes, that the alleged acts of commercial bribery under New York law does not count. This is so because a criminal conviction is required for an out-of-state violation to count under the Ohio Act, and Credit Suisse has not been criminally convicted in New York for any conduct relating to National Century, NPF VI, or NPF XII. See O.R.C. § 2923.31(I)(3).

### a.       Theft

Thus, in order for the UAT to state a claim under the Corrupt Activities Act, a predicate act of theft under O.R.C. § 2913.02 must be properly alleged.  Theft is defined as follows:

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1) Without the consent of the owner or person authorized to give consent;

(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

(3) By deception;

(4) By threat;

(5) By intimidation.

O.R.C. § 2913.02(A).  The complaint invokes paragraphs (1) and (2) of the theft provision.  It alleges that the Founders and Credit Suisse knowingly exerted control over note proceeds belonging to NPF VI and NPF XII without the consent of NPF VI and NPF XII and in a manner beyond the scope of their authority as agents.

Credit Suisse contends it was other parties, namely the Founders, indenture trustees, and servicer, who allegedly controlled note proceeds and manipulated reserve accounts.  The UAT responds that the complaint does allege theft by Credit Suisse and points to a single allegation: "[Credit Suisse] knowingly and fraudulently manipulated the Equity Accounts – by exercising dominion over them for a period of days so as to ensure that they 'met' the required reserve tests . . . ."  Compl., ¶860.

Credit Suisse rightly protests that this lone allegation is contradicted by a host of particularized allegations in the complaint detailing how the other defendants manipulated the accounts.  It is further contradicted by the provisions of the Master Indentures and the Sale and Subservicing Agreement, which are attached to the complaint.  These documents designate the trustees and servicer as the parties who had the ability to control the accounts.  One who has reviewed the first 300 pages of allegations would find that the allegation in paragraph 860 simply does not compute.  See <u>Griffin Industries, Inc. v. Irvin</u>,

496 F.3d 1189, 1205-06 (11th Cir. 2007) ("Our duty to accept the facts in the complaint as true does not require us to ignore specific factual details of the pleading in favor of general or conclusory allegations."); E.F.W. v. St. Stephen's Indian High School, 264 F.3d 1297, 1306 (10th Cir. 2001) (declining "to place significance on bare conclusory allegations . . . when, as here, they are not only unsupported by any factual allegations but are in fact contradicted by the factual allegations plaintiffs do make"); Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1095 (2d Cir. 1995) (sustaining dismissal of the complaint where "attenuated allegations" supporting a claim are contradicted "by more specific allegations in the complaint"); Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991) ("[I]n the event of conflict between the bare allegations of the complaint and any [attached] exhibit . . . the exhibit prevails."); In re Livent, Inc. Noteholders Secs. Litig., 151 F.Supp.2d 371, 405-06 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice.").

Even so, liability under the Corrupt Activities Act may be premised upon a conspiracy to commit a violation. See O.R.C. § 2923.34(A) (authorizing a civil claim for relief against any person who violates or conspires to violate § 2923.32). Courts have therefore held that when liability is premised upon a conspiracy, the plaintiff is not required to prove that each defendant committed two or more predicate acts. See Dowling v. Select Portfolio Servicing, Inc., No. 2:05-cv-049, 2006 WL 571895, at *7 (S.D. Ohio March 7, 2006) (that defendants "did not personally commit predicate acts" did not preclude liability under § 2923.34 for conspiracy to violate the Corrupt Activities Act); State v. Habash, No. 17071, 1996 WL 37747, at *6 (Ohio Ct. App. Jan. 31, 1996) (imposing conspiracy liability under § 2923.34 where "actual acts of forgery and theft were committed by [the head of the enterprise] and not defendant"). This is in keeping with federal RICO law, where courts have held that co-conspirators are liable for the acts of the enterprise:

> The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other. See Pinkerton v. United States, 328 U.S. 640, 646, 66 S.Ct. 1180, 1183-1184, 90 L.Ed. 1489 (1946)

> ("And so long as the partnership in crime continues, the partners act for each other in carrying it forward"). If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators. As Justice Holmes observed: "[P]lainly a person may conspire for the commission of a crime by a third person." United States v. Holte, 236 U.S. 140, 144, 35 S.Ct. 271, 272, 59 L.Ed. 504 (1915). A person, moreover, may be liable for conspiracy even though he was incapable of committing the substantive offense. United States v. Rabinowich, 238 U.S. 78, 86, 35 S.Ct. 682, 684, 59 L.Ed. 1211 (1915).

Salinas v. United States, 522 U.S. 52, 63-64 (1997); see also U.S. v. Corrado, 286 F.3d 934, 937 (6th Cir. 2002) ("Co-conspirators participating in a RICO enterprise should be held jointly and severally liable for any proceeds of the conspiracy reasonably foreseeable from conspiratorial operations.").

Here, the complaint expressly alleges that Credit Suisse conspired with the Founders to violate § 2923.32. As discussed in relation to the conspiracy claim, there are ample allegations that Credit Suisse and the Founders knowingly cooperated in a common plan to misappropriate the assets of NPF VI and NPF XII. Further, there is no dispute that the complaint adequately alleges that the Founders did commit theft of those assets. The court therefore finds that the UAT has satisfied the requirement under O.R.C. § 2923.34(A) that the complaint allege at least one predicate act that is not securities fraud, mail fraud, or wire fraud.

### b.    Fraud-based Acts

Credit Suisse next argues that even if theft counts as one of the predicate acts, there must be at least two predicate acts and the complaint fails to allege securities fraud, mail fraud, or wire fraud. See O.R.C. § 2923.31(E) (a "pattern of corrupt activity" requires two or more predicate acts).[5] The complaint asserts that Credit Suisse committed securities fraud under O.R.C. § 1707.44, which prohibits the knowing use of false representations in connection with the sale of any securities in Ohio. Though Credit Suisse contends that the complaint does not satisfy Rule 9(b)'s particularity requirement, the complaint lists the nineteen note issuances by series number and date for the offering materials in which the misrepresentations appeared and identifies the misrepresentations and material omissions – largely relating to violations of the Master Indenture – contained in those offering materials. Further, and as

---

[5] Credit Suisse challenges the predicate acts, but does not challenge that, if the predicate acts are sufficiently alleged, they constitute a pattern of corrupt activity under O.R.C. § 2923.31(E).

discussed in Part V.C.1 above, the complaint amply alleges that Credit Suisse knew of the Indenture violations.

The claims of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343 are based on the same conduct. The complaint alleges that the false offering materials were disseminated by means of interstate mail and wire communications. Such claims require a showing of fraudulent intent. Advocacy Org. for Patients and Providers v. Auto Club Ins. Ass'n, 176 F.3d 315, 322 (6th Cir. 1999). Again, the complaint sufficiently alleges Credit Suisse's knowledge and intent, as discussed above in Part V.C.1.

### 2. Enterprise

An "enterprise" is defined as "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity." O.R.C. 2923.31(C). Ohio courts have held that an "enterprise" should be interpreted broadly and need not be a formal, structured organization. See Habash, 1996 WL 37747, at *5 ("[T]he legislature defined this term broadly . . . ."); State v. Sands, No. 2007-L-003, 2008 WL 5428252, at *19 (Ohio Ct. App. Dec. 31, 2008); State v. Gregg, No. 2006-A-0013, 2007 WL 779203, at *4 (Ohio Ct. App. March 14, 2007).

The UAT alleges that the enterprise consisted of Lance Poulsen, Donald Ayers, Rebecca Parrett, and Credit Suisse. Poulsen allegedly headed the enterprise and gave it direction. Ayers allegedly caused NPF VI and NPF XII to purchase ineligible receivables and to make advances to parties related to the Founders. Parrett allegedly also caused NPF VI and NPF XII to purchase ineligible receivables, as well as manipulated the books to prevent events of default from being declared. Credit Suisse allegedly drafted offering materials and helped conceal the enterprise's activities from NPF VI and NPF XII and from outsiders.

Credit Suisse argues that it cannot be held liable under a RICO theory because its alleged role in the enterprise amounted to a business relationship that could have been equally filled by other underwriters in the open market. In support, Credit Suisse cites VanDenBroeck v. CommonPoint Mortgage Co., 210 F.3d 696 (6th Cir. 2000), a class action where plaintiffs sued a mortgage company. The defendant, after making a loan to consumer, would sell the loan to any one of "numerous secondary

lenders" on the open market. Plaintiffs alleged that defendant charged undisclosed and unreasonable lender's fees, and they brought a RICO claim, alleging that the defendant and the secondary lenders had formed an enterprise. The court found that a RICO enterprise did not exist because the defendant had nothing more than "a business relationship with the secondary lenders." 210 F.3d at 700. That the defendant used any available lender in the secondary lending market to carry out its fee-collecting scheme was not enough. The defendant and "the entire secondary lending market" was not an enterprise because there was no evidence of a hierarchy, chain of command, or that the participants functioned "as a continuous unit." Id.

Credit Suisse's attempt to compare this case to VanDenBroeck is unconvincing. The enterprise here is a defined group of the three Founders and Credit Suisse. The alleged scheme would not have worked with any underwriter available in the marketplace because the enterprise required more from Credit Suisse than its underwriting skills. The scheme worked because of Credit Suisse's alleged willingness to conceal the Founder's wrongdoing and to aid the fraudulent scheme. The Founders' alleged relationship with Credit Suisse was more than a business relationship. The complaint characterizes the relationship as one whereby Credit Suisse followed Poulsen's "direction" in attracting investment money to the enterprise and heeded his "demand[s]" in concealing the wrongdoing. Compl., ¶ 848.

Accordingly, the court finds that the complaint sufficiently pleads the existence of an enterprise and has stated a claim under Ohio's Corrupt Activities Act.

## VI.    BANKRUPTCY CLAIMS

The complaint alleges that NPF XII sold a variable funding note to Credit Suisse in December 2000. By May 2002, the outstanding balance owed by NPF XII on the note was $220 million. The complaint alleges that NPF XII was already insolvent at this time. On June 3, 2002, NPF XII made a payment to Credit Suisse of $100 million, purportedly on the debt of $220 million owed by NPF XII to Credit Suisse. NPF XII filed for bankruptcy on November 18, 2002. The complaint alleges that the June 3, 2002 payment is avoidable by the trustee as a preferential transfer under Section 547 of the Bankruptcy

Code and as a fraudulent transfer under Sections 544 and 548. The complaint further alleges that the payment may be recovered by the trustee under Section 550.

**A.      Preferential Transfer**

When a transfer of the debtor's property is made within 90 days before the date of the filing of the bankruptcy petition, the trustee may avoid the transfer if it was made to a creditor, on account of an antecedent debt, while the debtor was insolvent, and enabled the creditor to receive more than it otherwise would have received if the transfer had not been made and the debtor's assets had been liquidated under Chapter 7. See 11 U.S.C. § 547(b). But when, as here, the transfer was made between 90 days and one year before the petition date, the transfer is avoidable only if the creditor was "an insider" at the time of the transfer. See 11 U.S.C. § 547(b)(4)(B).

Credit Suisse's lone challenge to the preference claim is that it was not an insider. An "insider" of a debtor corporation is defined as including the officers, directors, and general partners of the corporation, as well as a "person in control of the debtor." 11 U.S.C. § 101(31). In making the determination of whether insider status exists, courts have focused on two factors: "(1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length." In re Holloway, 955 F.2d 1008, 1011 (5th Cir. 1992); accord In re Florida Fund of Coral Gables, Ltd., 144 Fed.Appx. 72, 75 (11th Cir. 2005); In re Broumas, Nos. 97-1182, 97-1183, 1998 WL 77842, at *7 (4th Cir. Feb. 24, 1998); In re U.S. Medical, Inc., 370 B.R. 340, 344 (10th Cir. BAP 2007); In re Rosen Auto Leasing, Inc., 346 B.R. 798, 804 (8th Cir. BAP 2006).

Credit Suisse argues that it was not a person in control because it had no authority over corporate policy or over the daily management of NPF XII. According to Credit Suisse, the primary purpose of NPF XII was to purchase healthcare receivables and Credit Suisse had no involvement in that operation. Credit Suisse contends that its provision of a professional service – drafting the offering materials – did not transform it into an insider.

Much of Credit Suisse's argument boils down to disagreements with the factual allegations of the complaint. The court must view those allegations in a light most favorable to the plaintiff. The

complaint alleges that the NPF XII had two equally important aspects of its operations: (1) issuing notes to investors and (2) purchasing receivables. While Credit Suisse stresses that it had little involvement in the latter, it ignores the allegation that Credit Suisse had "complete and comprehensive control" of the first. Compl., ¶ 768. The complaint characterizes Credit Suisse's role as far greater than providing incidental, professional services. Credit Suisse was allegedly responsible for structuring the NPF XII note program, deciding the limitations that would be imposed on the program's operations, drafting the Master Indentures and offering materials, and helping determine when a new series of notes would be issued. The complaint alleges that there were times when Credit Suisse used its own funds to help keep NPF XII running. This alleged role transcended a normal, business relationship of a corporation with an outside company. In sum, the complaint portrays Credit Suisse's relationship with the debtor as a close one, whereby the operation of NPF XII's note issuance business depended largely on Credit Suisse.

Importantly, the complaint characterizes the transfer at issue here as not being at arms' length. See Rosen Auto Leasing, 346 B.R. at 804 ("An insider is one who does not deal at arm's length with the debtor."). Credit Suisse, armed with knowledge of NPF XII's insolvency and worsening financial condition, allegedly determined that it needed to reduce its exposure to the $220 million debt owed it by NPF XII. The complaint alleges that in late May 2002 Credit Suisse caused NPF XII to issue an additional series of notes that raised $250 million. Credit Suisse and Poulsen used these funds to turn around on June 3, 2002 and direct the $100 million payment to Credit Suisse. The court finds that the complaint alleges a situation that implicates the very reason why the Bankruptcy Code has a provision for avoiding transfers to insiders. The one-year reachback period for insiders exists because of the danger that "insiders who lent money to the firm could use their knowledge to advantage by paying their own loans preferentially, then putting off filing the petition in bankruptcy until the preference period had passed." Levit v. Ingersoll Rand Fin. Corp., 874 F.2d 1186, 1195 (7th Cir. 1989); see also In re Friedman, 126 B.R. 63, 70 (9th Cir. BAP 1991) (holding that insider status may be based on a professional or business relationship with the debtor "where such relationship compels the conclusion that the individual or entity has a relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties.").

Thus, the court finds that the complaint sufficiently alleges insider status and that the preference claim should survive the motion to dismiss.

## B.      Fraudulent Transfer

The complaint also seeks to recover the $100 million transfer as being for less than "reasonably equivalent value." 11 U.S.C. § 548(a)(1)(B)(i). Credit Suisse objects that this claim is inconsistent with the preference claim, which requires that the transfer be made on account of an antecedent debt. A dollar-for-dollar reduction in the amount of antecedent debt constitutes "reasonably equivalent value," Credit Suisse argues. See In re Trace Int'l Holdings, Inc., 301 B.R. 801, 805-06 (Bankr. S.D.N.Y. 2003) (explaining general rule that a preferential transfer cannot also be a fraudulent transfer). However, at the pleading stage, a party "may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). The UAT may therefore assert separate claims for preferential transfer and fraudulent transfer based on the same transaction.

Finally, Credit Suisse argues that the complaint fails to allege fraudulent intent. The trustee may avoid a transfer made within one year of the petition date if the debtor made the transfer "with actual intent to hinder delay, or defraud" an entity to which the debtor was indebted. 11 U.S.C. § 548(a)(1)(A). Credit Suisse stresses that it is *the debtor* who must have the fraudulent intent, and that the theory behind the complaint is that the debtors were innocent parties who were subverted by their fiduciaries. The UAT responds that NPF XII acted through Poulsen, who is alleged to have had the requisite fraudulent intent in making the transfer.

Credit Suisse contends that the UAT cannot have it both ways – trying to escape application of the *in pari delicto* defense by arguing that the Founders' fraudulent conduct should not be imputed to NPF VI and NPF XII, while at the same time claiming that Poulsen's fraudulent intent should count against NPF XII for purposes of the bankruptcy claim. The court is sympathetic to Credit Suisse's plea, and ultimately the UAT will not be allowed to have it both ways. Nonetheless, the UAT is free to plead inconsistent claims in its complaint. Resolution of whether the Founders' conduct should be imputed to the plaintiff is best left until the factual record is fully developed.

Thus, the court finds that the complaint sufficiently alleges the fraudulent transfer claims.

## VII.    CONCLUSION

Accordingly, Credit Suisse's motion to dismiss (doc. 578) is granted in part and denied in part.

The motion is granted as to the UAT's deepening insolvency claim, but denied in all other respects.


<u>s/ James L. Graham</u>
JAMES L. GRAHAM
United States District Judge

DATE: March 18, 2009