**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**


| | | |
|---|---|---|
| In re National Century Financial Enterprises, Inc., Investment Litigation. | : | Case No. 2:03-md-1565 |
| | : | Judge Graham |
| | : | Magistrate Judge Abel |

---

| | | |
|---|---|---|
| The Unencumbered Assets, Trust, et al., | : | |
| | : | |
| Plaintiffs, | | Case No. 2:04-cv-1090 |
| | : | |
| vs. | | Judge Graham |
| | : | |
| JP Morgan Chase Bank, et al., | | |
| | : | |
| Defendants. | | |


<u>OPINION AND ORDER ON THE FOUNDERS' MOTIONS TO DISMISS
IN THE UNENCUMBERED ASSETS TRUST CASE</u>

This matter is before the court on the motions to dismiss filed by Lance and Barbara Poulsen, Donald Ayers, and Rebecca Parrett (collectively the "Founders") in the Unencumbered Assets Trust (the "UAT") case. The UAT is a creation of the bankruptcy court's April 16, 2004 order confirming the liquidation plan of National Century Financial Enterprises, Inc. The liquidation plan transferred to the UAT all of the unencumbered assets of debtor National Century and its subsidiaries. Those assets included legal causes of action that belonged to the debtors prior to bankruptcy.

The UAT brings this action to pursue claims allegedly belonging to National Century and two subsidiaries of National Century, NPF VI and NPF XII, which were limited-purpose corporations formed under Ohio law. NPF VI and NPF XII were securitization programs through which National Century purchased healthcare accounts receivable and issued investment-grade notes that were backed by the accounts receivable. The complaint names numerous defendants who were involved in some way in National Century's operations and are alleged to have caused legal injury to the debtors. This order

deals only with the motions to dismiss filed by the Founders.

## I.     BACKGROUND

### A.     Summary of the Factual Allegations

The complaint alleges that NPF VI and NPF XII were originally formed as legitimate businesses whose purpose was to "buy bona fide, health care accounts receivable with the proceeds of notes secured by those receivables." UAT Compl., ¶1. NPF VI and NPF XII each had a corporate existence independent from National Century, such that they each had their own corporate records, accounts, financial statements, books, and assets, and they were prohibited from becoming involved in the management of any other National Century entity. Master Indenture Agreements governed the NPF VI and NPF XII programs and imposed numerous safeguards to ensure that the notes they issued would be considered investment grade. Those safeguards included restrictions on the types of receivables purchased, the maintenance of reserve accounts, controls on transfers in and out of the accounts, audits, and other regular reporting requirements. A servicer, National Premier Financial Services, Inc. (the "Servicer"), was created to perform certain functions for NPF VI and NPF XII, including purchasing receivables and instructing the transfer of funds from accounts.

Lance Poulsen, Donald Ayers, and Rebecca Parrett formed National Century Financial Enterprises, Inc. in Ohio in 1990. They were shareholders and allegedly controlled the operations of National Century, NPF VI, NPF XII, and the Servicer. The complaint alleges that Lance Poulsen was president and a director of National Century; president, treasurer, and a director of NPF VI; president, treasurer, and a director of NPF XII; and president and treasurer of the Servicer. His wife, Barbara, served as a director of National Century and an officer of the Servicer. Donald Ayers was the chief operating officer and a director of National Century; a director of NPF VI; vice president and a director of NPF XII; and vice president of the Servicer. Rebecca Parrett was secretary, treasurer, and a director of National Century; vice president and a director of NPF VI; a director of NPF XII; and vice president of the Servicer.

The complaint alleges that the Founders conceived and executed a scheme to defraud and loot

NPF VI and NPF XII of their corporate assets. With the help of other defendants – such as the indenture trustees, the underwriter of the notes, and auditors – the Founders allegedly misappropriated nearly $3 billion. The Founders accomplished this, according to the complaint, by surreptitiously causing NPF VI and NPF XII to spend hundreds of millions of dollars in purchasing low-quality or even non-existent receivables from healthcare companies that the Founders controlled or had some financial interest in. In order to orchestrate such a fraud, the Founders allegedly forced NPF VI and NPF XII to commit numerous violations of the Master Indentures. The alleged violations include: purchasing worthless or non-existent accounts receivable, failing to maintain reserve accounts, engaging in related-party transactions, and exceeding concentration limits on the type and source of receivables purchased.

### B.     Claims Against the Founders

The complaint asserts claims against the Founders under the federal Racketeer and Influenced Corrupt Organizations Act, 18 U.S.C. § 1962, and the Ohio Corrupt Activities Act, O.R.C. § 2923.32. The UAT alleges that the Founders formed and directed an enterprise that subverted the otherwise lawful operation of the NPF VI and NPF XII note programs by causing them to issue billions of dollars of worthless notes, misappropriating their assets, and forcing them into insolvency. The alleged predicate acts include mail fraud, wire fraud, bank fraud, and theft.

Next, the complaint asserts a claim for fraud, alleging that the Founders defrauded NPF VI and NPF XII by misrepresenting how the note programs would be operated. According to the complaint, the Founders made misrepresentations and material omissions in the Master Indentures, which NPF VI and NPF XII allegedly relied on to their detriment by issuing notes and incurring debt.

The complaint next brings a claim for breach of fiduciary duty. The Founders were officers of NPF VI and NPF XII and are alleged to have owed fiduciary duties to the companies. They allegedly breached their duties by misappropriating corporate assets and failing to disclose the existence of numerous violations of the Master Indenture.

Claims for civil conspiracy and civil aiding and abetting are brought as well. The complaint alleges that the Founders conspired with each other and with the Indenture Trustees (Bank One, N.A.

and JPMorgan Chase Bank) to misappropriate the assets of NPF VI and NPF XII. Further, the Founders allegedly aided each other and the Trustees in committing acts of fraud and breaching their fiduciary duties.

As to Parrett and Ayers, the complaint asserts a claim for breach of contract. National Century allegedly made loans of $5 million to Parrett and $2.55 million to Ayers, and the loans were secured by stock pledges of National Century stock. According to the complaint, Parrett and Ayers never made any payments on their respective loans. They later executed a second round of promissory notes – this time, non-recourse loans – extending the time to repay the loans, but again allegedly failed to make any payments.

The final group of claims relate to transfers that the debtor entities made to the Founders or to healthcare companies owned by the Founders. The transfers range from March 1999 to October 28, 2002, and include the loans made to Parrett and Ayers. The complaint asserts claims for avoidable transfer under the Bankruptcy Code, fraudulent transfer under the Ohio Uniform Fraudulent Transfer Act, and for unlawful dividend payments under Ohio corporate law. The complaint also asserts another claim for breach of fiduciary duty, alleging that the Founders breached their duties by authorizing the transfers. Finally, the complaint brings a claim for unjust enrichment on the grounds that the transfers were made with no benefit or consideration provided to the debtors.


## II.     MOTION TO DISMISS STANDARD OF REVIEW

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)); Sensations, Inc. v. City of Grand Rapids, 526 F.3d 291, 295 (6th Cir. 2008). A motion to dismiss under Rule 12(b)(6) will be granted only if the complaint is without merit due to an absence of law to support a claim of the type made or of facts sufficient to make a valid claim, or where the face of the complaint reveals that there is an insurmountable bar to relief. See Evans-Marshall v. Bd. of Educ., 428 F.3d 223, 228 (6th Cir. 2005);

Westlake v. Lucas, 537 F.2d 857, 858 (6th Cir. 1976). Under Rule 8(a), "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson, 127 S.Ct. at 2200 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957). Because a motion under Rule 12(b)(6) is directed solely at the complaint itself, the court must focus on whether the claimant is entitled to offer evidence to support the claims, rather than whether the plaintiff will ultimately prevail. Scheuer, 416 U.S. at 236; Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007) (Rule 8 "does not impose a probability requirement at the pleading stage").

Despite this liberal pleading standard, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986); see also Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ("[W]e need not accept as true legal conclusions or unwarranted factual inferences."). Though the complaint need not contain detailed factual allegations, the factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim. Bell Atlantic, 550 U.S. at 555-56; Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 526 (1983). The plaintiff must provide the grounds of his entitlement to relief "rather than a blanket assertion of entitlement to relief." Bell Atlantic, 550 U.S. at 555 n.3. Labels, conclusions, and formulaic recitations of the elements of a cause of action "will not do." Id. at 555. "Accordingly, a complaint 'must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'" Ferron v. Zoomego, Inc., No. 07-4007, 2008 WL 1988587, at *2 (6th Cir. May 7, 2008) (quoting Lewis v. ACB Business Serv., Inc., 135 F.3d 389, 406 (6th Cir. 1998)).

## III.    THRESHOLD CHALLENGES TO THE COMPLAINT

### A.    Personal Jurisdiction Over Rebecca Parrett

Rebecca Parrett, an Arizona resident, argues that the court lacks personal jurisdiction over her. See Fed. R. Civ. P. 12(b)(2). Parrett, who has chosen not to submit an affidavit or other evidentiary materials, states that she is making a *prima facie* challenge to personal jurisdiction. Parrett acknowledges

that she is alleged to have been a founder and an officer of National Century, an Ohio company, but she argues under the corporate shield doctrine that the actions she took within the course of her employment do not confer personal jurisdiction over her.

The party asserting that the court has personal jurisdiction has the burden of proving it. Theunissen v. Matthews, 935 F.2d 1454, 1458 (6th Cir. 1991). Because the parties here do not seek an evidentiary hearing and the issue can be resolved without such a hearing, the plaintiff need only make a *prima facie* showing of personal jurisdiction. Id.; American Greetings Corp. v. Cohn, 839 F.2d 1164, 1168-69 (6th Cir. 1988). The burden on the plaintiff is "relatively slight," Am. Greetings Corp. v. Cohn, 839 F.2d 1164, 1169 (6th Cir. 1988), and "the plaintiff must make only a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal," Theunissen, 935 F.2d at 1458. "In that instance, the pleadings and affidavits submitted must be viewed in a light most favorable to the plaintiff, and the district court should not weigh 'the controverting assertions of the party seeking dismissal.'" Air Products and Controls, Inc. v. Safetech Int'l, Inc., 503 F.3d 544, 549 (6th Cir. 2007) (quoting Theunissen, 935 F.2d at 1459).

In examining personal jurisdiction over an out-of-state defendant, the central inquiry is whether the defendant established "certain minimum contacts with [the forum] such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). "Depending on the type of minimum contacts in a case, personal jurisdiction can either be specific or general." Air Products, 503 F.3d at 549-50. An exercise of specific jurisdiction is proper where the claims arise from or are related to the defendant's contacts with the forum state. Intera Corp. v. Henderson, 428 F.3d 605, 615 (6th Cir. 2005). The Sixth Circuit has established a three-part test to determine whether specific jurisdiction exists over a nonresident defendant:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

Southern Machine Co. v. Mohasco Indus., Inc., 401 F.2d 374, 381 (6th Cir. 1968); Intera Corp, 428 F.3d

at 615.

The UAT contends that when a federal RICO claim is asserted, courts evaluate personal jurisdiction based on nationwide contacts. The RICO statute provides for nationwide service of process, 18 U.S.C. § 1965, and some courts have interpreted this to mean that personal jurisdiction under RICO can be established through nationwide contacts. See, e.g., Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 119 F.3d 935, 942 (11th Cir. 1997) ("When a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction."); ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 627 (4th Cir. 1997) ("Because [defendants] have been validly served pursuant to RICO's nationwide service provision, 18 U.S.C. § 1965(d), in personam jurisdiction over them is established, provided that such jurisdiction comports with the Fifth Amendment."). Other courts have followed a different formulation, requiring personal jurisdiction based on minimum contacts with the forum state as to at least one defendant in the RICO enterprise before applying a nationwide contacts test to the remaining defendants. See, e.g. FC Inv. Group LC v. IFX Markets, Ltd., 529 F.3d 1087, 1099-1100 (D.C. Cir. 2008) ("[A] civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant."); PT United Can Co. Ltd. v. Crown Cork & Seal Co., 138 F.3d 65, 70 (2d Cir. 1998) (same). The Sixth Circuit has not stated a position on this issue. See NGS American, Inc. v. Jefferson, 218 F.3d 519, 524 n.5 (6th Cir. 2000) (stating without holding that Sixth Circuit precedent in the non-RICO context "supports acceptance of the national contacts approach").

Regardless of which formulation is applied here, personal jurisdiction over Parrett is established. Under the nationwide contacts approach, Parrett is alleged to be a United States citizen and resident and her conduct in this case allegedly took place in the United States. Under the PT United approach, defendants Poulsen and Ayers are alleged to be Ohio residents and their conduct in this case allegedly took place, at least in part, in Ohio; thus, this court has personal jurisdiction over at least one RICO defendant based on minimum contacts with Ohio.

Parrett contends that both approaches should be rejected and that the court should apply the traditional approach of examining her contacts with the state of Ohio. Though Parrett cites no case law

on point for ignoring RICO's nationwide service provision, her challenge to personal jurisdiction would fail even under the traditional minimum contacts approach. Ohio's long-arm statute provides:

(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:

(1) Transacting any business in this state;

(2) Contracting to supply services or goods in this state;

(3) Causing tortious injury by an act or omission in this state;

(4) Causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;

(5) Causing injury in this state to any person by breach of warranty expressly or impliedly made in the sale of goods outside this state when he might reasonably have expected such person to use, consume, or be affected by the goods in this state, provided that he also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;

(6) Causing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when he might reasonably have expected that some person would be injured thereby in this state;

(7) Causing tortious injury to any person by a criminal act, any element of which takes place in this state, which he commits or in the commission of which he is guilty of complicity.

(8) Having an interest in, using, or possessing real property in this state;

(9) Contracting to insure any person, property, or risk located within this state at the time of contracting.

Ohio Rev. Code § 2307.382(A).

The complaint alleges that Parrett is an Arizona resident who was a founder, officer, director, and shareholder of National Century, an Ohio corporation. It also alleges that Parrett served as either an officer or director of NPF VI, NPF XII, and the Servicer, all of which were Ohio corporations. The complaint further alleges that Parrett was a member/owner of three Ohio limited liability companies

that had their principal place of business in Ohio (Kachina Inc., South Atlantic Investments, LLC, Thor Capital Holdings, LLC) and was a member/owner of three other out-of-state limited liability companies that had their principal place of business in Ohio (Flohaz Partners, LLC, Healthcare Capital, LLC, Intercontinental Investment Associates).

Parrett argues that the complaint does not allege that she committed any wrongdoing in Ohio. This argument has no merit. The complaint contains exhaustive allegations of fraudulent transactions and wrongdoing that Parrett engaged in while she was an officer of National Century and that caused tortious injury to NPF VI and NPF XII in Ohio. These allegations include, but are not limited to: Parrett helped direct the kiting of billions of dollars of funds in and out of NPF XII's accounts at Bank One in Ohio; Parrett approved the fraudulent issuance of billions of dollars of securities by NPF VI and NPF XII in Ohio; she helped direct NPF VI and NPF XII to purchase worthless healthcare receivables that caused the Ohio corporations to lose billions of dollars; she communicated with Indenture Trustee JPMorgan Chase Bank through the U.S. mail, telephone, email, and facsimile communications originating in Ohio; she formed limited liability companies in Ohio, or with their principal place of business in Ohio, for the purpose of concealing funds that she and the other Founders had looted from NPF VI and NPF XII in Ohio; and she looted $5 million directly from National Century when she executed a promissory note that she never made any payment on. These allegations fully satisfy the Ohio long-arm statute and Southern Machine's three-part test for specific jurisdiction.

Parrett contends that her alleged conduct does not count for purposes of personal jurisdiction under the corporate shield doctrine. The doctrine states that "jurisdiction over the individual officers of a corporation cannot be predicated merely upon jurisdiction over the corporation." Weller v. Cromwell Oil Co., 504 F.2d 927, 929 (6th Cir. 1974). But Parrett is not protected by the doctrine because personal jurisdiction is not based simply upon jurisdiction over National Century. Rather, it is based on all of Parrett's actions that allegedly took place in Ohio or caused injury in Ohio. That she committed the actions in her capacity as an officer of National Century does not prevent the exercise of jurisdiction over her. The Sixth Circuit has addressed this very issue:

While it is true that "jurisdiction over the individual officers of a corporation cannot be

predicated merely upon jurisdiction over the corporation," Weller v. Cromwell Oil Co., 504 F.2d at 929, we hold that the mere fact that the actions connecting defendants to the state were undertaken in an official rather than personal capacity does not preclude the exercise of personal jurisdiction over those defendants. Hence, where an out-of-state agent is actively and personally involved in the conduct giving rise to the claim, the exercise of personal jurisdiction should depend on traditional notions of fair play and substantial justice; i.e., whether she purposely availed herself of the forum and the reasonably foreseeable consequences of that availment.

Balance Dynamics Corp. v. Schmitt Industries, Inc., 204 F.3d 683, 698 (6th Cir. 2000). Upon review of the complaint and its numerous allegations of Parrett's active and personal involvement in looting and defrauding NPF VI and NPF XII, the court finds that the complaint states a *prima facie* basis for exercising personal jurisdiction over Parrett.

## B. Standing

In order to establish standing under the "case or controversy" requirement of Article III of the United States Constitution, a plaintiff: (1) must have suffered some actual or threatened injury due to the alleged illegal conduct; (2) the injury must be fairly traceable to the challenged action; and (3) there must be a substantial likelihood that the relief requested will redress or prevent plaintiff's injury. In re Cannon, 277 F.3d 838, 852-53 (6th Cir. 2002); Grendell v. Ohio Supreme Court, 252 F.3d 828, 832 (6th Cir. 2001).

In the bankruptcy context, a trustee like the UAT "'has only those powers conferred upon him by the Bankruptcy [Code].'" Cannon, 277 F.3d at 853 (quoting Cissell v. American Home Assurance Co., 521 F.2d 790, 792 (6th Cir. 1975)). The Code empowers the trustee to "collect and reduce to money the property of the estate for which such trustee serves." 11 U.S.C. § 704(a)(1). The property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Because causes of action are included in the property interests of the debtor, § 704 of the Code "grants the trustee the exclusive right to assert the debtor's claims." Cannon, 277 F.3d at 853 (citing In re RCS Engineered Prods., 102 F.3d 223, 225 (6th Cir. 1996); In re Van Dresser Corp., 128 F.3d 945, 947 (6th Cir. 1997)). Thus, a trustee "stands in the shoes of the debtor and has standing to bring any action that the bankrupt could have brought had he not filed a petition for bankruptcy." Cannon, 277 F.3d at 853 (citing Melamed v. Lake County Nat'l Bank, 727

F.2d 1399, 1404 (6th Cir. 1984)); <u>see also</u> <u>In re Parmalat Secs. Litig.</u>, 383 F.Supp.2d 587, 594 (S.D.N.Y. 2005) ("A chapter 11 bankruptcy trustee stands in the shoes of the defunct corporation and may assert only the claim that the debtor could have asserted at the moment before it entered bankruptcy.").

Defendants Poulsen and Ayers argue that the UAT lacks standing under the analysis employed by the Second Circuit in <u>Shearson Lehman Hutton, Inc. v. Wagoner</u>, 944 F.2d 114, 120 (2d Cir. 1991). However, this court recently held in its March 18, 2009 Opinion, pp.7-8, that it will not apply the <u>Wagner</u> rule because, as a majority of courts that have addressed the issue have held, the rule confuses standing with the defense of *in pari delicto*. <u>See</u> <u>In re Senior Cottages of America, LLC</u>, 482 F.3d 997, 1003 (8th Cir. 2007) (collecting authorities criticizing <u>Wagoner</u>).

Poulsen and Ayers make the additional standing argument that the UAT's claims are based on injuries suffered by creditors, not by the debtors. This argument is without merit. The claims against the Founders are based on their alleged looting of NPF VI's and NPF XII's assets and their alleged breaches of fiduciary duties owed to NPF VI and NPF XII. These are the very types of harms for which the UAT does have standing to bring claims. <u>See</u> <u>Senior Cottages</u>, 482 F.3d at 1001-1002 (bankruptcy trustee has standing to pursue a breach of fiduciary duty claim for alleged breach by the debtor's fiduciaries); <u>Knauer v. Jonathon Roberts Financial Group, Inc.</u>, 348 F.3d 230, 234 (7th Cir. 2003) (receiver has standing to assert claims "involv[ing] the embezzlement, rather than the sales, step of the Ponzi scheme"); <u>In re Grumman Olson Indus.</u>, 329 B.R. 411, 427 (Bankr. S.D.N.Y. 2005) (trustee may sue dishonest fiduciary).

### C.  In Pari Delicto

Defendants Poulsen and Ayers next argue that the UAT's claims must be dismissed under the doctrine of *in pari delicto*, which "refers to the plaintiff's participation in the same wrongdoing as the defendant." <u>Bubis v. Blanton</u>, 885 F.2d 317, 321 (6th Cir. 1989) (citing <u>Memorex Corp. v. International Business Machines Corp.</u>, 555 F.2d 1379, 1382 (9th Cir. 1977)). When applied, this equitable doctrine bars the plaintiff from recovering damages resulting from his own wrongdoing. <u>Pinter v. Dahl</u>, 486 U.S. 622, 632 (1988); <u>In re Dublin Securities, Inc.</u>, 133 F.3d 377, 380-81 (6th Cir. 1997). The doctrine may bar a bankruptcy trustee who has stepped into the shoes of a wrongdoing debtor from bringing claims

against third party defendants.  Dublin Securities, 133 F.3d at 380.  On a motion to dismiss, the court can dismiss claims as being barred by the *in pari delicto* defense only if the complaint "establishes conclusively" that the defense applies.  Id., 133 F.3d at 380; see also Nisselson v. Lernout, 469 F.3d 143, 154 (1st Cir. 2006) (upholding the dismissal of a complaint on *in pari delicto* grounds when "the factual scenario, as pleaded, [was] clear enough to permit peremptory resolution of the dispositive issue").

The UAT has stepped into the shoes of NPF VI and NPF XII.  According to Poulsen and Ayers, the court should treat NPF VI and NPF XII as wrongdoers because a principal is liable for the conduct of its agents and, thus, the alleged misconduct of agents Poulsen and Ayers must be imputed to NPF VI and NPF XII.  Clark v. Southview Hosp. & Family Health Ctr., 68 Ohio St.3d 435, 438, 628 N.E.2d 46, 48 (Ohio 1994).  Once the wrongdoing is imputed to NPF VI and NPF XII, defendants argue that the UAT is deemed a participant in the wrongdoing and is barred from bringing suit against the Founders.

This argument must be rejected because it is the Founders who are alleged to have caused NPF VI and NPF XII to commit wrongdoing, and, thus, it cannot be said that the Founders are less at fault than NPF VI and NPF XII.  See Dublin Securities, 133 F.3d at 380 (defense of *in pari delicto* available only when defendants are less culpable than the plaintiff); Parmalat, 383 F.Supp.2d at 599 (looting by corporate insiders cannot be imputed to the company); In re Felt Mfg. Co., Inc., 371 B.R 589, 610 (Bankr. D.N.H. 2007) (defense not available to officers and directors seeking to impute their wrongful acts to the corporation).  If accepted, the Founders' argument would allow corporate insiders and fiduciaries to avoid responsibility for their own wrongdoing against their corporations.  See In re HealthSouth Corp. Shareholders Litig., 845 A.2d 1096, 1107 (Del. Ch. 2003) (rejecting insider's attempt to "wield the doctrine of *in pari delicto* to escape liability"); In re Granite Partners, L.P., 194 B.R. 318, 332 (Bankr. S.D.N.Y. 1996) (noting that a rule otherwise would mean that a bankruptcy trustee "could never sue the debtor's insiders on account of their own wrongdoing").  Courts therefore have repeatedly held that the *in pari delicto* defense "does not apply to bar claims against corporate insiders."  In re Amcast Indus. Corp., 365 B.R. 91, 124 (Bankr. S.D. Ohio 2007); see also Floyd v. Hefner, 556 F.Supp.2d 617, 657-658 (S.D. Tex. 2008) (citing cases); In re Student Finance Corp., 335 B.R. 539, 547 (D. Del. 2005)

("*In pari delicto* will not operate to bar claims against insiders of the debtor corporation."); <u>In re Walnut Leasing Co.</u>, No. 99-526, 1999 WL 729267, at *5 (E.D. Pa. Sept. 8, 1999) ("Vis-à-vis their corporations, insiders cannot avoid the consequences of their own handiwork."); <u>In re Oakwood Homes Corp.</u>, 340 B.R. 510, 536 (Bankr. D. Del. 2006) ("*In pari delicto* does not provide a defense for insiders."); <u>In re Greater Southeast Cmty Hosp. Corp.</u>, 333 B.R. 506, 538-39 (Bankr. D. Col. 2005); <u>In re KDI Holdings, Inc.</u>, 277 B.R. 493, 518 (Bankr. S.D.N.Y. 1999) ("[T]he *in pari delicto* doctrine is inapplicable where a cause of action is brought against an insider.").

### D.    Statute of Limitations

#### 1.    Ohio Law Claims

The Founders argue that various claims brought by the UAT must be dismissed as time-barred. For instance, defendant Parrett argues that the tort claims against her are all barred under Ohio's four-year statute of limitations, O.R.C. § 2305.09, and each of the Founders argue that the claims under the Ohio Uniform Fraudulent Transfer Act are likewise barred under a four-year statute of limitations, O.R.C. § 1336.09. They contend that some of the alleged tortious conduct and the alleged fraudulent transfers took place in 1999 and early 2000, more than fours years before the UAT filed its action on November 17, 2004.

This argument overlooks the bankruptcy tolling statute of 11 U.S.C. § 108(a), which gives the trustee two years to file any causes of action that existed at the time of the petition date, which was November 18, 2002. Because the UAT's claims are based on conduct and transfers occurring within four years before the petition date and because the UAT filed its complaint within two years after the petition date, its claims were timely filed.

#### 2.    RICO Claims

Poulsen argues that even with the effect of the tolling statute, the UAT's RICO claims are still barred as to conduct occurring before November 18, 1998. <u>See</u> <u>Rotella v. Wood</u>, 528 U.S. 549, 553 (2000) (a civil RICO action has a four-year limitation period). "The four-year period begins to run when a party knew, or through exercise of reasonable diligence should have discovered, that the party was injured by a RICO violation." <u>Sims v. Ohio Cas. Ins. Co.</u>, 151 Fed. Appx. 433, 435 (6th Cir. 2005)

(citing <u>Rotella</u>, 528 U.S. at 553-55); <u>see</u> <u>also</u> <u>Bygrave v. Van Reken</u>, No. 99-1702, 2000 WL 1769586, at *3 (6th Cir. Nov. 14, 2000) (noting that a plaintiff need not discover both the RICO "injury" and the "pattern of racketeering activity" in order to trigger the four-year statute of limitations).

Here, the complaint alleges that the Founders fraudulently concealed their conduct such that any pre-November 18, 1998 wrongdoing could not have been discovered until well after the start of the limitations period. Poulsen responds by arguing that complaint alleges "red flags" by which NPF VI's and NPF XII's independent director should have discovered the alleged RICO injuries before November 18, 1998. The red flags include reports by rating agencies, periodic reports issued to investors, and audited financial statements. There are two reasons why Poulsen's argument does not work. First, the complaint alleges that those reports and statements were the very documents which concealed the fraudulent conduct. The complaint, for example, alleges that the rating agencies "had long been deceived" and that the audited financial statements gave "clean" reports failing to disclose the underlying fraud. <u>See</u> UAT Compl., ¶¶ 800, 911. Thus, the complaint does not support a conclusion that the independent director should have discovered the fraud by reviewing the documents. Second, a majority of the documents were generated after November 18, 1998, so even if the fraud should have been discovered through the documents, it would not alter the limitations period. <u>See</u> UAT Compl., ¶¶ 190-205, 305, 801-15, 944, 954, 971 (discussing reports and audits issued 1999 through 2002).

### 3. Bankruptcy Code Claims

The Founders next argue that the UAT's fraudulent transfer claims under 11 U.S.C. § 548(a)(1) should be dismissed because they seek to recover transfers made beyond the statute's one-year look-back period.[1] However, the complaint expressly limits the fraudulent transfer claims to only those transfers made within the look-back period. <u>See</u> UAT Compl., ¶¶ 730-33. Thus, the claims under § 548 are timely.

---

[1] Since the time the UAT filed this action, Congress amended § 548(a)(1) to extend the look-back period to two years.

## IV.    SUFFICIENCY OF THE CLAIMS

### A.    RICO Claims

The UAT asserts claims under the federal RICO statute, which provides in relevant part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  The same conduct is prohibited by Ohio's Corrupt Activities Act.  O.R.C. § 2923.32(A)(1).  In order to state a RICO claim, plaintiff must plead the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985); see also Moon v. Harrison Piping Supply, 465 F.3d 719, 723 (6th Cir. 2006); Universal Coach, Inc. v. New York City Transit Authority, Inc., 90 Ohio App.3d 284, 291, 629 N.E.2d 28, 32 (Ohio Ct. App. 1993).

An "enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  The Supreme Court has stated that an enterprise is a group "associated together for a common purpose of engaging in a course of conduct" and "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981).  "The hallmark of an enterprise is structure. . . . [T]here must be some structure, to distinguish an enterprise from a mere conspiracy, but there need not be much.  A RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making.  The continuity of an informal enterprise and the differentiation among roles can provide the requisite structure to prove the element of enterprise."  United States v. Rogers, 89 F.3d 1326, 1337 (7th Cir. 1996) (citations and quotation marks omitted) (quoted with approval by U.S. v. Johnson, 440 F.3d 832, 840 (6th Cir. 2006)).

The UAT alleges that the enterprise consisted of Lance Poulsen, Donald Ayers, and Rebecca Parrett, as well as defendants JPMorgan, Bank One, and Credit Suisse.  The complaint identifies Poulsen

as the "head," "leader," and "principal architect" of the enterprise, whose purpose was to misappropriate the assets of NPF VI and NPF XII. Poulsen is alleged to be the person who gave "primary direction" to the enterprise and required that everyone else involved in the fraudulent enterprise report to him. See UAT Compl., ¶¶ 411-13, 498-500, 848. The alleged roles of Ayers and Parrett were to run the financial servicing aspects of the enterprise. Ayers and Parrett are alleged to have, among other things, arranged for purchasing accounts receivable, tracked receivables, and provided instructions to disburse and transfer funds in and out of the accounts of NPF VI and NPF XII. JPMorgan and Bank One served as trustees over the accounts held by the enterprise and allegedly executed the instructions to disburse or transfer funds. Credit Suisse's alleged role was in the note-issuance side of the enterprise's operations.

Poulsen argues that the complaint does not sufficiently allege the existence of an enterprise, but his argument is not that the enterprise lacked structure or purpose. Rather, he argues that the enterprise alleged by the UAT is too massive, too grand in scale to be believed. It is absurd, Poulsen argues, that a couple of individuals could have managed to enlist the help of three global financial institutions, while also involving two leading accounting firms and two prominent rating agencies, in committing a nearly $3 billion fraud. But the court finds that whether Poulsen thinks the alleged enterprise is too great to be believed is irrelevant because a massive fraud is exactly what the complaint alleges and what the court must accept as true for purposes of the motion to dismiss.

Next, Poulsen and Parrett argue that the predicate acts of fraud are not alleged with sufficient particularity. Under Rule 9(b), Fed. R. Civ. P., averments of fraud and the circumstances constituting the fraud must be stated with "particularity." The court finds that the complaint easily satisfies this standard. The complaint alleges that the Founders committed mail and wire fraud by instructing the Indenture Trustees to transfer funds in a manner prohibited by the Master Indentures governing the NPF VI and NPF XII programs. According to the complaint, both the instructions and the transfers were done though interstate mail and electronic communications. The Founders allegedly directed these fraudulent transfers from May 1998 to November 2002, kiting funds between accounts to give the appearance that each account had sufficient funds on whichever day the account's balance was

periodically checked. The complaint alleges that the Founders kited billions of dollars to conceal from NPF VI and NPF XII that they were misappropriating corporate assets. The predicate acts of mail and wire fraud are described with much particularity, even to the point of providing detailed charts of a 3-month sampling of 58 fraudulent transfers that the Founders directed in 1999. See, e.g., UAT Compl., ¶ 421.

Finally, Poulsen argues that the RICO claims must fail because the alleged RICO enterprise did not harm investors. Poulsen argues that, as a factual matter, many of the initial investors in NPF VI and NPF XII received the monies due them. This argument must be rejected. First, Poulsen makes factual assertions not found in the complaint.[2] Second, the harm for which the complaint seeks redress is the Founders' alleged looting of NPF VI's and NPF XII's assets, not the harm done to investors.

Accordingly, the court finds that the complaint sufficiently alleges federal and state RICO claims against the Founders.

### B.  Fraud

The elements of a fraud claim are: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. Russ v. TRW, Inc., 59 Ohio St.3d 42, 49, 570 N.E.2d 1076, 1083-84 (Ohio 1991).

Again Rule 9(b) requires that averments of fraud and the circumstances constituting the fraud be stated with "particularity." To comply with Rule 9(b), "a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" Walburn v. Lockheed Martin Corp., 431 F.3d 966, 972 (6th Cir. 2005) (quoting Coffey v. Foamex L.P., 2 F.3d 157,

---

[2]    Even if Poulsen is correct that initial investors in the mid-1990s were paid, this would hardly be surprising. The complaint alleges that the defendants operated a Ponzi scheme and it was later investors who suffered most of the loss.

161-62 (6th Cir. 1993)). Scienter may be averred generally and inferred from circumstantial evidence. <u>See</u> Fed. R. Civ. P. 9(b); <u>S.E.C. v. Blackwell</u>, 291 F.Supp.2d 673, 696 (S.D. Ohio 2003).

Though the Founders argue that the complaint fails to allege fraud with particularity, the court finds otherwise. The 400-page complaint contains extensive allegations as to how, when, and why the Founders defrauded NPF VI and NPF XII, and a full recital of those allegations here is not necessary. To summarize, the complaint alleges fraud both by affirmative misrepresentations and by failure to disclose. With respect to fraud by affirmative misrepresentations, the complaint alleges that the Founders signed the Master Indentures and helped prepare certain other offering documents, which falsely represented to NPF VI and NPF XII how the note programs would be operated. <u>See</u> UAT Compl., ¶¶ 585, 853-54. Among the many alleged misrepresentations were that: the assets of NPF VI and NPF XII would be used to buy healthcare receivables that were eligible for purchase under the criteria of the Master Indentures; the reserve accounts would be maintained at certain levels; and withdrawals from and deposits into the accounts would only be made under the conditions set forth in the Master Indentures. <u>See</u> UAT Compl., ¶¶ 16-37, 854. The complaint alleges that for many years the Founders routinely, knowingly, and intentionally engaged in conduct that violated the Master Indentures. They allegedly arranged for the purchase of billions of dollars of ineligible receivables, commingled the assets of NPF VI and NPF XII, directed impermissible withdraws from NPF VI and NPF XII accounts, and ultimately orchestrated the funds belonging to NPF VI and NPF XII to be secretly deposited with companies in which the Founders had an ownership interest.

With respect to fraud by failure to disclose, the complaint alleges that the Founders were officers of NPF VI and NPF XII and had a fiduciary duty to disclose to their principals any information within their knowledge that was material to NPF VI's and NPF XII's business interests. <u>See</u> <u>State v. Warner</u>, 55 Ohio St.3d 31, 54, 564 N.E.2d 18, 40 (Ohio 1990) (citing <u>Chiarella v. United States</u>, 445 U.S. 222, 228 (1980)). The complaint satisfies Rule 9(b) in identifying exactly what information the Founders should have disclosed to NPF VI and NPF XII, including that: the assets of NPF VI and NPF XII were

used to purchase healthcare receivables that were not eligible for purchase under the Master Indentures[3]; impermissible withdraws were being made from NPF VI and NPF XII accounts; the assets of NPF VI and NPF XII were being commingled; account reserves were often not at the required levels; and the Founders were self dealing by using the assets of NPF VI and NPF XII to purchase receivables in healthcare companies in which they had an ownership interest.

Defendants Poulsen and Ayers argue that element of reliance is not satisfied because their alleged knowledge of the fraud should be imputed to NPF VI and NPF XII.  It is true that a principal is generally charged with the knowledge of its agents.  Losito v. Kruse, 136 Ohio St. 183, 187-88, 24 N.E.2d 705, 707 (Ohio 1940); Clark v. Southview Hosp. & Family Health Ctr., 68 Ohio St.3d 435, 438, 628 N.E.2d 46, 48 (Ohio 1994).  Nonetheless, the complaint sufficiently invokes an exception to the rule – the adverse interest exception, whereby the principal is not charged with the knowledge or conduct of the agent in a matter when the agent's interests are adverse to those of the principal.  First Nat'l Bank of New Bremen v. Burns, 88 Ohio St. 434, 103 N.E. 93 (Ohio 1913); Burger v. Board of Liquor Control, 135 N.E.2d 786, 787 (Ohio Ct. App. 1955); see also Collins v. Pioneer Title Ins. Co., 629 F.2d 429, 436 (6th Cir. 1980).  Under this exception, the independent fraud of an agent acting "on his own account" will not ordinarily be imputed to the principal.  Aetna Cas. and Sur. Co. v. Leahey Const. Co., 219 F.3d 519, 541-42 (6th Cir. 2000) (quoting American Export & Inland Coal Corp. v. Matthew Addy Co., 112 Ohio St. 186, 198 147 N.E. 89, 92-93 (Ohio 1925)).  Here, the Founders' alleged conduct, which includes misappropriation of NPF VI's and NPF XII's assets and breaches of fiduciary duty, is the type of conduct traditionally considered adverse to the principal.  See Baena v. KPMG LLP, 453 F.3d 1, 8 (1st Cir. 2006) (stating that looting of corporate assets is "the classic example" of when the adverse interest exception should be applied); Beck v. Deloitte & Touche, 144 F.3d 732, 737 (11th Cir. 1998); In re Fuzion Technologies Group, Inc., 332 B.R. 225, 237 (Bankr. S.D.

---

[3] The complaint cites a variety of ways that the receivables being purchased were ineligible under the Master Indentures: they were purchased from parties related to National Century or its principals; they exceeded the maximum aging requirements; they were billed to payors that were not highly rated; they lacked supporting documentary information; and they exceeded concentration limits on buying too many receivables of the same class of receivables or from the same provider.

Fla. 2005).

### C.     Breach of Fiduciary Duty

A breach of fiduciary duty claim has three elements: (1) the existence of a duty arising from a fiduciary relationship, (2) a failure to observe such duty, and (3) an injury proximately resulting therefrom.  See Strock v. Pressnell, 38 Ohio St.3d 207, 216, 527 N.E.2d 1235, 1243 (1988); McConnell v. Hunt Sports Ent., 132 Ohio App.3d 657, 687, 725 N.E.2d 1193, 1215 (Ohio Ct. App. 1999).  The complaint alleges that the Founders were corporate officers of NPF VI and NPF XII and had a duty not to waste corporate assets.  The complaint alleges that the Founders breached their duties and caused injury by misappropriating the assets of NPF VI and NPF XII.

Defendants Poulsen and Ayers argue that the allegations do not support the existence of a duty. However, the complaint alleges that the Founders, as corporate officers, owed fiduciary duties to NPF VI and NPF XII.  "It is well-established that a corporate officer occupies a position of trust in relation to his corporation."  Wing Leasing, Inc. v. M & B Aviation, 44 Ohio App.3d 178, 181, 542 N.E.2d 671, 676, (Ohio Ct. App. 1988).  Thus, a corporate officer or director has a fiduciary relationship to the corporation and carries a duty not to waste or mismanage corporate funds.  Geygan v. Queen City Grain Co., 71 Ohio App.3d 185, 191, 593 N.E.2d 328, 331 (Ohio Ct. App. 1991); see also Ohio Drill & Tool Co. v. Johnson, 625 F.2d 738, 742 (6th Cir. 1980).

### D.     Conspiracy

A civil conspiracy is "'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.'"  Kenty v. Transamerica Premium Ins. Co., 72 Ohio St.3d 415, 419, 650 N.E.2d 863, 866 (Ohio 1995) (quoting LeFort v. Century 21-Maitland Realty Co., 32 Ohio St.3d 121, 126, 512 N.E.2d 640, 645 (Ohio 1987)). The elements of a civil conspiracy claim are: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy."  Universal Coach, Inc. v. New York City Transit Auth., Inc., 90 Ohio App.3d 284, 292, 629 N.E.2d 28, 33 (Ohio Ct. App. 1993).

Though Poulsen contends that the complaint fails to allege that he entered into an agreement

with other defendants, the court finds that the complaint adequately alleges the existence of a malicious combination. The complaint expressly alleges that in February and May 1998, "Poulsen solicited an agreement from each of the other Defendants to operate and manage the business of [NPF VI and NPF XII], not in compliance with the Master Indentures as they were contractually required to do, but rather according to extra-contractual operating procedures directed by Poulsen. . . . Defendants agreed to ignore the mandates of the Master Indenture, and, instead, agreed that the direction and operation of [the enterprise] would come from Poulsen directly in order to loot the trust funds belonging to [NPF VI and NPF XII] and pad their own pockets." UAT Compl., ¶¶ 417, 460.

Even putting aside the complaint's clear allegation of an agreement, the complaint also supports the inference that Poulsen and the other Founders, along with the Indenture Trustees and Credit Suisse, had a common understanding and design to misappropriate the assets of NPF VI and NPF XII. The element of a malicious combination "does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act." Gosden v. Louis, 116 Ohio App.3d 195, 219, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996); see also Aetna, 219 F.3d at 538 (discussing a conspiracy claim under Ohio law). The complaint alleges at length how the Founders worked in cooperation with each other and with the Indenture Trustees and Credit Suisse over the course of at least four years to execute a common, understood scheme of surreptitiously transferring the funds of NPF VI and NPF XII into healthcare companies owned by the Founders.

Parrett argues that the conspiracy claim fails to allege the existence of an unlawful act on her part. The complaint, however, alleges that "Parrett provided instructions to the Trustee to disburse funds and move money in and out of the [NPF VI and NPF XII] trust accounts." UAT Compl., ¶¶ 411, 454. These instructions are alleged to have been unlawful because they fraudulently violated the Master Indentures and were given to hide shortfalls in the reserve accounts of NPF VI and NPF XII's accounts. The complaint further alleges that Parrett directly stole funds from NPF VI and NPF XII when she and the other Founders authorized large monetary transfers from NPF VI and NPF XII accounts to healthcare companies owned by the Founders. See UAT Compl, ¶¶ 631-718.

### E.    Aiding and Abetting[4]

The elements of an aiding and abetting claim are: "(1) knowledge that the primary party's conduct is a breach of duty and (2) substantial assistance or encouragement to the primary party in carrying out the tortious act." <u>Andonian v. A.C. & S., Inc.</u>, 97 Ohio App.3d 572, 574-75, 647 N.E.2d 190, 191-92 (Ohio Ct. App. 1994); <u>see also</u> <u>Aetna</u>, 219 F.3d at 533. The complaint alleges that each of the Founders assisted one another and the Indenture Trustees in engaging in conduct that they knew amounted to fraud and breaches of fiduciary duty.

None of the Founders contest the first element. Parrett argues that the second element of substantial assistance is not alleged. This argument is not convincing. The complaint alleges several ways in which Parrett substantially assisted the tortious conduct, including: she followed Poulsen's directions in instructing the Indenture Trustees to kite funds between NPF VI and NPF XII accounts; she arranged for the purchase of ineligible receivables; she helped prepare reports which falsely concealed violations of the Master Indentures; and she authorized transfers of corporate funds to companies in which she and the other Founders had an ownership interest. The complaint also alleges that Parrett provided substantial assistance by failing to disclose any of the unlawful conduct to the independent director of NPF VI and NPF XII. <u>See</u> <u>Lerner v. Fleet Bank, N.A.</u>, 459 F.3d 273, 295 (2d Cir. 2006) (holding that a failure to act constitutes substantial assistance when there is a duty to act), <u>Cromer v. Berger</u>, 137 F.Supp.2d 452, 470 (S.D.N.Y. 2001) (holding that substantial assistance exists when a defendant "helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed").

### F.    Breach of Contract

The UAT asserts a claim for breach of contract against Parrett and Ayers. The complaint alleges

---

[4]    The case law is unclear about whether a cause of action exists in Ohio for civil aiding and abetting. <u>See</u> <u>Pavlovich National City Bank</u>, 435 F.3d 560, 570 (6th Cir. 2006) ("It is unclear whether Ohio recognizes a common law cause of action for aiding and abetting tortious conduct."). This court has held in prior orders that it will decline to dismiss the aiding and abetting claims on a Rule 12(b)(6) motion, because it cannot be said conclusively that Ohio law does not recognize such a cause of action. <u>See</u> Dec. 19, 2007 Opinion, p. 35; May 7, 2007 Opinion, p. 58; Oct. 3, 2006 Opinion, pp. 15-17.

that National Century made loans of $5 million to Parrett and $2.55 million to Ayers, and the loans were secured by stock pledges of National Century stock. According to the complaint, Parrett and Ayers both executed promissory notes promising to repay their respective loans, but they failed to make any payments on the loans.

The elements of a breach of contract claim are "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." Jarupan v. Hanna, 173 Ohio App.3d 284, 294, 878 N.E.2d 66, 73 (Ohio Ct. App. 2007) (citing cases). There is no dispute that the complaint pleads the elements of a breach of contract claim. The complaint alleges that both Parrett and Ayers entered into loan agreements with National Century, that National Century performed by loaning money, and that Parrett and Ayers breached the agreements and injured National Century by failing to repay the loans.

Parrett argues that the complaint does not plead the claim with "specific details." See Parrett Mot. to Dismiss, p. 19. The breach of contract claim, however, is not subject to the heightened pleading standard of Rule 9(b). Even so, the complaint does recite the material terms of the agreement, specifically alleging that Parrett executed a promissory note on December 22, 2000 whereby National Century loaned her $5 million and she promised National Century to repay the $5 million loan with 6% interest by June 22, 2001. The complaint alleges that Parrett never made a payment on the loan.

Ayers argues that the claim should be dismissed because plaintiff "fail[ed] to attach copies of these notes to the Amended Complaint." See Ayers Mot. to Dismiss, p. 18. This argument too is meritless, as there is no requirement that the promissory notes be attached to the complaint. A party asserting a claim for breach of contract need only make "a short and plain statement of the claim showing that the pleader is entitled to relief," see Fed. R. Civ. P. 8(a)(2), which the complaint here has done. The complaint alleges that Ayers entered into loan agreements with National Century on April 1 and August, 2001 for a total of $2.55 million with interest and signed promissory notes promising to pay back the loans, but never made a payment on the loans.

### G. Fraudulent Transfers

#### 1. Bankruptcy Code

The complaint alleges that the Founders caused National Century and its affiliates to make numerous transfers from March 1999 to October 28, 2002 to healthcare companies owned by the Founders. As to the transfers made within one year of when National Century filed for bankruptcy, the complaint alleges that the transfers are avoidable under § 548(a)(1) of the Bankruptcy Code, which allows the trustee to avoid any transfer of an interest of the debtor in property if the debtor:

> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>
> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C.A. § 548(a)(1).

Defendants Poulsen and Ayers argue that § 548(a)(1) applies only to the initial transferee and that the claims must be dismissed because the transfers went to companies owned by the Founders and not to the Founders directly. Section 550 provides that the trustee may recover an avoidable transfer under § 548 from "the initial transferee of such transfer or the entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1). The UAT alleges that the funds went first to the Founders' companies as a sham to make the transfers appear on the books like purchases of accounts receivable

from legitimate healthcare companies. According to the complaint, the funds were really transferred for the benefit of the Founders, who exercised dominion and control over the funds. The Founders' companies allegedly served as "mere conduits" whose initial receipt of the funds does not prevent the trustee from recovering the transfers from the Founders, if the allegations of the complaint are true. See In re Hurtado, 342 F.3d 528, 533-34 (6th Cir. 2003) ("An initial transferee must have 'dominion' over the funds to be an 'initial transferee' under the statute."); In re Baker & Getty Fin. Servs., Inc., 974 F.2d 712, 722 (6th Cir. 1992) (holding that fact that funds were "temporarily lodged" in agent's account did not make the agent an initial transferee); In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, 130 F.3d 52, 57-58 (2d Cir. 1997); Bonded Fin. Servs. Inc. v. European Am. Bank, 838 F.2d 890, 893-94 (7th Cir. 1988).

### 2. Ohio Uniform Fraudulent Transfer Act

The complaint also asserts claims under the Ohio Uniform Fraudulent Transfer Act in relation to the March 1999 to October 28, 2002 transfers. In language similar to § 548(a)(1) of the Bankruptcy Code, the Act enables a creditor to avoid a transfer made by the debtor if it was made "with actual intent to hinder, delay, or defraud any creditor of the debtor" or if it was not made for reasonably equivalent value and the debtor either was engaged in a business for which its remaining assets were unreasonably small in relation to the transfer or the debtor intended to incur, or believed it would incur, debts beyond its ability to pay. O.R.C. § 1336.04(A). Further, the Act provides that a prior creditor may avoid a transfer that is not made for reasonably equivalent value if the debtor is insolvent or becomes insolvent because of the transfer. O.R.C. § 1336.05(A).

Ayers argues that the complaint does not allege the UAT's status as a "creditor." The Act defines a "creditor" as "a person who has a claim." O.R.C. § 1336.01(D). A "claim" is a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." O.R.C. § 1336.01(C). Here, the complaint alleges that the bankruptcy court's liquidation plan transferred to the UAT all of the legal causes of action belonging to National Century and its subsidiaries prior to bankruptcy. Thus, the UAT stands in the shoes of National Century and its subsidiaries. The complaint

alleges that National Century and its subsidiaries were creditors under § 1336.01(D) because they had claims, or rights to payment, against the Founders based on unauthorized transfers the Founders allegedly made out of accounts belonging to National Century and its subsidiaries. The court finds that the complaint therefore sufficiently alleges the UAT's status as a creditor.

Parrett argues that the complaint does not specifically connect her to any of the alleged fraudulent transfers. This argument ignores the plain factual assertions of the complaint, which expressly link Parrett to the following transfers: cash transfers occurring on March 8, 1999, April 8, 1999, July 14, 1999, February 22 and 28, 2000, December 22, 2000, and October 28, 2002, as well as stock transfers occurring in March 1999, February 2000, and March 2001.

### 3. Unlawful Dividend

Under Ohio law, "[n]o dividend or distribution shall be paid to the holders of shares of any class . . . when the corporation is insolvent or there is reasonable ground to believe that by such payment it would be rendered insolvent." O.R.C. § 1701.33(C). A shareholder who knowingly receives such a dividend or distribution "shall be liable to the corporation for the amount received by that shareholder that is in excess of the amount that could have been paid or distributed without violation of law or the articles." O.R.C. § 1701.95(D). The complaint alleges that upon information and belief, each of the Founders received periodic dividend payments from National Century when the corporation was insolvent and in amounts that exceeded what National Century could have paid without violating O.R.C. § 1701.33(C).

Ayers alone challenges this claim. He argues that the complaint fails to allege that any dividends were paid. Though the complaint fails to specify the exact dates and amounts of the dividend payments, this claim is subject to Rule 8's liberal pleading standard and the complaint adequately alleges that National Century did pay dividends to the Founders. See UAT Compl., ¶¶ 718, 748. The UAT will have the opportunity through discovery to determine the dates and amounts of the alleged dividend payments.

### 4. Unjust Enrichment

Finally, the UAT asserts a claim for unjust enrichment. A claim for unjust enrichment has the

following elements: (1) a benefit upon the defendant, (2) the defendant's knowledge of the benefit, and (3) that it would be unjust for the defendant to retain the benefit without payment.  Hambleton v. R.G. Barry Corp., 12 Ohio St.3d 179, 183, 465 N.E.2d 1298, 1302 (Ohio 1984); Hiram College v. Courtad, 162 Ohio App.3d 642, 646, 834 N.E.2d 432, 435 (Ohio Ct. App. 2005).  "Recovery under unjust enrichment is designed to compensate the plaintiff for the benefit he has conferred upon another, not to compensate him for a loss suffered."  Jones v. Jones, 179 Ohio App.3d 618, 629, 903 N.E.2d 329, 337 (Ohio Ct. App. 2008).

The complaint alleges that the March 1999 to October 28, 2002 fraudulent transfers were made as a benefit to the Founders, with their knowledge.  It would be unjust for the Founders to retain the transfers, the UAT argues, because no benefit was conferred on National Century, NPF VI, or NPF XII in exchange or consideration for the transfers and because the Founders have never repaid the funds they obtained through the fraudulent transfers.

Repeating an argument he made against the fraud claim, Ayers argues that his alleged wrongful conduct should be imputed to plaintiff because a principal is responsible for the conduct of its agents acting within the scope of their employment.  But again, the conduct of Ayers, namely his alleged misappropriation of corporate assets through the fraudulent transfers, is the type of conduct that fits well within the adverse exception to the general rule of imputation.  See Aetna Cas. and Sur. Co. v. Leahey Const. Co., 219 F.3d 519, 541-42 (6th Cir. 2000); Baena v. KPMG LLP, 453 F.3d 1, 8 (1st Cir. 2006); Beck v. Deloitte & Touche, 144 F.3d 732, 737 (11th Cir. 1998).

Poulsen argues that the unjust enrichment claim fails because the complaint does not allege that he retained any benefit.  This argument is contradicted by the repeated allegations in the complaint alleging that Poulsen never paid back to National Century, NPF VI, or NPF XII any of the funds that were fraudulently transferred to him.

## V.       CONCLUSION

For the reasons stated above, the Founders' motions to dismiss the UAT's complaint (docs. 577, 580 in Case No. 2:03-md-1565; docs. 44, 45, 46, 183, 184 in Case No. 2:04-cv-1090) are DENIED in

their entirety.

                                      s/ James L. Graham
                                      JAMES L. GRAHAM
                                      United States District Judge

DATE: May 11, 2009