IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: National Century Financial Enterprises, Inc. Financial Investment Litigation | : | |
|  | : | Case No. 2:03-md-1565 |
|  | : | Judge James L. Graham |
|  | : | Magistrate Judge Abel |
|  | : | |

# Order

This matter is before the Magistrate Judge on the December 29, 2008 omnibus motion for sanctions against certain plaintiffs for discovery abuses (doc. 1445) of Credit Suisse Securities (USA) LLC, formerly known as Credit Suisse First Boston LLC, and Credit Suisse, New York Branch, formerly known as Credit Suisse First Boston, New York Branch ("Credit Suisse").

Credit Suisse seeks sanctions against 217 of the 231 plaintiffs in three separate complaints, which have been consolidated for discovery before this Court.[1] Credit Suisse has identified the plaintiffs for which it is seeking sanctions in Appendix 1 to its memorandum of law in support of its motion.

---

[1]The District of Arizona complaints are: *City of Chandler, et al. v. Bank One, N. A.., et al.*, 03-cv-1220: *State of Arizona, et al. v. Credit Suisse First Boston Corp., et al.*, 03-cv-1619; and *Crown Cork & Seal Company, Inc. Master Retirement Trust, et al. v. Credit Suisse First Boston Corp., et al.*, 03-cv-284 (collectively, the "Arizona Complaints").

Credit Suisse maintains that certain plaintiffs have engaged in serious and pervasive discovery abuses, which include a complete failure by most plaintiffs to produce any documents, spoliation, failure to preserve documents, and inexcusable and prejudicial delays in the production of clearly responsive and non-privileged communications. Credit Suisse seeks sanctions, including dismissal of the actions with prejudice, pursuant to Rules 16(f) and 37(b) and (c) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers. If the Court determines that sanctions short of dismissal of prejudice are warranted, Credit Suisse asks the Court to:

- give an adverse inference jury instructions;

-  to deem facts contained in certain late-produced documents by PIMCO, Ambac, and GMO, identified in Credit Suisse's Appendix 2's as established;

- preclude plaintiffs from presenting any evidence to deny the facts deemed established and the adverse inference instruction;

- exclude Ofivamo's selective and inexcusably late production of audiotapes; and,

- order monetary sanctions.

Credit Suisse maintains that 212 out of the 231 Arizona plaintiffs have not produced a single piece of paper in this case. Credit Suisse contends that it is simply not credible that 212 plaintiffs had no responsive documents because investment advisors have produced communications between themselves and many of the plaintiffs or documents referencing such communications. Credit Suisse argues that the failure of these

plaintiffs to produce any documents demonstrates that either they failed to produce documents in their possession or that they did not preserve the documents for purposes of the litigation they filed.

Credit Suisse asserts that six of those plaintiffs and/or their investment advisors–San Paolo, PIMCO, III Finance, Alliance Capital Management, Lincoln Capital Management, and Omaha–are guilty of spoliation and failure to preserve documents to a substantial degree. Credit Suisse also argues that at least four plaintiffs and/or investment advisors–PIMCO, Ambac, Ofivalmo, and GMO–inexcusably delayed their production of documents. According to Credit Suisse, these four plaintiffs withheld key documents during discovery and only made those materials available to it after discovery had closed or so close to the discovery cutoff as to render the production useless.

Credit Suisse contends that plaintiffs' discovery abuses have compromised its opportunity to examine the relevant records, to question witnesses about those records, and to defend itself fully and fairly against plaintiffs' claims.

Credit Suisse also argues that the Arizona plaintiffs have improperly denied it information concerning their document production and preservation efforts. According to Credit Suisse, the Arizona plaintiffs have failed to state whether they issued a "litigation hold" to preserve relevant evidence when NCFE collapsed in November 2002. Although counsel for the Arizona plaintiffs maintain that they advised their clients to retain all documents, including email, related to NCFE and the NPF Notes, they have refused to provide any additional information that would demonstrate whether they took steps to

preserve those documents. Credit Suisse further argues that April 25, 2003 was much too late for plaintiffs to begin implementing a litigation hold because their duty to preserve evidence arose when they first contemplated litigation relating to NCFE, which was as early as October or November 2002.

## I. When Sanctions are Warranted

This Court possesses inherent authority to sanction bad-faith conduct without regard to whether such conduct could be sanctioned under other applicable rules or statutes. *See First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 513 (6th Cir. 2002). Determination of the correct sanction for discovery misconduct is left to the broad discretion of the trial court. *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 642 (1976). Courts must consider the state of mind of the party who loses or destroys documents when determining whether the imposition of sanctions is appropriate. Courts evaluate conduct on a "continuum of fault," ranging "from innocence through the degrees of negligence to intentionality." *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009)(quoting *Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir. 1988)). Absent exceptional circumstances, courts generally do not dismiss an action or permit an adverse inference without consideration of whether the party acted in bad faith.

Credit Suisse argues that because plaintiffs' repeated and dilatory document preservation and production failures were not excusable or beyond their control, dismissal, or in the alternative, an adverse instruction are warranted.

## A. Dismissal

When evaluating whether dismissal is an appropriate sanction, courts consider whether the party's failure is due to willfulness, bad faith, or fault; whether the adversary was prejudiced by the dismissed party's conduct; whether the dismissed party was warned that failure to cooperate could lead to dismissal; and whether less drastic sanctions were imposed or considered before dismissal was ordered." *See U.S. v. Reyes*, 307 F.3d 451, 458 (6th Cir. 2002) (quoting *Knoll v. Am. Tel. & Tel. Co.*, 176 F.3d 359, 363 (6th Cir.1999)). "Although no one factor is dispositive, dismissal is proper if the record demonstrates delay or contumacious conduct." *Id.* Dismissal for failing to cooperate in discovery is a "sanction of last resort that may be imposed only if the court concludes that a party's failure to cooperate in discovery is due to willfulness, bad faith, or fault." *Patton v. Aerojet Ordnance Co.*, 765 F.2d 604, 607 (6th Cir. 1985).

Those courts which have imposed the sanction of dismissal have done so when a party's conduct has been egregious.  For instance, in *Bryant v. U.S., ex rel. U.S.Postal Service*,  2006 WL 305661 at*3, 166 Fed. Appx. 207 (6th Cir. 2006), Sixth Circuit held upheld the imposing the sanction of dismissal pursuant to Fed. R. Civ. P. 37(b)(2) based on the plaintiff's failure to comply with the defendant's discovery requests. The *Bryant* plaintiff could not remember her current treating physician, any of the details of her eight past hospitalizations for back pain, or where she had her pain medication prescriptions filled. She also could not remember pertinent details about a previous accident, including the city where the accident occurred and the defendant involved in a

previous lawsuit. Plaintiff failed to submit any evidence showing that the plaintiff suffered from memory loss. Under these circumstances, the *Bryant* Court found that the sanction of dismissal was warranted.

In *Leon v. IDX Systems Corporation*, 464 F.3d 951 (9th Cir. 2006), the Ninth Circuit concluded that the employee's destruction of data on his employer-owned laptop amounted to willful spoliation of evidence and supported dismissal as a sanction. The district court had concluded that the destruction of data amounted to willful spoliation because the plaintiff knew he was under a duty to preserve all data on his laptop, but he intentionally deleted many files and then wrote a program to write over the deleted documents. *Id* at 959.

In *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir, 2009), the Sixth Circuit abandoned the application of state law to spoliation claims. Instead, courts should apply federal law in cases concerning spoliation of evidence, which is derived from a court's inherent power to control the judicial process. Spoliation is "the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Zubulake v. UBS Warburg, LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004). A party can be sanctioned for destroying evidence if it had a duty to preserve it. *Zubulake v. USB Warbug, LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003). The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be

relevant to future litigation. *Id.* Here, the parties were on notice by October 2002 that future litigation concerning the collapse of NCFE was likely.

### B. Adverse Inference

Under federal law, "[a]ny adverse inference from spoliation, while not entirely dependant on bad faith, is based on the spoliator's mental state." *Joostberns v. United Parcel Services, Inc.*, 166 Fed. Appx. 783, 797 (6th Cir. 2006)(citing *Nation-Wide Check Corp., Inc. v. Forest Hills*, 692 F.2d 214, 219 (1st Cir.1982)). Generally, a court will not impose an adverse inference with respect to destroyed evidence, unless the party did so in bad faith. *O'Brien v. Ed Donnelly Enterprises, Inc.*, No. 2:04-cv-85, 2006 WL 2583327, at *3 (S.D. Oh. Sep. 5, 2006) (citing *Eaton Corp v. Appliance Valves Corp.*, 790 F.2d 874, 878 (Fed. Cir. 1986); *Coates v. Johnson & Johnson*, 756 F.2d 524, 551 (7th Cir.1985); *S.C. Johnson & Son v. Louisville & Nashville Railroad Co.*, 695 F.2d 253, 258-59 (7th Cir.1982); *Valentino v. United States Postal Service*, 674 F.2d 56, 73 n. 31 (D.C.Cir.1982); and *Vick v. Texas Employment Commission*, 514 F.2d 734, 737 (5th Cir.1975)); *but see Residential Funding Corp. v. Degeorge Financial Corp.*, 306 F.3d 99, 108 (2nd Cir. 2002)("The sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence.")

### II. Discussion

### A. Failure to Produce Documents

Credit Suisse maintains that 212 of the 231 Arizona plaintiffs failed to produce any documents in response to its August 31, 2007 First Request for Production of Docu-

ments or its April 25, 2008 Second Request for Production of Documents. Credit Suisse argues that documents produced by plaintiffs' investment advisors are not a substitute for plaintiffs' obligations to preserve, search for, and produce their own responsive documents. Credit Suisse further argues that there must be internal communications regarding the information plaintiffs were receiving from their investment advisors about NCFE and who they thought was to blame for its collapse. Credit Suisse also argues that because plaintiffs failed to produce documents, it has no way to assess the Arizona plaintiffs' internal communications regarding what their investment advisors were telling them about significant developments in the NPF programs, about the diligence and analysis that the investment advisors performed prior to purchasing NPF Notes, or about their or the investment advisors' post-default analysis of what went wrong with NCFE. Credit Suisse further argues that the advisors communicated in writing with their clients, and passive investors should, at a minimum, have had those documents. Credit Suisse maintains that is First Request for the Production of Documents asked for basic account statements and trade confirmations.

In response, the Arizona plaintiffs maintain that the vast majority of the Arizona plaintiffs are purely passive corporate investors with no relevant knowledge of the investment decision. They contend that the vast majority of the entities cited by Credit Suisse produced documents from the files of their advisors and had no other documents responsive to Credit Suisse's requests. The Arizona plaintiffs further argue that Credit Suisse placed limits on its own document requests and excluded broad common cate-

gories of documents, including customer statements and trade confirmations, common to passively advised clients. Plaintiffs maintain that they provided documents responsive to the discovery requests, as revised by Credit Suisse's counsel.

The Arizona plaintiffs further argue that Credit Suisse never sought the information it now claims it is prejudiced for not receiving because Credit Suisse's August 31, 2007 First Request for Production of Documents only sought documents for the period beginning January 1, 1990 and continuing through November 18, 2002. *See* doc. 1505-3, at 17. The Arizona plaintiffs assert that the Arizona local government entities were informed by the Arizona Treasurer's office of the defaulted holdings in NCFE after November 18, 2002.

The Arizona plaintiffs argue that Credit Suisse's Second Request for Production of Documents does not provide support for its motion for sanctions because Credit Suisse excluded the following of categories from its document request: (1) customer statements; (2) trade tickets; (3) monthly, quarterly, or annual securities holding lists; (4) communications concerning bankruptcy litigation; (5) communications concerning potential litigation strategies; (6) communications with counsel; (7) engagement letters; and, (8) documents concerning the selection of counsel. Credit Suisse also limited the production to physical documents or those documents on currently available media; and it agreed that the Arizona plaintiffs did not have to retrieve emails from Bloomberg servers or restore tapes or backup servers.

Following the filing of Credit Suisse's motion for sanctions, plaintiffs' counsel asked each of the Arizona Governmental plaintiffs to double-check its files to respond to this motion. As a result of that search, three responsive documents, which had not been previously produced, were located. The documents consist of announcements of the NCFE loss in the Local Government Investment Pool. *See* Pls.' Exh. C, doc. 1505-3 at 48-60.

Credit Suisse asserts that some of the documents that were produced late in discovery or after the close of discovery contained highly probative evidence. As an example, it points to a December 4, 2002 document headed "State of Arizona Government Investment Pool (LGIP) Concerns." Doc. 1505-3, Exh. C, AZT01001-05. Credit Suisse argues that the document discusses Arizona State University's investment policy and its view of NCFE. The document was prepared after the Arizona government-related entities learned through press reports that NCFE had breached the trust agreement and that there were investigations by the FBI, the SEC and state regulators into possible fraud and violation of federal and state laws. *Id.*, AZT-ASU 001001. These reports and the drop in the market value of the NPF bonds jeopardized their collective $131 million investment in NPF bonds. The document states that it intended to keep the public entities holding those investments informed. The investments were made by the LPIG. The document provides basic background information about the LPIG. The document includes a section headed: "<u>ASU's Response</u>." It states that the University has no ability

to control how LPIG invests its money.  *Id.,* AZT-ASU 001005.  Credit Suisse does not

explain how it might have been prejudiced by the late production of this document.

Credit Suisse also discusses documents produced by General Motors Investment

Management Corp. ("General Motors").  Doc. 1505-7, Exh. R.  They included a Nov-

ember 8, 2002 letter from Lincoln Capital Management to General Motors regarding

NCFE's breach of the trust agreement by removing $350 million in cash from the Trust,

NCFE's October 22, 2002 notification of that event, and Moody's October 25, 2002

downgrading of the bonds from AAA to A3.  It states that Lincoln Capital and other

institutional investors had formed an *ad hoc* committee to investigate this situation.  *Id.,*

LINCAP-GM 001001.  Lincoln Capital further informed its customer that on November

6 Moody's had downgraded NCFE bonds to B3–below investment grade.  No market

existed for the bonds.  *Id.,* LINCAP-GM 001002.

Credit Suisse also asserts that a November 5, 2002 letter from PIMCO to General

Motors valued the bonds at a different price than plaintiffs' expert now values them.

*Id.,* PMCO-GM 001000 (The letter states that "the range of potential outcomes is broad,"

but if the underlying assets exist "the final recovery of the notes should be substantially

above the current price of 35").

Finally, Credit Suisse points to documents produced by Pacific Life.  *Id.,* Exh. R,

PMCO-PacLife 001000-10.  Credit Suisse argues that these documents discuss valuation

and suggest that some trustees of the funds have or had responsive documents that

were not produced.  Credit Suisse does not point to any particular part of the docu-

ments to support these assertions. I see no suggestion that trustees had more documents relevant to material disputed factual issues in this case. The valuation information was from PIMCO, and it is the same as that discussed above regarding PIMCO's communication with General Motors.

Credit Suisse does not point to any prejudice resulting from these late productions. It asserts that other, similar documents may have been lost. But it offers no convincing evidence supporting that supposition.

I conclude that dismissal is not proper under these circumstances. Because these plaintiffs are passive corporate investors, the only documents responsive to Credit Suisse's requests were documents held by or sent to them by their financial advisors. Credit Suisse agreed to limit several categories of documents typically in the possession of passive corporate advisors, and as a result, documents falling within those categories were not produced.

I am troubled, however, by plaintiffs' cavalier approach to preservation of documents. Plaintiffs have not provided any factual information about their efforts to preserve documents. I have no facts before me that would help determine whether the institutional, passive investors had a pre-suit duty to preserve evidence. Plaintiffs have provided no information about when they first considered filing suit against Credit Suisse, when their own internal investigations determined that there were facts supporting a potential claim against Credit Suisse, when they first contacted counsel to discuss the possibility of filing suit, or when they retained counsel. Although plaintiffs

generally assert that in or around April 2003 their present counsel instructed them to preserve evidence, they have not submitted an affidavit(s) setting out the steps they took to do so, the writings used to communicate to their employees the duty to preserve, their efforts to monitor preservation activities, and the like. While I cannot find that plaintiffs have failed to preserve documents relevant to a disputed material factual issue, and thus do not find that a sanction of dismissal or claim preclusion is appropriate, defendant is free to proffer evidence at trial about plaintiffs' actions to preserve documents relevant to the claims and defenses of the parties if it can demonstrate that the evidence would support an inference that a particular plaintiff knowingly disregarded its duty to preserve evidence.

As to plaintiffs' failure to timely produce documents, I conclude that absent a showing of good cause for the failure to timely produce, plaintiffs may not affirmatively use any document that was not produced before the deposition of the deponents who had knowledge of the document and they may not affirmatively use any document that was not produced before the deadline for completing all discovery. Otherwise, Credit Suisse's motion for sanction is DENIED with respect to these plaintiffs.

### B. Spoliation of Evidence

Credit Suisse also argues that some of the Arizona plaintiffs are guilty of spoliation of evidence either through their own actions or as a result of spoliation by their investment advisors. In large part, the spoliation argument is based on an asserted failure to timely implement a litigation hold and to preserve all documents relevant to the claims

13

and defenses of the parties. Credit Suisse maintains that plaintiffs should have antici-pated litigation in November 2002 when the NCFE fraud was first uncovered–or shortly thereafter. In October 2002, NCFE sought a waiver of its breach of covenants for operat-ing the NPF programs. The largest holders of the notes, including Arizona Noteholder plaintiffs Ambac, Alliance Capital Management, PIMCO, and III Finance formed an *ad hoc* creditors' committee, which after investigation refused to grant the waiver. On Nov-ember 18, 2002, NCFE filed for bankruptcy protection. Thereafter, some of the largest Arizona Noteholder plaintiffs barred Credit Suisse from further service on the *ad hoc* creditors' committee because they were considering possible litigation against Credit Suisse. No later than April 2003, the Arizona Noteholder plaintiffs engaged Gibbs & Bruns L.L.P. as their outside litigation counsel. They filed suit on May 23 and October 9, 2003.

### 1. SanPaolo

Credit Suisse asserts that SanPaulo has not produced a single document or email, and there is no evidence that it ever put a litigation hold in place after the discovery of the NCFE fraud in October 2002. SanPaolo admits that it cannot locate emails, electronic files, and other documents that Credit Suisse asserts existed at the time of the NCFE default and that those documents cannot be located.

SanPaolo witness Francesco DiMario testified that purchases of asset backed secur-ities were documented by a physical, one-page checklist that was placed in a file. Doc. 1505-7, 40 (DiMario Dep., 127-28). That file "usually highlighted the transactions,

maturity, credit enhancement, all the required things." *Id.* The file "would contain the prospectus or the PPM or whatever documentation. The rating letter, the physical rating letter if it was available otherwise a photocopy of the Moody's . . . rating." *Id.* SanPaolo has been unable to locate this file for the NPF notes its purchased in August 1998.

SanPaolo's claims against Credit Suisse are based on two purchases of NPF notes in August 1998, but Credit Suisse asserts that SanPaolo was a significant investor in numerous NPF programs before those purchases. Credit Suisse argues that there is no evidence that SanPaolo ever received the Private Placement Memorandum from Credit Suisse or in connection with its initial purchase of NPF notes. Credit Suisse asserts that despite its initial purchases of the notes through PaineWebber, San Paolo's Rule 30(b)(6) witness falsely testified in his deposition that Credit Suisse introduced SanPaolo to NCFE.

Credit Suisse maintains it has no written evidence relating to any of the communications that SanPaolo witnesses allegedly had with Credit Suisse. Other than self-serving testimony by SanPaolo witnesses, there is no evidence that SanPaolo ever received the Private Placement Memorandum ("PPM") from Credit Suisse, or anyone else, in connection with its initial purchase of NPF notes. Credit Suisse argues that this is significant because the PPM is central to plaintiffs' claims and allegations against Credit Suisse. Credit Suisse argues that it has been prejudiced by Francesco Di Mario's testimony that he was not sure whether he first heard of NCFE from Credit Suisse or PaineWebber. *See*

Exh. U, Dep. 23-24. The spoliation compromises Credit Suisse's ability to fully show the nature of SanPaolo's diligence in connections with its NPF investments, SanPaolo's lack of reliance on Credit Suisse, and the comparative responsibility of other entities with whom SanPaolo dealt. Credit Suisse disputes that the files were lost prior to the bankruptcy of NCFE and relies on the testimony of Lowenstein that files were shipped sometime between the end of 2002 and the sale in 2004.

The Arizona plaintiffs acknowledge that SanPaolo is unable to locate any file it possessed regarding NCFE, but they argue that this fact does not demonstrate spoliation. The Arizona plaintiffs assert that Credit Suisse presents no evidence that any substantive files existed at the time SanPaolo anticipated litigation. Plaintiffs also contend that the SanPaolo's witnesses testified that they diligently searched for any files at the outset of litigation, but they were unable to locate any.

The Arizona plaintiffs further argue that there is no evidence suggesting that the file was destroyed in a deliberate effort to obstruct the defense or that Banco di Napoli had reason to anticipate that NCFE would collapse seven months prior to doing so. The Arizona plaintiffs further argue that Credit Suisse has not been prejudiced in any way by the loss of the documents because SanPaolo's witnesses testified that they did not prepare or create documents in connection with evaluating an investment opportunity. They did not use email until after they decided to purchase NCFE notes. The wit-nesses also testified that it was their practice to review the placement memorandum for the deal involved and that that was what was done with respect to NCFE.

The Arizona plaintiffs maintain that the missing SanPaolo file consisted at most of the PPM, a photocopy of the Moody's rating, servicer's reports, and possibly a letter acknowledging that Banco di Napoli was qualified to buy 144A offerings. Because Credit Suisse has all of these documents in its own files and from other investors, the Arizona plaintiffs maintain that there is no basis for any finding that SanPaolo acted in bad faith to destroy documents and that Credit Suisse has not met its burden for establishing spoliation.

The party seeking a spoliation instruction must first demonstrate that the documents did in fact exist at one time. *See, e.g., Otero v. Wood*, 316 F. Supp. 2d 612, 619 (S.D. Oh. 2004) and *Hadi v. State Farm Ins. Companies*, No. 2:07-cv-0060, 2008 WL 687166, at *3 (S.D. Oh. Mar. 11, 2008). DiMario's testimony established that there was a file documenting two August 1998 purchases of NPF notes. It likely would have contained a one-page checklist and a copy of the PPM, a photocopy of the Moody's rating, servicer's reports, and possibly a letter acknowledging that Banco di Napoli was qualified to buy 144A offerings, the Arizona plaintiffs have the burden of showing that the failure to comply with Credit Suisse's requests to produce documents was due to inability, not willfulness or bad faith. *U.S. v. Reyes*, 307 F.3d 451, 458 (6th Cir. 2002)(citing *Regional Refuse Sys., Inc. v. Inland Reclamation Co.*, 842 F.2d 150, 154 (6th Cir.1988)). The Sixth Circuit has held that a party acts sufficiently willfully for sanctions when it "has the ability to comply with a discovery order and does not." *Taylor v. Medtronics*, 861 F.2d 980, 985-87 (6th Cir. 1988).

The Arizona plaintiffs have provided evidence that SanPaulo's missing files were misplaced or destroyed, but it has not provided any evidence about when the files physically left the New York office for Italy. SanPaolo has not provided an affidavit with supporting documents describing its record keeping, setting out the steps it took to preserve documents, and stating when it took those steps. It offers no evidence regarding when it first learned that it might have a claim against Credit Suisse, when it first contacted an attorney to discuss possible claims, or when it engaged counsel to file this lawsuit. Instead, plaintiffs rely on brief excerpts from depositions to support its argument.

In March 2002, Bank di Napoli and SanPaolo announced their merger. Doc. 1505-7 at 30 (Francesco Di Mario Dep., 9).[2] At some point in 2002 or early 2003 before this lawsuit was filed, all of Banco di Napoli's asset-backed investment files in New York, which would have included any files related to NCFE, were boxed up and shipped to the Banco di Napoli headquarters in Naples, Italy. D. Maria Lowenstein testified that sometime after this lawsuit started, SanPaolo "looked for that file [1998 NPF bond purchase file] everywhere in Naples and everywhere in Turin," but nothing was located. Doc. 1505-8 at 11 (Lowenstein Dep., 337).

---

[2]DiMario last worked for Banco diNapoli in March 2002. He was then "preparing the disposition of the assets"of diNapoli. DiMario Dep., 9. But diNapoli remained a separate bank until December 2002. *Id.,* 28. The asset backed securities portfolio and therefore the 1998 NPF bond file was "destined to be handled out of Italy." *Id.,* 128-29. DiMario believed every file was transferred to Italy, but his testimony does not indicate when that transfer would have occurred. *Id.*

Because there is no evidence suggesting that the SanPaolo's files were deliberately destroyed, sanctions are not appropriate at this time. Credit Suisse may, however, raise this issue at trial and, if the evidence warrants, seek an adverse jury instruction at that time. Credit Suisse is free to serve discovery requests on SanPaolo for information about its record keeping practices as they relate to the August 1998 purchases of NPF notes and the transfer of those filed to the Bank di Napoli.

### 2. PIMCO

Credit Suisse asserts that PIMCO is guilty of spoliation because it (1) failed to distribute an appropriate litigation hold to all relevant employees; (2) did not retain contemporaneous descriptions of PIMCO's NPF investments and diligence performed in connection therewith; and, (3) failed to preserve electronically stored information.

Credit Suisse argues that PIMCO failed to take steps to preserve documents when it knew or should have known that litigation was imminent in the wake of the NCFE default in October 2002. According to Credit Suisse, PIMCO admits discarding documents that memorialized what Ivascyn and others at PIMCO knew about the NPF investments in the fall of 2002. PIMCO never advised Powell Thurston, Senior Vice President of its Product Management Group, to preserve the notes he took during multiple interviews and meetings with Ivascyn in the fall of 2002 after NCFE breached the Trust agreement and Thurston was tasked with assembling the facts about PIMCO's NPF investments and dealings with NCFE and other parties involved in the transactions. Thurston testified that he threw out his notes in spite of the fact that outside counsel sent

a litigation hold in the spring of 2003. Despite deposition testimony that it was impossible for PIMCO to invest in NPF notes during the relevant period without doing due diligence, PIMCO  produced virtually no contemporaneous evidence of its due diligence for investments in NPF programs between 1998 and 2002. No due diligence memoranda or investment analyses were produced in connection with NCFE. PIMCO's witnesses gave no explanation as to why these documents memorializing the due diligence process were not retained, and its particularly troubling because no one was able to identify with any specificity who performed due diligence for the NPF investments.

Credit Suisse further argues that PIMCO has admitted that it failed to preserve email and other electronic materials prior to late 2003, well after the collapse of NCFE and months after filing its lawsuit.

In response, plaintiffs contends that PIMCO has produced over 3,100 documents consisting of thousands of pages of information, including PPMs, servicer reports, trade tickets, handwritten notes of its portfolio managers, handwritten notes of its analysts, correspondence with its clients, and real-time emails about numerous NCFE-related investment decisions. The Arizona plaintiffs argue that Credit Suisse's attempt to seek a spoliation instruction despite this production is evidence of Credit Suisse's bad faith in filing its motion.

The Arizona plaintiff's contend that Credit Suisse's motion is based on the actions of one PIMCO employee, Powell Thurston, who was not involved in the decision to buy or sell NCFE securities. Instead, Thurston was responsible for drafting a letter to PIMCO's

clients about the collapse of NCFE.  In preparing the letter, Thurston took notes based on conversations with Dan Ivascyn, the portfolio manager, about the history of the NCFE investment.  Thurston did not preserve his notes based on this conversation, which he testified consisted of a ten minute discussion. The draft letter that resulted from Thurston's notes was produced to Credit Suisse, and Credit Suisse questioned Thurston regarding the letter during his deposition.

With respect to documents reflecting what due diligence was performed with respect to NCFE, the Arizona plaintiffs argue that PIMCO witnesses testified that there was no requirement that any such memorandum be prepared and that PIMCO did not routinely prepare such documents. The Arizona plaintiffs further maintain that documents memorializing the due diligence process were retained and PIMCO produced those notes. These types of notes were often attached to order tickets, which were produced to Credit Suisse. The Arizona plaintiffs maintain that PIMCO witness, Dan Ivascyn, testified that PIMCO backup information was no longer "kept on file" and that that would not be unusual for this type of high quality asset. Doc. 1505-8, at 26.  Mohan V. Phansaklar, the former Chief Legal Counsel for PIMCO, provided an affidavit stating that shortly after NCFE's default in October 2002, he asked those individuals he believed to have NCFE-related files to retain them. Phansaklar also stated that he believed that he asked PIMCO client managers who had client accounts with NCFE exposure to retain any documents related to NCFE during a May 1, 2003 conference call. Doc. 1505-10, at 6.  Stefanie Evans, a Senior Analyst at PIMCO, provided an affidavit stating that no later than January 2003,

at the request of PIMCO's legal counsel, she gathered documents and files related to

NCFE from the individuals at PIMCO who had been involved in the NCFE investments.

On January 23, 2003, Sandy Benson, the senior corporate paralegal, initiated an email

search for NCFE-related emails. The results of that search were preserved in a separate

location. These documents and emails were provided to the legal department.  Doc.

1505-10 at 7.

With respect to some of the documents that Credit Suisse seeks, Credit Suisse has

again failed to show that the documents did in fact exist. PIMCO witnesses testified that

there was no requirement that any memorandum be prepared concerning the per-

formance of due diligence and that PIMCO did not routinely prepare such documents.

Some of the documents sought by Credit Suisse did exist, and PIMCO acknowledges

that they were not kept. Courts have concluded, however, that despite a party's obliga-

tion to preserve relevant documents, the duty does not extend to every piece of paper.

For example, this Court has held that the failure to preserve notes which were the basis

for a final draft did not constitute spoliation:

> Even assuming the existence of some type of notes from which Ms.
> Kenmir drafted her memorandum, if Ms. Kenmir did not preserve these
> notes based on the fact that their content was set forth fully in her memor-
> andum, there would be no spoliation. It reasonably can be inferred from
> Ms. Kenmir's deposition testimony that she believed the relevant informa-
> tion required to be documented was contained in her memorandum. The
> scope of the duty to preserve does not extend to every "shred of paper."
> [*Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003).]
> Rather, the duty to preserve of a litigant or a potential litigant extends to
> what it knows or reasonably should know would be relevant to the

litigation. *Zubulake; see also Kemper Mortgage v. Russell*, 2006 WL 2319858
(S.D. Ohio 2006).

*Hadi v. State Farm Ins. Companies*, No. 2:07-cv-0060, 2008 WL 687166, at *3 (S.D. Oh. Mar.

11, 2008). Other courts have reached a similar conclusion:

> [A] corporation, upon recognizing the threat of litigation, need not pre-
> serve "every shred of paper, every e-mail or electronic document, and
> every backup tape." [*Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 217
> (S.D.N.Y. 2003).] Instead, the duty to preserve extends to any documents
> or tangible things made by individuals "likely to have discoverable
> information that the disclosing party may use to support its claims or
> defenses." *Id.* at 218. The duty also extends to documents prepared for
> those individuals and to information that is relevant to the claims and
> defenses of any party, or which is "relevant to the subject matter involved
> in the action." *Id.* Thus, the duty to preserve extends to those employees
> likely to have relevant information, i.e. the "key players" in the litigation.
> *Id.*

*Consolidated Aluminum Corp. v. Alcoa, Inc.*,  244 F.R.D. 335, 339 (M.D.La., 2006)(footnotes

omitted).  Credit Suisse maintains that Powell Thurston, a Senior Vice President at

PIMCO, failed to preserve notes he likely took during interviews following the demise of

NCFE. In accordance with his normal practice, Thurston acknowledges that he threw out

his notes after a year or so. Thurston Dep., 34, Doc. 1446, Exh. S. The letter that was pro-

duced as a result of those notes was provided to Credit Suisse. Credit Suisse has not pro-

vided any basis for its belief that the draft letter did not contain the complete content of

the missing notes.

Credit Suisse maintains that it is prejudiced by the loss of documents because PIMCO

employees were unable to recall with any specificity the details of what due diligence

was performed at PIMCO.  Without this evidence, Credit Suisse maintains that its ability

to probe issues relating to reliance, comparative responsibility, and other evidence that may be favorable to Credit Suisse.

The party seeking spoliation instruction must demonstrate that it was prejudiced by the loss of the information. There must be some showing of a nexus between the missing information and the issue on which the instruction is requested. *Consolidated Aluminum Corp. v. Alcoa, Inc.* 244 F.R.D. 335, 346 (M.D. La. 2006). Some evidence must be presented corroborating the assumption that the missing evidence would have been favorable to the plaintiff's case. *Id.* at note 24 (citing *Hamre v. Mizra*, No. 02Civ.9088, 2005 WL 1083978 (S.D.N.Y. May 9, 2005). Here, Credit Suisse has not presented any evidence that corroborates its position that the missing notes would have been favorable to its case.

### 3.  III Finance

III Finance is operated by AVM, Ltd. AVM carried out all due diligence, trading, monitoring, and office operations attendant to the investments in NPF notes. Julio Maceira was the individual at AVM who made the NPF notes purchases. Typically he prepared a written memo recommending the purchase of an investment such as the NPF notes. Maceira Dep., 47 and 49-51, Doc. 1446, Exh. K. The memo was not a justification for the purchase but "more a summary of the details of the trade." *Id.,* 32. Maceira would have kept a hard copy of the memo in a filing cabinet. *Id.,* 48. All of his memos would have been either in the filing cabinet or on his computer. *Id.* He did not know what happened to them and the electronic files after he left AVM at the end of 2002. *Id.* III Finance did not produce Maceira's notes.

Credit Suisse also argues that III Finance produced very few emails from October 2000 through September 2002. During that time frame, Maceira purchased more than $180 million of NPF notes. Maceira failed to produce versions of emails he received from Credit Suisse in August 2002 prior to III Finance's final and largest purchase of nearly $100 million of NPF notes.

According to Credit Suisse, III Finance acknowledged that it only searched its computer system on September 11 and 26, 2007 and that its current archive system was only implemented on June 27, 2005.[3] Credit Suisse believes that none of the individual's

---

[3]Although II Fiannce acknowledged that it searched its computer system on September 11 and 26, 2007, it also stated:

> In response to discovery requests from Credit Suisse, III Finance, Ltd. Searched its entire Exchange server as well as its e-mail archive hosted by Microsoft Exchange Archive. Both searches were system wide and covered each user's mailbox (i.e., inbox, sent box, deleted mail, drafts, and other folders). These searches were conducted on September 11 and September 26, 2007, and covered the time period between April 1, 2000 and December 31, 2002. Microsoft Exchange Hosted Archive captures Bloomberg messages as well as III Fiance's corporate e-mails, so the above referenced searches were inclusive of Bloomberg messages.

Doc. 1446. Exh. D(iv) at p.6. On January 28, 2008, III Finance provided further information related to its electronic searches:

> Prior to June 27, 2005, III used a local solution to backup its Exchange Server database and individual mailboxes. Monday through Thursday the entire Exchange database was backed up to a storage tape and individual user mailboxes were backed up on a differential basis. On Fridays, a full backup was created for both the Exchange database as well as the individual mailboxes. The automatic message destruction feature of the local solution was not enabled. III did not auto-delete any messages from its local Exchange server prior to using the Microsoft Hosted Exchange Service. An entire copy of the contents of III's local Exchange server was sent to Microsoft to be included in III's archive.

Doc. 1446, Exh. D(v).

personal folders on the computer network were preserved. Credit Suisse also argues that there is no evidence supporting III Finance's belief that its general counsel instructed employees to preserve the NCFE files as of April 25, 2003.

Credit Suisse maintains that III Finance's loss or destruction of Macerira's communications eliminates key evidence relating to III Finance's due diligence, reliance, and the comparative responsibility of other parties in connection with III Finance's investments in NPF notes.

The Arizona plaintiffs argue that Credit Suisse has mischaracterized Maceira's testimony. In fact, he testified that he did not recall whether he prepared a memorandum for the NCFE investment.[4] III Finance produced 1,993 pages of NCFE-related information, and Credit Suisse cannot demonstrate that the document it seeks ever existed. The Arizona plaintiffs also assert that prior to any litigation by III Finance, it had searched for and collected its NCFE-related paper and electronic documents and forwarded them to its litigation counsel. Plaintiffs contend that the search included files of former employees who had left NCFE-related files, III Finance's electronic documents, email, and Bloomberg email.

---

[4]Maceira testified in his deposition as follows:
        Do you have any further recollection about whether you prepared memos in connection with the various NPF purchases?
A.      I don't recall specifically.
Q.      But you recall typically that you would do so?
A.      Correct.
Doc. 1446, Exh. J Macerira Dep. At p. 50.

As earlier stated, the party seeking a spoliation instruction must first demonstrate that the documents did in fact exist at one time. A witness for III Finance could not recall whether he did in fact prepare a memorandum concerning the NCFE investment, and Credit Suisse has not met its burden of showing that spoliation occurred.

### 4. Alliance Capital Management Plaintiffs

Credit Suisse asserts that Alliance Capital Management ("Alliance) is a money manager for fifteen named Arizona plaintiffs suing it for approximately $188 million ("Alliance Capital Management plaintiffs"). Credit Suisse maintains that immediately upon the collapse of NCFE, Alliance intended to sue Credit Suisse and others in an attempt to recover its losses resulting from the purchase of the NPF notes. Despite this intent, however, Credit Suisse contends that Alliance failed to take steps to preserve documents at the time of NCFE's bankruptcy.

Credit Suisse argues that Alliance did nothing to preserve information relevant to its NPF notes purchases other than keeping its files for its investments in the ordinary course of business. Mark Gordon, Alliance's Rule 30(b)(6) witness, testified that he could not recall whether any document retention notice was distributed to Alliance employees, nor did he know whether any effort was made to obtain copies of emails. Gordon Dep., 22-23, Doc. 1446, Exh. F. Credit Suisse maintains that Alliance did not produce any written analyses or documentation of the process for its initial NPF investments that Gordon expected to have been prepared. Alliance also did not produce any notes taken by Amy Boothe, an analyst who communicated with Credit Suisse about NPF notes

before Alliance's October 2000 initial purchases of them. Boothe was not involved in buying or selling bonds. Boothe-Fuentes Dep., 57, Doc. 1446, Exh. F. According to Credit Suisse, Alliance produced very few emails and was unable to identify the dates on which its electronic system was searched.

Credit Suisse argues that it is prejudiced by the spoliation of evidence because it is unable to learn the true facts about Alliance's NPF investments with respect to critical issues of due diligence, mitigation of damages, and the comparative responsibility of Alliance, other investment banks, the trustees, accountants, and the rating agencies.

In response, the Arizona plaintiffs argue that Credit Suisse's argument is absurd because Alliance kept all of its files in the normal course of business. Gordon testified that it was Alliance's "normal course of business to keep files of all our investments for as long as we hold them." *Id.*, 22. Although Alliance did not take steps outside its normal course of business to preserve documents relevant to the claims and defenses of the parties in this lawsuit, it maintains that it preserved all NCFE files as a result of its normal practices.

In her deposition, Boothe testified that she produced the only buy recommendation memo that she recalled writing in regard to NCFE. *Id.*, 176-77. With respect to the absence of emails, the Arizona plaintiffs argue that Gordon testified that it would have been very unlikely for anyone to communicate internally about NCFE. *Id.*, 24. Booth testified that she communicated with portfolio managers by talking directly with them. Boothe-Fuentes Dep., Doc. 1505, Exh. HH.

With respect to Alliance, Credit Suisse has not provided any evidence to contradict Alliance's assertion that in the normal course of business it kept all documents about an investment until it was sold. Although it may not have instituted steps outside of its normal business practices, its normal business practices were to maintain everything. An Alliance witness also testified that it would have been highly unlikely for there to have been any emails related to the NCFE investment because people talked with one another daily regarding investments rather than via email. Consequently, Credit Suisse has failed to demonstrate that it is entitled to sanctions against Alliance or the Alliance plaintiffs.

### 5. Lincoln Capital Management

Lincoln Capital Management ("Lincoln Capital") is an investment advisor for institutional clients such as pension funds, retirement funds, 401(k) plans and non-profit corporations. Credit Suisse argues that Lincoln Capital failed to adequately preserve electronic materials and hard copy materials from the files of its key witnesses and its corporate representative, Terrance Glomski. Despite its knowledge that litigation would arise due to the NCFE bankruptcy, there is no evidence that Lincoln Capital distributed a litigation hold notice to its employees contemporaneously with the NCFE collapse.

Credit Suisse argues that Glomski admitted that he threw out the notes he took about NCFE during his due diligence on the NPF investments and at the time of NCFE's default. Credit Suisse maintains that the evidence shows that an entire drawer full of Glomski's contemporaneous notebooks were discarded after November 2002. Lincoln

Capital admitted that sometime in 2004, it lost its December 2002 snapshot of its employees' emails. Lincoln Capital also failed to fully integrate its email with the Lehman Brothers' system after it was acquired by Lehman Brothers.

Credit Suisse argues that it is limited to Glomski's self-serving and mistaken recollection of events. Glomski testified that he reviewed Credit Suisse publications in 1999, but he quickly recanted his testimony when counsel for Credit Suisse pointed out that the referenced publication was not published until 2000 and not sent to Lincoln Capital until 2002. Credit Suisse maintains that it has been deprived of critical evidence that is the best source of information about Lincoln Capital's due diligence, mitigation of damages, and the comparative responsibility of Lincoln Capital, NCFE, and others with whom Lincoln Capital communicated in connection with the NPF investments.

The Arizona plaintiffs maintain that Credit Suisse cannot identify what the information was or when it was allegedly destroyed. As a result, Credit Suisse cannot meet its burden to obtain a spoliation instruction. The Arizona plaintiffs assert that Lincoln Capital produced approximately 1,900 pages of NCFE-related information, including PPMs, trade tickets, service reports, handwritten notes, buy/sell logs, articles written about NCFE by Credit Suisse and others, road show presentation materials, memoranda regarding Lincoln Capital's NCFE investment history, internal memos, and emails from Credit Suisse and NCFE.

According to the Arizona plaintiffs, Credit Suisse merely assumes that handwritten notes of Glomski existed at one time, but Glomski testified that he could not say whether

30

or not he had taken any notes about the NCFE investments. Glomski Dep., 325-26, Doc. 1505, Exh. II. He conceded that Lincoln Capital had produced no contemporaneous written records showing that any due diligence was done before the first purchase of NPF notes. *Id.,* 105. He had no handwritten notes about NCFE. *Id.,* 322 and 326. During the period before October 2002, Glomski probably kept what notes he took on legal pads that he stored in a desk drawer. He would throw them out when the drawer was full. *Id.* 323. Polonsky further testified that he "definitely felt obligated to retain everything that was – that I considered useful for NCFE." *Id.,* 325. Richard Schneider, an analyst working with Glomski, took notes at that time, and those notes were produced.

From the above, I conclude that Credit Suisse has failed to demonstrate that the documents sought ever existed. Further, there is no evidence that the notes were intentionally destroyed. Sanctions are not warranted.

### 6. United of Omaha

Credit Suisse contends that as NCFE began to unravel, Omaha immediately recognized that litigation was inevitable, but it did nothing to preserve documents. As a result Omaha failed to produce emails relating to its NPF investments and hard copy documents including investment approval memorandum and handwritten notes relating to NPF notes investments.  Credit Suisse maintains that Omaha acknowledged that it did nothing to preserve its employees' emails from the relevant time period, that it had no

backup system in place, and that it had no ability to restore any emails. *See* Exh. D(vi) at pp. 7-8.[5]

Specifically, Credit Suisse argues that the following documents were missing from the documents produced by Omaha: (1) written materials that were required to be submitted to Omaha's investment committee on a quarterly basis to maintain the NPF notes status as an approved investment; (2) research reports that were required to be prepared for all NPF purchases; (iii) sales points and research materials allegedly received in connection with NPF purchases; and (4) at least some handwritten notes from the files of key witness Donna Ennis.

Ennis testified that when she began working in 1997 at Omaha, there was a policy that when an investment was made for the first time a presentation was made to the investment committee. A paragraph about the new investment was normally written for the investment committee, but Ennis testified that she did not see such a paragraph with respect to the 1996 NCFE investment. Ennis Dep., 46, Doc. 1446, Exh. Q. Ennis was not employed at Omaha in 1996, when the original NCFE investment was made, and she testified that she did not review any of the 1996 investment committee materials from that time. *Id.*, 47. Ennis also testified that each time a package of securities was presented to the investment committee for approval there should have been some evidence that the

---

[5] Attachment A to Kathy Patrick's February 20, 2008 letter to Susan DiCicco states: "United of Omaha did not preserve emails from the relevant period" and "does not maintain backup tapes or otherwise [have] the ability to restore emails from the relevant time period."

committee actually approved the investment. A package would have been presented for every quarter in which an investment was made. *Id.*, 47-48. A package went to the investment committee in connection with the purchase of NPF notes in 1998. *Id.*, 47.

Credit Suisse argues that it is prejudiced by the lack of evidence related to Omaha's purchase and trade history in NPF notes and on its communications with various parties during the course of its investments. According to Credit Suisse, Omaha purchased NPF notes well before the November 4, 1998 investment for which it has sued Credit Suisse. Omaha also purchased NPF notes for which other investment banks served as co-mangers. Omaha communicated with NCFE directly through email, but if failed to pro-duce that correspondence.

The Arizona plaintiffs argue that Credit Suisse cannot show that it is entitled to a spoliation instruction when Omaha produced at least 5,000 pages of documents. Scott Humphries, an attorney with Gibbs & Bruns, LLP, provided an affidavit that stated:

> United of Omaha produced at least 5000 pages of documents spanning six years of its NCFE investment timeline. This production included NCFE private placement memoranda dating from 1998 through 2002, NCFE financial statements, investor reports, an internally-generated graph of NCFE's default rates, faxes from NCFE, rating agency information, NCFE presentations, emails, Bloomberg emails, handwritten notes of meetings and analysis, internal memoranda regarding its decision-making process in investing in the NCFE securities, agendas of meetings attended with CFSB and NCFE, correspondence from Lance Poulsen, faxes from Credit Suisse with internal Mutual of Omaha handwritten notes on them, NCFE slide-show presentations containing handwritten notes, and charts about NCFE's structure, among other things.

Doc. 1505-10 at p. 15. Although Credit Suisse maintains that only a handful of emails were produced, Ennis testified that when she communicated with her colleagues intern-

ally, she did so verbally and not through email. Ennis Dep., 171, Doc. 1505-6, Exh. P. With the exception of the emails Credit Suisse examined Ennis with, there is no evidence that the emails Credit Suisse maintains were not produced were ever in existence. According to plaintiffs, Omaha's witnesses' testimony does not support Credit Suisse's argument that documents relevant to a material disputed fact existed at a time Omaha had a legal duty to preserve them and were subsequently destroyed.

I conclude that with respect to Credit Suisse's motion based on spoliation, it is not entitled to an adverse jury instruction at this time. However, Credit Suisse may renew its motion at trial. Credit Suisse may serve discovery on Mutual of Omaha regarding its record keeping system, document retention policy, and steps taken to preserve evidence relevant to the claims and defenses of the parties in this litigation. Credit Suisse is free to proffer evidence about the alleged failure to retain relevant documents that would support an instruction that if the jury finds that a plaintiff did not take reasonable steps to preserve relevant documents, they may, but they are not required, to draw an inference that the documents were not kept because they would help Credit Suisse defend against their claims. The trial judge would then rule on the admissibility of the evidence.

**C.    Late Production of Documents & Failure to Timely Provide an Adequate Privilege Log**

In addition to its arguments that certain Arizona plaintiffs engaged in spoliation of evidence, Credit Suisse also argues that a fourth of the Arizona plaintiffs and/or their investment advisors failed to timely produce their discovery responses. Credit Suisse maintains that these parties produced key evidence either after the close of discovery, or

34

so close to the discovery cutoff, that the evidence was of little value. Credit Suisse seeks an order that the facts contained in the documents produced late by PIMCO, Ambac, and GMO must be accepted by the jury as proved and that plaintiffs are precluded from presenting any evidence that denies the facts deemed established.

Credit Suisse argues that it was prejudiced by plaintiffs' late production which resulted from the failure to provide a privilege log until June 2008 and by the inadequacies in the log that was ultimately produced. Credit Suisse maintains that plaintiffs improperly claimed certain documents were privileged when they were clearly not. According to Credit Suisse, plaintiffs withheld key documents until they absolutely had to produce them. Credit Suisse also argues that it should not be faulted for its failure to re-depose people. A substantial number of documents were produced by plaintiffs after depositions were already taken and after the close of discovery. Credit Suisse maintains that plaintiffs strategically withheld damaging documents until late in the discovery period.

## 1. PIMCO Plaintiffs

On September 24 and 25, 2008, PIMCO produced 500 pages of documents previously withheld as privileged. Credit Suisse argues that at least five documents had absolutely no colorable basis for a claim of privilege, and four of the five documents are critical in that they reflect internal PIMCO communications and admissions of responsibility for the losses suffered as a result of the NPF investments. Credit Suisse contends that the delay suggests a deliberate effort to conceal this evidence during discovery.

Credit Suisse asserts that the documents acknowledge PIMCO's failure to perform adequate diligence on NPF investments and failure to undertake a comprehensive credit analysis. They also indicate that a private bond investor challenged PIMCO's claim that it did not know about NCFE's related party providers. Doc. 1445, Appx. 2 (PMCO 003310-11; PMCO 002859-65; PMCO 030521; PMCO 036466.)

The Arizona plaintiffs contend that Credit Suisse is misleading the Court because it failed to acknowledge that part of the email string labeled PMCO 3310-11 was produced on March 25, 2008. The Arizona plaintiffs also maintain that the production was made four months before Power's deposition and was not late. The second email that Credit Suisse alleges was produced late is an exact duplicate of an email message produced March 25, 2008, according to the Arizona plaintiffs.

The Arizona plaintiffs maintain that the remaining two emails were inadvertently withheld as privileged and promptly produced after they were reviewed a second time. They argue that there is no evidence to support Credit Suisse's claims that the emails were withheld in bad faith.

The PIMCO emails refer to NPF notes as "crap," "sink holes" and vulnerable assets. Doc. 1445, Appx. 2 (PMCO 00310). In the aftermath of the NCFE fraud, several plaintiffs made efforts to place blame on individuals for making the decision to invest in NCFE. This evidence will likely be used by Credit Suisse to demonstrate that the fault lies with those plaintiffs and not Credit Suisse. These emails have little or no relevance to whether the fault lies with PIMCO. The references to the notes as "crap," "sinkholes" and vulner-

able assets arguably accurately states their market value after the publicity about criminal and regulatory investigations. The delay in producing the emails does not demonstrate that PIMCO deliberately attempted to conceal the evidence during discovery, nor has Credit Suisse has shown that the delay in producing these documents caused it prejudice.

## 2. Ambac

Credit Suisse also points to Ambac's August 26, 208 production of almost 50 pages of handwritten notes that were previously withheld as privileged. ( ABK001514-15555; ABK 001560). According to Credit Suisse the notes were taken by two key Ambac witnesses, Nick Aloe and Diane Barlow. Aloe introduced the NPF investment to Ambac in July 2001. His notes were distilled in his initial presentation of the program to his superiors and Ambac's Credit Committee. Ex. I. (Aloe Ex 4 at ABK007298); Appx. 2 (ABK 001522-37). The notes contain extensive, detailed information Aloe gathered about the structure of the NPF program and NCFE. Appx. 2 (ABK 001529-37). These notes should be have been produced before Aloe's deposition. *See* Ex. H (Aloe Dep. 156:9-157:8.)

Barlow monitored Ambac's NPF investments. Barlow's July 2002 discussions with Moody's, Fitch, and Bank One (the trustee) resulted in less than thirty pages of detailed notes. Appx. 2 (ABK 001513-21; ABK 01538-41: ABK 001552-55; ABK 001560.) Credit Suisse requested Barlow's notes during her February 14, 2008 deposition. Ex. H. (Barlow Dep. 202:22-204:15.)

Plaintiffs respond that Aloe's notes were inadvertently withheld as privileged. Plaintiffs have not provided affidavits or other evidence explaining why these particular documents were withheld. *See* Ex. NN. Instead, plaintiffs assert that "almost all of Aloe's handwritten notes were used, sometimes verbatim, to prepare a typed presentation that was produced and used in his deposition." Ex. OO (Aloe Dep. 136 & 3-4.) The notes were used to prepare a typed presentation, and both the draft and final versions were produced, and Credit Suisse questioned Aloe about them during his deposition.

As noted previously, a party's obligation to preserve relevant documents does not extend to every piece of paper. Notes used to create a presentation by Aloe of Ambac were withheld as privileged in error and then subsequently produced. These notes were the basis for a draft and final version of the presentation that were timely produced. Because Credit Suisse was able to question Aloe based on the draft and final versions of his presentation, Credit Suisse has not shown that it was prejudiced by the delay in producing the notes.

With respect to Barlow's July 2002 notes, the Arizona plaintiffs maintain that these notes were inadvertently combined with notes of privileged post-default bondholder litigation calls. The privilege log identified the notes as 7/20/02-10/28/2002 handwritten notes re: bondholders group call re litigation. When Credit Suisse pointed out there were no bondholder litigation calls in July 2002, Ambac promptly produced the notes. Plaintiffs maintain that there is nothing "interesting" in the notes. The notes document Barlow's talks with Moody's, Fitch, and Bank One long after the investment

was made. Plaintiffs further argue that Credit Suisse did not request a supplemental deposition of Barlow. Finally, Credit Suisse never sought to question Barlow about the notes once they were produced.

While plaintiffs' counsel's carelessness is not readily excusable, I find that Credit Suisse has failed to demonstrate that a sanction is appropriate.

### 3. Ofivalmo

During a deposition, the Ofivalmo witness indicated that Ofivalmo taped telephone conversations, but they had been unable to locate or restore the relevant tapes. Six months later, Ofivalmo produced audio tapes of approximately 15 conversations contemporaneous with its purchase of NPF notes in February 2002. At least half of the conversations were between Ofivalmo and Credit Suisse. Credit Suisse maintains that this belated and seemingly selective production is highly prejudicial. Credit Suisse maintains that Ofivalmo has failed to describe its ordinary retention period for audio tapes in 2002 and 2003, and Credit Suisse has no way of knowing whether other tapes exist or if some tapes were destroyed in breach of its duty to preserve all evidence. Credit Suisse seeks to have Ofivamo's late production of audiotapes excluded.

In response, the Arizona plaintiffs maintain that Oliver Dieudonne testified at his deposition that certain telephone calls on the trading desk were routinely recorded. At that time, the tapes had not been located. Following his deposition, the search for the tapes continued. The tapes were located and produced within the discovery period, and plaintiffs maintains there is nothing sanctionable about Ofivalmo's conduct.

Credit Suisse acknowledges that it has no way of knowing whether or not other recordings even existed. On the other hand, plaintiffs have provided no explanation of its retention policy for tapes during the relevant time period. Credit Suisse asked plaintiffs to describe Ofivalmo's efforts to retrieve the audio tape of Diudonne's telephone calls Credit Suisse personnel and the ordinary retention period that applied to audio tapes in the 2002 and 2003 timeframe. Doc. 1446, Exh. D (vii) at p. 4. Plaintiffs responded that "Ofivalmo would be producing any existing, nonprivileged audio recordings of Dieudonne's telephone conversations with Credit Suisse personnel." *Id.* at p. 5. No further explanation was provided by plaintiffs. There was an unexplained six month delay in producing the tapes.

While Ofivalmo should have produced the tapes earlier, Credit Suisse has failed to demonstrate it is entitled to the sanction of dismissal, claim bar, or facts deemed admitted. Credit Suisse may serve discovery on Ofivalmo regarding its record keeping system for the audio recordings, its retention policies for them, and the efforts it took to preserve them and retrieve them for this litigation. If Credit Suisse believes Ofivalmo's conduct gives rise to an inference that it knowingly withheld production, it is free to make a proffer at trial.

### 4. GMO

On July 15, 2008, two weeks prior to the discovery cutoff, GMO produced 69 responsive documents. According to Credit Suisse, three of the emails produced were critical because they contained November 2002 communications with GMO's clients relating to

GMO's diligence and comparative responsibility in purchasing NPF notes. GMO produced an email responding to angry GMO investor that stated that the NCFE fraud was not anticipated by GMO, Credit Suisse, or other entities. Credit Suisse asserts that GMO produced an email in which the co-head of the Fixed Income Group at GMO, who was personally involved with asset-backed securities and NCFE specifically, acknowledged that Credit Suisse was duped by NCFE. This, however, is not an accurate representation of the email. The email states that GMO was the victim of "a massive fraud," which was "was not anticipated (obviously) by us . . . or the investment bank CFSB (who also own a large amount of this debt in their investment accounts)." *See* doc. 1445 at 27-28 & Appx. 2 (GMO 011118).

Plaintiffs offer no explanation for the late production of this email other than it was produced during the discovery period. Plaintiffs dispute the importance of the email because it postdates NCFE's default and it was written by individuals who were not involved in the NCFE investment decision and had no personal knowledge of GMO's NCFE investment.

The Arizona plaintiffs argue that Credit Suisse's motion seeking death penalty sanctions against GMO because it received one email string just prior to the discovery cutoff but after the depositions of GMO's witnesses is simply unreasonable. GMO produced over 1,200 documents and emails. Credit Suisse never sought to depose anyone following the production of this email string. Instead, Credit Suisse raised the issue for the first time in its motion for sanctions.

Credit Suisse has not identified any discovery that it would have taken had it received the emails earlier. On the other hand, GMO has not offered any explanation for the delay in the production of the email.

With respect to these four plaintiffs, PIMCO, Ambac, Ofivalmo, and GMO, plaintiffs have failed to provide an adequate explanation for the delay in producing these documents and for the failure in providing a timely privilege log. As a result, I conclude that, absent a showing of good cause for the failure to timely produce these documents, plaintiffs may not affirmatively use any document that was not produced before the deadline for completing all discovery.  Otherwise, Credit Suisse's motion for sanction is DENIED with respect to these plaintiffs.

### III.    Conclusion

For the reasons stated above, Credit Suisse's December 29, 2008 omnibus motion for sanctions against certain plaintiffs for discovery abuses (doc. 1445) is GRANTED in part and DENIED in part.

With respect to the passive corporate investors, absent a showing of good cause for the failure to timely produce, plaintiffs may not affirmatively use any document that was not produced before the deposition of the deponents who had knowledge of the document and they may not affirmatively use any document that was not produced before the deadline for completing all discovery.

With respect to plaintiffs  SanPaolo, PIMCO, III Finance, Alliance Capital Management plaintiffs, Lincoln Capital Management, United of Omaha and Credit Suisse's

claims of spoliation of evidence, I conclude that Credit Suisse may proffer evidence at trial that it believes would give rise to an adverse inference and entitle it to an adverse inference jury instruction.

With respect to plaintiffs PIMCO, Ambac, Ofivalmo, GMO, I conclude that, absent a showing of good cause for the failure to timely produce documents, plaintiffs may not affirmatively use any document that was not produced before the deadline for completing all discovery. If Credit Suisse believes their conduct gives rise to an inference that these plaintiffs knowingly withheld production, it is free to make a proffer at trial.

Under the provisions of 28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P., and Eastern Division Order No. 91-3, pt. F, 5, either party may, within ten (10) days after this Order is filed, file and serve on the opposing party a motion for reconsideration by the District Judge. The motion must specifically designate the Order, or part thereof, in question and the basis for any objection thereto. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

s/ Mark R. Abel
United States Magistrate Judge