IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re: National Century Financial Enterprises, Inc. Financial Investment Litigation | : | |
| | : | Case No. 2:03-md-1565 |
| | : | Judge James L. Graham |
| | : | Magistrate Judge Abel |
| | : | |

## Order

The Arizona Noteholder plaintiffs bring this action alleging Credit Suisse committed fraud and engaged in other actionable conduct in connection with the offering of now worthless National Century Financial Enterprises ("NCFE") notes they purchased. This matter is before the court on defendant Credit Suisse (USA) LLC's and Credit Suisse, New York Branch's ("Credit Suisse") January 27, 2009 motion to disqualify Gibbs & Bruns LLP ("Gibbs & Bruns") as counsel for plaintiffs because it retained Steven Schwarcz as an expert on securitized transactions (doc. 1457). In 1995 and 1996, Schwarcz was a partner at Kaye Scholer LLP ("Kaye Scholer"), which represented Credit Suisse in transactions marketing NCFE notes like those at issue in this lawsuit.

### I.    Introduction

The Arizona Noteholder plaintiffs, represented by Gibbs & Bruns, filed these cases asserting numerous claims, including fraud, negligent misrepresentation, and

professional negligence against Credit Suisse and other defendants. In this action, the Arizona Noteholder plaintiffs seek to hold Credit Suisse responsible for losses they incurred in purchasing notes issued by wholly-owned subsidiaries of NCFE. Credit Suisse served as a placement agent/initial purchaser in connection with notes issued in January 1996 and after. In these transactions, Credit Suisse was represented by Kaye Scholer LLP ("Kaye Scholer"). In late 1995 through 1996, Steven L. Schwarcz was the head of Kaye Scholer's Structured Finance Practice Group and identified as a billing partner/partner in charge for work completed by Kaye Scholer on three NCFE transactions. All of the notes issued during this period were paid off. None are the notes plaintiffs lost money on.

Specifically, the three transactions Credit Suisse relies on are as follows. On December 1, 1995, Schwarcz signed a New Client/New Matter form for "First Boston-Structure Finance." He signed both as billing partner and partner in charge. The engagement was for the NPF VI 1995-2 transaction that closed January 5, 1996. On a February 21, 1996 New Client/Matter Form for an NPF WL Series 1996 transaction Schwarcz is listed as a billing partner and partner in charge. However, the engagement was solely for NPF WL. Credit Suisse was not Kaye Scholer's attorney for the transaction. In November 1996, Schwarcz did bill less than an hour of time on a third transaction, NPF IX Series 1. Both Credit Suisse and the issuer were Kaye Scholer's clients.

In February 2008, Gibbs & Bruns retained Schwarcz, who left Kaye Scholer at the end of 1996 to become a law professor, to serve as an expert on securitization for plaintiffs. He is presently a professor at Duke Law School. He is the author of a textbook on securitization.

Schwarcz's Rule 26(a)(2) report describes securitization and explains the technical details of how securitization programs are set up, including the NPF securitizations. He also explains what would happen if the reserve accounts in the NPF securitization programs were not maintained at the levels required by the program documents. He does not consider any facts underlying plaintiffs' allegations of actionable conduct by Credit Suisse and expresses no opinions on liability. He did no investigation and relied on no facts other than those contained in several 1999-2000 publications.

During his deposition, Schwarcz testified that he did not recall ever having represented Credit Suisse or NCFE. When Credit Suisse presented evidence that Schwarcz had in fact been involved with Credit Suisse with respect to NCFE transactions, plaintiffs withdrew his designation as an expert. Credit Suisse now seeks to have Gibbs & Bruns disqualified on the basis that Schwarcz's disqualification should be imputed to Gibbs & Bruns.

At a minimum, plaintiffs lawyers knew from his *curriculum vitae* that Schwarcz

was a partner at Kaye Scholer in 1995-1996.[1] They were aware that Credit Suisse began

offering NCFE notes in January 1996 and that Kaye Scholer acted as Credit Suisse's

lawyer for those offerings. Third Amended Complaint, ¶ 1076.

## II.    Arguments of the Parties

### A.    Credit Suisse's Motion to Disqualify

Credit Suisse argues that the retention of Schwarcz, a former attorney for Credit

Suisse, as an expert witness against Credit Suisse, violated the applicable ethical rules

regarding former clients and would have required his disqualification had he not been

"de-designated" as an expert witness. Schwarcz had a clear ethical obligation not to

take an adverse position to Credit Suisse in the same or substantially-related

transactions. Credit Suisse maintains that federal courts have inherent authority to

discipline attorneys who appear before them for conduct deemed inconsistent with

ethical standards imposed by the court. This authority includes the power to disqualify

an attorney from representation for violating ethics rules.

Under Rule 1.9 of the Ohio Rules of Professional Conduct, an attorney is

prohibited from taking subsequent employment or engaging in conduct which is

adverse to the interests of his former client. To establish a violation of Ohio Rule 1.9(a),

one must show that a lawyer has taken a "materially adverse" position that is

---

[1]There is an apparent reference to Steven Schwarcz (spelled Schwarz) as a Kaye
Scholer lawyer who had written an article about whether future receivables could serve
as collateral for a securitization. Third Amended Complaint, ¶ 1100.

"substantially related to" the former representation. According to Credit Suisse, there can be no dispute that the retention of Schwarcz to serve as an expert witness against Credit Suisse violated Ohio Rule 1.9(a) because he represented Credit Suisse on the NCFE transactions and was responsible for reviewing key transaction documents and legal opinions. Not only has Schwarcz shared Credit Suisse's confidences in a substantially related matter, but he agreed to become a witness against his former client. Because Schwarcz took a materially adverse position to Credit Suisse that was substantially related to his former representation of Credit Suisse, there is an irrebuttable presumption that Credit Suisse's privileged information and confidences were shared with Gibbs & Bruns.

Credit Suisse maintains that the same ethical principles demanding the disqualification of Schwarcz also mandate the disqualification of Gibbs & Bruns as counsel for plaintiffs. If an attorney has been disqualified from representing a party because of an ethical violation, his entire firm is also disqualified. Credit Suisse maintains that the ethical violation committed in the retention of Schwarcz should be imputed to Gibbs & Bruns, which in turn should be disqualified from representing any party to these proceedings.

Credit Suisse argues that Gibbs & Bruns should be disqualified according to the Supreme Court of Ohio decision, *Kala v. Aluminum Smelting & Refining Co.*, 688 N.E.2d 258 (Ohio Sup. Ct. 1998). Credit Suisse maintains that there is a substantial relationship between the matter at issue and the matter of the former firm's prior representation,

that Schwarcz shared in the confidences and representation of the prior matter; and that Gibbs & Bruns cannot show that the adequate and timely screens were erected to wall off the tainted attorney from the remainder of the firm. Credit Suisse contends that the fact that Schwarcz served as an expert witness retained by Gibbs & Bruns, as opposed to being employed by the firm, does not change the analysis.

### B.    Plaintiffs' Response in Opposition to Credit Suisse's Motion

Plaintiffs contend that Credit Suisse's motion is nothing more than an obvious tactical ploy and not designed to protect any actual confidential information. Plaintiffs maintain that Credit Suisse seeks to exploit the fact that Schwarcz, a preeminent legal scholar engaged by plaintiffs as a testifying expert, forgot that he spent less than one hour of his time on a representation on which Credit Suisse was among the joint clients of his former firm. According to plaintiffs, Credit Suisse admits facts that establish no confidential information could have been shared. Plaintiffs further contend that defendant misconstrues the relevant legal standards and misrepresents the facts.

Plaintiffs argues that Credit Suisse was never entitled to any confidentiality as to the plaintiffs with respect to the three debt transactions by NCFE subsidiaries in 1996 upon which Credit Suisse bases its motion.  Credit Suisse was not involved at all in one of the transactions, nor was it a client of either Schwarcz or Kaye Scholer. With respect to the other transactions, plaintiffs (or their predecessors) were represented jointly with Credit Suisse, and Credit Suisse has no right to confidentiality in a dispute involving co-clients. Schwarcz did not work at all on the transaction that involved NPF VI and NPF

XII for which Kaye Scholer performed work on behalf of Credit Suisse. Plaintiffs maintain that Schwarcz spent a total of less than one hour on any representation for which Credit Suisse was even among the client group, and Schwarcz had no memory of having done any work related to NCFE, making it impossible for him to have shared confidential information stemming from that work with plaintiffs. Plaintiffs further argue that Credit Suisse waived any entitlement to disqualification by waiting for over five months before saying anything and purposefully permitting Gibbs & Bruns to meet with Schwarcz to allow them to exploit the situation and seek disqualification.

Plaintiffs maintain that Credit Suisse mischaracterizes many facts about the three transactions on which its motion is based. The transactions concerned NPF WL, Inc, NPF VI, Inc. and NPF IX, Inc. NCFE's various subsidiaries had at least 45 debt issuance transactions or "note series" from 1991 to 2002. Approximately fifteen of those series was still outstanding at the time of NCFE's 2002 bankruptcy, and the Arizona Noteholder plaintiffs have sued upon twelve of those series: nine by NPF XII and three by NPF VI. Credit Suisse attempts to link Schwarcz to three of the 45 debt transactions, but those three transactions had fully matured and been paid off. None of the claims of the Arizona Noteholders are based on those three transactions.

With respect to the NPF WL Series 1996 transaction, plaintiff argues that the Kaye Scholer's client was NPF WL and not Credit Suisse. Four of the five hours that Schwarcz worked on related to this transaction, and there is no evidence that Credit Suisse had any involvement in this transaction. According to plaintiffs, Credit Suisse's

sole basis for relying on this transaction can only have been to confuse or mislead the court.

Plaintiffs contend that Schwarcz never worked on the NPF VI series 2 transaction. The billing records show no time or entries whatsoever for Schwarcz on this transaction. Plaintiffs assert that the billing records attached to Credit Suisse's motion pertain to the other two transactions, which includes a transaction in which Credit Suisse was not even a client. The New Client/Matter Form on which Credit Suisse relies described Kaye Scholer as representing the placement agent, the structuring agent, and the investors. The investors referred to were two companies that are now clients of Gibbs & Bruns and plaintiffs in the Arizona Noteholders action. Kaye Scholer also represented the entity NPF VI in the 1995-2 transaction, as evidenced by the January 4, 1996 Placement Agency Agreement. NPF IV is one of the UAT's predecessor entities.

NPF IX was a separate subsidiary of NCFE. The NPF IX 1996-1 transaction was the only transaction in which Credit Suisse was a client of Kaye Scholer's and on which Schwarcz billed any time. Schwarcz billed less than an hour on this matter, and like the NPF VI 1995-1 transaction, Credit Suisse was a joint client with one of the UAT's predecessor entities. Plaintiffs also argue that the NPF IX series 1996-1 transaction has no meaningful connection or relationship to this litigation. This litigation does not concern any of NPF IX's debt or transactions. Plaintiffs further argue that Kay Scholer's

representation on this matter was a joint representation between Credit Suisse and the UAT's predecessor.

Plaintiffs further argue that Schwarcz's report does not discuss Credit Suisse. Schwarcz was engaged by the Arizona Noteholders to act as a "teaching" expert and to help the jury understand the otherwise complex nature and process of a securitization. Schwarcz had no positions or opinions adverse to, or critical of Credit Suisse. His report simply described the general structure and function of NPF VI, Inc. and NPF XII, Inc.

Credit Suisse has no confidentiality rights vis a vis plaintiffs because plaintiffs were also clients of Kaye Scholer on the designated transactions, and disqualification of counsel who have had subsequent contact with a Kaye Scholer attorney is not proper. Plaintiffs argue that no confidential information was actually shared with Gibbs & Bruns, and the court should not presume facts necessary to disqualify counsel. Instead, Credit Suisse must demonstrate actual transmission of confidential information to Gibbs & Bruns, and plaintiffs insist that the facts demonstrate that no actual confidential information was transmitted to Gibbs & Bruns. Schwarcz had no memory of his minimal work he performed twelve years ago. Furthermore, according to the time log, Schwarcz's work consisted of "review opinion." Within two days of this review, Kaye Scholer issued three opinion letters (two in their capacity as counsel to Credit Suisse and one as counsel to NPF IX). Plaintiffs maintain that privilege protections for work on opinion letters in routine transactions are minimal, and they are lost if the opinions are the subject of later litigation. Plaintiffs maintain that Schwarcz never discussed any of

his work at Kaye Scholer or any representation of Credit Suisse. According to plaintiffs, Credit Suisse's hypothetical analysis of potential disqualification of Schwarcz is both moot and erroneous, and its reliance on the Ohio Supreme Court's *Kala* decision is wholly misplaced.

Plaintiffs further argue that disqualification is inappropriate and unnecessary even if there was some theoretical possibility that confidences were shared because Credit Suisse's purposeful and tactical delay in objecting to Schwarcz's designation waived any right to disqualifying Gibbs & Bruns. Plaintiffs would be subjected to significant prejudice if their counsel was disqualified. Finally, plaintiffs maintain that Credit Suisse's request for costs should be denied, and instead, the court should award costs to plaintiffs. Plaintiffs maintains that Credit Suisse lacked a good faith basis for asserting that any of its confidences were in jeopardy and misrepresented many of the facts in its motion.

### C. Credit Suisse's Reply in Support of its Motion

Credit Suisse maintains that it established that retention of Schwarcz violated Rule 1.9 of the Ohio Rules, which governs an attorney's duties to former clients, and Gibbs & Bruns failed to address whether retaining Schwarcz violated Rule 1.9.

In response to plaintiffs' arguments, Credit Suisse maintains that Schwarcz owed a duty of confidentiality to Credit Suisse. According to Credit Suisse, there was no joint representation with any of the plaintiffs in this action. Joint representation only exists if the representation complies with Rule 1.7. The notion that Kaye Scholer jointly

represented Credit Suisse and NPF VI and IX is directly contrary to plaintiffs' allegations against Kaye Scholer in this lawsuit. Gibbs & Bruns argued that Kaye Scholer represented multiple clients thereby creating conflicts which were obvious from the outset yet never disclosed and for which consent was never given. Credit Suisse argues that plaintiffs are estopped from taking a different position with respect to this motion.

Credit Suisse maintains that Schwarcz owed it a duty of confidentiality and his representation is "substantially related" to his expert testimony. Although the transactions bear different names, they are otherwise the same in nature. The transactions are structured the same and comprised of similar, if not identical, documents, have the same or similarly situated stakeholders, and raise similar, if not identical, legal issues. Credit Suisse contends that Schwarcz's retention as an expert witness was "materially adverse" to it. Serving as an expert witness against a former client is materially adverse regardless of the substance of the testimony. Credit Suisse maintains that Schwarcz implicitly criticizes Credit Suisse, as the placement agent, by questioning the integrity of the securitization program. Schwarcz also provided a framework for plaintiffs' other expert, Bernard Black, who attacked Credit Suisse directly.

Schwarz's ethical violation should be imputed to Gibbs & Bruns, which should be disqualified as counsel for plaintiffs. Gibbs & Bruns incorrectly asserts that *Kala* does not apply to this case. According to Credit Suisse, the presumption of shared

11

confidences between Gibbs & Bruns and Schwarcz can only be rebutted by enacting

ethical walls or other screening mechanisms, and Gibbs & Bruns failed to take any such

measures. Whether confidences were actually disclosed to Gibbs & Bruns is of no legal

consequence. It also does not matter what amount of time Schwarcz personally spent on

the representation or the nature of his work. Credit Suisse further argues that Schwarcz

is charged with all confidences obtained by any Kay Scholer attorney working on the

Credit Suisse representation in connection with issuances of NPF VI and NPF IX. Kaye

Scholer attorneys spent at least 463 hours representing Credit Suisse in NCFE matters.

Whether Schwarcz has any recollection of representing Credit Suisse is also of no legal

consequence.

Credit Suisse argues that it did not waive its objection to the ethical violations

committed by Gibbs & Bruns and Schwarcz. Although it immediately recognized that

Schwarcz was one of its former attorneys, Credit Suisse assumed that Gibbs & Bruns

knew this as well because it had access to the same documents that revealed those facts.

Credit Suisse believed that Gibbs & Bruns must have considered Schwarcz's former

representation and circumscribed his retention in a way that it believed it avoided the

ethical prohibitions of Rule 1.9. The manner in which Gibbs & Bruns described

Schwarcz's proposed testimony indicated to Credit Suisse that he was not going to

specifically address the NPF transactions. On September 3, 2008, Credit Suisse obtained

Schwarcz's report and learned that he addressed the NPF transactions and implicated

Credit Suisse. However, it was not until his deposition that Credit Suisse learned that no steps were taken to preserve Credit Suisse's confidentiality.

### III. Discussion

Federal courts have responsibility for supervising the conduct of attorneys who appear before them and addressing unethical conduct occurring before them. Courts, however, must also guard against motions for disqualification being used as a means of gaining tactical advantage in the proceedings. *Kitchen v. Aristech Chemical*, 769 F. Supp. 254, 257 (S.D. Ohio 1991). In *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 889 (6th Cir. 1990), the Sixth Circuit outlined three factors to determine whether disqualification of counsel is appropriate: (1) whether a past attorney/client relationship existed between the party seeking disqualification and the attorney it seeks to disqualify; (2) whether the subject matter of those relationships is substantially related; and (3) whether the attorney acquired confidential information from the party seeking disqualification. *Id.* at 889. The party moving for disqualification bears the initial burden of persuasion and proof on its motion. *Bartech Industries, Inc. v. International Baking Co. Inc.*, 910 F. Supp. 388, 392 (E.D. Tenn. 1996).

Attorneys practicing in this court are governed by the Ohio Rules of Professional Conduct. *See* Model Fed. Rules of Disciplinary Enforcement IV(B) ("The Rules of Professional Conduct adopted by this court are the Rules of Professional Conduct adopted by the highest court of the state in which this Court sits. . . ."). Defendants seek

disqualification of Gibbs & Bruns because Schwarcz violated Rule 1.9, which provides in pertinent part:

> Unless the former client gives informed consent, confirmed in writing, a lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client.

Rules of Prof. Cond., Rule 1.9(a).

Three transactions are at issue for purposes of Credit Suisse's motion to disqualify: the NPF VI Series 2 transaction, the NPF-WL transaction, and the NPF IX Series 1 transaction. In his deposition, Schwarcz testified that he did not recall representing NCFE. Schwarcz dep. 32:14-21.

NPF VI . The first transaction concerned the NPF VI series 2 transaction, which occurred in January 1996. This transaction is the only one of the three transactions at issue which concerns NPF VI, one of the entities that had outstanding notes series at the time of NCFE's collapse. None of the Arizona Noteholders are suing on this particular transaction—the Series 2 transaction. The April 30, 1997 invoice addressed to NCFE for the NPF VI series 2 transaction demonstrates that Schwarcz did not bill any time for this transaction. Pls.' Exh. 15; doc. 1526-12 at 16-24 .

Schwarcz is listed as a billing partner and partner in charge on a December 1, 1995 New Client/Matter Form for First Boston-Structured Finance in which Kaye Scholer would represent the placement agent (First Boston), the structuring agent (Ascendant Capital) and the investors in a private placement healthcare securitization.

Defs. Exh. B; doc. 1457-1 at 16. This was Credit Suisse's first NCFE healthcare receivables-backed notes offering. Schwarcz billed no time on the matter.

In his deposition, Schwarcz testified that he did not recall representing Credit Suisse, although he acknowledged that documents reflected that he was the billing partner in charge. Schwarcz Dep. 50:10-52:22. The investors referred to in the engagement form are Grantham Mayo van Otterlo and Bayerische Landesbank. Pls.' Exh 16; doc. 1526-13 at 7 & 15.  Grantham Mayo van Otterloo is a plaintiff in this case, and Bayerische Landesbank was a plaintiff but withdrew its claims, according to plaintiffs,  for unrelated reasons.

Kaye Scholer also represented NPF VI in the 1995-2 transaction. Pls.' Exh. 17 at ¶ 8(e); doc. 1526-14 at 23 ("The Placement Agent [Credit Suisse] and Ascendent Capital Services, Inc shall have received an opinion of . . . Kaye, Scholer, Fierman, Hays & Handler, LLP, special counsel to the issuer [NPF IV]. . . ").  The UAT, as successor to NPF VI, retains all of NPF VI's attorney-client privileges. The evidence submitted to the court suggests that Kaye Scholer jointly represented Credit Suisse with plaintiffs in this action.

NPF-WL. Credit Suisse also relies on the NPF WL Series 1996 transaction. Schwarcz is listed as a billing partner and partner in charge on a February 21, 1996 New Client/Matter Form for NPF-WL. Defs.' Exh. K; doc. 1457-3 at 38-44. A handwritten notation on the form indicates that an engagement letter was not necessary because the matter involved a "subsidiary of major healthcare finance co, and we have worked with

them before–and they have wonderful market reputation." *Id.* at 39. As plaintiffs point

out, however, the New Client/Matter Form indicates that NPF WL was Kaye Scholer's

client in this matter, not Credit Suisse. Because Kaye Scholer did not represent Credit

Suisse in this matter, it cannot be used to demonstrate that Credit Suisse's

confidentiality was breached.

NPF-IX. Although plaintiffs concede that Schwarcz worked on the NPF IX Series

1 transaction[2] and that Credit Suisse was a client of Kaye Scholer with regard to that

transaction, plaintiffs maintain that this transaction is simply not related to this

litigation because NPF IX paid off its notes prior to the collapse of NCFE, and this

transaction does not relate to the NPF VI or NPF XII notes that are the subject of this

litigation. Plaintiffs do not rely on this transaction in any manner.

Plaintiffs also contend that Kaye Scholer provided joint representation to Credit

Suisse along with one of the UAT's predecessor entities. Credit Suisse has not provided

the New Client/Matter Form for the NPF IX Series 1 transaction. The Placement Agency

Agreement demonstrates that Kaye Scholer also acted as "special counsel to the Issuer"

on this transaction. The Issuer was NPF, IX, one of the entities for whom the UAT is a

successor. Pls.' Exh. 19 at ¶ 8(e).

Schwarcz's Expert Report. Schwarcz's expert report attempts to explain:

---

[2]A November 14, 1996 invoice concerning NPF-IX indicates that Schwarcz billed
0.21 hours to review opinion. Credit Suisse submitted the Kaye Scholer invoice, but
Credit Suisse's name does not appear on this invoice.

the basics of securitization, including healthcare securitization; how securitization works, including the importance of overcollateralization, reserve accounts, a bankruptcy-remote structure, and operation of the securitization program consistently with the governing documents; that securitization is a regular and unexceptional tool; why securitization creates benefits; and the role of rating agencies in a securitization.

Defs.' Exh. N. Doc. 1457-4 at 13-14. In preparing the report, Schwarcz relied on his general knowledge, training, experience and expertise and the October 10, 2000 Sales Points Broadcast for the $250,000,000 Health Care Receivables Securitization Program Notes, Series 2000-2, issued by NPF XII, Inc. He also reviewed an article by Neil McPherson and Todd Fasanella included in INVESTING IN ASSET-BACKED SECURITIES (2000) and Article V of the NPF XII Health Care Receivables Securitization Program Notes Master Indenture (March 10, 1999). He made no independent investigation. Both his analysis and the factual observation he made in the report were "based solely on the foregoing." Defs.' Exh. N. Doc. 1457-4 at 14-15.

In his report, Schwarcz described health securitization transactions and the NPF securitization programs:

NPF VI and NPF XII purchased, from multiple originators, healthcare receivables–representing amounts owing to healthcare providers for the provision of healthcare services. Only "eligible" receivables were identified for purchase, meaning (among other requirements) only high quality receivables consisting of the insured portions of such receivables owed either by federal or state governmental entities, in the case of Medicare and Medicaid receivables: or by highly rated private insurers and managed care programs, such as Blue Cross, Blue Shield and other domestic commercial insurers and HMOs, PPOs, and other similar managed care programs. NPF VI and NPF XII obtained funds to purchase these receivables by issuing securities, in the form of Class A and Class B Notes, to investors. An experienced healthcare securitization servicer, NCFE's affiliate National Premier Financial Services, Inc. ("NPFS"),

served as both the servicer and the program manager for NPF VI and XII. Under the Master Indenture Servicing Provisions, one of NPFS duties was to monitor performance of NPF VI's and NPF XII's receivable portfolios. If a portfolio at any time failed to meet contractual performance standards, NPF VI and/or NPF XII, as the case may be, would be required to stop purchasing newly-arising receivables, thereby liquidating its receivables portfolio before performance worsened. Under the Master Indenture Servicing Provisions, NPFS also had a duty to monitor and administer the flow of funds within the NPF securitization programs, including the use of reserve funds and the maintenance of required levels in the reserve accounts. If such required levels failed to be maintained, NPF VI and/or NPF XII, as the case may be, would either automatically or, by direction of the trustee for the notes of the majority of noteholders, be required to stop purchasing newly-arising receivables, thereby liquidating its receivables portfolio.

*Id.* at Doc. 1457-4 at 19-20. (Footnotes omitted.) Schwarcz describes the three forms of reserve accounts that were required and intended to provide a source of repayment for noteholder principal and interest in the event that the receivables were not collected at the expected levels. In order to ensure proper operation of a securitization program, the required reserve accounts must be properly maintained and their assets could only be used as permitted by the governing documents. Reserve accounts that are not properly funded can indicate poor performance of the portfolio because reserve accounts are often tied to the performance of the underlying receivables portfolio. The intentional failure of the servicer to maintain reserves at required levels calls into question the honesty and integrity of the servicer and the entire securitization program.

Schwarcz described early amortization events, such as poor performance of the receivables portfolio, failure to maintain reserve account balances, failure to maintain certain collateral coverage requirements, and failure of the servicer and program

manger to comply with its covenants and warranties. In the event of one of these events, the purchase of additional receivables should have been discontinued, but if early amortization events were manipulated to create the appearance of compliance, the early amortization events could not perform their functions. As a result, investors were placed at risk.

Analysis. Courts have denied motions for disqualification on the basis of waiver when the moving party failed to move for disqualification in a timely manner:

> "It is well settled that a former client who is entitled to object to an attorney representing an opposing party on the ground of conflict of interest but who knowingly refrains from asserting it promptly is deemed to have waived that right." *Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir.1983) (denying motion for disqualification where it was asserted just prior to the scheduled trial date).

*In re Valley-Vulcan Mold Co.*,  5 Fed. Appx. 396, 401, 2001 WL 224066 at * 5 (6th Cir. 2001).

In *Exterior Systems, Inc. v. Noble Composites, Inc.*, 175 F. Supp.2d 1112, 122 (N.D. Ind. 2001), the court articulated five factors to consider whether a party has waived its objections: (1) the length of the delay in bringing the motion to disqualify; (2) when the former client learned of the conflict; (3) whether the former client was represented by counsel during the delay; (4) why the delay occurred; and (5) whether the delay would result in prejudice to the moving party. *Id.*

While it is clear that plaintiffs failed to adequately investigate potential conflicts before retaining Schwarcz, Credit Suisse's delay in raising the issue constitutes a waiver. Rather than attempt to resolve this matter expeditiously and efficiently, Credit

Suisse hoped to gain an advantage through pure gamesmanship. This court does not

tolerate such behavior:

> Lawyers who practice the art of making life difficult -- who . . .
> deliberately make litigation more expensive or time consuming -- bring
> disrepute on the legal profession and harm the reputation of this Court's
> bar in the community. Lawyers engaging in such conduct, and litigants
> who encourage or tolerate it, undermine immeasurably their own
> standing with the Court.
> . . .
> Those who have chosen to practice law as a profession have sworn to
> uphold a legal system which offers all people a fair and just way to resolve
> disputes. Inappropriate behavior – treating litigation as a "game" in which
> the party with the most overtly aggressive lawyer might prevail
> regardless of the merits of the case . . . brings disrespect upon the legal
> system as a whole.

S. D. Ohio Civ. Rules Introductory Statement on Civility.

Credit Suisse states that it first learned that plaintiffs' retained Schwarcz in July

2008:

> After receiving G&B's expert witness designation (and being struck
> by the oddity of party naming an expert witness who was a partner at one
> of the former defendants in this case), and then reviewing Schwarcz's
> report (which was oddly structured and seemingly carefully
> circumscribed), Credit Suisse conducted a review of documents produced
> by Kaye Scholer in this litigation. These were in large part documents that
> G&B itself produced to Credit Suisse on July 12, 2007–document that G&B
> had in its possession since the year -2004, when Kaye Scholer produced
> the documents in conjunction with Rule 2004 examinations. The Kaye
> Scholer documents seemed to confirm that Schwarcz personally
> represented Credit Suisse in certain NCFE-related transactions.
> Credit Suisse confronted Schwarz with this information at the first
> reasonable opportunity–his deposition on December 16, 2008. . . .

Doc. 1457 at 18-19. Credit Suisse's delay in bringing the court's attention to this matter

was improper. Waiting five months before raising the issue with opposing counsel

cannot be characterized as "the first reasonable opportunity" under any circumstances. If Credit Suisse had genuine concerns regarding whether confidences would be shared with plaintiffs' counsel, it would have acted immediately. No reasonable person would have waited that length of time given the uncertainty that a court would in fact disqualify counsel. Quite possibly, this entire matter could have been resolved quickly had counsel for Credit Suisse placed a telephone call to opposing counsel. Had plaintiffs' counsel failed to respond to Credit Suisse's concerns, the court would have been available to resolve any disputes concerning Schwarcz's participation while the parties investigated the matter further.

From its motion, it appears that Credit Suisse recognized the potential for conflict as soon as Schwarcz was identified as an expert. Credit Suisse maintains that it delayed in seeking disqualification because it believed that plaintiffs' would have circumscribed his retention in a way that plaintiffs believed would have avoided the ethical prohibitions of Rule 1.9. Credit Suisse suggests that had Schwarcz testimony been limited to what a securitization is, how it works, and why the relevant features of securitized notes are material to investors and rating agencies, it would not have objected, and the reason for the delay was to discover whether Schwarcz would address the NPF transactions or implicate Credit Suisse. Credit Suisse acknowledged that it learned the substance of his proposed testimony when it received his expert report on September 3, 2008. Credit Suisse maintains that it did not know that Gibbs & Bruns was unaware that Schwarcz had previously represented Credit Suisse related to NCFE

transactions until the date Schwarcz was deposed. Credit Suisse asserts that it was not until then that it learned that "the retention was not circumscribed in any fashion, that no ethical walls had been built, and that no steps whatsoever had been taken to preserve Credit Suisse's confidentially. It was only then that the full scope of the ethical violation became clear." Doc. 1542 at 37-38. Credit Suisse's argument is baseless. The idea that Credit Suisse believed that walls might have been erected is not worthy of belief. Chinese walls are used to ensure that an attorney has no contact with the attorneys litigating the matter that presents a potential conflict. Here, Schwarcz was engaged as an expert by the very attorneys that he would have been foreclosed from contacting had he joined the firm. It should have been clear that Gibbs & Bruns was unaware of the conflict. Delay in bringing this matter to the attention of plaintiffs' counsel and the court has resulted in increased and unnecessary expense. Plaintiffs have paid a significant fee to an expert that they cannot use. Both parties have expended significant costs in briefing this issue. While it is clear that plaintiffs failed to adequately investigate potential conflicts, Credit Suisse was aware of the conflict and did not nothing to address this issue in a timely manner.

As a result, the court finds that disqualification under these circumstances is not warranted. In reaching this decision, the court notes that it believes that Schwarcz's testimony that he had no recollection of representing Credit Suisse or any role in any NCFE transactions. Furthermore, the documents submitted by Credit Suisse suggest that plaintiffs were jointly represented by Kaye Scholer with Credit Suisse which casts

some doubt on whether in fact Schwarcz obtained confidential information from Credit Suisse. Finally, were the court to disqualify Gibbs &Bruns, the prejudice to plaintiffs would be great. This complex litigation has been pending since 2003.

The court elects not to award either party its attorney fees with respect to this matter. Although the court finds that defendant failed to raise this issue in a timely manner which resulted in a waiver of its right to seek disqualification, plaintiffs also failed to act diligently with respect to their investigation of whether Schwarcz had conflicts which prohibited him from serving as an expert for plaintiffs.

## V.     Conclusion

For the reasons stated above, defendant Credit Suisse (USA) LLC and Credit Suisse, New York Branch's ("Credit Suisse") January 27, 2009 motion to disqualify Gibbs & Bruns LLP ("Gibbs & Bruns") as counsel for plaintiffs and to obtain ancillary relief (doc. 1457) is DENIED.


                                        s/ James L. Graham
                                        James L. Graham
                                        United States District Judge

DATE: March 29, 2010