IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re National Century Financial Enterprises, Inc., Investment Litigation. | : | Case No. 2:03-md-1565 |
| | : | Judge Graham |
| | : | Magistrate Judge Abel |

**OPINION AND ORDER ON THE MOTIONS FOR SUMMARY JUDGMENT
AS TO CREDIT SUISSE'S LIABILITY TO THE NOTEHOLDER PLAINTIFFS
UNDER SECTION 1707.43 OF THE OHIO SECURITIES ACT**

Before the court on cross motions for summary judgment is the issue of whether defendant Credit Suisse Securities LLC is liable under Ohio Revised Code § 1707.43 for its role in the sale of asset-backed securities issued by National Century Financial Enterprises, Inc. It is undisputed that National Century committed a massive fraud that cost the plaintiffs (the "Noteholders") nearly $2 billion.

Credit Suisse served as the initial purchaser for many of National Century's note issuances and then sold the notes to institutional investors like the Noteholders. Credit Suisse also sold notes to some of the Noteholders in the secondary market. The Noteholders allege that Credit Suisse is liable under the Ohio Securities Act both as a seller and as one who has "participated in or aided the seller in any way in making such sale." O.R.C. § 1707.43(A). The court, however, finds that applying the Ohio Securities Act to the securities transactions here – sales by Credit Suisse in New York to the Noteholders in states outside of Ohio – would be an extraterritorial application that violates the Commerce Clause of the United States Constitution.

I.    **Background**

National Century committed a multi-billion dollar fraud on investors. It issued investment-grade notes, representing them to be backed by health care receivables National Century obtained in the regular course of its business. In reality, a great deal of the accounts receivable that National Century "purchased" were worthless or non-existent receivables from health care companies in which National Century's executives held undisclosed ownership interests. What appeared on paper to be legitimate

transactions in fact amounted to little more than transfers of corporate funds into the pockets of National Century's executives.  When National Century went bankrupt in November 2002, the Noteholders and other investors suffered substantial losses.

In late 1995, Credit Suisse and National Century entered into a letter agreement whereby Credit Suisse agreed to be National Century's "agent and financial advisor in connection with the marketing" of two $50 million note offerings by NPF VI, one of National Century's wholly-owned, note-issuing entities.  See Credit Suisse's Mem. in Opp'n to Pls.' Mots. for Partial Summ. J., Ex. 42, ¶ 1 (hereinafter "CS Opp'n Ex. __").  The letter agreement called on Credit Suisse to "structure, market and place the [note] Offerings."  Id.  Shortly thereafter, in early 1996, Credit Suisse entered into a Placement Agency Agreement with National Century, NPF VI, and the receivables servicer, National Premier Financial Services, Inc.  See CS Opp'n Ex. 45.  The agreement required Credit Suisse to privately place the notes with qualified institutional buyers in return for a placement fee of 1% of the principal amount of notes sold.  See id., pp. 2-4.

The arrangement changed for the later note issuances in which the Noteholders invested.  Credit Suisse entered into a series of Purchase and Agency Agreements with National Century, the note-issuing entity (either NPF VI or NPF XII), and the servicer.  See CS Opp'n Ex. 44.  These agreements defined Credit Suisse as an "initial purchaser"[1] who would purchase the notes from the issuer at a slight discount, such as 0.6 % less face value of Series NPF XII 2001-1A notes.  See id., p. 3.  Credit Suisse would then work with a placement agent (Banc One Capital Markets, for example) to place the notes with qualified institutional buyers.  See id., p. 2.  In no way though was Credit Suisse contractually required to sell the notes, and Credit Suisse says it lost about $130 million in notes it had on hand when National Century collapsed.  See Credit Suisse's Mot. for Summ. J., Ex. 143 (hereinafter "CS MSJ Ex.

---

[1] In earlier orders, the court referred to Credit Suisse as an underwriter, as the complaints had alleged.  The Purchase and Agency Agreements did not refer to Credit Suisse as an underwriter, and because the NPF notes were not public offerings, Credit Suisse did not meet the federal statutory definition of an underwriter.  See 15 U.S.C. § 77d(2).  Nonetheless, Credit Suisse functioned like an underwriter, purchasing securities from the issuer with a view to distributing them.  See 15 U.S.C. § 77b(a)(11).

—").[2]

National Century and its entities were all Ohio corporations. The Credit Suisse Group is a Swiss financial services company. Its subsidiary, Credit Suisse Securities (USA) LLC, is the defendant in this litigation and is a Delaware corporation with its principal place of business in New York. The closings and delivery of notes from NPF VI and NPF XII to Credit Suisse took place in New York. See CS MSJ Ex. 16, at CSFB-2004 0006615; Ex. 227, at CSFB-2004 0015483.

The Noteholders are institutional investors who purchased NPF VI and NPF XII notes. Metropolitan Life Insurance Co., a New York corporation with its principal place of business in New York, purchased a total of $121 million in NPF XII notes from June 2001 to July 2002. All but one purchase was made from Credit Suisse, which sold the notes from its New York office. MetLife purchased $104.5 million of NPF XII Series 2001-1, 2001-2, 2001-4, and 2002-1 notes from Credit Suisse. See Consolidated Mot. of MetLife and Lloyds for Partial Summ. J., Feb. 18, 2009 Aff. of Sarah Gibbs Leivick, Ex. 50. Credit Suisse served as the initial purchaser for all of these notes. MetLife made one purchase from Bear Stearns & Co., which also had its offices in New York. Id. at ML_004916. This purchase occurred in the secondary market and consisted of $16.6 million of NPF XII 2001-2 Series notes for which Credit Suisse had been the initial purchaser.

Lloyds TSB Bank plc is a British public limited company with its principal place of business in London, England and an office in New York. Lloyds purchased from Credit Suisse in New York $60 million of NPF XII 2001-1 Series notes in March 2001. See Consol. MSJ, Leivick Aff., Ex. 89. Lloyds separately invested $68 million in a NPF XII 2000-4 Series variable funding note ("VFN"). In December 2000, Credit Suisse entered into an agreement with NPF XII and a conduit purchaser whereby Credit Suisse committed to purchase an undivided interest in the VFN upon the occurrence

---

[2] Exhibit 143 is a summary chart, offered under Fed. R. Evid. 1006, of Credit Suisse's monthly note holdings from 1998 to 2002. MetLife and Lloyds object to the admissibility of the chart, arguing that Credit Suisse has failed to prove the accuracy of the underlying trade data, which is attached to the Sept. 25, 2009 Decl. of Allan W. Kleidon. See CS Opp'n to Consol. Mot. to Strike (doc. 1765), Dec. 23, 2009 Aff. of Matthew Lawson, Ex. 7. Without ruling on the objection as to the proper method for determining the precise amount of Credit Suisse's loss, the court finds it sufficient to say here that Credit Suisse did suffer significant losses.

of certain events.  See CS MSJ Ex. 145.  In turn, Credit Suisse and Lloyds entered into a Participation Agreement, signed by both parties in New York, under which Lloyds assumed a $68 million undivided interest in the VFN.  See CS MSJ Ex. 219.  The Participation Agreement had an original termination date of December 26, 2001, but Credit Suisse and Lloyds renewed the agreement for another year.  See CS MSJ Ex. 145, at LL_ 000217-19 (renewal signed by both parties in New York).  On October 31, 2002, the triggering events occurred that required Credit Suisse to purchase its interest in the VFN.  On November 5, 2002, Lloyds purchased from Credit Suisse its participation interest in the VFN.  See CS MSJ Ex. 217.

The Arizona Noteholder plaintiffs include numerous governmental entities from Arizona and other states, as well as investment funds, banks, insurance companies, trusts and other entities from various states and foreign countries.  The Arizona Noteholder plaintiffs collectively purchased over $1.5 billion of NPF VI and NPF XII notes between 1998 and 2002.  In a prior order, the court dismissed as time-barred the Ohio Securities Act claims based on the Arizona Noteholders' earliest purchases in 1998 and early 1999.  See Dec. 19, 2007 Order, pp. 26-28.

Of the Arizona Noteholders with claims remaining under the Ohio Securities Act, just one has its principal place of business in Ohio: FirstEnergy Health Benefits Trust.  FirstEnergy's purchase was made by investment advisor Lincoln Capital in Illinois.  According to the complaint, the solicitation of the notes and the decision to purchase took place in Illinois.  See City of Chandler Second Am. Compl., ¶ 105QQ.  The Arizona Noteholders do not contend that any of their purchases took place in Ohio.

The Arizona Noteholders' purchases fit into three categories: (1) purchases made from Credit Suisse in its capacity as the initial purchaser; (2) purchases made from Credit Suisse of notes circulating in the secondary market; and (3) purchases made from brokers or dealers other than Credit Suisse. These second and third categories include both notes for which Credit Suisse served as the initial purchaser and notes for which PaineWebber Inc., a Delaware corporation with it principal place of business in New York, served as initial purchaser.  None of the secondary market purchases from Credit Suisse took place in Ohio, nor did any of the sales by other brokers or dealers occur in Ohio.  The majority of the $1.5 billion of notes purchased by the Arizona Noteholders fall into the first category.

MetLife, Lloyds, and the Arizona Noteholders have asserted numerous claims against Credit Suisse for its alleged involvement in National Century's wrongdoing. This opinion focuses on their claims under Ohio Revised Code § 1707.43(A). The parties have filed cross motions for summary judgment and presented oral argument on the issue. To summarize, the Noteholders argue that National Century and Credit Suisse were joint sellers and that Credit Suisse is liable under § 1707.43(A) as a seller and as one who has "participated in or aided the seller in any way in making such sale." They contend that secondary liability is broad and akin to strict liability, in that scienter need not be shown as to the aider. Credit Suisse challenges liability on several grounds, including standing and statute of limitations. Credit Suisse further argues that the transactions occurred wholly outside of Ohio and, as such, applying the Ohio Securities Act would violate the dormant Commerce Clause.

## II.    Standard of Review

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more

than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

## III.    Standing

Standing is "the threshold question in every federal case." Warth v. Seldin, 422 U.S. 490, 498 (1975). "To satisfy Article III's standing requirement, a plaintiff must have suffered some actual or threatened injury due to the alleged illegal conduct of the defendant; the injury must be 'fairly traceable' to the challenged action; and there must be a substantial likelihood that the relief requested will redress or prevent the plaintiff's injury." Coyne v. American Tobacco Co., 183 F.3d 488, 494 (6th Cir. 1999) (citing Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982)).

A court should also consider the following prudential limits on standing: (1) alleging a generalized grievance not particular to the plaintiff; (2) asserting the legal rights and interests of a third party; and (3) claiming an injury outside the zone of interests of the statute providing the cause of action. In re Cannon, 277 F.3d 838, 853 (6th Cir. 2002) (citing Valley Forge, 454 U.S. at 474-75).

6

### A.    Arizona Governmental Entities

Among the Arizona Noteholder plaintiffs are the Arizona State Treasurer and 109 Arizona governmental entities that invested through a local government investment pool named LGIP-5. Under Arizona law, political subdivisions and other public entities may place their funds in the hands of the Treasurer for investing on their behalf. See Ariz. Rev. Stat. Ann. §§ 35-326.D, 35-326.01. The Treasurer has the authority to invest and manage the funds in the pool. Ariz. Rev. Stat. Ann. § 35-326.A-B ("The state treasurer may maintain one or more pooled investment funds for the collective investment of monies in this state. . . . The assets of a pooled investment fund shall be invested by the state treasurer . . . ."). The Treasurer decides how funds are invested (within certain parameters, see CS Reply Ex. 428 (investing guidelines)), regularly accounts for the funds in the pool, ensures that records are audited, disburses or reinvests mature securities, and allocates pooled income earnings, subject to operating costs, on a pro rata basis. Ariz. Rev. Stat. Ann. § 35-327.

Credit Suisse contends that the governmental entities lack standing because none of them are a "purchaser," as Ohio Revised Code § 1707.43(A) requires. Credit Suisse argues that the Treasurer is the one who purchased the notes and has standing; the governmental entities simply have beneficial interests in the pool. Plaintiffs respond that the issue is academic because the Treasurer is a plaintiff and has asserted the same claims with the same legal counsel as they have.

The Ohio Securities Act does not definitively answer whether having a beneficial interest is enough to be a purchaser under O.R.C. § 1707.43(A), and there appears to be no Ohio case law on point. A "purchase" is defined as the "acquisition of, or attempt to acquire, a security or an interest in a security." O.R.C. § 1707.01(GG)(1). The record shows that the Arizona Treasurer acquired the securities and the account was held in the name of LGIP; none of the governmental entities had their names on the account. See CS MSJ Ex. 199; CS Reply Exs. 422, 423, 667 (trade tickets). Though the Ohio Securities Act makes reference to a "beneficial owner," it is not in the context of defining a securities purchase or establishing who has the right to bring suit. See O.R.C. §§ 1707.03(M)(2) (registration), 1707.131(A) (registration), 1707.32 (insurance securities). The definition of a "beneficial owner" does not help either. It includes those who have the authority to direct the disposition of a

security. O.R.C. § 1707.01(Z).  Under Arizona law, local governmental entities may request to withdraw their money from the pool, but there is no provision authorizing them to dispose of securities.  See Ariz. Rev. Stat. Ann. § 35-316.B.

Both sides liken the LGIP-5 to a trust for which the Treasurer is trustee.[3]  Plaintiffs cite James v. Gerber Prods. Co., 483 F.2d 944 (6th Cir. 1973), in drawing a comparison to private litigation under Section 10(b) of the Securities Exchange Act, where the general rule is that only an actual purchaser or seller may bring suit.  See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731 (1975) (adopting the "Birnbaum Rule" established in Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952)).  In James, the trustee of a testamentary trust sold the trust's shares of stock in Gerber back to Gerber for a price the beneficiary believed to be far below market value.  The beneficiary sued both the trustee and Gerber under Rule 10b-5, and the Sixth Circuit held that the beneficiary had standing to do so because she was the real party in interest.  James, 483 F.2d at 949 ("[S]eparating the legal and beneficial incidents of ownership in the property is a mere technical argument since there is only one interest at stake and that is the beneficiary's.").

The plaintiffs' reliance on James fails, however, because the trustee in that case was allegedly a party to the wrongdoing.  Without the ability to bring her own suit, the beneficiary – "the party in interest who actually suffered the fraud" – would have been "without an avenue of redress in the federal courts."  James, 483 F.2d at 949.  There are no allegations here that the Treasurer took part in wrongdoing or breached any duties to the investment pool beneficiaries.  More applicable is the common law rule that "a trustee can maintain an action in law or equity against a third person to remedy an injury with respect to trust property as if he held the property free of the trust; generally, beneficiaries

---

[3]  The parties have not briefed the issue of whether the LGIP-5 is in fact a trust.  After reviewing the statutory language and the Treasurer's Office materials submitted by Credit Suisse, the court agrees with the characterization of the LGIP-5 as a trust.  See Carrillo v. Taylor, 81 Ariz. 14, 27, 299 P.2d 188, 197 (Ariz. 1956) (express trust exists when there is a competent settlor and a trustee, a clear and unequivocal intent to create a trust, an ascertainable trust res, and sufficiently certain beneficiaries).

of the trust cannot." Cannon, 277 F.3d at 854 (citing Restatement (Second) of Trusts §§ 280-82); cf. In re Redden Family Trust, No. 1 CA-CV 08-0206, 2009 WL 3415728, at *7 (Ariz. Ct. App. Oct. 22, 2009) (following the Restatement's rules for when a beneficiary may bring suit). Here, the Treasurer seeks to enforce the interests of the governmental entities, and there is no suggestion that the Treasurer's interests are adverse to theirs. Because the harm alleged is to the value of the securities in the trust, the claims asserted by the governmental entities are derivative in nature and are already being vigorously litigated by the Treasurer as trustee of the LGIP-5. The court thus concludes that only the Treasurer has standing to sue. See Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 732-34 (3d Cir. 1970) (holding that mutual fund shareholder had no standing to bring his own action to recover for diminution in value of the shares resulting from harm inflicted on the fund).

### B.    Authorization to File Suit

Credit Suisse next challenges the standing of numerous Arizona Noteholders who made purchases through investment agents. Credit Suisse contends that these plaintiffs have yet to prove that they authorized the commencement of suit either directly with counsel or through their investment advisors.

In response, plaintiffs have submitted for the court's *in camera* review a collection of legal engagement letters. These documents are the subject of a motion to strike (doc. 1648) and were previously the subject of a motion to compel. The magistrate judge denied Credit Suisse's motion to compel, finding that Credit Suisse had asked only for communications between plaintiffs and their investment advisors and had "specifically excluded documents that would have shown that the plaintiffs retained Gibbs & Bruns." July 2, 2009 Order, p. 10.

Credit Suisse now argues that *in camera* review of evidence is improper at the summary judgment stage. However, Credit Suisse itself argued that if the motion to compel were denied, then the legal engagement letters should at least be produced for *in camera* review by the court. See CS Reply in Support of Mot. to Compel (doc. 1479), p. 5. Moreover, the rule disfavoring *in camera* review at the summary judgment stage applies to resolving the merits of a case and not necessarily to resolving

threshold issues like standing.  See Vining v. Runyon, 99 F.3d 1056, 1057 (11th Cir. 1996) (noting that "'[o]ur adversarial legal system generally does not tolerate *ex parte* determinations on the merits of a civil case'") (quoting Application of Eisenberg, 654 F.2d 1107, 1112 (5th Cir. Unit B Sept. 1981)); Abourezk v. Reagan, 785 F.2d 1043, 1061 (D.C. Cir. 1986) (citing the "main rule that a court may not dispose of the merits of a case on the basis of *ex parte*, *in camera* submissions").

Upon review of the documents submitted for *in camera* inspection, the court is satisfied that plaintiffs authorized their counsel, Gibbs & Bruns L.L.P., to file suit.

### C.      Arizona Noteholders who Sold their Notes

Certain of the Arizona Noteholders sold all or part of their notes after National Century filed for bankruptcy in November 2002.  Credit Suisse argues that some of these plaintiffs – namely the AmerUs plaintiffs, the Dreyfus plaintiffs, the Lincoln Capital plaintiffs, Phoenix Life, and SanPaolo – cannot produce evidence that they retained their litigation rights when they sold their notes.

Causes of action generally are assignable, but the nature of the cause of action must be examined.  See Leber v. Buckeye Union Ins. Co., 125 Ohio App.3d 321, 332, 708 N.E.2d 726, 733 (Ohio Ct. App. 1997).  Actions that are personal to the one who suffered the harm often are not assignable or must be expressly assigned.  See In re Schmelzer, 350 F.Supp. 429, 431 (S.D. Ohio  1972) ("It has been the law in Ohio from a very early date that personal torts, in the absence of a statute allowing the survival of these claims, are not capable of assignment.") (citing Grant v. Ludlow's Adm'r, 8 Ohio St. 1, 38 (1857)); see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt, LLC, 479 F.Supp.2d 349, 373 (S.D.N.Y. 2007) (New York law requires an express assignment of a cause of action based on fraud).

Plaintiffs allege that they are the victims of fraud.  Their claims under O.R.C. § 1707.43 arise from their alleged reliance upon misrepresentations made to them when they purchased NPF notes.[4]

---

[4]  As discussed below, the Noteholders' claims for secondary liability under O.R.C. § 1707.43 do not require Credit Suisse to have committed fraud, but they do require fraud to have been committed by the primary violator.  See O.R.C. §§ 1707.41(A), 1707.44(B),(G),(J).

Such a cause of action is personal to the plaintiffs.  See In re Nucorp Energy Securities Litig., 772 F.2d 1486, 1490 (9th Cir. 1985) ("A cause of action arising from reliance on misrepresentation is personal to those persons who relied; it does not follow the security to remote purchasers who had no basis for reliance.").  That certain plaintiffs sold their notes after the fraud was disclosed to the market means they, and not the subsequent purchasers, suffered the loss.

Notably, Credit Suisse is not arguing that plaintiffs expressly assigned their litigation rights.  Credit Suisse instead argues that plaintiffs implicitly assigned their litigation rights by not expressly reserving them.  This contention must be rejected as contrary to the general rule.  In the context of federal securities fraud, claims are not automatically assignable.  See Bluebird Partners, L.P. v. First Fidelity Bank, N.A., 85 F.3d 970, 974 (2nd Cir. 1996) (citing cases); Nucorp, 772 F.2d at 1490.  Indeed a recent decision surveying the case law found only two district court decisions allowing even an express assignment of a Rule 10b-5 claim.  See Dobyns v. Trauter, 552 F.Supp.2d 1150, 1154 (W.D. Wash. 2008).  As one court explained: "Ordinarily the injury remains with the first purchaser who was actually the victim of the fraud.  If he has managed to sell the securities, in most cases they will have sold for far less than he paid for them precisely because of the fraud.  If he is to be compensated for his loss, the right of action should ordinarily remain with him as well." Soderberg v. Gens, 652 F.Supp. 560, 564 (N.D. Ill. 1987) (citing cases).

The result is all the more clear because the remedy sought by plaintiffs is rescission.  See O.R.C. § 1707.43(A).  Rescission is "'a purely personal remedy.'"  Gawry v. Countrywide Home Loans, Inc., 640 F.Supp.2d 942, 962 (N.D. Ohio 2009) (quoting James v. Home Construction Co. of Mobile Inc., 621 F.2d 727, 731 (5th Cir. 1980)).  Claims for rescission generally are not assignable, and one court has in particular held that rescission claims under federal securities law are not assignable.  See Soderberg, 652 F.Supp. at 566.

Accordingly, the court finds that the plaintiffs who sold their notes do have standing to assert a claim under O.R.C. § 1707.43.

## IV.     Statute of Limitations[5]

A claim under § 1707.43 must be brought within two years "after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the person or director were unlawful," or within five years from the sale or contract for sale of securities, whichever period is shorter.  O.R.C. § 1707.43(B).  Ohio courts "have not definitively determined what constitutes 'constructive notice' under this provision." Cain v. Mid-Ohio Securities., Inc., No. 06CA008933, 2007 WL 2080553, at *2 (Ohio Ct. App. July 23, 2007).  In the absence of any state case law, the Sixth Circuit found that Ohio courts would apply the standard used in federal securities fraud claims.  Wyser-Pratte Mgmt. Co. v. Telxon Corp., 413 F.3d 553, 562 (6th Cir. 2005) (recognizing that Ohio applies a different standard for other types of fraud claims, but noting that the Ohio legislature gave § 1707.43(B) its own limitations period specific to securities fraud claims); see Cain, 2007 WL 2080553, at *2 (following Wyser-Pratte's interpretation of § 1707.43(B)); Ryan v. Ambrosio, No. 91036, 2008 WL 5258308, at * 3 (Ohio Ct. App. Dec. 18, 2008) (interpreting § 1707.43(B)'s limitations period with reference to federal case law).  Under the federal standard, knowledge of "suspicious facts" or "storm warnings" triggers a plaintiff's duty to investigate, and the limitations period "begins to run only when a reasonably diligent investigation would have discovered the fraud." Wyser-Pratte, 413 F.3d at 562-63 (internal citation and quotations marks omitted).  Mere notice of the "possibility of fraud" is not enough to start the limitations period.  Id.

According to Credit Suisse, the statute of limitations began to run on May 19, 2000 when a financial publication called the Asset Sales Report ran an article entitled "NCFE Investigated Amid Charges of Fraud." See CS Opp'n Ex. 305.  The article discussed three anonymous letters that had been sent to Duff & Phelps Credit Rating Company in 1999 and 2000.  The article characterized the letters as "implying that NCFE is involved in a pattern of fraudulent activity connected with either non-existent or misappropriated receivables" and "alleg[ing] that 'it is estimated that approximately 50% or more of the $2 billion portfolio is either worthless or non-existent.'" Id., p. 1.  The article described the

---

[5]  Credit Suisse has raised its statute of limitations challenge in opposition to the Noteholders' motions for partial summary judgment.  It did not affirmatively seek summary judgment on statute of limitations grounds in its own motion for summary judgment.

third and final letter as urging a closer examination of the validity of receivables that National Century had been purchasing from Lincoln Hospital. The article went on to report that Duff & Phelps, underwriter Deutsche Bank, and credit rating agency Fitch (which had just acquired Duff & Phelps) had each launched investigations into National Century and were examining records relating to Lincoln Hospital.

Credit Suisse's statute of limitations argument does not affect MetLife, which made its first note purchase in June 2001 and filed suit in April 2003. Though Credit Suisse seems to argue in its brief that MetLife should have filed suit by May 2002 - two years from the publication of the Asset Sales Report – Credit Suisse conceded at oral argument that the period cannot start running before a purchase is made. See Tr. of Nov. 16, 2009 Hearing, pp. 118-19; see also Hild v. Woodcrest Ass'n, 59 Ohio Misc. 13, 26, 391 N.E.2d 1047, 1055 (Ohio Ct. C.P. 1977) (limitations period of § 1707.43 begins to run upon the completion of the sale of the security). Thus, the court finds that MetLife's claim is not time-barred.

The statute of limitations challenge still pertains to Lloyds, who made a note purchase in March 2001 and filed suit in June 2003, and to numerous Arizona Noteholders who filed suit more than two years after they purchased NPF notes. Many of these plaintiffs admit to having had actual knowledge of the anonymous allegations. See CS Opp'n Ex. 270, March 10, 2008 Dep. of Amy Vespasiano, p. 495 (acknowledging Lloyds knew about the article); CS Opp'n Exs. 205, 208, 218, 246, 306-312 (showing that many of the investment advisors for the Arizona Noteholders knew of the anonymous allegations).

As for the Arizona Noteholders who did not have actual knowledge, Credit Suisse has presented sufficient evidence from which a jury could reasonably find that those plaintiffs had constructive notice of the allegations. See Merck & Co., Inc. v. Reynolds, __ U.S. __, 130 S.Ct. 1784, 1796 (2010) (securities plaintiffs are charged with knowledge of "those facts a reasonably diligent investor would have known"). The Asset Sales Report article was published and made available to the relevant segment of interested investors and their investment agents. Moreover, and as described in detail below, Duff & Phelps, Fitch, and auditor Deloitte & Touche each issued public statements or reports in response to the anonymous allegations, and these responses were available to investors and their agents. The existence of the anonymous allegations was therefore well-known to reasonably diligent investors. See

13

Mathews v. Kidder, Peabody & Co., Inc., 260 F.3d 239, 252 (3d Cir. 2001) ("The existence of storm warnings is a totally objective inquiry.  Plaintiffs need not be aware of the suspicious circumstances or understand their import.  It is enough that a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning.  Thus, investors are presumed to have read prospectuses, quarterly reports, and other information relating to their investments.").

Credit Suisse points to the publishing of the May 2000 Asset Sales Report article as the event that started the limitations period running.  The court disagrees that a jury could reasonably so find.  It is better to view the article as a "storm warning," which triggered a duty to investigate.  The Supreme Court's recent decision in Merck makes this clear:

> If the term "inquiry notice" refers to the point where the facts would lead a reasonably diligent plaintiff to investigate further, that point is not necessarily the point at which the plaintiff would already have discovered facts showing scienter or other "facts constituting the violation."  But the statute says that the plaintiff's claim accrues only after the "discovery" of those latter facts.  Nothing in the text suggests that the limitations period can sometimes begin before "discovery" can take place. . . . Because the statute contains no indication that the limitations period should occur at some earlier moment before "discovery," when a plaintiff would have *begun* investigating, we cannot accept Merck's argument.

Merck, 130 S.Ct. at 1797 (emphasis in original).  See also In re Ambac Fin. Group, Inc. Securities Litig., 693 F.Supp.2d 241, 276-77 (S.D.N.Y. 2010) ("If a defendant has shown that a duty to inquire arose, a court must take the second step of assessing when, 'in the exercise of reasonable diligence, [the plaintiff] should have discovered the facts underlying the alleged fraud.'") (quoting Rothman v. Gregor, 220 F.3d 81, 97 (2d Cir. 2000)).

In the same way, the Ohio statute says that a claim accrues only when the plaintiff knew or should have known the "the facts by reason of which the actions of [the seller] were unlawful."  O.R.C. § 1707.43(B).  The Asset Sales Report article did not purport to offer facts showing that National Century had purchased nonexistent receivables or engaged in self-dealing.  See Benak v. Alliance Capital Mgmt. L.P., 435 F.3d 396, 402 (3rd Cir. 2006) ("Speculation should not be given the same weight as reports of objective wrongdoing.").  Rather, the article simply reported that the anonymous letters had

14

raised the possibility of wrongdoing and the allegations were being investigated.  See Merck, 130 S.Ct. at 1799 (holding that a warning letter released to the public and pleadings in a prior lawsuit did not trigger limitations period because they raised only the possibility of fraud in general terms and did not contain "any specific information suggesting the fraud"); Freeman v. Laventhol & Horwath, 34 F.3d 333, 341-42 (6th Cir. 1994) (holding that statute of limitations applicable to § 10(b) claim did not begin when plaintiff received a letter from brokerage house describing some of problems incurred in a project in which he had invested; it began when the first interest payment was not paid).

The most specific allegation described in the article concerned the Lincoln receivables.  Even then, the article did not present facts suggesting that the receivables had little or no value.  The article merely reported that the last letter had urged for someone to take a closer look at those receivables.  The court must therefore reject Credit Suisse's position that the reporting of generalized, anonymous allegations should trigger the limitations period, for it would only encourage worried investors who hear market rumors to file premature suits.  See Mathews v. Kidder, Peabody & Co., Inc., 260 F.3d 239, 253 (3d Cir. 2001) ("If a relatively generic enumeration of possible risks, without any meaningful discussion of their magnitude, can be enough to establish inquiry notice at the summary judgment stage, we would encourage a flood of untimely litigation."); Law v. Medco Research, Inc., 113 F.3d 781, 786 (7th Cir. 1997) ("[T]oo much emphasis on the statute of limitations can precipitate premature and groundless suits, as plaintiffs rush to beat the deadline without being able to obtain good evidence of fraud.").

The Noteholders do not appear to contest that a fact finder could reasonably conclude that the May 2000 article triggered a duty to inquire further.  Indeed, the responses of the Noteholders at the time displayed their concern over the anonymous allegations.  Lloyds representatives promptly arranged to meet with National Century's senior management and Deutsche Bank to discuss the allegations.  See CS Opp'n Ex. 270, Vespasiano Dep., pp. 255, 495.  Other Noteholders or their investment advisors quickly made contact with National Century, Credit Suisse, Deutsche Bank, or PaineWebber about the allegations.  See CS Opp'n Exs. 184, 202, 205, 246, 306, 307, 309-13; CS Reply Exs. 222, 223.

The message sent to concerned investors was that the allegations appeared to be unfounded but would be fully investigated.  According to the Asset Sales Report article, Fitch, Duff & Phelps, and

15

Deutsche Bank had already started investigating the allegations. A Duff & Phelps source said it had looked into the first two letters and determined not to take a rating action. A Fitch representative stated that National Century had been "unbelievably cooperative" and that "[t]here is no reason to believe that the allegations are true at this point." CS Opp'n Ex. 305, p. 2. Deutsche Bank said the allegations were "hearsay" but they would work with National Century "until we get to the bottom of it." Id., p. 3. A press release issued by Fitch at the time, entitled "Fitch IBCA and DCR Comment on NCFE Article," told investors that Fitch and Duff & Phelps were investigating the matter and had yet to find any evidence to support the allegations. See Consol. Reply of MetLife and Lloyds, July 15, 2009 Supp. Aff. of Sarah Gibbs Leivick, Ex. 8. Likewise, Lloyds was told in its meeting with National Century and Deutsche Bank that the anonymous allegations were false, the ratings agencies were continuing to investigate, and Fitch's investigation in particular was "well down the road" and had "uncovered nothing." CS Opp'n Ex. 270, Vespasiano Dep., p. 257.

On June 29, 2000, Deloitte & Touche released an independent audit opinion of National Century for the fiscal year ending December 31, 1999. See Consol. Reply, Leivick Supp. Aff., Ex. 3. The audit gave National Century a clean bill of financial health. On June 30, Asset Sales Report published another article, entitled "NCFE Investigation Almost Complete." Id., Ex. 22. The article reported that Fitch had nearly finished its investigation of the anonymous letter and had "found nothing" to suggest the allegations were true. Id., p. 1. According to the article, Fitch had done "tremendous analysis related to Lincoln Hospital receivables" and had gone "into much more detail" than it normally would do for a transaction. Id., p. 2.

On July 7, 2000, Fitch issued a press release reaffirming its AAA rating on the NPF notes. See CS Opp'n Ex. 316. Fitch had gathered and analyzed information from National Century and third parties in response to the anonymous allegations. Its investigation included: (1) obtaining "extensive information" from National Century about the nature of its receivables and its relationship with Lincoln Hospital; (2) "extensively discuss[ing]" the allegations with Credit Suisse, Deutsche Bank, a private equity investor in National Century, and other parties who had acted as National Century's advisors, agents, or underwriters, with the discussions focused on "credit issues and the independent due diligence

16

process that each party engaged in as part of the variety of transactions that they have participated in with NCFE"; (3) discussing the allegations with the lead audit partner for National Century's 1997 and 1998 audits and receiving assurance that there was no concern about the validity of the receivables; (4) conducting an on-site review with National Century's senior management; and (5) reviewing the Deloitte & Touche audit opinion for 1999.  Id.  Fitch concluded that the anonymous allegations did not warrant a rating action.

With Deloitte & Touche having issued a clean audit and Fitch having reaffirmed its rating, the consensus at the time was that anonymous allegations were unfounded.  See, e.g., CS Opp'n Ex. 270, Vespasiano Dep., pp. 495-97.  As an advisor with Mutual of New York, one of the Arizona Noteholders, put it, "I was satisfied at the end of the day with all the analysis that had been done and all the research that had been done by various parties involved.  I was comfortable at that point that the fraud had not been confirmed and in fact had been disproven."  CS Opp'n Ex. 202, Nov. 5, 2007 Dep. of William H. Sidford, p. 234-35.  Credit Suisse itself admits with respect to the institutional investors, "None found reason to believe there was fraud or that they should distrust NCFE's management, and most continued to invest in NPF securitizations."  CS Reply Statement of Facts (doc. 1657), p. 37. Indeed, Credit Suisse's own Jonathan Clark testified that the anonymous letters were no longer a red flag "after everybody had been in there" to investigate.  Consol. Reply, Leivick Supp. Aff., Ex. 15, Nov. 13, 2007 Dep. of Jonathan Clark, p. 111.

The parties do not dispute these facts, and the court finds as a matter of law that a reasonably diligent investor would not have discovered the fraud.  See Merck, 130 S.Ct. at 1798 (when there are storm warnings, limitations period begins to run when "the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' including scienter").  Lloyds was the most aggressive investor in confronting the anonymous allegations, likely because it was considering in June 2000 whether to renew its participation in a warehouse line of credit to a National Century subsidiary.  It arranged multiple meetings with National Century and Deutsche Bank by telephone and in person.  See Consol. Reply, Leivick Supp. Aff., Ex. 16-19.  National Century and Deutsche Bank consistently told Lloyds to wait for the conclusion of the Fitch investigation.  Based on

17

the limited investigation Lloyds was able to conduct, it believed that the allegations had been made up by an upset competitor who had lost Lincoln Hospital's receivables business to National Century.  See Consol. Reply, Leivick Supp. Aff., Ex. 21 (Lloyds's internal recommendation that it renew its participation in the warehouse line of credit).  Even the most diligent investor in this situation therefore did not uncover the fraud.  See Consol. Reply, Leivick Supp. Aff., Ex. 20, Jan. 31, 2008 Dep. of Dilian Schulz, p. 115 (stating that Lloyds "spent significant time to make sure that these were just allegations").

Lloyds and other investors acted reasonably in relying on the rating affirmation by Fitch, which had much greater access to information than any outside investor could obtain.  Investors received further reassurance from Deloitte & Touche's clean audit.  Thus, the red flag raised by the anonymous allegations was negated by later, independent statements of comfort.  See LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 155 (2d Cir. 2003) (limitations period for federal securities claim not triggered by storm warnings if investors reasonably rely on statements of comfort); Ambac, 693 F.Supp.2d at 276-77 (same).

Undoubtedly the work of credit rating agencies and accountants has its limits, particularly with respect to verifying the accuracy of the facts on which their conclusions are based.  See CS Opp'n Ex. 316, July 7, 2000 Fitch press release, pp. 2-3 (noting that Fitch did not verify the accuracy of information provided by National Century); Consol. Reply, Leivick Supp. Aff., Ex. 3, June 29, 2000 Deloitte & Touche audit opinion, p. 1 (same).  Nonetheless, the court finds no evidence suggesting that a reasonably diligent investor in this situation had reason to doubt the objectivity of, or the adequacy of the work done by, Fitch or Deloitte & Touche.  The June 30, 2000 Asset Sales Report told investors that Fitch had dug much deeper than normal.

Credit Suisse's main objection is not with the facts but with a perceived inconsistency in the stance the Noteholders have taken as to the anonymous letters and ensuing investigation.  On one hand, the Noteholders say it was reasonable for investors to accept the Fitch report as the final word on the anonymous letters.  On the other hand, they have argued elsewhere in this litigation – namely in support of their fraud-based claims against Credit Suisse – that Credit Suisse should have conducted a more extensive forensic audit, rather than rely solely on the Fitch report and the Deloitte & Touche audit.

18

They have submitted expert opinions concluding that if Credit Suisse had conducted a proper investigation, it would have discovered that the anonymous letters correctly alleged fraud at National Century.  See Consol. Opp'n to CS MSJ, April 30, 2009 Decl. of Sarah Gibbs Leivick, Ex. 275, Expert Report of John C. Coffee, Jr., pp. 24-29; Az. Noteholders' Statement of Facts, Ex. 431, Expert Report of Bernard S. Black, pp. 71-78.

The court finds no inconsistency in the Noteholders' position.  Though sophisticated, they were outside investors who lacked access to the information necessary to have unraveled the fraud.  The Noteholders depended on professionals with expertise and access to supply information relevant to investment decisions.  Credit Suisse was one of those professionals.  It had a close and established relationship with National Century, having served as its financial advisor, placement agent, and initial purchaser of notes.  Credit Suisse had conducted due diligence of National Century and was one of the select parties Fitch looked to when it investigated the anonymous letters.  See CS Opp'n Ex. 316, July 7, 2000 Fitch press release, p. 1 (stating that Fitch extensively discussed the allegations with Credit Suisse, Deutsche Bank, and PaineWebber).  Moreover, the Noteholders have presented substantial evidence in this litigation showing that Credit Suisse knew or should have known of other indications of National Century's fraud.  Given Credit Suisse's closeness to the situation and awareness of other warning signs, it is not contradictory for the Noteholders to argue that the anonymous allegations should have prompted a more vigorous response from Credit Suisse.

In summary, the court finds that a reasonably diligent investor would not have discovered the fraud at National Century after inquiring about the anonymous allegations publicized in May 2000.  The Noteholders' remaining claims under § 1707.43 are not time-barred.

## V.      The Ohio Securities Act

### A.      Scope

Chapter 1707 of the Ohio Revised Code governs the sale and purchase of securities in Ohio. Its purpose is "to prevent the fraudulent exploitation of the investing public through the sale of

securities." In re Columbus Skyline Securities, Inc., 74 Ohio St.3d 495, 498, 660 N.E.2d 427, 429 (Ohio 1996). The Ohio Securities Act requires securities to be registered and salespersons and dealers to be licensed, and it proscribes fraudulent conduct. See O.R.C. §§ 1707.08 - 1707.13 (registration); §§ 1707.14 - 1707.19 (licensing); §§ 1707.41, 1707.44 (proscribing fraud). Courts have liberally construed the Act to effectuate its remedial purpose. See, e.g., Columbus Skyline, 74 Ohio St.3d at 498, 660 N.E.2d at 429; Federated Mgmt. Co. v. Coopers & Lybrand, 137 Ohio App.3d 366, 391, 738 N.E.2d 842, 860-61 (Ohio Ct. App. 2000).

The Noteholders' motions for partial summary judgment concern their claims against Credit Suisse under § 1707.43(A). This provision states that every sale or contract for sale in violation of Chapter 1707 is voidable at the election of the purchaser. Further,

> The person making such sale or contract for sale, and every person that has participated in or aided the seller in any way in making such sale or contract for sale, are jointly and severally liable to the purchaser, in an action at law in any court of competent jurisdiction, upon tender to the seller in person or in open court of the securities sold or of the contract made, for the full amount paid by the purchaser and for all taxable court costs, unless the court determines that the violation did not materially affect the protection contemplated by the violated provision.

O.R.C. § 1707.43(A).

Liability under § 1707.43(A) for participating in the sale or aiding the seller arises only if there has been a primary violation of the Act. The Noteholders allege the following primary violations by National Century: (1) knowingly making material misrepresentations or omissions in written offering materials on which the Noteholders relied in purchasing securities, § 1707.41(A); (2) knowingly making material misrepresentations, oral or written, for the purpose of selling securities, § 1707.44(B)(4); (3) knowingly engaging in a fraudulent act or practice in selling securities, § 1707.44(G); and (4) knowingly making a false statement, with the purpose to deceive, about the value of securities or the financial condition of an issuer of securities, § 1707.44(J).

The Act defines a "sale" as having the meaning "accepted in courts of law or equity, and includes every disposition, or attempt to dispose, of a security or of an interest in a security." O.R.C. § 1707.01(C)(1). A "sale" also "includes a contract to sell, an exchange, an attempt to sell, an option

20

of sale, a solicitation of a sale, a solicitation of an offer to buy, a subscription, or an offer to sell, directly or indirectly, by agent, circular, pamphlet, advertisement, or otherwise." Id.

The Ohio Securities Act says little about its territorial scope, particularly when compared to other state blue sky laws involved in this multidistrict litigation. For instance, New Jersey has adopted the Uniform Securities Act, and its law contains a "Scope of act" provision limiting the law's application to a sale or an offer to sell made in New Jersey or to an offer to buy that is made or accepted in New Jersey.[6] See N.J. Stat. Ann. § 49:3-51(a); see also Ariz. Rev. Stat. § 44-1998(A) (applying to "securities offered or sold within or from this state"). The Ohio Act has no such scope provision or language. At most, in various provisions dealing with disclosures in advertisements and the use of licensed dealers and salesmen, it refers to the sale of securities "in this state." O.R.C. § 1707.01(C)(3), (C)(4), (E)(1), (F)(1); O.R.C. § 1707.44(A)(1). And in one of the provisions cited by the Noteholders as having been violated by National Century, the Act prohibits the knowing use of misrepresentations for the purpose of "selling any securities in this state." O.R.C. § 1707.44(B)(4).

Ohio courts have applied the Act to securities transactions in which both the seller and purchaser were Ohio residents and to transactions in which either only the seller or only the purchaser resided in Ohio. See Perrysburg Twp. v. Rossford Arena Amphitheater Auth., 175 Ohio App.3d 549, 888 N.E.2d 440 (Ohio Ct. App. 2008) (seller and buyer both Ohio residents); Johnson v. Church of the Open Door, 179 Ohio App.3d 532, 902 N.E.2d 1002 (Ohio Ct. App. 2008) (Canadian seller, Ohio buyer); Howard v. Rowley & Brown Petroleum Corp., No.78AP-113, 1978 WL 217030 (Ohio Ct. App. Aug. 15, 1978) (Ohio seller, Mississippi buyer).

The Act has been applied too where the securities issuer was an Ohio company, even though the purchasers and the sellers/underwriters did not reside in Ohio. Federated, 137 Ohio App.3d at 385-87, 738 N.E.2d at 856-58. Despite the general presumption against extraterritorial application of state

---

[6] For discussions of the territoriality provisions of the Uniform Securities Act and of the blue sky laws of various states, see Louis Loss, *The Conflict of Laws and the Blue Sky Laws*, 71 Harv. L. Rev. 209 (1957); Joseph Long, *The Conflict of Laws Provisions of the Uniform Securities Act, or When Does a Transaction 'Take Place in this State?' Part I*, 31 Okla. L. Rev. 781, 784 (1978); Jack E. McClard, *The Applicability of Local Securities Acts to Multi-State Securities Transactions*, 20 U. Rich. L. Rev. 139 (1985).

law, see generally 73 Am. Jur. 2d Statutes § 250, the court in Federated held that the Ohio Act reaches a securities transaction between a non-Ohio seller and non-Ohio buyer, so long as the issuer is from Ohio and the seller has "significant contacts" with the issuer. Federated, 137 Ohio App.3d at 387, 738 N.E.2d at 857. This decision squarely rejected an unpublished decision from an Ohio federal court, which concluded that the Act would not reach such a sale. In re Revco Securities Litig., No. 89-cv-593, 1991 WL 353385, at *14 (N.D. Ohio Dec. 12, 1991). The court in Revco focused on where the sale took place. The Federated court said the focus should be on where the fraud occurs. Thus under Federated, the Ohio Act applies to the sale of Ohio-issued securities by an out-of-state seller to an out-of-state buyer if the seller has significant contacts with the issuer's Ohio-based fraud. Federated, 137 Ohio App.3d at 387, 738 N.E.2d at 857.

At the motion to dismiss stage, certain out-of-state defendants urged this court to reject Federated and follow Revco in holding that the presence of an Ohio securities issuer is not enough to apply the Ohio Act. This court could not do, for the Federated court's interpretation of the scope of the Ohio Securities Act must be followed here. See Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938). The court's July 22, 2008 Order held that a sufficient nexus existed to apply the Act because National Century, an Ohio corporation, issued the notes and because Credit Suisse allegedly had many points of contact with National Century's fraud.

## B. Commerce Clause Challenge

### 1. The Extraterritoriality Principle

Even though the Ohio Securities Act would apply to the sales here, a different question is whether the Commerce Clause permits it. Historically, the "principal objects of dormant Commerce Clause scrutiny are statutes that discriminate against interstate commerce." CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 87 (1987). Credit Suisse does not argue that the Ohio Securities Act is such a statute. Indeed, the Supreme Court long ago upheld Ohio's authority to enact blue sky legislation. Hall v. Geiger-Jones Co., 242 U.S. 539 (1917) (rejecting a Commerce Clause challenge because burden on interstate commerce created by licensing requirement for securities dealers was incidental). Congress

too has expressly recognized the validity of state blue sky laws and has saved them from preemption. 15 U.S.C. §§ 77r(c)(1), 78bb(a), 80b-18a(a).

Credit Suisse instead argues that applying the Ohio Act to the facts of this case would violate the extraterritoriality principle.[7] This principle "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." Edgar v. MITE Corp., 457 U.S. 624, 642-43 (1982) (plurality opinion). In MITE, the Supreme Court struck down an Illinois law requiring that takeover offers for shares of a target company be registered with the Illinois Secretary of State. The law applied whenever the target was an Illinois company with either at least 10% of its shareholders residing in Illinois or at least 10% of its capital located in Illinois, even if the tender offeror resided outside of Illinois. The Court, in a plurality opinion authored by Justice White, found that this law ran afoul of the Commerce Clause:

> The Illinois Act differs substantially from state blue-sky laws in that it directly regulates transactions which take place across state lines, even if wholly outside the State of Illinois. A tender offer for securities of a publicly held corporation is ordinarily communicated by the use of the mails or other means of interstate commerce to shareholders across the country and abroad. Securities are tendered and transactions closed by similar means. Thus, in this case, MITE Corp., the tender offeror, is a Delaware corporation with principal offices in Connecticut. Chicago Rivet is a publicly held Illinois corporation with shareholders scattered around the country, 27% of whom live in Illinois. MITE's offer to Chicago Rivet's shareholders, including those in Illinois, necessarily employed interstate facilities in communicating its offer, which, if accepted, would result in transactions occurring across state lines. These transactions would themselves be interstate commerce. Yet the Illinois law, unless complied with, sought to prevent MITE from making its offer and concluding interstate transactions not only with Chicago Rivet's stockholders living in Illinois, but also with those living in other States and having no connection with Illinois. Indeed, the Illinois law on its face would apply even if not a single one of Chicago Rivet's shareholders were a resident of Illinois, since the Act applies to every tender offer for a corporation meeting two of the following conditions: the corporation has its principal executive office in Illinois, is organized under Illinois laws, or has at least 10% of its stated capital and paid-in surplus represented in Illinois. Ill. Rev. Stat., ch. 121 ½, ¶ 137.52-10(2) (1979). Thus the Act could be applied to regulate a tender offer which would not affect a single Illinois shareholder.

___

[7] Credit Suisse makes an as-applied challenge and not a facial challenge. See Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450-51 (2008) (facial challenges to the constitutionality of statutes are "disfavored").

It is therefore apparent that the Illinois statute is a direct restraint on interstate commerce and that it has a sweeping extraterritorial effect.  Furthermore, if Illinois may impose such regulations, so may other States; and interstate commerce in securities transactions generated by tender offers would be thoroughly stifled.  In Shafer v. Farmers Grain Co., [268 U.S. 189, 199, 45 S.Ct. 481, 485, 69 L.Ed. 909 (1925)], the Court held that "a state statute which by its necessary operation directly interferes with or burdens [interstate] commerce is a prohibited regulation and invalid, regardless of the purpose with which it was enacted."  See also Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 806, 96 S.Ct. 2488, 2496, 49 L.Ed.2d 220 (1976).  The Commerce Clause also precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.  In Southern Pacific Co. v. Arizona, 325 U.S. 761, 775, 65 S.Ct. 1515, 1523, 89 L.Ed. 1915 (1945), the Court struck down on Commerce Clause grounds a state law where the "practical effect of such regulation is to control [conduct] beyond the boundaries of the state. . . ."  The limits on a State's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts.  In either case, "any attempt 'directly' to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power."  Shaffer v. Heitner, 433 U.S. 186, 197, 97 S.Ct. 2569, 2576, 53 L.Ed.2d 683 (1977).

Because the Illinois Act purports to regulate directly and to interdict interstate commerce, including commerce wholly outside the State, it must be held invalid . . . .

MITE, 457 U.S. at 641-43.

In response to Credit Suisse's reliance on MITE, the Noteholders cite CTS Corp. v. Dynamics Corp. of America., 481 U.S. 69 (1987), where the Court dealt with a similar Commerce Clause challenge. At issue was an Indiana statute that conditioned the acquisition of "control shares" in a corporation upon the approval of a majority of disinterested shareholders.  The statute applied when the corporation had its principal place of business in Indiana and when Indiana residents either constituted at least 10% of the shareholders or owned 10% of the shares.  The Court distinguished MITE without disavowing its analysis:

Dynamics relies heavily on the statement by the MITE Court that "[i]nsofar as the . . . law burdens out-of-state transactions, there is nothing to be weighed in the balance to sustain the law."  457 U.S., at 644, 102 S.Ct., at 2641.  But that comment was made in reference to an Illinois law that applied as well to out-of-state corporations as to in-state corporations.  We agree that Indiana has no interest in protecting nonresident shareholders of nonresident corporations.  But this Act applies only to corporations incorporated in Indiana.  We reject the contention that Indiana has no interest in providing for the shareholders of its corporations the voting autonomy granted by the

> Act. Indiana has a substantial interest in preventing the corporate form from becoming a shield for unfair business dealing. Moreover, unlike the Illinois statute invalidated in MITE, the Indiana Act applies only to corporations that have a substantial number of shareholders in Indiana. See Ind. Code § 23-1-42-4(a)(3) (Supp. 1986). Thus, every application of the Indiana Act will affect a substantial number of Indiana residents, whom Indiana indisputably has an interest in protecting.

CTS, 481 U.S. at 93. Justice Powell, who did not join in Justice White's discussion of extraterritoriality in MITE, wrote for the majority in CTS, and Justice White dissented.

Against that backdrop, the parties present starkly different views about whether applying the Ohio Securities Act to the transactions here would violate the Commerce Clause. Credit Suisse relies on these undisputed facts: Credit Suisse is not an Ohio resident; Credit Suisse's participation in the sales to the Noteholders took place in New York; all but one of the Noteholders, FirstEnergy, reside outside of Ohio; and, from the buyers' side of the transactions, every one of the note purchases occurred outside of Ohio, including the one by FirstEnergy.

The Noteholders counter that: they are asserting violations of the Act's remedial, anti-fraud provisions; National Century's fraud had its base in Ohio; and Credit Suisse's placement of NPF notes aided the fraud. According to the Noteholders, not a single case exists in which a court has found that applying the anti-fraud provisions of a state's blue sky law violates the Commerce Clause when the fraud was centered in that state.

The parties' arguments reflect the differences seen in MITE and CTS. The plurality's extraterritoriality analysis in MITE focused on where the commercial activity – the tender offer – took place. A Delaware corporation made the offer to an Illinois company's shareholders, a majority of whom were not Illinois residents. Credit Suisse's argument thus emphasizes where its participation and the Noteholders' participation in the sale of National Century notes took place. Indeed, it would appear that Credit Suisse's case is even more compelling than the one in MITE because none of the transactions here occurred in Ohio, whereas 27% of the tender offers in MITE went to Illinois shareholders.

By contrast, the Court in CTS employed the Pike balancing test, whereby the burden imposed

on interstate commerce by a state regulation must not be excessive in relation to the state's interests. See Pike v. Bruce Church, Inc., 397 U.S. 137 (1970).  The majority in CTS focused on the interests of the state: "[S]tate regulation of corporate governance is regulation of entities whose very existence and attributes are a product of state law."  CTS, 481 U.S. at 89.  The Court found the burden imposed on interstate commerce by Indiana's regulation to be incidental compared to its interest in "promoting stable relationships among parties involved in the corporations it charters."  Id. at 91.  The Noteholders' argument thus emphasizes Ohio's interests in regulating fraud committed by its own corporations.  And it would appear that the Noteholders' case is even the more compelling than the one in CTS because remedial regulation of fraud improves commerce, not burdens it, whereas Indiana's regulation of control-share acquisitions put some burden on interstate commerce.

The Noteholders would have the court steer away from the extraterritoriality principle in favor of the Pike balancing test, but the court cannot do that.  A majority of the Court in MITE used the Pike balancing test, but it is the plurality's extraterritoriality analysis that has become its own component of Commerce Clause jurisprudence.  In decisions after MITE, the Court twice applied the extraterritoriality principal in striking down state price-affirmation statutes.  Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 581-84 (1986); Healy v. Beer Institute, Inc., 491 U.S. 324, 335-40 (1989).  The Court in both cases found that the statutes had the practical effect of controlling out-of-state liquor prices.  In Healy, the Court reiterated its "established view that a state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause."  Healy, 491 U.S. at 332.

Several circuits refer to "extraterritorial control" as the third part of their dormant Commerce Clause test – economic protectionism and Pike balancing being the first two.  See Selevan v. New York Thruway Auth., 584 F.3d 82, 90 (2d Cir. 2009); Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd., 462 F.3d 249, 261-63 (3d Cir. 2006); Grand River Enterprises Six Nations, Ltd. v. Beebe, 574 F.3d 929, 942 (8th Cir. 2009); KT & G Corp. v. Att'y Gen. of Okla., 535 F.3d 1114, 1143 (10th Cir. 2008).  Other circuits have expressly recognized the extraterritoriality principle.  See, e.g., Midwest Title Loans, Inc. v. Mills, 593 F.3d 660, 665 (7th Cir. 2010) ("But another class of nondiscriminatory local regulations

26

is invalidated without a balancing of local benefit against out-of-state burden, and that is where states actually attempt to regulate activities in other states."); Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc., 492 F.3d 484, 489 (4th Cir. 2007). And the First Circuit, despite calling the extraterritoriality principle the "dormant branch of the dormant Commerce Clause," conceded that the doctrine "remains viable." IMS Health Inc. v. Mills, 616 F.3d 7, 29 n. 27 (1st Cir. 2010).

The Sixth Circuit recently adopted the extraterritoriality principle in International Dairy Foods Association v. Boggs, 622 F.3d 628 (6th Cir. 2010). The court followed the other circuits in holding that "a state regulation that controls extraterritorial conduct is per se invalid." 622 F.3d at 645. The key inquiry is whether the regulation would control conduct occurring wholly outside the state's boundaries. Id. at 645-46.

### 2.    Discussion

The parties' starkly different views of this case permeates to the question of what is the "commerce" or "conduct" that the Ohio Securities Act would regulate. Credit Suisse contends that it is the sale of securities, which took place outside of Ohio. The Noteholders call this approach too literal and too narrowly focused on where legal title passed. They argue that fraud is the conduct being regulated and that National Century's fraud had its base in Ohio.

In considering whether applying Ohio's blue sky law to the securities transactions between Credit Suisse and the Noteholders constitutes extraterritorial control, the court looks first to the historical rationale for the constitutionality of such laws. The Supreme Court upheld the right of states to regulate securities in Hall v. Geiger-Jones Co., 242 U.S. 539 (1917) and the other Blue Sky Cases, Caldwell v. Sioux Falls Stock Yards Co., 242 U.S. 559 (1917) and Merrick v. N.W. Halsey & Co., 242 U.S. 568 (1917). The newly-enacted blue sky laws of Ohio, South Dakota, and Michigan authorized state securities commissions to block the in-state sale or purchase of unlicensed securities. A dormant Commerce Clause challenge was made by unlicensed in-state securities sellers and by out-of-state buyers who had traveled to those states to purchase securities. The Court rejected their challenge, reasoning that the laws regulated only transactions occurring within the regulating states: "The provisions of the

27

law . . . apply to dispositions of securities *within* the State and while information of those issued in other States and foreign countries is required to be filed . . ., they are only affected by the requirement of a license of one who deals with them *within* the State." Hall, 242 U.S. at 557 (emphasis in original). Because the statutes applied to transactions occurring within the state, the Court concluded that they were "police regulation[s]" affecting interstate commerce "only incidentally." Id.

In time securities transactions became more complex. Professor Louis Loss, draftsman of the Uniform Securities Act, observed in 1957 that "[i]n the normal course of the securities business a large percentage of all transactions has points of contact with more than one state." Louis Loss, *The Conflict of Laws and the Blue Sky Laws*, 71 Harv. L. Rev. 209, 209 (1957). Professor Loss found "very little case law on this basic question of the scope of the blue sky laws in interstate transactions." Id. at 242. Though his concern rested not with the Commerce Clause but with codifying of a scope provision to settle choice-of-law questions, Professor Loss did make two comments worth noting here. First he stated that a Commerce Clause question would be avoided "[s]o long as the law chosen to govern a securities transaction is the law of the place of contract or performance or solicitation." Id. at 226. Second, when discussing the California's statute "peculiar" emphasis on the word "issued," he noted that "the typical blue sky law strikes only at the 'offer' or 'sale,' not the 'issue' or 'delivery.'" Id. at 235.

Those two points warn against the Noteholders' attempt to apply Ohio law. The places of contract and performance were not Ohio, nor do the Noteholders contend that an offer to sell originated from Ohio. The alleged nexus to Ohio is the issuance – and this goes to the second point. The anti-fraud provisions of the Ohio Act speak in terms of offers and sales, not issuances. As one court discussing Oklahoma's blue sky law held, "a sale of securities does not 'originate' in Oklahoma merely because the security was originally issued here. Some nexus between the 'sale' – not merely the security – and the state is required." Nuveen Premium Income Municipal Fund 4, Inc. v. Morgan Keegan & Co., Inc., 200 F.Supp.2d 1313, 1318 (W.D. Okla. 2002) (later vacated as to one defendant as part of a settlement agreement); see also Johnston v. Norton, No. 92 Civ. 6844, 1993 WL 465333, at *22-23 (S.D.N.Y. Nov. 19, 1993) (holding that the anti-fraud provisions of New Jersey's blue sky law did not apply to out-of-state sale of partnership interests in New Jersey limited partnership because there

was no "transactional connection" to the state); <u>Allen v. Oakbrook Secs. Corp.</u>, 763 So.2d 1099, 1100-01 (Fla. Dist. Ct. App. 1999) (per curiam) (holding that anti-fraud provisions of Florida's blue sky law did not apply to out-of-state sales of securities issued from Florida).

After the drafting of the Uniform Securities Act, courts eschewed choice-of-law determinations in favor of an approach whereby the law of more than one state could apply to a securities transaction. The Third Circuit's decision in <u>A.S. Goldmen & Co., Inc. v. New Jersey Bureau of Securities</u>, 163 F.3d 780 (3d Cir. 1999) illustrates this approach.  Goldmen was a New Jersey securities broker that underwrote an initial public offering of a Delaware corporation.  Goldmen registered the securities in many states but not in New Jersey.  From its New Jersey offices Goldmen solicited and sold the securities to individuals in the states of registration.  It did not sell securities to anyone in New Jersey. The state of New Jersey ordered Goldmen to cease and desist selling the securities, and Goldmen filed a declaratory judgment action.

The Third Circuit's survey of Commerce Clause jurisprudence found that a "consistent strain of these cases authorizes courts to invalidate state regulations when their extraterritorial impact is so great that their 'practical effect . . . is to control conduct beyond the boundaries of the state.'"  <u>A.S. Goldmen</u>, 163 F.3d at 784-85 (quoting  <u>Healy</u>, 491 U.S. at 336).  But a state may regulate "in-state components of interstate transactions so long as the regulation furthers legitimate in-state interests." <u>Id</u>. at 785 (citing the Blue Sky Cases).  The court then looked to the "modern approach" that "contracts formed between citizens in different states implicate the regulatory interests of both states.  Thus, when an offer is made in one state and accepted in another, we now recognize that elements of the transaction have occurred in each state, and that both states have an interest in regulating the terms and performance of the contract."  <u>Id</u>. at 787 (citing cases).

The Third Circuit held that applying New Jersey's law did not violate the extraterritoriality principle.  The securities transactions had the requisite in-state component because the seller offered and sold the securities from New Jersey.  <u>Id</u>. at 785.  Moreover, New Jersey had an interest in maintaining the integrity of legitimate, in-state sellers and brokers and preventing the state "'from being used as a base of operations for crooks marauding outside the state.'"  <u>Id</u>. at 788 (quoting <u>Stevens v.</u>

<u>Wrigley Pharm. Co.</u>, 154 A. 403, 403 (N.J. Ch. Div. 1931)).

The court distinguished <u>Arizona Corp. Comm'n v. Media Products, Inc.,</u> 158 Ariz. 463, 763 P.2d 527 (Ariz. App. 1988), a case running "counter to the many upholding state blue sky laws against dormant commerce clause challenges":

> [I]n that case Arizona sought to bar an Arizona company from selling a security outside of Arizona through an agent outside of Arizona to a buyer who was also outside of Arizona.  In other words, the only connection the transaction had with Arizona was that the principal place of business of the seller was located there.  <u>See</u> [<u>Arizona Corp</u>, 158 Ariz. at 464-65, 763 P.2d at 528-29]  ("Sales of the entire issue were negotiated out-of-state [,] solely by [an] out-of-state underwriter. . . .  No sales or offers of sale were made in Arizona.").  Because the offer and acceptance took place entirely outside of Arizona, Arizona's attempt to block the transaction was not an effort to regulate the in-state component of an interstate transaction, as is the case here.

<u>A.S. Goldmen</u>, 163 F.3d at 789 n.16.

The Noteholders cite <u>Goldmen</u> and other cases like it in correctly arguing that the blue sky law of more than one state may apply to multi-state securities transactions.  <u>See also</u> <u>Lintz v. Carey Manor Ltd.,</u> 613 F.Supp. 543, 550 (W.D. Va. 1985) ("[S]o long as there is some territorial nexus to a particular transaction, the laws of two or more states may simultaneously apply.").  Nonetheless, the transactions here do not fit the mold of the cases cited by the Noteholders.  In those cases, courts rejected Commerce Clause challenges in multi-state transactions because either the seller or buyer participated in the sale from the state of the challenged law.  <u>See, e.g.,</u> <u>A.S. Goldmen</u>, 163 F.3d at 786 (seller in New Jersey); <u>Houston v. Seward & Kissel, LLP.,</u> No. 07-cv-6305, 2008 WL 818745, at *5 (S.D.N.Y. March 27, 2008) (buyer in Oregon).  None of the Noteholders' transactions occurred in Ohio, either in whole or in part.

The Noteholders might concede that focusing on where legal title passes is appropriate when applying blue sky regulatory provisions, such as registration and licensing requirements.  They argue though that the focus must be on where the fraud occurred when applying remedial, anti-fraud provisions.  They go so far as to say that no case exists in which a court has found that applying the anti-fraud provisions of a blue sky law would violate the Commerce Clause.  In support the Noteholders cite

Chrysler Capital Corp. v. Century Power Corp., 800 F.Supp. 1189, 1194 (S.D.N.Y. 1992), wherein the court said the defendant had failed "to cite any case in which a remedial anti-fraud statute was found to burden interstate commerce." The court in Chrysler, however, did not address the extraterritoriality principle, but limited its analysis to the Pike balancing test. For purposes of Pike balancing, the court distinguished between state statutes of a "regulatory nature" that tend "to burden otherwise lawful interstate transactions" and anti-fraud statutes that are "remedial in nature" and impose "no additional requirements on persons engaged in interstate commerce." Id. at 1194-95. "[L]ike any tort recovery statute, [an anti-fraud provision] merely provides a post-hoc remedy for persons aggrieved by allegedly unlawful conduct. Thus, in no sense does it prevent or burden interstate commerce. . . . If anything, such legislation facilitates commerce far more than it can even be argued to 'burden' in any sense . . . because it provides a measure of assurance that commerce will be honestly transacted." Id. at 1195.

Even though Chrysler is distinguishable because it did not discuss extraterritoriality concerns, the Noteholders' underlying point is the same – fraud should be viewed as the in-state conduct regulated by the Ohio Securities Act. They contend, without any real rebuttal from Credit Suisse, that Ohio was the center of National Century's fraud. National Century, the NPF programs, and the servicer were incorporated in Ohio. The small group of individuals who formed National Century, served as its corporate principals, and were the primary wrongdoers all resided in Ohio. The NPF entities issued the notes from Ohio, and the NPF reserve accounts that were plundered were located in Ohio. Further, the Noteholders point out the many connections Credit Suisse had with National Century in Ohio,[8] including entering into purchase agreements for the initial purchase of notes. The Noteholders thus

---

[8] It is important not to conflate the issues of what contacts count for purposes of personal jurisdiction and what conduct matters for purposes of the Commerce Clause. See Midwest Title Loans, Inc. v. Mills, 593 F.3d 660, 668 (7th Cir. 2010) ("[I]f the presence of an interest that might support state jurisdiction without violating the due process clause of the Fourteenth Amendment dissolved the constitutional objection to extraterritorial regulation, there wouldn't be much left of Healy and its cognates.").

Nonetheless, under the Noteholders' approach to the circumstances of this case, there would be overlap of the facts relevant to both issues. See Shaffer v. Heitner, 433 U.S. 186, 224-24 (Brennan, J., concurring and dissenting) (discussing how the inquiries of judicial and legislative jurisdiction "are often closely related" and "depend upon similar considerations").

argue that the necessary in-state element is easily satisfied because the fraud occurred in Ohio and Credit Suisse's participation in, or aiding of, the fraud had significant Ohio connections.

The court concludes, however, that the "commerce" or "conduct" reached by the Ohio Securities Act is the securities transaction and not the fraud. This conclusion is guided by the Supreme Court's recent decision in Morrison v. National Australia Bank Ltd., __ U.S. __, 130 S.Ct. 2869 (June 24, 2010). In Morrison the Court dealt not with the dormant Commerce Clause but with the related issue of the extraterritorial reach of the federal securities fraud statute. Foreign investors had brought suit under § 10(b) of the Securities Exchange Act of 1934 against foreign and American defendants. The investors had purchased securities in an Australian bank, whose stock was not traded on any exchange in the United States. They alleged that the stock's value had decreased because the bank had purchased an American mortgage company that was engaging in fraud.

The question in Morrison was whether § 10(b) reached a foreign sale of securities whose value declined because of fraud occurring in the United States. In determining the reach of § 10(b), the Court began with the "longstanding principle" that federal statutes "apply only within the territorial jurisdiction of the United States" absent clear Congressional intent otherwise. Morrison, 130 S.Ct. at 2877 (internal quotation marks omitted). The Court next rejected the Second Circuit's "conduct and effects" test – which asked whether the wrongful conduct occurred in the United States and whether it had a substantial effect in the United States or upon its citizens, see SEC v. Berger, 322 F.3d 187, 192-93 (2d Cir. 2003) – as being contrary to the presumption against extraterritoriality. Morrison, 130 S.Ct. at 2879-81. After conducting a textual analysis of § 10(b) and finding no clear statement by Congress of extraterritorial effect, the Court held that § 10(b) did not have an exterritorial application. Id. at 2881-83.

The investors argued that they were not seeking extraterritorial application of § 10(b) in any event because the fraud was located in the United States. The defendants countered that the absence of a sale in the United States or a listing on an American exchange precluded § 10(b)'s application. The Court agreed with the defendants and announced a "transactional test," under which the focus is on where the transaction took place and not where the fraud occurred:

[W]e think that the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States. Section 10(b) does not punish deceptive conduct, but only deceptive conduct "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered." 15 U.S.C. § 78j(b). See SEC v. Zandford, 535 U.S. 813, 820, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002). Those purchase-and-sale transactions are the objects of the statute's solicitude. It is those transactions that the statute seeks to "regulate," see Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co., 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); it is parties or prospective parties to those transactions that the statute seeks to "protec[t]," id., at 10, 92 S.Ct. 165. See also Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). And it is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies.

The primacy of the domestic exchange is suggested by the very prologue of the Exchange Act, which sets forth as its object "[t]o provide for the regulation of securities exchanges . . . operating in interstate and foreign commerce and through the mails, to prevent inequitable and unfair practices on such exchanges . . . ." 48 Stat. 881. We know of no one who thought that the Act was intended to "regulat[e]" foreign securities exchanges – or indeed who even believed that under established principles of international law Congress had the power to do so. The Act's registration requirements apply only to securities listed on national securities exchanges. 15 U.S.C. § 78*l* (a).

With regard to securities not registered on domestic exchanges, the exclusive focus on domestic purchases and sales is strongly confirmed by § 30(a) and (b), discussed earlier. The former extends the normal scope of the Exchange Act's prohibitions to acts effecting, in violation of rules prescribed by the Commission, a "transaction" in a United States security "on an exchange not within or subject to the jurisdiction of the United States." § 78dd(a). And the latter specifies that the Act does not apply to "any person insofar as he transacts a business in securities without the jurisdiction of the United States," unless he does so in violation of regulations promulgated by the Commission "to prevent evasion [of the Act]." § 78dd(b). Under both provisions it is the foreign location of the transaction that establishes (or reflects the presumption of) the Act's inapplicability, absent regulations by the Commission.

130 S.Ct. at 2884-85 (footnotes omitted). Thus, § 10(b) reaches only those transactions involving a security listed on an American exchange or involving a purchase or sale of a security in the United States.

The Ohio Securities Act similarly focuses on the "purchase" and "sale" of a security. Section 1707.43(A) imposes liability on the person making an unlawful "sale or contract for sale" and on the

person who participates in the sale or aids the seller "in making such sale or contract for sale." A cause of action accrues to the person who "purchased the security." O.R.C. § 1707.41(A). Further, the Act makes unlawful the use of misrepresentations in connection with "selling any securities in this state," O.R..C. § 1707.44(B)(4), and the use of a fraudulent practice "in purchasing or selling securities." O.R..C. § 1707.44(G).

Using a transactional test to determine the permissible reach of the Ohio Securities Act comports with the United States Supreme Court's original reasoning for upholding blue sky laws as constitutional. As the Third Circuit put it, "[t]he key to the laws' constitutionality, the Court held, was that '[t]he provisions of the law . . . apply to dispositions of securities *within* the state.'" A.S. Goldmen, 163 F.3d at 785 (quoting Hall, 242 U.S. at 557) (emphasis in original). Even in securities transactions having points of contact with more than one state, the contacts that matter are the offer, sale, and purchase. See A.S. Goldmen, 163 F.3d at 789 n.16 (distinguishing Arizona Corp. on the grounds that there was no in-state offer, sale, or purchase in that case).

The transactional test also best fits the broad standard for secondary liability under § 1707.43. A secondary actor need not commit fraud to be liable; the secondary actor need only participate in or aid the sales transaction. Joint and several liability extends to "every person that has participated in or aided the seller in any way in making such sale or contract for sale." O.R.C. § 1707.43(A). The statute does not require knowledge, intent, or any other mental state on the part of secondary actor,[9] nor does it require reliance, inducement, or proximate cause as between the secondary actor and purchaser. See Nickels v. Koehler Mgmt. Corp., 541 F.2d 611, 616 (6th Cir. 1976) (noting that rescission is available under § 1707.43 "without a showing of reliance"); Federated, 137 Ohio App.3d at 391, 738 N.E.2d at 861 ("R.C. 1707.43 does not require that a person induce a purchaser to invest in order to be held liable.

---

[9] Credit Suisse contends that the lack of a scienter requirement for secondary violations means that the Act treats secondary actors more harshly than it does primary actors, for whom a showing of scienter is required under § 1707.41(A). This result, Credit Suisse argues, violates the Equal Protection and Due Process Clauses of the Constitution. Because the court finds that applying the Act would violate the Commerce Clause, Credit Suisse's other constitutional arguments need not be reached.

Rather, the language is very broad, and participating in the sale or aiding the seller in any way is sufficient to form a basis for liability under R.C. 1707.43.").

The statute simply requires an act of participation or assistance in the sale and some form of remuneration, either direct or indirect. See O.R.C. § 1707.43.1(B) (remuneration requirement, which is waived for investment advisers). Indeed, one Ohio court has referred to the statute as creating a strict liability standard. Ryan v. Ambrosio, No. 91036, 2008 WL 5258308, at *4 (Ohio Ct. App. Dec. 18, 2008). Courts have held that § 1707.43 imposes liability on persons who introduce investment opportunities, serve as conduits of information, act as intermediaries in the exchange of money and securities, and arrange meetings between buyers and sellers. See, e.g., Johnson v. Church of the Open Door, 179 Ohio App.3d 532, 541, 902 N.E. 2d 1002, 1009 (Ohio Ct. App. 2008); Boland v. Hammond, 144 Ohio App.3d 89, 94, 759 N.E.2d 789, 793 (Ohio Ct. App. 2001); Perkowski v. Megas Corp., 55 Ohio App.3d 234, 235, 563 N.E.2d 378, 379 (Ohio Ct. App. 1990); Gerlach v. Wergowski, 65 Ohio App.3d 510, 514, 584 N.E.2d 1220, 1222 (Ohio Ct. App. 1989).

Ohio's imposition of secondary liability thus targets the sales transaction. In seeking summary judgment on their § 1707.43 claims, the Noteholders assert that Credit Suisse aided National Century's primary violations by serving as the initial purchaser of notes, preparing and distributing sales materials, and otherwise acting as the market maker in NPF notes. As the Noteholders stress, they do not need to show that Credit Suisse acted with knowledge of National Century's fraud or with intent to defraud purchasers. In other words, they merely need to establish that Credit Suisse participated or aided in making the *sale*, not in committing the *fraud*.

Section 1707.43(A)'s broad standard belies the notion that interstate commerce will not be burdened by applying the Ohio Securities Act to out-of-state sales. The Noteholders argue that applying the Act would only curb fraud and promote legitimate commerce. The court views the impact differently. Section 1707.43's standard for secondary liability is unlike that of the other blue sky laws at issue in this multidistrict litigation. See, e.g., Cal. Corp. Code § 25504.1 (requiring that the person who materially assists a primary violation act with intent to deceive or defraud); Neb. Rev. Stat § 8-

1118(3) (requiring that person providing material aid act with knowledge or constructive knowledge of facts forming the basis of the primary violation); N.J. Stat. Ann. § 49:3-71(d) (same); 70 Pa. Stat. Ann. § 1-503(a) (same).  Of particularly note is the law of New York, from where Credit Suisse sold the notes. New York's Martin Act does not provide for a private cause of action, see N.Y. Gen Bus. Law § 352, et seq., Broder v. Cablevision Systems Corp., 418 F.3d 187, 201 (2d Cir. 2005), and some New York courts have held that the Martin Act preempts common law claims not requiring proof of scienter.  See In re Beacon Associates Litig., __ F.Supp.2d __, 2010 WL 3895582, at *35 (S.D.N.Y. Oct. 5, 2010).[10] Thus, if this court granted the Noteholders' motions for summary judgment and found Credit Suisse liable under § 1707.43 for aiding a primary violation, it would result in the rescission of sales that took place entirely in other states and under whose laws the transactions would not be rescinded without further proof of intent or knowledge.  It can hardly be argued that such an application would have no effect on interstate commerce.

The Noteholders argue that in any event National Century and its note-issuing entities meet the definition of a seller under the Ohio Act.  This would potentially satisfy the transactional test's requirement of an in-state element to the securities transaction.  The definition of a "sale" includes a disposition accomplished "directly or indirectly, by agent."  O.R..C. § 1707.01(C)(1).  The Noteholders cite Boland v. Hammond, 144 Ohio App.3d 89, 759 N.E.2d 789 (Ohio Ct. App. 2001), for the proposition that a party is a seller even if he uses an intermediary to handle the exchange of securities and money.[11]

---

[10]  There is a direct conflict among New York courts about the preemption issue.  See Assured Guaranty (UK) Ltd. v. J.P. Morgan Invest. Mgmt., __ N.Y.S.2d __, 2010 WL 4721590, at *6 (N.Y. App. Div. Nov. 23, 2010) (discussing split of authority and concluding that the Martin Act does not preempt common law claims); Anwar v. Fairfield Greenwich Ltd., __ F.Supp.2d __, 2010 WL 3022848 (S.D.N.Y. July 29, 2010) (same).

This court does not herein take sides on the issue, though the matter is ripe for decision in other summary judgment motions submitted in the multidistrict litigation.  For purposes of Commerce Clause analysis, it suffices to say that the laws of Ohio and New York differ in how they treat the securities transactions between Credit Suisse and the Noteholders.

[11]  In Boland, the intermediary resided in Ohio.

The difficulty with this argument is that it allows Ohio's statutory definitions to trump Commerce Clause jurisprudence.  Ohio cannot circumvent territorial limitations on its authority to regulate by merely expanding its definition of who is a seller.  The transactions by which the Noteholders purchased securities occurred wholly outside of Ohio—this analysis is controlled by federal Commerce Clause and extraterritoriality jurisprudence.  Only once a transaction comes within Ohio's authority to regulate may it define who is liable for certain proscribed conduct.

The court's ruling does not undermine Ohio's ability to prevent the state "'from being used as a base of operations for crooks marauding outside the state.'"  A.S. Goldmen, 163 F.3d at 788 (quoting Stevens, 154 A. at 403).  To the contrary, Ohio law does apply to the initial transactions between National Century and Credit Suisse.  Credit Suisse claims that it was a victim of National Century's fraud, having itself lost about $130 million in notes.  No one disputes that the Ohio Securities Act would apply to the sale of notes by National Century, NPF VI, and NPF XII to Credit Suisse.  And nothing in the court's ruling hinders the state of Ohio from fully enforcing its own regulations, including those in the Ohio Securities Act, against Ohio corporations.

The Noteholders' overall theory of the case is that National Century and Credit Suisse joined forces to defraud investors.  In support of their other claims that do require scienter, the Noteholders have presented evidence suggesting that Credit Suisse knew or should have known of National Century's fraud.  They argue that Ohio's interest in combating securities fraud would be undermined if an in-state fraudster can enlist the help of an out-of-state accomplice and avoid application of the Ohio Securities Act by layering transactions so that the passing of legal title occurs outside of Ohio.  But again, Ohio retains full authority to regulate National Century, the in-state fraudster.  And, as to the out-of-state aider, § 1707.43 simply does not contain a scienter requirement.  It is unclear how Ohio's interests would be advanced allowing the Act to reach and rescind transactions made by out-of-state sellers, for whom knowledge of the Ohio-based fraud is not required.

The pertinent concern for the Noteholders is not Ohio's ability to enforce its laws against an in-state fraudster.  It is which states' blue sky laws they should have a private cause of action under.

There is nothing unfair about the Noteholders not having a cause of action under the Ohio Securities Act when they purchased notes outside of Ohio from a seller in New York. They knew they were purchasing the notes from Credit Suisse and not from National Century. See, e.g., CS Opp'n Ex. 43 (Supplemental Private Placement Memorandum for NPF XII 2001-2 notes, notifying prospective investors that Credit Suisse was the initial purchaser of the notes).

The manner in which National Century and Credit Suisse structured their transactions is no mere technicality. In Boland the middleman simply collected money from the investors and forwarded it to the seller, and then passed along promissory notes from the seller to the investors. Here, Credit Suisse first purchased the notes and obtained legal title. See CS Opp'n Ex. 44. Though Credit Suisse was expected to resell the notes – and had incentive to make a profit by reselling them – it was not required to resell and in fact bore the risk of loss.

The decision in Dean Foods Co. v. Brancel, 187 F.3d 609 (7th Cir. 1999), underscores the importance of how commercial transactions are structured. In that case, the Seventh Circuit examined the extraterritorial effect of a Wisconsin regulation prohibiting the payment of price premiums to large volume sellers of raw milk. Before the regulation took effect, Dean Foods, an Illinois milk processor, hired milk haulers to collect and transport raw milk from farms in Wisconsin, and it paid premiums to volume sellers. Dean Foods took title and assumed the risk of loss once its haulers picked the milk up in Wisconsin. After the regulation went into effect, Wisconsin dairy farmers contracted with milk haulers and arranged for their milk to be transported to Dean Foods in Illinois, where Dean Foods then chose whether to purchase the milk.

Wisconsin objected to Dean Foods' restructuring of the transactions and argued that the numerous "contacts" and "interactions" between Dean Foods and Wisconsin farmers should carry the day over contractual formalities. The court rejected this argument: "Our view of these facts leads us to conclude that the sales indisputably occurred in Illinois, and that no contracts were formed in Wisconsin. No agreement or meeting of the minds, as is required by contract principles, occurred regarding the purchase of any shipment of milk until the product actually arrived in Illinois. Moreover,

38

it was only at that point, when the necessary formalities of contract law had taken place, that title, possession and risk of loss passed." Id. at 619.  The court thus held that Wisconsin's efforts to enforce its regulations against Dean Foods violated the extraterritoriality principle.

Likewise unavailing is the Noteholders' attempt to label the notes as "Ohio commodities." See Az. Noteholders' Reply Br. (Doc. 1661), at p. 57 (arguing that the notes "are inextricably tied to the state of Ohio").  The Noteholders argue that the notes, once placed into commerce, provide the requisite connection to Ohio everywhere they go, including the secondary market.  This argument must be rejected as a repackaging of the failed argument that issuance in Ohio alone suffices for Commerce Clause purposes.  The critical inquiry is whether conduct wholly outside of Ohio would be regulated. Healy, 491 U.S. at 336.  With conduct properly defined as the sales transactions between Credit Suisse and the Noteholders, the answer is "yes."  Again, Dean Foods illustrates the point.  That the sales involved Wisconsin milk was not enough to apply the Wisconsin regulation because the sales occurred wholly in Illinois.  "[T]hese sales involve Wisconsin farmers and Wisconsin milk.  Nevertheless, as the legal rules we apply here make clear, the fact that a particular transaction may affect or impact a state does not license that state to regulate commerce which occurs outside of its jurisdiction." Dean Foods, 187 F.3d at 619-20 (citing Healy and MITE).  See also Midwest Title Loans, Inc. v. Mills, 593 F.3d 660, 669 (7th Cir. 2010) (holding that Indiana's attempt to regulate automobile title loans made in Illinois violated the Commerce Clause even though the motor vehicles, which were collateral, were titled in Indiana).

VI.    Conclusion

The court finds that under the transactional test, the conduct being regulated by the Ohio Securities Act is the sale and purchase of securities.  The sales between Credit Suisse and the Noteholders occurred wholly outside of Ohio; thus, applying Ohio Revised Code § 1707.43 to the transactions would violate the extraterritoriality principle of the Commerce Clause.

The Noteholders' motions for partial summary judgment (docs. 1517, 1521) are DENIED, and

Credit Suisse's motion for summary judgment (doc. 1510) is GRANTED as to the Noteholders' claims under the Ohio Securities Act.

The following motions to strike are DENIED as moot: docs. 1559, 1669, and 1679.


s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: December 13, 2010

40