IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re National Century | : | Case No. 2:03-md-1565 |
| Financial Enterprises, | | |
| Inc., Investment Litigation. | : | Judge Graham |
| | : | Magistrate Judge Abel |

**OPINION AND ORDER ON CREDIT SUISSE'S MOTION FOR
SUMMARY JUDGMENT IN THE NOTEHOLDER ACTIONS**

This matter is before the court on the motion of defendants Credit Suisse Securities (USA) LLC
and Credit Suisse, New York Branch (together, "Credit Suisse"), for summary judgment on the claims
brought by the Noteholder plaintiffs. The Noteholders are institutional investors who collectively
purchased nearly $2 billion in notes issued by National Century Financial Enterprises, Inc., through its
subsidiaries NPF VI, Inc. and NPF XII, Inc. In most cases, the Noteholders purchased their notes
directly from Credit Suisse, which served in the role of initial purchaser and placement agent for
National Century. It is undisputed that National Century committed a massive fraud. What is disputed
here is the extent to which Credit Suisse can be held liable to the Noteholders for their losses.

According to the Noteholders, the evidence demonstrates that Credit Suisse knew or should
have known of the material aspects of National Century's fraud. They argue that Credit Suisse sold the
notes despite knowing of various ways in which National Century ran it operations contrary to how
those operations were described in the offering materials that Credit Suisse supplied to them, as well
as in other communications Credit Suisse made to them. The Noteholders assert numerous claims,
including for fraud, negligent misrepresentation, aiding and abetting fraud, violations of Section 10(b)
of the Securities Exchange Act of 1934, and violations of the blue sky laws of various states.

Credit Suisse's motion offers a host of reasons why it believes it is entitled to summary
judgment. It contends that the evidence demonstrates as a matter of law that Credit Suisse did not
know, nor should have known, of National Century's fraud. According to Credit Suisse, National
Century deliberately hid the fraud from Credit Suisse and other third parties involved in its operations.

Credit Suisse further argues that it did not make any actionable misrepresentations to the Noteholders because it was not the maker of the statements in the offering materials and because its various direct communications with the Noteholders amounted to no more than sales talk and factually accurate descriptions of the note programs.  It also contends that the Noteholders cannot establish that they relied upon any alleged Credit Suisse misrepresentation in making their decisions to purchase notes and that, in any event, their purported reliance was not reasonable.

For the reasons set forth below, the court finds that the Noteholders have submitted sufficient evidence in support of their fraud-based claims to create genuine issues of material fact.  Thus, Credit Suisse's motion for summary judgment is largely denied.

## I.  Background

The court provides this overview of undisputed facts regarding National Century's fraud, Credit Suisse's role with National Century, and the Noteholders' purchases.  More extensive discussions of the facts and the matters in dispute are reserved for the particular legal issue to which those facts relate.

### A.  National Century's Fraud

National Century was a privately-held finance company founded in 1990 by Lance Poulsen, Donald Ayers, and Rebecca Parrett in Dublin, Ohio.  It provided financing to healthcare providers by purchasing their accounts receivable at a discount under the terms of Sale and Subservicing Agreements. See CS Ex. 11 at NCFE-1865-1642 (template Sale and Subservicing Agreement).[1]  Under the

---

[1]  A brief explanation of the court's form of citation to the record is in order.  Citations to evidence accompanying Credit Suisse's motion for summary judgment (doc. 1510) will appear as "CS Ex. __" and citations to evidence accompanying Credit Suisse's reply brief (doc. 1656) will appear as "CS Reply Ex. __."  A citation to a deposition transcript will be further noted as follows, for example: "CS Ex. 1, Glomski Dep. at 52."  Page references to Credit Suisse's memorandum of law in support of its motion for summary judgment (doc. 1520) will be cited as "CS MSJ at __" and references to the reply brief will be cited as "CS Reply Brief at __."  Citations to Credit Suisse's reply statement of facts (doc. 1657) will take the form of "CS SOF at __" and citations to Credit Suisse's plaintiff-specific appendix (attached to doc. 1657) will take the form of "CS App'x at __."

Citations to evidence accompanying the brief in opposition submitted by the plaintiffs known as the Arizona Noteholders (doc. 1581) will appear as "Az. Ex. __."  Page references to the brief itself will be cited as "Az. Opp'n Brief at __."  Citations to the Arizona Noteholders' statement of facts (doc. 1582) will take the form of "Az. SOF at __" and citations to the plaintiff-specific

Agreements, National Century would purchase only "eligible" receivables – those that satisfied certain criteria designed to ensure the receivables were of high quality.  Id. at NCFE-1865-1669 to -1671.

National Century generated cash by issuing notes through special-purpose and wholly-owned subsidiaries.  The most prominent of these subsidiaries were NPF VI and NPF XII, in whose issuances all of the Noteholders invested.  Each NPF note program operated as a trust under a Master Indenture.  See CS Ex. 11 (NPF VI Master Indenture); CS Ex. 12 (NPF XII Master Indenture). The parties to the Indentures were the Trust (either NPF VI or NPF XII), the Servicer (National Premier Financial Services, Inc., also a wholly-owned subsidiary of National Century), and the Trustee (either JPMorgan or Bank One).  Credit Suisse was not a party to the Indentures.

The NPF notes typically received the highest ratings by the credit rating agencies and were sold to institutional investors through private placement.  The notes were secured by the healthcare receivables owned by NPF VI and NPF XII, see CS Exs. 11, 12 at § 3.01, and the Servicer had an obligation to ensure the note programs purchased only eligible receivables.  Id. at § 5.04(b).  The Indentures offered further layers of protection to investors.  These layers included: maintaining the corporate separateness of the NPF entity from National Century and the Servicer and prohibiting the commingling of funds, see id. at § 4.04; subjecting the NPF entity to various monitoring, reporting, and auditing requirements, see id. at §§ 4.12, 5.04(b); observing concentration limits on the percentage amounts of receivables purchased from certain sources, see id. at § 4.13; establishing various reserve accounts, which were required to be maintained at specified percentage levels of the net value of purchased receivables, see id. at §§ 6.01, 6.02, 6.03; and directing the Trustees to declare an event of default if a party committed a material breach of the Indentures, see id. at §§ 7.01, 8.01.

---

appendix (attached to doc. 1581) will take the form of "Az. App'x at __."

The presentation of the New Jersey Noteholders (MetLife and Lloyds) is slightly different. Their evidence is not sequentially numbered, but rather is grouped under several declarations they have filed.  Citations to evidence accompanying MetLife and Lloyds's consolidated brief in opposition to the motion for summary judgment (doc. 1565) will appear, for instance, as "NJ Leivick Ex. __."  Citations to a paragraph in the declaration itself will appear, for instance, as "NJ Leivick Decl. at ¶ __."  Page references to the consolidated brief will be cited as "NJ Opp'n Brief at __."  MetLife and Lloyds have not submitted any additional appendixes or statements of fact.

In reality, National Century committed a multi-billion dollar fraud on investors.  The mechanics of the fraud have been thoroughly detailed in orders of this court (in the multidistrict litigation, in the criminal proceedings against National Century's executives, in civil enforcement actions brought by the Securities and Exchange Commission, and in numerous bankruptcy matters appealed to this court), as well as in orders of the Sixth Circuit in the appeals of the criminal convictions, and in orders of the bankruptcy court overseeing the Chapter 11 liquidation of National Century and its subsidiaries.  See, e.g., U.S. v. Poulsen, 655 F.3d 492, 498-99 (6th Cir. 2011); U.S. v. Faulkenberry, 614 F.3d 573, 577-79 (6th Cir. 2010); In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 617 F.Supp.2d 700, 705-07 (S.D. Ohio 2009); U.S. v. Poulsen, 568 F.Supp.2d 885, 890-912 (S.D. Ohio 2008); In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., No. 2:03-md-1565, 2006 WL469468 at **1-6 (S.D. Ohio Feb. 27, 2006); In re Nat'l Century Fin. Enterprises, Inc., 341 B.R. 198, 209-10 (Bankr. S.D. Ohio 2006).

Briefly stated, a great deal of the accounts receivable that National Century "purchased" were worthless or non-existent receivables from healthcare companies in which National Century's executives held undisclosed ownership interests.  What appeared on paper to be legitimate transactions amounted to little more than transfers of corporate funds into the pockets of National Century's executives.  In testimony given in the criminal proceedings, a government witness provided a four-year snapshot of the fraud at National Century.  He found that National Century had made $1.3 billion in unsecured advances in that time window to eight healthcare providers, seven of which the Founders held an ownership stake.  See Poulsen, 568 F.Supp.2d at 900.

The Sixth Circuit summarized the fraud as follows:

> The record before us makes unmistakably clear that NCFE's representations were false. NCFE executives lied to investors in sales presentations; they lied to them in the governing documents for bond sales; and they lied to them in monthly investor reports that showed NCFE in full compliance with the obligations recited above. This practice of deception was continuous from approximately 1995 to October 2002, when NCFE ceased operations.

> The deception centered on the practice of "advancing."  Contrary to what it told investors, NCFE routinely advanced funds to healthcare providers without obtaining any receivables, much less eligible ones, in return.  NCFE apparently just fronted these monies – investor monies – with the hope that someday the provider would pay them back.  Indeed, some providers were already so buried in debt that even the hope must

4

have been absent.  Moreover, the advances were large and focused on only a handful of providers, which meant that NCFE blew past its concentration limits as well.

Faulkenberry, 614 F.3d at 578.

By the time National Century went bankrupt in November 2002, investors suffered losses of well over $2 billion.

**B.**     **Credit Suisse and Its Role with National Century**

Defendant Credit Suisse Securities (USA) LLC is an investment bank and broker-dealer that is a subsidiary of the Swiss bank Credit Suisse Group AG.  Defendant Credit Suisse, New York Branch, is a branch of the Swiss bank.  Both Credit Suisse defendants have their principal places of business in New York.

National Century used various financial institutions to bring its notes to market.  See CS Ex. 10 (chart listing all of the NPF note issuances and identifying the underwriter for each issuance).  Over time, and particularly from 1998 to 2002, Credit Suisse became the predominant placement agent for the NPF notes.  See id.; see also Az. Ex. 199 (August 30, 2000 agreement by which National Century granted Credit Suisse the right to serve as the sole lead in placing additional note offerings until Credit Suisse received at least $15 million in upfront fees).  In this same time frame, the total dollar amount of each note issuance increased substantially from the pre-1998 issuances.  See CS Ex. 10.

Credit Suisse's involvement with National Century can be traced to late 1995, when the parties entered into a letter agreement whereby Credit Suisse agreed to be National Century's "agent and financial advisor in connection with the marketing" of two $50 million note offerings by NPF VI.  CS Ex. 19 at ¶ 1.  The letter agreement called on Credit Suisse to "structure, market and place the [note] Offerings."  Id.  Shortly thereafter, in early 1996, Credit Suisse entered into a Placement Agency Agreement with National Century, NPF VI, and the Servicer.  See CS Ex. 36.  The agreement required Credit Suisse to privately place the notes with qualified institutional buyers in return for a placement fee of 1% of the principal amount of notes sold.  See id. at 2-4.

The arrangement changed slightly for the later note issuances in which the Noteholders invested. Credit Suisse entered into a series of Purchase and Agency Agreements with National Century, the note-

5

issuing entity (either NPF VI or NPF XII), and the Servicer.  See, e.g., CS Ex. 35.  These agreements defined Credit Suisse as an "initial purchaser" who would purchase the notes from the issuer at a slight discount, such as 0.6 % less face value.  See id. at § 3.  Credit Suisse would then work with a placement agent (Banc One Capital Markets, for example) to place the notes with qualified institutional buyers. See id. at 2.  Credit Suisse was not contractually required to sell the notes and in fact suffered losses of approximately $130 million from notes it had on hand when National Century collapsed.  See CS Ex. 143.[2]

Credit Suisse had additional points of involvement with National Century besides serving as the initial purchaser of NPF notes.  It was a lender on the NPF WL, a fully-funded revolving warehouse line of credit to National Century.  See CS Ex. 230.  By the summer of 2000, Credit Suisse had a commitment of $50 million to the NPF WL.  Id.  In August 2000, Credit Suisse increased its commitment by $20 million by agreeing to purchase the loan of another bank who had declined to renew its commitment in the NPF WL.  See Az. Ex. 181.  The parties contemplated that National

---

[2]  The parties have filed numerous evidentiary objections (docs. 1648, 1678, 1737).  The court will discuss objections that relate to evidence it has relied on in resolving the motion for summary judgment and will defer decisions on the admissibility of other evidence to the trial court.

Lloyds and MetLife have objected to Credit Suisse Exhibit 143, which is a summary chart showing Credit Suisse's month-end NPF note holdings from August 1998 to October 2002.  Credit Suisse contends that the chart summarizes a voluminous amount of trade data and thus qualifies as summary evidence under Fed. R. Evid. 1006.  Lloyds and MetLife argue that Credit Suisse has not established which data it selected for use in the chart, nor established that the chart accurately reflects the data.  See U.S. v. Moon, 513 F.3d 527, 545 (6th Cir. 2008) (discussing the criteria for admissibility under Rule 1006, including that the underlying documents or data are admissible and available to the other party and that the summary is accurate).

The court finds that Exhibit 1006 is admissible.  At the top of the chart, Credit Suisse has identified the underlying data it used in preparing the chart.  Lloyds and MetLife admit that this data was provided to them in electronic form during discovery, and they have not challenged the admissibility of the underlying data.  Further, those persons responsible for preparing the chart have sworn to its accuracy.  See CS Opp'n to NJ Mot. to Strike (doc. 1765), Kleidon Decl. at ¶ 5 and DiCicco Decl. at ¶ 3.

It seems that Lloyds and MetLife's real quibble with Exhibit 143 is that Credit Suisse selected the month's end in summarizing its holdings instead of the month's average.  They believe this choice possibly exaggerates how much exposure Credit Suisse had on the notes.  The court finds that this dispute is of little moment to the motion for summary judgment.  It is undisputed that Credit Suisse lost significant sums of money when National Century went bankrupt, even if Lloyds and MetLife dispute the exact amount of the loss.

Century would find another lender for the NPF WL and that National Century would pay the $20 million back by September 30, 2000. See id. In late September 2000, National Century requested a two-week extension in paying off the $20 million, which Credit Suisse granted in exchange for a $100,000 fee. See Az. Exs. 59, 189.

Later in 2000, Credit Suisse helped National Century obtain short-term financing under a separate revolving liquidity facility. National Century issued the NPF XII 2000-4 variable funding note ("VFN"), which was backed by healthcare receivables held by NPF XII. See CS Ex. 10. In December 2000, Credit Suisse, New York Branch, entered into a Liquidity Asset Purchase Agreement with NPF XII and a conduit purchaser whereby Credit Suisse committed to purchase an undivided interest in the VFN upon the occurrence of certain events. See CS Ex. 145 at LL_000108. In turn, Credit Suisse prepared materials and marketed participation interests in the VFN to other banks. See NJ Leivick Exs. 112, 113, 114, 117. On October 31, 2002, the triggering events occurred that required Credit Suisse to purchase its $127 million interest in the VFN. See CS Ex. 192 at LL_002039; CS Ex. 340, Lengel Dep. at 48.

Credit Suisse also extended credit to National Century in the form of a short-term loan in September 2002. National Century requested a $100 million increase in the VFN from Credit Suisse. See CS Ex. 137 at CSFB-EMAIL-0384677; Az. Ex. 146. Credit Suisse declined that request, but later approved a $75 million loan on September 4, 2002. See Az. Ex. 145. The loan was extended to the NPF XII program through the VFN. Id.; CS Reply Ex. 330. Credit Suisse earned $1 million above its usual fees in connection with this loan. See Az Ex. 146 at 2; Az. Ex. 147.

### C. The Noteholders and Their NPF Note Purchases

The Noteholders are institutional investors who purchased NPF VI and NPF XII notes. Plaintiff Lloyds TSB Bank plc is a British public limited company with its principal place of business in London, England and an office in New York. Lloyds purchased $60 million in NPF XII 2001-1 notes from Credit Suisse in March 2001. See NJ Vespasiano Decl. at ¶ 3. In the same month, Lloyds and Credit Suisse entered into a Participation Agreement, under which Lloyds assumed a $68 million undivided interest in the VFN. See CS Ex. 219. In exchange, Lloyds received payment of certain fees.

See id. at § 4.  On November 5, 2002, Lloyds purchased its participation interest from Credit Suisse in the VFN.  See CS Ex. 217.

Plaintiffs Metropolitan Life Insurance Company and Metropolitan Insurance and Annuity Company (together, "MetLife"), both with their principal places of business in New York, purchased a total of $121 million in NPF XII notes from June 2001 to July 2002.  All but one purchase was made from Credit Suisse.  MetLife purchased $104.5 million of NPF XII Series 2001-1, 2001-2, 2001-4, and 2002-1 notes from Credit Suisse.  See NJ Tau Decl. at ¶¶ 3-8; NJ Leivick Ex. 50.  Credit Suisse served as the initial purchaser for all of these notes.  See CS Ex. 10.  MetLife made one purchase from Bear, Stearns & Company.  This purchase occurred in the secondary market and consisted of $16.6 million of NPF XII 2001-2 notes for which Credit Suisse had been the initial purchaser.  See NJ Leivick Ex. 50 at ML_004915-16.

The Arizona Noteholder plaintiffs include numerous governmental entities from Arizona and other states, as well as investment funds, banks, insurance companies, trusts and other entities from various states and foreign countries.  The Arizona Noteholders collectively purchased over $1.5 billion of NPF VI and NPF XII notes between 1998 and 2002.  See CS Ex. 191 (chart listing all of the Arizona Noteholders' purchases).  The great majority of the Arizona Noteholders' purchases were made directly from Credit Suisse, either at the time of initial issuance or in the secondary market.  Id.  Approximately $200 million of their purchases were made from an agent or broker other than Credit Suisse.  Id. Certain of the Arizona Noteholders (the Asset Allocation & Management plaintiffs, the Clifton Group plaintiffs, Louisiana Corporate Credit Union, and Oregon Insurance Guaranty Association) purchased all of their notes from a source other than Credit Suisse.

### D.    Procedural Background

The Noteholders have asserted numerous claims against Credit Suisse for its alleged knowing involvement in National Century's wrongdoing.  Their claims have been the subject of several orders of this court.  See In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 755 F.Supp.2d 857 (S.D. Ohio 2010) (granting summary judgment to Credit Suisse as to the Noteholders' claims under the Ohio Securities Act); In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 541 F.Supp.2d 986 (S.D. Ohio

2007) (largely denying Credit Suisse's motion to dismiss the Noteholders' complaints).

Still remaining are the following claims: Lloyds's claim under § 10(b) of the Securities Exchange Act of 1934 and its claims for fraud, negligent misrepresentation, and breach of contract; MetLife's claims under § 10(b) and under New Jersey's securities statute and its claims for fraud and negligent misrepresentation; and the Arizona Noteholders' claims under the blue sky laws of various states and their claims for fraud, negligent misrepresentation, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, conspiracy, and unjust enrichment. Two of the Arizona Noteholders – Grantham, Mayo, Van Otterloo & Company (GMO) and Pacific Investment Management Company, LLC (PIMCO) – have also asserted fraud-based statutory claims under the laws of Massachusetts and California, respectively.

Credit Suisse has filed a motion for summary judgment against the claims of all of the Noteholders. The parties have presented oral argument, and the matter is ripe for decision.

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar

9

Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

## III.   Choice of Law

The court has thus far refrained from making a choice-of-law determination for the Noteholders' common law claims against Credit Suisse. For issues of federal law, a transferee court receiving a case from the Judicial Panel on Multidistrict Litigation applies the law of the circuit in which it is located. In re Cardizem CD Antitrust Litig., 332 F.3d 896, 912 n.17 (6th Cir. 2003); In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig., 97 F.3d 1050, 1055 (8th Cir. 1996). For issues of state law, however, the transferee court must apply the state law that would have applied had the cases not been transferred for consolidation. Id.

The court has thus far used Ohio law as its default reference point in evaluating the Noteholders' common law claims against Credit Suisse and numerous other defendants. At the summary judgment stage, Credit Suisse urges the court to make a choice-of-law determination because

it believes the facts demonstrate that New York law should apply.

The parties differ greatly in their approach to this issue. Credit Suisse argues that New York law should apply because Credit Suisse, MetLife, Lloyds, and certain of the Arizona Noteholders have their principal places of business in New York. Credit Suisse also emphasizes that it sold the notes and made its alleged representations from New York. In contrast, MetLife and Lloyds argue that Ohio law should apply because it was the "center of gravity" of the fraud in which Credit Suisse participated. The Arizona Noteholders offer yet a different view. They argue that it is not necessary to make a choice of law because a conflict does not exist. If a conflict is found to exist, they contend that the court should examine the matter on an issue-by-issue basis and conclude that the interests of the plaintiffs residing in various states outweigh the interest in applying the law of Credit Suisse's place of business.

The court finds that it is an appropriate time to make a choice of law. The relevant evidence is undisputed and the parties have fully briefed their positions. Further, there are enough conflicts among the laws of the various states implicated here to make a difference. One such difference is New York's requirement that the Noteholders prove their fraud claims by clear and convincing evidence, rather than by a preponderance of the evidence. Compare In re Vivendi Universal, S.A. Sec. Litig., 765 F.Supp.2d 512, 534 (S.D.N.Y. 2011), with Cornwall v. N. Ohio Surgical Ctr., 185 Ohio App.3d 337, 345, 923 N.E.2d 1233, 1239-40 (Ohio Ct. App. 2009). Another difference relates to the claims for negligent misrepresentation, for which New York law requires a showing of "a special or privity-like relationship" between the parties. Compare Bonded Waterproofing Servs., Inc. v. Anderson-Bernard Agency, Inc., 927 N.Y.S.2d 133, 135 (N.Y. App. Div. 2011), with Kaufman v. i-Stat Corp., 754 A.2d 1188, 1195-96 (N.J. 2000). Further, several of the Noteholders have asserted "holder" claims, arguing that assurances made by Credit Suisse caused them to refrain from selling their NPF notes. New York law recognizes such a claim in limited circumstances, but many states do not. See In re Worldcom Sec. Litig., 336 F.Supp.2d 310, 318-322 (S.D.N.Y. 2004) (surveying the law of various states).

### A.    Restatement of Conflict of Laws

As a transferee court, this court must apply the choice of law rules of the transferor courts, New Jersey and Arizona. See Rosen v. Chrysler Corp., 205 F.3d 918, 921 n.2 (6th Cir. 2000). Both states

have adopted the Restatement (Second) of Conflicts of Laws (1971). See P.V. v. Camp Jaycee, 962 A.2d 453, 460 (N.J. 2008); Bates v. Superior Ct., 749 P.2d 1367, 1369-70 (Ariz. 1988).

Section 6 of the Restatement identifies general factors that are relevant to any choice of law determination:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability, and uniformity of result, and

(g) ease in determination and application of the law to be applied.

Restatement (Second) of Conflicts of Laws § 6(2).

With respect to torts, the inquiry is which state "has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Id., § 145(1); see also Camp Jaycee, 962 A.2d at 460; Bates, 749 P.2d at 1370. Contacts to be considered include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

Restatement § 145(2).

For claims of fraud and misrepresentation in particular, the Restatement provides that in cases where the plaintiff's reliance and the defendant's representations took place in the same state, then the law of that state should be applied unless the principles of § 6 dictate otherwise. Id., §148(1). But when "plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made," the court should consider the following contacts in determining the state

12

that has the most significant relationship to the occurrence and the parties:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
>
> (b) the place where the plaintiff received the representations,
>
> (c) the place where the defendant made the representations,
>
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
>
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
>
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement § 148(2).

In evaluating the applicable Restatement provisions, courts typically start with the most particularized section – here, § 148 on fraud and misrepresentation – and then turn to the more general guidance in § 145 and the cornerstone principles of § 6. See e.g., Camp Jaycee, 962 A.2d at 461 (describing the tort-specific section as the "point of departure"). The focus throughout is which state has the most significant relationship to the occurrence and the parties. Id.

### B.    Lloyds

Lloyds contends, without any challenge from Credit Suisse, that it acted in reliance upon Credit Suisse's alleged misrepresentations and omissions in several locations. Before Lloyds entered into an asset-backed transaction like the ones with Credit Suisse, it conducted a risk assessment by its "Structured Finance New York" unit and a risk analysis by its credit services department in Miami, Florida. See CS Ex. 178, Vespasiano Dep. at 53-56; NJ Vespasiano Decl. at ¶ 15. Once both groups recommended a transaction, the recommendation went to certain individuals in London for final approval. See CS Ex. 178, Vespasiano Dep. at 55-58; NJ Seggins Decl. at ¶¶ 3-4.

Lloyds received materials from Credit Suisse regarding the notes and the Variable Funding Note ("VFN") at its New York office. See, e.g., NJ Vespasiano Exs. A-J; NJ Mayor Decl. at ¶ 20. Lloyds argues that it also received materials at its Miami office, but the materials received in Miami did not

13

come directly from Credit Suisse.  They were forwarded from Lloyds Structured Finance New York.  See NJ Swaby-Hinds Decl. at ¶¶ 3, 6; NJ Leivick Ex. 119.  Moreover, Lloyds attended a presentation by National Century at Credit Suisse's New York offices.  See NJ Leivick Ex. 100, Mayor Dep at 161.

Credit Suisse dealt with Lloyds from its New York office.  Nonetheless, Lloyds argues that the representations came in part from Ohio because the offering materials were "issued out of Ohio."  Lloyds is correct that, to the extent that the offering materials can be attributed to any one particular state, Ohio has ties as strong as the ties of any other state.  The materials were authored at least in part by National Century and its legal counsel in Ohio, with the input of other parties involved in the securitization programs.  Even so, Credit Suisse's input on the materials originated from its Asset Finance Group in New York.  See CS Ex. 83, O'Connell Dep. at 18-20; CS Exs. 103, 104.  And in any event, where the offering materials were authored is not of greater importance than where Credit Suisse provided them to Lloyds.  It is undisputed that New York is the state from which Credit Suisse provided materials to Lloyds and otherwise made representations to Lloyds.

The parties' places of business also point to a strong connection with New York.  Lloyds, a British bank with it principal place of business in London, established its American offices in New York and Miami, but it accounted the NPF transactions to the Structured Finance New York unit.  See CS Ex. 178, Vespasiano Dep. at 38; CS Ex. 218.  Credit Suisse, a Delaware corporation and subsidiary of the Swiss bank Credit Suisse Group AG, has its principal place of business in New York.  See Restatement § 148, cmt. i (stating that the place of business is typically more important than the place of incorporation).

According to Lloyds, factor (e) – the place where the subject of the transaction is situated – weighs in favor of Ohio because the assets that collateralized the notes were held in National Century accounts with Trustee Bank One in Ohio.  This is a strained application of factor (e).  Lloyds did not purchase the accounts receivable held in Ohio; it acquired a security interest in them.  The Restatement makes clear that factor (e) has importance when the subject of the transaction is a "tangible thing," particularly when "the subject of the transaction is land."  Restatement § 148, cmt. i.

The final factor of § 148 is the place where the plaintiff is to render performance under a

contract which he has been induced to enter by the false representations of the defendant. This factor has no real application to Lloyds purchase of NPF XII 2001-1 notes, but Lloyds does concede that the parties agreed that the Participation Agreement relating to the VFN investment would be governed by New York law. See CS Ex. 219 at § 15.

The court concludes that under § 148, New York has the most significant relationship to the occurrence and the parties. The first three factors of § 145 support the same conclusion. However, Lloyds argues that factor (d) of § 145 – the place where the parties' relationship is centered – and the principles of § 6 support application of Ohio law. Lloyds contends that this litigation is about an Ohio-based fraud and describes Ohio as the center of gravity of National Century's fraud. Lloyds points out some of the many ways in which the litigation has Ohio connections: the notes sold by Credit Suisse were originally issued from Ohio; the Master Indentures governing the note programs had an Ohio choice-of-law provision; the NPF bank accounts were held in Ohio; and Credit Suisse's due diligence of National Century was conducted in Ohio. Lloyds argues that Ohio has a strong interest in securing an honest marketplace and that it is the state with the greatest interest in having its law applied to the participants in the fraud.

The court is not persuaded by Lloyds's argument for focusing on the center of gravity of the overall National Century fraud. The Restatement instructs courts to give separate consideration to each issue in a case. See Restatement § 145, cmt. d. The approach of Lloyds is to lump everything together and arrive at the conclusion that Ohio was home to the fraud. Lloyds even cites the decision of the Judicial Panel on Multidistrict Litigation to consolidate and transfer the various actions to this court. The Restatement requires greater precision, and the Judicial Panel's rationale for choosing an Ohio court to oversee the National Century multidistrict litigation does not dictate the choice of law for a particular issue within the litigation.

Lloyds's tort claims present the issue of whether Credit Suisse made misrepresentations to Lloyds in relation to the note purchase and the Participation Agreement. The case is about Credit Suisse's alleged fraud. The fraud at National Century matters to the extent Credit Suisse knew or should have known of it. That National Century was located in Ohio is of no overriding significance, and there

is no evidence that National Century's location was relevant to any of Lloyds's investment decisions. Thus, the focus for choice-of-law purposes should be on the securities transactions between Credit Suisse and Lloyds, and not on the overall National Century fraud. Credit Suisse and Lloyds dealt with each other in New York – that is where their relationship was centered. See Restatement § 145(2)(d). The parties should have expected New York law to apply (indeed, they contracted for as much in the Participation Agreement), and New York has the greatest interest in regulating the alleged fraudulent transactions that took place almost fully within its boundaries (saving for the steps requiring Lloyds personnel in Miami and London to approve the note purchase). See Restatement § 6(2). Accordingly, the court will apply New York law in evaluating the fraud and negligent misrepresentation claims of Lloyds.

### C. MetLife

MetLife argues that if the court rejects applying Ohio law, then New Jersey is the state with the most significant relationship to its claims. Two MetLife entities purchased notes from Credit Suisse: Metropolitan Life Insurance Company, a New York corporation with its principal place of business in New York, and Metropolitan Insurance and Annuity Company, a Delaware corporation with its principal place of business in New York. Despite the apparent connections to New York, MetLife states that it acted out of a New Jersey office in dealing with Credit Suisse. MetLife's Asset-Backed Securities Unit in New Jersey received sales materials and other communications from Credit Suisse and also hosted a May 2001 "roadshow" presentation put on by National Century and attended by a Credit Suisse representative. See NJ Tau Decl. at ¶ 2; NJ Fretwell Decl. at ¶ 2; NJ Leivick Exs. 62-64. Moreover, the unit in New Jersey made the decision to purchase the notes. See NJ Tau Decl. at ¶ 2; NJ Fretwell Decl. at ¶ 2.

Both parties can therefore claim two § 148 factors in their favor. MetLife received representations and acted in reliance upon those representations in New Jersey. Credit Suisse made the representations from New York,[3] which is also where Credit Suisse and MetLife have their principal

---

[3] Even though Credit Suisse representative Todd Fasanella attended the May 2001 roadshow in New Jersey, MetLife has not identified any representations made by him.

places of business.  The comments to § 148 offer inconclusive guidance.  When the loss is strictly pecuniary, the place of loss has less importance and the place where the defendant made the representations has greater importance than when the injury is to persons or tangible things.  See Restatement § 148, cmt. c.  This supports Credit Suisse's argument for applying New York law.  But in support of MetLife's position, the comments suggest that the place of reliance has somewhat more importance than the place where the defendant made the representation.  Id., cmt. f.  New Jersey case law also could support either side.  Compare Fink v. Ricoh Corp., 839 A.2d 942, 988 (N.J. Super. Law Div. 2003) (putting greatest weight in the place where plaintiffs received and acted in reliance upon representations) with In re Mercedes-Benz Tele Aid Contract Litig., 257 F.R.D. 46, 68 (D. N.J. 2009) (holding that the place where the defendant made the representations outweighed other § 148 factors).

Looking to § 6 and § 145 of the Restatement, the court finds that New York law should apply to MetLife's claims.  New York has the greatest interest in regulating the securities transactions that occurred here between two of its own companies.  See Restatement § 6(2)(c) and cmt. f ("In general, it is fitting that the state whose interests are most deeply affected should have its local law applied."); Restatement § 145 cmt. b (court may consider competing state interests in regulating the conduct).  It is true that New Jersey was the location of the MetLife employees most involved with the purchases, but at the end of the day these were securities transactions between two New York businesses.  Credit Suisse and MetLife undoubtedly are accustomed to operating under New York law and under the Martin Act in particular, as both parties engage frequently in securities transactions.  See Restatement § 6(2)(f) and (g) (court may consider the interests of predictability and ease in the application of the law to be applied); Restatement § 145 cmt. b (same).  Thus, there is nothing unfair about holding MetLife's common law claims to the standards of New York, even if those standards are more stringent than those of New Jersey law.

Viewing this matter as an alleged fraud between a New York seller and New York buyer (who happened to negotiate through its agents in New Jersey), the court concludes that the relevant considerations of the Restatement weigh in favor of applying New York law.

17

### D.     The Arizona Noteholders

There are approximately 118 remaining Arizona Noteholder plaintiffs.[4]  When counting the plaintiffs' places of incorporation or organization, principal places of business, and places where certain plaintiffs are governmental entities, the plaintiffs come from 26 states, the District of Columbia, 9 foreign countries, 2 British Overseas Territories, and 1 British Crown Dependency.

Of these plaintiffs, 13 have principal places of business in New York and one more is incorporated in New York.  This means that New York has more plaintiffs organized under its laws or with a principal place of business in its borders than does any other state or foreign jurisdiction.[5]  Illinois is home 10 plaintiffs, and the Cayman Islands are home to 8 plaintiffs.

The Arizona Noteholders' argument against applying New York law depends heavily on a comment to Restatement § 145: "When certain contacts involving a tort are located in two or more states with identical local law rules on the issue in question, the case will be treated for choice-of-law purposes as if these contacts were grouped in a single state."  Restatement § 145, cmt. i.  They contend that the contacts of the non-New York plaintiffs should be aggregated because the laws of all of the implicated states are identical with respect to fraud and negligent misrepresentation.  They argue that the contacts of the non-New York plaintiffs, once aggregated, easily outnumber and outweigh the contacts of the New York plaintiffs.

---

[4]  Plaintiffs Bayerische Landesbank and Abu Dhabi Investment Company voluntarily dismissed their claims (docs. 1200 and 1416).  In an earlier order the court held that the Arizona governmental entity plaintiffs (109 in number) lacked standing because the Arizona State Treasurer, who is also a plaintiff, was the one who had purchased the NPF notes and had standing to pursue causes of action on behalf of the investment pool to which the governmental entities had contributed.  See In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 755 F.Supp.2d 857, 864-66 (S.D. Ohio 2010).  That same order addressed the other standing arguments Credit Suisse raised in its motion for summary judgment.  Id. at 866-68.

[5]  The complaints do not identify the jurisdiction of organization or principal place of business for about 24 plaintiffs who invested through PIMCO, which has its principal place of business in California.  See, e.g., City of Chandler Second Am. Compl., ¶ 43; State of Arizona Second Am. Compl., ¶ 28.  Some of these plaintiffs have obvious jurisdictional connections, such as the Public Employees' Retirement System of Mississippi and the District of Columbia Teachers' Retirement Fund, but for those who do not, the court did not attempt to further discern to which states or jurisdictions they have a connection.

18

Comment i to Restatement § 145 has limited value here. The illustration to the comment shows that it relates to aggregating the multi-state contacts of a single party, not aggregating the various contacts of numerous plaintiffs. See Restatement § 145, Illustration 4. Even more importantly, New York's contacts go far beyond the 14 plaintiffs who are organized or have their principal places of business there, and this makes the Arizona Noteholders' attempt to cast those 14 plaintiffs as a small minority inappropriate. Many plaintiffs purchased notes through investment advisors, including some non-New York plaintiffs who purchased notes through New York agents. Twenty-five entities purchased the notes owned by the Arizona Noteholders. See Az. App'x at ii. Some of these entities, like PIMCO and Alliance Capital Management (ACM), are investment advisors who acted on behalf of numerous plaintiffs. Others, like United of Omaha Life Insurance Company, are singular plaintiffs who purchased notes on their own behalf. Of these 25 purchasing entities, 4 are located in New York: ACM, Ambac, Dreyfus, and Mutual of New York (MONY). New York is home to twice as many purchasing entities as the next closest jurisdictions – Illinois and the Cayman Islands, both of which have 2 purchasing entities. And New York purchasing entities invested more in NPF notes, $467 million, than the purchasing entities of any other jurisdiction. The next highest was California, home to PIMCO, which invested $440 million in notes.

There are 7 purchasing entities located in foreign jurisdictions, including France, Italy, Luxembourg, the United Kingdom, Bermuda, and the Cayman Islands. For these foreign plaintiffs, New York law is the most natural choice. Six of the foreign purchasing entities directed their contacts to New York. See Az. App'x at 18-20 (RenaissanceRe in Bermuda and the European Bank for Reconstruction and Development in London dealt with representatives of Credit Suisse's New York office); id. at 24 (Highland plaintiffs of the Cayman Islands traveled to New York City to meet with representatives of National Century and Credit Suisse); Az. Ex. 329, Dieudonne Dep. at 95-101 (Ofivalmo of France dealt with representatives of Credit Suisse's New York office); Az. Ex. 386, DiMario Dep. at 45-46 (SanPaolo IMI of Italy visited Credit Suisse's offices in New York); Az. Ex. 392, Kizner Dep. at 271 (Drake of Cayman Islands dealt with representatives of Credit Suisse's New York office).

Thus, the contacts with New York are many and strong. New York is home to the seller Credit Suisse, which made representations and sold the notes from New York. More plaintiffs are organized under the laws of or have their principal places of business in New York than in any other state. New York has the most purchasing entities, and New York purchasing entities bought more NPF notes, in terms of dollar value, than did the purchasing entities of any other state. New York was also the primary point of contact within the United States for the foreign plaintiffs. Finally, for the American-based plaintiffs with places of organization or principal places of business in states other than New York, it is clear from the materials submitted – particularly in the plaintiff-specific appendix (attached to doc. 1581) regarding how plaintiffs received and relied on Credit Suisse's alleged misrepresentations – that those plaintiffs knew they were dealing with a New York seller. The court accordingly will apply New York law to the Arizona Noteholders' tort claims.

## IV.    New York's Martin Act

Credit Suisse has argued that the Noteholders' claims for negligent misrepresentation and aiding and abetting breach of fiduciary duty are precluded by New York's Martin Act. Many courts have held that the Martin Act, N.Y. Gen. Bus. Law § 352 *et seq.*, preempts common law claims relating to securities transactions if the claim does not require proof of intent. See *e.g.*, In re Wachovia Equity Sec. Litig., 753 F.Supp.2d 326, 380-81 (S.D.N.Y. 2011) (citing cases). These courts reasoned that the Martin Act gives the New York Attorney General exclusive authority to prosecute such claims and that no private right of action is allowed. See In re Beacon Assocs. Litig., 745 F.Supp.2d 386, 431-32 (S.D.N.Y. 2010).

New York's highest court, however, has now held that the Martin Act does not preempt common law causes of action arising out of a securities transaction. In Assured Guar. (UK) Ltd.v. J.P. Morgan Inv. Mgmt. Inc., 2011 N.Y. Slip. Op. 9162, 2011 WL 6338898 (N.Y. Dec. 20, 2011), the plaintiff asserted claims for breach of fiduciary duty and gross negligence relating to securities transactions. The court found that the Martin Act's language contains no preemptive language and that the statute's purpose would be best served by allowing nonfraud common law claims to proceed. It concluded that "an injured investor may bring a common-law claim (for fraud or otherwise) that is not

entirely dependent on the Martin Act for its viability.  Mere overlap between the common law and the Martin Act is not enough to extinguish common-law remedies."  2011 WL 6338898, at *4.

Accordingly, Credit Suisse's argument that the Martin Act preempts the Noteholders' claims for negligent misrepresentation aiding and abetting breach of fiduciary duty must be rejected.

## V.     Whether Certain Tort Claims are Precluded by Breach of Contract Claims

Credit Suisse argues that certain tort claims asserted by Lloyds and the Arizona Noteholders are precluded because they duplicate their respective breach of contract claims.  Credit Suisse raised this same argument in its motion to dismiss and the court agreed that "'the existence of a contract action generally excludes a cause of action based upon the same conduct sounding in tort,'" but denied the motion because the rules of civil procedure allow a party to assert inconsistent claims at the pleading stage.  In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 541 F.Supp.2d 986, 1016 (S.D. Ohio 2007) (quoting Hanlin v. Ohio Builders and Remodelers, Inc., 196 F.Supp.2d 572, 579 (S.D. Ohio 2001)).

Credit Suisse argues that it is now appropriate at the summary judgment stage to preclude any tort claims that arise from the same operative facts as the breach of contract claims.  Under New York law, a party's breach of contract cannot form the basis for a tort claim "unless a legal duty independent of the contract itself has been violated."  Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193-94 (N.Y. 1987) (citations omitted).  This legal duty must not arise from circumstances constituting the elements of the contract claim, but from circumstances "extraneous" or "collateral" to the contract claim.  Id.; Gruet v. Care Free Housing Div. of Kenn-Schl Enterprises, Inc., 759 N.Y.S.2d 276, 278 (N.Y. App. Div. 2003); Calcutti v. SBU., Inc., 223 F.Supp.2d 517, 521 (S.D.N.Y. 2002); Ladenburg Thalmann & Co., Inc. v. Imaging Diagnostic Sys., Inc., 176 F.Supp.2d 199, 206 (S.D.N.Y. 2001).

When a fraud-based claim is simultaneously asserted with a breach of contract claim, a court should look to the existence of the following in determining whether the fraud-based claim is precluded: (1) a legal duty separate from the duty to perform under the contract; (2) a fraudulent misrepresentation collateral or extraneous to the contract; and (3) damages caused by the misrepresentation and

21

unrecoverable as contract damages. MacQuesten Gen. Contracting, Inc. v. HCE, Inc., 191 F.Supp.2d 407, 410 (S.D.N.Y. 2002); Ladenburg Thalmann, 176 F.Supp.2d at 206 (holding that a fraud claim was precluded because it was based on the "same operative facts" and "same damages" as the breach of contract claim).

### A.     Lloyds

The breach of contract claim brought by Lloyds relates to the Participation Agreement it entered into with Credit Suisse on March 1, 2001. Lloyds alleges that three provisions of the Agreement were breached. First, Lloyds contends that Credit Suisse breached a provision in which it promised not to consent to the modification of certain NPF XII transaction documents without Lloyds's approval. See CS Ex. 219 at § 7. According to Lloyds, Credit Suisse breached this provision because it knew of material violations of the transaction documents, particularly the Master Indenture, yet purchased its interest in the VFN without informing Lloyds of the violations. This allegedly amounted to a waiver or modification by Credit Suisse of the requirements set forth in the Master Indenture.

Second, Lloyds alleges that the Agreement imposed a duty of care on Credit Suisse to not act with "gross negligence or willful misconduct." CS Ex. 219 at § 10(a). Lloyds argues that Credit Suisse breached its duty by failing to advise Lloyds of National Century's violations of the Master Indenture. Lloyds further alleges that Credit Suisse acted wilfully and with gross negligence when it made the decision to purchase its interest in the VFN and trigger Lloyds's' obligations under the Agreement, despite knowing of the violations of the Master Indenture.

Third, Lloyds alleges that Credit Suisse assumed a "responsibility for information prepared by it and furnished to [Lloyds]" in connection with the Agreement. CS Ex. 219 at § 12(a). Credit Suisse allegedly breached this duty by furnishing Lloyds with a January 2011 sales document (the "term sheet"), which contained misrepresentations about National Century's operations. See CS Ex. 253. The term sheet allegedly misrepresented that NPF XII would, among other things, purchase eligible receivables, maintain reserve accounts at certain levels, over-collateralize the receivables, and be bankruptcy remote.

Lloyds also brings tort claims for fraud and negligent misrepresentation relating to its investment in the VFN. Its tort claims are based on alleged misrepresentations and material omissions about

22

National Century's operations in the materials that Credit Suisse gave to Lloyds, including private placement memoranda, the term sheet, and the VFN (which incorporated the Master Indenture by reference). Lloyds alleges that Credit Suisse is liable for the misrepresentations and omissions in those materials because, having undertaken to speak in the transaction, Credit Suisse had a duty to speak truthfully and completely. See Rubin v. Schottenstein, Zox & Dunn, 143 F.3d 263, 268 (6th Cir. 1998) (en banc).

The court concludes that the tort claims of Lloyds are duplicative of its breach of contract claim. Lloyds strains to argue that Credit Suisse owed a duty independent from the duty to perform the contract because Credit Suisse chose to supply offering materials relating to the proposed participation of Lloyds in the VFN. However, the parties' dealings culminated in a written contract, the Participation Agreement, which Lloyds itself contends contained provisions imposing a duty of care on Credit Suisse. Lloyds is unable to explain how an independent duty could exist when sections 10 and 12 of the Agreement defined the scope of Credit Suisse's alleged duty of care with respect to the information it supplied to Lloyds. See International Cabletel Inc. v. Le Groupe Videotron Ltee, 978 F.Supp. 483, 486 (S.D.N.Y. 1997) ("It is well settled under New York law that a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations.") (quotation marks and citations omitted).

Moreover, the same alleged misrepresentations form the basis of both types of claims. In its contract claim, Lloyds alleges that Credit Suisse breached the Agreement by failing to advise Lloyds of National Century's violations of the Master Indenture and by misrepresenting in the term sheet how National Century ran its operations. Lloyds's tort claims are based on the exact same misrepresentations and omissions. Lloyds argues that its tort claims are "broader" in the sense that the contract claim relates just to the term sheet's misrepresentations, while the tort claims additionally relate to alleged misrepresentations in other documents; however, the alleged misrepresentations and omissions in the other documents concerned the same subject matter as the term sheet's misrepresentations – National Century's violations of the Master Indenture. In other words, Lloyds has not identified a "collateral" or "extraneous" misrepresentation separate from the alleged promises made in the Participation

Agreement. See Astroworks, Inc. v. Astroexhibit, Inc., 257 F.Supp.2d 609, 616-17 (S.D.N.Y. 2003) (allowing fraud claims to survive a motion dismiss but cautioning the plaintiff that "[i]f discovery reveals that the agreement between [the parties] included all of the promises that [plaintiff] alleges in his fraud claim, then the fraud claim will be dismissed at summary judgment").

Finally, Lloyds has not shown any damages caused by the misrepresentations that are not recoverable as contract damages. Its alleged tort damages are the lost $68 million investment in the VFN. This is the same amount of damages as the breach of contract claim. And the alleged breach of contract was that Credit Suisse failed to perform the Participation Agreement by disclosing the true nature of National Century's operations, which is the same alleged cause of Lloyds's alleged tort damages.

In sum, the court finds that the tort claims of Lloyds relating to the VFN are precluded because they are based on the same operative facts and "same damages" as the breach of contract claim.

**B.     The Arizona Noteholders**

In response to the motion for summary judgment, the Arizona Noteholders state that they are voluntarily dismissing their breach of contract claim. Even so, Credit Suisse argues that the existence of the contract claim in the complaint is sufficient grounds for excluding the tort claims.

Credit Suisse is correct in theory that, if the parties entered into a contract which by operation of New York law precluded plaintiffs' tort claims, then plaintiffs could not salvage their tort claims by tactically dismissing the contract claim. But that is not the case here. Unlike Lloyds, the Arizona Noteholders did not enter into any written agreements with Credit Suisse. Discovery has shown that Credit Suisse's contractual obligations to the Arizona Noteholders at most amounted to delivering a certain quantity of NPF notes at a certain price. See, e.g., CS Reply Ex. 600 (trade confirmation). Thus, there is no contract here that would act to preclude the Arizona Noteholders' tort claims, and the court finds that the Arizona Noteholders' tort claims are not precluded.

**VI.     Section 10(b), Fraud, and Negligent Misrepresentation Claims**

Lloyds and MetLife bring claims against Credit Suisse for violations of Section 10(b) of the

Securities Exchange Act of 1934. Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U.S.C. § 78j(b). Rule 10b–5 prohibits "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

In order to prevail on a § 10(b) claim, a plaintiff must prove that, in connection with the purchase or sale of securities: (1) the defendant made a misrepresentation or omission (2) of a material fact (3) with scienter (4) justifiably relied on by plaintiffs (5) and proximately causing injury. Frank v. Dana Corp., 646 F.3d 954, 958 (6th Cir. 2011); Helwig v. Vencor, Inc., 251 F.3d 540, 554 (6th Cir. 2001) (en banc).

Lloyds and MetLife also brings claims for fraud, as do the Arizona Noteholders.[6] The elements of this claim under New York law are: "a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury." Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V., 952 N.E. 2d 995, 1000 (N.Y. 2011); see also Eurycleia Partners, LP v. Seward & Kissel, LLP, 910 N.E.2d 976, 979 (N.Y. 2009). Fraud claims must be proved by clear and convincing evidence. See e.g., In re Vivendi Universal, S.A. Sec. Litig., 765 F.Supp.2d 512, 534 (S.D.N.Y. 2011). "Clear and convincing evidence is evidence that makes the fact to be proved highly probable." Century Pacific, Inc. v. Hilton Hotels Corp., 528 F.Supp.2d 206, 219 (S.D.N.Y. 2007) (internal quotation marks omitted).

Finally, all of the Noteholders bring claims for negligent misrepresentation, the elements of which are: "(1) the defendant had a duty, as a result of a special relationship, to give correct information;

---

[6] One of the Arizona Noteholders, PIMCO, has also brought a claim for deceit under California statutory law. See Cal. Civil Code §§ 1709, 1710. The elements of this claim are the same as for common law fraud. See Small v. Fritz Cos., Inc., 65 P.3d 1255, 1258 (Cal. 2003).

It should be further noted that the court will address separately in Part X below all of the claims relating to note purchases not made from Credit Suisse.

(2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." Hydro Inv., Inc. v. Trafalgar Power, Inc., 227 F.3d 8, 20 (2d Cir. 2000); MatlinPatterson ATA Holdings LLC v. Federal Express Corp., 929 N.Y.S.2d 571, 575-76 (N.Y. App. Div. 2011).

The court notes from the outset that the element of materiality is not seriously in dispute. The misrepresentations that the Noteholders seek to attribute to Credit Suisse go to the core of how the NPF programs supposedly functioned. These included, among other things, that NPF VI and NPF XII would use note proceeds to purchase only eligible receivables, would limit the use of funds in reserve accounts to certain purposes, and would maintain reserve accounts at certain percentage levels. The Noteholders also seek to hold Credit Suisse responsible for omitting any statements that would have disclosed National Century's extensive practice of engaging in related party transactions. These misrepresentations and omissions naturally were material to an investor interested in purchasing NPF notes, particularly because the notes were secured by the receivables. These misrepresentations conveyed to investors "why the bonds [were] worth buying." CS Ex. 216, Hutchings Dep. at 179. Certainly, reasonable investors would have considered it important to know that National Century intended to misuse their money.

## A.    Misrepresentation or Omission of Material Fact

The Noteholders received various forms of communication about the NPF notes. These included private placement memoranda and supplements (collectively the "PPMs"), "Sales Points" brochures, road show presentations, and various emails and telephone calls. Credit Suisse argues that it did not make any misrepresentations to the Noteholders. This argument has two components. The first relates to those statements for which Credit Suisse says it is not responsible because it was not the author or speaker. The second relates to those statements that Credit Suisse admits to having made but says were factually accurate and thus not actionable as misrepresentations.

26

### 1. Private Placement Memoranda

The PPMs served as the primary source of information about the NPF notes for many of the Noteholders. It is undisputed that these materials were replete with material misrepresentations about how the note programs would operate. Credit Suisse, however, argues that it did not draft the PPMs and thus cannot be held responsible for their content. Credit Suisse contends that the issuers (NPF VI or XII) and their legal counsel authored the PPMs. See CS Ex. 26, Purcell Dep. at 81-82, 84-86; CS Ex. 32 (showing that counsel for National Century helped draft PPMs for issuances prior to Credit Suisse's involvement).

The Noteholders dispute this point and submit evidence showing that Credit Suisse did indeed have input in the PPMs. For the note transactions at issue in this case, counsel for Credit Suisse, Kaye Scholer, took the PPMs from prior transactions and used them as a template or starting place for preparing the PPMs that were distributed to the Noteholders. See Az. Ex. 18, O'Connell Dep. at 13-20. The PPMs were tailored as needed for each note issuance. Id. The preparation of the PPMs involved a process that Credit Suisse's counsel and its Rule 30(b)(6) witness described as "collaborative" and done with the participation of Credit Suisse, the issuers, and counsel for both. Id.; Az. Ex. 11, Donovan Dep. at 472-74[7]; see also CS Exs. 103, 104 (showing Credit Suisse's edits to a draft PPM). Credit Suisse considered the PPMs to be "shared product[s]" over which it exercised some degree of control over the content before it distributed them to investors. Az. Ex. 11, Dononvan Dep. at 474-76; Az. Ex. 18, O'Connell Dep. at 24 (testifying that Credit Suisse had the right to approve the contents of the PPMs). Thus, Credit Suisse had the authority to suggest making disclosures in the PPMs – disclosures of, for instance, specific ways in which the note programs' operations had varied from the requirements of the Master Indentures. See NJ Leivick Ex. 43, Fasanella Dep. at 462-64; Az. Ex. 11, Dononvan Dep. at 223-25 (testifying that Credit Suisse considered disclosing in the PPMs the existence of related party transactions but chose not to do so).

---

[7] Credit Suisse objects to Donovan's deposition testimony agreeing that the process of preparing a PPM was "collaborative." It argues that the testimony was elicited by an improperly vague question. However, Donovan went on to describe the PPMs as a "shared product." An ordinary understanding of these terms is that both parties took part in preparing the PPMs.

Credit Suisse responds that it did not "control" the content of the PPMs and ultimately the PPMs belonged to the issuers. Credit Suisse attempts to cast the issue of attribution as an either-or situation: the PPMs either belonged to the issuers or Credit Suisse, but not to both. However, a factfinder could reasonably find from the available evidence that the PPMs should be attributed to the issuers and to Credit Suisse. The Noteholders have produced testimony and evidence that the PPMs were a shared product. Credit Suisse's own witnesses testified of playing a role in drafting and preparing the PPMs and of exercising control over their content. The PPMs displayed the Credit Suisse name prominently on the front pages and told potential investors that Credit Suisse was "specifically designated" to make representations about the notes. See, e.g., CS Ex. 227 at 1, 4. This is sufficient to create a triable issue as to whether Credit Suisse can be held liable for the misrepresentations in the PPMs. See Janus Capital Group, Inc. v. First Derivative Traders, __ U.S. __, 131 S.Ct. 2296, 2302, 2305 (2011) (holding that the key to § 10(b) liability is whether a party has "control over a statement's content and whether and how to communicate it," and placing importance in whether "anything on the face of the prospectuses indicates that any statements therein came from [defendant]").

Moreover, Credit Suisse's focus on the PPMs "belonging" to the issuers ignores the fact that it was Credit Suisse who took these statements and put them into investors' hands. Even if Credit Suisse did not author every word in the PPMs, it did communicate them to investors. See Janus Capital, 131 S.Ct. at 2303 (rejecting the argument that § 10(b) liability requires that the defendant "create" the statement). It is fraud to knowingly provide false information to another person, regardless of who originally drafted the words. As the Seventh Circuit held, "One doesn't have to be the inventor of a lie to be responsible for knowingly repeating it to a dupe." S.E.C. v. Lyttle, 538 F.3d 601, 604 (7th Cir. 2008). And under New York law, one may liable for fraud accomplished through the "exhibition" of a false document. Lukowsky v. Shalit, 487 N.Y.S.2d 781, 785 (N.Y. App. Div. 1985). The Noteholders have produced ample proof to survive the motion for summary judgment that it was Credit Suisse who supplied them with the PPMs. See, e.g., NJ Vespasiano Ex. A (Lloyds); NJ Ex. Tau Ex. B (MetLife); Az. Opp'n Brief at 55 n.78 (citing numerous evidentiary sources showing that Credit Suisse supplied them with PPMs). With Credit Suisse having played a role in preparing the PPMs and having provided

them to the Noteholders, the real issue is less one of attribution and more one of knowledge (i.e., did Credit Suisse know that the information it supplied to the Noteholders was false?).

Credit Suisse further contends that it owed no duty to the Noteholders to verify the completeness of the PPMs. Though the Master Indentures prohibited related party transactions, see CS Ex. 11 at § 4.11(c); CS Ex. 12 at § 4.11(c), the PPMs did not expressly make a representation to that effect. The Noteholders correctly argue that the PPMs' omission of National Century's practice of related party transactions was material both because of the inherent risks and costs associated with self-dealing and because it constituted a violation of the Master Indentures, which the PPMs expressly referred to as governing the note programs. Further, the court must reject Credit Suisse's contention that it did not owe a duty to disclose, for one who chooses to speak, as Credit Suisse did, in a securities transaction undertakes a duty to speak truthfully and completely about the matters on which he speaks. See Rubin v. Schottenstein, Zox & Dunn, 143 F.3d 263, 268 (6th Cir. 1998) (en banc).

## 2.      Road Show Presentations and Joint Meetings

Credit Suisse facilitated contacts between National Century executives and many of the Noteholders. Road show presentations were one such type of contact. A handful of plaintiffs have demonstrated that they were the recipients of a road show presentation, either in person or online: MetLife, ACM, GMO, Lincoln Capital, and III Finance. Credit Suisse argues that any statements made during the road show presentations cannot be attributed to it because Lance Poulsen made the substantive representations. See CS Ex. 30, Beacham Dep. at 309 (stating that Poulsen did "98 percent of the talking" during the road shows that took place in the summer of 2001).

MetLife has produced evidence that Credit Suisse representative Neil McPherson made specific representations during an October 11, 2000 road show that MetLife viewed online. See NJ Fretwell Ex. A (contemporaneous notes of MetLife's Simon Fretwell reflecting McPherson's statements); NJ Leivick Ex. 54 (McPherson's handwritten presentation notes). In particular, McPherson represented that NPF XII had a "high" quality of underlying assets, "strong credit controls" with "~17% cash enhancement" and "3% overcollateralization," and "strong management." Id. Credit Suisse contends that these statements are not actionable because words like "high" and "strong" are mere puffery. However,

representations that the note program would operate with cash enhancements of about 17% and with 3% overcollateralization are sufficiently concrete to form the basis of a securities fraud claim.  See Indiana State Dist. Council of Laborers and Hod Carriers Pension & Welfare Fund v. Omnicare, Inc., 583 F.3d 935, 943-44 (6th Cir. 2009); In re Ford Motor Co. Sec. Litig., Class Action, 381 F.3d 563, 570–71 (6th Cir. 2004) (defining non-actionable puffery as "'loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important'") (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996)).

ACM hosted a presentation by National Century in May 2001.  Fasanella of Credit Suisse was present, but ACM is unable to identify any representations that he made.  See CS Reply Ex. 57, Gordon Dep. at 140 (testifying that he could not recall what Fasanella said); Az. Ex. 23, Boothe Dep. at 130 (testifying that she could not recall what Fasanella said).[8]

GMO also hosted a presentation by National Century in May 2001 and Fasanella was present. Fasanella discussed the timing and pricing of the note issuance, but GMO cannot identify any specific misrepresentations made by him.  See Az. Ex. 316, Braggs Dep. at 154-55, 183-88.

The same can be said about Lincoln and III Finance.  They both hosted road show presentations by National Century in May 2001 but fail to identify any misrepresentations made by Credit Suisse.  See Az. Ex. 354, Glomski Dep. at 191 (Lincoln); Az. Ex. 357, Schneider Dep. at 61-62 (Lincoln); Az. Ex. 393, Maceira Dep. at 69-70 (III Finance).

In addition to the road show presentations, Credit Suisse arranged other meetings or contacts between National Century executives and several of the Arizona Noteholders.  See Az. Opp'n Brief at

---

[8]  Credit Suisse's motion to strike ¶ 6 of Amy Boothe's affidavit is well taken.  See Az. Ex. 303.  In this affidavit, Boothe states that Poulsen *and* Fasanella made certain representations at the May 2001 presentation, but she testified in her deposition that she did not have a personal recollection of Fasanella having said anything.  See Penny v. United Parcel Serv., 128 F.3d 408, 415 (6th Cir. 1997) ("[A] party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony.").  In addition, her notes from the presentation do not attribute any statements to Fasanella.  See CS Mot. to Strike (doc. 1648), Ex. 12.

83-85 (outlining these points of contact).[9]  Though the Arizona Noteholders can demonstrate that Poulsen made numerous misrepresentations, they are unable to produce evidence that Credit Suisse made any actionable misrepresentations during these meetings or joint phone calls.  See, e.g., Az. Ex. 25, Ennis Dep. at 166, 211-13 (United of Omaha); Az. Ex. 341, Ullman Dep. at 201-02 (Highland).  The most that any of the Arizona Noteholders can show is that Fasanella, when asked by plaintiff Wachovia about anonymous allegations of fraud at National Century,  gave a statement of "comfort" during a phone call with a National Century executive.  Az. Ex. 410, Premo Dep. at 186.  Without more specificity, such a vague, loosely optimistic statement is not actionable.

The Arizona Noteholders argue that Credit Suisse should be liable for the misrepresentations Poulsen or other National Century executives made during these joint meetings, even if Credit Suisse itself did not make any misrepresentations.  They contend that Credit Suisse knew National Century was making false statements and cannot escape liability for arranging or facilitating meetings in which it had reason to expect the Noteholders would be lied to.  The court, however, finds that a cause of action for aiding and abetting fraud – a claim that the Arizona Noteholders have asserted – best fits these facts.

Thus, the court finds that only MetLife has demonstrated that Credit Suisse made actionable misrepresentations to it during a road show presentation or other joint meeting.

### 3.      Sales Points

The Sales Points were prepared by Credit Suisse as summaries of the PPMs.  Credit Suisse used them to educate its sales staff about upcoming deals Credit Suisse was bringing to market.   Though Credit Suisse labeled the Sales Points as being meant only for internal use, it circulated them to many of the Noteholders, including MetLife and about half of the Arizona Noteholders.  See, e.g., NJ Fretwell Ex. B; Az. Ex. 16, Ivascyn Dep. at 106-09; Az. Ex. 421; Az. Ex. 434, Whalen Dep. at 65.

Credit Suisse argues that the statements made in the Sales Points cannot form the basis of a

---

[9]  It is unclear why the statements made by Fasanella to plaintiff Bristol during a phone call are included in the listing of misrepresentations made during joint meetings and calls with National Century executives.  It appears to the court that no National Century executives participated in the phone call, only that another Credit Suisse representative did.  See Az. Ex. 413, Miller Dep. at 246-54.  The court therefore will treat this phone call as belonging in the category of "various other communications" between Credit Suisse and the Noteholders, discussed below in Part VI.A.4.

fraud claim because they simply distilled what the PPMs said and because Credit Suisse did not claim to be independently verifying that information.  The court disagrees.  The Sales Points were approximately 15 pages long and contained detailed statements regarding how the NPF note programs operated.  See, e.g., Az. Ex. 309.  These statements were sufficiently specific to amount to more than a generalized summary on which an investor could not reasonably rely.  And while Credit Suisse attempts to distance itself from the Sales Points as being meant for internal use only and not independently verified, ultimately it was Credit Suisse who composed and provided these materials to the Noteholders and thereby conveyed the misrepresentations contained therein.

### 4.    Various Other Communications

Credit Suisse sales staff made numerous other points of contact with the Noteholders while marketing the NPF notes.  These included making numerous telephone and email communications and providing written reports.  The Noteholders have carefully documented these many and various communications.  See NJ Opp'n Brief at 114-129; Az. Opp'n Brief at 73-82; Az. App'x at 1-49.  Credit Suisse admits to having made these communications but argues that they are not actionable because they were either honestly-held opinions, factually accurate, or constituted sales talk or puffery.

The argument as to honestly-held opinions relates primarily to two written reports that Credit Suisse sent to investors: a March 2000 "Healthcare ABS – A Clean Bill of Health" report, and a July 2002 "Market Tabs" report regarding Fitch's downgrade of NPF notes.  See CS Exs. 255, 257.  Credit Suisse's Neil McPherson authored these reports, and Credit Suisse contends that McPherson genuinely believed what he wrote.  See, e.g., CS Ex. 256, McPherson Dep. at 193, 257-58, 394-95.  Even so, the statements made in the reports went beyond his opinions or beliefs and into specific factual representations about the NPF programs.  As with the PPMs, there is no disputing the inaccuracy of those factual representations.  For instance, the Clean Bill of Health purported to generally discuss healthcare ABS deals, but it described NPF in particular when detailing how such deals worked and made specific factual representations regarding credit enhancements, the maintenance of reserve levels, concentration limits, and other aspects of the NPF programs – representations that were false.  See CS Ex. 255 at 2-10.  The July 2002 report sought to reassure investors after Fitch downgraded NPF notes.

It misrepresented that, among other things, the note programs had "no significantly increasing receivables aging, "no significant seller overconcentrations," and "no significant material deterioration in collateral performance." CS. Ex. 257 at 4. The report concluded that it was a good time to "add or initiate exposure to NPF healthcare ABS." Id. In sum, the Noteholders have produced clear and convincing evidence from which a jury could conclude that the two reports contained actionable misrepresentations.

Credit Suisse argues that other communications were factually accurate. One such communication was the term sheet Credit Suisse drafted and sent to Lloyds in connection with the VFN.[10] See CS Ex. 253; NJ Leivick Exs. 109, 110, 111,114 (showing Credit Suisse's drafting of the term sheet). This term sheet contained many misrepresentations, including that NPF XII: was bankruptcy remote, owned over $1.1 billion in receivables, acquired receivables in "true sale" transactions, had credit enhancement for the notes equal to 20% of the receivables, had ratably secured the notes with receivables, and maintained reserve accounts at specified levels. CS Ex. 253 at CSFB-EMAIL-0257075 and -0257085. According to Credit Suisse, the term sheet was accurate because it simply described how the note programs were *supposed* to operate. However, the court finds that there is at least a genuine dispute about this issue. The cover letter and term sheet make factual representations about NPF XII without cautioning Lloyds with words to the effect that "this is only how the program is supposed to operate" or "we are merely repeating what National Century has told us." A jury could reasonably find that these representations purported to be specific statements of existing fact about how NPF XII operated. This situation is thus distinguishable from cases holding that true statements of historical fact are non-actionable – where, for instance, a seller accurately states that a security has been given a AAA credit rating. See, e.g., J & R Marketing, SEP v. General Motors Corp., 549 F.3d 384, 393 (6th Cir. 2008) ("GMAC's disclosure of its credit rating was merely a true statement of historical fact.").

As for the various other personal contacts that members of Credit Suisse's sales staff had through telephone and email with the Noteholders, Credit Suisse argues that these communications

---

[10] Lloyds's claim for fraud relating to the VFN has been dismissed above as duplicative of its breach of contract claim. Nonetheless, Lloyds's § 10(b) claim is not precluded on those grounds.

were either puffery or accurately repeated representations made in the PPMs about how the NPF programs were supposed to operate. After a review of the substantial evidence submitted by the Noteholders, the court finds that a jury could reasonably find that the statements made by Credit Suisse constituted actionable misrepresentations. To provide a representative example, Credit Suisse told MetLife's Mei-Feng Tau in telephone conversations that NPF XII owned $1 billion in receivables, kept certain amounts in reserve accounts, observed a limit on the age of receivables, and had certain payor concentration limits. See NJ Tau Ex. O. Yes, there was some sales talk sprinkled in (National Century had "good" management), but Credit Suisse's statements went beyond mere sales talk and into specific representations about National Century's operations. And though Credit Suisse argues that it was only accurately describing statements made in the PPMs, the court has found above that Credit Suisse may be held liable for the misrepresentations in the PPMs. It is no defense for a person to argue that they are merely repeating a lie they have already made before.

The Arizona Noteholders have outlined a host of representations that Credit Suisse sales staff made to them. See Az. Opp'n Brief at 77-82, 85 (accompanied by citations to the evidentiary record). As it did with Lloyds, Credit Suisse made concrete misrepresentations about the NPF programs to the Arizona Noteholders, with some sales talk sprinkled in. A factfinder could reasonably conclude that Credit Suisse's communications are actionable.

### B. Scienter

For § 10(b) claims, scienter "may take the form of knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness." Frank v. Dana Corp., 646 F.3d 954, 959 (6th Cir. 2011) (internal quotation marks omitted). When, as here, the fraud claim is based on misrepresentations of present or past facts, this element is satisfied by showing that the defendant knew or should have known of the falsity of the statements. See Brown v. Earthboard Sports USA, Inc., 481 F.3d 901, 917-18 (6th Cir. 2007); PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 681 (6th Cir. 2004) ("In securities fraud claims based on statements of present or historical fact . . . scienter consists of knowledge or recklessness."). Negligence does not suffice; there must be "an extreme departure from the standards of ordinary care," such that the danger of misleading buyers is "either known to the defendant or is so obvious that the

defendant must have been aware of it." Earthboard Sports, 481 F.3d at 917-18 (quoting Platsis v. E.F. Hutton & Co., 946 F.2d 38, 40 (6th Cir. 1991)).

Similarly under New York law, a plaintiff must demonstrate that the defendant acted with knowledge of the falsity of his statements or with reckless disregard for the truth of the statements. See Old Republic Title Ins. Co. v. Cardinal Abstract Corp., 790 N.Y.S.2d 143, 145 (N.Y. App. Div. 2005); Klembczyk v. DiNardo, 705 N.Y.S.2d 743, 744 (N.Y. App. Div. 1999); see also Morse v. Weingarten, 777 F.Supp. 312, 310 (S.D.N.Y. 1991) (explaining that a fraud claim under New York law is "substantially identical" to a § 10(b) claim).

The crux of this entire litigation quite frankly comes down to what Credit Suisse knew, or should have known, of the wrongdoing at National Century. The court could spend a multitude of pages reviewing the evidence on this matter and the parties' respective interpretations of the evidence. The parties have taken well over 200 depositions of fact witnesses and exchanged 23 million pages in document discovery. A good amount of that discovery was undoubtedly intended to examine the issue of Credit Suisse's knowledge. The parties have filed separate volumes of briefs dedicated to this issue, and the evidence of scienter served as the focal point during oral argument.

That the parties wrote separate volumes regarding exactly what Credit Suisse knew of National Century's wrongdoing perhaps is a good indication that a genuine dispute of material fact exists. The court's examination of the record leads it to the conclusion that the Noteholders have submitted clear and convincing evidence from which a jury could reasonably conclude that Credit Suisse knew or should have known of the material aspects of National Century's fraud. The court finds it unnecessary to discuss this evidence in exhausting detail, but it will review the primary evidence supporting a finding of scienter with respect to the main aspects of National Century's fraud: (1) purchase of ineligible receivables, (2) misuse of reserve funds, (3) failure to maintain reserve fund levels, (4) related party transactions, and (5) manipulation of receivables default rates. The court will then address Credit Suisse's arguments in support of it position that it is entitled to summary judgment on the issue of scienter.

1.      The Evidence Concerning Credit Suisse's Knowledge

a.      Ineligible Receivables

The PPMs falsely represented that the note programs would use proceeds from the issuances of notes to purchase "eligible receivables."  See e.g., Az. Ex. 2B at NCFE-1865-1134; Az. Ex. 3A at CSFB-2004-0007946.  It is well-established that National Century used program assets to purchase receivables that did not satisfy the criteria set forth in the Master Indentures for eligible receivables.  Often, National Century "purchased" nothing – it simply advanced money to healthcare providers without receiving anything of value in return.  See U.S. v. Poulsen, 655 F.3d 492, 498-99 (6th Cir. 2011); U.S. v. Faulkenberry, 614 F.3d 573, 578 (6th Cir. 2010) ("The deception centered on the practice of 'advancing.").

The Noteholders have submitted substantial evidence in support of the proposition that Credit Suisse knew or should have known that National Century was advancing program assets without receiving eligible receivables in return.  This evidence includes:

- a 1994 audited financial statement of National Century was given to Credit Suisse in 1996 in connection with Credit Suisse's due diligence on its first NPF note transaction as a placement agent.  This statement disclosed that National Century "has advanced amounts in excess of receivables provided by certain Providers . . . . Subsequent to December 31, 1994, the Company has continued to advance funds to certain Providers, thus increasing exposure."  Az. Ex. 74 at CSFB-2004-0051557 to -0051558[11];

- public offering working documents were received by Todd Fasanella in connection with an unsuccessful attempt to take National Century's stock public in 1999.  These documents stated that "certain Programs advance funds to clients in excess of the Net Value of the client's Purchased Receivables and purchase Receivables which have aged beyond 150 days (i.e. which are not Eligible Receivables under the client's [sale and subservicing agreement])."  Az. Ex. 262 at CSFB-2004-0034708;

- the 1999 10-K disclosures of PhyAmerica (a large seller of receivables to National Century), were reviewed by Credit Suisse's counsel in 2000.  These indicated that of the $196 million National Century advanced to PhyAmerica

_____

[11] MetLife and Lloyds have produced largely the same evidence of scienter as the Arizona Noteholders have.  For sake of simplicity, the court will cite to only the Arizona Noteholders' exhibits.

in 1999, only $79 million could be attributed to the sale of eligible receivables. Az. Ex. 78 at 28;

- a September 2001 email exchange between National Century and Fitch, on which Credit Suisse was copied, stated that National Century had increased improper advances to PhyAmerica. Az. Ex. 101; and

- Deloitte & Touche's August 30, 2002 letter to National Century (on which Credit Suisse was copied) raised "significant questions regarding the eligibility and collectibility of provider receivables" and stated that Poulsen had admitted that "certain receivables would not meet the eligibility requirements of the Master Indentures." Az. Ex. 129. A member of Credit Suisse's credit department commented, "This seems like potential fraud." Az. Ex. 130.

### b. Misuse of Reserve Funds

The PPMs misrepresented that funds in the reserve accounts would be used only for certain specified purposes. See e.g., Az. Ex. 2B at NCFE-1865-1140 to -1142; Az. Ex. 3A at CSFB-2004-0007975 to -0007978. For instance, funds in the seller credit reserve account could be drawn only to repay a note program for a purchased receivable that defaulted. The offering materials did not disclose to investors that the reserve funds, which were designed and marketed as a form of credit enhancement for the protection of investors, would be advanced to healthcare providers. Yet this is exactly what happened. See Poulsen, 655 F.3d at 498-99; Faulkenberry, 614 F.3d at 578-79.

The Noteholders have submitted substantial evidence in support of the proposition that Credit Suisse knew or should have known that National Century was misusing the funds in the note programs' reserve accounts:

- potential equity investor GMAC discovered National Century's misuse of funds during due diligence and disclosed it to Credit Suisse's Jonathon Clark and Oliver Sarkozy in October 2000. An internal Credit Suisse email noted that National Century had "got through their cash crunch" by "reserve account movement." Az. Ex. 120;

- shortly thereafter, Poulsen admitted in a meeting with GMAC and Sarkozy that National Century had used reserve funds to purchase receivables and stated that he could use the funds "for any purpose, including to buy lollipops." Az. Ex. 103, Gleason Dep. at 148;

- Sarkozy told members of Credit Suisse's asset finance group – Fasanella, Clark,

37

and Joseph Donovan – by email in November 2000 of National Century's use of reserve funds to get through a liquidity crisis. Az. Ex. 128;

- Clark attended another meeting on November 29, 2000 with GMAC and National Century about the issue of reserve funds being used to purchase receivables. After the meeting Donovan sent Clark the following email: "How did it go today? Did your nose grow?" Az. Ex. 11, Donovan Dep. at 379 (referring to Pinocchio); Az. Ex. 136A; and

- Fasanella informed Clark again in August 2002 that Poulsen was using reserve funds to buy receivables. Az. Ex. 141; Az. Ex. 10, Clark Dep. at 304, 307.

### c. Reserve Account Shortages

Because National Century misappropriated reserve account funds, the reserve levels fell well below the levels at which investors were told they would be maintained. See e.g., Az. Ex. 2B at NCFE-1865-1140 to -1142; Az. Ex. 3A at CSFB-2004-0007975 to -0007978. The various accounts had monthly determination dates on which their balances would be checked against the required levels. These dates, however, differed from account to account and National Century hid the vast shortages by: (1) shifting program funds among accounts within a certain NPF program, (2) transferring funds between NPF programs, and (3) obtaining short-term loans or extensions of credit. See Poulsen, 655 F.3d at 499; Faulkenberry, 614 F.3d at 579. In this manner, National Century eluded detection of reserve shortfalls on the determination dates.

The Noteholders again have submitted substantial evidence in support of the proposition that Credit Suisse knew or should have known that National Century failed to maintain reserve accounts at the levels represented to investors:

- a revised NPF VI investor report received by Credit Suisse in April 1999 disclosed an $11 million shortfall in the equity account and a $28 million shortfall in the seller reserve account. Az. Ex. 154;

- in a July 2000 meeting, Poulsen told several Credit Suisse representatives that National Century had "internally produced cash" by moving money between programs. Az. Ex. 175;

- an August 31, 2000 fax to Credit Suisse showed that NPF reserve funds were at $214 million, but based on the reported amount of notes payable, the reserve funds should have been at $333 million. Az. Ex. 157;

38

- a September 27, 2000 chart (that National Century faxed to Credit Suisse in connection with its request for Credit Suisse to extend the deadline on the $20 million NPF WL commitment) indicated that the note programs had just $110 million, when they should have had $325 million. Az. Ex. 188. It also indicated National Century's intentions to use short-term loans and the practice of improper transfers between note programs to cover shortfalls on monthly determination dates. Credit Suisse agreed to the extension in return for a $100,000 fee. Az. Ex. 189;

- in the October 30, 2000 meeting with GMAC, Poulsen disclosed that the equity reserve accounts were routinely below their required levels and even had been drawn down to $0. Az. Ex. 103, Gleason Dep. at 129; Az. Ex. 125. It was clear that National Century had borrowed money (including the lending commitment from Credit Suisse) to cover up the cash shortage. Az. Ex. 105, Gleason Dep. at 123-24;

- in the second meeting with GMAC, the reserve shortages were again discussed. Az. Ex. 103, Gleason Dep. at 166-68;

- in preparation for a proposed private placement of National Century equity, co-placement agent Shattan Group questioned Credit Suisse in May 2001 why reserve levels were low. Az. Exs. 204, 208, 209;

- in June 2001, National Century forwarded to Credit Suisse questions that credit rating agency Fitch had made as to why reserve levels were low and why reserve funds had been commingled. Az. Ex. 42. Fasanella assured Fitch that everything was fine, Az. Ex. 221, prompting Fitch to release it ratings for a NPF XII note offering. Az. Ex. 222.

- in September 2001, Fitch again questioned Credit Suisse why "the reserves are much lower than the specified levels." Az. Ex. 44. Fasanella again gave a misleading response. Id.

- potential equity investors Goldman Sachs and CIVC questioned Credit Suisse in January 2002 why "[r]estricted cash has typically been less than provider reserves at month end" and why the shortfalls "have grown" over time. Az. Ex. 211 at CSFB-EMAIL-0030832; and

- knowing in August 2002 that Poulsen had misused reserve funds and that National Century was short on cash, Credit Suisse agreed to make a $75 million short-term loan so that National Century could avoid default. Az. Exs. 142, 145.

39

**d.      Related Party Transactions**

Many of the funds misappropriated from the NPF programs were directed to healthcare providers in which National Century's executives held undisclosed ownership interests. Poulsen, 655 F.3d at 498; U.S. v. Poulsen, 568 F.Supp.2d 885, 900 (S.D. Ohio 2008). By the time National Century filed for bankruptcy, $2.2 billion of the $2.7 billion in "purchased receivables" listed as assets on the bankruptcy schedule could be attributed to related parties. Az. Ex. 231. Credit Suisse never told any of the Noteholders about the related party transactions. Indeed, it determined that including such a disclosure in the PPMs was unnecessary. Az. Ex. 11, Donovan Dep. at 223-24.

The Noteholders have set forth substantial evidence demonstrating that Credit Suisse knew or should have known of National Century's practice of advancing funds to related parties:

- the 1994 audited financial statement that Credit Suisse received in 1996 indicated that National Century's executives held an ownership interest in provider Rx Medical, from whom National Century had purchased receivables. Az. Ex. 74 at CSFB-2004-0051557 and -0051565;

- a draft S-1 registration statement for National Century (in connection with a proposed public offering of National Century stock) disclosed that National Century's executives owned more than a 5% interest in several providers from which it purchased a substantial amount of receivables. Az. Ex. 229 at 2-3. As a member of the IPO working group, Credit Suisse received the draft S-1. Az. Ex. 236 at CSFB-2004-0086356;

- May 2000 faxes from Poulsen to Credit Suisse expressly admitted that National Century held ownership interests in the "two top" providers to the NPF programs. Az. Ex. 85 at CSFB-2004-0021705 and -0021708.

- in the meetings with GMAC in 2000, GMAC questioned why there were a "significant number of sellers and significant number of receivables [related to] companies that were actually owned by the principals of NCFE." Az. Ex. 103, Gleason Dep. at 107;

- an April 2002 email to potential equity investor Goldman Sachs (an email on which Credit Suisse was copied) identified certain related parties as being providers from which National Century purchased receivables. Az. Ex. 230; and

- Fasanella and Donovan acknowledged in deposition testimony that they knew of related party transactions. Az. Ex. 1, Fasanella Dep. at 158-59; Az. Ex. 11, Donovan Dep. at 222-23.

### e. Manipulation of Receivables Default Rates

The PPMs defined a "defaulted" receivable in terms of its age, payor insolvency, and uncollectibility. See e.g., Az. Ex. 2B at NCFE-1865-1136; Az. Ex. 3A at CSFB-2004-0007972. The PPMs represented that the note programs would monitor the overall rate of defaulted receivables and would increase cash reserves if the rate exceeded a designated percentage. See e.g. Az. Ex. 2B at NCFE-1865-1110; Az. Ex. 3A at CSFB-2004-0007942. The PPMs also purported to chronicle the historical program default rates, and they represented that monthly reports would state, among other things, the current rates of default. See e.g. Az. Ex. 2B at NCFE-1865-1122; Az. Ex. 3A at CSFB-2004-0007955; Az. Ex. 62C at NCFE-1865-1728; Az. Ex. 63A at NCFE-4610-3260. However, it is well-established that National Century manipulated the default rates by removing troubled receivables before they defaulted and had to be reported. These receivables were classified as "other notes" that National Century "purchased" out of the programs. See Az. Ex. 201, Staub Dep. at 30-32, 62; Az. Ex. 202; Az. Ex. 203.

Here too the Noteholders have submitted substantial evidence in support of the proposition that Credit Suisse knew or should have known about the manipulation of the receivables default rates:

- April and May 2001 emails from the Shattan Group told Credit Suisse of accounts receivable that were "out of compliance" and "purchased by NCFE corporate to avoid non-compliance." Az. Exs. 202, 203;

- an investor report prepared by Credit Suisse in May 2001 attempted to explain the existence of aged receivables that had been removed from the note programs. Az. Ex. 135 at CSFB-EMAIL-0021574;

- potential equity investors Goldman Sachs and CIVC questioned Credit Suisse in January 2002 about the "purchase of non-performing program receivables by NCFE [to] reduce bad debt write-offs." Az. Ex. 211 at CSFB-EMAIL-0030832; and

- a January 31, 2002 email from National Century's Roger Faulkenberry to Fasanella stating that National Century had purchased "sellers" out of the programs for purposes of "managing the default rate." Az. Ex. 260.

### 2. Discussion of Credit Suisse's Arguments

#### a. The Reply Statement of Facts

Credit Suisse offers numerous lines of defense as to why the evidence submitted by the Noteholders does not create a genuine issue of fact regarding scienter. One of these is Credit Suisse's Reply Statement of Facts (doc. 1657), which in broad terms represents Credit Suisse's attempt to give an explanation for each piece of evidence submitted by the Noteholders. In the court's view, nothing Credit Suisse presents is so compelling as to force a conclusion that genuine issues of fact do not exist. Rather, at best the Reply Statement of Facts takes small chips out of the mountain of evidence presented by the Noteholders.

For instance, Credit Suisse contends that other third parties also knew of some of the information (such as the audited financial statements and April 1999 revised investor report) that was presented to Credit Suisse, yet they were not alarmed. Credit Suisse argues that because the information troubled no one else, that information must not have truly indicated that National Century had done anything wrong. Further along those lines, Credit Suisse contends that for other pieces of information, third parties (such as the Indenture Trustees) assured Credit Suisse that there was nothing to worry about. According to Credit Suisse, this shows that the Noteholders cannot prove that Credit Suisse should have known of the fraud.

The court believes that a jury should decide whether to credit this interpretation of the evidence. At the summary judgment stage, this interpretation is countered by evidence that not only did Credit Suisse know about the fraud, it also knew of National Century's attempts to cover up the fraud and even aided National Century in the concealment. The Noteholders have submitted evidence that Credit Suisse, for example, knew the reserve accounts were low, knew National Century had "internally produced cash" to conceal the shortages, and extended loans to National Century to help it through its liquidity crunches.

Much of the rest of Credit Suisse's Reply Statement amounts to Credit Suisse simply disagreeing about the facts. It argues that nothing improper was learned during its interactions with prospective investors and credit rating agencies, and it denies that GMAC told Credit Suisse of anything amiss at National Century. Credit Suisse claims that its extensions of credit to National Century were routine financial transactions and not efforts to help National Century conceal fraud. It further disputes whether

certain pieces of evidence – despite all appearances – actually indicated the existence of reserve shortfalls or the misuse of funds.  Ultimately, the court finds that the parties' competing interpretations of the evidence is a matter for a jury to resolve.

### b.    Credit Suisse Was Deceived

Credit Suisse argues that National Century's executives fooled it just like they deceived everyone else.  In support of this position, Credit Suisse points to the testimony of three National Century employees with intimate familiarity of how the company perpetrated the fraud: Sherry Gibson, Vice President of Compliance; Jessica Bily, a funding and data analyst; and Jon Beacham, Director of Securitizations.[12]  These individuals had particular involvement with National Century's practices of entering false receivables data, generating false reports, and authorizing improper advances.  See generally U.S. v. Poulsen, 568 F.Supp.2d 885, 894-99 (S.D. Ohio 2008).  They testified that they did not tell anyone at Credit Suisse of National Century's improprieties.  See CS Ex. 114, Gibson Dep. at 213; CS Ex. 124, Bily Dep. at 80; CS Ex. 30, Beacham Dep. at 238-39.

This testimony does not entitle to Credit Suisse to summary judgment.  Gibson, Bily, and Beacham could not claim to have possessed personal knowledge that Credit Suisse was completely unaware of National Century's fraud.  Rather, they testified that they personally did not tell Credit Suisse.  The Noteholders have provided substantial evidence that Credit Suisse did know of various aspects of National Century's fraud.  Even if Credit Suisse lacked knowledge of the particular tasks that Gibson, Bily, and Beacham performed, a jury could still find that Credit Suisse had enough knowledge of National Century's wrongdoing to satisfy the element of scienter.  To look at it another way, Credit Suisse may not have known all of the intricacies of how National Century carried out its fraudulent operations (few had such knowledge), but substantial evidence exists to support a conclusion that Credit Suisse had sufficient knowledge to appreciate that its representations to investors were untrue.

### c.    Economic Irrationality and Motive

When National Century went bankrupt in November 2002, Credit Suisse lost about $130 million on its holdings of NPF VI and XII notes and another $127 million on its extension of credit through the

---

[12] Gibson and Beacham were criminally convicted for their roles in the fraud.

short-term loan and VFN. See CS Ex. 135, Kleidon Report at Ex. 6A[13]; CS Ex. 143; CS Ex. 340, Lengel Dep. at 48. Credit Suisse argues that at several points in time from 1998 to early 2002, its investment in National Century stood at or below $100 million. See CS Ex. 135, Kleidon Report at Ex. 6A. According to Credit Suisse, no reasonable jury could find that Credit Suisse would have increased its exposure to National Century had it really known of the fraud.

There are two basic reasons why this irrationality argument fails to win the day on summary judgment. For one, Credit Suisse's monetary loss is not conclusive of scienter – it is just one piece of evidence a factfinder may consider in weighing all of the evidence. See Earthboard Sports, 481 F.3d at 920 (that the defendant also fell victim to a fraudulent scheme "does not render him immune to liability"); Florida State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 662 (8th Cir. 2001) ("The ultimate profitability of a course of conduct is not conclusive of intent. Just as we cannot countenance pleading fraud by hindsight, neither can we infer innocence by hindsight because the alleged misdeeds did not pay off."). Parties to wrongdoing often continue in their conduct, believing they will not suffer the consequences of their actions. A jury should decide how to reconcile the evidence of Credit Suisse's knowledge with the seeming irrationality of Credit Suisse's monetary exposure to National Century.

Second, the Noteholders have submitted evidence that, if credited, would vitiate the irrationality theory on a factual level. The individuals who recommended and approved Credit Suisse's investments in National Century were not the same individuals at Credit Suisse who knew, or should have known, of the fraud. It was the officers in Credit Suisse's credit department or conduit group who recommended and approved Credit Suisse's investments in National Century. See, e.g., Az. Ex. 61, Irwin Dep. at 38-39;

---

[13] Lloyds and MetLife argue that Exhibit 6A to the Kleidon Report should not be considered. The exhibit is a graph purporting to show Credit Suisse's credit exposure to National Century from August 1998 to November 2002. Lloyds and MetLife dispute the graph's indication that Credit Suisse stopped trading in NPF notes after October 10, 2002.

The court agrees that Credit Suisse's exposure on October 10, 2002 may not have been the exact amount of its exposure on November 18, 2002, when National Century went bankrupt. However, Lloyds and MetLife have not pointed to any evidence suggesting that the amount changed significantly. In any event, it is undisputed that Credit Suisse suffered significant losses when National Century went bankrupt. Moreover, even accepting Credit Suisse's assertion of it actual loss as true, the court finds that it is still not entitled to summary judgment on the issue of scienter.

Az. Ex. 110, Hunt Dep. at 13-14; Az. Ex. 112, Xanthos Dep. at 33; Az. Ex. 180, Giordano Dep. at 92-93; Az. Ex. 242; Az. Ex. 256, Monaco Dep. at 247-49; Az. Ex. 257. And it was individuals in the asset finance group – Clark, Donovan, and Fasanella – who the evidence points to as having knowledge of the fraud. The credit officers each testified that they were not told by the asset finance group about any aspects of National Century's fraud. See, e.g., Az. Ex. 61, Irwin Dep. at 58-61; Az. Ex. 110, Hunt Dep. at 110-11; Az. Ex. 112, Xanthos Dep. at 73; Az. Ex. 180, Giordano Dep. at 108-10; Az. Ex. 256, Monaco Dep. at 266.[14]

Credit Suisse nonetheless contends that Clark, Donovan, and Fasanella had no motive to hide the fraud. While the lack of a motive is relevant, it is just one factor a jury may consider in examining all of the evidence. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 596 (1986) ("Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence . . . ."). But Credit Suisse's contention that it had no motive turns a blind eye to clear evidence of what Credit Suisse stood to gain by prolonging the fraud. First, after Credit Suisse made the $20 million credit extension to National Century in August 2000, National Century granted Credit Suisse the right to serve as the sole lead in placing additional note offerings until Credit Suisse received at least $15 million in upfront fees. See Az. Ex. 199. Second, Credit Suisse earned, or at least had the expectation of earning, substantial fees in connection with its short-term lending to National Century. See Az. Ex. 189 ($100,000 fee for extending the payment date on the $20 million loan); Az. Ex. 146 at 2 (Fasanella stating his expectation that Credit Suisse would earn a fee of at least $1 million over and above the customary fee in relation to the $75 million loan); Az. Ex. 147 (invoice billing National Century $1 million in connection with the loan). Finally, Credit Suisse was able to reduce its exposure on NPF notes

---

[14]  Credit Suisse objects to the credit officers' testimony that no one from the asset finance group informed them of the fraud at National Century. Credit Suisse argues that the testimony is without foundation and assumes facts not in evidence, or at least not presented to the witnesses.
   The court finds, for reasons already discussed, that the Noteholders have submitted sufficient evidence that the members of asset finance knew or should have known of the fraud. Moreover, the deposition questioning did not require the witnesses to assume that asset finance knew of the fraud. The questioning simply went to whether the credit officers had ever been told of the fraud.

by over $100 million in the 10 week period before National Century collapsed. See Az. Ex. 11, Donovan Dep. at 603 (testifying that Credit Suisse sold $120 million in notes in that time frame); Az. Ex. 12, Richter Dep. at 314 (Credit Suisse employee testifying, "It's a fact that we traded down from 247 to 130.5 [million dollars]."); Az. Ex. 132 at 2, 5 (chart of Credit Suisse's trading in NPF securities); CS Ex. 143 (summary chart of month-end holdings) delete b/c NJ objects.

### d.    Neil McPherson Lacked Knowledge

Certain misrepresentations made to the Noteholders have been attributed to Credit Suisse's Neil McPherson. McPherson made factually inaccurate statements to MetLife in a road show presentation and authored the March 2000 "Clean Bill of Health" report and the July 2002 "Fitch Downgrades NPF Healthcare Deals" report. See NJ Leivick Ex. 54; CS Exs. 255, 257. Credit Suisse argues that there is no evidence of McPherson having knowledge of the fraud and that it cannot be held liable for the statements of a speaker who lacked scienter.

The Noteholders respond to this argument with slightly different variations on the same theme: even if McPherson did not know of the falsity of his statements, it is enough that others at Credit Suisse did. MetLife and Lloyds rely on the collective knowledge doctrine, whereby to "carry their burden of showing that a corporate defendant acted with scienter, plaintiffs in securities fraud cases need not prove that any one individual employee of a corporate defendant also acted with scienter. Proof of a corporation's collective knowledge and intent is sufficient." In re WorldCom, Inc. Sec. Litig., 352 F.Supp.2d 472, 497 (S.D.N.Y. 2005). The Arizona Noteholders rely on the tenet of agency law whereby a principal is liable for an agent's innocently-made misrepresentation if the principal knows the falsity of the statement and believes that the agent will make the statement. See Restatement (Second) of Agency § 256 (1958).

Credit Suisse correctly notes that many courts have rejected the collective knowledge doctrine. See, e.g., Southland Sec. Corp v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 366 (5th Cir. 2004) (citing cases). Even putting that approach aside, the Noteholders have presented sufficient evidence that Fasanella not only saw McPherson's materials before they were presented but also had an opportunity to provide his input, and thus correct, the statements McPherson would make to investors. See NJ

Leivick Ex. 51 (email to Fasanella of a draft of the road show presentation; Fasanella was told to "[f]eel free to send me any changes"); NJ Leivick Ex. 260, McPherson Dep. at 187-89 (testifying that he sent the "Clean Bill of Health" report to Fasanella for fact-checking).  In light of the evidence, the court concludes that a jury could reasonably find that Credit Suisse acted with scienter as to McPherson's innocently-made misrepresentations.  Cf. In re Vivendi Universal, S.A. Sec. Litig., 765 F.Supp.2d 512, 544 (S.D.N.Y. 2011) (holding that a corporation was not liable for an agent's innocently-made representations where other agents who did have scienter did not review or endorse the misrepresentations).

### e.    No Government Charges Against Credit Suisse

Credit Suisse puts much importance on the fact that no criminal charges were brought against any Credit Suisse employees, nor did the SEC initiate legal action against Credit Suisse.  Credit Suisse contends that the absence of government charges is "highly relevant" evidence to the scienter issue.

Credit Suisse has cited three cases but these lend no real support to its argument.  The cases dealt with motions to dismiss and whether the complaints satisfied the heightened standard for pleading scienter in § 10(b) actions.  In the first case, the Eighth Circuit found that "in the absence of particular facts giving rise to a strong inference of fraud," the most plausible inference was that the defendants lacked scienter, especially when an SEC investigation had found no fraud.  In re Ceridian Corp. Sec. Litig., 542 F.3d 240, 248-49 (8th Cir. 2008).  In the second case, the complaint again lacked particularized allegations of scienter, and the court observed in a footnote that it was "interesting" that the SEC did not include the defendants in its investigation of the larger fraud.  Cordova v. Lehman Bros., Inc., 526 F.Supp.2d 1305, 1319 (S.D. Fla. 2007).  In the final case, the court rejected the plaintiff's contention that an SEC investigation supported a strong inference of scienter because the investigation did not result in any adverse findings.  In re MoneyGram Int'l, Inc. Sec. Litig., 626 F.Supp.2d 947, 981 (D. Minn. 2009).

Here the Noteholders' § 10(b) and fraud claims have already survived Credit Suisse's motion to dismiss, see In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 541 F.Supp.2d 986 (S.D. Ohio 2007). And at the summary judgment stage the Noteholders have opposed the motion with clear and convincing evidence from which a jury could find that Credit Suisse acted with scienter.  That Credit

Suisse faced no criminal or SEC charges is merely one piece of evidence that a jury could potentially use in weighing all of the evidence.

### f.        Admissibility

Credit Suisse makes hearsay objections to a number of the Noteholders' evidentiary materials.[15] They contend that these documents, or a deposition in one instance, consist of out-of-court statements introduced to prove that National Century was committing fraud. See Fed. R. Evid. 801. These statements were authored by various individuals or entities, including National Century's Poulsen and Beacham, as well as Fitch, Hausser & Taylor, PhyAmerica, and the Shattan Group. These documents and deposition all indicate at least one problem area in National Century's operations, such as the purchase of ineligible receivables or the shortage of reserve funds.

Evidence is not hearsay when it is not offered to prove the truth of the matter asserted. See Anthony v. DeWitt, 295 F.3d 554, 563 (6th Cir. 2002). "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801, Advisory Committee Note to Subdivision (c), 1972 Proposed Rules. The court finds that the Noteholders have properly offered the evidence to show that Credit Suisse was aware that the statements were made, not for the truth of the matter asserted. "Statements to prove the listener's knowledge are not hearsay." U.S. v. Boyd, 640 F.3d 657, 664 (6th Cir. 2011). If credited, the evidence establishes that Credit Suisse knew that the declarants claimed improprieties had taken place at National Century. A jury could conclude from this evidence – particularly when coupled with other evidence of Credit Suisse's actual knowledge (to which Credit Suisse has not objected) – that Credit Suisse acted with reckless disregard for the truth by continuing to bring NPF notes to market without investigating whether there was any truth to the red flags brought to its attention.[16] See PR Diamonds,

---

[15]  The hearsay objections are directed at Az. Exs. 42, 44, 74, 78, 101, 103, 125, 157, 204, 208, 209, 211, 229, and the corresponding exhibits submitted by Lloyds and MetLife.

[16]  The Noteholders have submitted expert reports on the issue of how a placement agent in Credit Suisse's position should have responded to the red flags. Given the abundant evidence of repeated red flags and Credit Suisse's actual knowledge of the fraud, the court finds that the Noteholders have submitted sufficient evidence, without resort to the expert opinions, to create a genuine dispute of material fact as to whether Credit Suisse acted with the requisite scienter.

Inc. v. Chandler, 364 F.3d 671, 686 (6th Cir. 2004) ("Specific factual allegations that a defendant ignored red flags, or warning signs that would have revealed the accounting errors prior to their inclusion in public statements, may support a strong inference of scienter.").

Credit Suisse argues that the court should be skeptical of the Noteholders' use of such evidence and expresses concern that a jury could interpret the evidence as proving the improprieties did occur. The court finds that it should be left to the trial judge's discretion to determine whether a limiting instruction would be appropriate. Moreover, there is ample other evidence at the Noteholders' disposal to establish that National Century committed fraud. See Boyd, 640 F.3d at 664 (rejecting an argument that out-of-court statements about the occurrence of a crime should be excluded because they contained "implicit factual assertions" and holding that the district court properly gave a limiting instruction and that other evidence was sufficient to establish the fact that the crime had occurred).

Accordingly, Credit Suisse's motion to strike is denied as to Arizona Exhibits 42, 44, 74, 78, 101, 103, 125, 157, 204, 208, 209, 211, 229, and the corresponding exhibits submitted by Lloyds and MetLife.

## C. Justifiable Reliance

To prevail on their § 10(b), fraud, and negligent misrepresentation claims, the Noteholders must prove that they relied on Credit Suisse's representations in connection with their investment decisions and that their reliance was justifiable. Frank v. Dana Corp., 646 F.3d 954, 958 (6th Cir. 2011); Eurycleia Partners, LP v. Seward & Kissel, LLP, 910 N.E.2d 976, 979 (N.Y. 2009); MatlinPatterson ATA Holdings LLC v. Federal Express Corp., 929 N.Y.S.2d 571, 575-76 (N.Y. App. Div. 2011). Reliance "ensures that, for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists as a predicate for liability." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 243 (1988)). "[R]eliance is tied to causation, leading to the inquiry whether respondents' acts were immediate or remote to the injury." Stoneridge, 552 U.S. at 160; see also OSJ, Inc. v. Work, 710 N.Y.S.2d 666, 668 (N.Y. App. Div. 2000)

---

Accordingly, Credit Suisse's motions to strike the expert reports (docs. 1649, 1650) are denied as moot. Credit Suisse's motions to exclude the experts from testifying at trial (docs. 1649, 1650) are denied without prejudice to renewal before the trial court.

(holding that reliance requires a "causal connection" between the misrepresentation and the injury).

### 1.   Actual Reliance

#### a.   The Dreyfus Plaintiffs

The Dreyfus plaintiffs purchased all of their notes in April and May of 2002 in the secondary market from Credit Suisse. See Az. Ex. 351. The notes were originally placed by PaineWebber in 1999. See CS Ex. 289. Dreyfus's portfolio manager put a call out to several brokers, including one at Credit Suisse, that he needed bonds of a certain duration and yield. See Az. Ex. 250, Deonarain Dep. at 86. The Credit Suisse broker came back with at least a few suggestions, one of them being NPF XII 1999-1 notes. Id. at 87. The portfolio manager obtained the PPM originally distributed by PaineWebber, but he could not recall for sure if the Credit Suisse broker provided it to him. Id. at 96, 148-49 (testifying that he may have obtained the PPM from an independent source). The Credit Suisse broker gave a basic description of healthcare receivables over the telephone to the portfolio manager, but he made no specific representations other than that he had other clients who had purchased the notes. Id. at 88-91.

Credit Suisse argues that the Dreyfus plaintiffs cannot prove they relied on any statements made by Credit Suisse. According to the portfolio manager, the Credit Suisse broker did not make any representations about National Century or the NPF notes, nor did they review the PPM together. See Az. Ex. 350, Deonarain Dep. at 90, 149. The Dreyfus plaintiffs respond that the portfolio manager did receive Credit Suisse's Clean Bill of Health report. Id. at 138-39, 161. Even so, the manager testified that what he relied on from the report was a diagram of the cash flow in healthcare asset-backed securities deals, and this diagram did not specifically relate to National Century. Id. at 98-100 (testifying that he reviewed the article to get a general understanding of healthcare receivables and that he did not recall relying on any National Century-specific statements); see also CS Ex. 255 at CSFB-2004-0062315.

Thus, Credit Suisse has established that the Dreyfus plaintiffs did not rely on any affirmative representations made by Credit Suisse. Plaintiffs nonetheless argue that the element of reliance need not be proved for a fraud claim based on omissions. They contend that Credit Suisse should have disclosed what it knew of the fraud to the portfolio manager. See Stutman v. Chemical Bank, 731 N.E.2d 608, 613 n.2 (N.Y. 2000) (noting that "proof of reliance is not required where a duty to disclose material

information has been breached").

A duty to disclose arises when "there is a fiduciary or confidential relationship, or one party's superior knowledge of essential facts renders nondisclosure inherently unfair." Barrett v. Freifeld, 908 N.Y.S.2d 736, 737-38 (N.Y. App. Div. 2010). In the case of superior knowledge, the essential fact must not be readily available to the plaintiff. P.T. Bank Central Asia v. ABN AMRO Bank N.V., 754 N.Y.S.2d 245, 252 (N.Y. App. Div. 2003); Swersky v. Dreyer & Traub, 643 N.Y.S.2d 33, 37 (N.Y. App. Div. 1996).

A jury could reasonably find that Credit Suisse had superior knowledge of the essential facts regarding National Century's fraud and that those facts were not readily available to the Dreyfus plaintiffs. Indeed, there is no evidence of record to suggest that the Dreyfus plaintiffs could have readily ascertained the facts relating to the fraud. See Swersky, 643 N.Y.S.2d at 37 (noting that a plaintiff can be charged with knowledge of facts he could have reasonably ascertained); Jana L. v. West 129th Street Realty Corp., 802 N.Y.S.2d 132, 135 (N.Y. App. Div. 2005) (holding that the plaintiff had a duty to "exercise ordinary intelligence"). Credit Suisse might argue that the individual broker who sold the notes lacked personal knowledge of the fraud. However, a jury could find that it was inherently unfair for Credit Suisse to be the selling notes at all, especially given the late stage at which the Dreyfus plaintiffs bought them. As discussed above regarding scienter, by April and May of 2002 Credit Suisse possessed sufficient information from which a jury could find that Credit Suisse knew or should have known of the fraud. If a jury so found, it could likewise also find that Credit Suisse should have not been in the business of selling NPF notes and that its sale to the Dreyfus plaintiffs, even if in the aftermarket, was inherently unfair.

### b. Plaintiffs Who Had Purchased NPF Notes Before

Credit Suisse next argues that certain Arizona Noteholders could not have relied on Credit Suisse because of their previous knowledge of the note programs. The plaintiffs in question – Dexia, MONY, PIMCO, SanPaolo, and Wachovia – purchased NPF notes from other sellers before buying notes from Credit Suisse. These plaintiffs had already acquired substantial familiarity with the note programs before turning to Credit Suisse to purchase additional notes. See, e.g., CS Ex. 13 (MONY research on the

National Century).  According to Credit Suisse, plaintiffs needed Credit Suisse only to complete the sales transactions, not to supply information.

This argument has potential merit; however, each of the plaintiffs have produced evidence sufficient to withstand the motion for summary judgment that they reviewed and relied upon offering materials given to them by Credit Suisse in connection with their note purchases from Credit Suisse.  See, e.g., Az. Ex. 388, LeCoq Dep. at 185-86 (Dexia); Az. Ex. 401, Sidford Aff. at ¶¶ 6, 8, 9, 11 (MONY); Az. Ex. 320, Mather Aff. at ¶¶ 3, 5, 6 (PIMCO); Az. Ex. 386, DiMario Dep. at 150-51 (SanPaolo); Az. Ex. 410, Premo Dep. at 135, 177-78 (Wachovia).  It is not the court's role at the summary judgment stage to weigh the evidence or judge the credibility of witnesses.  Schreiber v. Moe, 596 F.3d 323, 333 (6th Cir. 2010).

### c.    Mix of Information Relied Upon

Not surprisingly, the Noteholders reviewed and relied on numerous sources of information in deciding whether to invest in National Century.  The investments often were multi-million dollar purchases and made by experienced investment advisors.  Credit Suisse argues that many Noteholders put great importance on the NPF notes' AAA credit ratings and attractive credit spread.  See, e.g., CS Reply Ex. 78, Katz Dep. at 212-13 (Highland).  Credit Suisse contends that the Noteholders cannot prove that their reliance, if any, on information derived from Credit Suisse was sufficient to establish the requisite causal connection.

As with the issue of scienter, the parties have submitted separate appendixes dedicated to the reliance issue.  The court finds that there is a triable issue regarding whether the Noteholders actually relied on representations made to them by Credit Suisse.  To prevail on their claims, the Noteholders need not show that they relied solely or exclusively on Credit Suisse's representations.  See In re Parmalat Sec. Litig., 477 F.Supp.2d 602, 611 n. 62 (S.D.N.Y. 2007).  This is a point Credit Suisse concedes.  The Noteholders' reliance on Credit Suisse must be a substantial or contributing factor in their conduct, not the sole factor.  See id.; Restatement (Second) of Torts § 546 (1977).  Importantly, each of the Noteholders have submitted evidence that, within the mix of information available and relevant to them, they relied on Credit Suisse's representations regarding credit enhancements, overcollateralization, and

the level of reserve accounts. See, e.g., CS Reply Ex. 447 at LL_002133 and _002134 (Lloyds); Az. Ex. 303, Boothe Aff. at ¶ 3 (ACM); Az. Ex. 329, Dieudonne Dep. at 169-70 (Ofivalmo); Az. Ex. 392, Kizner Dep. at 262 (Drake); Az. Ex. 393, Maceira Dep. at 59-61, 283-84 (III Finance). A jury could reasonably find from this evidence that the Noteholders actually relied on information they received from Credit Suisse and that this information was a substantial factor in their decisions to purchase the notes.

### d.    Admissibility

In its motion to strike, Credit Suisse argues that plaintiffs Ambac and PIMCO submitted sham affidavits in support of their attempts to show that they actually relied upon representations made by Credit Suisse. In their affidavits, plaintiffs stated that they received, reviewed, and relied upon the PPMs' representations as to the amount of overcollateralization, maintenance of the reserve accounts, and the nature and performance of the healthcare receivables. See Az. Ex. 378, Aloe Aff. at ¶ 4 (Ambac); Az. Ex. 320, Mather Aff. at ¶¶ 3, 5, 6 (PIMCO). According to Credit Suisse, these statements contradict earlier deposition testimony.

A party "cannot create a disputed issue of material fact by filing an affidavit that contradicts the party's earlier deposition testimony." Aerel, S.R.L. v. PCC Airfoils, L.L.C., 448 F.3d 899, 906 (6th Cir. 2006). But an affidavit submitted in opposition to a motion for summary judgment should be stricken only if it "directly contradicts" prior sworn testimony and no "persuasive justification" is provided for the contradiction. Id. at 908. Thus, a district court should not strike an affidavit which "supplement[s] incomplete deposition testimony" or "fills a gap left open" by prior evidence Id. at 907.

With respect to plaintiff Ambac, Nicholas Aloe stated in his affidavit that he reviewed the PPMs for all three of Ambac's note purchases. See Az. Ex. 378, Aloe Aff. at ¶ 4. He testified in his deposition that he read the first PPM he received but not the rest because they were "a template deal." Az. Ex. 377, Aloe Dep. at 71. While Credit Suisse is technically correct that Aloe's affidavit contradicts his deposition testimony that he did not read the second and third PPMs, Aloe himself recognized the important point – the later PPMs were simply templates of the first. Credit Suisse has not made any showing why Aloe's reliance on the misrepresentations in the first PPM cannot carry over to later purchases from Credit Suisse. See Restatement (Second) of Torts § 552(2)(b) (liability for misrepresentation may extend to loss

53

suffered through reliance in the intended transaction as well as in a "substantially similar transaction").

Turning to PIMCO, Scott Mather stated in his affidavit that he relied on the PPMs before making purchases from Credit Suisse.[17] Credit Suisse argues that Mather testified in his deposition that he could not recall having "read" the PPMs. See Az. Ex. 321, Mather Dep. at 41. The court finds that the Mather affidavit and deposition are not in direct contradiction. Mather explained in his deposition that he did not read the PPMs like one would "read a novel," but that he did review the PPMs for all pertinent information about a proposed investment. Id. at 41-42. Moreover, Mather's contemporaneous handwritten notes on the trade tickets for each purchase from Credit Suisse show that he wrote down information – including the rate of overcollateralization and the required percentages for the reserve accounts – that he would have obtained from the PPMs. See Az. Ex. 320, Mather Aff., Exs., B & C. Mather's affidavit thus should be viewed as supplementing the deposition testimony and other evidence, and a jury should ultimately decide whether Mather's claim of reliance is credible.

Accordingly, Credit Suisse's motion to strike is denied as to the Aloe and Mather affidavits.

### 2. Reasonableness of Reliance

In considering whether a party's reliance is justifiable, a court may consider many factors, including:

> (1) the sophistication of the parties; (2) the existence of long-standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

Earthboard Sports, 481 F.3d 901, 921 (6th Cir. 2007). New York courts likewise consider the entire context of the transaction in determining whether reliance is justifiable. See, JP Morgan Chase Bank v. Winnick, 350 F.Supp.2d 393, 406 (S.D.N.Y. 2004).

All of the parties are sophisticated in securities transactions. Credit Suisse is a global financial services company, and the Noteholders routinely invest in asset-backed securities and include some of

---

[17] PIMCO also purchased notes from sellers other than Credit Suisse. Its claims against Credit Suisse relating to those purchases are addressed separately below.

the largest institutional investors in the United States. Several of the Noteholders had well-established relationships with Credit Suisse. See, e.g., NJ Vespasiano Decl. at ¶ 16 (Lloyds); NJ Tau Decl. at ¶ 31 (MetLife); CS Ex. 146, Alperin Dep. at 212 (PIMCO).

Though both sides to these transactions were highly sophisticated, the evidence demonstrates a wide disparity in knowledge. Credit Suisse worked extensively with National Century from late 1995 to 2002 on various types of transactions, including 16 NPF note issuances, the VFN, a proposed initial public offering, equity private placements, warehouse facilities, and other lending arrangements. See CS Ex. 10. By 2000 National Century selected Credit Suisse to serve as "sole lead-manage" for its NPF transactions. Az. Ex. 199. The record thoroughly establishes that Credit Suisse had access to a great deal of information not available outside investors. Much of Credit Suisse's special access is exemplified by the evidence reviewed above in relation to scienter. To provide a few examples, Credit Suisse was a member of the "working group" for the proposed IPO and in that capacity received a due diligence report and a draft Form S-1 registration statement. See NJ Leivick Ex. 178[18]; NJ Leivick Ex. 263, O'Connell Dep. at 395. In 2002, Credit Suisse was privy to exchanges between National Century and potential equity investors Goldman and CIVC Partners. See NJ Leivick Ex. 245, Sarkozy Dep. at 261-62. There is no evidence to suggest that the Noteholders had any such access or knowledge.

A jury could therefore reasonably determine that, while the Noteholders were sophisticated investors, a sufficient disparity in access and knowledge existed to make the Noteholders' reliance on Credit Suisse justifiable. Moreover, Credit Suisse made specific representations about how the note programs were supposed to operate: criteria for what constituted an eligible receivable, restrictions on how reserve funds could be used, requirements for the percentage levels of reserve accounts, the rate of overcollateralization, the Servicer's function, the banktruptcy-remote status of the note programs, and so on. A jury could find that the Noteholders were entitled to rely on such specific representations.

Credit Suisse offers numerous reasons why it believes that the Noteholders' reliance was not

---

[18] Credit Suisse objects to NJ Leivick Ex. 178 to the extent it is offered to prove the contents of the public offering working documents. In this instance, it is offered simply to show that Credit Suisse received the documents.

justifiable. It argues that certain of the Noteholders used outdated PPMs and that reliance upon stale materials was unreasonable. It further argues that no reasonable institutional investor would invest millions of dollars based on informal telephone and email communications with Credit Suisse sales staff. Credit Suisse contends that some of the Noteholders should have conducted more analysis before making their purchases. For others who did conduct greater analysis, Credit Suisse argues that they should have relied on their own investigation and not any statements made by Credit Suisse.

None of Credit Suisse's arguments win the day on summary judgment. Rather, they are considerations a jury should weigh when determining whether, based on all of the evidence, the Noteholders' reliance was justifiable. Each consideration raised by Credit Suisse has a counter-point. Reliance upon a one-year old PPM was not necessarily unreasonable if nothing had materially changed in the operation of the note program and investors were told that the PPM's description was still accurate. Reliance upon the sales staff's informal communications was not necessarily unreasonable if they made specific representations and confirmed the Noteholders' understanding, based on the PPMs, of how the note programs worked. Investors did not necessarily act unreasonably by not conducting greater analysis if a reasonable investor would have been satisfied with the seeming thoroughness of the information provided to them by Credit Suisse. For Noteholders who dug deeper, there is no indication that a reasonable investigation would have actually discovered the fraud at National Century, particularly when the Noteholders have submitted evidence showing that Credit Suisse helped conceal it. See, e.g., Az. Ex. 188 (Credit Suisse's extension of credit when it knew of reserve shortfalls); Az Exs. 44, 221 (Credit Suisse's representations to Fitch that National Century had kept reserve levels in compliance with the Indentures).

Credit Suisse also contends that disclaimers in the PPMs and similar cautionary language in other written materials warned investors that: (1) Credit Suisse did not conduct "any independent investigation" of the statements in the PPMs; (2) Credit Suisse made no "representations or warranties as to the accuracy or completeness of the information"; (3) prospective purchasers were to "rely on their own examination" of the issuer and note offering; (4) no person, apart from those "specifically designated," was "authorized to give any information or to make any representations other than those

contained in [the memoranda]"; and (5) financial information presented about the healthcare receivables was unaudited. CS Ex. 293 at CSFB-2004-0016436, -0016437, -0016442.

The court examined this argument before in denying Credit Suisse's motion to dismiss. See In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 541 F.Supp.2d 986, 1004-1005 (S.D. Ohio 2007) (holding that the existence of the disclaimers did not preclude the Noteholders from showing that they justifiably relied on misrepresentations in the PPMs). In that order, this court held that "general disclaimers of accuracy do not shield sellers who knowingly make false statements." 541 F.Supp.2d at 1005 (citing cases). The court further explained that the PPMs told potential investors on the second page: "You should rely only on the information contained in this document or to which we have referred you." See CS Ex. 293 at CSFB-2004-0016435. Further, the PPMs made clear that Credit Suisse was "specifically designated" to make representations about the notes. 541 F.Supp.2d at 1005.

Credit Suisse has not offered any evidence to change the result on summary judgment. The Noteholders, on the other hand, have now produced evidence regarding the specific misrepresentations that Credit Suisse made. Importantly, the disclaimers were not tailored to address the substance of the specific misrepresentations that the Noteholders have shown Credit Suisse made. See In re Prudential Sec. Inc. Ltd. Partnerships Litig., 930 F.Supp. 68, 72 (S.D.N.Y. 1996) (denying a motion for summary judgment in securities fraud case and holding that general disclaimers did not preclude reliance when they did not "precisely address the substance" of the specific misrepresentations relied upon). The court thus finds that a jury could determine that the Noteholders' reliance upon the PPMs and other written materials was justifiable, even in light of the disclaimers. See Bass v. Janney Montgomery Scott, Inc., 210 F.3d 577, 590 (6th Cir. 2000) (denying summary judgment in securities fraud case and holding that "the question of whether [plaintiff's] reliance was reasonable is beyond doubt a question of fact for a jury to decide, and not a fit subject for judgment as a matter of law").

### 3. Lloyds and the VFN

Lloyds asserts a § 10(b) claim as to the VFN. Credit Suisse argues that Lloyds did not actually rely on any representations made by Credit Suisse. In response, Lloyds has submitted evidence that Credit Suisse provided it with the term sheet in January 2001. See NJ Leivick Ex. 118. The term sheet

contained specific misrepresentations about the NPF XII program, including that: NPF XII owned over $1.1 billion worth of receivables; the receivables were obtained in "true sale" transactions; the program had a credit enhancement of 20% of eligible receivables; the notes were ratably secured by receivables; reserve accounts would be maintained at specified levels; and NPF XII was a bankruptcy remote corporation. Id. at CSFB-EMAIL-0257075 and -0257085. Lloyds has also submitted sufficient evidence that it relied upon those misrepresentations in deciding to participate in the VFN. See NJ Leivick Ex. 152, Vespasiano Dep. at 375-77.

Credit Suisse contends that any reliance upon the term sheet was not reasonable because it, like the PPMs, contained cautionary language. The term sheet advised potential investors to make their own assessments and stated that Credit Suisse was not making a warranty of the accuracy of information contained therein. See NJ Leivick Ex. 118 at CSFB-EMAIL-0257079. Credit Suisse further notes that the Participation Agreement to which the parties later entered into contained a clause stating that Lloyds would make its own appraisal of the transaction, "without reliance" upon Credit Suisse. CS Ex. 219 at § 12(a). However, as with the PPMs, the court finds that a jury could still find that reliance upon the specific representations in term sheet was justifiable. Furthermore, the Sixth Circuit has directly held that "[t]o erect a *per se* rule with respect to non-reliance clauses would undermine the essential point of undertaking a contextual analysis" of reliance in securities fraud cases. Earthboard Sports, 481 F.3d at 921 (rejecting on summary judgment the argument that a non-reliance clause is an absolute bar to reasonable reliance).

### D. Loss Causation

Credit Suisse's final argument concerning the § 10(b) and fraud claims is that the Noteholders have failed to demonstrate loss causation. The Noteholders must prove a causal connection between Credit Suisse's misrepresentations and their losses. See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342 (2005); Helwig v. Vencor, Inc., 251 F.3d 540, 554 (6th Cir. 2001) (en banc); Global Minerals and Metals Corp. v. Holme, 824 N.Y.S.2d 210, 214 (N.Y. App. Div. 2006). No one disputes that the Noteholders lost vast sums of money when National Century went bankrupt, but Credit Suisse says the blame for the Noteholders' losses should be put on National Century's principals, who authorized the improper

advances.

Credit Suisse's attempt to escape liability for fraud by blaming National Century's principals is misdirected. The Noteholders' theory of the case is that Credit Suisse misrepresented to investors the nature of the NPF note programs in order to make the notes appear to be a sound investment. The law of fraud by misrepresentation would be eviscerated if the deceiver could evade liability by simply ensuring that another party was committing the underlying bad acts.

"[A] misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (2d Cir. 2005). "Thus to establish loss causation, 'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' . . . i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise, the loss in question was not foreseeable." Id. (quoting Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001) (emphasis added in Lentell).

The Noteholders have easily satisfied this standard at the summary judgment stage. The subjects of Credit Suisse's misrepresentations and omissions were that: (1) program funds would be used to purchase eligible receivables; (2) reserve funds would be maintained at required levels and would be used only for limited purposes; (3) receivables would be acquired in "true sale" transactions; and (4) the rate of defaulted receivables would be carefully monitored and reported. These four subjects correspond directly to how National Century's principals misappropriated program funds by: (1) purchasing ineligible receivables; (2) raiding reserve accounts; (3) engaging in related-party transactions; and (4) manipulating data to avoid triggering an event of default.

### E.    Holder Claims

Certain Noteholders have also asserted what is known as a "holder" claim. These plaintiffs are: Lloyds, AmerUs, the Arizona Treasurer, Drake, Lincoln Capital, MONY, Ofivalmo, United of Omaha, Phoenix Life Insurance Company, and PIMCO. See NJ Opp'n Brief at 129; Az. Opp'n Brief at 124. They contend that Credit Suisse is not only liable for inducing them to purchase notes but also liable for

inducing them to hold their notes at times when they could have sold them. Plaintiffs argue that Credit Suisse's assurances in the July 2002 Market Tabs report following Fitch's downgrade of NPF notes caused them to refrain from selling their notes. See CS Ex. 257; Az. Ex. 225 (Fitch downgrade). In response, Credit Suisse argues that a holder claim is not a viable theory of recovery and that plaintiffs have failed to submit factual proof of their theory.

As an initial matter, plaintiffs argue that the court should not consider Credit Suisse's challenge to their holder claims because Credit Suisse did not specifically address the holder theory until its reply brief. The court, however, finds that Credit Suisse did move for summary judgment against plaintiffs' fraud claims on the grounds of reliance and causation. See CS MSJ at 92, 111. As discussed below, holder claims are disfavored – particularly when these plaintiffs have brought well-supported fraud claims against Credit Suisse for inducing them to purchase – and none of the plaintiffs, save PIMCO, adduced evidence during discovery of a plan to sell notes. The court will therefore consider Credit Suisse's challenge to the holder claims and the accompanying evidence submitted in the reply brief.

Though Credit Suisse argues that a holder claim is not a valid theory of recovery, New York is one jurisdiction where such a theory is viable. Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F.Supp.2d 163, 204 (S.D.N.Y. 2006) ("New York recognizes a claim of fraud where investors were induced to retain securities in reliance on a defendant's misrepresentations."). Even so, holder claims are generally disfavored and recognized only in limited circumstances. See In re Worldcom Sec. Litig., 336 F.Supp.2d 310, 318-21 (S.D.N.Y. 2004) (explaining the policy reasons for why courts have severely limited or refused to recognize holder claims). "Because of the inherent difficulty of proving reliance and damages in such actions," the holder must prove "specific reliance" upon a "direct communication" from the defendant. Id. at 319-21 (imposing these limitations as a protection against "vague and "speculative" holder claims). A securities holder satisfies its burden by proving that it had a plan to sell the security but decided not to sell in reliance upon a misrepresentation directly communicated from the defendant. Id. at 321 (citing Gutman v. Howard Sav. Bank, 748 F.Supp. 254, 263 (D.N.J. 1990) and Small v. Fritz Companies, Inc., 65 P.3d 1255, 1265 (Cal. 2003)). Further, the holder must show that the defendant acted with intent to induce him not to sell. See In re Enron Corp.

60

Sec., Derivative & ERISA Litig., 761 F.Supp.2d 504, 538 (S.D. Tex. 2011) (noting that a plaintiff must prove reliance on a "direct communication aimed to stop [the] sale") (citing In re Worldcom Sec. Litig., 382 F.Supp.2d 549, 559 (S.D.N.Y. 2005)).

Putting aside PIMCO for the moment, plaintiffs fail to meet their burden on summary judgment. The record is devoid of evidence that plaintiffs had a plan to sell their notes in the wake of Fitch's downgrade. See Worldcom, 336 F.Supp.2d at 321 (noting that plaintiffs must demonstrate "a specific plan to sell their shares at a date certain") (internal quotation marks omitted); Enron, 761 F.Supp.2d at 538 (noting that a holder must prove "an existing and definite plan to sell that would have occurred in the absence of the false communication"). None have testified of being inclined to sell, let alone specified when, at what price, and how many notes they would have sold. See Worldcom, 336 F.Supp.2d at 321 (citing Small, 65 P.3d at 1265). Though it is a fair inference from their testimony that many of the plaintiffs were "concerned" by the downgrade, see, e.g., Az. Ex. 392, Kizner Dep. at 271 (Drake), there is no evidence that these plaintiffs made plans to sell. See, e.g., Az. Ex. 354, Glomski Dep. at 307 (Lincoln Capital, "I don't think that we were seriously considering selling the notes.").

Further, plaintiffs have not established specific reliance on a direct communication intended to stop them from selling their notes. Plaintiffs argue that the Market Tabs report is what convinced them to hold their notes, but this report was published to the market in general. See, e.g., Az. Ex. 24, Bemis Dep. at 348 (AmerUs, testifying of having pulled the report from Credit Suisse's website). The report cannot be characterized as a communication directed at plaintiffs and aimed to prevent them from selling notes.

Phoenix Life's holder claim is not based on the Market Tabs report, but on PPMs and Sales Points it received and two conversations with Fasanella. Still, there is no evidence that the PPMs and Sales Points were supplied in an effort to stop Phoenix Life from selling notes. Indeed, by Phoenix Life's own admission, it received the documents in connection with note purchases. See Az App'x at 44-46. Similarly, the first conversations with Fasanella took place in contemplation of a note purchase. See Az. Ex. 17, Rinaldi Dep. at 126-28 (testifying that he spoke to Fasanella well before Phoenix Life's first note purchase and again in immediate connection with it). Turning to the second conversation, which

concerned Fitch's rating action in 2002, Phoenix Life offers no evidence that it relied on that conversation in deciding to hold its notes. See id. at 128-30.

PIMCO has a somewhat different story. It did have a plan to sell, a plan made by analyst Stefanie Evans in July 2002 and emailed to other PIMCO employees shortly after the Fitch downgrade. See CS Ex. 173 at PMCo 091282. She expressed "concern" over the downgrade, particularly of the report that the default rate in the receivables pool had increased; however, her concern was somewhat offset by her belief that Fitch had "recently changed their rating methodology" in the healthcare receivables field to make it more difficult to obtain the highest credit rating. Id. Evans recommended a two-part approach: first, selling "longer dated holdings, those maturing after [February 3, 2003]"; and second, holding those notes that were set to mature before February 3, 2003. Id. At the time of the recommendation, PIMCO held $92 million in longer-dated NPF XII notes and $292 million in NPF XII notes that were set to mature by February 3, 2003. Id. Portfolio manager Dan Ivascyn accepted this recommendation and solicited bids for the longer-dated notes. See id. at PMCo 091281-82; Az. Ex. 16, Ivascyn Dep. at 177. PIMCO sold $80 million of those notes to Credit Suisse, but sold no other notes. See Az. Ex. 16, Ivascyn Dep. at 176.

Despite having proof of a plan to sell, PIMCO's holder claim still fails. With respect to the $12 million of longer-dated notes that PIMCO planned to sell but did not, it held those notes because it was unable to get a bid for them and not because Credit Suisse convinced it to hold them. See id. at PMCo 091280; Az. Ex. 16, Ivascyn Dep. at 177. With respect to the $292 million of shorter-dated notes that Evans recommended be held, PIMCO has not established that it ever had a plan to sell those notes, let alone showed that Credit Suisse caused it to refrain from carrying out that plan. Indeed Evans testified that her recommendation to hold the notes was not based on any assurances from Credit Suisse. See CS Reply Ex. 43, Evans Dep. at 188.

PIMCO argues that Ivascyn spoke to Fasanella about the downgrade before he decided to accept Evans's recommendation to hold. Even still, PIMCO has not established specific reliance on any statements by Fasanella. Ivascyn recalled that Fasanella was "very favorable" about the performance of the collateral and about the due diligence done on the NPF XII program, but he could not remember

62

any "specific conversations" with Fasanella.  Az. Ex. 16, Ivascyn Dep. at 168-69.  Ivascyn stated that the decision to hold was based on PIMCO's own analysis and that "the reason to hold was not based on the simple fact that [Credit Suisse] First Boston told us to hold them."  Id. at 170, 173.

Accordingly, Credit Suisse is entitled to summary judgment as to the holder claims asserted by Lloyds, AmerUs, the Arizona Treasurer, Drake, Lincoln Capital, MONY, Ofivalmo, United of Omaha, Phoenix Life, and PIMCO.

> **F.      Special Relationship for Negligent Misrepresentation Claim**

New York law requires a plaintiff asserting a claim for negligent misrepresentation to prove the existence of a "special relationship" that would support "imposing a duty on the defendant to impart correct information to the plaintiff."  MatlinPatterson, 929 N.Y.S.2d at 575.  "To establish liability for negligent misrepresentation arising out of a commercial transaction, a party must demonstrate that the person making the misrepresentation possessed specialized or unique experience, or the persons involved are in a special relationship of confidence and trust such that reliance on the negligent misrepresentation is justified."  Salesian Soc'y, Inc. v. Nutmeg Partners Ltd., 706 N.Y.S.2d 459, 461 (N.Y. App. Div. 2000).  This type of relationship requires more than commercial parties acting at arms' length in business transactions.  See Dobroski v. Bank of Am., N.A., 886 N.Y.S.2d 106, 109 (N.Y. App. Div. 2009); H & R Project Assocs. v. City of Syracuse, 737 N.Y.S.2d 712, 715 (N.Y. App. Div. 2001).

Credit Suisse argues that a special relationship could not have existed here because the parties were sophisticated financial institutions dealing at arms-length.  The court agrees and finds that as a matter of law the evidence does not support the conclusion that a special relationship of confidence and trust existed between Credit Suisse and any of the Noteholders.  Credit Suisse did not act as a broker, advisor, or agent on behalf of any of the Noteholders, each of whom are institutional investors with considerable assets.  In fact, the Noteholders either hired investment advisors or had their own professional asset managers to represent them in their dealings with Credit Suisse.  The Noteholders have failed to cite any applicable authority where a court has found that a special relationship existed in a

situation analogous to the circumstances here.[19]  On the other hand, substantial authority exists supporting a conclusion that a special relationship did not exist.  See, e.g., Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 158 (2d Cir. 1995) (dismissing claim for negligent misrepresentation under New York law because "[i]n the case of arm's length negotiations or transactions between sophisticated financial institutions, no extra-contractual duty of disclosure exists"); In re Enron Corp., 292 B.R. 752, 787-88 (Bankr. S.D.N.Y. 2003) (no fiduciary relationship exists between sophisticated financial institutions dealing at arm's length).

Accordingly, the motion for summary judgment is granted as to Noteholders' claims for negligent misrepresentation.

### G. Summary

The court therefore finds that, with limited exceptions, Credit Suisse's motion for summary judgment is denied as it relates to the § 10(b) and fraud claims of Lloyds and MetLife and the fraud claims of the Arizona Noteholders.  These limited exceptions are: Lloyds's tort claims relating to the Participation Agreement (precluded by the existence of a contract); certain Arizona Noteholders' fraud claims relating to road show presentations and joint meetings (no evidence of Credit Suisse having made a misrepresentation); and certain Noteholders' holder claims (no evidence of a plan to sell or of specific reliance).

Credit Suisse's motion for summary judgment is granted it relates to the Noteholders' negligent misrepresentation claims.

## VII. Blue Sky Law Claims

### A. Primary Liability

Many of the Noteholders who purchased notes from Credit Suisse have claims remaining under

---

[19]  Lloyds and MetLife emphasize that they had established relationships with Credit Suisse. See NJ Vespasiano Decl. at ¶ 16 (Lloyds); NJ Tau Decl. at ¶ 31 (MetLife).  Nonetheless, the fact that sophisticated parties have had prior dealings "does not elevate [an] arms-length transaction into a relationship of trust and confidence."  MBIA Ins. Corp. v. Royal Bank of Canada, No. 12238/09, 2010 WL 3294302, at *34 (N.Y. Sup. Ct. Aug. 19, 2010).

the securities laws of various states: MetLife (New Jersey), AmerUS (Iowa), the Arizona State Treasurer (Arizona), the Board of Trustees of the State of Indiana Public Employees' Retirement Fund (Indiana), GMO (Massachusetts), III Finance (Florida), Lincoln Capital (Illinois), Mellon Investor Services (New Jersey), the Metropolitan Government of Nashville and Davidson County (Tennessee), Phoenix Life Insurance (Connecticut), PIMCO (California), United of Omaha (Nebraska), and Wachovia (North Carolina).[20]

### 1. Substantive Elements are Satisfied

The state blue sky laws at issue here generally prohibit the use of misrepresentations or material omissions in connection with the sale of securities. See, e.g., Ariz. Rev. Stat. Ann. § 44-1991(A); N.J. Stat. Ann. § 49:3-71(a). Against these claims, Credit Suisse makes the same arguments that it made against the § 10(b) and fraud claims – that it made no material misrepresentations and did not act with scienter, and that the Noteholders cannot prove justifiable reliance and loss causation. As discussed in Part VI, these arguments are not persuasive.

Moreover, certain blue sky laws do not require the plaintiff to prove scienter. They place the burden upon the defendant to establish lack of knowledge as an affirmative defense. See, e.g., Cal. Corp. Code § 25501; N.C. Gen. Stat. § 78A-56(a)(2). Credit Suisse has not satisfied this burden on summary judgment. Further, Credit Suisse concedes that several state laws do not require reliance (see Ariz. Rev. Stat. Ann. § 44-1991; Cal. Corp. Code § 25501; Conn. Gen. Stat. § 36b-29; Mass. Gen. Laws, ch. 110A, § 410; N.J. Stat. Ann. § 49:3-71), and most do not require loss causation (see Conn. Gen. Stat. § 36b-29; Fla. Stat. § 517.301; 815 Ill. Comp. Stat. § 5/12; Mass. Gen. Laws, ch. 110A, § 410; Neb. Rev. Stat. § 8-1102; N.J. Stat. Ann. § 49:3-71; N.C. Gen. Stat. § 78A-56; Tenn. Code Ann. § 48-2-121).

### 2. State of Domicile

Three of the Noteholders have asserted blue sky law claims under the law of the state in which

---

[20] Some of the Noteholders' blue sky law claims were dismissed in earlier orders. See In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 755 F.Supp.2d 857, 888 (S.D. Ohio 2010) (granting summary judgment to Credit Suisse as to all of the Ohio blue sky law claims); In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 541 F.Supp.2d 986, 1019-20 (S.D. Ohio 2007) (dismissing a handful of blue sky law claims on various technical grounds). Plaintiff Bristol has since withdrawn its Kentucky blue sky law claim. See Az. Opp'n Brief at 190-91.

they are domiciled, even though they made their purchases through an advisor located in another state. Plaintiff Mellon of New Jersey invested through Dreyfus in New York. Plaintiffs the Board of Trustees of the State of Indiana Public Employees' Retirement Fund (the "Indiana Retirement Fund") and the Metropolitan Government of Nashville and Davidson County (the "Nashville Government") invested through Lincoln Capital in Illinois.

Credit Suisse argues that these plaintiffs' domicile-based claims fail because the respective blue sky laws do not apply unless an offer or sale is made within the state. Plaintiffs respond that it is absurd and unfair that a defrauded buyer would not be able to invoke the blue sky law of its own state.

Credit Suisse has the better of this argument. The New Jersey, Indiana, and Tennessee statutes limit their scope to offers to sell and offers to buy that are made or accepted "in this state." See N.J. Stat. Ann. § 49:3-51; Tenn. Code Ann. § 48-2-121(a); Pippenger v. McQuik's Oilube, Inc., 854 F.Supp. 1411, 1426 (S.D. Ind. 1994) (interpreting Ind. Code § 23-2-1-12 to apply to "the sale of securities in this state").[21] It is undisputed that the transactions here took place between a seller in New York and buyers in Illinois and New York. Plaintiffs have submitted no evidence that they had any contact with Credit Suisse. See N.J. Stat. Ann. § 49:3-51(c) (offers to sell are considered to be made in New Jersey if it is directed by the offeror to a buyer in New Jersey).

The evidence does not support plaintiffs' argument that it is unfair they cannot assert claims under the blue sky laws of their states of domicile. They chose to have investment advisors act on their behalf, and plaintiffs' own rendition of the facts demonstrates that Credit Suisse dealt only with Lincoln Capital and Dreyfus, not with the individual plaintiffs. See Az. App'x at 27-29. Moreover, in advancing their fraud claims against Credit Suisse in this litigation, plaintiffs have relied entirely on the actions of their investment advisors to support the elements of the claim. To show that Credit Suisse made a misrepresentation to them, plaintiffs point to the written materials that their advisors received in New York and Illinois and to the direct contacts their advisors in those states had with Credit Suisse.

---

[21] Indiana amended its blue sky law several years after the Noteholders filed suit. The law in effect at the time the litigation was commenced still governs. See Ind. Code § 23-19-1-0.2(a) (stating that the predecessor act governs all actions pending as of the new act's effective date).

Similarly, to satisfy the elements of materiality, justifiable reliance, and loss causation, plaintiffs point to the testimony of their advisors concerning their decision-making processes in New York and Illinois to buy the NPF notes. In other words, there is no evidence that anyone from Mellon, the Indiana Retirement Fund, or the Nashville Government had any contact with Credit Suisse or ever read the materials from Credit Suisse. The evidence thus demonstrates that the securities transactions between Credit Suisse and the investment advisors had no territorial nexus to New Jersey, Indiana, or Tennessee. See Bramblewood Investors, Ltd. v. C&G Assocs., 619 A.2d 1332, 1336-37 (N.J. Super. Ct. Law Div. 1992) (granting summary judgment against New Jersey investors' claim under New Jersey blue sky law because the offer was made and accepted in North Carolina). This result is not unfair considering that plaintiffs made a deliberate choice to act through out-of-state advisors and considering that they have other available avenues for recovery. See 12 Joseph C. Long, Blue Sky Law § 4:2 (2011) ("[T]he drafters of the Uniform Act consciously rejected citizenship or residence within a particular state as the policy base for application of the Uniform Act.").

Accordingly, Credit Suisse is entitled to summary judgment on the primary liability (as well as secondary liability) blue sky law claims brought by Mellon under New Jersey law, the Indiana Retirement Fund under Indiana law, and Nashville Government under Tennessee blue sky law.

### 3. The Arizona State Treasurer

The Arizona State Treasurer has brought claims under Arizona blue sky law on behalf of 109 local governmental entities in Arizona. Credit Suisse, who sold the notes from New York, argues that these claims cannot be sustained because the statute does not apply unless the entire transaction took place "within" Arizona. The Treasurer responds that Credit Suisse's argument is based on a misreading of the statute, which applies to "a transaction or transactions *within* or *from* this state involving an offer to sell or buy securities, or a sale or purchase of securities." Ariz. Rev. Stat. Ann. § 44-1991(A) (emphasis added). The court agrees with the Treasurer's position.

Credit Suisse is correct that the word "within" denotes "a transaction which occurs entirely inside the state." Chrysler Capital Corp. v. Century Power Corp., 800 F.Supp. 1189, 1191 (S.D.N.Y. 1992) (interpreting the Arizona statute). However, the rest of the statute plainly applies to an offer to sell or

buy or to a sale or purchase made "from" Arizona.  Id. ("[T]he words 'from this state' must apply to transactions which do not occur entirely inside Arizona.").  As the Treasurer states, Credit Suisse is unable to cite to any authority holding that the statute does not apply to a transaction where the purchase was made from Arizona.  And as the Treasurer further observes, the Arizona act "'shall not be given a narrow or restricted interpretation or construction, but shall be liberally construed as a remedial measure in order not to defeat the purpose thereof.'"  Siporin v. Carrington, 23 P.3d 92, 95 (Ariz. Ct. App. 2001) (quoting 1951 Ariz. Sess. Laws ch. 18, § 20).  The court's interpretation of the Arizona act is in keeping with the well-accepted rule that the law of more than one state can apply to a securities transaction so long as each state has a territorial nexus to the transaction.  See A.S. Goldmen & Co., Inc. v. New Jersey Bureau of Sec., 163 F.3d 780, 787 (3d Cir. 1999) ("[W]hen an offer is made in one state and accepted in another, we now recognize that elements of the transaction have occurred in each state, and that both states have an interest in regulating the terms and performance of the contract.").

**B.**     **Secondary Liability**

The blue sky laws at issue in this case extend liability to persons who participate in or aid the unlawful sale of securities.  See Ariz. Rev. Stat. Ann. § 44-2003(A) (imposing liability on those who "made, participated in or induced the unlawful sale"); Cal. Corp. Code § 25504 ("materially aids"); Conn. Gen. Stat. § 36b-29(a)(2) ("materially assists"); Fla. Stat. § 517.211(1) ("participated in or aided"); 815 Ill. Comp. Stat. § 5/13(A) ("participated in or aided in any way"); Iowa Code § 502.509(7)(d) ("materially aids"); Mass. Gen. Laws, ch. 110A, § 410(b) ("materially aids"); Neb. Rev. Stat. § 8-1118(3) ("materially aids"); N.J. Stat. Ann. § 49:3-71(d) ("materially aids"); N.C. Gen. Stat. § 78A-56(c)(2) ("materially aids").

In some cases, secondary liability is limited to a control person, broker-dealer, or agent who materially aids in the primary violation.  See Cal. Corp. Code § 25504; 815 Ill. Comp. Stat. § 5/13(A); N.J. Stat. Ann. § 49:3-71(d).

**1.**     **Definitional Objection**

Credit Suisse contends that, as the seller of the notes, it cannot be secondarily liable under the blue sky statutes because it could not have both made the sales and aided the sales.  To use Credit Suisse's words, "secondary liability cannot exist by definition because it is impossible for Credit Suisse

to aid itself."  CS MSJ at 140.

On one level, this argument makes good sense – a person cannot simultaneously be the primary violator as well as a secondary actor in a particular transaction.  But given the breadth of the blue sky laws, there is no reason why the Noteholders should be precluded from taking both types of claims to the jury and letting the jury decide which role, if either, the evidence proves Credit Suisse played.  Credit Suisse's premise that only it could possibly be the primary violator is flawed.  The blue sky laws are expansive enough to include NPF VI and NPF XII as primary violators.  See, e.g., Ariz. Rev. Stat. Ann. § 44-1991(A)(1) (primary violator can be any person who employs a scheme to defraud in connection with the sale of securities); N.J. Stat. Ann. § 49:3-52(a) (same).  Based on the evidence of record, a jury could reasonably find that National Century or one of the note programs was the primary violator and that Credit Suisse was a secondary actor in its role as placement agent.

## 2.  Material Aid

If National Century is determined to be the primary violator, then a jury could readily find that Credit Suisse provided material aid or assistance in the unlawful sales.  Establishing that the act of assistance was material can be satisfied by showing, among other things, the act influenced or induced the decision to purchase.  See Ariz. Rev. Stat. Ann. § 44-2003(A); Connecticut Nat'l Bank v. Giacomi, 699 A.2d 101, 122 (Conn. 1997); Venturtech II v. Deloitte Haskins & Sells, 790 F.Supp. 576, 589 (E.D.N.C. 1992).  The Noteholders have put forth substantial evidence showing that Credit Suisse disseminated the PPMs, marketed the notes, and induced the sales in its role as National Century's placement agent.  See Az. App'x at 1-49 (detailing Credit Suisse's marketing efforts directed at the Arizona Noteholders); NJ Opp'n Brief at 106-124 (detailing Credit Suisse's marketing efforts directed at Lloyds and MetLife); Az. Ex. 199 at 2 (letter agreement in which National Century appointed Credit Suisse as its "agent and financial advisor in connection with the marketing" of NPF note offerings); CS Ex. 35 (purchase and agency agreement).  These actions readily satisfy the element of material aid or assistance.

## 3.  Knowledge

The secondary liability provisions of the blue sky laws either have a knowledge requirement or

a lack-of-knowledge defense. See, e.g., Cal. Corp. Code § 25504; Iowa Code § 502.509(7)(d); Neb. Rev. Stat. § 8-1118(3). For reasons already explained, the Noteholders have submitted sufficient evidence to create a genuine issue of fact regarding Credit Suisse's knowledge.

Accordingly, Credit Suisse's motion for summary judgment as it pertains to secondary liability claims under the blue sky laws is denied, except with respect to the domicile-based claims discussed in Part VII.A.2 above.

## VIII.  GMO's Claim under the Massachusetts Unfair Trade Practices Statute

GMO has brought a claim against Credit Suisse for violating the Massachusetts Unfair Trade Practices Statute, under which persons who engage "in any trade or commerce" are prohibited from the use of "an unfair method of competition or an unfair or deceptive act or practice." Mass. Gen. Laws, ch. 93A, § 11. Credit Suisse argues that this claim fails because the relevant conduct took place outside of Massachusetts and because its conduct does not rise to the level of egregiousness courts have required to prove a violation of the law. See Daley v. Twin Disc, Inc., 440 F.Supp.2d 48, 53 (D. Mass. 2006).

The unfair trade practices law applies when "the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 781 N.E.2d 787, 799 (Mass. 2003). This analysis is not based on a fixed set of factors, but upon the particular facts the court finds relevant after examining the entire context of the claim. Id.; RGJ Associates, Inc. v. Stainsafe, Inc., 338 F.Supp.2d 215, 233-34 (D. Mass. 2004) (noting that "'the source" of the wrongful conduct, where the misconduct was received, and where it was 'acted on'" are all permissible considerations in the "center of gravity" determination). The defendant bears the burden of showing that the conduct did not occur primarily and substantially in Massachusetts. Mass. Gen. Laws, ch. 93A, § 11.

GMO's unfair trade practices claim mirrors its common law fraud claim in that the alleged actionable conduct is Credit Suisse's use of misrepresentations to induce GMO to purchase notes. The evidence shows that Credit Suisse's New York staff supplied PPMs and made phone calls to GMO's Boston staff. See Az. Ex. 316, Braggs Dep. at 172-73, 257-58; Az. Exs. 317, 318. In similar cases, courts

have found that Massachusetts is not the center of gravity when deceptive communications are simply received in Massachusetts, without more.  See Ezenia! Inc. v. Datacraft Mexico, S.A., Nos. 033390, 86763, 2004 WL 3091658, at * 3 (Mass. Super. Ct. Nov. 23, 2004); BT Triple Crown Merger Co., Inc. v. Citigroup Global Markets Inc., No. 600899/08,  2008 WL 1970900, at *7 (N.Y. App. Div. May 7, 2008) (applying the Massachusetts statute in holding that "[a] plaintiff's receipt of deceptive communications from parties located outside the state does not fulfill that requirement.").  See also Boston Hides & Furs, Ltd. v. Sumitomo Bank, Ltd., 870 F.Supp. 1153, 1166 (D. Mass. 1994) (noting that Massachusetts courts have rejected their initial approach of focusing on the "place of injury" in favor of an approach focusing on the "place of conduct").

Here, the court finds that Credit Suisse has met its burden of showing that the relevant conduct did not occur primarily and substantially in Massachusetts.  Credit Suisse committed its allegedly deceptive conduct in New York.  Though GMO argues that Credit Suisse's Fasanella was present when Lance Poulsen visited GMO in Boston in May 2001, GMO cannot identify any misrepresentation that he made while in Boston. See Az. Ex. 316, Braggs Dep. at 154-55, 183-88.  This contact should not be considered. See RGJ Associates at 234 ("[T]he analysis examines the actionable conduct as opposed to the benign conduct on the part of the alleged wrongdoer.  Contacts with Massachusetts that were neither unfair nor deceptive do not play a part in assessing whether the misconduct occurred primarily and substantially in Massachusetts.").  Thus, the events giving rise to GMO's claim occurred largely outside of Massachusetts.  Even though a component of the conduct was received by GMO in Massachusetts, it cannot be said that the conduct occurred "primarily" in that state or that Massachusetts was the "center of gravity" of the conduct.

Accordingly, Credit Suisse is granted summary judgment on GMO's claim under the Massachusetts Unfair Trade Practices Statute.

## IX.    The Arizona Noteholders' Other Common Law Claims

### A.    Aiding and Abetting Fraud

Under New York law a claim for aiding and abetting fraud requires (1) the existence of a

fraudulent scheme, (2) the defendant's actual knowledge of the fraud, and (3) the defendant's substantial assistance to the fraudulent scheme. Oster v. Kirschner, 905 N.Y.S.2d 69, 72 (N.Y. App. Div. 2010); see also Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292 (2d Cir. 2006). "A claim for aiding and abetting fraud must be proved by clear and convincing evidence." de Abreu v. Bank of Am. Corp., __ F.Supp.2d __, 2011 WL 2652188, at *4 (S.D.N.Y. 2011). Evidence of constructive knowledge is not enough; the plaintiff must demonstrate actual knowledge of the fraud. Id.

It is undisputed that National Century conducted a fraudulent scheme, and the court finds that the Arizona Noteholders have met their burden at summary judgment of submitting clear and convincing evidence of Credit Suisse's actual knowledge of the fraud. The Arizona Noteholders have submitted evidence establishing that Credit Suisse knew of each material aspect of National Century's fraud. See, e.g., Az. Exs. 130 and 262 (ineligible receivables); Az. Exs. 120, 128, 141 (misuse of reserve funds); Az. Exs. 175 and 188 (reserve account shortages); Az. Exs. 85 and 230 (related party transactions); Az. Exs. 135 and 260 (manipulation of receivables default rate).

Credit Suisse argues that it did not substantially assist National Century's fraud. Substantial assistance exists "where (1) a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed, and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." Stanfield Offshore Leveraged Assets, Ltd. v. Metropolitan Life Ins. Co., 883 N.Y.S.2d 486, 489 (N.Y. App. Div. 2009); McDaniel v. Bear Stearns & Co., Inc., 196 F.Supp.2d 343, 352 (S.D.N.Y. 2002 ).

Credit Suisse contends that it performed "routine banking functions" for National Century. It cites several cases in support of this proposition, all of them distinguishable from the case at hand. In Rosner v. Bank of China, 528 F.Supp.2d 419, 427 (S.D.N.Y. 2007), the court held that the defendant bank did not provide substantial assistance because it did nothing more than follow routine instructions in executing wire transfers of investors' funds. In both Greenberg v. Bear, Stearns & Co., Inc., 220 F.3d 22, 29 (2d Cir. 2000) and Fezzani v. Bear, Stearns & Co., Inc., 592 F. Supp.2d 410, 426 (S.D.N.Y. 2008), the courts held that the defendants did not provide substantial assistance by merely performing ordinary clearing services to a primary broker. See also McDaniel, 196 F.Supp.2d at 352 (noting the "clearing

firm" exception to aiding and abetting liability).

The assistance Credit Suisse provided to National Century was more than "ministerial." Id. (aiding and abetting liability arises when the defendant "becomes actively and directly involved" in the fraud). Credit Suisse went well beyond simply clearing sales transactions – it served as the primary marketer and solicitor of the NPF notes. Credit Suisse targeted potential investors, disseminated offering materials and other sales literature, made sales calls, and arranged for interested investors to meet with National Century. In addition, it actively attempted to allay investor's fears in July 2002 after Fitch downgraded NPF notes. See CS. Ex. 257 at 4 (reporting to investors that the note programs had "no significantly increasing receivables aging," "no significant seller overconcentrations," and "no significant material deterioration in collateral performance," and that it was a good time to "add or initiate exposure to NPF healthcare ABS"). And Credit Suisse twice made short-term loans, see Az. Exs. 142, 145, 181, 189, that were used to keep the NPF programs afloat during liquidity crises and avert events of default that would have revealed the fraud. See Aetna Cas. and Sur. Co. v. Leahey Constr. Co., 219 F.3d 519, 537 (6th Cir. 2000) (holding that a bank had provided substantial assistance by extending a short-term loan which allowed the primary wrongdoer to inflate his assets and induce an insurance company to bond his construction projects). Credit Suisse further assisted National Century in hiding the fraud by misrepresenting to Fitch and Moody's that National Century had kept reserve levels in compliance with the Indentures. See, e.g., Az. Exs. 44, 221 (Credit Suisse's misrepresentations to Fitch); Az. Ex. 14, Caldwell Dep. at 138, 158-60, 184-86, 251-52, 264-65 (Credit Suisse's misrepresentations to Moody's); see also Tindle v. Birkett, 64 N.E. 210, 211 (N.Y. 1902) (permitting recovery against defendant who misrepresented his firm's financial condition to a rating agency, on whose rating plaintiffs relied in extending credit to the firm); Restatement (Second) of Torts § 533 cmt. f (creating liability for misrepresentations communicated through a third party, including when a misrepresentation is reflected in a rating assigned by a credit rating agency).

In short, the Noteholders have submitted sufficient evidence from which a jury could reasonably conclude that Credit Suisse's assistance was critical to the success of National Century's fraudulent scheme and a proximate cause of the Noteholders' injury. Thus, Credit Suisse's motion for summary

judgment is denied as to the Arizona Noteholders' claims for aiding and abetting fraud.

**B.     Aiding and Abetting Breach of Fiduciary Duty**

A claim for aiding and abetting breach of fiduciary duty has the following elements: "(1) a breach by a fiduciary of obligations to another, (2) that the defendant[s] knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." Kaufman v. Cohen, 760 N.Y.S.2d 157, 169 (N.Y. App. Div. 2003). The Arizona Noteholders allege that National Century's officers owed a fiduciary duty to creditors not to waste corporate assets while the company was insolvent or near the brink of insolvency. They further allege that the company's officers breached this duty by transferring corporate assets, often to related parties, in exchange for receivables of little or no value and that Credit Suisse knowingly assisted the breach by defrauding investors and extending short-term loans to the company.

**1.     Existence of a Fiduciary Duty**

Credit Suisse argues that National Century's officers did not owe a fiduciary duty to the company's creditors. On this issue, both sides agree that Ohio law applies. In an earlier order on a motion to dismiss, the court noted that defendant Lance Poulsen had not contested that he owed a fiduciary duty to creditors not to waste corporate assets while the company was in the zone of insolvency. In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., No. 03-md-1565, 2006 WL 469468, at *12 (S.D. Ohio Feb. 27, 2006) (citing DeNune v. Consolidated Capital of North America, Inc. 288 F.Supp.2d 844, 859 (N.D. Ohio 2003)). In DeNune, the court briefly stated that such a duty existed and cited Thomas v. Matthews, 113 N.E. 669 (Ohio 1916), as support for that proposition. The Arizona Noteholders urge the court to continue to accept DeNune as the rule.

However, since this court issued its unpublished decision in which the issue was not contested, another court held in a well-reasoned opinion that Ohio law does not recognize a fiduciary duty owed by corporate officers and directors to creditors. In re Amcast Indus. Corp., 365 B.R. 91 (Bankr. S.D. Ohio 2007), the court began its inquiry with the Ohio Revised Code's provisions regarding the authority and duties of corporate directors. See Ohio Rev. Code §§ 1701.33, 1701.59, 1701.95. None of these provisions impose a fiduciary duty to creditors. In fact, § 1701.59(E) "codifies the general rule that

corporate directors owe their fiduciary obligation directly to the corporation and its shareholders, not to any creditors of the corporation." Amcast, 365 B.R. at 104. The court then thoroughly examined Matthews and found that it did not support the broad proposition for which DeNune cited it. Rather, the holding in Matthews was that directors of an insolvent corporation could not transfer corporate assets to stockholders in the form of dividends. The court in Amcast explained as follows:

> [O]utside of this limited duty to cease dividend payments, there is nothing in the Matthews case that suggests to this court that a director's duty to creditors upon insolvency expands to the same fiduciary obligations that a director owes to the corporation itself. All other discussions in the Matthews decision of a director's duty to hold assets in "trust" and conserve them for payment of debts is limited to when a dissolution proceeding is pending rather than upon insolvency. Matthews, 113 N.E. at 673. Indeed, to read Matthews more expansively to require directors to hold assets in trust and distribute them to creditors upon insolvency would, in essence, require an insolvent company to immediately cease operations and liquidate. Such a reading is not only contrary to the plain language of Ohio Rev. Code § 1701.59(E), but also runs afoul of general corporate law principles which allow an insolvent company to continue to operate with aspirations of turning a profit.

Amcast, 365 B.R. at 107 (footnote omitted).

The court in Amcast noted how the Ohio legislature had codified the holding in Matthews. Section 1701.33(C) prohibits directors from distributing dividends when a company is insolvent. But the legislature stopped short of creating further duties to creditors:

> The plain language of Ohio Rev. Code § 1701.59(E) clarifies that a director has discretion to consider many constituencies of the corporate enterprise, including creditors, when making corporate decisions. However, a director has no distinct legal obligation directly to creditors, separate from the corporate entity as a whole, even when a corporation has reached the point of insolvency. The court concludes that while a company operates outside a pending dissolution, receivership, bankruptcy, or similar formal insolvency proceeding the directors' fiduciary obligations remain to the corporation and its shareholders and they are under no obligation to treat the corporate assets as a "trust" that must be liquidated on behalf of creditors. The court concurs with the analysis in [Official Comm. of Unsecured Creditors of PHD, Inc. v. Bank One, No. 1:03-cv-2466, 2004 WL 3721325, at *5 (N.D. Ohio April 23, 2004)] that the explicit language of Ohio Rev. Code § 1701.59(E) forecloses any claim against a director for breach of a fiduciary duty directly to creditors upon insolvency.

Amcast, 365 B.R. at 110 (footnote omitted).

This court concurs with the analysis in Amcast and finds that corporate officers and directors in

Ohio do not owe a general fiduciary duty to the company's creditors while the company is insolvent or in the zone of insolvency. Since the decision in DeNune, that court has twice issued decisions which have departed from its holding. See Official Comm. of Unsecured Creditors of PHD, 2004 WL 3721325, at *5 ("In short, Ohio Rev. Code § 1701.59(E) forecloses the Committee's claims that PHD's directors had a legal duty to consider the interests of creditors in carrying out their duties for the corporation."); Washington Penn Plastic Co., Inc. v. Creative Engineered Polymer Products, LLC, No. 5:06-cv-1224, 2007 WL 2509873, at *3 (N.D. Ohio Aug. 30, 2007) (noting that DeNune had failed to account for § 1701.59(E) and stating that the court was "persuaded" by the Amcast opinion). Further, Amcast is supported by Delaware law on this issue:

> Recognizing that directors of an insolvent corporation owe direct fiduciary duties to creditors, would create uncertainty for directors who have a fiduciary duty to exercise their business judgment in the best interest of the insolvent corporation. To recognize a new right for creditors to bring direct fiduciary claims against those directors would create a conflict between those directors' duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it, and the newly recognized direct fiduciary duty to individual creditors. Directors of insolvent corporations must retain the freedom to engage in vigorous, good faith negotiations with individual creditors for the benefit of the corporation. Accordingly, we hold that individual creditors of an insolvent corporation have no right to assert direct claims for breach of fiduciary duty against corporate directors.

North Am. Catholic Educ. Programming Found., Inc. v. Gheewalla, 930 A.2d 92, 103 (Del. 2007) (footnote omitted).

### 2. Breach by the Trustees

The Arizona Noteholders argue that if their aiding and abetting claim cannot rest on a fiduciary duty owed by National Century's officers to the creditors, then it rests on a fiduciary duty owed by the Indenture Trustees to the creditors. The Arizona Noteholders contend that Trustees JPMorgan and Bank One had fiduciary duties to declare events of default for the NPF note programs whenever a material breach of the Indentures occurred. The Trustees breached this duty, the Arizona Noteholders contend, by failing to declare events of default when program reserves dropped below the required levels and when reserve funds were improperly withdrawn.

It is true that the Trustees owed fiduciary duties to the noteholders, as provided in the Master

Indentures.  See, e.g., CS Ex. 11 at § 8.01 (describing the Trustee's duties, including declaring an event of default when a material breach of the Indenture occurred).  But the Trustees did not breach this duty unless they had "actual knowledge" of an event of default and still failed to declare the default.  Id. at § 8.01(a).  The Arizona Noteholders have not submitted any evidence establishing if and when the Trustees had actual knowledge of the occurrence or possible occurrence of an event of default.[22] Moreover, as Credit Suisse correctly argues, the Arizona Noteholders have not explained, let alone submitted evidence to support, how Credit Suisse participated in the Trustees' alleged breaches.  The Arizona Noteholders merely point to how Credit Suisse generally aided National Century in defrauding investors and have failed to identify what actions Credit Suisse took in particular to aid the Trustees in deciding not to declare an event of default.

Accordingly, the motion for summary judgment is granted as to the Arizona Noteholders' claims for aiding and abetting a breach of fiduciary duty.

### C.    Conspiracy

The Arizona Noteholders allege that Credit Suisse conspired with National Century to defraud investors.  New York does not recognize civil conspiracy as an independent cause of action.  See Abacus Fed. Sav. Bank v. Lim, 905 N.Y.S.2d 585, 588 (N.Y. App. Div. 2010).  A plaintiff may nonetheless advance a theory of civil conspiracy in order to connect the actions of a defendant to the actions of another party (here, National Century) in committing an otherwise actionable tort.  Id. Thus, to establish a claim of civil conspiracy under New York law, a plaintiff "must demonstrate the primary tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury."  Id. (Internal quotations marks and citations omitted); Eaves v. Designs for Finance, Inc., 785 F.Supp.2d 229, 257 (S.D.N.Y. 2011).  Credit Suisse does not dispute the

---

[22]  The Arizona Noteholders refer to a particular section of their Statement of Facts as supporting the proposition that the Trustees failed to declare an event of default despite knowing the Indentures had been violated.  See Az. Opp'n Brief at 161 (citing Az. SOF at § III.C.2).  Even so, this section – entitled "NCFE Routinely Failed to Maintain Reserve Accounts at Required Levels and Concealed This Fact" – does not discuss or present evidence of the Trustees' knowledge.

occurrence of a primary tort by National Century.

### 1.    An Agreement

A conspiracy requires an agreement between two or more parties to accomplish an unlawful purpose.  As is the case here, a formal agreement often does not exist.  See Borden, Inc. v. Spoor Behrins Campbell & Young, Inc., 828 F.Supp. 216, 225 (S.D.N.Y. 1993) ("[D]irect proof of a conspiracy is seldom available, and therefore an illicit agreement may be shown via circumstantial evidence."); Miltland Raleigh-Durham v. Myers, 807 F.Supp 1025, 1053 (S.D.N.Y. 1992) (same).  "Proof of tacit, as opposed to explicit, understanding is sufficient to show agreement, and among the factors a fact finder may consider in inferring a conspiracy are the relationship of the parties, proximity in time and place of the acts, and the duration of the actors' joint activity."  Borden, 828 F.Supp. at 225 (citations omitted).

Credit Suisse argues that the allegations of a common design are unsupported and implausible. National Century's fraud began no later than 1995, see U.S. v. Poulsen, 568 F.Supp.2d 885, 897 (S.D. Ohio 2008), and Credit Suisse contends that the members of its Asset Finance Group – Clark, Donovan, and Fasanella, to whom the bulk of the evidence regarding knowledge relates – were not employed by Credit Suisse until several years later.  See CS Ex. 285 at (Fasanella began employment in 1998); Az. Exs. 65 at 4, 105 at 3 (Clark and Donovan began in 2000).  However, that Fasanella, Clark, and Donovan were latecomers to the scheme does not mean they could not have joined in the conspiratorial objective.  If the latecomers obtained knowledge of the scheme, tacitly agreed to it, and committed an overt act in furtherance of the plan, then Credit Suisse is liable at a minimum for the injury done by the conspiracy after they joined.  See Borden, 828 F.Supp. at 223; In re Processed Egg Products Antitrust Litig., __ F.Supp.2d __, 2011 WL 4465355, at *23 n. 33 (E.D. Pa. 2011) (noting the uncertainty in case law as to whether latecomers in a civil conspiracy can be held liable for acts committed prior to their joinder); Macomber v. Travelers Property and Cas. Corp., 894 A.2d 240, 255 (Conn. 2006) (rejecting latecomer liability for injury caused by civil conspiracy before joinder).  Here, all of the Arizona Noteholders' note purchases took place after Fasanella joined Credit Suisse.  See CS Ex. 285 at 3 (Fasanella began in June 1998); CS Ex. 191 at 7(the earliest note purchase by one of the Arizona Noteholders was August 1998).

The court finds that there is sufficient evidence from which a jury could reasonably conclude that

Credit Suisse's representatives understood National Century's fraudulent scheme and tacitly agreed to join the plan. Again, the Arizona Noteholders have submitted evidence that the members of Credit Suisse's Asset Finance Group had actual knowledge of each material aspect of National Century's fraud. See, e.g., Az. Exs. 130 and 262 (ineligible receivables); Az. Exs. 120, 128, 141 (misuse of reserve funds); Az. Exs. 175 and 188 (reserve account shortages); Az. Exs. 85 and 230 (related party transactions); Az. Exs. 135 and 260 (manipulation of receivables default rate). That any given individual among Fasanella, Clark, and Donovan did not have full knowledge of every detail of how National Century conducted the fraud is not fatal to the conspiracy claim. Borden, 828 F.Supp. at 225 ("plaintiffs need not show that each conspirator agreed to every detail of the conspiracy but only that each agreed on the 'essential nature of the plan.'").

Despite receiving this knowledge, the Asset Finance Group continued to work with National Century to bring its notes to market. Indeed, over time – and as Credit Suisse gained more knowledge of the fraud – Credit Suisse increased its involvement in National Century. In August 2000, Credit Suisse committed to serve as the sole lead in placing NPF notes. See Az. Ex. 199 (agreement signed by Clark and Poulsen). The dollar amount of note issuances took a general upswing as Credit Suisse took over as placement agent. See CS Ex. 10. Credit Suisse arranged and attended road show presentations and meetings in which Poulsen lied to investors. See, e.g., Az. Opp'n Brief at 166-67 n.255 and n.256 (citing a multitude of evidentiary sources concerning Credit Suisse's attendance at meetings between National Century and investors). It misrepresented to the ratings agencies that the reserve accounts were not depleted. See Az. Ex. 14, Caldwell Dep. at 138, 158-60, 184-86, 252-52, 264-65; Az Exs. 44. 221. And in 2002 after Fitch had downgraded the NPF notes, Credit Suisse came to National Century's defense in a report that disclaimed any cause for concern and encouraged investors to "add or initiate exposure to NPF healthcare ABS." CS. Ex. 257 at 4. See Eaves v. Designs for Fin., Inc., 785 F.Supp.2d 229, 257-58 (S.D.N.Y. 2011) (finding that allegation of an agreement was sufficiently supported because the co-conspirator agreed to give legitimacy to a scheme by "falsely endorsing" a tax plan that otherwise would have been rejected).

Perhaps the most compelling evidence of a common conspiratorial design relates to Credit

Suisse's provision of short-term credit that kept the scheme financially afloat and beyond detection. In July 2000, Poulsen openly told Fasanella, Clark, and Donovan that National Century had "internally produced cash by moving Seller's between programs." Az. Ex. 175. An ensuing fax from National Century to Fasanella indicated a vast shortfall in reserves, see Az. Ex. 157, and Credit Suisse then was provided with a chart that laid bare National Century's practice of improper transfers between note programs to cover shortfalls on monthly determination dates. See Az. Ex. 188. Internal emails among Credit Suisse's Asset Finance Group showed their understanding of the seriousness of National Century's "cash crunch." See Az. Exs. 120, 128. Notwithstanding, Credit Suisse provided National Century with a $20 million extension of credit, which took the form of increasing its commitment in the NPF-WL facility when another lender refused to continue to lend to National Century. See Az. Exs. 179, 181. With National Century still short on cash and unable to meet upcoming reserve tests, Credit Suisse granted a two-week extension on the loan until the reserve tests were completed. See Az. Exs. 55, 59, 189 (emails among Fasanella, Clark, and Donovan regarding the loan extension). Credit Suisse received a $100,000 fee for the two-week extension. See Az. Ex. 189.

In August 2002, National Century was again confronted with a severe cash shortage and looming reserve tests. Donovan approached Credit Suisse's Credit Risk Management unit to obtain a $75 million loan to "enable [National Century] to meet its month-end cash reserve requirement." Az. Ex. 142 at 1. Without the interim funding, Donovan believed National Century "would be placed in termination and that if not properly managed, could get out of control." Id.; see also Az. Ex. 146 at 1 (Fasanella stating that the loan was needed to "tide the company over until the next term deal"). Credit Suisse then decided to extend the loan, with the expectation of receiving $1 million above its usual fees. See Az. Exs. 145, 146, 147. See Borden, 828 F.Supp. at 226-27 (fact finder could conclude that conspiracy existed where defendant took steps to conceal co-conspirator's fraud).

Despite the large volume of evidence submitted in this case, Credit Suisse has not pointed to even one example in which it opposed, stood in the way of, or truly detracted from, anything National

Century wanted to accomplish.[23]  Consider, for example, Credit Suisse's response to the May 2000 report of anonymous allegations that National Century was fraudulently "purchasing" non-existent receivables and that 50% of its portfolio was worthless.  See Az. Ex. 83.  Credit Suisse never demanded a forensic audit of National Century but was content to accept a less rigorous review conducted by Fitch, which found the allegations to be "without merit."  CS Ex. 175 at FITCH-MDL 00047231.  Consider also Credit Suisse's failure to act in the face of GMAC's accusations that National Century was misusing reserve funds to buy receivables.  See Az. Ex. 121.  Rather than press the issue with National Century, Credit Suisse instead sided with National Century's characterization of the alleged draw on reserve funds as not being a violation of the Master Indenture.  See Az. Ex. 123.

The Arizona Noteholders thus have submitted sufficient evidence to create a genuine issue of fact as to whether National Century and Credit Suisse had a tacit understanding to defraud investors. A jury could reasonably conclude that Fasanella, Clark, and Donovan obtained actual knowledge of the fraud and, through a series of acts spanning four years, assisted and cooperated with National Century in its scheme to defraud investors.  See Miltland, 807 F.Supp. at 1053 (a conspiracy can be inferred from a sequence of cooperative actions and the parties' interdependence); First Fed. Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co., 629 F.Supp. 427, 444 (S.D.N.Y. 1986) (holding that allegations of "intimate business relationship between" defendant and third-party and of defendant's knowledge of the third party's unlawful acts "constitute sufficient facts from which a trier of fact could infer an agreement").  Credit Suisse's track record of cooperation whenever National Century was accused of wrongdoing could reasonably be considered as further evidence that a agreement existed.

## 2.    Credit Suisse's Other Arguments

Credit Suisse half-heartedly suggests that the Arizona Noteholders cannot prove the existence of an overt act in furtherance of the agreement.  The Arizona Noteholders have submitted ample evidence from which a jury could find that Credit Suisse committed an overt act, including: Credit

---

[23]  One possible minor exception to this could be that Credit Suisse lent $75 million to National Century in September 2002 when the company originally requested $100 million.  See Az. Ex. 146.

Suisse's marketing efforts, misrepresentations to investors, completion of sales transactions with the Noteholders, misrepresentations to ratings agencies, publication of the report downplaying Fitch's ratings downgrade, and extensions of credit to National Century. A jury could conclude that any of these acts served the conspiratorial purpose of defrauding investors.

Credit Suisse next contends that it lacked actual knowledge of the fraud – an argument that must be rejected at the summary judgment stage for reasons already discussed. Credit Suisse also argues that there is no evidence of Credit Suisse's intent to further the objective of the conspiracy. However, the evidence of Credit Suisse's knowledge and voluntary participation suffices to support a finding of intentional participation in furtherance of the plan. See Borden, 828 F.Supp. at 226-27; see also GMAC, LLC v. Hillquist, 652 F.Supp.2d 908, 922-23 (N.D. Ill. 2009) (under Illinois law evidence of knowledge and voluntary participation suffices to prove actual intent).

Finally, Credit Suisse argues that the conspiracy claim is undone by the intercorpate conspiracy doctrine. Under this doctrine, officers, directors, and agents of a corporation cannot form a legally-recognized conspiracy among themselves or with the corporation. See In re Verestar, Inc., 343 B.R. 444, 483 (Bankr. S.D.N.Y. 2006). Credit Suisse argues that it acted pursuant to placement agency agreements with National Century and therefore should be considered its agent for purposes of the intracorpate conspiracy doctrine.

As an initial matter, Credit Suisse raised this issue for the first time in its reply brief, and the court need not entertain the argument. See S.E.C. v. Sierra Brokerage Servs., Inc., 608 F.Supp.2d 923, 952 n.29 (S.D. Ohio 2009). Even so, the doctrine does not apply here, at least on summary judgment, because the scope of Credit Suisse's placement agency agreements with National Century on their face did not include such actions as Credit Suisse's publication of the report downplaying Fitch's downgrade of the NPF notes and its extensions of credit to National Century. The placement agency agreements required Credit Suisse to structure, market, and place the NPF note offerings. See CS Exs. 19, 35, 36. Even the "sole lead-manage" letter agreement does not help Credit Suisse's argument. While Credit Suisse did promise in the letter agreement to "assist" National Century in the "marketing of any renewal or extension and, if required, the restructuring" of the NPF-WL facility – the same facility whereby Credit

Suisse extended $20 million to National Century in September 2002 – the plain terms of the agreement did not call on Credit Suisse to act as a lender to National Century.  See Az. Ex. 199 at 1.

Accordingly, Credit Suisse's motion for summary judgment is denied as to the Arizona Noteholders' claim for conspiracy.

### D.  Unjust Enrichment

The Arizona Noteholders also assert a claim against Credit Suisse for unjust enrichment.  They allege that Credit Suisse unjustly retained placement agency fees for its role in inducing investors to purchase worthless notes.  To prevail on this claim, plaintiffs must demonstrate that: (1) the defendant was enriched, (2) at plaintiff's expense, and (3) that "it is against equity and good conscience to permit the other party to retain what is sought to be recovered."  Old Republic Nat'l Title Ins. Co. v. Luft, 859 N.Y.S.2d 261, 262 (N.Y. App. Div. 2008).

Credit Suisse makes two arguments in opposition to this claim.  First, it argues that the existence of other legal remedies precludes an unjust enrichment claim.  See Bongat v. Fairview Nursing Care Center, Inc., 341 F.Supp.2d 181, 188-89 (E.D.N.Y. 2004) (dismissing unjust enrichment claim because plaintiffs had viable remedies at law).  Second, Credit Suisse argues that it was contractually entitled to the placement fees and that, in any event, those fees were procured from National Century, not the Arizona Noteholders.  See IDT Corp. v. Morgan Stanley Dean Witter & Co., 907 N.E.2d 268, 274 (N.Y. 2009) (holding that unjust enrichment claim failed because defendant's fees were paid by a party other than plaintiff).

The court agrees with Credit Suisse on both counts.  The Arizona Noteholders allege that Credit Suisse's conduct was unjust because it was fraudulent, but they have remedies available at law for their alleged losses caused by Credit Suisse's fraud, including their fraud claims and blue sky law claims.  New York law will not allow a claim in equity under such circumstances.  See Bongat, 341 F.Supp.2d at 188-89; Crigger v. Fahnestock and Co., Inc., No. 01-cv-7819, 2003 WL 22170607, at *12 (S.D.N.Y. Sept. 18, 2003) (dismissing an unjust enrichment claim that recasted plaintiff's fraud claim and holding that "where a remedy at law will provide an adequate action for compensatory damages, a court will not allow a claim in equity"); see also In re Apple and AT&T iPad Unlimited Data Plan Litig., 802 F.Supp.2d 1070, 1077

(N.D. Cal. 2011) ("[P]laintiffs can not assert unjust enrichment claims that are merely duplicative of statutory or tort claims.").

On the second point, the Arizona Noteholders allege that Credit Suisse procured unjust fees from National Century, not the Arizona Noteholders. To prevail on their claim, the Arizona Noteholders must show that Credit Suisse was enriched at their expense. Old Republic, 859 N.Y.S.2d at 262; Granite Partners, L.P. v. Bear, Stearns & Co. Inc., 17 F.Supp.2d 275, 313 (S.D.N.Y. 1998) (dismissing unjust enrichment claim because defendant did not receive "a benefit of money or property belonging to the plaintiff"). Though New York law does not require "direct dealing" between the plaintiff and defendant in an unjust enrichment claim, the plaintiff still must demonstrate that the defendant was enriched at the plaintiff's expense. Amusement Indus., Inc. v. Midland Ave. Assocs., LLC, __ F.Supp.2d __, 2011 WL 3463117, at *19 (S.D.N.Y. 2011) (holding that plaintiff had satisfied this requirement by alleging that defendant took possession of funds plaintiff had placed in escrow with another party). Here, the Arizona Noteholders have not offered any evidence that it was their money which ended up in Credit Suisse's hands.

Thus, Credit Suisse's motion for summary judgment is granted as to the Arizona Noteholders' unjust enrichment claim.

### E.    Punitive Damages

New York law does not permit recovery of punitive damages in a case of "ordinary fraud and deceit." Hoeffner v. Orrick, Herrington & Sutcliffe LLP, 924 N.Y.S.2d 376, 377 (N.Y. App. Div. 2011). Such damages are "permitted only when a defendant's wrongdoing is not simply intentional but evinces a high degree of moral turpitude and demonstrates such wanton dishonesty as to imply a criminal indifference to civil obligations." Id. (internal quotation marks and citations omitted).

The court finds that there is sufficient evidence from which a jury could find that the Arizona Noteholders are entitled to punitive damages. If a jury finds that the evidence proves Credit Suisse's actual knowledge of the fraud, then the circumstances concerning Credit Suisse's sales to plaintiffs, particularly in the final months before National Century's bankruptcy, could support a finding of wanton dishonesty. The members of Credit Suisse's asset finance group – Clark, Donovan, and Fasanella –

admittedly knew by August 27, 2002 that National Century had misappropriated reserve funds and desperately needed cash.  See Az. Ex. 10, Clark Dep. at 304, 307; Az. Ex. 11, Donovan Dep. at 592-94; Az. Ex. 141 at 2.  Rather than halt its marketing efforts, Credit Suisse temporarily infused National Century with $75 million and unloaded $120 million in notes onto certain unsuspecting Arizona Noteholders (Bristol, Drake, III Finance, Lincoln, Louisiana Corporate Credit Union, and United of Omaha) before National Century went bankrupt.  See Az. Ex. 11, Donovan Dep. at 603; Az. Ex. 12, Richter Dep. at 314; Az. Ex. 132 at 2, 5; CS Ex. 191.  Fasanella even had personal contact with III Finance and Bristol in this time frame, but he never informed them of National Century's misuse of funds or Credit Suisse's emergency lending to National Century.  See Az. Ex. 393, Maceira Dep. at 86-93; Az. Ex. 413, Miller Dep. at 30-31.  In the court's view, a jury could reasonably conclude that Credit Suisse's conduct was sufficiently egregious to warrant an award of punitive damages.

Credit Suisse responds that punitive damages should at best be available only to those plaintiffs who purchased notes after August 27, 2002.  But a jury could find from the evidence submitted on summary judgment that Credit Suisse had actual knowledge of National Century's fraud much earlier than August 2002.  The court believes that a jury should decide at what point, if at all, Credit Suisse knew of the fraud and whether the particular circumstances of the sales after that point warrant awards of punitive damages.

Accordingly, Credit Suisse's motion for summary judgment as to the Arizona Noteholders' request for punitive damages is denied.[24]

## X.    Claims Relating to Notes Not Purchased from Credit Suisse

A number of the Noteholders purchased notes from a broker other than Credit Suisse.  The following Noteholders purchased all of their notes from a source other than Credit Suisse: the Asset

---

[24]  In its motion for summary judgment, Credit Suisse did not challenge the claims of Lloyds and MetLife for punitive damages.  Credit Suisse later in its reply brief attempted to bring their claims within the ambit of its motion.  Even if Credit Suisse's late challenge is considered, the court concludes that the punitive damages claims of Lloyds and MetLife are sufficient to withstand summary judgment, for the same reasons as stated for the Arizona Noteholders' punitive damages claim.

Allocation & Management plaintiffs (AAM), the Clifton Group plaintiffs, Louisiana Corporate Credit Union (LCCU), and Oregon Insurance.  Other Noteholders made purchases from both Credit Suisse and other brokers: MetLife, Phoenix Life, and PIMCO.  In all, the Noteholders' purchases from other brokers totaled about $210 million.

### A.     Blue Sky Law Claims

#### 1.     Territorial Nexus

##### a.     Crown, Cork & Seal – State of Domicile

Plaintiff Crown Cork & Seal Company, one of the Clifton Group plaintiffs, asserts a blue sky law claim under the law of its home state Pennsylvania.  The Pennsylvania statute applies only when an offer or sale is made "in this State."  70 Pa. Cons. Stat. § 1-401.  Crown Cork has submitted no evidence that it had any contact with seller Advest, which was located in Connecticut.  Rather, the evidence establishes that the Clifton Group dealt with Advest on Crown Cork's behalf and that Crown Cork played no role in the decision to invest in NPF notes.  See Az. Ex. 419, Ballsrud Dep. at 97, 138-40 (Clifton Group witness testifying that he had "no discussions [with Crown Cork] about NPF securities prior to the purchase").

Thus, a territorial nexus to Pennsylvania is lacking and Credit Suisse is entitled to summary judgment on Crown Cork's claim under Pennsylvania's blue sky law.

##### b.     The Other Plaintiffs

Without greater explanation, Credit Suisse briefly argues that there is also no territorial nexus linking the sales from other brokers to the states under whose laws the rest of the plaintiffs – AAM (Illinois), Clifton Group (Minnesota), LCCU (Louisiana), MetLife (New Jersey), Oregon Insurance (Oregon), Phoenix Life (Connecticut), and PIMCO (California) – are asserting claims.  This argument is without merit.  It is undisputed that each of these plaintiffs purchased their notes from offices in those respective states.  A purchase occurring in the state constitutes a sufficient nexus for invoking that state's blue sky law.  See, e.g., Cal. Corp. Code § 25400 (requiring an offer, sale, or purchase "in this state"); N.J. Stat. Ann. § 49:3-51(same); see generally A.S. Goldmen & Co., Inc. v. New Jersey Bureau of Sec., 163 F.3d 780, 784-87 (3d Cir. 1999).

### 2.    Primary Liability

AAM, the Clifton Group, LCCU, MetLife, and Phoenix Life have brought claims against Credit Suisse for primary liability under state blue sky laws.[25]  The statutes at issue make it unlawful for a person to "offer or sell" securities by means of an untrue statement.  See Conn. Gen. Stat. § 36b-4(a)(2); 815 Ill. Comp. Stat. § 5/12(A); La. Rev. Stat. Ann. § 51:712(A)(2); Minn Stat. § 80A.68; N.J. Stat. Ann. § 49:3-71(a)(2).  Credit Suisse argues that it did not "offer or sell" the NPF to these buyers who purchased from another broker.

At the motion to dismiss stage, the court allowed these claims to survive on the ground that plaintiffs sufficiently alleged that Credit Suisse had solicited them to purchase the notes.  See Nat'l Century, 541 F.Supp.2d at 1013 (noting Credit Suisse's alleged nationwide solicitation of investors and its interest in the existence of a strong secondary market for NPF notes).  State courts have commonly looked to Pinter v. Dahl, 486 U.S. 622, 647 (1988) (interpreting 15 U.S.C. § 77l(a)(1)), in holding that the "offers or sells" language of their blue sky laws also extends to a person who "successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  See Gorga v. Uniroyal Chem. Corp., 697 A.2d 731, 734-36 (Conn. Super. Ct. 1996); In re Prof'l Fin. Mgmt., Ltd., 692 F.Supp. 1057, 1064-65 (D. Minn. 1988).  Even though Credit Suisse was not a direct seller of these notes, it could still be primarily liable if, for instance, it encouraged an investor to buy from another broker, knowing that the other broker would have to source its notes from Credit Suisse.  The court thus afforded plaintiffs an opportunity to develop facts showing that Credit Suisse solicited them to purchase notes from other brokers.  As discussed below, MetLife is the only plaintiff able to met this burden at summary judgment.

---

[25]  The primary liability claims of PIMCO under California law and Oregon Insurance under Oregon law were dismissed in an earlier order because they did not allege privity between the plaintiff and Credit Suisse, as those states' laws required.  See In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 541 F.Supp.2d 986, 1012-13 (S.D. Ohio 2007).

MetLife too had a claim dismissed for that it had brought for primary violations of a certain provision of New Jersey law.  The provision invoked by MetLife had been determined by another court as not creating a private right of action; instead, as this court noted, MetLife's primary liability claim against Credit Suisse had to proceed under a separate remedy provision of the New Jersey statute.  Id.

a.      **AAM**

AAM purchased NPF XII 1999-1 notes in 1999 from PaineWebber, who was the initial placement agent for that note issuance. See Az. Ex. 416. AAM argues that Credit Suisse solicited the purchase because Credit Suisse had previously introduced AAM to the note programs. AAM claims to have made a NPF note purchase directly from Credit Suisse in 1996.

This argument is without merit. For one, there is no admissible evidence on the record establishing that AAM made a note purchase from Credit Suisse in 1996. AAM's witness on this matter testified that she did not recall having purchased notes from Credit Suisse. See Az. Ex. 415, Lange Dep. at 56.[26] Moreover, there is no evidence that Credit Suisse solicited or otherwise encouraged AAM to make the 1999 purchase from PaineWebber. See Az. Ex. 417, Ortiz Dep at 134, 138-39 (testifying that he could not recall having any conversations with Credit Suisse regarding the purchase from PaineWebber). Nor has AAM submitted any evidence that Credit Suisse supplied it with offering materials in connection with the 1999 purchase. See Az. Ex. 415, Lange Dep. at 7-9 (testifying that she could not recall a specific PPM she reviewed before making the purchase); Az. Ex. 417, Ortiz Dep at 44-45 (same).

AAM's primary liability claim under Illinois blue sky law for fraud by means of an untrue statement thus fails. See 815 Ill. Comp. Stat. § 5/12.

b.      **Clifton Group**

The Clifton Group purchased NPF XII 2000-2 and 2000-3 notes in 2000 and 2001 in the

---

[26] During her deposition, Lange referred to a letter she had executed and sent to Credit Suisse in 1996 as indicating that AAM had in fact purchased notes from Credit Suisse. See Az. Ex. 415, Lange Dep, at 51, 56 ("I don't recall – Well, right here is says CS First Boston in 1996."). Credit Suisse argues that this statement is hearsay. AAM argues that the letter is admissible as a recorded recollection under Federal Rule of Evidence 803(5). AAM has not submitted the letter into evidence, and Credit Suisse disputes that the letter's contents stand for what Lange said they did.

Without the letter, the court is unable to determine whether Lange's statement qualifies as a recorded recollection. See U.S. v. Arnold, 486 F.3d 177, 206 (6th Cir. 2007) (burden of proving a hearsay exception is on the proponent of the exception). Further, the letter did not serve to refresh Lange's recollection such that she could affirmatively testify that AAM had purchased notes from Credit Suisse in 1996. See Az. Ex. 415, Lange Dep, at 56 ("I don't specifically remember this . . . . I have no specific recollection of any individual [purchase].").

secondary market from Advest and Wells Fargo. See Az. Ex. 419, Ballsrud Dep. at 95-96. Though Credit Suisse served as the initial purchaser for these issuances, Clifton has offered no evidence that Credit Suisse encouraged it to buy or provided it with any offering materials. Id. at 249-51, 269 (testifying that he did not speak with anyone from Credit Suisse and that he was unfamiliar with the PPMs for the notes). Rather, Clifton consulted an outside source in gathering information about the NPF notes. Id. at 114; see Rosenzweig v. Azurix Corp., 332 F.3d 854, 871 (5th Cir. 2003) ("To count as 'solicitation,' the seller must, at a minimum, directly communicate with the buyer.").

The Clifton Group's primary liability claim under Minnesota blue sky law for fraud by means of an untrue statement thus fails. See Minn Stat. § 80A.68(2).

### c.    LCCU

LCCU purchased NPF XII 2001-4 notes in the secondary market in 2002 from Morgan Keegan. See CS Ex. 191 at 4. LCCU admits to never having had any direct contact with Credit Suisse but argues that the notes were sourced from Credit Suisse's inventory and that Credit Suisse supplied it with a PPM for the note issuance. See Az. Ex. 399, Savoie Dep. at 29-30, 34-37 (testifying of his understanding that Morgan Keegan obtained the notes from Credit Suisse and that Credit Suisse supplied the PPM to Morgan Keegan at LCCU's request). LCCU contends that Credit Suisse solicited it to purchase the notes by means of the PPM.

The evidence, however, shows that LCCU did not receive the PPM prior to placing the purchase order. LCCU's David Savoie indicated in deposition testimony only that he received the PPM "prior to settlement" on September 25, 2002. Id. at 34-35. The fuller picture is this: LCCU placed its order at 9:52 a.m. on Friday, September 20, 2002; Savoie requested Morgan Keegan to obtain a PPM from Credit Suisse; Savoie received the PPM at 1:11 p.m. on September 20. See CS. Ex. 195, Snyder Dep. at 74; CS Ex. 196; see also Az. Ex. 399, Savoie Dep. at 90-91 (conceding that he initiated the purchase without first reviewing the PPM). LCCU decided to buy the notes over three hours before it received the PPM, and Savoie made clear in a later email (sent at 3:25 p.m on September 20) to Morgan Keegan that he wanted the PPM only for the sake of appearance and not because he intended to read its contents. See CS Ex. 196 ("Great job digging that up – the examiners always pick on me on prospectuses – make it look like

I bought something crazy if I don't have one. This makes it legit."). Accordingly, LCCU cannot establish that Credit Suisse solicited it to buy the NPF notes.[27]

LCCU's primary liability claim under Louisiana blue sky law for fraud by means of an untrue statement thus fails. See La. Rev. Stat. Ann. § 51:712(A)(2).

### d. MetLife

MetLife purchased NPF XII 2001-2 notes in the secondary market from Bear Stearns in June 2002. See NJ Leivick Ex. 50 at ML_004915-16. Credit Suisse originally placed these notes, and MetLife had previously purchased NPF XII 2001-2 notes directly from Credit Suisse in June 2001 at the time of initial issuance. Id. at ML_004921-24. Credit Suisse supplied MetLife with a PPM for the issuance in June 2001, and Credit Suisse again provided the PPM on January 3 and May 24, 2002. See NJ Leivick Exs. 69, 81, 84.

MetLife contends that Credit Suisse solicited the 2002 purchase by twice resending the PPM, over 6 months after the initial June 2001 purchase. The evidence, while mixed, is enough to survive summary judgment. A jury could conclude that Credit Suisse would not have resent the PPM unless it was trying to encourage MetLife to purchase more of the notes. See NJ Tau Decl. at ¶ 4 (stating that she relied on the PPM which was resent on January 3, 2002 in deciding to purchase more notes in June 2002). Countering that conclusion is evidence that Credit Suisse resent the PPM on May 24, 2002 so MetLife could compare receivables data for the NPF XII 2001-2 issuance with data for an upcoming NPF XII 2002-1 issuance in which MetLife invested on May 29, 2002. See NJ Leivick Ex. 80.

Even though the evidence is not entirely in its favor, MetLife's evidence is sufficient to create a genuine dispute of material fact as to whether Credit Suisse solicited it to buy the notes from Bear Stearns in June 2002. See N.J. Stat. Ann. § 49:3-49(j)(2) (defining an "offer" as including a "solicitation of any offer to buy" a security). Here, the evidence and "any inferences that may permissibly be drawn

---

[27] After Credit Suisse filed its motion for summary judgment, Savoie submitted an affidavit claiming he relied on the PPM supplied by Credit Suisse. See Az. Ex. 400, Savoie Aff. at ¶ 2. This attempt to create an issue of fact is not well-taken. See Penny v. United Parcel Serv., 128 F.3d 408, 415 (6th Cir. 1997). In any event, Savoie stopped short of saying that he actually received the PPM before placing the order, and his affidavit still provides no evidence that Credit Suisse encouraged or solicited LCCU to make the purchase.

from the facts must be viewed in the light most favorable to the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The court thus denies Credit Suisse's motion for summary judgment as to MetLife's claim for primary liability under New Jersey blue sky law.

### e.  Phoenix Life

Phoenix Life purchased NPF XII 1999-1 and 2001-3 notes in the secondary market from RBC Dain Rauscher in 2001 and 2002.  See CS Ex. 191 at 5.  Phoenix Life had previously purchased NPF notes from Credit Suisse in 1999, see id.; Az. Ex. 17, Rinaldi Dep. at 27 (testifying of a 1999 purchase for which Phoenix Life has not asserted any claims), and it continued to rely on the 1999 PPM, as well as a corresponding Sales Points brochure, when it decided to later buy from RBC.  Id. at 121, 254, 321-22.  Further, Phoenix Life received the Clean Bill of Health report from Credit Suisse in March 2000, id. at 140-41, and talked to Fasanella in May 2000 about the anonymous allegations of fraud.  Id. at 128, 133.

The question is whether Credit Suisse's contacts with Phoenix Life are sufficient to constitute solicitation under the Connecticut blue sky law as to Phoenix Life's later purchases from RBC.  For the statute to apply, there must be a "solicitation of an offer."  Gorga, 697 A.2d at 735; see also Pinter, 486 U.S. at 647 ("A natural reading of the statutory language would include in the statutory seller status at least some persons who urged the buyer to purchase.").

While Phoenix Life has presented evidence that it continued to rely on Credit Suisse's earlier representations when making the purchases from RBC, the record lacks any evidence that Credit Suisse encouraged or solicited Phoenix Life to keep purchasing NPF notes, regardless of the seller.  When Credit Suisse supplied the sales materials to Phoenix Life in 1999, it did so in connection with the immediate purchase from Credit Suisse.  See Az. Ex. 17, Rinaldi Dep. at 121, 124-25 (testifying also that Phoenix Life did not talk to Credit Suisse about the notes it bought from RBC).  When Phoenix Life received the Clean Bill of Health and spoke with Fasanella in 2000, the purpose of each communication was not to promote further NPF investments but to allay any concerns Phoenix Life had about its existing investment.  See id. at 140 ("I was essentially just interested in this particular write-up [the Clean Bill of Health] because we had invested in these securities or had an investment in these securities."); id.

at 128 ("When I spoke to Todd Fasanella in May of 2000 it was in regards to a letter that had come out . . . . [A]t that point in time I had notes that were maturing.").

Phoenix Life's primary liability claim under Connecticut blue sky law for fraud by means of an untrue statement thus fails. See Conn. Gen. Stat. § 36b-4(a)(2).

### f.  Scheme Liability

AAM and the Clifton Group argue that the Illinois and Minnesota statutes support a finding of primary liability against Credit Suisse under a theory of scheme liability. In addition to prohibiting the use of an untrue statement in connection with the offer or sale of a security, these statutes also prohibit the use of "a device, scheme, or artifice to defraud" or "an act, practice, or course of business that operates or would operate as a fraud." 815 Ill. Comp. Stat. § 5/12(F), (I); Minn Stat. § 80A.68(1), (3).[28] Plaintiffs contend that Credit Suisse is liable, even if it did not make a misrepresentation to them, because of its participation in a scheme to defraud.

Plaintiffs rely on Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148 (2008), in arguing that an actual misrepresentation is not required to commit a primary violation of § 10(b), after which the Illinois and Minnesota statutes are modeled. In Stoneridge, the Court rejected the argument that § 10(b) requires the existence of "a specific oral or written statement." 552 U.S. at 158. "Conduct itself can be deceptive . . . ." Id. Notably, however, the Court went on to preclude recovery under a scheme liability theory against defendants upon whose deceptive conduct plaintiff did not rely. Id. at 160-61.

Though Stoneridge demonstrates that a direct misrepresentation is not the exclusive way to establish primary liability, this does not help AAM and the Clifton Group for two reasons. First, the statutes at issue create a private right of action for primary liability only against the one who offers or sells

---

[28]  It appears that LCCU and Phoenix Life also could have made the scheme liability argument. See La. Rev. Stat. Ann. § 51:712(D); Conn. Gen. Stat. § 36b-4(a). However, these plaintiffs did not assert such an argument in their brief. See Az. Opp'n Brief at 50-52. Oregon Insurance did attempt to argue scheme liability, see id., but its claim against Credit Suisse for primary liability under Oregon law already has been dismissed. See In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 541 F.Supp.2d 986, 1012-13 (S.D. Ohio 2007).

the securities.  See 815 Ill. Comp. Stat. § 5/13(A)[29]; Minn Stat. § 80A.76(b)[30].  For purposes of primary liability, therefore, Credit Suisse's allegedly deceptive conduct is irrelevant because it did not sell the notes to plaintiff.  Second, plaintiffs cannot establish reliance upon any deceptive conduct committed by Credit Suisse.  Indeed the plaintiffs' briefing on the issue fails to cite even a single deceptive act by Credit Suisse on which they relied in purchasing their notes from PaineWebber, Advest, and Wells Fargo.  See Az. Opp'n Brief at 209-12, 215-16.  And this court, in its thorough review of the record, has found no such evidence.

Finally, plaintiffs argue in their motion to strike that Credit Suisse should not be allowed to oppose their scheme liability theory because Credit Suisse failed to specifically mention it in its motion for summary judgment.  The motion to strike is not well-taken.  Credit Suisse argued in its motion that the primary liability provisions of the Illinois and Minnesota statutes could not be satisfied because Credit Suisse did not offer or sell notes to plaintiffs.  Credit Suisse also argued that plaintiffs could not establish the element of reliance.  These arguments apply regardless of whether plaintiffs frame their claim for primary liability as one by means of an untrue statement or as one by means of a scheme to defraud.

Accordingly, Credit Suisse's motion for summary judgment is granted as to the scheme liability claims of AAM and the Clifton Group.[31]

### 3.    Secondary Liability

The following plaintiffs have asserted claims against Credit Suisse for secondary liability under

---

[29]  Illinois law also imposes primary liability upon the "issuer, controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made."  815 Ill. Comp. Stat. § 5/13(A).  Credit Suisse does not fit within that description in connection with PaineWebber's sales to AAM.

[30]  Minnesota has revised its blue sky law since the Arizona Noteholders filed suit.  The result is no different under the former statute.  See Minn. Stat. § 80A.23(2) (limiting primary liability to the deceptive seller or the deceptive purchaser).

[31]  It should be noted that several of the Arizona Noteholders who purchased notes directly from Credit Suisse have asserted scheme liability claims.  See Az. Opp'n Brief at 50-52.  Though these Noteholders' primary liability claims are grounded largely on their reliance on misrepresentations and material omissions by Credit Suisse, see Part VII.A.1 above, the court sees no reason why they could not present evidence at trial in support of their scheme liability theory.

the securities laws of certain states: AAM (Illinois); Clifton Group (Minnesota); LCCU (Louisiana); MetLife (New Jersey); Oregon Insurance (Oregon); Phoenix Life (Connecticut); PIMCO (California). The statutes at issue make it unlawful for any person – or an underwriter, broker-dealer, or agent in the case of the Illinois, Louisiana, Minnesota, and New Jersey statutes – to participate in or materially aid an unlawful sale of securities. See Cal. Corp. Code §§ 25504, 25504.1; Conn. Gen. Stat. § 36b-29(a)(2) and (c); Illinois, 815 Ill. Comp. Stat. § 5/13(A); La. Rev. Stat. Ann. § 51:714(B); Minn Stat. § 80A.76(g)(4); N.J. Stat. Ann. § 49:3-71(d); Or. Rev. Stat. § 59.115(3). Credit Suisse argues that it had no material role in the sale of notes to these plaintiffs.

### a.    AAM, Clifton Group, and LCCU

AAM, the Clifton Group, and LCCU have failed to present evidence showing that Credit Suisse participated in or materially assisted the sale of securities to them. Plaintiffs contend that they relied on offering materials that Credit Suisse helped draft and disseminate to investors. As noted above in relation to their primary liability claims, the evidence does not support that contention. See Az. Ex. 415, Lange Dep. at 7-9 (AAM); Az. Ex. 419, Ballsrud Dep. at 249-51, 269 (Clifton Group); CS. Ex. 196 (LCCU). Plaintiffs next argue that Credit Suisse is liable because it played a "comprehensive role in assisting NCFE." Az. Opp'n Brief at 217. However, the statutes' imposition of secondary liability is limited to those who participate in or materially aid the *sale* and does not encompass all who assist in the overall fraud. See 815 Ill. Comp. Stat. § 5/13(A); La. Rev. Stat. Ann. § 51:714(B); Minn Stat. § 80A.76(g)(4).

Plaintiffs also argue that Credit Suisse aided the sales by helping National Century obtain fraudulent credit ratings on which they relied in purchasing the notes. Plaintiffs have offered evidence that they relied on the notes' AAA credit ratings in deciding to make their purchases. See Az. Ex. 415, Lange Dep. at 6-7 (AAM); Az. Ex. 419, Ballsrud Dep. at 101-04 (Clifton Group); Az. Ex. 399, Savoie Dep. at 32 (LCCU). Borrowing from tort principles, they contend that Credit Suisse is liable for its misrepresentations to the credit rating agencies, who in turn assigned inaccurate ratings to the notes. See Restatement (Second) of Torts § 533 (imposing liability on one who makes a misrepresentation to a third party with the intent that the third party will communicate the misrepresentation to plaintiff, whose detrimental reliance on the misrepresentation is reasonably foreseeable).

This argument misses the mark when applied to plaintiffs' blue sky law claims. Again these statutes require participation or aid in the sale of securities. Plaintiffs' theory is directed at Credit Suisse's alleged conduct in relation to the rating agencies, not to the sale. The connection between Credit Suisse and the sale thus is attenuated – Credit Suisse made a misrepresentation to the credit rating agencies, the agencies assigned inaccurate ratings, and plaintiffs later relied on the ratings when purchasing notes (from brokers other than Credit Suisse). Plaintiffs have cited no cases in which a court from the states at issue have allowed this tort principle to satisfy the statutory requirement of participation or aid in the sale, nor have they cited a case imposing liability on a defendant so far removed from the sale transaction.

Moreover, the Louisiana and Minnesota statutes restrict secondary liability to a broker-dealer, agent, or salesman who participates or aids in the sale. See La. Rev. Stat. Ann. § 51:714(B); Minn Stat. § 80A.76(g)(4). Plaintiffs have failed to explain how, if Credit Suisse's actionable conduct was making a misrepresentation to a rating agency, Credit Suisse functioned as a broker-dealer or agent in the particular sales to the Clifton Group and LCCU.

Finally, the facts do not support plaintiffs' theory with respect to at least AAM and the Clifton Group. Credit Suisse's misrepresentations to Fitch occurred in the summer of 2001.[32] AAM purchased its notes at the time of issuance in March 1999, and thus Credit Suisse's alleged misrepresentations to Fitch in 2001 could not have affected the rating assigned to AAM's notes in 1999. See CS Ex. 191 at 2. The Clifton Group made three of its four note purchases before the summer of 2001. See id. Its final purchase came on July 2, 2001, but the Clifton Group has offered no evidence that the rating it relied on for that purchase was artificially inflated by Credit Suisse's misrepresentation to Fitch on June 26, 2001. See Az. Ex. 221. In other words, plaintiff has not offered evidence that Fitch reaffirmed its AAA rating of the NPF XII 2000-2 notes between June 26 and July 2, 2001.

Accordingly, Credit Suisse is entitled to summary judgment as to the secondary blue sky law claims of AAM, Clifton Group, and LCCU.

---

[32] Fitch had become concerned about National Century's maintenance of reserve accounts. See, Az. Exs. 42, 44, 221. Credit Suisse's Fasanella downplayed their concerns and gave misleading indications in June and September 2001 that everything was fine with the reserve accounts. See Az. Exs. 44, 221.

### b. MetLife

As discussed above, MetLife has produced evidence that Credit Suisse supplied it with the PPM MetLife used in purchasing notes in the secondary market from Bear Stearns in June 2002. See NJ Leivick Exs. 69, 81, 84. Even if MetLife falls short at trial of proving its primary liability claim against Credit Suisse, MetLife may use the same evidence to show that Credit Suisse materially aided the sale by supplying, in its role as a broker-dealer or agent, the materials on which MetLife relied in deciding to make the purchase. See N.J. Stat. Ann. § 49:3-71(d). This is what distinguishes MetLife's claim from those of AAM, Clifton Group, and LCCU – MetLife has submitted evidence placing Credit Suisse in immediate relation to its note purchase and has produced evidence that Credit Suisse materially aided the sale by directly communicating information for that particular note issuance to MetLife.

Thus, the court denies the motion for summary judgment as to MetLife's secondary liability claim under New Jersey blue sky law.

### c. Oregon Insurance

Oregon Insurance purchased NPF XII 1999-1 notes in the secondary market from Piper Jaffray in May 2002. See CS Ex. 191 at 5. PaineWebber had originally placed the notes in 1999. Plaintiff's own rendition of the facts shows that it had no contact whatsoever with Credit Suisse, nor did it review any materials prepared by Credit Suisse. See Az. App'x at 52-53. Oregon Insurance's claim for secondary liability under Oregon's blue sky law rests on the assertion that it relied on the note's inaccurate AAA rating, for which Credit Suisse is liable because of misrepresentations it made to Fitch. For reasons already explained, this theory fails as applied to a blue sky law claim. See Or. Rev. Stat. § 59.115(3) (requiring participation or aid in the sale). In addition, the record clearly demonstrates that the ratings Oregon Insurance relied on were assigned before Credit Suisse's 2001 misrepresentations to Fitch. See Az. Ex. 467, Legge Aff. at ¶ 2 and ORE001029 (relying on credit ratings in a Bloomberg financial report, which stated the ratings as of March 1999 and July 2000).

Thus, the court grants the motion for summary judgment as to Oregon Insurance's secondary liability claim under Oregon blue sky law.

### d. Phoenix Life

Phoenix Life purchased notes from Credit Suisse in 1999 and allegedly continued to rely on the 1999 PPM when it made secondary market purchases in 2001 and 2002. See Az. Ex. 17, Rinaldi Dep. at 121, 254, 321-22. Also borrowing from tort principles, Phoenix Life argues that once Credit Suisse introduced Phoenix Life to the NPF program, it should be liable for later note purchases in which it relied on Credit Suisse's misrepresentations, even if the transactions did not involve Credit Suisse and concerned different note issuances than what Phoenix Life originally bought from Credit Suisse.

The flaw in Phoenix Life's argument is that it has submitted no evidence that Credit Suisse supplied the PPM in connection with, or contemplation of, Phoenix Life's later purchases. This is in contrast to MetLife, which has submitted proof that after Credit Suisse originally supplied it with a PPM, it later resent the PPM when MetLife was considering another purchase. Phoenix Life chose to continue to rely on the 1999 PPM, but it did so in the absence of encouragement from Credit Suisse. While Phoenix Life's theory supports a common law fraud claim, as will be discussed below, it fails to satisfy Connecticut law's transactional requirement of material assistance in the offer, sale, or transaction. See Connecticut Nat'l Bank v. Giacomi, 699 A.2d 101, 119 (Conn. 1997); Conn. Gen. Stat. § 36b-29(a)(2) and (c); cf. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 162 (2008) (rejecting the argument that § 10(b)'s requirement of reliance is satisfied merely because plaintiff's theory of an indirect chain of reliance supported a common law fraud action).

Thus, summary judgment is granted to Credit Suisse as to Phoenix Life's claim for secondary liability under the Connecticut blue sky law.

### e. PIMCO

PIMCO's argument is much the same as Phoenix Life's. It first purchased NPF XII 1999-2 notes from Credit Suisse in June 1999 and subsequently purchased NPF XII 1999-3 notes five months later from PaineWebber, the initial placement agent. See Az. Ex. 319; CS Ex. 334. Credit Suisse provided a PPM to PIMCO in connection with the series 1999-2 notes. See Az. Ex. 320, Mather Aff. at ¶ 3. PIMCO states that it continued to rely on the Credit Suisse PPM when it purchased the series 1999-3 notes. Id. at ¶ 4.

97

Before reaching the merits of PIMCO's claim, the court notes that the parties dispute exactly the total value of notes that PIMCO purchased from PaineWebber. Credit Suisse contends that it was $162 million, while PIMCO argues that it was $142 million because $20 million worth of series 1999-3 notes was purchased from Credit Suisse in June 2001. The evidence firmly supports Credit Suisse. The transaction sheet shows that PIMCO purchased $162 million of notes in November 1999. See CS Ex. 334. PIMCO allocated blocks of these notes to internal customer accounts. Id. It occasionally reallocated the blocks to other accounts through "maintenance trades" using an outside broker in sell/buy-back transactions. See CS Ex. 277, Ivascyn Dep. at 119-25, 132). The $20 million "purchase" from Credit Suisse in June 2001 was one such trade. See CS Ex. 334 (showing that $20 million was allocated to account number 489 in Nov. 1999); CS Ex. 335 (showing that PIMCO sold the $20 million block belonging to account number 489 on June 21, 2001 to Credit Suisse); Az. Ex. 266 (showing that PIMCO repurchased the $20 million block from Credit Suisse on the same day, June 21, 2001).

Nonetheless, PIMCO's blue sky law claim relating to the $162 million purchase fails on the merits. Beyond arguing that it continued to rely on the Credit Suisse PPM when it purchased the series 1999-3 notes, PIMCO has submitted no evidence that Credit Suisse encouraged, participated, or assisted in the transaction with PaineWebber. See CS Ex. 277, Ivascyn Dep. at 102 (conceding that he could not testify that Credit Suisse had helped PaineWebber sell the series 1999-3 notes). Because California law requires material aid in the offer, sale, or transaction before secondary liability can be imposed, see Cal. Corp. Code §§ 25504, 25504.1, Credit Suisse is entitled to summary judgment on PIMCO's claim.

### B. MetLife's § 10(b) Claim

Of the plaintiffs who bought notes from a broker other than Credit Suisse, only MetLife asserts a federal § 10(b) claim. Credit Suisse does not separately address the merits of this claim. The court notes that, for reasons stated in relation to MetLife's claim for primary liability under New Jersey's blue sky law, MetLife has submitted sufficient evidence at the summary judgment stage showing that Credit Suisse solicited its purchase from Bear Stearns. See Pinter v. Dahl, 486 U.S. 622, 646-47 (1988).

C.    Fraud Claims

1.    **MetLife, Phoenix Life, and PIMCO**

MetLife, Phoenix Life, and PIMCO each assert a fraud claim against Credit Suisse, and PIMCO additionally brings a California statutory claim for deceit, see Cal. Civil Code §§ 1709, 1710.  Credit Suisse argues that these plaintiffs cannot prove that they actually relied on a Credit Suisse misrepresentation in making their purchases from other brokers.  The court finds otherwise.  MetLife, Phoenix Life, and PIMCO have each offered sufficient evidence that, if credited by a jury, would establish that they relied on misrepresentations made to them by Credit Suisse in deciding to purchase notes from other brokers. See NJ Tau Decl. at ¶ 4 (MetLife); Az. Ex. 17, Rinaldi Dep. at 121, 254, 321-22 (Phoenix Life); Az. Ex. 320, Mather Aff. at ¶ 4 (PIMCO).  Although for at least Phoenix Life and PIMCO there is a disconnect between the transaction for which the PPM was supplied and the transaction for which they later relied on the PPM, this is not fatal to their fraud claims.  That disconnect is just one factor for the jury to consider in determining whether plaintiffs' reliance was reasonable and whether plaintiffs' losses were proximately caused by Credit Suisse (i.e., was it foreseeable to Credit Suisse that buyers like MetLife, Phoenix Life, and PIMCO would purchase more notes?).

Accordingly, Credit Suisse's motion for summary judgment is denied as to the fraud claims of MetLife, Phoenix Life, and PIMCO relating to their purchases from brokers other than Credit Suisse.

2.    **AAM and its Holder Claim**

Credit Suisse argues that AAM has failed to produce evidence that Credit Suisse made any misrepresentations to it.  The court agrees.  AAM has not submitted any evidence showing that Credit Suisse made a misrepresentation or that AAM relied on a Credit Suisse misrepresentation in purchasing notes from PaineWebber.  AAM purportedly had made a prior purchase directly from Credit Suisse, but its employees could not recall that alleged transaction and offered no testimony as to a misrepresentation that Credit Suisse made to them.  See Az. Ex. 415, Lange Dep. at 7-9, 55-56; Az. Ex. 417, Ortiz Dep. at 44-45, 134, 138-39.

AAM argues that this failure of proof does not spell the defeat of its fraud claim.  It contends that Credit Suisse made post-purchase assurances which caused AAM to refrain from selling its notes.  AAM

argues that once the anonymous allegations of fraud at National Century were made public in May 2000, Credit Suisse and AAM had several conversations about the allegations. According to AAM, it decided to retain the notes as a result of Credit Suisse's statements that National Century and its note programs were still sound.

As discussed in Part VI.E above, holder claims are recognized in limited circumstances. AAM must prove specific reliance upon a direct communication from Credit Suisse intended to stop a definite plan to sell. See In re Worldcom Sec. Litig., 336 F.Supp.2d 310, 318-21 (S.D.N.Y. 2004); In re Enron Corp. Sec., Derivative & ERISA Litig., 761 F.Supp.2d 504, 538 (S.D. Tex. 2011). AAM falls well short of meeting its burden on summary judgment. Though AAM establishes that it was troubled by the anonymous allegations, see Az. Ex. 418, Lange Dep. at 303-04 ("Nobody wants to hear an allegation of fraud in any investment that they make."), the record is devoid of any evidence of a plan AAM made to sell the notes. See Enron, 761 F.Supp.2d at 538; Small v. Fritz Companies, Inc., 65 P.3d 1255, 1265 (Cal. 2003).

Morever, AAM struggles to identify a direct misrepresentation that Credit Suisse made to it, much less prove specific reliance or an intent to induce AAM not to sell. AAM claims that two of its employees had contact with Credit Suisse after the disclosure of the anonymous allegations. One of those employees, Kathy Lange could not recall when or with whom she spoke and testified in vague terms that a Credit Suisse employee told her Credit Suisse was "comfortable . . . with the company [National Century]" and "didn't feel that they really had any exposure." Az. Ex. 418, Lange Dep. at 306-309. Lange then admitted that this conversation was not what gave her comfort, but rather it was National Century's ability to get a commitment from an investment bank of Credit Suisse's caliber to participate in another note deal. Id. at 308-09 (". . . I took it as a positive that they could get another investment bank to issue their deal, and that must mean that something is okay.").

Lange further testified that she viewed an online Credit Suisse road show presentation in October 2000, but she had no specific recollection of the subject matter of the presentation. See Az Ex. 415, Lange Dep. at 20. Lange also testified that she occasionally monitored the NPF XII program by reviewing NPF-related materials, including PPMs of subsequent deals brought to the market by Credit

Suisse.  See id. at 10-11; Az. Ex. 418, Lange Dep. at 211-13.  She received a PPM from Credit Suisse in October 2001, but Lange offered no testimony as to what statements she read in the PPM, nor did she testify that she relied on the PPM in deciding to retain AAM's notes.  See Az. Ex. 415, Lange Dep. at 22-23.

As for the second employee, David Ortiz, AAM argues that Credit Suisse's Neil McPherson sent him the March 2000 Clean Bill of Health.  There are two flaws with this line of argument.  First, Ortiz testified that McPherson gave him "certain research reports" but did not identify the Clean Bill of Health as one of them.  Az. Ex. 417, Ortiz Dep. at 139.  Second, the Clean Bill of Health pre-dated the disclosure of the anonymous allegations.  If the May 2000 anonymous allegations were what caused AAM to consider selling its notes, then AAM has failed to demonstrate how any representations made in the Clean Bill of Health eased their concerns.

Ortiz further testified that he spoke with McPherson at least twice "about NPF in general" and that McPherson was "very favorable in terms of both the asset class . . . and the NPF program."  Az. Ex. 417, Ortiz Dep. at 139-42.  When asked what McPherson specifically told him, Ortiz testified that he said National Century had a sound business model and was an attractive investment.  Id. at 143-44.  But, as with Lange, AAM has failed to offer evidence that Ortiz relied on anything Credit Suisse said in deciding whether to hold the notes.  Indeed, Ortiz and Lange both testified that they consulted numerous sources – including PaineWebber, Fitch, Lance Poulsen, and the Indenture Trustees – in the wake of the anonymous allegations.  See id. at 110-14; Az. Ex. 418, Lange Dep. at 303-05, 316.  AAM's conclusion that the anonymous allegations lacked merit "was based upon everything that we had found out and all our effort."  Az. Ex. 417, Ortiz Dep. at 118.  In other words, AAM cannot demonstrate specific reliance upon Credit Suisse in its deciding to hold its notes.

Accordingly, Credit Suisse is entitled to summary judgment as to AAM's fraud claim.

### 3. Clifton Group and Oregon Insurance

Credit Suisse argues that the Clifton Group and Oregon Insurance have failed to produce evidence that Credit Suisse made any misrepresentations to them.  The court agrees.  As discussed in relation to their blue sky law claims, these plaintiffs have not submitted evidence of having had any

contact with Credit Suisse or having received any representations from Credit Suisse.  See Az. Ex. 419, Ballsrud Dep. at 249-51, 269 (Clifton Group); Az. Ex. 467, Legge Decl. at ¶¶ 1-3 (Oregon Insurance).

Plaintiffs repeat their argument that Credit Suisse is liable for its misrepresentations to the rating agencies, on whose ratings plaintiffs relied.  See Restatement (Second) of Torts § 533.  Again, this argument finds no support in the facts, as the ratings on which plaintiffs relied were assigned before Credit Suisse made misrepresentations to Fitch.  See Parts X.A.3.a and .c.

Credit Suisse is thus entitled to summary judgment as to the fraud claims of the Clifton Group and Oregon Insurance.

### 4.    LCCU

LCCU likewise has failed to produce evidence of having directly received any misrepresentations from Credit Suisse in connection with its purchase.  See CS. Ex. 196.  However, its claim regarding Credit Suisse's liability for its misrepresentations to the rating agencies has sufficient factual support to withstand the motion for summary judgment.

LCCU purchased NPF XII 2001-4 notes in the secondary market from Morgan Keegan in September 2002.  Moody's had rated these notes in late 2001, see Az. Ex. 3H, and LCCU relied on the rating in purchasing the notes.  See Az. Ex. 399, Savoie Dep. at 32; CS Reply Ex. 597.  LCCU's claim relates to an alleged misrepresentation made by Credit Suisse to Moody's about Fitch's reasons why it stopped rating new NPF issuances after June 2001.  Fitch had rated prior NPF note issuances, see CS Ex. 10, but informed Credit Suisse in a September 2001 email that it had "significant issues" with the "timing, depth, [and] breadth" of National Century's reporting of information and with the "credit enhancement structure of NPF XII."  Az. Ex. 248.  When Moody's learned Fitch would no longer be rating new NPF note issuances, it asked Credit Suisse for an explanation.  See Az. Ex. 14, Caldwell Dep. at 264-65.  Credit Suisse told Moody's that Fitch had experienced some personnel issues and that a rating from Fitch was not needed to sell the new note issuances planned for October and November 2001.  See id.; CS Ex. 10.

The legal basis for LCCU's fraud claim against Credit Suisse is the Restatement of Torts:

The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not

102

> made directly to the other, is made to a third person and the maker intends or has reason
> to expect that its terms will be repeated or its substance communicated to the other, and
> that it will influence his conduct in the transaction or type of transaction involved.

Restatement (Second) of Torts § 533; see also Securities Investor Protection Corp. v. BDO Seidman, L.L.P., 746 N.E.2d 1042, 1047 (N.Y. 2001) (noting that "liability for fraud can be imposed through communication by a third party"). A comment to § 533 states that the rule "is frequently applied" where misrepresentations are made to a credit rating agency. Restatement (Second) of Torts § 533, cmt. f.; see also Tindle v. Birkett, 64 N.E. 210, 211 (N.Y. 1902) (permitting recovery against defendant who misrepresented his firm's financial condition to a rating agency, on whose rating plaintiffs relied in extending credit to the firm).

A requisite to liability under § 533 in the context of credit ratings is that "the rating given expresses the effect of the misstatements made." Restatement (Second) of Torts § 533, cmt. f. For instance, in Tindle the defendant misrepresented financial information material to the rating agency's assessment of the firm. Credit Suisse argues that its alleged deception of Moody's had no effect on the rating because Moody's would have performed its own independent analysis even if Credit Suisse had disclosed its true understanding of why Fitch pulled out.

Credit Suisse's argument is certainly plausible. One could interpret Fitch's stated reasons for pulling out as relating to its own experience in procuring information from National Century and to its particular standards for credit enhancement structure. See Az. Ex. 248. Even had Credit Suisse disclosed these reasons, Moody's was committed to base its rating on its own satisfaction with how National Century reported information and on its own independent credit analysis. See CS Reply Ex. 41, Eisbruck Dep. at 45-47; Az. Ex. 14, Caldwell Dep. at 286 (Moody's strove to "maintain the integrity of our own individual opinion"). As Moody's put it, "we don't care what . . . the other rating agencies do. We don't care what they think, particularly." Az. Ex. 14, Caldwell Dep. at 286.

Nonetheless, there is clear evidence from which a jury could reasonably find that Credit Suisse's deception did affect the rating on which LCCU relied. Fitch characterized one of its concerns as relating to the "credit enhancement structure of NPF XII." Az. Ex. 248. Ample evidence exists showing Credit Suisse knew this reason referred to reserve shortages and improper use of funds. Fitch had pressed

103

National Century and Credit Suisse several times from June to September 2001 on why it appeared that National Century had violated the Indentures in multiple ways, including failing to maintain reserves and making improper advances. See Az. Ex. 42 at CSFB-EMAIL-0300607 (Fitch identifying eight areas of "potential document violations"); Az. Ex. 44 (Fitch asking Fasanella why reserves were "much lower than the specified levels"); Az. Ex. 101; Az. Ex. 221. A jury could find that Moody's would have assigned a different rating (or not assigned a rating at all), to the notes LCCU purchased had Credit Suisse disclosed to Moody's that Fitch's true reason for refusing to rate NPF deals was its belief that National Century had violated the Indentures. To prove the importance of this issue to Moody's, LCCU has submitted evidence that Moody's expressed concern to Credit Suisse about possible reserve shortages a year earlier. See Az. Ex. 14, Caldwell Dep. at 138, 158-60, 184-86, 251-52. These discussions occurred in the wake of the anonymous allegations of fraud in May 2000 and at a time Moody's was preparing to make its first rating of a NPF issuance. Credit Suisse flatly misrepresented to Moody's that National Century had maintained the reserve accounts in compliance with the Indentures. See id. at 184-86, 251-52.

Credit Suisse argues that liability under § 533 applies only when a company misrepresents its own financial condition or creditworthiness, as opposed to the condition of another party. Credit Suisse made a misrepresentation about National Century and was not attempting to obtain a favorable credit rating for itself. The court must reject this argument because a misrepresentation about one's own creditworthiness is not required. Rather, it is enough that the speaker has an "interest" or "an advantage to gain" by making the misrepresentation. Restatement (Second) of Torts § 533, cmts. d and e. As discussed already in this opinion, the record fully supports a conclusion that Credit Suisse, which brought new issuances to market and played a major role in supporting an active secondary market, had a financial interest in the credit rating of NPF notes and in National Century's continued ability to issue new NPF deals.

Accordingly, Credit Suisse's motion for summary judgment is denied as to LCCU's fraud claim.

104

D.    **Other Common Law Claims**

    1.    **Negligent Misrepresentation, Aiding and Abetting Breach of Fiduciary Duty, and Unjust Enrichment**

Each of the plaintiffs assert a claim for negligent misrepresentation, and, except for MetLife, they also assert claims for aiding and abetting breach of fiduciary duty, and unjust enrichment. These claims all fail.

New York law requires a plaintiff asserting a claim for negligent misrepresentation to prove the existence of a "special relationship" that would support "imposing a duty on the defendant to impart correct information to the plaintiff." MatlinPatterson ATA Holdings LLC v. Federal Express Corp., 929 N.Y.S.2d 571, 575 (N.Y. App. Div. 2011). As discussed above in Part VI.F, those Noteholders who purchased notes directly from Credit Suisse cannot establish the existence of a special relationship – even more so for these plaintiffs' purchases from brokers other than Credit Suisse. AAM, Clifton Group, LCCU, and Oregon Insurance had no dealings or relationship with Credit Suisse leading up to their note purchases. And while MetLife, Phoenix Life, and PIMCO did make earlier purchases from Credit Suisse, these prior commercial transactions did not transform their dealings into a special relationship of trust and confidence. See MBIA Ins. Corp. v. Royal Bank of Canada, No. 12238/09, 2010 WL 3294302, at *34 (N.Y. Sup. Ct. Aug. 19, 2010).

Equally unavailing are plaintiffs' claims for aiding and abetting breach of fiduciary duty and for unjust enrichment. As discussed in Part IX.B above, National Century's officers did not owe a fiduciary duty to creditors. See In re Amcast Indus. Corp., 365 B.R. 91 (Bankr. S.D. Ohio 2007). As for the unjust enrichment claim, plaintiffs wholly fail to identify what benefit was conferred on Credit Suisse at their expense, particularly when Credit Suisse did not participate in these transactions. See Granite Partners, L.P. v. Bear, Stearns & Co. Inc., 17 F.Supp.2d 275, 313 (S.D.N.Y. 1998) (dismissing unjust enrichment claim because defendant did not receive "a benefit of money or property belonging to the plaintiff").

Accordingly, summary judgment is granted to Credit Suisse on plaintiffs' claims for negligent misrepresentation, aiding and abetting breach of fiduciary duty, and unjust enrichment.

    2.    **Aiding and Abetting Fraud and Conspiracy**

Plaintiffs AAM, Clifton Group, LCCU, Oregon Insurance, Phoenix Life, and PIMCO have

brought claims for aiding and abetting fraud and for conspiracy. The court found in Parts IX.A and .C that the Noteholders have adduced sufficient evidence in support of their claims for aiding and abetting fraud and conspiracy. Credit Suisse has not presented any additional arguments as to why plaintiffs' claims relating to purchases from other brokers are not equally viable. As plaintiffs point out, these claims do not require a showing of privity, direct communication, or reliance. Plaintiffs have established that they suffered losses as a result of National Century's fraudulent scheme, and they have further established Credit Suisse's actual knowledge and substantial participation in the scheme. See Oster v. Kirschner, 905 N.Y.S.2d 69, 72 (N.Y. App. Div. 2010). Moreover, plaintiffs have established the existence of a tacit understanding between National Century and Credit Suisse, as well as Credit Suisse's commission of an overt act in furtherance of the agreement and its intentional participation in the plan to defraud. See Abacus Federal Savings Bank v. Lim, 905 N.Y.S.2d 585, 588 (N.Y. App. Div. 2010).

Accordingly, Credit Suisse's motion for summary judgment is denied as to plaintiffs' claims for aiding and abetting fraud and conspiracy.

## XI. Lloyds's Breach of Contract Claim

The Participation Agreement is governed by the law of New York. See CS Ex. 219 at § 15. "Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011).

### A. Factual Background

National Century issued a NPF XII 2000-4 variable funding note backed by healthcare receivables held by NPF XII. The VFN was used to obtain short-term financing under a revolving liquidity facility. See NJ Leivick Ex. 104, Fasanella Dep. at 40 (testifying that Credit Suisse proposed the VFN to National Century as a means to obtain financing in the gaps between term note issuances). In December 2000, Credit Suisse entered into a Liquidity Asset Purchase Agreement (the "LAPA") with NPF XII and a conduit purchaser whereby Credit Suisse committed to purchase an undivided interest in the VFN upon the occurrence of certain events. See CS Ex. 145 at LL_000108. In turn, Credit Suisse

prepared materials and marketed participation interests in the VFN to other banks. See NJ Leivick Exs. 112, 113, 114, 117.

Credit Suisse solicited Lloyds to participate in the VFN in January 2001. See NJ Leivick Ex. 115; NJ Leivick Ex. 120, Mayor Dep. at 55-57, 71 (testifying that Fasanella approached Lloyds about the VFN). Fasanella provided Lloyds with a term sheet that misrepresented, among other things, the levels at which NPF XII would maintain certain reserve accounts. See NJ Leivick Ex. 118 at CSFB-EMAIL-0257085. Lloyds relied upon those misrepresentations in deciding to participate in the VFN. See NJ Leivick Ex. 152, Vespasiano Dep. at 375-77.

On March 1, 2001 Credit Suisse and Lloyds entered into a Participation Agreement under which Lloyds purchased a $68 million undivided interest in the VFN. See CS Ex. 219. In exchange, Lloyds received payment of certain fees. See id. at § 4. The agreement came up for renewal in December 2001, and the parties renewed the agreement for another year. See CS Ex. 145 at LL_000217-19. On October 31, 2002, the triggering events occurred that required Credit Suisse to purchase its interest in the VFN. On November 5, 2002, Lloyds purchased from Credit Suisse its participation interest in the VFN. See CS Ex. 217.

Lloyds alleges that Credit Suisse breached three provisions of the Participation Agreement, which will be examined in turn below.

### B. Section 7 – Modification of Transaction Documents

The Agreement provided that Credit Suisse could not, without the prior written consent of Lloyds, "agree to . . . (iv) waive the occurrence of any Event of Default under the Master Indenture or the Series Supplement, or (v) consent to any amendment of the definitions of 'Event of Default,' 'Interest Reserve,' 'Specified Credit Reserve Balance,' 'Specified Interest Shortfall Reserve Requirement,' 'Specified Offset Reserve Balance,' or 'Specified Series Equity Account Balance,' as such terms relate to the Series 2000-4 Notes . . . ." CS Ex. 219 at § 7(a).

Lloyds argues that because Credit Suisse knew National Century was violating the terms of the Master Indenture, Credit Suisse "effectively waived numerous events of default" when it purchased its interest in the VFN in October 2002. NJ Opp'n Brief at 255. Lloyds further argues that Credit Suisse

effectively consented to the amendment of the definition of certain terms of the Master Indenture because it knew National Century was not abiding by those terms.

The court finds that Lloyds's argument is untenable. Credit Suisse did not have the authority to declare an event of default; the Trustee held that authority. See CS Ex. 12 at § 7.01(c) (Master Indenture). Once an event of default was declared, then § 7 of the Agreement operated to prohibit Credit Suisse from waiving its rights without the consent of Lloyds and the other participants in the VFN. Here, the Trustee declared an event of default on October 25, 2002. See CS Ex. 142. Credit Suisse proposed to the participants a response of forbearance and directing the Trustee not to declare a principal amortization event. See CS Reply Ex. 662. Lloyds gave its written consent to this plan on October 28, 2002. See CS Reply Exs. 663, 664, 665. Because Lloyds expressly consented in writing to Credit Suisse's response to the event of default, Credit Suisse did not breach § 7(a)(iv) of the Agreement.

Credit Suisse also did not breach § 7(a)(v). That provision prohibited Credit Suisse from unilaterally consenting to modifications of the definitions of certain terms in the Master Indenture. For instance Credit Suisse could not, without Lloyds's approval, consent to National Century changing the Master Indenture's balance requirements for various reserve accounts or its definition of an event of default. The title of § 7 of the Participation Agreement – "Modification of Transaction Documents" – confirms this understanding. Whether National Century breached those terms of the Master Indenture with Credit Suisse's knowledge is a different matter. Lloyds has submitted no evidence that Credit Suisse consented to an amendment of the Master Indenture's definitions.

### C.       Section 10 – Limitation on the Liability of the Selling Bank

The Agreement stated that Credit Suisse did not owe a fiduciary duty to Lloyds and would not be liable to Lloyds "for any error in judgment or for any action taken or omitted to be taken by the Selling Bank [Credit Suisse] except for gross negligence or willful misconduct of the Selling Bank." CS Ex. 219 at § 10(a). "Subject to the preceding sentence, the Selling Bank will exercise the same care in administering the LAPA as the Selling Bank exercises with respect to similar facilities entered into by the Selling Bank for its own account and risk, and the Selling Bank shall have no further responsibility to the Participant [Lloyds]." Id.

Lloyds contends that Credit Suisse breached the "gross negligence or willful misconduct" standard of care in two respects. First, Lloyds argues that Credit Suisse engaged in gross negligence and willful misconduct by failing to disclose what it knew of National Century's fraud. Second, Lloyds argues that Credit Suisse breached this standard by purchasing its interest in the VFN, which in turn obligated Lloyds to purchase its interest from Credit Suisse.

The first argument fails because the next paragraph of § 10 expressly provided that Credit Suisse "makes no representation or warranty" as to "the financial condition of the Company or the Issuer." CS Ex. 219 at § 10(b). Further, the "Selling Bank shall not have any duty or responsibility to provide the Participant with any credit or other information concerning the affairs, financial condition or business of the Company, the Servicer, the Issuer or any other parties to the LAPA." Id. Simply put, the Agreement imposed no duty on Credit Suisse to disclose to Lloyds what it knew about National Century's operations.

The second argument also fails. Credit Suisse had an unconditional obligation to purchase its interest in the VFN on October 31, 2002 after the Trustee declared an event of default – a point Lloyds does not dispute. See CS Ex. 145 at LL_000112 to _000119 (LAPA's provisions regarding Credit Suisse's obligation to purchase). Lloyds was fully aware of Credit Suisse's obligations under the LAPA. See NJ Mayor Decl. at ¶ 3; NJ Mayor Ex. A at LL_000145. Lloyds cannot be heard to argue that Credit Suisse breached the Participation Agreement by performing its contractual obligations under the LAPA, upon which the Participation Agreement was premised. See CS Ex. 219 at § 1.

D.    **Section 12 – Representations**

Lloyds's strongest argument for breach of contract relates to the term sheet and § 12 of the Agreement, which provided that the "Selling Bank shall have responsibility for the information prepared by it and furnished to the Participant in connection with this Agreement." CS Ex. 219 at § 12(a). The term sheet prepared and furnished by Credit Suisse to MetLife misrepresented that: NPF XII owned over $1.1 billion worth of receivables; the receivables were obtained in "true sale" transactions; the program had a credit enhancement of 20% of eligible receivables; the notes were ratably secured by receivables; reserve accounts would be maintained at specified levels; and NPF XII was a bankruptcy

remote corporation.  NJ Leivick Ex. 118 at CSFB-EMAIL-0257075 and -0257085.

Credit Suisse offers several arguments in response.  It argues that the provision referred to a prospective obligation on Credit Suisse's part to periodically report information to Lloyds.  But the language of the provision is in the past tense, making Credit Suisse responsible for information it "prepared" and "furnished" to Lloyds.  Moreover, a different section in the Agreement separately addressed Credit Suisse's prospective obligation to furnish Lloyds with certain reports.  See CS Ex. 219 at § 6 ("The Selling Bank agrees to furnish to the Participant copies of all reports and documents furnished to the Purchasers . . . .").

Next Credit Suisse argues that it was impossible for the contract to have been breached in January 2001 when it gave the term sheet to Lloyds, before the parties even entered into the March 2001 Participation Agreement.  This argument too is misguided.  The language of § 12(a) imposed a present obligation on Credit Suisse for information it had furnished to Lloyds in the past.  Under Lloyds's theory, the breach did not occur when Credit Suisse gave the term sheet to Lloyds; it occurred when Credit Suisse took on "responsibility" for the term sheet in the Participation Agreement yet failed to correct it or notify Lloyds of its inaccuracies.

Credit Suisse contends that opening sentence of § 12(a) undermines Lloyds's assertion of a breach.  Credit Suisse points out that this sentence of § 12(a) concerned a representation of Lloyds to Credit Suisse.  See CS Ex. 219 at § 12(a) (Lloyds's representation that it had made its own credit evaluation of the Company, Servicer, and Issuer).  How then, Credit Suisse asks, could the next sentence be read to impose an obligation on Credit Suisse?  Simply put, the sentence at issue was an exception to the prior sentence – "*Notwithstanding the foregoing*, the Selling Bank shall have responsibility for the information prepared by it and furnished to the Participant in connection with this Agreement."  CS Ex. 219 at § 12(a) (emphasis added).  And it was a bargained-for exception, at that.  See NJ Vespasiano Ex. I at LL_007735 (initial draft authored by Credit Suisse did not include the sentence at issue).

Finally, Credit Suisse contends that Lloyds's assertion of a breach must rejected because it directly conflicts with other language in the Agreement providing that Credit Suisse was making no representations as to National Century's financial condition or its performance of the Master Indenture.

Section 10 contained two "no representation" provisions. The first of these provisions stated that Credit Suisse made "no representation or warranty" with respect to the LAPA, the Note Purchase Agreement, and "any Related Document." CS Ex. 219 at § 10(b)(i). The Master Indenture was defined as a "Related Document." Id. at § 1(c); CS Ex. 145 at LL_000010. The second provision stated that Credit Suisse made no representation as to "the financial condition of the Company or the Issuer" or as to their "performance or observance" of the LAPA, Note Purchase Agreement, or any Related Document. CS Ex. 219 at § 10(b)(ii). Section 10 further provided that Credit Suisse "shall not have any duty or responsibility to provide the Participant with any credit or other information concerning the affairs, financial condition or business of the Company, the Servicer, the Issuer or any other parties to the LAPA." Id.

The court finds that there is an ambiguity in the contract. Under New York law, the issue of whether a contract is ambiguous is a question of law to be resolved by the court. See W.W.W. Assocs. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990). A contract is ambiguous when "the agreement on its face is reasonably susceptible of more than one interpretation." Chimart Assocs. v. Paul, 489 N.E.2d 231, 233 (N.Y. 1986). On its face, the Participation Agreement provided both that (a) Credit Suisse made no representation, and had no duty to provide information, about the financial condition of National Century or NPF XII or about their performance of the LAPA, Note Purchase Agreement, or the Master Indenture, and that (b) Credit Suisse assumed "responsibility for the information prepared by it and furnished to the Participant in connection with this Agreement."

Where contract language is ambiguous, extrinsic evidence may be used to resolve the ambiguity and the issue is one for the trier of fact. See State of New York v. Home Indem. Co., 486 N.E.2d 827, 829 (N.Y. 1985). The parties here have not offered any extrinsic evidence to help resolve the ambiguity. In such a case, the issue of contract interpretation remains a question of law for the court to determine. See Williams & Sons Erectors, Inc. v. South Carolina Steel Corp., 983 F.2d 1176, 1184 (2d Cir. 1993) ("Ambiguity without the existence of extrinsic evidence of intent presents not an issue of fact, but an issue of law for the court to rule on."); Superior Ice Rink, Inc. v. Nescon Contracting Corp., 861 N.Y.S.2d 362, 366 (N.Y. App. Div. 2008).

New York case law directs courts, in the absence of extrinsic evidence concerning the parties' intent, to resolve ambiguities against the drafter of the ambiguous provision.  See Superior Ice Rink, 861 N.Y.S.2d at 366 (citing cases); Sarinsky's Garage Inc. v. Erie Ins. Co., 691 F.Supp.2d 483, 486 (S.D.N.Y. 2010).  According to Lloyds, it was the party who proposed and bargained for the inclusion of the "responsibility" provision of § 12.  See NJ Opp'n Brief at 259; NJ Vespasiano Exs. H, I.  Lloyds argues that although § 10 imposed no duty on Credit Suisse to provide information to Lloyds, § 12 made Credit Suisse responsible for information that it did elect to provide to Lloyds.  Further, Lloyds contends that although Credit Suisse made no representation about National Century's financial condition or its performance of certain agreements, § 12 imposed a general responsibility upon Credit Suisse for any representations made in the term sheet.

The court must reject Lloyds's argument.  In contract interpretation, specific terms control over general ones:

> New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary.  As one New York Court has explained, "Thus, where the parties have particularized the terms of a contract an apparently inconsistent general statement to a different effect must yield."  Preminger v. Columbia Pictures Corp., 49 Misc.2d 363, 267 N.Y.S.2d 594, 599 (Sup. Ct. N.Y. Co.), aff'd, 25 App.Div.2d 830, 269 N.Y.S.2d 913 (1st Dept. 1966).

John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co., 717 F.2d 664, 670 n.8 (2d Cir. 1983).

Lloyds argues that § 12 created a broad umbrella of responsibility for every statement in the term sheet; however, the only statements Lloyds has identified as misrepresentations are ones for which § 10 expressly provided that Credit Suisse was making no representations.  The term sheet contained information about National Century's financial condition (that it owned $1.1 billion worth of receivables) and its performance of the Master Indenture (that the receivables were obtained in "true sale" transactions, the note program had a credit enhancement of 20% of eligible receivables, the notes were ratably secured by receivables, and reserve accounts would be maintained at specified levels).  Section 10 specifically provided that Credit Suisse was making "no representation or warranty and assumes no responsibility with respect to . . . the financial condition of the Company or the Issuer or the performance or observance by the Company, the Servicer or the Issuer of their respective obligations

112

under . . . any Related Document," of which the Indenture was one.  CS Ex. 219 at § 10(b)(ii); CS Ex. 145 at LL_000010.

Accordingly, the court finds as a matter of law that Credit Suisse did not breach § 12 of the Participation Agreement, and Credit Suisse's motion for summary judgment is therefore granted as to Lloyds's breach of contract claim.

## XII.   Remaining Evidentiary Motions

Lloyds and MetLife have moved to exclude the report and trial testimony of Credit Suisse' damages expert, Allan W. Kleidon.  The court finds that this matter is best left to the judgment of the trial court, and the motion to exclude (doc. 1726) is thus denied without prejudice to renewal before the trial court.

Credit Suisse, Lloyds and MetLife, and the Arizona Noteholders have filed their own separate motions to strike certain evidence or arguments.  The court has addressed the motions throughout this opinion where appropriate.  The court has not taken the remainder of the evidence into consideration in deciding the motion for summary judgment.  Accordingly, the motions to strike (docs. 1648, 1678, 1737) are denied, except as otherwise stated in this order.  The Arizona Noteholders' request to file a surreply (doc. 1678) is also denied; the Arizona Noteholders have already adequately presented their arguments in the briefs they filed in connection with their  motion to strike.

## XIII.   Conclusion

Credit Suisse's motion for summary judgment (doc. 1510) is granted in part and denied in part. The motion is granted with respect to the following claims:

- Lloyds's tort claims relating to the Participation Agreement;

- certain Arizona Noteholders' fraud claims relating to road show presentations and joint meetings with National Century;

- the "holder" fraud claims asserted by AmerUs, the Arizona Treasurer, Drake, Lincoln Capital, Lloyds, MONY, Ofivalmo, United of Omaha, Phoenix Life, and PIMCO;

- all of the Noteholders' negligent misrepresentation claims;

113

- Mellon's New Jersey blue sky law claim;

- the Indiana Retirement Fund's Indiana blue sky law claim;

- the Nashville Government's Tennessee blue sky law claim;

- GMO's claim under the Massachusetts Unfair Trade Practices Statute;

- all of the Arizona Noteholders' claims for aiding and abetting breach of fiduciary duty;

- all of the Arizona Noteholders' claims for unjust enrichment;

- Crown, Cork & Seal's Pennsylvania blue sky law claim;

- AAM's Illinois blue sky law claim and fraud claim ;

- the Clifton Group's Minnesota blue sky law claim and fraud claim;

- LCCU's Louisiana blue sky law claim;

- Oregon Insurance's Oregon blue sky law claim and fraud claim;

- Phoenix Life's Connecticut blue sky law claim;

- PIMCO's California blue sky law claim; and

- Lloyds's breach of contract claim.

The motion for summary judgment is denied with respect to the following claims:

- Lloyds's and MetLife's claims under § 10(b) of the Securities Exchange Act of 1934, their fraud claims relating to note purchases, and their claims for punitive damages;

- MetLife's New Jersey blue sky law claims;

- the fraud claims (except for the holder claims) of all of the Arizona Noteholders who purchased notes directly from Credit Suisse, and their claims for punitive damages;

- the blue sky law claims of all of the Arizona Noteholders who purchased notes directly from Credit Suisse (except for Mellon's New Jersey claim, the Indiana Retirement Fund's Indiana claim, and the Nashville Government's Tennessee claim);

- all of the Arizona Noteholders' aiding and abetting fraud claims and conspiracy claims; and

- the fraud claims of LCCU, Phoenix Life, and PIMCO.


IT IS SO ORDERED.

                                        s/ James L. Graham
                                        JAMES L. GRAHAM
                                        United States District Judge


DATE: March 2, 2012

115